## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FRONTIER AIRLINES, INC., <br><br>                            Plaintiff, <br><br>     v. <br><br> AMCK AVIATION HOLDINGS IRELAND LIMITED, ACCIPITER INVESTMENT 4 LIMITED, VERMILLION AVIATION (TWO) LIMITED, ACCIPITER HOLDINGS DAC, CARLYLE AVIATION MANAGEMENT LIMITED, MAVERICK AVIATION HOLDINGS LTD., MANCHESTER AVIATION FINANCE S.a.r.l., WELLS FARGO TRUST COMPANY, N.A., solely in its capacity as OWNER TRUSTEE, and UMB BANK, N.A., solely in its capacity as OWNER TRUSTEE, <br><br>                        Defendants. | Case No. 1:22-cv-02943 (PAE) <br><br> **<u>AMENDED COMPLAINT</u>** |

       Plaintiff, Frontier Airlines, Inc. ("Frontier"), by its attorneys Binder & Schwartz LLP, states as follows:

### <u>INTRODUCTION</u>

     1.    Frontier is a U.S.-based passenger airline that operates commercial passenger aircraft leased from various aircraft lessors. AMCK Aviation Holdings Ireland Limited ("AMCK Holdings") is an international aircraft leasing company that, prior to the transaction described herein and through various affiliates, subsidiaries and owner-trustee entities (collectively, "AMCK"), owned and leased multiple aircraft to Frontier through sale-leaseback financing arrangements (the "Leases").

     2.    AMCK (through owner trusts it controlled) and Frontier were parties to fifteen lease agreements (the "Lease Agreements") relating to fifteen Airbus aircraft owned by AMCK and leased to Frontier for use in Frontier's operations.

3.      These Lease Agreements cover a critical component of Frontier's aircraft fleet and are vital to its operations.  The fifteen aircraft have an aggregate value of more than $500 million.

4.      Frontier and AMCK Holdings are also parties to a Framework Agreement (the "Framework Agreement").  Pursuant to the Framework Agreement, AMCK committed to purchasing from and leasing back to Frontier six new Airbus model A320-251N aircraft that Frontier was scheduled to purchase and take possession of from Airbus in 2020.

5.      AMCK breached the Framework Agreement.  In November 2020, Frontier brought an action in this Court against AMCK and its then-subsidiaries and affiliates seeking damages in excess of $53 million arising from that breach and AMCK's related conduct.  That action (the "Framework Agreement Action") remains pending.

6.      Upon information and belief, on or about December 22, 2021— in the midst of active litigation of Frontier's claims against AMCK—AMCK Holdings fraudulently transferred over 98% of its total assets, consisting of ownership interests in various aircraft-owning entities, including certain entities that beneficially owned aircraft subject to one of the Leases.

7.      AMCK Holdings initially transferred the assets to the newly formed entity Defendant Manchester Aviation Finance S.a.r.l. ("Manchester"), which is, upon information and belief, a Luxembourg holding company.

8.      On information and belief, for a very brief time (possibly only a day), AMCK Holdings became the sole shareholder (or member) of Manchester before AMCK Holdings relinquished its full ownership in Manchester to Vermillion Aviation Holdings Limited ("Vermillion Holdings").  On information and belief, AMCK Holdings did not receive value in exchange for the transfer.

9. As announced in a press release issued on December 23, 2021, Vermillion Holdings sold its full ownership interest in Manchester, consisting of all the assets previously owned by AMCK, to Carlyle Partners (collectively with its affiliates and subsidiaries, "Carlyle") through its subsidiary, Defendant Maverick Aviation Holdings Ltd. ("Maverick"). After unloading its assets, AMCK Holdings was left out of the acquisition by Carlyle and to date, on information and belief, remains a shell entity whose current ownership is unknown to Frontier and with insufficient assets to satisfy claims against it, including Frontier's pending claims in the Framework Agreement Action. Following the acquisition, Carlyle took over the role previously held by AMCK Holdings and installed a brand-new management team. AMCK, as the industry knew it, now no longer exists.

10. The transfer of AMCK Holdings' assets raided it of its assets without fair consideration and to the detriment of Frontier, as a creditor of AMCK. The transfer left AMCK Holdings with less than 2% of its assets and unable to satisfy a future judgment in the Framework Agreement Action.

11. The transfer of assets by AMCK Holdings, as well as the ultimate sale to Carlyle of the asset portfolio, effected a change in the beneficial ownership of interests in the aircraft, the Lease Agreements, and other Operative Documents (as defined in the Lease Agreements).

12. According to the same press release, in addition to the purchase of the ownership interest in Manchester, to acquire all the aircraft owned by AMCK (including fourteen of the fifteen aircraft subject to the Leases), Carlyle also purchased the ownership interest in Accipiter Finance s.a.r.l. ("Accipiter Finance"), a Luxembourg company. Accipiter Finance was the owner of Accipiter Holding DAC, which in turn owned the aircraft-owning entities.

3

13.     On information and belief, Accipiter Holdings DAC was functionally equivalent to AMCK Holdings within the AMCK corporate structure, except that Accipiter Holdings DAC was a defendant in the Framework Agreement Action.

14.     On information and belief, unlike AMCK Holdings, Accipiter Holdings DAC was acquired by Carlyle (while AMCK Holdings was left out of the deal) and Accipiter Holdings DAC did not take the extra step AMCK took to migrate assets (while AMCK did).

15.     Under the Lease Agreements and related documents, Frontier is deemed to consent to such transfers only in those circumstances where certain preconditions have been satisfied. These preconditions are important bargained-for protections to ensure that any such transfer will not cause any interruption in Frontier's rights with respect to the aircraft (including the ability to continue using the aircraft under applicable laws and regulations) or otherwise adversely impact Frontier's obligations, interests, risks or liabilities under the Lease Agreements and related Operative Documents, including warranties, engine maintenance agreements, lessee's consent to security assignments, and insurance assignments. This includes a Tripartite Agreement that pertains to twelve of the Leases, which Defendant Accipiter Investments Aircraft 4 Limited ("Accipiter") must properly assign in connection with any transaction or Frontier may be exposed at lease expiration to millions of dollars in additional liabilities. Frontier, as the lessee of the aircraft, also must be able to ascertain that the new beneficial owner is not subject to sanctions and that Frontier is permitted to make payments to the new owner without violating anti-money laundering and other applicable laws.

16.     Neither AMCK nor Carlyle informed Frontier of the transfer of nearly all of AMCK Holdings' assets or the subsequent sale to Carlyle; in fact, both insisted on various occasions that Frontier had no right to inquire. Frontier only learned of the December

4

transaction months later through its review of publicly available disclosures and information after Carlyle had purported to take over. To date, despite repeated requests, neither AMCK nor Carlyle has provided Frontier with sufficient information to determine whether the preconditions for consent to the lease transfer transaction have been satisfied

17. Since the closing of the sale, entities now purportedly controlled by Carlyle, including Defendants Maverick and Carlyle Aviation Management Limited ("Carlyle Aviation") have caused further breaches of the Lease Agreements by failing to comply with the express terms and conditions set forth in each of the Lease Agreements in connection with security assignments. Specifically, these defendants have assigned security interests in the Lease Agreements without complying with the Lease Agreements' express requirements and preconditions for such assignments.

18. By this action, Frontier seeks an order determining that the Lessors (who are owner-trustees) and the respective Owner Participants (as defined in the Lease Agreements, and who are now supposedly Carlyle affiliates) breached the Lease Agreements and other Operative Documents by failing (1) to provide information sufficient to assure Frontier that the preconditions for consent to the lease-transfer transaction have been satisfied, including information to demonstrate that Frontier's rights in connection with the Lease Agreements are not being impaired, and (2) to comply with the terms and conditions that must be satisfied before a security assignment can be effectuated. Frontier further seeks damages arising from the transfer of interests in the Lease Agreements without Frontier's consent. Frontier also seeks declarations (1) that defendants are legally required to provide the information requested by Frontier and called for under the Lease Agreements; that (2) absent such information, Frontier should not be deemed to have consented to the transfer of any interest with respect to the Lease

Agreements; and that (3) the security assignment completed without complying with the terms and conditions of each of the Lease Agreements violates Frontier's rights and interests under the Lease Agreements.

19.     Further, to the extent that the lease-transfer transaction involved the transfer of a controlling beneficial ownership interest in the Lessor or Owner Participant or granted participation rights in the Lease Agreements, Frontier is entitled to information to establish that the new beneficial owner (or owners) is a "Permitted Transferee" (as defined in the Lease Agreements). Absent such an assurance, Frontier could find itself in a circumstance where it is not permitted to pay rent or is otherwise harmed. Accordingly, Frontier seeks injunctive relief providing that, until such time as it is determined that AMCK and Carlyle have entered into a lawful lease-transfer transaction with a permitted transferee, all rent due under the Lease Agreements should be paid into the Court pursuant to Fed. R. Civ. P. 67 or alternatively held in escrow.

20.     Additionally, Frontier seeks injunctive relief prohibiting Defendants from requiring Frontier to redirect rent payments to the alleged security trustees or to take any actions as a result of the ineffective security assignment.

21.     Finally, Frontier seeks to hold AMCK Holdings and any other related entities who participated in the scheme to strip AMCK Holdings of its assets accountable for fraudulently transferring assets from AMCK Holdings in an effort to render itself judgment-proof and frustrate Frontier's efforts to hold AMCK Holdings to account for its conduct and breaches of the Framework Agreement.

## PARTIES, JURISDICTION, AND VENUE

22.     Plaintiff Frontier, a Colorado corporation, is headquartered in Denver, Colorado.

23.     On information and belief, Defendant AMCK Holdings is a company incorporated in Ireland and is headquartered in Dublin, Ireland. AMCK Holdings is party to the Framework Agreement with Frontier.

24.     On information and belief, Defendant Accipiter, a company incorporated in Ireland, is headquartered in Dublin, Ireland. Accipiter is the Owner Participant for fourteen of the fifteen aircraft Lease Agreements executed by Frontier and AMCK, and serves as Guarantor for seven of those transactions.

25.     On information and belief, Defendant Accipiter Holdings DAC ("Accipiter Holdings"), a company incorporated in Ireland, is headquartered in Dublin, Ireland. Accipiter Holdings serves as Guarantor for the other seven lease transactions involving Accipiter.

26.     On information and belief, Defendant Vermillion Aviation (Two) Limited ("Vermillion"), a company incorporated in Ireland, is headquartered in Dublin, Ireland. Vermillion is the Owner Participant for the fifteenth lease and the trustor of the aircraft trust. On information and belief, prior to the fraudulent transfer, Vermillion was wholly owned by AMCK Holdings.

27.     On information and belief, Defendant Wells Fargo Trust Company, N.A. ("Wells Fargo), a national banking association, not in its individual capacity, but solely as Owner Trustee, is headquartered in Salt Lake City, Utah. Wells Fargo serves as lessor of seven aircraft Lease Agreements and owner trustee of seven aircraft trusts.

28.     On information and belief, Defendant UMB Bank, N.A. ("UMB"), a national banking association, not in its individual capacity, but solely as Owner Trustee, is headquartered in Salt Lake City, Utah. UMB serves as lessor of the remaining eight aircraft Lease Agreements and the owner trustee of those eight aircraft trusts

7

29.     Defendants Wells Fargo and UMB are named solely in their capacity as owner trustees.

30.     On information and belief, Defendant Carlyle Aviation is a Bermuda company, with offices located in Dublin, Ireland, Miami, Florida and Singapore.  Pursuant to notices sent by Carlyle Aviation, it purportedly serves as the current Lease Manager, or Servicer, as applicable, of the Lease Agreements.

31.     On information and belief, Defendant Maverick is a Canadian company headquartered in Ontario, Canada, with offices in Toronto, Canada, Dublin, Ireland and Miami, Florida.  Maverick owns each of the aircraft-owning entities and is the borrower that caused a security assignment of the aircraft and the Lease Agreements after the sale of the assets to Carlyle.

32.     On information and belief, Defendant Manchester is a company incorporated in Luxembourg, and is headquartered in Luxembourg.  On information and belief, Manchester was formed for the sole purpose of the Carlyle acquisition.  It was the parent company of the Owner Participants of the Leases, and one of the two companies acquired by Carlyle in December 2021.

33.     The Defendants named in paragraphs 30-32 are collectively referred to as Carlyle and individually as a Carlyle entity.

34.     This Court has diversity jurisdiction under 28 U.S.C. § 1332, since Plaintiff and Defendants are citizens of different states and the amount in controversy is greater than $75,000.

35.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(3) and because the defendants are subject to the Court's personal jurisdiction by agreement of parties.

36.     This Court has personal jurisdiction over Defendants because the parties submitted to the jurisdiction of this Court by agreement.

37.     The Lease Agreements, the Guarantees, the Participation Agreements, and the Framework Agreement each provide that the parties to each respective agreement irrevocably submit to the jurisdiction of this Court with respect to any suit, action, or proceeding relating to the respective agreement or any matter between the parties arising under or in connection with the agreement or any related Lease Document (as defined in each Lease Agreement).

38.     The Carlyle entities are bound by Defendants' consent to jurisdiction in the Lease Agreements and related Lease Documents and are equitably estopped from contesting submission to this Court's jurisdiction. The Carlyle entities are receiving direct benefits from the Lease Agreements, the Participation Agreements, and the other Operative Documents (as defined in each Lease Agreement). Further, Carlyle Aviation purports to act as Lease Manager (or Servicer) under the Lease Agreements.

## FACTUAL ALLEGATIONS

### A.     The Sale Leaseback Structure

39.     Frontier relies on leased aircraft for 100% of its aircraft fleet. Aircraft leasing through sale and leaseback arrangements is a widely used method by airlines to finance new aircraft acquisitions.

40.     AMCK, through such sale and leaseback arrangements, owned and leased fifteen aircraft to Frontier, which made AMCK one of the largest lessors of aircraft to Frontier.

41.     Due to regulatory requirements in the United States, foreign leasing companies, such as AMCK, may only own and register aircraft in the United States through a qualified U.S. "owner trustee." Under this structure, a foreign leasing company typically has a special purpose entity, or a subsidiary, establish an owner trust with a U.S. bank or trust company. The trust, acting through the "owner trustee," holds the interest in the aircraft and acts as the lessor to the aircraft lease. The foreign leasing company serves as the trustor to the owner trust and is

9

referred to in the Lease Agreements and related documentation as an "Owner Participant" or "Beneficiary." Aircraft owner trusts are widely used in commercial aviation transactions in the United States.

42.     As a result of these requirements, the counterparty lessor to each of the Lease Agreements is the trust company, not in its individual capacity but solely as owner trustee. To ensure contractual privity and provide assurance that the lessor's obligations under the agreements are performed by the leasing company that owns and controls the aircraft, the foreign leasing companies execute guarantees or participation agreements (or both) in favor of the lessee. The guarantees and participation agreements also require verification and confirmation of a minimum net worth of the guarantor. Guarantors and beneficiaries each are responsible to perform and fulfill the lessor's obligations under the leases when a lessor default.

43.     Commercial aviation is a heavily regulated industry. In addition to strict safety rules, aircraft lease transactions are subject to U.S. and global banking and finance regulations, including sanctions laws, export controls, anti-money laundering laws and other banking laws. Indeed, thirteen of the Lease Agreements expressly provide that AMCK and its parent companies, including the ultimate parent company, CK Asset Holdings Limited, must be in compliance with U.S. export controls and sanctions laws.

44.     Prior to the Carlyle acquisition, AMCK Holdings served as the Lease Manager (also referred to as the Servicer) for all fifteen of the Lease Agreements.

45.     On or about April 13, 2022, Carlyle Aviation purported to provide notice to Frontier that it would be serving as Lease Manager for all of the Lease Agreements.

46.     Under each of the Lease Agreements, the Lease Manager (or Servicer, as applicable) is authorized to act on behalf of the lessor and it interfaces with Frontier on day-to-

day leasing matters, including collecting Frontier's monthly rent payments (which total millions of dollars each month) and communicating with Frontier regarding aircraft operations and maintenance.

**B.    The Lease Agreements Protect Frontier in the Event of a Change in Ownership**

47.    Aircraft finance is an active market. Leasing companies trade their aircraft (including the attached active operating leases), directly or indirectly, regularly. Leasing companies, like airlines, also go through relatively frequent acquisitions, restructurings, or mergers. Such transactions pose major risks to lessees because a lessor's creditworthiness and industry experience are directly relevant to a lessee's financial risks and rights in the aircraft.

48.    Specifically, lessors owe significant financial responsibilities to lessees throughout the lease term. Typically, lessors must: (1) return the lessee's security deposit at the time of lease return; (2) reimburse the lessee for certain maintenance costs and expenses, including costs associated with performing any airworthiness directives issued by the FAA; (3) pay certain insurance and warranty claim proceeds to the lessee, and (4) maintain compliance with U.S. regulations regarding the aircraft's registered owner. These standard obligations are part of the Lease Agreements and Operative Documents for each of the aircraft lease transactions at issue in this dispute.

49.    The financial stability, industry experience, and regulatory compliance status of a lessor and owner participant directly affects their ability to satisfy these aircraft lease requirements.

50.    Because of these recognized commercial risks, it is standard industry practice for lessees to require that lessors agree and acknowledge to lessees that they will not: (1) make any transfers or assignments to a third party that do not have the required net worth (or having a guarantor that has such net worth) or is a competitor; (2) jeopardize the registration of the aircraft

as a result of the transfer; and (3) conduct transfers, assignments, or novation in a manner that would increase lessee's risks or liabilities.

51.    To that end, each of the fifteen Lease Agreements protect Frontier in the event of any transfer of an ownership interest with respect to the Lease Agreements or the aircraft.

52.    Thirteen of the fifteen Lease Agreements are subject to substantially similar form lease agreements referred to as an Aircraft Operating Lease Agreement ("Aircraft Lease Form 1"). These leases each provide that the transfer of beneficial ownership, the grant of participations in the lease or other Operative Documents, or any other transfer or disposal of rights and obligations under the agreements are subject to certain preconditions.

53.    Specifically, Section 20.2(a) of Aircraft Lease Form 1 provides in relevant part:

Each of Lessor and Owner Participant (and any subsequent permitted assignee or transferee) shall have the right at any time, at its own expense and upon prior written notice to Lessee, to transfer ownership or beneficial ownership, as applicable, of the Aircraft, or to assign (including to assign as security), mortgage, novate, transfer, grant participations in, or otherwise dispose of its rights and obligations under this Agreement and the other Operative Documents, to any other person by outright transfer or assignment or collateral assignment or by operation of law and Lessee hereby consents to any such transfer or assignment; provided that:

(i)    Lessee shall have no greater financial obligation or liability under this Agreement and the other Lessee Documents as a result of such transfer based on the facts and circumstances existing and applicable laws in effect at the time of such transfer, than it would have had if such transfer had not taken place . . . .

. . .

(iii)    in the case of a sale of the Aircraft by Lessor or transfer of the beneficial interest of Owner Participant in the Aircraft or a transfer (other than to an Affiliate of the Lessor Guarantor) of a controlling interest in the Owner Participant, any such assignee or transferee shall be a Permitted Transferee and shall unconditionally guaranty the obligations of Lessor under this Agreement pursuant to a Guarantee in form substantially similar to the Guarantee executed by Owner Participant in favor of Lessee unless the existing Lessor Guarantee will remain in full force and effect following such transfer.

54.    The remaining two leases share a different basic form ("Aircraft Lease Form 2").

Section 22.3 of Aircraft Lease Form 2 provides in relevant part:

Lessor may sell, assign, novate or otherwise transfer its right, title and interest in the Aircraft or this Lease without Lessee's consent (a "Transfer"), subject to the following conditions:

> (i)    the proposed purchaser, assignee or transferee (the "Transferee") shall enter into an agreement, reasonably satisfactory to Lessee, assuming all obligations of Lessor under this Lease and the other Operative Documents and of Beneficiary under the Participation Agreement and other Operative Documents;
>
> . . .
>
> (v)    any Transfer will not increase Lessee's obligations, liabilities (financial or otherwise), or risks or diminish Lessee's rights and benefits, in each case under any Operative Document or in respect of the Aircraft (to be determined in each case as at the time of such Transfer by applying all applicable laws as are enacted and/or in effect on the effective date of such Transfer), . . . .

55.    Consistent with generally accepted industry practice, the parties intended for conditions relating to the transfer of ownership by lessors to be interpreted broadly and to cover transfers occurring at different levels of the corporate structure that could have an impact on the commercial rights and risks faced by the lessee.

56.    Lessees in the aircraft leasing market are permitted to examine any proposed transaction, pursuant to which interests in the lease are to be transferred, to confirm that the transfer preconditions under the lease are satisfied, and to receive assurances from the existing lessor parties as well as documentary evidence, that: (1) any fees incurred by lessee will be paid; (2) the new lessor will meet the criteria of a permitted transferee; and (3) the transaction will not prejudice the lessee's rights under the lease agreement.

57.    The guarantees (the "Guarantees") and participation agreements (the "Participation Agreements") executed in connection with the Lease Agreements provide further protection in the event of a transfer of interest.

58.    Each of the fifteen Lease Agreements is guaranteed by the Owner Participant or a parent company.

59.   Each of these Guarantees contains a representation and warranty from the Guarantor that it has a total net worth as determined in accordance with GAAP or similar internal accounting standard that exceed a specified dollar value that, in each case, is in the tens of millions of dollars.

60.   The Guarantees further state that upon transfer of the Owner Participant's or Lessor's interest in the underlying transaction, the Guarantee shall terminate only upon execution of a replacement guarantee meeting the same requirements as the Guarantees (including assurances that the new guarantor has a net worth in excess of the specified dollar value).

61.   Each Guarantor further agrees to be liable for the payment of all reasonable fees and expenses, including attorney's fees, incurred by Frontier in connection with the enforcement of the Guarantee.

62.   With respect to the other two lease transactions, the Owner Participants also entered into Participation Agreements with Frontier.  These agreements function similarly to the Guarantees.

63.   Pursuant to the Participation Agreements, the Owner Participant may sell or transfer its interest *only* if the following conditions are met:

> (1)   the proposed transferee confirms in writing, in a form reasonably satisfactory to Frontier, its undertaking to perform the obligations of Owner Participant in a form substantially similar to the Participation Agreement;
>
> (2)   the Owner Participant pays Frontier's reasonable legal fees and costs incurred in connection with the transfer;
>
> (3)   the transferee entity meets certain requirements, including that it is a citizen of the U.S.; not an airline or aircraft operator; and has, or through a guarantee acceptable to Frontier by a person having, a minimum net worth of a specified value in the tens of millions of dollars;
>
> (5)   the transfer does not increase Frontier's obligations or risks or diminish Frontier's rights and benefits under any of the lease documents; and
>
> (6)   the transfer does not affect the registration of the aircraft.

14

C.     **Frontier Learns of the December 2021 Fraudulent Transfer of AMCK's Assets and the Carlyle Transaction**

64.     In or about early January 2022, Frontier became aware through a press release issued by Carlyle in late December 2021, that AMCK had entered into an agreement to sell its aviation assets to Maverick Aviation Partnership LP (the "Carlyle Transaction"). On information and belief, Maverick Aviation Partnership LP is managed by Carlyle Aviation Partners, which in turn controls Carlyle Aviation.

65.     The press release stated that Carlyle "has signed an agreement to acquire AMCK Aviation's ('AMCK') portfolio of aircraft."

66.     On information and belief, the sale included all fifteen of the aircraft subject to the Lease Agreements.

67.     Based on disclosures made by AMCK's parent company, CK Asset Holdings Limited ("CK Asset"), Frontier learned that on or about December 23, 2021, Carlyle and CK Assets executed a sale agreement relating to the sale of AMCK's portfolio of assets in which Carlyle and CK Assets agreed on the sale structure and other key terms.

68.     Frontier now knows that prior to the announcement of acquisition and the execution of the sale agreement, and in connection with the sale of its assets to Carlyle, AMCK fraudulent transferred over 98% of its assets through transferring its ownership of asset holding entities to Defendant Manchester. The transfer included transfer of AMCK Holdings' ownership interest in the entity that beneficially owned one of the aircraft subject to a Lease Agreement and operated by Frontier.

69.     Specifically, on information and belief, on or about December 22, 2021, the day prior to the execution of the sale agreement, AMCK transferred nearly all of its assets to Manchester to become the sole shareholder (or member) of Manchester.

15

70.     On information and belief, promptly after AMCK Holdings became the sole shareholder of Manchester, AMCK Holdings relinquished its full ownership interest in Manchester to Vermillion Aviation Holding Limited.

71.     On information and belief, AMCK Holdings received no fair consideration for the transfer.

72.     The series of transfers made by AMCK Holdings are collectively referred to as the "December 2021 Transfer."

73.     On information and belief, the December 2021 Transfer left AMCK Holdings with insufficient assets to satisfy Frontier's claims against AMCK Holdings arising from its breaches of the Framework Agreement.

74.     The December 2021 Transfer occurred approximately one year after Frontier filed the Framework Agreement action against AMCK and while the action remained pending before this Court.

75.     Based on the disclosures as well the 2021 corporate filings of Manchester, on information and belief, the transfer of AMCK Holdings' assets constituted an in-kind contribution of approximately $574,839,553 to Manchester by transferring AMCK's ownership of the following entities to Manchester:

- Vermillion Aviation (One) Limited

- Defendant Vermillion Aviation (Two) Limited

- Vermillion Aviation (Three) Limited

- Vermillion Aviation (Four) Limited

- Vermillion Aviation (Five) Limited

- Vermillion Aviation (Six) Limited

- Vermillion Aviation (Seven) Limited

- Vermillion Aviation (Eight) Limited

- Vermillion Aviation (Nine) Limited

- Allenwood Aircraft Leasing Limited

- Ballyhaunis Aircraft Leasing Limited

- Carlow Aircraft Leasing Limited

- Dungarvan Aircraft Leasing Limited

- Elphin Aircraft Leasing Limited

- Howth Aircraft Leasing Limited

- Inver Aircraft Leasing Limited

- Jamestown Aircraft Leasing Limited; and

- Kildare Aircraft Leasing Limited.

76.     On information and belief, and according to AMCK's 2020 financial statements filed with government of Ireland, these entities represented the vast majority of AMCK Holdings' subsidiaries and, thus, AMCK Holdings' assets.

77.     On information and belief, the only two entities not contributed to Manchester were AMCK Aviation (US) Inc. and AMCK Aviation (Japan) Inc.

78.     On information and belief, based on AMCK's most recent financial disclosures, these subsidiaries represented less than 1.5% of AMCK Holdings' net worth prior to the transfer.

79.     On information and belief, AMCK Holdings was left with less than $10 million in assets after the December 2021 Transfer—far less than Frontier's pending claim against AMCK Holdings, which exceeds $53 million.

80.     Thus, upon information and belief, AMCK transferred over 98% of its assets to Manchester and almost immediately following the transfer, relinquished its ownership of Manchester to Vermillion Aviation Holdings Limited.

81.     Further, on information and belief and based on publicly available disclosures, AMCK Holdings did not receive any value in exchange for its transfer of its interest in Manchester.  After AMCK Holdings was stripped of its aircraft assets, Carlyle purchased the aircraft portfolio, leaving AMCK Holdings as a severely undercapitalized shell entity whose present ownership is unknown to Frontier.  In contrast, Accipiter Aviation Holdings DAC, a holding company that functioned like AMCK Holdings and is not named as a defendant in the Framework Agreement Action, was acquired in whole by Carlyle without being stripped of its assets.

82.     In addition to raiding AMCK Holdings of its assets and hindering Frontier's ability to satisfy a future judgment against AMCK, the December 2021 Transfer resulted in a change to the beneficial ownership of the Lessor and Owner Participant of one of the fifteen Leases that triggered disclosure obligations under the Lease Agreement.

83.     The fourteen other Leases also underwent a change in beneficial ownership upon the transfer of assets to Accipiter Finance and the subsequent sale of those assets to Carlyle.

84.     AMCK did not disclose to Frontier the transfer of the beneficial ownership of Frontier's lessors at the time it occurred, nor did it provide the information and assurances required under the Lease Agreements in the event of a transfer.

**D.     Frontier Requests Information Regarding the Carlyle Transaction but AMCK Refuses to Provide Any Information**

85.     Despite repeated requests for information made to both AMCK and Carlyle, to date, Frontier has not been provided with information necessary for its to ascertain that the

Carlyle acquisition of AMCK's assets, which resulted in the change of beneficial ownership of all of the aircraft and the related holding entities, has satisfied the express requirements set forth in each of the Lease Agreements.

86.     After learning of the incoming Carlyle Transaction from public sources, Frontier immediately reached out to AMCK for details on the transaction. By written demand to AMCK dated January 4, 2022, Frontier requested that AMCK provide information and documents relating to the Carlyle Transaction. At that time, Frontier had not yet learned of the December 2021 Transfer.

87.     By letter dated February 3, 2022, AMCK refused to provide any information concerning the acquisition and categorically denied that AMCK owed Frontier any obligations under the aircraft leases in connection with the Carlyle Transaction. While vehemently denying it had done anything improper, AMCK entirely failed to mention the December 2021 Transfer despite Frontier making clear that it had concerns about the consequences of the Carlyle Transaction, especially in light of the pending Framework Agreement Action. .

88.     On or about March 4, 2022, Frontier sent AMCK another demand letter, again informing AMCK that it was in breach of its obligations and requesting that it immediately: (1) provide notice of the acquisition along with adequate information regarding the deal structure and its impact on the entities relevant to the leases; and (2) provide all other assignment instruments customarily reviewed in connection with lessor transfers.

89.     On or about March 21, 2022, counsel for AMCK responded to the demand and reiterated AMCK's position that it would not be providing any information concerning the acquisition.

90.     Without providing any details concerning the transaction, AMCK stated that the Carlyle Transaction "does not involve any transfer or assignment by a Lessor or an Owner Participant" and, therefore, AMCK would not be providing the requested assurances and documentation.

91.     AMCK again failed to address the secret transfer that took place in December 2021 when an Owner Participant's beneficial ownership was transferred.

92.     AMCK's position violates the Lease Agreements and undermines the purpose of Section 20.2(a) and Section 22.3 in the Lease Agreements.  AMCK's actions also flout established industry customs and norms concerning a lessor's obligations to a lessee with respect to the transfer of beneficial ownership interests in leased aircraft.

93.     Pursuant to the Lease Agreements, Frontier cannot be deemed to have consented to a transaction unless Frontier has been provided sufficient information and assurances to determine that each of the requirements has been satisfied, including the requirement that a transaction will not prejudice any of Frontier's rights under the Lease Agreements.

94.     Because neither AMCK nor Carlyle had disclosed this information prior to the transactions—and still have not provided sufficient information and confirmation that the transactions satisfied the lease requirements—Frontier cannot be deemed to have consented to either the December 2021 Transfer or the Carlyle Transaction.

**E.      AMCK and Carlyle Purport to Notify Frontier of a Change in Lease Manager, Without Providing the Required Assurances**

95.     On or about March 30, 2022, AMCK notified Frontier that as a result of the Carlyle Transaction, AMCK would cease to be the Lease Manager and that AMCK expected Carlyle or one of its affiliates to act as the new manager under the Lease Agreements.

20

96.     At this time, AMCK again failed to provide any information regarding the
structure of the acquisition and how the impending Carlyle Transaction would satisfy the
requirements under each of the Leases. The March 30 letter provided no further information as
to the corporate ownership changes that will take place at the lower level of each of the current
AMCK subsidiaries, including the owner participants of each of the Frontier leased aircraft.

97.     To effect a change in the lease manager for the Aircraft Leases, however, the
Owner Participants and Owner Trustees must grant participations in the aircraft and Aircraft
Lease to the new lease manager, which must be done pursuant to the terms of the Lease
Agreements.

98.     Additionally, while the March 30 letter directly contradicted AMCK's initial
position that the Carlyle Transaction is not relevant to Frontier and that the lease transfer
provisions do not apply, the letter nonetheless fell far short of affirming that all the transfer
requirements were met at the time of closing.

99.     In particular, the letter provided a general statement about Carlyle's overall asset
status and experience in aircraft leasing but did not otherwise offer any support for AMCK's
assertion that Carlyle will be a competent servicer nor did it provide any specifics regarding the
Carlyle entities that are now purportedly responsible for the lease transactions. Rather than
comply with its discrete obligations under the Lease Agreements by providing Frontier with
proper documentations and information, AMCK vaguely asserted only that it is "confident that
Carlyle will have the expertise to continue managing the relevant aircraft and aircraft leases."

100.    On information and belief, the Carlyle Transaction closed on April 12, 2022.
Despite Frontier's repeated demands to AMCK to comply with its contractual obligations,
AMCK marched ahead to close the acquisition with Carlyle while refusing to engage with

Frontier and failing to provide information relating to the Carlyle acquisition sufficient for Frontier to be deemed to have consented to the transaction prior to the closing.

101.    After the deal closed, on or around April 13, 2022, Carlyle Aviation sent to Frontier fifteen notices, each entitled "Lessee Notice," purporting to provide notice that Carlyle had acquired the aircraft portfolio and as a result, Carlyle had replaced AMCK Holdings as Lease Manager under each of the fifteen Lease Agreements.

102.    The notices further demanded Frontier provide (1) liability coverage to Carlyle's alleged lenders and purported affiliates and (2) "tail" insurance coverage for the AMCK entities and AMCK's parent entities previously associated with the Leases.

103.    Under the Lease Agreements, tail insurance coverage is only required following a "transfer" that complied with the requirements stated in the Lease Agreements.

104.    Carlyle's "Lessee Notices" made clear that a "transfer" under the Lease Agreements had occurred, despite AMCK's and Carlyle's earlier protestations otherwise.

105.    The "Lease Notices" purported to avail Carlyle and AMCK of protections and contractual benefits (such as insurance coverage) afforded only in the event of a "transfer" completed pursuant to the terms of the Lease Agreements.

106.    Additionally, Carlyle had no right to demand that Frontier provide insurance coverage for its lenders because each of the Lease Agreements unequivocally provides that lenders will not be acknowledged by Frontier unless specific lease requirements are met.  Those requirements were not, and have never been, met.

107.    As with AMCK's prior communications, Carlyle's "Lessee Notices" did not provide the required information for Frontier to be deemed to have consented to the Carlyle Transaction.

108. Further, Carlyle's purported "notices" of a change in Lease Manager (or Servicer) were ineffective. Each Lease Agreement requires that such notice be sent to Frontier by the respective Lessor. Carlyle's notices were by Carlyle Aviation and thus were not effective.

109. On April 21, 2022, Frontier responded to Carlyle's Lessee Notices, reiterated Frontier's contractual rights as Lessee, and set out a detailed list of questions and demands for Carlyle to answer.

110. Frontier further explained that Carlyle failed to implement technical amendments to the Leases that are necessary following a change of ownership, including amendments relating to sanction compliance.

111. Since Frontier's April 21 letter, Carlyle has provided incomplete responses and has continued to refuse to acknowledge that the lease requirements applicable to transfers applied to the Carlyle Transaction.

112. Carlyle also has refused to cover Frontier's costs arising from the purported transfer.

113. Carlyle further refused to provide net worth certificates or documentation affirming that the Guarantors remain compliant with the net worth requirement following the closing of the Carlyle Transaction, even though the Guaranties contain an express, ongoing net worth covenant.

**F.    Carlyle Breached the Leases By Assigning Each of the Aircraft and Leases to the Lenders as Security without Complying with Each of the Requirements Provided Under the Lease Agreements**

114. On June 1, 2022, Carlyle sent Frontier a series of notices notifying Frontier that it had effectuated a security assignment of its interest in the Leases and in the fifteen Aircraft and Aircraft Leases (the "Security Assignment").

23

115. Frontier was not given prior written notice of the closing nor any opportunity to review any Security Assignment documents that require Frontier's sign-off prior to the closing, in further violation of the Lease Agreements.

116. Section 20.2(a) of Aircraft Lease Form 1, applicable to thirteen of the fifteen Lease Agreements, expressly requires the lessors and owner participants provide advance written notice of any security assignment in the Lease Agreements.

117. As with any transfer of beneficial ownership, the provision further requires assurances from the lessors and owner participants that Frontier's rights under the Leases Agreements are not restricted or impaired.

118. The provision further grants Frontier the express right to ensure that any security assignment of the lessor's or owner participant's interest in the lease is in a "form and substance reasonably satisfactory" to Frontier and requires that the Lessor "provide [Frontier] with . . . financial and other information relating to a transferee as [Frontier] may reasonably request."

119. The security assignment notices sent to Frontier are not reasonably acceptable to Frontier because, among other things, they do not contain customary protective language that Frontier reasonably requires in such notices. The notices further fail to specify how each of the requirements under the Lease Agreements relating to security assignments are satisfied.

120. Section 22.2 of Aircraft Lease Form 2, applicable to two of the Lease Agreements, grants Frontier similar protections. Specifically, pursuant to the provision, the owner participant or lessor must ensure that the documents, assurances and actions relating to the security assignment are "in a form and of a nature reasonably acceptable to [Frontier]" and that "none of [Frontier's] rights and benefits in respect [of the Lease Agreements] shall be diminished as a result of any such Security Interest or assignment." Once again, the security assignment

24

notices relating to Lease Agreements governed by Aircraft Lease Form 2 fails to meet the lease requirements.

121.    Carlyle, through the Owner Participants it now purports to own (Defendants Accipiter and Vermillion), breached these provisions.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract against Defendants Accipiter, Accipiter Holdings, Vermillion, UMB Bank, and Wells Fargo)

122.    Frontier incorporates the allegations in paragraphs 1-XX, as if fully set forth herein.

123.    AMCK, through various AMCK entities and the respective owner trustees, executed fifteen valid aircraft Lease Agreements and related documentation, including Guarantees and Participation Agreements, for each of the fifteen aircraft that Frontier leases from it.

124.    Each of the aircraft Lease Agreements, Guarantees, and Participation Agreements are in full force.

125.    Frontier has performed its obligations under the Lease Agreements, Guarantees, and Participation Agreements.

126.    Each of the Lease Agreements provides for Frontier's consent to certain lease-transfer transactions only in circumstances where certain preconditions have been satisfied, in order to ensure that Frontier's rights under the agreements will not be impaired.

127.    AMCK informed Frontier of its intent to transfer its interests in each of the Lease Agreements to Carlyle less than one month prior to the scheduled closing of the acquisition, leaving Frontier with very little time to evaluate the transaction and its impact on Frontier. AMCK also failed to provide any further information in compliance with the lease requirements

and instead denied that the lease transfer/assignment provisions even applied. This failure breached each of the fifteen Lease Agreements.

128.    Defendants Accipiter, Vermillion, UMB Bank, and Wells Fargo breached their contractual obligations by not providing information about the Carlyle Transaction, by refusing to comply with the specific lease requirements for transfers and assignments (including failing to take any action to ensure that Frontier's rights as lessee are not diminished by, *e.g.*, proposing proper lease amendments and proposing amendment or assignment of the Tripartite Agreement), and improperly deeming Frontier to have consented to the transaction.

129.    Defendants Vermillion and UMB Bank breached the Lease Agreement and related documentation, including the Guarantee, by failing to provide Frontier the opportunity to examine the transaction and the new lessor to confirm that the transfer requirements under the Lease Agreement are satisfied in connection with the December 2021 Transfer.

130.    Defendants Accipiter, Accipiter Holdings, Vermillion, UMB Bank, and Wells Fargo breached the Lease Agreements and related documentation, including the Guarantees and the Participation Agreement (as applicable), by failing to provide Frontier the opportunity to examine the transaction and the new lessor to confirm that the transfer requirements under the lease are satisfied in connection with the Carlyle Transaction.

131.    Defendants Accipiter, Accipiter Holdings, Vermillion, UMB Bank, and Wells Fargo breached the Lease Agreements and related documentation, including the Guarantees and Participation Agreements, by failing to provide Frontier with assurances and documentary support that in connection with the Carlyle Transaction: (1) any fees incurred by lessee will be paid, (2) the existing lessor will remain liable to any existing obligations (unless proper

assignment arrangement has been made and agreed to by the parties); and (3) the transaction will not prejudice the lessee's rights under the Lease Agreements.

132.   Further, Defendant Vermillion and UMB Bank also breached their contractual obligations as a result of the December 2021 Transfer.  The December 2021 Transfer resulted in a transfer of the beneficial ownership of the aircraft associated with the Lease Agreement executed by UMB Bank (as the owner trustee of Vermillion).  Neither Vermillion nor UMB Bank notified Frontier and the transfer impaired Frontier's right and interest as Lessee.

133.   Defendants Vermillion and UMB Bank breached the Lease Agreement and related documentation, including the Guarantee, by failing to provide Frontier with assurances and documentary support in connection with the December 2021 Transfer, including assurances that: (1) any fees incurred by lessee will be paid, (2) the existing lessor will remain liable to any existing obligations (unless proper assignment arrangement has been made and agreed to by the parties); and (3) the transfer will not prejudice the lessee's rights under the lease agreement.

134.   Defendants Accipiter, Vermillion, UMB Bank, and Wells Fargo further breached the Lease Agreements and related documentation, including the Participation Agreements, by failing to provide advance written notice and assurances and documentary support in connection with the purported Security Assignment entered into by Carlyle in June 2022.

135.   Each of these breaches of the Lease Agreements caused, and continues to cause, reasonably foreseeable damages to Frontier by diminishing or restricting Frontier's rights under the Lease Agreements, diminishing the value of the Lease Agreements, and causing Frontier to incur costs and expenses, all in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF
### (Declaratory Judgment against all Defendants)

136.    Frontier incorporates the allegations in paragraphs 1-135, as if fully set forth herein.

137.    Pursuant to the Lease Agreements, upon a transfer of beneficial ownership or the grant of participations in the lease or other operative documents by operation of law or by transfer, Frontier is deemed to have consented to the transfer or grant only if it is provided with sufficient information and assurances to conclude that the transaction complies with the lease requirements, including but not limited to confirmation that the transaction will not diminish Frontier's rights and interests under the Lease Agreements.

138.    AMCK and its related entities failed to provide sufficient information to determine whether the December 2021 Transfer and Carlyle Transaction satisfies the requirements of the Lease Agreements, Guarantees, and Participation Agreements.

139.    Carlyle has also failed to provide information sufficient to determine whether the Carlyle Transaction satisfies the requirements of the Lease Agreements, Guarantees, and Participation Agreements.

140.    To date, neither AMCK nor Carlyle, or any related entity of either, has provided the required assurances and information.

141.    Carlyle further caused breaches of the Lease Agreements by effectuating a purported Security Assignment for each of the aircraft subject to the Lease Agreements without complying with the requirements for security assignments under the Lease Agreements.

142.    Carlyle also refuses to pay Frontier's costs and expenses and to provide documents and records to confirm that the Carlyle Transaction has satisfied the lease requirements, both of which violate the Lease Agreements.

143.    Frontier has attempted to resolve this dispute arising from the Carlyle Transaction, but AMCK, and now Carlyle, insisted that they had no contractual obligations and have refused to reimburse Frontier for the costs relating to the transfers/assignments and to provide the requested information and assurances as required under the Lease Agreements, Guarantees and the Participation Agreements, despite Frontier's repeated demands.

144.    Absent such assurances, the fundamental economic bargain of the Lease Agreements is undermined and Frontier's rights and interests as lessee are in jeopardy.

145.    This dispute is a justiciable controversy pursuant 28 U.S.C. § 2201.

146.    Frontier is entitled to a declaration that it is entitled to sufficient information from AMCK and Carlyle that will enable Frontier to determine whether the Carlyle Transaction satisfies the requirements of the Lease Agreements.

147.    Frontier is further entitled to a declaration that it is entitled to advance written notice of any security assignment and that it is entitled to sufficient assurances and information from Carlyle to enable Frontier to evaluate and, as applicable, acknowledge that a security assignment meets the requirement of the Lease Agreements, Guarantees, Participation Agreements, and other Operative Documents.

## THIRD CLAIM FOR RELIEF
### (Declaratory Judgment against all Defendants)

148.    Frontier incorporates the allegations in paragraphs 1-147, as if fully set forth herein.

149.    Pursuant to the Lease Agreements, upon a transfer of beneficial ownership or the grant of participations in the lease or other operative documents by operation of law or by transfer, Frontier is deemed to have consented to the transfer or grant only if it is provided with

sufficient information and assurances to conclude that the transaction will not diminish Frontier's rights and interests under the Lease Agreements.

150.    Pursuant to the Participation Agreements, transfer of the beneficial ownership of the Owner Participant must comply with specific requirements that mirror the requirements as provided in the Lease Agreements.

151.    Absent such information, Frontier is not deemed to have consented to the December 2021 Transfer or the Carlyle Transaction.

152.    AMCK, and now Carlyle, has failed to provide sufficient information to determine whether the Carlyle Transaction satisfies the requirements of the Lease Agreements despite Frontier's repeated demands.  Indeed, rather than providing the information, AMCK conducted the December 2021 Transfer in secret and failed to disclose the occurrence of the transaction even after Frontier's requests for information relating to the then-upcoming Carlyle Transaction after Frontier learned of the deal.

153.    Absent such assurances, the fundamental economic bargain of the Lease Agreements is undermined and Frontier's rights with respect to its aircraft are in jeopardy.

154.    Carlyle further failed to provide advance notice of effectuating a purported Security Assignment for each of the aircraft subject to the Leases without complying with the requirements for security assignments under the Lease Agreements.

155.    Carlyle also refuses to pay Frontier's costs and expenses and to provide documents and records to confirm that the Carlyle Transaction has satisfied the lease requirements, both of which violate the Lease Agreements.

156.    As a result of AMCK's, and now Carlyle's, refusal to provide this information, Frontier is not deemed to have consented to the transactions under the Lease Agreements.

157. Frontier has attempted to resolve this dispute arising from the December 2021 Transfer, the Carlyle Transaction, and the Security Assignment, but AMCK and Carlyle, respectively, have refused to provide Frontier with the required information and assurances. This dispute is a justiciable controversy pursuant 28 U.S.C. § 2201.

158. Frontier is entitled to a declaration that (1) it is not deemed to have consented to the transfer of the Lease Agreements in connection with the December 2021 Transfer and the Carlyle Transaction; (2) the Security Assignment was closed in violation of each of the Lease Agreements; and (3) Frontier is entitled to reimbursement of reasonable costs and expenses incurred in connection with the December 2021 Transfer, the Carlyle Transaction, and the Security Assignment, as provided in the Lease Agreements.

## FOURTH CLAIM FOR RELIEF
### (Injunctive Relief)

159. Frontier incorporates the allegations in paragraphs 1-158, as if fully set forth herein.

160. Pursuant to the Lease Agreements, Guarantees, and Participation Agreements, in connection with a transfer of beneficial ownership or the grant of participations in the lease or other operative documents by operation of law or by transfer, Frontier is entitled to (1) information to establish that the new beneficial owner is a permitted transferee and (2) a guarantee or such confirmation that the guarantor continues to meet the net worth requirement based on the express terms of the Guaranties and the Lease Agreements.

161. Absent information sufficient to confirm that the transferee is a permitted transferee and that Frontier is legally permitted to do business with the entity, Frontier is unable to make its rent payments, jeopardizing Frontier's interest in the Lease Agreements.

31

162.    Since the purported closing of the Carlyle Transaction, Carlyle has failed to provide Frontier with the required information and assurances.

163.    Carlyle refused to pay Frontier's costs and expenses and further refused to provide records and financial information for the Guarantors.

164.    Carlyle also closed the Security Assignment without following the procedures set forth in the Lease Agreements and without complying with the requirements under each of the Lease Agreements.

165.    Following this wrongful security assignment, Carlyle directed Frontier to deposit rent to an account earmarked for its lenders, even though Carlyle has effectuated a security assignment in violation of express lease terms including failing to provide proper security assignment instruction to sufficiently ensure that Frontier's right as Lessee is not diminished or restricted as a result of the security assignment.

166.    Frontier has attempted to resolve this dispute arising from the Carlyle Transaction, but AMCK and Carlyle have refused to cooperate with Frontier to adequately address Frontier's requests.

167.    Frontier seeks an order providing that until such time as it is determined that the Security Assignment has been completed in compliance with the Lease Agreements, all rent due under the Lease Agreements should be paid into the Court pursuant to Fed. R. Civ. P. 67 or, alternatively, held in escrow.

## FIFTH CLAIM FOR RELIEF
### (Violation of N.Y. Uniform Voidable Transfer Act § 273 against Defendant AMCK Holdings)

168.    Frontier incorporates the allegations in paragraphs 1-167, as if fully set forth herein.

169.    The December 2021 Transfer transferred the property of AMCK to Vermillion
Holdings, including AMCK Holdings' interest in the fifteen aircraft subject to the Leases.

170.    AMCK Holdings made these transfers with the actual intent to hinder, delay, or
defraud Frontier to the benefit of AMCK and Carlyle.

171.    At the time of the transfer, Frontier was a creditor of AMCK Holdings.

172.    The December 2021 Transfer evidences numerous of the badges of fraud set forth
in Section 273(b) of the New York Uniform Voidable Transfer Act.

173.    For example, the transfer was made after Frontier filed its first action against
AMCK Holdings arising from its breach of the Framework Agreement.

174.    The transfer was of substantially all of AMCK Holdings' assets.

175.    AMCK Holdings removed and thereafter concealed the removal of assets from
Frontier.

176.    AMCK Holdings did not receive reasonably equivalent value for the assets
transferred to Vermillion Holdings.

177.    The transfer rendered AMCK Holdings insolvent and unable to satisfy Frontier's
claims against it.  The December 2021 Transfer left AMCK Holdings with 1.5% of its assets
prior to the transfer.  Based on AMCK Holdings' most recent financial disclosures, AMCK
Holdings was left with less than $10 million in assets while Frontier's pending claim against
AMCK Holdings is in excess of $53 million.

178.    The transfer occurred shortly after AMCK Holdings incurred a substantial debt as
a result of its breaches of the Framework Agreement.  The transfer occurred less than a year after
Frontier filed its initial complaint against Frontier and shortly after the Court denied AMCK
Holdings' motion to dismiss the action.

179. The December 2021 Transfer violates Section 273 of the New York Uniform Voidable Transactions Act.

180. Pursuant to Sections 273, 276(a), and 276-a of the New York Uniform Voidable Transactions Act, the December 2021 Transfer is voidable and should be unwound.

181. Frontier is entitled to an award of damages, attorneys' fees, and costs arising from the violation, including attorneys' fees and costs resulting from this action.

## SIXTH CLAIM FOR RELIEF
### (Violation of N.Y. Uniform Voidable Transfer Act § 274 against Defendant AMCK Holdings)

182. Frontier incorporates the allegations in paragraphs 1-181, as if fully set forth herein.

183. The December 2021 Transfer transferred the property of AMCK Holdings to Vermillion Holdings, including AMCK Holdings' interest in the aircraft subject to the fifteen Leases.

184. At the time of the transfer, Frontier was a creditor of AMCK Holdings.

185. AMCK Holdings did not receive reasonably equivalent value in exchange for the assets transferred to Vermillion Holdings.

186. The transfer rendered AMCK Holdings insolvent.

187. The transfer represented nearly all of AMCK's assets, totaling over 98.5% of the assets on its balance sheet.

188. The December 2021 Transfer violates Section 274 of the New York Uniform Voidable Transactions Act.

189. Pursuant to Sections 274, 276(a), and 276-a of the New York Uniform Voidable Transactions Act, the December 2021 is voidable and should be unwound.

190.    Frontier is entitled to an award of damages, attorneys' fees, and costs arising from the violation, including attorneys' fees and costs resulting from this action.

**WHEREFORE**, Frontier prays for judgment in its favor against Defendants as follows:

1.      On its First claim for relief, damages in an amount to be determined, prejudgment and post judgment interest, and reasonable attorneys' fees and costs;

2.      On its Second claim for relief, a declaration that it is entitled to sufficient information from AMCK and Carlyle that will enable Frontier to determine whether the December 2021 Transfer, the Carlyle Transaction, and the Security Assignment satisfy the requirements of the Lease Agreements, plus reasonable attorneys' fees and costs;

3.      On its Third claim for relief, a declaration that Frontier is not deemed to have consented to the December 2021 Transfer or the Carlyle Transaction, and that the Security Assignment was effectuated in violation of the Lease Agreements, plus reasonable attorneys' fees and costs;

4.      On its Fourth claim for relief, an order directing that until such time as it is determined that Carlyle entered into a lawful security assignment, all rent due under the lease should be paid into Court pursuant to Fed. R. Civ. P. 67 or alternatively held in escrow, plus reasonable attorneys' fees and costs;

5.      On its Fifth claim for relief, an order voiding the December 2021 Transfer, damages in an amount to be determined, prejudgment and post judgment interest, and reasonable attorneys' fees and costs;

6.      On its Sixth claim for relief, an order voiding the December 2021 Transfer,

damages in an amount to be determined, prejudgment and post judgment interest,

and reasonable attorneys' fees and costs; and

7.      For such other relief as the court deems reasonable and just.

Dated:  June 24, 2022

Respectfully submitted,

**BINDER & SCHWARTZ LLP**

By:   /s/ Eric B. Fisher
      Eric B. Fisher
      Neil S. Binder
      Tessa B. Harvey
      366 Madison Avenue, 6th Floor
      New York, New York 10017
      Telephone No.: (212) 510-7008
      Facsimile No.:  (212) 510-7299
      Email: efisher@binderschwartz.com

*Attorneys for Plaintiff Frontier Airlines, Inc.*