UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FRONTIER AIRLINES, INC.,<br><br>                                    Plaintiff,<br><br>v.<br><br>AMCK AVIATION HOLDINGS IRELAND LIMITED, ACCIPITER INVESTMENT 4 LIMITED, VERMILLION AVIATION (TWO) LIMITED, ACCIPITER HOLDINGS DAC, CARLYLE AVIATION MANAGEMENT LIMITED, MAVERICK AVIATION HOLDINGS LTD., MANCHESTER AVIATION FINANCE S.a.r.l., VERMILLION AVIATION HOLDINGS LIMITED, WELLS FARGO TRUST COMPANY, N.A., solely in its capacity as OWNER TRUSTEE, and UMB BANK, N.A., solely in its capacity as OWNER TRUSTEE,<br><br>                                    Defendants. | Case No. 1:22-cv-02943 (PAE)<br><br>__SECOND AMENDED COMPLAINT__ |

Plaintiff, Frontier Airlines, Inc. ("Frontier"), by its attorneys Binder & Schwartz LLP,

states as follows:

## SUMMARY OF THE ACTION

1.      At its core, this action concerns serious breaches of lease agreements for fifteen

Airbus A320 aircraft, as well as the fraudulent transfer of assets relating to those leases for the

purpose of defeating Frontier's ability to collect upon any judgment that may be rendered in

separate litigation against Defendant AMCK Aviation Holdings Ireland Limited ("AMCK

Holdings") pending in this District and nearing trial.

2.      Frontier is a U.S.-based passenger airline that operates commercial passenger

aircraft leased from various aircraft lessors.  AMCK Holdings was an international aircraft

leasing company.  Prior to the transaction described herein, AMCK Holdings, through various

affiliates, subsidiaries and owner-trustee entities (collectively, "AMCK"), owned and leased over

100 aircraft, including fifteen aircraft leased to Frontier through sale-leaseback financing arrangements (the "Leases").  Frontier was one of AMCK's largest aviation customers and played a pivotal role in AMCK's successful entrance into the U.S. commercial aviation market. In late 2021, AMCK sold its assets to Carlyle Group Inc. (collectively with its affiliates and subsidiaries, "Carlyle").  (The various asset transfers that were part of that sale are collectively referred to as the "Carlyle Transaction.")  Carlyle announced that Maverick Aviation Partners LP, "an investment vehicle managed by Carlyle Aviation Partners" had "signed an agreement to acquire AMCK Aviation's portfolio of aircraft" worth more than $4 billion.  Carlyle describes itself as a "global investment firm" that manages "$376 billion in assets, spanning 3 business segments and 520 investment vehicles."

3.     AMCK Holdings was intentionally excluded from AMCK's sale to Carlyle in order to allow AMCK Holdings to evade actual and potential liabilities to Frontier and in an attempt to insulate Carlyle from claims of successor liability.  AMCK Holdings' assets were funneled through multiple entities to ultimately reach Carlyle while the liabilities remained with AMCK Holdings.  As a consequence of the Carlyle Transaction, AMCK Holdings now appears to be a stand-alone shell company without meaningful assets.

4.     AMCK (through owner trusts it controlled) and Frontier were parties to fifteen lease agreements (the "Lease Agreements") relating to fifteen Airbus aircraft owned by AMCK and leased to Frontier for use in Frontier's operations.  AMCK Holdings was the Lease Manager (also referred to as the Servicer) of the Lease Agreements and was delegated to perform the duties of each of the lessors as the lessors' authorized agent and delegate up until AMCK sold its assets to Carlyle.  AMCK Holdings therefore managed the leases on behalf of affiliates and subsidiary entities and was the ultimate beneficiary of the Lease Agreements.

5.     These Lease Agreements cover a critical component of Frontier's aircraft fleet and are vital to its operations, representing over 10% of Frontier's fleet .  The fifteen aircraft have an aggregate value of more than $500 million.

6.     Frontier and AMCK Holdings are also parties to a Framework Agreement (the "Framework Agreement").  Pursuant to the Framework Agreement, AMCK committed to purchasing from and leasing back to Frontier six new Airbus model A320-251N aircraft that Frontier was scheduled to purchase from Airbus and take possession of in 2020.

7.     AMCK breached the Framework Agreement.  In November 2020, Frontier brought an action in this Court against AMCK Holdings and its then-subsidiaries and affiliates seeking damages in excess of $50 million, plus interest and fees, arising from that breach and AMCK's related conduct.  That action (the "Framework Agreement Action") has its pretrial conference scheduled for January.

8.     Upon information and belief, on or about December 22, 2021— in the midst of active litigation of Frontier's claims against AMCK—AMCK Holdings fraudulently transferred over 98% of its total assets, consisting of ownership interests in various aircraft-owning entities, including certain entities that beneficially owned aircraft subject to one of the Leases.

9.     AMCK Holdings initially transferred the assets to a newly formed entity Defendant Manchester Aviation Finance S.a.r.l. ("Manchester"), which is, on information and belief, a Luxembourg holding company formed for the sole purpose of stripping AMCK Holdings of its assets to render AMCK Holdings judgment-proof.

10.     On information and belief, for a very brief time (possibly only a day), AMCK Holdings became the sole owner of Manchester before AMCK Holdings relinquished its full ownership interest in Manchester to Defendant Vermillion Aviation Holdings Limited

("Vermillion Holdings").  On information and belief, AMCK Holdings did not receive value in exchange for the transfer to Vermillion Holdings.

11.     As announced in a press release issued on December 23, 2021, Vermillion Holdings then sold its full ownership interest in Manchester (consisting of all the assets previously owned by AMCK Holdings) to Carlyle through Carlyle's subsidiary, Defendant Maverick Aviation Holdings Ltd. ("Maverick").  Despite Carlyle publicly announcing that it had "purchased" AMCK's portfolio of leased aircraft, including the aircraft leased to Frontier, AMCK Holdings was intentionally left out of the acquisition and, to date, on information and belief, remains a shell entity whose current ownership is unknown to Frontier and which, on information and belief, has insufficient assets to satisfy claims against it, including Frontier's pending claims in the Framework Agreement Action.  Following the acquisition, Carlyle took over the role previously held by AMCK Holdings and installed a new management team. AMCK, as the industry knew it, now no longer exists.

12.     These transfers raided AMCK Holdings of its assets without fair consideration and to the detriment of Frontier, as a creditor of AMCK, and to the ultimate benefit of Carlyle. On information and belief, the transfer left AMCK Holdings with less than 2% of its assets and unable to satisfy a future judgment in the Framework Agreement Action.

13.     In addition to the fraudulent nature of the AMCK Holdings transactions, each of these transfers changed the beneficial ownership of interests in the aircraft under the Lease Agreements and other Operative Documents (as defined in the Lease Agreements), or otherwise constituted a transfer, novation, or disposal of assets and obligations to Carlyle.

14.     Under the Lease Agreements and related documents, including the Participation Agreements, Frontier is deemed to consent to such transfers only after certain preconditions are

satisfied.  These preconditions are important, bargained-for protections to ensure that any such transfer will not cause any interruption in Frontier's rights with respect to the aircraft or related credit support or otherwise adversely impact Frontier's interests under the Lease Agreements and related Operative Documents.  Such interests include, but are not limited to, Frontier's uninterrupted use of the aircraft consistent with applicable laws and regulations, prompt receipt of refunds of Security Deposits and insurance proceeds, reimbursement for expenses and costs incurred in connection with maintenance or as a result of lessors' or owner participants' transfer or assignment activities, its right to consent to security assignments and insurance assignments, and its rights under warranties and engine maintenance agreements.

15.    An example of the economic significance of Frontier's rights with regard to a consent to transfer: Frontier, Defendant Accipiter Holdings DAC, and the manufacturer of the aircraft engines on the 15 leased aircraft entered into a Tripartite Agreement that allows important engine maintenance benefits worth potentially millions of dollars to be portable upon termination of Frontier's leases.  If portability is not available, Frontier will be solely responsible for compensating the then-lessor even if Frontier has been in full compliance with all of its obligations.  The Tripartite Agreement and any related agreements that allow the portability to take effect are not freely assignable by any one of the parties.  After the Carlyle Transaction, no analysis or inquiry was made as to whether the Tripartite Agreement was properly assigned in order to ensure its continued binding effect.  Frontier could incur financial penalties in excess of $30 million absent such assurance and proper assignment.

16.    Neither AMCK nor Carlyle informed Frontier of the Carlyle Transaction as required by the leases and related agreements, nor did they take any of the steps required of them upon a transfer.  Instead, both insisted, and continue to insist, that there has been no transfer and

that Frontier has no right to obtain any information about the new owners of the aircraft or commitments that Frontier's interests have not been harmed.  In fact, Frontier learned of the transfer to Carlyle through its review of publicly available disclosures and information well after the December 2021 transfer of AMCK Holdings' assets.  To date, despite repeated requests, neither AMCK nor Carlyle has provided Frontier with sufficient information to determine whether the preconditions for consent to the lease transfer transaction have been satisfied.

17.     Since the closing of the sale, entities now purportedly controlled by Carlyle, including Defendants Maverick and Carlyle Aviation Management Limited ("Carlyle Aviation") have caused further breaches of the Lease Agreements by failing to comply with the express terms and conditions set forth in each of the Lease Agreements in connection with security assignments.  Specifically, these defendants have assigned security interests in the Lease Agreements without complying with the Lease Agreements' express requirements and preconditions for such assignments.

18.     In addition to the many ways in which Frontier's contractual rights have been breached and Frontier has been damaged, the ultimate consequence of all these actions has been to render AMCK Holdings judgment-proof and unable to satisfy the obligations that are the subject of the Framework Agreement Action.

## PARTIES, JURISDICTION, AND VENUE

19.     Plaintiff Frontier, a Colorado corporation, is headquartered in Denver, Colorado.

20.     On information and belief, Defendant AMCK Holdings is a company incorporated in Ireland and is headquartered in Dublin, Ireland.  AMCK Holdings is party to the Framework Agreement with Frontier.

21.     On information and belief, Defendant Accipiter, a company incorporated in Ireland, is headquartered in Dublin, Ireland.  Accipiter is the Owner Participant for fourteen of

the fifteen aircraft Lease Agreements executed by Frontier and AMCK, and serves as Guarantor for seven of those transactions.

22.    On information and belief, Defendant Accipiter Holdings DAC ("Accipiter Holdings"), a company incorporated in Ireland, is headquartered in Dublin, Ireland.  Accipiter Holdings serves as Guarantor for the other seven lease transactions involving Accipiter.

23.    On information and belief, Defendant Vermillion Aviation (Two) Limited ("Vermillion"), a company incorporated in Ireland, is headquartered in Dublin, Ireland. Vermillion is the Owner Participant for the fifteenth lease and the trustor of the aircraft trust.  On information and belief, prior to the fraudulent transfer, Vermillion was wholly owned by AMCK Holdings.

24.    On information and belief, Defendant Wells Fargo Trust Company, N.A. ("Wells Fargo), a national banking association, not in its individual capacity, but solely as Owner Trustee, is headquartered in Salt Lake City, Utah.  Wells Fargo serves as lessor of seven aircraft Lease Agreements and owner trustee of seven aircraft trusts.

25.    On information and belief, Defendant UMB Bank, N.A. ("UMB"), a national banking association, not in its individual capacity, but solely as Owner Trustee, is headquartered in Salt Lake City, Utah.  UMB serves as lessor of the remaining eight aircraft Lease Agreements and the owner trustee of those eight aircraft trusts

26.    Defendants Wells Fargo and UMB are named solely in their capacity as owner trustees.

27.    On information and belief, Defendant Carlyle Aviation is a Bermuda company, with offices located in Dublin, Ireland, Miami, Florida and Singapore.  Pursuant to notices sent by Carlyle Aviation, it purportedly serves as the current Lease Manager, or Servicer, as

applicable, of the Lease Agreements.

28.     On information and belief, Defendant Maverick is a Canadian company headquartered in Ontario, Canada, with offices in Toronto, Canada, Dublin, Ireland and Miami, Florida.  Maverick owns each of the aircraft-owning entities and is the borrower that caused a security assignment of the aircraft and the Lease Agreements after the sale of the assets to Carlyle.

29.     On information and belief, Defendant Manchester is a company incorporated in Luxembourg, and is headquartered in Luxembourg.  On information and belief, Manchester was formed for the sole purpose of the Carlyle acquisition.  It was the parent company of the Owner Participants of the Leases after AMCK Holdings transferred its ownership interest to it, and one of the two companies acquired by Carlyle in December 2021.  On information and belief, Manchester is now wholly owned by Maverick and ultimately by Carlyle.

30.     On information and belief, Defendant Vermillion Holdings is a company incorporated and headquartered in Hong Kong.  It was the recipient of AMCK Holdings' assets and sole owner of Manchester at the time of AMCK's sale to Carlyle.

31.     The Defendants named in paragraphs 27-28 are collectively referred to as Carlyle and individually as a Carlyle entity.

32.     This Court has diversity jurisdiction under 28 U.S.C. § 1332, since Plaintiff and Defendants are citizens of different states and the amount in controversy is greater than $75,000. Frontier has suffered damages in excess of $75,000, and Defendants have failed to comply with their contractual, statutory, and common law obligations to Frontier as regards leases of aircraft worth in excess of $500,000,000, all as more fully described herein.

33.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(3) and because the

defendants are subject to the Court's personal jurisdiction by agreement of parties.

34.    This Court has personal jurisdiction over Defendants because the parties submitted to the jurisdiction of this Court by agreement.

35.    The Lease Agreements, the Guarantees, the Participation Agreements, and the Framework Agreement each provide that the parties to each respective agreement irrevocably submit to the jurisdiction of this Court with respect to any suit, action, or proceeding relating to the respective agreement or any matter between the parties arising under or in connection with the agreement or any related Lease Document (as defined in each Lease Agreement).

36.    Carlyle and Vermillion Holdings are bound by Defendants' consent to jurisdiction in the Lease Agreements and related Lease Documents and are equitably estopped from contesting submission to this Court's jurisdiction.  Vermillion Holdings received, and the Carlyle entities are receiving, direct benefits from the Lease Agreements, the Participation Agreements, and the other Operative Documents (as defined in each Lease Agreement).  Further, Carlyle Aviation purports to act as Lease Manager (or Servicer) under the Lease Agreements.

## FACTUAL ALLEGATIONS

### A.    The Sale Leaseback Structure

37.    Frontier relies on leased aircraft for 100% of its aircraft fleet.  Aircraft leasing through sale and leaseback arrangements is a widely used method by airlines to finance new aircraft acquisitions.

38.    AMCK, through such sale and leaseback arrangements, owned and leased fifteen aircraft to Frontier, which made AMCK one of the largest lessors of aircraft to Frontier.

39.    Due to regulatory requirements in the United States, foreign leasing companies, such as AMCK, may only own and register aircraft in the United States through a qualified U.S. "owner trustee."  Under this structure, a foreign leasing company typically has a special purpose

entity, or a subsidiary, establish an owner trust with a U.S. bank or trust company. The trust, acting through the "owner trustee," holds the interest in the aircraft and acts as the lessor to the aircraft lease. The foreign leasing company serves as the trustor to the owner trust and is referred to in the Lease Agreements and related documentation as an "Owner Participant" or "Beneficiary." Aircraft owner trusts are widely used in commercial aviation transactions in the United States.

40.     As a result of these requirements, the counterparty lessor to each of the Lease Agreements is the trust company, not in its individual capacity but solely as owner trustee. To ensure contractual privity and provide assurance that the lessor's obligations under the agreements are performed by the leasing company that owns and controls the aircraft, the foreign leasing companies execute guarantees or participation agreements (or both) in favor of the lessee.

41.     The guarantees and participation agreements also serve to protect Frontier's interest in the leases and require verification and confirmation of a minimum net worth of the guarantor. Guarantors and beneficiaries each are responsible to perform and fulfill the lessor's obligations under the leases when a lessor defaults. Under the guarantees for the Lease Agreements (the "Guarantees"), each Guarantor specifically represents and warrants that it has at least $15,000,000 in net worth as determined by GAAP. This net worth amount is intended to ensure that the lessor or owner participant will have the financial resources to fulfill its financial obligations owed to Frontier. For example, the Guarantor secures the lessor's and owner participant's obligation to return to Frontier its security deposit at the time of lease return. Each security deposit under the Lease Agreements exceeds $200,000. Absent confirmation that a Guarantor meets the net worth requirement set forth in the Lease Agreements and Guarantees, the value of Frontier's leasehold interest is substantially diminished.

42.     Because commercial aviation is a heavily regulated industry, in addition to strict safety rules, aircraft lease transactions are subject to complex U.S. and global regulations, including sanctions laws, export controls, anti-money laundering laws and other banking laws. Thirteen of the Lease Agreements expressly provide that AMCK and CK Asset Holdings Limited, AMCK's ultimate parent company, must be in compliance with U.S. export controls and sanctions laws.

43.     Prior to the Carlyle acquisition, AMCK Holdings served as the Lease Manager (also referred to as the Servicer) for all fifteen of the Lease Agreements.

44.     On or about April 13, 2022, Carlyle Aviation purported to provide notice to Frontier that it was replacing AMCK Holdings as Lease Manager for all of the Lease Agreements.  Carlyle provided this notice despite continuing to deny that it had any direct contractual rights or responsibilities under the Lease Agreements and despite the express requirement under each of the Lease Agreements that only lessors may nominate another entity to serve in such role.

45.     Under each of the Lease Agreements, the Lease Manager (or Servicer, as applicable) is authorized to act on behalf of the lessor and it interfaces with Frontier on day-to-day leasing matters, including collecting Frontier's monthly rent payments (which total millions of dollars each month) and communicating with Frontier regarding aircraft operations and maintenance.

**B.      The Lease Agreements Protect Frontier in the Event of a Change in Ownership**

46.     Aircraft finance is an active and highly competitive market.  Leasing companies trade their aircraft (including the attached active operating leases), directly or indirectly, regularly.  Leasing companies, like airlines, also go through relatively frequent acquisitions,

restructurings, and mergers.  Such transactions pose major risks to lessees such as Frontier because a lessor's creditworthiness and industry experience impact the value of the lessee's leasehold interest, and financial and operational risks under the transaction.

47.     Lessors typically owe significant financial responsibilities to lessees throughout the lease term.  In the Lease Agreements at issue in this case, as is typical in the aircraft leasing industry, the Lessors must: (1) return the lessee's security deposit at the time of lease return; (2) reimburse the lessee for certain maintenance costs and expenses, including costs associated with performing any airworthiness directives issued by the FAA; (3) pay certain insurance and warranty claim proceeds to the lessee, (4) pay the lessee for its expenses and costs incurred in connection with transfers, assignments and financing activities, (5) ensure compliance with U.S. regulations regarding the aircraft's registered owner, and (6) assume ongoing contractual obligations and payment in connection with engine service agreements that extend beyond the lease term.

48.     The financial stability, industry experience, and regulatory compliance status of a lessor and owner participant directly affects their ability to satisfy these aircraft lease requirements.  Given the requirements of the lessor, the value of a lessee's leasehold interest is significantly diminished if the lessor lacks financial resources or if its creditworthiness is not verified to the lessee.  Further, certain lessee obligations relate to specific corporate owners of the lessor.  For example, certain of the Lease Agreements require Frontier to ensure its conduct does not cause AMCK Holdings' parent company to violate sanctions.

49.     Because of these recognized commercial risks, it is standard industry practice for lessees to require that lessors agree and acknowledge to lessees that they will not: (1) make any transfers or assignments to a third party that do not have the required net worth (or having a

guarantor that has such net worth) or is a competitor; (2) jeopardize the registration of the aircraft as a result of the transfer; or (3) conduct transfers, assignments, or novation in a manner that would increase lessee's risks or liabilities.

50.    To that end, each of the fifteen Lease Agreements protect Frontier in the event of any transfer of an ownership interest with respect to the Lease Agreements or the aircraft.

51.    Thirteen of the fifteen Lease Agreements are subject to substantially similar form lease agreements referred to as an Aircraft Operating Lease Agreement ("Aircraft Lease Form 1"). These leases each provide that the transfer of beneficial ownership, the grant of participations in the lease or other Operative Documents, or any other transfer or disposal of rights and obligations under the agreements are subject to certain preconditions.

52.    Specifically, Section 20.2(a) of Aircraft Lease Form 1 provides in relevant part:

Each of Lessor and Owner Participant (and any subsequent permitted assignee or transferee) shall have the right at any time, at its own expense and upon prior written notice to Lessee, to transfer ownership or beneficial ownership, as applicable, of the Aircraft, or to assign (including to assign as security), mortgage, novate, transfer, grant participations in, or otherwise dispose of its rights and obligations under this Agreement and the other Operative Documents, to any other person by outright transfer or assignment or collateral assignment or by operation of law and Lessee hereby consents to any such transfer or assignment; provided that:

(i)    Lessee shall have no greater financial obligation or liability under this Agreement and the other Lessee Documents as a result of such transfer based on the facts and circumstances existing and applicable laws in effect at the time of such transfer, than it would have had if such transfer had not taken place . . . .

(ii)    such transfer shall not result in any restriction, based on the facts and circumstances existing and applicable laws in effect at the time of such transfer, on Lessee's rights under this Agreement or the other Lessee's Documents or on Lessee's use or operation of the Aircraft;

(iii)    in the case of a sale of the Aircraft by Lessor or transfer of the beneficial interest of Owner Participant in the Aircraft or a transfer (other than to an Affiliate of the Lessor Guarantor) of a controlling interest in the

Owner Participant, any such assignee or transferee shall be a Permitted Transferee and shall unconditionally guaranty the obligations of Lessor under this Agreement pursuant to a Guarantee in form substantially similar to the Guarantee executed by Owner Participant in favor of Lessee unless the existing Lessor Guarantee will remain in full force and effect following such transfer;

…

(v) Lessor shall have reimbursed to Lessee (or shall have agreed in writing to promptly reimburse to Lessee following such assignment, transfer or novation) Lessee's reasonable and invoiced out-of-pocket costs and expenses incurred in connection with its cooperation with Lessor under this Clause 20.2, including reasonable legal fees.

53.    The remaining two leases share a different basic form ("Aircraft Lease Form 2").

Section 22.3 of Aircraft Lease Form 2 provides in relevant part:

Lessor may sell, assign, novate or otherwise transfer its right, title and interest in the Aircraft or this Lease without Lessee's consent (a "Transfer"), subject to the following conditions:

(i)    the proposed purchaser, assignee or transferee (the "Transferee") shall enter into an agreement, reasonably satisfactory to Lessee, assuming all obligations of Lessor under this Lease and the other Operative Documents and of Beneficiary under the Participation Agreement and other Operative Documents;

(ii)
Lessor shall be responsible for Lessee's reasonable legal fees and other reasonable costs and expenses incurred in respect of such Transfer and shall pay such costs and expenses promptly upon demand therefor;

. . .

(v)    any Transfer will not increase Lessee's obligations, liabilities (financial or otherwise), or risks or diminish Lessee's rights and benefits, in each case under any Operative Document or in respect of the Aircraft (to be determined in each case as at the time of such Transfer by applying all applicable laws as are enacted and/or in effect on the effective date of such Transfer), . . . .

54.    Consistent with generally accepted industry practice, the parties intended for

conditions relating to the transfer of ownership by lessors to be interpreted broadly and to cover

transfers occurring at different levels of the corporate structure that could impact the lessee's commercial rights and the risks it faced, including beneficial interest transfers at a parent company level or any other form of transfers that results in the change of ownership structure of the lessor.

55.    Lessees in the aircraft leasing market are permitted to examine any proposed transaction, pursuant to which interests in the lease are to be transferred, to confirm that the transfer preconditions under the lease are satisfied, and to receive assurances from the existing lessor parties as well as documentary evidence, that: (1) any fees incurred by lessee will be paid; (2) the new lessor will meet the criteria of a permitted transferee; and (3) the transaction will not prejudice the lessee's rights under the lease agreement.   Frontier is entitled to all of these protections under the language and intent of the Lease Agreements.

56.    The guarantees (the "Guarantees") and participation agreements (the "Participation Agreements") executed in connection with the Lease Agreements provide further protection in the event of a transfer of interest.

57.    Each of the fifteen Lease Agreements is guaranteed by the Owner Participant or a parent company in circumstances where the Owner Participant could not meet the net worth requirement.

58.    Each of these Guarantees contains a representation and warranty from the Guarantor that it has a total net worth as determined in accordance with GAAP or similar internal accounting standard that exceed a specified dollar value that, in each case, is in the tens of millions of dollars.  To ensure that the Guarantors meet this net worth threshold throughout the life of the lease, Frontier is afforded an ongoing right to verify the Guarantor's net worth status as appropriate.

59.     The Guarantees further state that upon transfer of the Owner Participant's or Lessor's interest in the underlying transaction, the Guarantee shall terminate only upon execution of a replacement guarantee meeting the same requirements as the Guarantees (including assurances that the new guarantor has a net worth in excess of the specified dollar value).

60.     Each Guarantor further agrees to be liable for the payment of all reasonable fees and expenses, including attorney's fees, incurred by Frontier in connection with the enforcement of the Guarantee.

61.     With respect to the other two lease transactions, the Owner Participants also entered into Participation Agreements with Frontier. These agreements function similarly to the Guarantees.

62.     Pursuant to the Participation Agreements, the Owner Participant may sell or transfer its interest *only* if all of the following conditions are met:

> (1)     the proposed transferee confirms in writing, in a form reasonably satisfactory to Frontier, its undertaking to perform the obligations of Owner Participant in a form substantially similar to the Participation Agreement;

> (2)     the Owner Participant pays Frontier's reasonable legal fees and costs incurred in connection with the transfer;

> (3)     the transferee entity meets certain requirements, including that it is a citizen of the U.S.; not an airline or aircraft operator; and has, or through a guarantee acceptable to Frontier by a person having, a minimum net worth of a specified value in the tens of millions of dollars;

> (4)     the transfer does not increase Frontier's obligations or risks or diminish Frontier's rights and benefits under any of the lease documents; and

> (5)     the transfer does not affect the registration of the aircraft.

**C.     Frontier Learns of the Fraudulent Transfer of AMCK's Assets and the Carlyle Transaction**

63.     In or about early January 2022, while the Framework Action was pending, and

after the Court denied AMCK's motion to dismiss, Frontier became aware through a press release issued by Carlyle in late December 2021 that AMCK had entered into an agreement to sell its aviation assets to Maverick Aviation Partnership LP.  On information and belief, Maverick Aviation Partnership LP is managed by Carlyle Aviation Partners, which in turn controls Carlyle Aviation.

64.     The press release stated that Carlyle "has signed an agreement to acquire AMCK Aviation's ('AMCK') portfolio of aircraft."  The press release further stated that the value of the assets subject to the agreement exceed $4 billion and that Goldman Sachs led the acquisition financing and Milbank and Kirkland & Ellis serving as legal counsel to Carlyle.

65.     On information and belief, the sale included all fifteen of the aircraft subject to the Lease Agreements.

66.     Based on disclosures made by AMCK's parent company, CK Asset Holdings Limited ("CK Asset"), Frontier learned that on or about December 23, 2021, Carlyle and CK Assets executed a sale agreement relating to the sale of AMCK's portfolio of assets in which Carlyle and CK Assets agreed on the sale structure and other key terms.

67.     Frontier now knows that prior to the announcement of acquisition and the execution of the sale agreement, and as part of the sale of its assets to Carlyle, over 98% of AMCK Holdings' assets were transferred out of AMCK Holdings, with the AMCK Holdings entity intentionally excluded from the Carlyle Transaction.  The transfer included transfer of AMCK Holdings' ownership interest in the entity that beneficially owned one of the aircraft subject to a Lease Agreement and operated by Frontier.

68.     Specifically, on information and belief, on or about December 22, 2021, the day before execution of the sale agreement, AMCK Holdings transferred nearly all of its assets to

17

Manchester, and became the sole shareholder (or member) of Manchester.

69.    On information and belief, promptly after AMCK Holdings became the sole shareholder of Manchester, AMCK Holdings relinquished its full ownership interest in Manchester to Defendant Vermillion Holdings.

70.    On information and belief, AMCK Holdings received no fair consideration for that transfer.

71.    The series of transfers made by AMCK Holdings are collectively referred to as the "December 2021 Transfer."

72.    On information and belief, the December 2021 Transfer left AMCK Holdings with insufficient assets to satisfy AMCK Holdings' liabilities to Frontier, including a judgment in the Framework Agreement Action, and was the first step in a series of transactions in connection with the ultimate sale to Carlyle.

73.    Specifically, AMCK Holdings transferred its assets first to Manchester and then to Vermillion Holdings, both of which are not defendants in the Framework Agreement Action. The transfer was, on information and belief, designed to allow Carlyle to acquire AMCK Holdings' assets free of any risks that those assets would be called upon to satisfy obligations to Frontier including liabilities resulting from the Framework Agreement Action.

74.    The December 2021 Transfer occurred approximately one year after Frontier filed the Framework Agreement action and while the action remained pending before this Court.

75.    Based on the disclosures as well as the 2021 corporate filings of Manchester, on information and belief, the transfer of AMCK Holdings' assets constituted an in-kind contribution of approximately $574,839,553 by transferring AMCK's ownership of the following entities to Manchester:

- Vermillion Aviation (One) Limited

- Defendant Vermillion Aviation (Two) Limited

- Vermillion Aviation (Three) Limited

- Vermillion Aviation (Four) Limited

- Vermillion Aviation (Five) Limited

- Vermillion Aviation (Six) Limited

- Vermillion Aviation (Seven) Limited

- Vermillion Aviation (Eight) Limited

- Vermillion Aviation (Nine) Limited

- Allenwood Aircraft Leasing Limited

- Ballyhaunis Aircraft Leasing Limited

- Carlow Aircraft Leasing Limited

- Dungarvan Aircraft Leasing Limited

- Elphin Aircraft Leasing Limited

- Howth Aircraft Leasing Limited

- Inver Aircraft Leasing Limited

- Jamestown Aircraft Leasing Limited; and

- Kildare Aircraft Leasing Limited.

76.     According to AMCK's 2020 financial statements filed with the government of Ireland, these entities represented the vast majority of AMCK Holdings' subsidiaries and, thus, AMCK Holdings' assets.

77.     On information and belief, the only two entities not contributed by AMCK Holdings to Manchester were AMCK Aviation (US) Inc. and AMCK Aviation (Japan) Inc.

78.     On information and belief, based on AMCK's most recent financial disclosures, these subsidiaries represented less than 1.5% of AMCK Holdings' net worth prior to the transfer.

79.     On information and belief, AMCK Holdings was left with less than $10 million in assets after the December 2021 Transfer—far less than AMCK's obligations to Frontier in the Framework Agreement Action, in which Frontier seeks damages in excess of $50 million.

80.     Further, on information and belief and based on publicly available disclosures, AMCK Holdings did not receive any value in exchange for its transfer of its interest in Manchester (which held 98% of AMCK Holdings' assets) to Vermillion Holdings.

81.     After AMCK Holdings was stripped of its assets, Carlyle purchased the aircraft portfolio from Vermillion Holdings.

82.      AMCK Holdings was left as a severely undercapitalized shell entity whose present ownership is unknown to Frontier.

83.     That result was by design.  In contrast to the circumstances surrounding the sale of AMCK Holdings' assets to Carlyle, an affiliate of AMCK Holdings, Accipiter Aviation Holdings DAC, which functioned similarly to AMCK Holdings and also served as a holding company for various aircraft subject to lease agreements, was directly acquired by Carlyle in connection with the Carlyle Transaction.  It was not stripped of its assets or left out of the sale, evidently because it, unlike AMCK Holdings, is not a defendant in the Framework Agreement Action.

84.     In addition to raiding AMCK Holdings of its assets and hindering Frontier's ability to satisfy a future judgment against AMCK Holdings, the December 2021 Transfer resulted in a change to the beneficial ownership of the Lessor and Owner Participant of one of the fifteen Leases that triggered disclosure obligations under the Lease Agreement.

85.     The fourteen other Leases also underwent a change in beneficial ownership upon the transfer of assets to Accipiter Finance and the subsequent sale of those assets to Carlyle.

86.     AMCK did not disclose to Frontier the transfer of the beneficial ownership of Frontier's lessors at the time it occurred, nor did it provide the information and assurances or affirmation required under the Lease Agreements in the event of a transfer.  This deprived Frontier of its contractual right to be given notice of and to review and object to the transfers if they did not meet the requirements in the Lease Agreements, and to prevent any fraudulent transfers from occurring.

**D.     Frontier Requests Information Regarding the Carlyle Transaction but AMCK Refuses to Provide Any Information**

87.     Despite repeated requests for information made to both AMCK and Carlyle, to date, Frontier has not been provided with information necessary for its to ascertain that the Carlyle acquisition of AMCK's assets, which resulted in the change of beneficial ownership of all of the aircraft and the related holding entities, has satisfied the express requirements set forth in each of the Lease Agreements.

88.     After learning of the incoming Carlyle Transaction from public sources, Frontier immediately reached out to AMCK for details on the transaction.  By written demand to AMCK dated January 4, 2022, Frontier requested that AMCK provide information and documents relating to the Carlyle Transaction.  At that time, Frontier had not yet learned of the December 2021 Transfer.

89.     By letter dated February 3, 2022, AMCK refused to provide any information concerning the acquisition and categorically denied that AMCK owed Frontier any obligations under the aircraft leases in connection with the Carlyle Transaction.  While vehemently denying it had done anything improper, AMCK entirely failed to mention the December 2021 Transfer despite Frontier making clear that it had concerns about the consequences of the Carlyle Transaction, especially in light of the pending Framework Agreement Action.

90.     On or about March 4, 2022, Frontier sent AMCK another demand letter, again informing AMCK that it was in breach of its obligations and requesting that it immediately: (1) provide notice of the acquisition along with adequate information regarding the deal structure and its impact on the entities relevant to the leases; and (2) provide all other assignment instruments customarily reviewed in connection with lessor transfers.

91.     On or about March 21, 2022, counsel for AMCK responded to the demand and reiterated AMCK's position that it would not be providing any information concerning the acquisition.

92.     Without providing any details concerning the transaction, AMCK stated that the Carlyle Transaction "does not involve any transfer or assignment by a Lessor or an Owner Participant" and, therefore, AMCK would not be providing the requested assurances and documentation.  AMCK (and later Carlyle) made the unreasonable and contract-violative contention that as long as the names of the first-line special purpose aircraft holding entities and the guarantor entities remain unchanged, no transfer or assignment had occurred even though AMCK readily admits that the transfer between itself and Carlyle would fundamentally upend the leasing relationship Frontier has with respect to these Lease Agreements and the aircraft and even though Carlyle publicly announced it had "purchased" AMCK's portfolio of leased aircraft including the aircraft leased to Frontier.

93.     AMCK's (and now Carlyle's) actions violate the express terms of the Lease Agreements and undermine the purpose of Section 20.2(a) and Section 22.3 in the Lease Agreements.  This conduct also flouts established industry customs and norms concerning a lessor's obligations to a lessee with respect to the transfer of beneficial ownership interests in leased aircraft.

94.     Pursuant to the Lease Agreements, Frontier cannot be deemed to have consented to a transaction unless the express requirements of Sections 20.2(a) and 22.3, respectively, are met and, to date, AMCK and Carlyle have refused to provide Frontier with the information Frontier reasonably needs to ascertain if the requirements are satisfied,   including the express requirement that the transaction will not prejudice and has not prejudiced any of Frontier's rights under the Lease Agreements.

95.     And Frontier has already been prejudiced.  The value of its leasehold interests has been significantly diminished due to the failure to provide the required confirmation that the obligations of the lessors are guaranteed by entities that satisfy the net worth requirement. Frontier is also required to ensure compliance with sanctions laws on behalf of the former parent companies in Hong Kong with which Frontier no longer has any direct or indirect business relationship.  As a result of the breach, and AMCK and Carlyle's failure to provide the required assurances and information to Frontier, Frontier has suffered damages in excess of $75,000.

96.     Further, Frontier's ability to collect amounts owed to it by AMCK Holdings, including its contractual damages under the Framework Agreement, has been hampered.

97.     Because neither AMCK nor Carlyle had disclosed this information prior to the transactions—and still have not provided sufficient information and confirmation that the transactions satisfied the lease requirements—Frontier cannot be deemed to have consented to either the December 2021 Transfer or the Carlyle Transaction.

**E.     AMCK and Carlyle Purport to Notify Frontier of a Change in Lease Manager, Without Providing the Required Assurances**

98.     On or about March 30, 2022, AMCK notified Frontier that as a result of the Carlyle Transaction, AMCK would cease to be the Lease Manager and that AMCK expected Carlyle or one of its affiliates to act as the new manager under the Lease Agreements.

99.     At this time, AMCK again failed to provide any information regarding the structure of the acquisition and how the impending Carlyle Transaction would satisfy the requirements under each of the Leases.  The March 30 letter provided no further information as to the corporate ownership changes that will take place at the lower level of each of the current AMCK subsidiaries, including the owner participants of each of the Frontier leased aircraft.

100.    To effect a change in the lease manager for the Aircraft Leases, however, the Owner Participants and Owner Trustees must grant participations in the aircraft and Aircraft Lease to the new lease manager, which must be done pursuant to the terms of the Lease Agreements.

101.    Additionally, while the March 30 letter directly contradicted AMCK's initial position that the Carlyle Transaction is not relevant to Frontier and that the lease transfer provisions do not apply, the letter nonetheless fell far short of affirming that all the transfer requirements were met at the time of closing.

102.    In particular, the letter provided a general statement about Carlyle's overall asset status and experience in aircraft leasing but did not otherwise offer any support for AMCK's assertion that Carlyle will be a competent servicer nor did it provide any specifics regarding the Carlyle entities that are now purportedly responsible for the lease transactions.  Rather than comply with its discrete obligations under the Lease Agreements by providing Frontier with proper documentations and information, AMCK vaguely asserted only that it is "confident that Carlyle will have the expertise to continue managing the relevant aircraft and aircraft leases."

103.    On information and belief, the Carlyle Transaction closed on April 12, 2022. Despite Frontier's repeated demands to AMCK to comply with its contractual obligations, AMCK marched ahead to close the acquisition with Carlyle while refusing to engage with

Frontier and failing to provide information relating to the Carlyle acquisition sufficient for Frontier to be deemed to have consented to the transaction prior to the closing.

104.    After the deal closed, on or around April 13, 2022, Carlyle Aviation sent to Frontier fifteen notices, each entitled "Lessee Notice," purporting to provide notice that Carlyle had acquired the aircraft portfolio and as a result, Carlyle had replaced AMCK Holdings as Lease Manager under each of the fifteen Lease Agreements.

105.    The notices further demanded Frontier provide (1) liability coverage to Carlyle's alleged lenders and purported affiliates and (2) "tail" insurance coverage for the AMCK entities and AMCK's parent entities previously associated with the Lease Agreements.  Under the Lease Agreements, "tail" insurance is only available following a termination of the lease or when a transfer contemplated thereunder has taken place.

106.    Under the Lease Agreements, tail insurance coverage is only required following a "transfer" that complied with the requirements stated in the Lease Agreements.

107.    Carlyle's "Lessee Notices" made clear that a "transfer" under the Lease Agreements had occurred, despite AMCK's and Carlyle's earlier protestations otherwise.

108.    The "Lease Notices" purported to avail Carlyle and AMCK of protections and contractual benefits (such as insurance coverage) afforded only in the event of a "transfer" completed pursuant to the terms of the Lease Agreements.

109.    Additionally, Carlyle had no right to demand that Frontier provide insurance coverage for its lenders because each of the Lease Agreements unequivocally provides that lenders will not be acknowledged by Frontier unless specific lease requirements are met.  Those requirements were not, and have never been, met.

110.    As with AMCK's prior communications, Carlyle's "Lessee Notices" did not

provide the required information for Frontier to be deemed to have consented to the Carlyle Transaction.

111.    Further, Carlyle's purported "notices" of a change in Lease Manager (or Servicer) were ineffective.  Each Lease Agreement requires that such notice be sent to Frontier by the respective Lessor.  Carlyle's notices were by Carlyle Aviation and thus were not effective.

112.    On April 21, 2022, Frontier responded to Carlyle's Lessee Notices, reiterated Frontier's contractual rights as Lessee, and set out a detailed list of questions and demands for Carlyle to answer.

113.    Frontier further explained that Carlyle failed to implement technical amendments to the Leases that are necessary following a change of ownership, including amendments relating to sanction compliance.

114.    Since Frontier's April 21 letter, Carlyle has provided incomplete responses and has continued to refuse to acknowledge that the lease requirements applicable to transfers applied to the Carlyle Transaction.

115.    As a result of deficient notices issued by both AMCK and Carlyle in connection with their transfers, Frontier incurred costs and legal fees in excess of $75,000, and Frontier is entitled to reimbursement under the Lease Agreements.  Carlyle also has refused to reimburse Frontier's costs arising from the purported transfer.

116.    Carlyle further refused to provide net worth certificates or documentation affirming that the Guarantors remain compliant with the net worth requirement following the closing of the Carlyle Transaction, even though the Guaranties contain an express, ongoing net worth covenant.

**F.    Carlyle Breached the Leases by Assigning Each of the Aircraft and Leases to the Lenders as Security without Complying with Each of the Requirements Provided Under the Lease Agreements**

117.    On June 1, 2022, Carlyle sent Frontier a series of notices notifying Frontier that it had effectuated a security assignment of its interest in the Leases and in the fifteen Aircraft and Aircraft Leases (the "Security Assignment").

118.    Frontier was not given prior written notice of the closing nor any opportunity to review any Security Assignment documents that require Frontier's sign-off prior to the closing, in further violation of the Lease Agreements. Rather than complying with its obligations under the Lease Agreements, Carlyle sent Frontier fully executed security assignment notices (which lack basic protections for the lessee) purporting to effectuate the security assignment.   This conduct not only violated the express lease terms but also violated well-established industry norms.

119.    Section 20.2(a) of Aircraft Lease Form 1, applicable to thirteen of the fifteen Lease Agreements, expressly requires that the lessors and owner participants provide advance written notice of any security assignment in the Lease Agreements.  Section 22.2 of Aircraft Lease Form 2 also expressly provides that Frontier will only comply with Lessor's requests in connection with security assignment if (1) the Lessor's documents, assurances and actions are in a form and of a nature reasonably acceptable to Frontier, (2) Lessor pays all reasonable and documented out-of-pocket costs and expenses, including reasonable fees and disbursements of counsel, incurred by Lessee in connection with any such security interest or assignment, and (3) none of Frontier's rights and benefits in respect of the lease agreement and the aircraft are diminished as a result of any such security interest or assignment.

120.    As with any transfer of beneficial ownership, the provision further requires

assurances from the lessors and owner participants that Frontier's rights under the Lease Agreements are not restricted or impaired.

121.     The provision further grants Frontier the express right to ensure that any security assignment of the lessor's or owner participant's interest in the lease is in a "form and substance reasonably satisfactory" to Frontier and requires that the Lessor "provide [Frontier] with . . . financial and other information relating to a transferee as [Frontier] may reasonably request."

122.     The security assignment notices sent to Frontier are not reasonably acceptable to Frontier because, among other things, they do not contain customary protective language that Frontier reasonably requires in such notices.  The notices do not provide customary protections that Frontier requires in connection with all security assignments.   Further, Frontier's rights under the Lease Agreements, including its entitlement to a refund of its security deposit, reimbursement of costs, and to receive insurance proceeds, are now subordinate to the rights of Carlyle's lender.   The notices further fail to specify how each of the requirements under the Lease Agreements relating to security assignments are satisfied.

123.     Carlyle, through the Owner Participants it now purports to own (Defendants Accipiter and Vermillion), breached these provisions.

124.     Frontier incurred costs and expenses, including legal fees, in connection with the wrongful security assignment to which it is entitled to reimbursement by Carlyle.

### FIRST CLAIM FOR RELIEF
**(Breach of Contract against Defendants Accipiter, Accipiter Holdings, Vermillion, UMB Bank, and Wells Fargo)**

125.     Frontier incorporates the allegations in paragraphs 1-124, as if fully set forth herein.

126.     AMCK, through various AMCK entities and the respective owner trustees,

executed fifteen valid aircraft Lease Agreements and related documentation, including Guarantees and Participation Agreements, for each of the fifteen aircraft that Frontier leases from it.

127.    Each of the aircraft Lease Agreements, Guarantees, and Participation Agreements are in full force.

128.    Frontier has performed its obligations under the Lease Agreements, Guarantees, and Participation Agreements.

129.    Each of the Lease Agreements provides for Frontier's consent to certain lease-transfer transactions only in circumstances where certain preconditions have been satisfied, in order to ensure that Frontier's rights under the agreements will not be impaired.

130.    AMCK informed Frontier of its intent to transfer its interests in each of the Lease Agreements to Carlyle less than one month prior to the scheduled closing of the acquisition, leaving Frontier with very little time to evaluate the transaction and its impact on Frontier. AMCK also failed to provide any further information in compliance with the lease requirements and instead denied that the lease transfer/assignment provisions even applied.   This failure breached each of the fifteen Lease Agreements.

131.    Defendants Accipiter, Vermillion, UMB Bank, and Wells Fargo breached their contractual obligations by not providing information about the Carlyle Transaction, by refusing to comply with the specific lease requirements for transfers and assignments (including failing to take any action to ensure that Frontier's rights as lessee are not diminished by, *e.g.*, proposing proper lease amendments and proposing amendment or assignment of the Tripartite Agreement), and improperly deeming Frontier to have consented to the transaction.

132.    Defendants Vermillion and UMB Bank breached the Lease Agreement and

related documentation, including the Guarantee, by failing to provide Frontier the opportunity to examine the transaction and the new lessor to confirm that the transfer requirements under the Lease Agreement are satisfied in connection with the December 2021 Transfer.

133.    Defendants Accipiter, Accipiter Holdings, Vermillion, UMB Bank, and Wells Fargo breached the Lease Agreements and related documentation, including the Guarantees and the Participation Agreement (as applicable), by failing to provide Frontier the opportunity to examine the transaction and the new lessor to confirm that the transfer requirements under the lease are satisfied in connection with the Carlyle Transaction.

134.    Defendants Accipiter, Accipiter Holdings, Vermillion, UMB Bank, and Wells Fargo breached the Lease Agreements and related documentation, including the Guarantees and Participation Agreements, by failing to provide Frontier with assurances and documentary support that in connection with the Carlyle Transaction: (1) any fees incurred by lessee will be paid, (2) the existing lessor will remain liable to any existing obligations (unless proper assignment arrangement has been made and agreed to by the parties); and (3) the transaction will not prejudice the lessee's rights under the Lease Agreements.

135.    Further, Defendant Vermillion and UMB Bank also breached their contractual obligations as a result of the December 2021 Transfer.  The December 2021 Transfer resulted in a transfer of the beneficial ownership of the aircraft associated with the Lease Agreement executed by UMB Bank (as the owner trustee of Vermillion).  Neither Vermillion nor UMB Bank notified Frontier and the transfer impaired Frontier's right and interest as Lessee.

136.    Defendants Vermillion and UMB Bank breached the Lease Agreement and related documentation, including the Guarantee, by failing to provide Frontier with assurances and documentary support in connection with the December 2021 Transfer, including assurances

that: (1) any fees incurred by lessee will be paid, (2) the existing lessor will remain liable to any existing obligations (unless proper assignment arrangement has been made and agreed to by the parties); and (3) the transfer will not prejudice the lessee's rights under the lease agreement.

137.    Defendants Accipiter, Vermillion, UMB Bank, and Wells Fargo further breached the Lease Agreements and related documentation, including the Participation Agreements and the respective Guarantees, by failing to complete the purported security assignment pursuant to the terms of the Lease Agreement, including but not limited to refusing to pay Frontier's costs and expenses and provide advance written notice and assurances and documentary support in connection with the purported Security Assignment entered into by Carlyle in June 2022.

138.    Each of these breaches of the Lease Agreements caused, and continues to cause, reasonably foreseeable damages to Frontier by diminishing or restricting Frontier's rights under the Lease Agreements, significantly diminishing the value of Frontier's leasehold interest in the Lease Agreements, and causing Frontier to incur costs and expenses, all in an amount in excess of $75,000 to be determined at trial.

**SECOND CLAIM FOR RELIEF**
**(Declaratory Judgment against all Defendants)**

139.    Frontier incorporates the allegations in paragraphs 1-138, as if fully set forth herein.

140.    Pursuant to the Lease Agreements, upon a transfer of beneficial ownership or the grant of participations in the lease or other operative documents by operation of law or by transfer, Frontier is deemed to have consented to the transfer or grant only if it is provided with sufficient information and assurances to conclude that the transaction complies with the lease requirements, including but not limited to confirmation that the transaction will not diminish Frontier's rights and interests under the Lease Agreements.

141.    AMCK and its related entities failed to provide sufficient information to determine whether the December 2021 Transfer and Carlyle Transaction satisfies the requirements of the Lease Agreements, Guarantees, and Participation Agreements.

142.    Carlyle has also failed to provide information sufficient to determine whether the Carlyle Transaction satisfies the requirements of the Lease Agreements, Guarantees, and Participation Agreements.

143.    To date, neither AMCK nor Carlyle, or any related entity of either, has provided the required assurances and information.

144.    Carlyle further caused breaches of the Lease Agreements by effectuating a purported Security Assignment for each of the aircraft subject to the Lease Agreements without complying with the express requirements for security assignments under the Lease Agreements. If valid, these purported Security Assignments would have the effect of significantly diminishing Frontier's rights as a lessee by subordinating them to the Assignee's rights.  Frontier's right to recover its security deposit and any maintenance cost sharing and insurance proceeds may now be trumped by the lenders' priority right to collect against the lessor because the security assignment notices fail to include customary language that would have prevented this exact situation – language that Frontier would have required be added to the assignments if it had been given the contractually required notice.

145.    Carlyle also refuses to pay Frontier's costs and expenses and to provide documents and records to confirm that the Carlyle Transaction has satisfied the lease requirements, both of which violate the Lease Agreements.

146.    Frontier has attempted to resolve this dispute arising from the Carlyle Transaction, but AMCK, and now Carlyle, insisted that they had no contractual obligations and

have refused to reimburse Frontier for the costs relating to the transfers/assignments and to provide the requested information and assurances as required under the Lease Agreements, Guarantees and the Participation Agreements, despite Frontier's repeated demands.

147.    Absent such information and assurances, the fundamental economic bargain of the Lease Agreements is undermined and Frontier's rights and interests as lessee are in jeopardy.

148.    This dispute is a justiciable controversy pursuant 28 U.S.C. § 2201.

149.    Frontier is entitled to a declaration that it is entitled to sufficient information from AMCK and Carlyle that will enable Frontier to determine whether the Carlyle Transaction satisfies the requirements of the Lease Agreements.

150.    Frontier is further entitled to a declaration that it is entitled to advance written notice of any security assignment and that it is entitled to sufficient assurances and information from Carlyle to enable Frontier to evaluate and, as applicable, acknowledge that a security assignment meets the requirement of the Lease Agreements, Guarantees, Participation Agreements, and other Operative Documents.

## THIRD CLAIM FOR RELIEF
### (Declaratory Judgment against all Defendants)

151.    Frontier incorporates the allegations in paragraphs 1-150, as if fully set forth herein.

152.    Pursuant to the Lease Agreements, upon a transfer of beneficial ownership or the grant of participations in the lease or other operative documents by operation of law or by transfer, Frontier is deemed to have consented to the transfer or grant only if it is provided with sufficient information and assurances to conclude that the transaction will not diminish Frontier's rights and interests under the Lease Agreements.

153.    Pursuant to the Participation Agreements, transfer of the beneficial ownership of

the Owner Participant must comply with specific requirements that mirror the requirements as provided in the Lease Agreements.

154.    Absent such information, Frontier is not deemed to have consented to the December 2021 Transfer or the Carlyle Transaction.

155.    AMCK, and now Carlyle, has failed to provide sufficient information to determine whether the Carlyle Transaction satisfies the requirements of the Lease Agreements despite Frontier's repeated demands.  Indeed, rather than providing the information, AMCK conducted the December 2021 Transfer in secret and failed to disclose the occurrence of the transaction even after Frontier's requests for information relating to the then-upcoming Carlyle Transaction after Frontier learned of the deal.

156.    Absent such assurances, the fundamental economic bargain of the Lease Agreements is undermined and Frontier's rights with respect to its aircraft are in jeopardy.

157.    Carlyle further failed to provide advance notice of effectuating a purported security assignment for each of the aircraft subject to the Leases without complying with the requirements for security assignments under the Lease Agreements.

158.    Carlyle also refuses to pay Frontier's costs and expenses and to provide documents and records to confirm that the Carlyle Transaction has satisfied the lease requirements, both of which violate the Lease Agreements.

159.    As a result of AMCK's, and now Carlyle's, refusal to provide this information, Frontier is not deemed to have consented to the transactions under the Lease Agreements.

160.    Frontier has attempted to resolve this dispute arising from the December 2021 Transfer, the Carlyle Transaction, and the security assignment, but AMCK and Carlyle, respectively, have refused to provide Frontier with the required information and assurances. This

dispute is a justiciable controversy pursuant 28 U.S.C. § 2201.

161.    Frontier is entitled to a declaration that (1) it is not deemed to have consented to the transfer of the Lease Agreements in connection with the December 2021 Transfer and the Carlyle Transaction; (2) the security assignment was closed in violation of each of the Lease Agreements; and (3) Frontier is entitled to reimbursement of reasonable costs and expenses incurred in connection with the December 2021 Transfer, the Carlyle Transaction, and the security assignment, as provided in the Lease Agreements.

### FOURTH CLAIM FOR RELIEF
**(Fraudulent Transfer against Defendants Vermillion Holdings and Maverick)**

162.    Frontier incorporates the allegations in paragraphs 1-161, as if fully set forth herein.

163.    The December 2021 Transfer transferred the property of AMCK Holdings first to Manchester and, within approximately one day, to Vermillion Holdings.

164.    Promptly after the December 2021 Transfer, Carlyle announced it had agreed to purchase Vermillion Holdings' assets, including the assets transferred from AMCK Holdings, via a sale to Maverick.

165.    These series of transactions (the "Fraudulent Transfer") were all part of a single, choreographed process to fraudulently transfer AMCK Holdings' assets to Carlyle while simultaneously shielding Carlyle from AMCK Holdings' liabilities.

166.    The Fraudulent Transfer was made with the actual intent to hinder, delay, or defraud Frontier for the benefit of Vermillion Holdings and ultimately Carlyle, through its affiliate Maverick.

167.    At the time of the transfer, Frontier was a creditor of AMCK Holdings.

168.    The Fraudulent Transfer exhibits numerous of the badges of fraud set forth in

Section 273(b) of the New York Uniform Voidable Transfer Act.

169.    For example, the Fraudulent Transfer was made after Frontier filed its first action against AMCK Holdings arising from its breach of the Framework Agreement.

170.    The Fraudulent Transfer was of substantially all of AMCK Holdings' assets.

171.    AMCK Holdings removed and thereafter concealed the removal of assets from Frontier.

172.    AMCK Holdings did not receive reasonably equivalent value for the assets transferred to Vermillion Holdings and ultimately to Maverick.

173.    The Fraudulent Transfer rendered AMCK Holdings insolvent and unable to satisfy Frontier's claims against it.  The Fraudulent Transfer left AMCK Holdings with 1.5% of its assets prior to the transfer.  Based on AMCK Holdings' most recent financial disclosures, AMCK Holdings was left with less than $10 million in assets while Frontier's pending claim against AMCK Holdings is in excess of $50 million, plus interest and fees.

174.    The Fraudulent Transfer occurred shortly after AMCK Holdings incurred a substantial debt as a result of its breaches of the Framework Agreement.  The first step in the transfer, the December 2021 Transfer, occurred less than a year after Frontier filed its initial complaint against Frontier and shortly after the Court denied AMCK Holdings' motion to dismiss the action.

175.    The Fraudulent Transfer violates Section 273 of the New York Uniform Voidable Transactions Act.

176.    Pursuant to Sections 273, 276(a), and 276-a of the New York Uniform Voidable Transactions Act, the Fraudulent Transfer is voidable and should be unwound to the extent of AMCK Holdings' obligations in the Framework Agreement Action.

177.    In the alternative, the Fraudulent Transfer constitutes a fraudulent transfer under Irish law.

178.    Frontier is entitled to an order avoiding the transfer to the extent of AMCK Holdings' obligations in the Framework Agreement Action, and to an award of damages, attorneys' fees, and costs arising from the violation, including attorneys' fees and costs resulting from this action.

**FIFTH CLAIM FOR RELIEF**
**(Constructive Fraudulent Transfer against Defendant Vermillion Holdings)**

179.    Frontier incorporates the allegations in paragraphs 1-178, as if fully set forth herein.

180.    The December 2021 Transfer transferred the property of AMCK Holdings to Vermillion Holdings, including AMCK Holdings' interest in the aircraft subject to the Lease Agreement with Vermillion.

181.    At the time of the transfer, Frontier was a creditor of AMCK Holdings.

182.    AMCK Holdings did not receive reasonably equivalent value in exchange for the assets transferred to Vermillion Holdings.

183.    The transfer rendered AMCK Holdings insolvent.

184.    The transfer represented nearly all of AMCK's assets, totaling over 98.5% of the assets on its balance sheet.

185.    The December 2021 Transfer violates Section 274 of the New York Uniform Voidable Transactions Act.

186.    Pursuant to Sections 274, 276(a), and 276-a of the New York Uniform Voidable Transactions Act, the December 2021 is voidable and should be unwound to the extent of AMCK Holdings' obligations in the Framework Agreement Action.

187.    In the alternative, the transfer constitutes a constructive fraudulent transfer and is voidable under Irish law.

188.    Frontier is entitled to an order avoiding the transfer to the extent of AMCK Holdings' obligations in the Framework Agreement Action, and an award of damages, attorneys' fees, and costs arising from the violation, including attorneys' fees and costs resulting from this action.

**WHEREFORE**, Frontier prays for judgment in its favor against Defendants as follows:

1.    On its First claim for relief, damages in an amount to be determined, prejudgment and post judgment interest, and reasonable attorneys' fees and costs;

2.    On its Second claim for relief, a declaration that it is entitled to sufficient information from AMCK and Carlyle that will enable Frontier to determine whether the December 2021 Transfer, the Carlyle Transaction, and the security assignment satisfy the requirements of the Lease Agreements, plus reasonable attorneys' fees and costs;

3.    On its Third claim for relief, a declaration that Frontier is not deemed to have consented to the December 2021 Transfer or the Carlyle Transaction, and that the security assignment was effectuated in violation of the Lease Agreements, plus reasonable attorneys' fees and costs;

4.    On its Fourth claim for relief, an order avoiding the Fraudulent Transfer to the extent of AMCK Holdings' obligations in the Framework Agreement Action, damages in an amount to be determined, prejudgment and post judgment interest, and reasonable attorneys' fees and costs;

5.      On its Fifth claim for relief, an order avoiding the Fraudulent Transfer to the

extent of AMCK Holdings' obligations in the Framework Agreement Action,

damages in an amount to be determined, prejudgment and post judgment interest,

and reasonable attorneys' fees and costs; and

6.      For such other relief as the court deems reasonable and just.

Dated:    New York, New York
          September 16 2022

Respectfully Submitted,

**BINDER & SCHWARTZ LLP**

/s/ Eric B. Fisher
Eric B. Fisher
Neil S. Binder
Tessa B. Harvey
366 Madison Avenue, 6th Floor
New York, New York 10017
Tel:  (212) 510-7008
Fax:  (212) 510-7299
Email: efisher@binderschwartz.com

*Attorneys for Plaintiff Frontier Airlines, Inc.*