**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

FRONTIER AIRLINES, INC.,

                Plaintiff,

     v.

AMCK AVIATION HOLDINGS IRELAND
LIMITED, ACCIPITER INVESTMENT 4
LIMITED, VERMILLION AVIATION (TWO)
LIMITED, ACCIPITER HOLDINGS DAC,
CARLYLE AVIATION MANAGEMENT
LIMITED, MAVERICK AVIATION HOLDINGS
LTD., MANCHESTER AVIATION FINANCE
S.a.r.l., VERMILLION AVIATION HOLDINGS
LIMITED, WELLS FARGO TRUST COMPANY,
N.A., solely in its capacity as OWNER TRUSTEE,
and UMB BANK, N.A., solely in its capacity as
OWNER TRUSTEE,

                Defendants.

22 Civ. 2943 (PAE)

---

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS**

Dated: October 7, 2022

Jeff E. Butler
John P. Alexander
Gege Wang
CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, New York 10019

*Attorneys for Defendants*

# TABLE OF CONTENTS

Page

Introduction ............................................................................................................... 1

Factual Background .................................................................................................... 3

    A.    The Lease Agreements and Related Contracts. ...................................... 3

    B.    The Carlyle Transaction. ....................................................................... 6

    C.    Frontier Protests the Carlyle Transaction. ............................................ 7

    D.    The Instant Lawsuit. .............................................................................. 8

Argument .................................................................................................................... 8

    I.    THERE IS NO SUBJECT MATTER JURISDICTION FOR
FRONTIER'S CONTRACT-BASED CLAIMS. ................................... 8

    II.    THE FIRST CLAIM FOR BREACH OF CONTRACT SHOULD
BE DISMISSED FOR FAILURE TO STATE A CLAIM. ................... 12

        A.    The SAC Does Not Allege Any Transfer or Assignment by a
Lessor or an Owner Participant. ................................................ 13

        B.    The SAC Does Not Allege Damages. ........................................ 17

    III.    THE SECOND AND THIRD CLAIMS FOR DECLARATORY
RELIEF SHOULD BE DISMISSED. .................................................. 18

    IV.    THE VOIDABLE TRANSFER CLAIM SHOULD BE
DISMISSED. ....................................................................................... 21

Conclusion ............................................................................................................... 23

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Standard, Inc. v. Oakfabco, Inc.*,
   498 F. Supp. 2d 711 (S.D.N.Y. 2007).................................................................... 9, 10

*Best Food Corp. v. N.Y. 46th LLC*,
   56 A.D.3d 302 (1st Dep't 2008) ................................................................................ 14

*Boehner v. Heise*,
   734 F. Supp. 2d 389 (S.D.N.Y. 2010)....................................................................... 13

*Bolanos v. Hooten*,
   No. 21 Civ. 366, 2021 WL 516580 (S.D.N.Y. Feb. 11, 2021) ................................. 11

*Chase Manhattan Bank, N.A. v. Aldridge*,
   906 F. Supp. 870 (S.D.N.Y. 1995)............................................................................ 12

*City of N.Y. v. N.Y. Pizzeria Delicatessen, Inc.*,
   No. 05 Civ. 2754, 2006 WL 2850237 (S.D.N.Y. Sept. 29, 2006)............................ 19

*Dennis' Nat. Mini-Meals, Inc. v. 91 Fifth Ave. Corp.*,
   172 A.D.2d 331 (1st Dep't 1991) ............................................................................. 15

*DirecTV Latin Am., LLC v. Park 610, LLC*,
   691 F. Supp. 2d 405 (S.D.N.Y. 2010)....................................................................... 16

*Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*,
   411 F.3d 384 (2d Cir. 2005)...................................................................................... 18

*E.R. Squibb & Sons, Inc. v. Accident & Cas. Ins. Co.*,
   160 F.3d 925 (2d Cir. 1998)...................................................................................... 12

*Edwards v. Sequoia Fund, Inc.*,
   938 F.3d 8 (2d Cir. 2019) ......................................................................................... 13

*EFG Bank AG, Cayman Branch v. AXA Equitable Life Ins. Co.*,
   309 F. Supp. 3d 89 (S.D.N.Y. 2018)................................................................... 18, 20

*ESPN, Inc. v. Off. of Com'r of Baseball*,
   76 F. Supp. 2d 383 (S.D.N.Y. 1999)......................................................................... 19

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
   545 U.S. 546 (2005)..................................................................................................... 8

*Ferring B.V. v. Allergan, Inc.*,
    4 F. Supp. 3d 612 (S.D.N.Y. 2014) ........................................................................ 20

*Fleisher v. Phoenix Lite Ins. Co.*,
    858 F. Supp. 2d 290 (S.D.N.Y. 2012) ..................................................................... 18

*Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*,
    30 N.Y.3d 508 (2017) ............................................................................................. 14

*Greenfield v. Philles Recs., Inc.*,
    98 N.Y.2d 562 (2002) ............................................................................................. 13

*Hirsch v. Arthur Andersen & Co.*,
    72 F.3d 1085 (2d Cir.1995) .................................................................................... 15

*In re Prudential Lines Inc.*,
    158 F.3d 65 (2d Cir. 1998) ..................................................................................... 19

*INTL FCStone Markets, LLC v. Intercambio Mexicano de Comercio S.A. de C.V.*,
    No. 18 Civ. 1004, 2021 WL 5304285 (S.D.N.Y. Nov. 15, 2021) ........................... 17

*Ixe Banco, S.A. v. MBNA Am. Bank, N.A.*,
    No. 07 Civ. 432, 2008 WL 650403 (S.D.N.Y. Mar. 7, 2008) ......................... 20, 21

*Jordan v. Verizon Corp.*,
    No. 08 Civ. 6414, 2009 WL 1490813 (S.D.N.Y. May 27, 2009) ........................... 10

*Kashef v. BNP Paribas SA*,
    442 F. Supp. 3d 809 (S.D.N.Y. 2020) ..................................................................... 22

*Katel Liab. Co. v. AT & T Corp.*,
    607 F.3d 60 (2d Cir. 2010) ..................................................................................... 16

*Keiler v. Harlequin Enters. Ltd.*,
    751 F.3d 64 (2d Cir. 2014) ..................................................................................... 16

*Kheel v. Port Auth. of N.Y.*,
    457 F.2d 46 (2d Cir. 1972) ....................................................................................... 8

*Kolari v. New York-Presbyterian Hosp.*,
    455 F.3d 118 (2d Cir. 2006) ................................................................................... 12

*Krause v. Forex Exch. Mkt., Inc.*,
    356 F. Supp. 2d 332 (S.D.N.Y. 2005) ..................................................................... 12

*L. Audit Servs., Inc. v. Studebaker Tech., Inc.*,
    No. 96 Civ. 0926, 1996 WL 137492, at (S.D.N.Y. Mar. 27, 1996) ........................ 10

*L-7 Designs, Inc. v. Old Navy LLC*,
   64 F.3d 419 (2d Cir. 2011)..........................................................................................3

*L-7 Designs, Inc. v. Old Navy, LLC*,
   647 F.3d 419 (2d Cir. 2011)........................................................................................15

*Lopez v. Heritage of Pride, Inc.*,
   No. 19 Civ. 6065, 2019 WL 6529317 (S.D.N.Y. Dec. 3, 2019)..................................9

*Mariah Re Ltd. v. Am. Family Mut. Ins. Co.*,
   52 F. Supp. 3d 601 (S.D.N.Y. 2014)..........................................................................18

*MassMutual Asset Fin. LLC v. ACBL River Operations, LLC*,
   220 F. Supp. 3d 450 (S.D.N.Y. 2016)..................................................................15, 16

*Meyer, Suozzi, Eng. & Klein, P.C. v. Higbee*,
   No. 18 Civ. 3353, 2020 WL 1140424 (E.D.N.Y. Mar. 9, 2020) ..............................11

*Miller v. HSBC Bank U.S.A., N.A.*,
   No. 13 Civ. 7500, 2015 WL 585589 (S.D.N.Y. Feb. 11, 2015) ................................17

*Oppenheimer & Co. v. Trans Energy, Inc.*,
   946 F. Supp. 2d 343 (S.D.N.Y. 2013)...................................................................3, 6, 7

*Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru*,
   109 F.3d 850 (2d Cir. 1997).................................................................................14, 19

*Purchase Partners, LLC v. Carver Fed. Sav. Bank*,
   914 F. Supp. 2d 480 (S.D.N.Y. 2012)........................................................................19

*Robinson v. Berkshire Life Ins. Co. of Am.*,
   No. 18 Civ. 7689, 2019 WL 1614831 (S.D.N.Y. Apr. 16, 2019)........................10, 11

*Rowe v. Great Atl. & Pac. Tea Co.*,
   46 N.Y.2d 62 (1978) ..................................................................................................14

*Scherer v. Equitable Life Assurance Soc'y of U.S.*,
   347 F.3d 394 (2d Cir. 2003)......................................................................................8, 9

*Sea Cliff Delicatessen, Inc. v. Skrepek*,
   199 A.D.2d 510 (2d Dep't 1993) ................................................................................15

*SEC v. Credit Bancorp, Ltd.*,
   738 F. Supp. 2d 376 (S.D.N.Y. 2010)........................................................................18

*Skanska USA Bldg. Inc. v. Atl. Yards B2 Owner, LLC*,
   31 N.Y.3d 1002 (2018) ..............................................................................................22

*W.W.W. Assocs., Inc. v. Giancontieri*,
    77 N.Y.2d 157 (1990) ..................................................................................................... 14

*Weir v. Cenlar FSB*,
    No. 16 Civ. 8650, 2018 WL 3443173 (S.D.N.Y. July 17, 2018) .................................... 9

*Wiederman v. Spark Energy, Inc.*,
    No. 19 Civ. 4564, 2020 WL 3965258 (S.D.N.Y. Mar. 9, 2020) .................................... 20

*Wolff v. Rare Medium, Inc.*,
    210 F. Supp. 2d 490 (S.D.N.Y. 2002)............................................................................ 13

## Rules & Regulations

28 U.S.C. § 1332 .................................................................................................................... 8

28 U.S.C. § 1367 .................................................................................................................. 12

28 U.S.C. § 2201 .................................................................................................................. 18

N.Y. Debt. & Cred. Law § 279(b) ......................................................................................... 27

Fed. R. Civ. P. 44.1 ............................................................................................................... 28

Defendants AMCK Aviation Holdings Ireland Limited ("AMCK Holdings"), Accipiter Investments Aircraft 4 Limited ("Accipiter"), Vermillion Aviation (Two) Limited ("Vermillion"), Accipiter Holdings DAC ("Accipiter Holdings"), Carlyle Aviation Management Limited ("Carlyle Aviation"), Maverick Aviation Holdings Ltd. ("Maverick"), Manchester Aviation Finance S.a.r.l. ("Manchester"), UMB Bank, N.A., not in its individual capacity but solely as Owner Trustee ("UMB"), and Wells Fargo Trust Company, N.A., not in its individual capacity but solely as Owner Trustee ("Wells Fargo") (collectively, "Defendants") submit this Memorandum of Law in support of their Motion to Dismiss the Second Amended Complaint ("SAC") filed by Plaintiff Frontier Airlines, Inc. ("Frontier").[1]  The motion is also supported by the accompanying Declaration of Jeff E. Butler dated October 7, 2022 ("Butler Decl.").

## Introduction

Plaintiff Frontier is a commercial airline that leases some of the passenger aircraft used in its business.  Defendants Accipiter and Vermillion are the beneficial owners of certain Airbus A320 aircraft on lease to Frontier.  This action arises from recent corporate transactions in which Accipiter and Vermillion were sold to an affiliate of defendant Carlyle Aviation.  These transactions are referred to collectively as the "Carlyle Transaction."

Before the Carlyle Transaction, Accipiter and Vermillion were owned by affiliates of defendant AMCK Holdings.  As a result of the Carlyle Transaction, Accipiter and Vermillion are now owned indirectly by Maverick, an affiliate of Carlyle Aviation.  Importantly, nothing else has changed with respect to the leasing of the aircraft to Frontier.  The same corporate entities own the aircraft; the same lease agreements remain in place and unchanged; Frontier continues to

---

[1] Vermillion Aviation Holdings Limited ("Vermillion Holdings") is also named as a defendant in the SAC.  However, Vermillion Holdings has not been served with process and does not yet have any obligation to respond to the SAC.

possess and operate the relevant aircraft; and Frontier continues to make monthly rent payments as required under the leases.  In short, Frontier is operating its business today in exactly the same way as before the Carlyle Transaction.

The SAC asserts that the lease agreements give Frontier the right to "advance notice" of the Carlyle Transaction and "assurances" that Frontier's rights will not be impaired.  Even assuming those assertions to be true, the SAC does not explain how Frontier has suffered financial harm from any breach of these alleged rights.  Indeed, the SAC fails to quantify *any* harm to Frontier's business arising from the closing of the Carlyle Transaction.

Frontier's contract-based claims should be dismissed primarily because the Carlyle Transaction did not actually breach any provision of the lease agreements.  The restrictions in the lease agreements, which are quoted and incorporated by reference into the SAC, apply only to transfers and/or assignments of aircraft or leases by Accipiter or Vermillion, neither of which has occurred here.  There is no language in these lease agreements that restricts equity transfers made by corporate parents of Accipiter or Vermillion.  Accordingly, based solely on the facts alleged in the SAC and/or incorporated by reference, Frontier's contract-based claims are meritless and should be dismissed as a matter of law.

In addition, the failure to allege damages should be fatal to Frontier's contract-based claims.  *First*, Frontier has the burden to satisfy the amount in controversy requirement for federal subject matter jurisdiction.  In the absence of plausible allegations of financial harm, Frontier cannot meet this fundamental requirement.  *Second*, damages are an essential element of any breach of contract claim.  In the absence of monetary damages, a breach of contract claim should be dismissed as a matter of law.

The SAC also asserts claims under the New York Uniform Voidable Transactions Act arising from AMCK Holdings' transfer of assets as part of the Carlyle Transaction. These claims should be dismissed for the simple reason that this New York statute applies only to transfers by persons located in New York, and AMCK Holdings is located in Ireland, not New York. In the SAC, Frontier adds the suggestion that it may have a claim under Irish law. However, under relevant Irish law, the equivalent claim is allowed only in the context of an Irish liquidation proceeding. Thus, whether considered under New York or Irish law, these claims should be dismissed as a matter of law.

## **Factual Background[2]**

### A.    **The Lease Agreements and Related Contracts.**

Frontier is a passenger airline based in Denver, Colorado. (SAC ¶ 19.) Frontier is a party to individual lease agreements for 15 Airbus A320 aircraft (the "Lease Agreements"). (*Id.* ¶¶ 4, 5, 21, 24-25, 40.) The counterparty in each Lease Agreement is either UMB or Wells Fargo, acting not in its individual capacity, but as the "Owner Trustee" under the terms of a related trust agreement. Each of the Lease Agreements was signed by Frontier as the "Lessee" and either UMB or Wells Fargo as the "Lessor." No other party signed the Lease Agreements. (*Id.* ¶¶ 4, 21, 24, 25 & Butler Decl. Exs. 1-3.)[3] Under each Lease Agreement, the Lessor acts for

---

[2] Defendants accept well-pled factual allegations as true solely for the purpose of this motion to dismiss.

[3] The Court may consider the contracts attached to the Butler Declaration. On a motion to dismiss, a complaint is "deemed to include" documents that are "incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint." *L-7 Designs, Inc. v. Old Navy LLC*, 64 F.3d 419, 422 (2d Cir. 2011) (internal quotation marks and alterations omitted); *Oppenheimer & Co. v. Trans Energy, Inc.*, 946 F. Supp. 2d 343, 344 (S.D.N.Y. 2013) ("Where the claim is for breach of contract, as here, the complaint is deemed to incorporate the alleged contract by reference because the alleged contract is integral to the claim.").

the beneficial owner of the aircraft, known as the "Owner Participant."  (SAC ¶¶ 4, 39-40.)

Accipiter is the Owner Participant for 14 of the leases, and Vermillion is the Owner Participant

for one.  (*Id.* ¶¶ 21, 23.)  At the time the Lease Agreements were entered, Accipiter and

Vermillion were affiliates of AMCK Holdings.  (*Id.* ¶¶ 4, 23.)

      Frontier's contract claims are based on language appearing in one or the other of two

forms of lease agreements, which are substantially similar and which the SAC calls "Aircraft

Lease Form 1" and "Aircraft Lease Form 2."  These provisions govern transfers by the Lessors

(UMB or Wells Fargo) or Owner Participants (Accipiter or Vermillion).

      Specifically, 13 of the Lease Agreements use Aircraft Lease Form 1, which provides in

relevant part:

> Each of Lessor and Owner Participant (and any subsequent permitted
> assignee or transferee) shall have the right at any time, at its own expense
> and upon prior written notice to Lessee, to transfer ownership or beneficial
> ownership, as applicable, of the Aircraft, or to assign (including to assign as
> security), mortgage, novate, transfer, grant participations in, or otherwise
> dispose of its rights and obligations under this Agreement and the other
> Operative Documents, to any other person by outright transfer or
> assignment or collateral assignment or by operation of law and Lessee
> hereby consents to any such transfer or assignment; provided that . . . .
>
> (i)    Lessee shall have no greater financial obligation or liability under this
>       Agreement and the other Lessee Documents as a result of such transfer
>       based on the facts and circumstances existing and applicable laws in
>       effect at the time of such transfer, than it would have had if such
>       transfer had not taken place . . . .
>
> (iii) in the case of a sale of the Aircraft by Lessor or transfer of the
>       beneficial interest of Owner Participant in the Aircraft or a transfer
>       (other than to an Affiliate of the Lessor Guarantor) of a controlling
>       interest in the Owner Participant, any such assignee or transferee shall
>       be a Permitted Transferee and shall unconditionally guaranty the
>       obligations of Lessor under this Agreement pursuant to a Guarantee in
>       form substantially similar to the Guarantee executed by Owner
>       Participant in favor of Lessee unless the existing Lessor Guarantee will
>       remain in full force and effect following such transfer. . . .

(SAC ¶¶ 51-52; Butler Decl. Ex. 1, § 20.2(a).)

The remaining two Lease Agreements use Aircraft Lease Form 2, which provides in relevant part:

> Lessor may sell, assign, novate or otherwise transfer its right, title and interest in the Aircraft or this Lease without Lessee's consent (a "**Transfer**"), subject to the following conditions:
>
> > (i)      the proposed purchaser, assignee or transferee (the "**Transferee**") shall enter into an agreement, reasonably satisfactory to Lessee, assuming all obligations of Lessor under this Lease and the other Operative Documents and of Beneficiary under the Participation Agreement and other Operative Documents; . . .
> >
> > (v)      any Transfer will not increase Lessee's obligations, liabilities (financial or otherwise), or risks or diminish Lessee's rights and benefits, in each case under any Operative Document or in respect of the Aircraft (to be determined in each case as at the time of such Transfer by applying all applicable laws as are enacted and/or in effect on the effective date of such Transfer), it being acknowledged by Lessee that the inclusion of the Transferee as an Indemnitee and as an Additional Insured will not constitute an increase in Lessee's obligations, liabilities or risks . . . .

(SAC ¶ 53; Butler Decl. Exs. 2-3, § 22.3.)

In connection with the Lease Agreements using Aircraft Lease Form 2, the Owner Participant (Accipiter) also entered into a "Participation Agreement" with Frontier.  (SAC ¶¶ 56, 61-62; Butler Decl. ¶ 5 & Ex. 4.)  In this agreement, Accipiter agreed that it could transfer "all or any of its rights" under various contracts, including the Lease Agreements, in certain circumstances.  (SAC ¶ 62; Butler Decl. Ex. 4, §§ 1, 3.1(a).)

The SAC also refers to written guarantees (the "Guarantees") that were provided for each lease by one of Accipiter, Accipiter Holdings or Vermillion.  (SAC ¶¶ 21-23, 57.)  Each Guarantee provides a guarantee of performance for the obligations under the Lease Agreement. (*See* Butler Decl. ¶¶ 6-7 & Exs. 5-6, § 1.)  Thirteen of the Guarantees provide:

> If Lessor fails to perform or comply with any such Guaranteed Obligation(s) in accordance with the Lease, then Guarantor hereby agrees to pay, perform or cause to be paid and/or performed, on demand, such

Guaranteed Obligation(s) to the same extent as if it were the primary obligor.

(*Id.*)  The remaining two guarantees use substantially the same language, but refer to the underlying obligation of the Owner Participant, rather than the Lessor.  (*See id.* Ex. 6, § 1.)

### B.    The Carlyle Transaction.

In December 2021, the ultimate corporate parent of AMCK Holdings, Accipiter and Vermillion announced an agreement to sell its aircraft leasing business to an affiliate of Carlyle Aviation.  (SAC ¶¶ 63, 66.)  As applicable here, the SAC alleges that this transaction proceeded in two phases.  *First*, in December 2021, AMCK Holdings transferred its ownership in numerous corporate entities—including the entity that owned Vermillion—to defendant Manchester (which AMCK Holdings owned), and then transferred its ownership interest in Manchester to Vermillion Holdings.  (*Id.* ¶¶ 69, 75.)  The SAC refers to these events as the "December 2021 Transfer."  (*Id.* ¶ 71.)  *Second*, in April 2022, Vermillion Holdings transferred Manchester to defendant Maverick, an affiliate of defendant Carlyle Aviation.[4]  (*See id.* ¶¶ 11, 17, 69, 73, 103, 123.)  The SAC refers to this event as the closing of the Carlyle Transaction.  (*Id.* ¶ 103.)  For the sake of clarity, this memorandum will refer to this event as the "April 2022 Transfer."

As a result of these transfers, the Owner Participants for the 15 aircraft leased to Frontier were no longer owned by AMCK Holdings or its affiliates.  However, there is no allegation that the ownership of the aircraft changed, or that any rights or obligations of the Lessor or Owner Participant were transferred.

---

[4] At the same time, another AMCK affiliate transferred Accipiter to Maverick.

### C.    Frontier Protests the Carlyle Transaction.

After learning about the Carlyle Transaction from public sources, Frontier began sending agitated letters to AMCK Holdings, demanding detailed information about the deal. (SAC ¶¶ 88-90.) AMCK Holdings responded, but declined to provide the requested information at that time, noting that the transaction "does not involve any transfer or an assignment by a Lessor or an Owner Participant." (*Id.* ¶¶ 89-102.) By letter dated March 30, 2022, AMCK Holdings informed Frontier it expected "Carlyle or one of its affiliates to act as the new manager (or servicer) under the Lease Agreements," and that Carlyle would send a further notice to that effect after the closing. (*See id.* ¶¶ 98-102; Butler Decl. ¶ 8 & Ex. 7.) The SAC alleges that the information provided was insufficient. (SAC ¶¶ 99, 102.)

The Carlyle Transaction closed on April 12, 2022. (*Id.* ¶ 106.) Following the closing, Carlyle Aviation took on the role of Servicer under the Lease Agreements. (*Id.* ¶ 104.) On or about April 13, 2022, Carlyle Aviation provided Frontier with notice regarding this change. (*Id.*; Butler Decl. ¶ 9 & Ex. 8.)

On June 1, 2022, the Lessors under the Lease Agreements—UMB and Wells Fargo, as owner trustees—pledged all their interests in the Lease Agreements to UMB Bank, N.A., acting in its capacity as security trustee under a separate financing arrangement (the "June 2022 Security Assignment"). (SAC ¶ 117; Butler Decl. ¶¶ 10-12 & Exs. 9-11.) The same day, Carlyle Aviation provided Frontier with a "Notice of Security Assignment" for each Lease Agreement describing the pledge. (*Id.*) The notices explained that the pledge was taking place pursuant to an April 11, 2022 Security Agreement among the Lessor, Maverick, UMB Bank, N.A. as security trustee and other parties. (Butler Decl. Exs. 9-11.)

D.     **The Instant Lawsuit.**

Frontier commenced this action on April 8, 2022, before the Carlyle Transaction had closed.  Frontier filed the Amended Complaint on June 24, 2022.  Defendants moved to dismiss on August 26, 2022.  Frontier filed the SAC on September 16, 2022.  The SAC includes claims for breach of contract (First Claim), declaratory relief (Second and Third Claims) and claims for voidable transfer (Fourth and Fifth Claims).

<u>**Argument**</u>

I.     **THERE IS NO SUBJECT MATTER JURISDICTION FOR FRONTIER'S CONTRACT-BASED CLAIMS.**

The First through Third Claims of the SAC allege that the December 2021 Transfer, the April 2022 Transfer and the June 2022 Security Assignment violated Frontier's contractual rights.  Specifically, Frontier contends that Defendants did not provide sufficient information or assurances about those transactions and have not agreed to pay Frontier's unspecified "costs and expenses."  (SAC ¶¶ 131-138, 149-50, 161.)  These claims should be dismissed because the SAC does not satisfy the amount in controversy requirement for subject matter jurisdiction.

Frontier invokes the Court's diversity jurisdiction under 28 U.S.C. § 1332.  (*See* SAC ¶ 32.)  Under this provision, a plaintiff has the burden of showing both that there is complete diversity and that the amount in controversy exceeds $75,000.  *See Scherer v. Equitable Life Assurance Soc'y of U.S.*, 347 F.3d 394, 397 (2d Cir. 2003).  The purpose of the amount in controversy requirement is to "ensure that diversity jurisdiction does not flood the federal courts with minor disputes."  *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005).  To satisfy the jurisdictional amount, the dispute must involve some claimed *monetary* benefit to plaintiff.  *See Kheel v. Port Auth. of N.Y.*, 457 F.2d 46, 49 (2d Cir. 1972) ("The federal courts cannot take cognizance . . . of cases in which the rights are not capable of valuation in monetary

terms."). On a claim for declaratory relief, the amount in controversy is measured by "the monetary value of the benefit that would flow to the plaintiff." *Am. Standard, Inc. v. Oakfabco, Inc.*, 498 F. Supp. 2d 711, 717 (S.D.N.Y. 2007).

There is a "rebuttable presumption" that "the face of the complaint is a good faith representation about the amount in controversy . . . ." *Scherer*, 347 F.3d at 397 (internal quotation marks omitted). However, "where a complaint does not contain facts plausibly suggesting that the amount in controversy meets the jurisdictional minimum, the Court is not required to presume that the bare allegations in the complaint are a good faith representation of the actual amount in controversy." *Lopez v. Heritage of Pride, Inc.*, No. 19 Civ. 6065, 2019 WL 6529317, at *5 (S.D.N.Y. Dec. 3, 2019); *see also Weir v. Cenlar FSB*, No. 16 Civ. 8650, 2018 WL 3443173, at *12 (S.D.N.Y. July 17, 2018) ("[T]he jurisdictional amount, like any other factual allegation, ought not to receive the presumption of truth unless it is supported by facts rendering it plausible.").

Frontier does not meet its burden here. In its first Amended Complaint, Frontier included only a formulaic statement that the "amount in controversy is greater than $75,000." (Am. Compl. ¶ 34.) This conclusory assertion was insufficient. The SAC now includes some additional allegations about the amount in controversy, but still fails to provide any plausible factual support to satisfy the jurisdictional amount.

Notably, the SAC does not allege that the transactions at issue have in fact caused Frontier to suffer any monetary harm. Instead, the primary claim is that Frontier has not received sufficient information or assurances about those transactions. (*See* SAC ¶¶ 131-37.) The SAC contains no allegations concerning the value of the information or assurances allegedly withheld. Under these circumstances, the amount in controversy requirement has not been satisfied. *See*

*Robinson v. Berkshire Life Ins. Co. of Am.*, No. 18 Civ. 7689, 2019 WL 1614831, at *5 (S.D.N.Y. Apr. 16, 2019) (finding jurisdictional amount not satisfied where the value of certain rights under insurance policy "depends on multiple contingencies" and was too "speculative"); *Jordan v. Verizon Corp.*, No. 08 Civ. 6414, 2009 WL 1490813, at *3 (S.D.N.Y. May 27, 2009) (same, where plaintiff complained of being denied "exit interview" but failed to allege that it "would have yielded any tangible or financial benefit"); *Am. Standard*, 498 F. Supp. 2d at 718 (same, where claimed indemnification rights lacked "precise monetary benefit" and were "too uncertain and speculative to be quantifiable").

The SAC attempts to distract from this problem by pointing out that the contracts involve "leases of aircraft worth in excess of $500,000,000." (SAC ¶ 32.) This allegation is irrelevant. The issue here is whether Frontier's alleged rights to assurances and information can be valued at $75,000 or more, not whether the underlying aircraft or leases as a whole have such value. *See Robinson*, 2019 WL 1614831, at *4 (noting that "the more limited declaratory relief sought here puts at issue some amount less than the Policy's full worth"); *L. Audit Servs., Inc. v. Studebaker Tech., Inc.*, No. 96 Civ. 0926, 1996 WL 137492, at *4 (S.D.N.Y. Mar. 27, 1996) (finding no jurisdiction where "the contract price of $150,000 for the entire Agreement does not necessarily express the value to the Plaintiff of the particular rights at issue"); *see also Am. Standard*, 498 F. Supp. 2d at 718 ("[M]erely because there is ultimately an issue involving a great deal of money lurking somewhere in the relationship between the parties is no reason to transform this [case] into a matter involving federal court diversity jurisdiction." (internal citation and quotation marks omitted)).

The SAC notes that some of the issues about which it seeks information *might eventually* implicate dollar amounts. For example, Frontier states that, for each Lease Agreement, the

guarantor must have a net worth sufficient to ensure repayment of Frontier's $200,000 security deposit at the end of the lease term. (SAC ¶ 41.) Frontier asserts that, "[a]bsent confirmation" about the guarantor's net worth, the value of its leases is "significantly diminished." (*Id.* ¶¶ 41, 95.) However, there is no allegation that the Carlyle Transaction actually has resulted in the reduction of any guarantor's net worth, and there is no quantification of the alleged diminishment of the value of any lease.

Finally, Frontier makes the conclusory assertion that the alleged breaches have caused it to "incur costs and expenses." (*Id.* ¶ 138.) The only costs and expenses identified in the SAC are legal fees. (*See id.* ¶¶ 115, 124.) A mere reference to possible legal fees is not sufficient to meet the jurisdictional requirement. This is especially true where the speculative and non-monetary nature of the alleged harm makes an award of large legal fees unreasonable. *See Bolanos v. Hooten*, No. 21 Civ. 366, 2021 WL 516580, at *1 (S.D.N.Y. Feb. 11, 2021) (dismissing claim where legal fees would have to be "nine times the amount of damages" to reach $75,000, which "would be unreasonable"); *Meyer, Suozzi, Eng. & Klein, P.C. v. Higbee*, No. 18 Civ. 3353, 2020 WL 1140424, at *3 (E.D.N.Y. Mar. 9, 2020) (same, where plaintiff claimed damages for "expending time and effort," but "it is inconceivable that the monetary value of those efforts exceeded $75,000," and "it is simply not plausible that the Plaintiff would be entitled to attorney's fees in excess of $75,000").[5]

Defendants acknowledge that the Fourth and Fifth Claims for voidable transfer may satisfy the amount in controversy requirement. (*See* SAC ¶ 173.) These claims, however, are asserted solely against Maverick and Vermillion Holdings (which has not been served). They do

---

[5] In addition, to the extent Frontier seeks to include legal fees in its recovery, such fees are relevant to the amount in controversy "only where they are recoverable as of right pursuant to statute or contract." *Robinson*, 2019 WL 1614831, at *4 (internal quotation marks omitted).

not give rise to original subject matter jurisdiction over any other defendant.  It is well-settled

that a plaintiff cannot "aggregate its claims against individual defendants to meet the

jurisdictional requirement," but rather "must satisfy the jurisdictional amount with respect to

each defendant."  *E.R. Squibb & Sons, Inc. v. Accident & Cas. Ins. Co.*, 160 F.3d 925, 933 (2d

Cir. 1998); *Chase Manhattan Bank, N.A. v. Aldridge*, 906 F. Supp. 870, 874 (S.D.N.Y. 1995).

Moreover, there is no reason for the Court to exercise supplemental jurisdiction here.  As

discussed in Section IV below, the Fourth and Fifth Claims should be dismissed because they are

facially defective.  The Court may decline supplemental jurisdiction where it has "dismissed all

claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3); *see also Kolari v. New

York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (noting that courts typically decline

supplemental jurisdiction "in the usual case in which all federal-law claims are eliminated before

trial" (internal quotation marks omitted)).  In any event, even if the Fourth and Fifth Claims

survive this motion to dismiss in some form, courts may decline supplemental jurisdiction where

an additional claim "substantially predominates" over the claim within the Court's original

jurisdiction.  *See* 28 U.S.C. § 1367(c)(2).  Here, the contract-based claims are clearly the focus of

the SAC and they are factually distinct from the voidable transfer claims.  In these

circumstances, the Court should decline to exercise supplemental jurisdiction.  *See, e.g., Krause

v. Forex Exch. Mkt., Inc.*, 356 F. Supp. 2d 332, 338 (S.D.N.Y. 2005) (declining jurisdiction over

state law claims concerning contractual relationship where main claim involved different issues

of fraud).

## II.    THE FIRST CLAIM FOR BREACH OF CONTRACT SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM.

In its First Claim, Frontier alleges that various Defendants breached their contractual

obligations in connection with the December 2021 Transfer, the April 2022 Transfer and the

June 2022 Security Assignment.  This claim should be dismissed because the Carlyle

Transaction did not violate any provision of the Lease Agreements and because the SAC fails to

allege any damages.

> ### A.  The SAC Does Not Allege Any Transfer or Assignment by a Lessor or an Owner Participant.

Frontier asserts that the December 2021 Transfer and the April 2022 Transfer triggered

the "lease transfer" provisions of the Lease Agreements and Participation Agreements, and that

Defendants did not comply with those terms or the related terms of the Guarantees.  (SAC

¶¶ 129-31, 133-134.)  This claim is meritless.  The lease transfer provisions are inapplicable

because, as alleged in the SAC, the December 2021 Transfer and the April 2022 Transfer did not

involve any transfer or assignment *by a Lessor or an Owner Participant*.

For a breach of contract claim, "the complaint must allege: (i) the formation of a contract

between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and

(iv) damages."  *Edwards v. Sequoia Fund, Inc.*, 938 F.3d 8, 12 (2d Cir. 2019) (internal quotation

marks omitted).  In addition, "[w]hen pleading these elements, a plaintiff must identify the

specific provision of the contract that was breached as a result of the acts at issue."  *Wolff v. Rare

Medium, Inc.*, 210 F. Supp. 2d 490, 494 (S.D.N.Y. 2002); *see also Boehner v. Heise*, 734 F.

Supp. 2d 389, 408 (S.D.N.Y. 2010) ("Under New York law, a plaintiff must allege the specific

provisions within a contract upon which the breach of contract claim is based.").

It is well-established that "[t]he best evidence of what parties to a written agreement

intend is what they say in their writing," and so an unambiguous contract "must be enforced

according to the plain meaning of its terms."  *Greenfield v. Philles Recs., Inc.*, 98 N.Y.2d 562,

569 (2002).  For that reason, "[e]vidence outside the four corners of the document as to what was

really intended but unstated or misstated is generally inadmissible to add to or vary the writing."

*W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990).  In addition, "where an agreement is negotiated between sophisticated, counseled business people negotiating at arm's length, courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include."  *Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*, 30 N.Y.3d 508, 518-19 (2017) (internal quotation marks and alterations omitted).

Courts give contractual restrictions on assignment an especially narrow reading.  Indeed, "[u]nder New York law, only *express* limitations on assignability are enforceable" and "such covenants are to be construed strictly even if expressly stated."  *Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru*, 109 F.3d 850 (2d Cir. 1997); *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 69 (1978); *see also Best Food Corp. v. N.Y. 46th LLC*, 56 A.D.3d 302, 303 (1st Dep't 2008) (noting that "restrictions against assignment are disfavored as restraints on alienation and are to be construed strictly").

In this case, the Lease Agreements and Participation Agreements contain restrictions on transfers or assignments by the Lessor or Owner Participant only.  (SAC ¶¶ 52-53, 62; Butler Decl. Ex. 1, § 20.2; *id.* Exs. 2-3, § 22.3; *see also id.* Ex. 4, §§ 1, 3.1(a).)  The Lease Agreements and Participation Agreements do not restrict transfers by other persons, such as corporate affiliates of the Owner Participant.  Accordingly, the Carlyle Transaction did not violate the plain language of these restrictions.  Indeed, the Carlyle Transaction is not alleged to involve any assignment, transfer or disposal by a Lessor or Owner Participant.  Rather, the SAC states only that there was a "change to the beneficial ownership of the Lessor and Owner Participant."  (*See* SAC ¶¶ 11, 84.)  In other words, the December 2021 Transfer and the April 2022 Transfer

involved transfers *of* the Owner Participants, not transfers *by* the Owner Participants.[6]

    These indirect changes in corporate control do not trigger the conditions set forth in the Lease Agreements or the Participation Agreements. The relevant contract language regulates only actions taken by the Lessors or the Owner Participants. The contracts do not contain any restriction on upstream actions by the corporate parents of the Owner Participants. Moreover, it is well-settled that changes in corporate ownership do not affect a corporate party's rights or obligations under existing contracts. As one court has explained:

> [I]t is well-established that a corporate parent and subsidiary possess a separate existence and are to be treated separately from one another. Similarly, a corporate parent which owns the shares of a subsidiary does not own or have legal title to the assets of the subsidiary. A contract with a subsidiary does not constitute a contract with a subsidiary's parent.

*MassMutual Asset Fin. LLC v. ACBL River Operations, LLC,* 220 F. Supp. 3d 450, 456-57 (S.D.N.Y. 2016) (internal citations and alterations omitted). On that basis, the court in *MassMutual* rejected an argument that a contractual restriction on transfer applied to an "upstream 'change of control'" by a party's corporate parents. *Id.* at 456; *see also Sea Cliff Delicatessen, Inc. v. Skrepek*, 199 A.D.2d 510, 511 (2d Dep't 1993) ("The landlord's argument, that the sale of [tenant's] shares to [third party] constituted an assignment of the lease, is without merit."); *Dennis' Nat. Mini-Meals, Inc. v. 91 Fifth Ave. Corp.*, 172 A.D.2d 331, 334 (1st Dep't 1991) (holding that "a corporate tenant's transfer of all of its stock to a third party does not

---

[6] The SAC vaguely alleges in one paragraph that AMCK Holdings will "transfer its interests in each of the Lease Agreements to Carlyle." (SAC ¶ 130.) However, this conclusory assertion is belied by the more detailed allegations discussed above. For that reason, it should be disregarded. *See L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (noting that factual allegations are "assume[d] to be true unless contradicted by more specific allegations or documentary evidence"); *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir.1995) ("General, conclusory allegations need not be credited . . . when they are belied by more specific allegations of the complaint.").

constitute a breach of a nonassignment provision of a lease").

If the parties had wanted broader restrictions that would apply to changes in corporate

ownership, they could have included appropriate language in the agreements.  The fact that they

did not should be fatal to Frontier's breach of contract claim.  *See MassMutual*, 220 F. Supp. 3d

at 456 ("Courts routinely refuse to find a change of control provision in contracts that do not use

the phrase 'change of control.'"); *DirecTV Latin Am., LLC v. Park 610, LLC*, 691 F. Supp. 2d

405, 431 (S.D.N.Y. 2010) ("[T]he language of the Joint Venture Agreement only prohibits

attempts by a Member . . . to transfer an interest in [the venture].  It does not prevent [a member]

from transferring interests in itself.").

Frontier alleges that there is an "industry practice" to treat lease transfer provisions

"broadly and to cover transfers occurring at different levels of the corporate structure . . . ."

(SAC ¶ 54.)  Even if true (and it is not), industry practice does not take precedence over the plain

language of the contract.  "[A] written agreement that is complete and unambiguous is to be

interpreted without the aid of extrinsic evidence and that *industry practice may not be used to

vary the terms of such a contract*."  *Keiler v. Harlequin Enters. Ltd.*, 751 F.3d 64, 69 (2d Cir.

2014) (emphasis added); *see also Katel Liab. Co. v. AT & T Corp.*, 607 F.3d 60, 66 (2d Cir.

2010) ("Because the Agreement is unambiguous, there is no occasion to consider evidence of

custom or practice.").

In sum, because the Lease Agreements and Participation Agreements do not restrict or

impose conditions on changes in upstream corporate ownership of the Owner Participants, the

transfer provisions of those contracts do not apply to the December 2021 Transfer or the

April 2022 Transfer.  For similar reasons, there was no breach of the Guarantees in connection

with these transfers.  The Guarantees only apply "[i]f Lessor [or the Owner Participant] fails to

perform" under the Lease Agreements. (*See* Butler Decl. Exs. 5-6, § 1.) Because there is no underlying failure to perform, the Guarantees are not implicated.

### B.    The SAC Does Not Allege Damages.

Frontier does not allege any damages arising from the December 2021 Transfer, the April 2022 Transfer or the June 2022 Security Assignment. As discussed in Section I above, the Amended Complaint does not identify any harm to Frontier's business arising from the alleged failure to provide information and assurances about the Carlyle Transaction. In the absence of any alleged harm, Frontier's breach of contract claim should be dismissed. *See INTL FCStone Markets, LLC v. Intercambio Mexicano de Comercio S.A. de C.V.*, No. 18 Civ. 1004, 2021 WL 5304285, at *5 (S.D.N.Y. Nov. 15, 2021) (dismissing breach of contract claim because "Defendant does not plausibly allege how damages could, or did, result"); *Miller v. HSBC Bank U.S.A., N.A.*, No. 13 Civ. 7500, 2015 WL 585589, at *4 (S.D.N.Y. Feb. 11, 2015) (noting that an "unsupported claim that [plaintiff] 'suffered damages,' without any further factual enhancement, is not enough to properly plead the damages element of a breach of contract claim").

Frontier does make the conclusory assertion that the alleged breaches have caused it to "incur costs and expenses." (SAC ¶ 138.) However, Frontier does not explain what costs or expenses it has actually incurred. Moreover, to the extent Frontier seeks to recover legal fees, it cites no contractual basis for doing so other than a provision in the Guarantees. (*See* SAC ¶ 60; Butler Decl. Exs. 5-6, § 2.2.) That provision applies only to fees incurred "in connection with the enforcement of this Guaranty." (*Id.*) The SAC does not allege that Frontier has incurred any such fees.

### III.    THE SECOND AND THIRD CLAIMS FOR DECLARATORY RELIEF SHOULD BE DISMISSED.

Frontier's claims for declaratory relief—the Second and Third Claims—are premised on the same alleged breaches of contract discussed above.  (*See* SAC ¶¶ 140-50, 152-61.)  These claims should be dismissed because they are redundant and serve no useful purpose.

In "a case of actual controversy," a court "may declare the rights and other legal relations of any interested parties seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201.  Courts have discretion to grant declaratory relief and, in exercising that discretion, generally consider: "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty."  *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 389 (2d Cir. 2005).  Declaratory relief is designed to be "prospective," and is therefore not appropriate "where only past acts are involved."  *Mariah Re Ltd. v. Am. Family Mut. Ins. Co.*, 52 F. Supp. 3d 601, 623 (S.D.N.Y. 2014) (internal quotation marks omitted); *SEC v. Credit Bancorp, Ltd.*, 738 F. Supp. 2d 376, 388-89 (S.D.N.Y. 2010) (same).

Here, a declaratory judgment would serve no useful purpose because the First Claim would resolve the same issues.  *See EFG Bank AG, Cayman Branch v. AXA Equitable Life Ins. Co.*, 309 F. Supp. 3d 89, 99 (S.D.N.Y. 2018) (dismissing claim for declaratory relief as duplicative); *Fleisher v. Phoenix Lite Ins. Co.*, 858 F. Supp. 2d 290, 302 (S.D.N.Y. 2012) ("The fact that a lawsuit has been filed that will necessarily settle the issues for which declaratory judgment is sought suggests that the declaratory judgment will serve no useful purpose." (internal quotation marks omitted)).  Moreover, the declaratory claims suffer from the same legal defects as the breach of contract claims, namely, that the Lease Agreements, by their terms, do not apply to the transfers carried out in the Carlyle Transaction.

Frontier also fails to articulate any need for prospective relief. The transactions described in the SAC have already taken place. If they violated some applicable contract provision, then Frontier may obtain damages for breach. However, the transactions themselves would not be void. On the contrary, it is well-settled that an assignment in violation of contract terms is *not* void unless the contract contains "clear, definite, and appropriate language declaring an assignment invalid." *Purchase Partners, LLC v. Carver Fed. Sav. Bank*, 914 F. Supp. 2d 480, 505 (S.D.N.Y. 2012) (internal quotation marks omitted); *see also Pravin*, 109 F.3d at 856. The Lease Agreements contain no such language.

Importantly, Frontier is not seeking to terminate the Lease Agreements. The SAC alleges that the Lease Agreements are "in full force." (*See* SAC ¶ 127.) Therefore, Frontier must continue to perform its own obligations under the Lease Agreements. Indeed, under the election of remedies doctrine:

> [I]t is black-letter law that when one party to a contract materially breaches, the nonbreaching party has two options: it can terminate the agreement and sue for total breach, or it can continue the contract and sue for partial breach. There is, however, no third option allowing the party claiming a breach to invoke self-help and only perform those obligations it wishes to perform.

*ESPN, Inc. v. Off. of Com'r of Baseball*, 76 F. Supp. 2d 383, 397-98 (S.D.N.Y. 1999) (internal citations and quotation marks omitted); *see also City of N.Y. v. N.Y. Pizzeria Delicatessen, Inc.*, No. 05 Civ. 2754, 2006 WL 2850237, at *7 (S.D.N.Y. Sept. 29, 2006) (same). Thus, backward-looking declaratory relief as to whether the Carlyle Transaction violated Frontier's rights would not have any prospective effect on Frontier's obligations under the Lease Agreements.[7]

---

[7] In its Second Claim, Frontier asks for a declaration regarding "advance written notice of any security assignment." (SAC ¶ 150.) While this is potentially prospective in nature, Frontier does not allege that there is likely to be any future assignment. In such circumstances, declaratory relief is inappropriate. *See In re Prudential Lines Inc.*, 158 F.3d 65, 70 (2d Cir. 1998) ("Where

Even if the Court upholds the Second or Third Claims in some form, these claims should be dismissed as to AMCK Holdings, Carlyle Aviation, Manchester and Maverick because these entities are not party to any relevant agreement.  "It is hornbook law that a non-signatory to a contract cannot be named as a defendant in a breach of contract action unless it has thereafter assumed or been assigned the contract." *Ferring B.V. v. Allergan, Inc.*, 4 F. Supp. 3d 612, 625 (S.D.N.Y. 2014) (internal quotation marks omitted); *see also Wiederman v. Spark Energy, Inc.*, No. 19 Civ. 4564, 2020 WL 3965258, at *8 (S.D.N.Y. Mar. 9, 2020) ("It is black letter law that non-parties ordinarily cannot be held liable for a breach of contract." (internal alteration and quotation marks omitted)).  This is so even with respect to related corporate entities.  Indeed, "New York law respects corporate separateness," and so a plaintiff seeking to hold non-party affiliates liable must plausibly allege facts to support the "heavy burden" of piercing the corporate veil.  *Ixe Banco, S.A. v. MBNA Am. Bank, N.A.*, No. 07 Civ. 432, 2008 WL 650403, at *12 (S.D.N.Y. Mar. 7, 2008).

Here, Frontier's counterparties under the Lease Agreements are UMB or Wells Fargo. (SAC ¶¶ 24-25, 40; Butler Decl. ¶¶ 2-4 & Exs. 1-3.)  The counterparties to the Guarantees are Accipiter, Vermillion or Accipiter Holdings.  (*See* SAC ¶¶ 21-22, 57; Butler Decl. ¶¶ 6-7 & Exs. 5-6.)  Only Accipiter and Wells Fargo are party to the Participation Agreements.  (*See* Butler Decl. ¶ 5 & Ex. 4.)  The SAC sets forth no basis for seeking declaratory relief against AMCK Holdings, Carlyle Aviation, Manchester or Maverick.  Since they are not party to any relevant agreement, there is no legitimate controversy between Frontier and those entities.

---

the contingent event upon which the controversy rests is unlikely to occur, the controversy lacks 'sufficient immediacy and reality' to warrant declaratory relief."); *EFG Bank*, 309 F. Supp. 3d at 99 (dismissing declaratory claim concerning "other matters" not "at issue in this case").

## IV.    THE VOIDABLE TRANSFER CLAIM SHOULD BE DISMISSED.

In the Fourth Claim, Frontier alleges that AMCK Holdings engaged in the

December 2021 Transfer to frustrate a potential judgment against AMCK Holdings that Frontier

is seeking in a separate lawsuit pending before Judge Stanton, *Frontier Airlines, Inc. v. AMCK*

*Aviation Holdings Ireland Limited et al.*, No. 20 Civ. 9713 (LLS) (S.D.N.Y.).  (*See* SAC ¶¶ 6-12,

164-66.)  The Fourth Claim seeks to hold Maverick liable on the theory that Maverick was the

ultimate recipient of the assets in the December 2021 Transfer.  (SAC ¶¶ 163-66.)  For the

reasons discussed below, the Fourth Claim should be dismissed.[8]

The Fourth Claim seeks relief under the New York Uniform Voidable Transactions Act

(the "New York UVTA").  (*Id.* ¶¶ 175-77.)  However, the 2020 revisions to the New York

UVTA make clear that this statute does not apply to the December 2021 Transfer.  The statute

contains an express choice of law provision, stating:

> A claim for relief in the nature of a claim for relief under this article is
> governed by the *local law of the jurisdiction in which the debtor is located*
> when the transfer is made or the obligation is incurred.

N.Y. Debt. & Cred. Law § 279(b) (emphasis added).  An organizational debtor that has only one

place of business is "located" at "its place of business," and one that has more than one place of

business is located at its chief executive office.  *Id.* § 279(a).  This "clear rule" of Section 279

"eliminates the risk that the laws of multiple jurisdictions might be applicable to a single transfer

involving property in multiple jurisdictions or injuring creditors in multiple jurisdictions."  *Id.*,

McKinney's cmt.

AMCK Holdings does not maintain any place of business in New York.  As alleged in

---

[8] The SAC also brings the Fourth Claim against Vermillion Holdings, as well as a separate Fifth
Claim only against Vermillion Holdings.  (SAC ¶¶ 162-88.)  Vermillion Holdings has not yet
been served, so these claims against Vermillion Holdings are not addressed on this motion.

the SAC, AMCK Holdings is located in Ireland.  (SAC ¶ 20.)  Thus, the New York UVTA does

not apply to transfers by AMCK Holdings.[9]

The SAC includes a vague assertion that, in the alternative, Frontier has a claim under

Irish law.  (*See* SAC ¶ 177.)  However, Frontier cites no provision of Irish law and makes no

effort to plead the elements of a claim under Irish law.  Moreover, under Irish law, a claim for

the alleged improper transfer of assets can only be made in the context of an Irish liquidation

proceeding.  Specifically, Section 608 of the Irish Companies Act gives the court power to order

the return of assets "on the application of a liquidator, creditor or contributory of *a company*

*which is being wound up* . . . ."  (Butler Decl. Ex. 12, § 608(1) (emphasis added).)[10]  In such

circumstances, the court can order the delivery of assets or a payment "*to the liquidator* on such

terms or conditions as the court thinks fit."  (*Id.* § 608(2) (emphasis added).)  This statute does

not give a creditor any right to bring a freestanding fraudulent transfer claim outside the context

of an Irish liquidation proceeding.  At the risk of stating the obvious, this is not an Irish

liquidation proceeding.  Thus, any claim under Section 608 of the Irish Companies Act should be

dismissed.

---

[9] The Framework Agreement's choice-of-law clause is not relevant to this issue.  While the
parties chose New York law to govern their relationship, they did not, and could not, incorporate
New York statutory law that does not by its terms apply.  S*ee Skanska USA Bldg. Inc. v. Atl.
Yards B2 Owner, LLC*, 31 N.Y.3d 1002, 1007 (2018) ("The mere fact that an agreement, and
disputes arising thereunder, are governed by the law of a particular jurisdiction does not
transform all statutory requirements that may otherwise be imposed under that body of law into
contractual obligations . . . .").

[10] In determining foreign law, including on a motion to dismiss, courts may consider "any
relevant material or source," such as "the parties' filings, witness testimony, and any foreign
materials discovered through their own research."  Fed. R. Civ. P. 44.1; *Kashef v. BNP Paribas
SA*, 442 F. Supp. 3d 809, 824 (S.D.N.Y. 2020).

### **Conclusion**

For the reasons set forth above, Defendants' Motion to Dismiss should be granted.

Dated: October 7, 2022                Respectfully submitted,
       New York, New York

                             s/ Jeff E. Butler

                            Jeff E. Butler
                            John P. Alexander
                            Gege Wang
                            CLIFFORD CHANCE US LLP
                            31 West 52nd Street
                            New York, New York 10019

                            *Attorneys for Defendants*