## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FRONTIER AIRLINES, INC.,<br><br>    Plaintiff,<br><br>    v.<br><br>AMCK AVIATION HOLDINGS IRELAND LIMITED, ACCIPITER INVESTMENT 4 LIMITED, VERMILLION AVIATION (TWO) LIMITED, ACCIPITER HOLDINGS DAC, CARLYLE AVIATION MANAGEMENT LIMITED, MAVERICK AVIATION HOLDINGS LTD., MANCHESTER AVIATION FINANCE S.a.r.l., VERMILLION AVIATION HOLDINGS LIMITED, WELLS FARGO TRUST COMPANY, N.A., solely in its capacity as OWNER TRUSTEE, and UMB BANK, N.A., solely in its capacity as OWNER TRUSTEE,<br><br>    Defendants. | Case No. 1:22-cv-02943 (PAE)<br><br>**ECF Case** |

## MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

**BINDER & SCHWARTZ LLP**
366 Madison Avenue, 6th Floor
New York, New York 10017
(212) 510-7008

*Attorneys for Plaintiff Frontier Airlines, Inc.*

## <u>TABLE OF CONTENTS</u>

*Page*

PRELIMINARY STATEMENT ................................................................................................... 1

FACTUAL BACKGROUND ...................................................................................................... 3

I.    THE PARTIES ENTER INTO THE LEASE AGREEMENTS ................................... 3

II.   AMCK HOLDINGS BREACHES THE FRAMEWORK AGREEMENT AND
      FRONTIER FILES THE FRAMEWORK AGREEMENT ACTION .............................. 7

III.  WHILE THE FRAMEWORK AGREEMENT ACTION IS PENDING, AMCK
      FRAUDULENTLY TRANSFERS AMCK HOLDINGS' ASSETS TO CARLYLE ........ 8

IV.   FRONTIER LEARNS OF THE CARLYLE TRANSACTION AND CONRACTING
      DEFENDANTS REFUSE TO COMPLY WITH THEIR OBLIGATIONS ..................... 9

V.    CARLYLE TAKES OVER AS "LEASE MANAGER" AND IMPROPERLY
      EXECUTES A SECURITY ASSIGNMENT AFFECTING THE LEASES .................. 10

ARGUMENT ............................................................................................................................ 11

I.    FRONTIER HAS MET THE AMOUNT-IN-CONTROVERSY THRESHOLD ........... 11

II.   THE MOTION TO DISMISS UNDER RULE 12(b)(6) SHOULD BE DENIED .......... 15

      A.    Frontier Has Pled a Claim For Breach of Contract ................................................. 15

            1.    The Carlyle Transaction Was a Transfer ..................................................... 15

            2.    Defendants Violated The Transfer Requirements. .................................... 16

            3.    Defendants' Claim They Effected a Transfer Without it Being a Transfer
                  Should Be Rejected. ..................................................................................... 18

            4.    Frontier Has Adequately Pled Breach of Contract Damages. ................... 21

      B.    Frontier Has Properly Pled Claims For Declaratory Relief .................................. 22

      C.    Frontier Has Pled a Viable Claim For Fraudulent Transfer ................................. 23

CONCLUSION ........................................................................................................................ 25

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Am. Standard, Inc. v. Oakfabco, Inc.*,
  498 F. Supp. 2d 711 (S.D.N.Y. 2007)......................................................................... 14

*Beacon Constr. Co., Inc. v. Matco Elec. Co., Inc.*,
  521 F.2d 392 (2d Cir. 1975)...................................................................................... 13

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................. 15

*Blackrock Balanced Cap. Portfolio v. HSBC Bank USA, Nat'l. Ass'n*,
  95 F. Supp. 3d 703 (S.D.N.Y. 2015)........................................................................ 15

*Cow Bay Sprinkler Corp. v. Houston Cas. Co.*,
  No. 19-cv-5854, 2020 WL 9812929 (E.D.N.Y. Feb. 1, 2020)................................. 13

*DirectTV Latin Am., LLC v. Park 610, LLC*,
  691 F. Supp. 2d 405 (S.D.N.Y. 2010)..................................................................... 20

*Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*,
  411 F.3d 384 (2d Cir. 2005)..................................................................................... 23

*E. Best Food Corp. v. N.Y 46th LLC*,
  56 A.D.3d 302 (1st Dep't 2008)............................................................................... 18

*EFG Bank AG, Cayman Branch v. AXA Equitable Life Ins. Co.*,
  309 F. Supp. 3d 89 (S.D.N.Y. 2018)........................................................................ 23

*Fleisher v. Phoenix Life Ins. Co.*,
  858 F. Supp. 2d 290 (S.D.N.Y. 2012)...................................................................... 23

*Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*,
  442 F. Supp.3d 576 (S.D.N.Y. 2020)....................................................................... 21

*GW Holdings Grp., LLC v. U.S. Highland, Inc.*,
  794 F. App'x 49 (2d Cir. 2019).......................................................................... 12, 13

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977) ................................................................................................. 12

*INTL FCStone Markets, LLC v. Intercambio Mexicano de Comercio S.A. de C.V.*,
  No. 18-cv-1004 (AKH), 2021 WL 5304285 (S.D.N.Y. Nov. 15, 2021).................. 22

iii

*Jordan v. Verizon Corp.*,
  No. 09-cv-6414 (GEL), 2009 WL 1490813 (S.D.N.Y. May 27, 2009) ................................. 14

*Kassner v. 2nd Ave. Delicatessen Inc.*,
  496 F.3d 229 (2d Cir. 2007) ........................................................................................ 15

*Katel Ltd. Liab. Co., v. AT&T Corp.*,
  607 F.3d 60 (2d Cir. 2010) .......................................................................................... 21

*Keiler v. Harlequin Enters. Ltd.*,
  751 F.3d 64 (2d Cir. 2014) .......................................................................................... 21

*LaRoss Partners, LLC v. Contact 911 Inc.*,
  874 F. Supp. 2d 147 (E.D.N.Y. 2012) ........................................................................ 24

*Lee v. Marvel Enters., Inc.*,
  386 F. Supp. 2d 235 (S.D.N.Y. 2005) ......................................................................... 19

*Marcus v. AT&T Corp.*,
  138 F.3d 46 (2d Cir. 1998) .......................................................................................... 15

*Mariah Re Ltd. v. Am. Fam. Mut. Ins. Co.*,
  52 F. Supp. 3d 601 (S.D.N.Y. 2014) ........................................................................... 23

*MassMutual Asset Fin. LLC v. ACBL River Operations, LLC*,
  220 F. Supp. 3d 450 (S.D.N.Y. 2016) ......................................................................... 20

*MedImmune, Inc. v. Genentech, Inc.*,
  549 U.S 118 (2007) ..................................................................................................... 23

*Miller v. HSBC Bank U.S.A., N.A.*,
  No. 13-cv-7500 (RWS), 2015 WL 585589 (S.D.N.Y. Feb. 11, 2015) ......................... 22

*Ministers & Missionaries Benefit Bd. v. Snow*,
  26 N.Y.3d 466 (2015) ................................................................................................. 24

*Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*,
  830 F.3d 152 (2d Cir. 2016) ........................................................................................ 21

*Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru*,
  109 F.3d 850 (2d Cir. 1997) ........................................................................................ 18

*Robinson v. Berkshire Life Ins. Co. of Am.*,
  No. 18-cv-7689 (JPO), 2019 WL 1614831 (S.D.N.Y. Apr. 16, 2019) ......................... 14

*Rowe v. Great Atl. & Pac. Tea Co., Inc.*,
  46 N.Y.2d 62 (1978) ................................................................................................... 18

*Scherer v. Equitable Life Assurance Soc'y of U.S.*,
   347 F.3d 394 (2d Cir. 2003) .................................................................................. 12

*SEC v. Credit Bancorp, Ltd.*,
   738 F. Supp. 2d 376 (S.D.N.Y. 2010) .................................................................... 23

*Tongkook Am., Inc. v. Shipton Sportswear Co.*,
   14 F.3d 781 (2d Cir. 1994) .................................................................................... 12

*Travelers Ins. Co. v. Buffalo Reinsurance Co.*,
   739 F. Supp. 209 (S.D.N.Y. 1990) ........................................................................ 21

*Winklevoss Cap. Fund, LLC v. Shrem*,
   351 F. Supp. 3d 710 (S.D.N.Y. 2019) ................................................................... 12

**Statutes**

28 U.S.C. § 1332 ............................................................................................................ 12

28 U.S.C. § 1367 ............................................................................................................ 15

28 U.S.C. § 2201 ............................................................................................................ 22

N.Y. Voidable Transfer Act §279(b) ............................................................................. 24

**Rules**

Fed. R. Civ. P. 12(b)(6) ............................................................................................ 2, 15

Plaintiff Frontier Airlines, Inc. ("Frontier") respectfully submits this memorandum of law in opposition to the Motion to Dismiss the Second Amended Complaint (the "Motion") filed by Defendants AMCK Aviation Holdings Ireland Limited ("AMCK Holdings"),[1] Accipiter Investments Aircraft 4 Limited ("Accipiter"), Vermillion Aviation (Two) Limited ("Vermillion"), Accipiter Holdings DAC ("Accipiter Holdings"), Carlyle Aviation Management Limited ("Carlyle Aviation"), Maverick Aviation Holdings Ltd. ("Maverick"), Manchester Aviation Finance S.a.r.l. ("Manchester"), UMB Bank, N.A., not in its individual capacity but solely as Owner Trustee ("UMB"), and Wells Fargo Trust Company, N.A., not in its individual capacity but solely as Owner Trustee ("Wells Fargo") (collectively, "Defendants").

## PRELIMINARY STATEMENT

This action concerns sale-leaseback agreements for fifteen Airbus A320 passenger jet aircraft. These aircraft comprise a significant percentage of Frontier's fleet and are valued at more than $500 million. Without consulting with Frontier or obtaining Frontier's approval as required by the applicable agreements, Defendants collectively engaged in a series of transfers and transactions that resulted in Frontier being forced into a commercial relationship with entirely different parties, including new beneficial owners, lease servicer, and security trustee. The economics of Frontier's relationships also have changed, including the guaranty relationships that are critical to the value of Frontier's leasehold interests. These are not insignificant harms to an airline like Frontier that leases all of its aircraft and must rely on its lessors to perform functions necessary to keep the aircraft flying safely throughout the lease term. As alleged in detail in Frontier's Second Amended Complaint (ECF No. 35) ("Complaint" or "SAC"), Defendants likely refused to disclose these transactions because they were also designed to raid AMCK Holdings of assets to satisfy a potential judgment in Frontier's $50 million claim arising out of AMCK's prior contract breaches.

---

[1] Consistent with the Second Amended Complaint, the term "AMCK" is used to refer to actions taken collectively by AMCK Holdings and its affiliates.

Defendants do not deny any of this.  Instead, the lead argument in their Motion is that Frontier's breach of contract and declaratory relief claims for impairing the value of $500 million worth of leases do not meet the $75,000 amount-in-controversy threshold.  As will be shown below, this argument should be rejected out of hand.  Defendants do not come close to making the required showing to a "legal certainty" that Frontier's express averments of more than $75,000 in damages are insufficient to satisfy the amount-in-controversy threshold.

Defendants' arguments for dismissing the SAC under Rule 12(b)(6) are equally without merit. Elevating form over substance, they urge the Court to apply an "especially narrow reading" of the relevant agreements to find that AMCK's sale to Carlyle of beneficial ownership of both the aircraft and the aircraft leases is not a "transfer" because AMCK transferred ownership of the entity that owned the aircraft and leases to Carlyle rather than transferring the aircraft and leases themselves.  As will be shown, this is not a viable construction of the leases. They contain broad language defining and describing transfers that trigger the Lessee's rights, including "transfer . . . of a controlling interest" in the owner participant.  They also incorporate mandatory guarantee commitments by the parent entities to guarantee the Lessor's performance. Construed in light of the parties' plausibly alleged mutual intent and industry standards that transfer requirements such as this must be read broadly to encompass sale of the subsidiary parties, Defendants have not shown that the breach of contract claims must be dismissed at the pleading stage.  Similarly, Defendants' argument that Frontier has not plausibly pled any damages caused by Defendants' breaches should also be rejected.  Frontier plausibly pled that Defendants' breaches reduced the value of the leases, and in addition that Frontier is entitled to fees and expenses as well as likely future damages.  Additionally, Frontier's claims for declaratory relief should not be dismissed because the declaratory relief sought is directed towards the ongoing and prospective relationship among Frontier and Defendants with respect to the leases and related agreements.  Finally, Frontier's fraudulent transfer claim should not be dismissed under controlling New York law.

2

## FACTUAL BACKGROUND

### I.    THE PARTIES ENTER INTO THE LEASE AGREEMENTS

Frontier and AMCK Holdings entered into sale-leaseback transactions via lease agreements (the "Lease Agreements" or "Leases") and related agreements for fifteen aircraft leased by Frontier as part of its United States fleet. SAC ¶¶ 37-38. This arrangement made AMCK Holdings one of the largest lessors of aircraft to Frontier. *Id.* ¶ 38. Regulatory requirements in the United States require foreign leasing companies, such as AMCK Holdings, to own and register aircraft in the United States through a qualified U.S. "owner trustee." *Id.* ¶ 39. Accordingly, Frontier entered into the Lease Agreements with the U.S. owner trustees of trusts established by AMCK through special purpose entities. *Id.* Each trust, acting through its "owner trustee," holds legal title to the aircraft and acts as the lessor under the aircraft lease, and the foreign leasing company serves as the trustor and beneficial owner of the owner trust and the aircraft, and is referred to in the Lease Agreements and related documentation as an "Owner Participant" or "Beneficiary." *Id.* ¶ 39.

To effectuate these leasing transactions, industry participants, such as Frontier and AMCK, utilize negotiated form lease agreements. Thirteen of the fifteen Lease Agreements at issue utilize Aircraft Lease Form 1, and the remaining two Lease Agreements utilize Aircraft Lease Form 2. *Id.* ¶¶ 51-53.[2]

To ensure contractual privity and provide assurance that the lessor's obligations under the agreements are performed by the leasing company that actually owns and controls the aircraft, the foreign leasing companies execute guarantees or participation agreements (or both) in favor of the lessee. *Id.* ¶ 40. Under the guarantees for the Lease Agreements (the "Guarantees"), each Guarantor is responsible to fulfill its respective Lessor's obligations in the event of defaults.

---

[2] An exemplar Lease Agreement utilizing Aircraft Lease Form 1 is attached as Exhibit 1 to the Declaration of Jeff Butler (ECF No. 39) ("Butler Decl.").

Because the Lessors are special purposes entities backed by the Guarantors, each Guarantee contains a specific representation and warranty that the Guarantor has a United States GAAP-calculated net worth of at least $15 million. *Id.* ¶ 41.

Each Lease Agreement also appoints a Lease Manager or Servicer. *Id.* ¶ 45. Under each of the Lease Agreements, the Lease Manager (or Servicer, as applicable) is authorized to act on behalf of the lessor in administering the leases. *Id.* The Lease Manager/Servicer interfaces with Frontier on day-to-day leasing matters, including aircraft registration, use reports, insurance and rent payment issues, and is the primary point of contact for the lessee. *Id.* Frontier pays its monthly rent payments to the Lease Manager and communicates regularly with the Lease Manager regarding aircraft operations and maintenance. *Id.* Aircraft lease agreements require a lease manager to fulfill the ongoing obligations of the lessor under U.S. regulations to meet all safety and operational requirements. *Id.*

Under the Lease Agreements, and as is typical in the competitive aircraft leasing market, the Lessors undertake significant financial responsibilities to Frontier throughout the lease term. SAC ¶ 47. For example, the Lessors must: (1) return the lessee's security deposit at the time of lease return; (2) reimburse the lessee for certain maintenance costs and expenses; (3) pay insurance and warranty claim proceeds to the lessee, (4) pay the lessee for its costs incurred in connection with transfers, assignments and financing activities, (5) ensure compliance with U.S. regulations applicable to the aircraft's registered owner, and (6) assume ongoing payment obligations for engine service agreements that extend beyond the lease term. *Id.* These requirements, along with the ongoing maintenance and operational requirements managed by the Lease Manager, place substantially more burdens on the lessor than typical non-aviation equipment sale-leaseback transactions.

Given the requirements imposed on the Lessor, which are guaranteed by the Guarantors, the value of Frontier's leasehold interest is significantly diminished if the Lessor or Guarantor is at risk of nonperformance due to questionable or unknown financial resources or

creditworthiness.  *Id.* ¶ 48.  Because of these recognized risks, it is standard industry practice for lessees to require lessors to acknowledge to lessees that they will not: (1) make any transfers or assignments to a third party that do not have the required net worth (or have a guarantor with sufficient net worth); (2) jeopardize the registration of the aircraft as a result of the transfer; or (3) conduct transfers, assignments, or novations in a manner that would increase lessee's risks or liabilities.  *Id.* ¶ 49.

To protect lessee from these risks, each Lease Agreement includes requirements and assurances that must be provided to Frontier in the event of a transfer of beneficial ownership, the grant of participations or security interests in the lease or other Operative Documents, or any other transfer or disposal of rights and obligations under the Lease Agreements.  *Id.* ¶ 51. Section 20.2(a) of Aircraft Lease Form 1 provides in relevant part:

> Each of Lessor and Owner Participant (and any subsequent permitted assignee or transferee) shall have the right at any time, at its own expense and upon prior written notice to Lessee, to transfer ownership or beneficial ownership, as applicable, of the Aircraft, or to assign (including to assign as security), mortgage, novate, transfer, grant participations in, or otherwise dispose of its rights and obligations under this Agreement and the other Operative Documents, to any other person by outright transfer or assignment or collateral assignment or by operation of law and Lessee hereby consents to any such transfer or assignment; provided that:

> (i) Lessee shall have no greater financial obligation or liability under this Agreement and the other Lessee Documents as a result of such transfer based on the facts and circumstances existing and applicable laws in effect at the time of such transfer, than it would have had if such transfer had not taken place . . . .

> (ii) such transfer shall not result in any restriction, based on the facts and circumstances existing and applicable laws in effect at the time of such transfer, on Lessee's rights under this Agreement or the other Lessee's Documents or on Lessee's use or operation of the Aircraft;

> (iii) in the case of a sale of the Aircraft by Lessor or transfer of the beneficial interest of Owner Participant in the Aircraft or a transfer (other than to an Affiliate of the Lessor Guarantor) of a controlling interest in the Owner Participant, any such assignee or transferee shall be a Permitted Transferee and shall unconditionally guaranty the obligations of Lessor under this Agreement pursuant to a Guarantee in form substantially similar to the Guarantee executed by

Owner Participant in favor of Lessee unless the existing Lessor Guarantee will remain in full force and effect following such transfer;

…

(v) Lessor shall have reimbursed to Lessee (or shall have agreed in writing to promptly reimburse to Lessee following such assignment, transfer or novation) Lessee's reasonable and invoiced out-of-pocket costs and expenses incurred in connection with its cooperation with Lessor under this Clause 20.2, including reasonable legal fees.

*Id.* ¶ 52; *see also* Butler Decl. Ex. 1 ("Lease Agreement Form 1") § 20.2(a)).[3]  With respect to these two Leases, the Owner Participants also entered into Participation Agreements with Frontier which specifically require the Owner Participant to meet the following conditions in order to sell or transfer its interest:

(1) the proposed transferee confirms in writing, in a form reasonably satisfactory to Frontier, its undertaking to perform the obligations of Owner Participant in a form substantially similar to the Participation Agreement;

-----

[3] Section 22.3 of Aircraft Lease Form 2 similarly provides:

Lessor may sell, assign, novate or otherwise transfer its right, title and interest in the Aircraft or this Lease without Lessee's consent (a "Transfer"), subject to the following conditions:

(i) the proposed purchaser, assignee or transferee (the "Transferee") shall enter into an agreement, reasonably satisfactory to Lessee, assuming all obligations of Lessor under this Lease and the other Operative Documents and of Beneficiary under the Participation Agreement and other Operative Documents;

(ii) Lessor shall be responsible for Lessee's reasonable legal fees and other reasonable costs and expenses incurred in respect of such Transfer and shall pay such costs and expenses promptly upon demand therefor; . . .

(v) any Transfer will not increase Lessee's obligations, liabilities (financial or otherwise), or risks or diminish Lessee's rights and benefits, in each case under any Operative Document or in respect of the Aircraft (to be determined in each case as at the time of such Transfer by applying all applicable laws as are enacted and/or in effect on the effective date of such Transfer), . . . .

*Id.* ¶ 53; *see also* Butler Decl. Ex. 2 ("Lease Agreement Form 2") § 22.3.

6

> (2) the Owner Participant pays Frontier's reasonable legal fees and costs incurred in connection with the transfer;
>
> (3) the transferee entity meets certain requirements, including that it is a citizen of the U.S.; not an airline or aircraft operator; and has, or through a guarantee acceptable to Frontier by a person having, a minimum net worth of a specified value in the tens of millions of dollars;
>
> (4) the transfer does not increase Frontier's obligations or risks or diminish Frontier's rights and benefits under any of the lease documents . . . .

*Id.* ¶ 62; *see also* Butler Decl. Ex. 4 (Participation Agreement §§ 1, 3.1(a)).  The parties further expressly define "transfer" to include sale, assignment or direct or indirect transfer through an operation-of-law transfer such as a merger, consolidation, or sale of membership interest.  *Id.*

Protections such as these are standard in the airline industry, and are intended to provide necessary broad rights and protections to the lessee in the event of transfers occurring at different levels of the beneficiary's corporate structure that could impact the lessee's commercial rights and risks, including beneficial interest transfers at a parent company level or any other transfer that results in a change in the *de facto* ownership of the leased aircraft.  SAC ¶ 54.  And under each Guarantee, Frontier has an ongoing right to verify the Guarantor's net worth, providing lessee with further assurance that any changes to the Guarantor's ownership status does not harm Frontier's interests.  *Id.* ¶ 58.  Frontier also has a right to attorneys' fees from each Guarantor incurred to enforce the Guarantees.  *Id.* ¶ 60.

## II.    AMCK HOLDINGS BREACHES THE FRAMEWORK AGREEMENT AND FRONTIER FILES THE FRAMEWORK AGREEMENT ACTION

In early 2020, Frontier and AMCK Holdings entered into a framework agreement (the "Framework Agreement") concerning the purchase and leaseback of six new Airbus model A320-251N aircraft.  SAC ¶ 6.  AMCK promptly breached the Framework Agreement and refused to purchase the aircraft, which Frontier was scheduled to obtain from Airbus and take possession of that year.  *Id.* ¶ 7.  Frontier filed an action (the "Framework Agreement Action") in this Court in November 2020, seeking damages in excess of $50 million from AMCK Holdings and its then-subsidiaries and affiliates, including the lessors, arising from that breach and

AMCK's related conduct.  *Id.*  The Court denied AMCK's motion to dismiss in or about January 2021 and the parties then conducted fact discovery in the case which is now complete.  *Id.* ¶ 63. The Framework Agreement Action is on track for trial in early 2023.  *Id.* ¶ 7.

III.    **WHILE THE FRAMEWORK AGREEMENT ACTION IS PENDING, AMCK FRAUDULENTLY TRANSFERS AMCK HOLDINGS' ASSETS TO CARLYLE**

Just over one year after Frontier filed the Framework Agreement Action, Carlyle and AMCK schemed to fraudulently transfer AMCK Holdings' assets to Carlyle as part of a larger sale.  SAC ¶ 68.  The scheme involved AMCK Holdings transferring 98% of its assets to newly formed shell entities, then selling the new entities to Carlyle purportedly free and clear of liability to Frontier for the $50 million potential liability in the Framework Agreement Action. The hoped-for effect of these fraudulent transfers (the "Asset Transfers") was to leave AMCK Holdings—the sole defendant in the Framework Agreement Action – not owned by Carlyle and with no assets to pay any judgment obtained by Frontier.

In furtherance of this objective, on or about December 22, 2021, the day before execution of the sale agreement between AMCK and Carlyle, AMCK Holdings transferred nearly all of its assets to Defendant Manchester and became the sole equity owner of Manchester.  *Id.*  The transfer of AMCK Holdings' assets constituted an in-kind contribution of approximately $574,839,553 by transferring AMCK's ownership of nearly all of its subsidiary entities, including Defendant Vermillion Aviation (Two) Limited.  *Id.* ¶ 75.  According to AMCK's 2020 financial statements filed with the government of Ireland, these entities represented over 98.5% of AMCK Holdings' net worth prior to the transfer, *id.* ¶ 184, and left AMCK Holdings with less than $10 million in assets—far less than its liabilities to Frontier and the minimum GAAP net worth requirement under the guarantees.  *Id.* ¶ 79.

Promptly after this transaction, AMCK Holdings relinquished its full ownership interest in Manchester to Defendant Vermillion Holdings.  Based on publicly available disclosures,

AMCK Holdings did not receive any value in exchange for transfer of its interest in Manchester (holding over 98.5% of AMCK Holdings' assets) to Vermillion Holdings. *Id.* ¶¶ 69-70

Carlyle and AMCK entered into a sale agreement the next day (the "Carlyle Transaction") whereby AMCK sold newly-formed Vermillion Holdings to Carlyle together with Accipiter and Vermillion (the Owner Participants named in the Frontier Leases). *Id.* ¶¶ 63-65. Claiming that no transfer had taken place because Accipiter and Vermillion still "owned" the aircraft despite the fact they were shell companies whose ownership had been transferred to Carlyle, Defendants failed to notify Frontier of these transactions beforehand and refused to comply with the transfer obligations in the Lease Agreements. *Id.* ¶¶ 85-86.

## IV.    FRONTIER LEARNS OF THE CARLYLE TRANSACTION AND CONRACTING DEFENDANTS REFUSE TO COMPLY WITH THEIR OBLIGATIONS

Neither AMCK nor any other party disclosed the Asset Transfers or the Carlyle Transaction to Frontier. SAC ¶¶ 86-87. Instead, Frontier learned of the Carlyle Transaction from press releases and other publicly available information. After learning of the impending Carlyle Transaction, Frontier immediately asked—and then demanded—the detailed information it was entitled to under the Lease Agreements and industry practice. *Id.* ¶ 88. AMCK refused to provide any information or assurances, instead telling Frontier that the Carlyle Transaction "does not involve any transfer or assignment by a Lessor or an Owner Participant." *Id.* ¶¶ 88-92. While vehemently denying it had done anything improper, AMCK entirely failed to mention the Asset Transfers despite Frontier's stated serious concerns about the consequences of the Carlyle Transaction and the possibility of a fraudulent transfer to avoid paying a judgment in the Framework Agreement Action.

As time went on, AMCK (and later Carlyle) doubled down on their refusal to provide the information requested by Frontier and required under the Lease Agreements. SAC ¶ 99. They continued to maintain that as long as the names of the first-line special purpose aircraft holding entities and the guarantor entities remained unchanged, no transfer or assignment had occurred.

9

Yet at the same time, Carlyle publicly announced that it had "purchased" AMCK's portfolio of leased aircraft—including the aircraft leased to Frontier. *See id.* ¶ 11.  At that time, Frontier was not yet aware of the Asset Transfers leading up to the sale, and AMCK refused to disclose any details about the transaction. *See id.* ¶¶ 67, 75.

## V.    CARLYLE TAKES OVER AS "LEASE MANAGER" AND IMPROPERLY EXECUTES A SECURITY ASSIGNMENT AFFECTING THE LEASES

On or about March 30, 2022, AMCK notified Frontier that as a result of the Carlyle Transaction, AMCK would cease to be the Lease Manager and that AMCK expected Carlyle or one of its affiliates to act as the new manager under the Lease Agreements.  SAC ¶ 99.  To effect a change in the lease manager for the Leases, however, the Owner Participants and Owner Trustees must grant participations in the aircraft and Lease to the new lease manager, which must be done pursuant to the terms of the Lease Agreements. *Id.* ¶ 100.  Neither AMCK nor Carlyle made any effort to comply with this obligation. *Id.*

On or around April 13, 2022, Carlyle sent Frontier fifteen notices, each entitled "Lessee Notice," purporting to provide notice that Carlyle had replaced AMCK Holdings as Lease Manager under each of the fifteen Lease Agreements. *Id.* ¶ 104.  The notices demanded that Frontier provide (1) liability coverage to Carlyle's new lenders and affiliates and (2) "tail" insurance coverage for the AMCK entities and AMCK's parent entities previously associated with the Lease Agreements. *Id.* ¶ 105.  Notably, under the Lease Agreements, "tail" insurance is only available following a termination of the lease or when a transfer contemplated thereunder has taken place. *Id.*  Thus, Carlyle's own Lessee Notices confirmed what Frontier already knew to be true: the Carlyle Transaction (and as Frontier would later learn, the Asset Transfers) constituted transfers of beneficial ownership under the Lease Agreements to a third party that had not complied with the applicable transfer conditions.  In response to the Lessee Notices, Frontier again requested the information required under the Lease Agreements in order to verify

that the Carlyle sale had not harmed Frontier's interest in the Lease Agreements and the aircraft. Carlyle refused. *Id.* ¶¶ 112-16.

The Carlyle Transaction's repercussions did not stop there. On June 1, 2022, Carlyle sent Frontier a series of notices notifying Frontier that it had effectuated a security assignment of its interests in the fifteen leases and aircraft (the "Security Assignment"). SAC ¶ 117. Under each Lease Agreement, advance written notice of any security assignment must be provided to Frontier. *Id.* ¶ 119; Lease Agreement Form 1 § 20.2(a). Section 22.2 of Aircraft Lease Form 2 also expressly provides that Frontier will only comply with Lessor's requests regarding a security assignment if (1) the Lessor's documents, assurances and actions are in a form and of a nature reasonably acceptable to Frontier, (2) Lessor pays all reasonable and documented out-of-pocket costs and expenses, including reasonable fees and disbursements of counsel, incurred by Lessee in connection with any such security interest or assignment, and (3) none of Frontier's rights and benefits in respect of the lease agreement and the aircraft are diminished as a result of any such security interest or assignment. *Id.*

Carlyle failed to provide advance written notice of the Security Assignment and did not provide Frontier with an opportunity to review any of the assignment documents prior to closing on the assignment; and the notices lacked basic protections for Frontier and exposed Frontier to additional lenders' risks that did not exist prior to the security assignment. *Id.* ¶ 118. The improper after-the-fact notices provided to Frontier were not acceptable to Frontier and failed to contain customary protective language Frontier reasonably requires in all security assignments, and Carlyle failed to reimburse Frontier's costs and expenses arising from the notices. *Id.* ¶ 122.

## ARGUMENT

## I.    FRONTIER HAS MET THE AMOUNT-IN-CONTROVERSY THRESHOLD

Defendants' motion contends in error that Frontier's first claim (for breach of contract) and its second and third claims (for declaratory relief) arising out of an improper transfer of rights under more than $500 million in aircraft leases do not meet the $75,000 amount-in-

controversy requirement under 28 U.S.C. § 1332.  Mem. Law Supp. Mot. Dismiss (ECF No. 40) ("Defs. Br") at 11.  Defendants acknowledge that Frontier's fourth and fifth claims for relief (for fraudulent transfer) meet the jurisdictional threshold, but argue that the Court should decline to exercise supplemental jurisdiction unless the first through third causes of action also involve disputes worth more than $75,000.  *Id.*

Frontier meets the amount-in-controversy requirement for each of its claims.  A party invoking the jurisdiction of the federal courts bears the initial burden of proof that its claim exceeds $75,000.  *Scherer v. Equitable Life Assurance Soc'y of U.S.*, 347 F.3d 394, 397 (2d Cir. 2003).  But this burden is "hardly onerous" and courts apply a "rebuttable presumption that the face of the complaint is a good faith representation of the actual amount in controversy."  *GW Holdings Grp., LLC v. U.S. Highland, Inc.*, 794 F. App'x 49, 51 (2d Cir. 2019).  Once this "liberal standard[]" is met and "a good faith representation has been made," the party opposing jurisdiction "must show to a '*legal certainty*' that the amount recoverable does not meet the jurisdictional threshold."  *Id.* (emphasis added).  As the Second Circuit noted in *GW Holdings*:

> It is not easy to do this. The legal impossibility of recovery must be so certain as virtually to negate the plaintiff's good faith in asserting the claim.  Even where the allegations leave grave doubt about the likelihood of a recovery of the requisite amount, dismissal is not warranted.

*Id.* (alterations and internal citations and quotation marks omitted).  Any uncertainty with respect to the quantum of damages "should be resolved in favor of the plaintiff's pleadings."  *Tongkook Am., Inc. v. Shipton Sportswear Co.*, 14 F.3d 781, 785 (2d Cir. 1994); *see also Winklevoss Cap. Fund, LLC v. Shrem*, 351 F. Supp. 3d 710, 715-16 (S.D.N.Y. 2019).  Further, where declaratory relief is sought, "it is well established that the amount in controversy is measured by the value of the object of the litigation," *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 347 (1977), and "the court's valuation of the amount in controversy here may be forward looking, as the amount in controversy is not necessarily the money judgment sought or recovered, but rather the value of the consequences which may result from the litigation."  *Cow Bay Sprinkler Corp. v.*

*Houston Cas. Co.*, No. 19-cv-5854, 2020 WL 9812929, at *4 (E.D.N.Y. Feb. 1, 2020) (quoting *Beacon Constr. Co., Inc. v. Matco Elec. Co., Inc.*, 521 F.2d 392, 399 (2d Cir. 1975)).

The Complaint's express allegations of damages in excess of the jurisdictional threshold easily satisfy this modest burden. *See, e.g.*, SAC ¶ 32 ("Frontier has suffered damages in excess of $75,000, and Defendants have failed to comply with their contractual, statutory, and common law obligations to Frontier as regards leases of aircraft worth in excess of $500,000,000"). With respect to its breach of contract claims, Frontier alleges that it has suffered monetary damages in the form of the diminished value of its leasehold interests and unreimbursed costs and fees incurred in connection with the transfer of interest and security assignment effectuated by AMCK or Carlyle. SAC ¶¶ 41, 95, 124, 137-38, 144. This satisfies the "liberal" standard applicable to good-faith allegations relevant to meeting the jurisdictional threshold. *See, e.g.*, *GW Holdings Grp., LLC,* 794 F. App'x at 51 (plaintiff met initial burden that claims exceed jurisdictional amount). Further, Frontier's declaratory judgment claims concern the fundamental economic bargain under the Leases, potentially jeopardizing Frontier's interests in $500 million worth of leased aircraft. *See* SAC ¶¶ 149-50, 161.

The Complaint details how Defendants' breaches and refusal to provide the required assurances and information have and will continue to harm Frontier's interests under the leases. *See* SAC ¶¶ 13-15. As one example, Frontier alleges that Defendants have failed to confirm that, in connection with the transfer of beneficial ownership of the Leases arising from the Carlyle Transaction, a Tripartite Agreement concerning the engine maintenance obligations remain binding and were properly assigned to and assumed by the Carlyle parties. In the event they were not, Frontier could incur financial obligations and penalties to the engine maintenance provider in excess of $30 million. SAC ¶ 15. Defendants' failure to address this issue has

diminished the value of Frontier's leasehold interests and exposes Frontier to harm well in excess of $75,000.[4]

Defendants claim that Frontier has not properly pled the amount in controversy because its "primary claim is that [it] has not received sufficient information or assurances about those transactions." Defs. Br. at 9. This statement wishfully ignores Frontier's pleading, mistaking Defendants' breaches (*i.e.*, the failure to provide the required information and assurances that Frontier seeks) for the harm suffered by Frontier as a result of those breaches. In the SAC, Frontier seeks, among other damages, the difference between the value of the Leases prior to the Carlyle Transaction (when AMCK was in full compliance with the Lease Agreements, including its obligation to provide assurances that the Guarantors and Owner Participants each met specified net worth requirements) and the Leases' value after the Carlyle Transaction (when Carlyle has refused to confirm guarantors' net worth, refused to provide information sufficient for Frontier to ensure that there will not be any interruption in Frontier's rights with respect to the aircraft or related credit support, and after a purported security assignments to which lessee did not agree). *See* SAC ¶¶ 41, 95, 124, 137-38, 144.[5] Since the leases are worth more than $500 million, Frontier would only have to show that their value was diminished by 0.015% in

---

[4] The cases cited by Defendants are inapplicable. *See Robinson v. Berkshire Life Ins. Co. of Am.*, No. 18-cv-7689 (JPO), 2019 WL 1614831, at *5 (S.D.N.Y. Apr. 16, 2019) (plaintiff's contract damages were $60,000 and statutory attorneys' fees were permissive not mandatory); *Jordan v. Verizon Corp.*, No. 09-cv-6414 (GEL), 2009 WL 1490813, at *2-3 (S.D.N.Y. May 27, 2009) (plaintiff included "[o]nly a few spare[] paragraphs" concerning its contract claim and did not specify how the breach harmed plaintiff); *Am. Standard, Inc. v. Oakfabco, Inc.*, 498 F. Supp. 2d 711, 718 (S.D.N.Y. 2007) (claims remanded where the plaintiff did not claim any monetary damages, much less damages in excess of $75,000).

[5] Defendants wrongly focus on whether Frontier alleges the "diminished value" of the Guarantors' net worth. Defs. Br. at 11. But Frontier alleges that it has been harmed as a result of the failure by Carlyle to confirm—as required under the Lease Agreements—that the Guarantors and Owner Participants meet the minimum net worth threshold. It is this failure, among others, which has diminished the value of Frontier's leasehold interest. SAC ¶¶ 41, 95.

order to meet the jurisdictional threshold.  This amply supports Frontier's express allegations of damages exceeding the jurisdictional limit.

The Complaint easily satisfies the minimal requirement that plaintiff provide a good-faith representation that the amount-in-controversy requirement is satisfied, and Defendants have failed to carry their burden to establish to a legal certainty that the threshold has not been met.[6]

## II.    THE MOTION TO DISMISS UNDER RULE 12(b)(6) SHOULD BE DENIED

On a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a court accepts all well-pleaded factual allegations as true, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and must "draw all reasonable inferences in favor of the plaintiff." *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).

### A.    Frontier Has Pled a Claim For Breach of Contract

Frontier has pled a viable claim for breach of contract.  In the Carlyle Transaction, AMCK sold the aircraft and the beneficial owners' rights to Carlyle.  This constituted a "Lessor Transfer" under the Leases which triggered disclosure and guarantee obligations the Defendants admit they failed to honor.

#### 1.    The Carlyle Transaction Was a Transfer.

Paragraph 20.2(a) contains the transfer requirements.  These are triggered when the Owner Participant (here, Accipiter and Vermillion), defined to include their "respective successors, assigns and transferees," "transfer[s] beneficial ownership . . . of the Aircraft" or

---

[6] Even if, *arguendo*, Frontier's first three claims did not satisfy the amount in controversy requirement, this Court may exercise supplemental jurisdiction over the claims. *See* 28 U.S.C. § 1367; *Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998).  A court may exercise supplemental jurisdiction over claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy, including those that "derive from a common nucleus of operative fact and are such that one would ordinarily expect them to be tried in one judicial proceeding." *Blackrock Balanced Cap. Portfolio v. HSBC Bank USA, Nat'l. Ass'n*, 95 F. Supp. 3d 703, 708 (S.D.N.Y. 2015).  Frontier's breach of contract and declaratory judgment claims concern the same Carlyle Transaction that forms the basis of the Asset Transfer claims and, accordingly, supplemental jurisdiction is proper.

"assign[s], mortgage[s], novate[s], transfer[s], grant[s] participations in, or otherwise dispose[s] of its rights and obligations under this Agreement and the other Operative Documents" to "any other person" by "outright transfer or assignment or collateral assignment or by operation of law . . . ." Lease Agreement Form 1 §§ 1.2(vi), 20.2(a). In addition, subsection (iii) provides that "in the case of a . . . transfer of the beneficial interest of Owner Participant in the Aircraft **_or a transfer . . . of a controlling interest in the Owner Participant_**," "any such assignee or transferee shall be a Permitted Transferee and shall unconditionally guaranty the obligations of Lessor under this Agreement." *Id.* (emphasis added).

Defendants concede that "Accipiter and Vermillion were sold to an affiliate of defendant Carlyle Aviation." Defs. Br. at 1. Accipiter and Vermillion were, directly or indirectly, wholly owned subsidiaries of AMCK. And Carlyle admits it purchased "AMCK's portfolio of leased aircraft, including the aircraft leased to Frontier." SAC ¶ 11. Under any reasonable reading of the above language, the Owner Participants (defined broadly to include successors, assigns, and transferees) have "transferred," "granted participations in" or "otherwise disposed of" their rights and obligations under the Lease Agreements to Carlyle, and AMCK has admittedly transferred a "controlling interest" in Accipiter and Vermillion to Carlyle. And, as alleged in the Complaint, industry standards call for these terms to be construed broadly "and to cover transfers occurring at different levels of the corporate structure . . . including beneficial interest transfers at a parent company level . . ." SAC ¶ 54. Therefore, the Carlyle Transaction was a transfer.

### 2.    Defendants Violated The Transfer Requirements.

Defendants do not contest that they failed to provide Frontier with notice of the transfers, leaving Frontier scrambling to try to learn about them from public sources. Defs. Br. at 7. Thereafter, Defendants also acknowledge that they "declined to provide the requested information" despite Frontier's "agitated letters . . ." demanding information about this significant transaction involving a substantial portion of its entire commercial aircraft fleet. *Id.*

16

Frontier was perfectly within its rights to demand financial information about the transfer, and Defendants were obligated to provide it. Specifically, under Aircraft Lease Form 1, which governed 13 of the aircraft leases, the Owner Participants are required to provide "***prior written notice** to Lessee [Frontier]*" of a transfer. Lease Agreement Form 1 § 20.2(a)) (emphasis added). They failed to do so. Further, a transfer is permitted only if "Lessee shall have no greater financial obligation or liability . . . than it would have had if such transfer had not taken place." *Id.* § 20.2(a)(1). Moreover, Carlyle, to qualify as a Permitted Transferee, is required to "unconditionally guaranty" the obligations of Lessor. *Id.* § 20.2(a)(iii). As alleged in the Complaint, "Lessees in the aircraft leasing market are permitted to examine any proposed transaction, pursuant to which interests in the lease are to be transferred" so that they can determine whether to agree or not agree to it based on the transferee's financial wherewithal. *Id.* ¶ 55.[7]

Defendants have consistently refused to provide Frontier with any assurances in this regard, and they have not made any showing that the transfer will have no impact on Frontier's obligations or liabilities under the Lease Agreements. Such impacts have already occurred. Contrary to the contention in Defendants' motion that apart from the change in ownership of the Owner Participants, "nothing else has changed with respect to the leasing of the aircraft to

_____

[7] Similarly, under Aircraft Lease Form 2, "Lessor may sell, assign, novate or otherwise transfer its right, title and interest in the Aircraft or this Lease without Lessee's consent (a 'Transfer')," only if "the ***proposed** purchaser, assignee or transferee (the 'Transferee') **shall enter into an agreement, reasonably satisfactory to Lessee***, assuming all obligations of Lessor under this Lease and the other Operative Documents." *See* Lease Agreement Form 2 § 22.3) (emphasis added). Obviously, the requirement that any transfer must include an agreement "reasonably satisfactory to Lessee" demonstrates that the transfer requires review and consent from Frontier. No such consent was sought, let alone granted. Further, under Aircraft Lease Form 2, Defendants must demonstrate that "any Transfer will not increase Lessee's obligations, liabilities (financial ***or otherwise***) ***or risks*** or diminish Lessee's rights or benefits, in each case under any Operative Document ***or in respect of the Aircraft***." *Id.* (emphasis added). As with Lease Form 1, Defendants have made no effort to provide any information or assurance that this prerequisite to a lease-transfer has been satisfied.

Frontier" *Id.* at 1, buyer Carlyle Aviation immediately made itself as Servicer under the Lease Agreements in place of AMCK. *Id.* at 7; *see also* SAC ¶¶ 99-105. And as Frontier eventually learned, Carlyle also pledged all of Accipiter's and Vermillion's interests to a new Security Trustee, UMB Bank, N.A. Defs. Br. at 7. These changes, combined with Defendants' continuing refusal to provide information or assurances about them, constitute material changes that Frontier has been denied the right to approve or reject. Defendants' failure to acknowledge a transfer and refusal to comply with industry-standard information requests have resulted in multiple other contract breaches by Defendants.[8]

### 3. Defendants' Claim They Effected a Transfer Without it Being a Transfer Should Be Rejected.

Defendants' argue that the AMCK-Carlyle transfer was not a transfer based on what they seem to admit is an "especially narrow reading" of the Leases.[9] Defs. Br. at 14. Under their

---

[8] The parties also entered into Guarantees that include a continuing representation that the Guarantor has a total GAAP-compliant net worth in excess of a specified threshold. *Id.* ¶ 58. Defendants failed to comply with the contractual requirement that they confirm that the Guarantors meet the critical net worth threshold. *Id.* ¶¶ 41, 95. Two leases are also subject to Participation Agreements that require, among other things, (1) any "proposed transferee confirms in writing, in a form reasonably satisfactory to Frontier, its undertaking to perform the obligations of Owner Participant in a form substantially similar to the Participation Agreement," (2) the "Owner Participant pays Frontier's reasonable legal fees and costs incurred in connection with the transfer," (3) the transferee provide a "guarantee acceptable to Frontier by a person having a minimum net worth of a specified value in the tens of millions of dollars," and (4) the "transfer does not increase Frontier's obligations or risks or diminish Frontier's rights and benefits under any of the lease documents." *Id.* ¶ 62. Defendants failed to comply with any of these requirements.

[9] The cases relied on by Defendants to support their argument for an "especially narrow reading" are easily distinguished. In *Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru*, 109 F.3d 850, 856 (2d Cir. 1997), the Second Circuit affirmed a decision finding an assignment to be valid in a case involving an agreement containing language that "fails to restrict the assignment expressly in any way." Here, in contrast, the Lease Agreements and related documents contain carefully negotiated conditions and restrictions on assignment. Similarly, in *Rowe v. Great Atl. & Pac. Tea Co., Inc.*, 46 N.Y.2d 62, 67-68 (1978), the Court of Appeals refused to read a restriction on assignment into an agreement that contained no such restriction. *See also E. Best Food Corp. v. N.Y 46th LLC*, 56 A.D.3d 302 (1st Dep't 2008) (assignment of less than a controlling interest in building lease permitted where such an assignment not prohibited by

proposed reading, Defendants evaded all of the transfer requirements simply by selling Accipiter and Vermillion rather than having those wholly owned single-purpose entities sell their interests as Owner Participant. This is not a ground on which to dismiss Frontier's breach of contract claims at the pleading stage.

First, Defendants' post-transfer conduct estops them from even claiming that no transfer took place. One of the lease requirements is that the lessee name the Lessor, the Owner Participant, and their lenders as additional insureds on the leased aircrafts' insurance policies. Lease Agreement Form 1 § 14.4(a); *see also id.* § 1.1 (definition of "Lender"). After the transfer, Carlyle sent Frontier fifteen notices demanding that Frontier provide insurance coverage to Carlyle's alleged lenders and purported affiliates. SAC ¶ 104. Significantly, the notice also demanded that Frontier provide "tail" liability insurance coverage for the AMCK entities that had previously been the Owner Participants. *Id* ¶ 105. The Lease Agreements require Frontier to provide this additional insurance, but ***only after a transfer has occurred***. Lease Agreement Form 1 § 14.13(b). Having treated the Carlyle Transaction as a transfer under the Lease Agreements when it benefitted them, Defendants cannot now claim it was not a transfer as justification for their failure to comply with their transfer-related obligations.

Second, the Court should reject Defendants' proposed construction of the Lease Agreements because it would make Frontier's bargained-for transfer rights meaningless. In general, courts should not read contract provisions so narrowly as to defeat their purpose. *Lee v. Marvel Enters., Inc.*, 386 F. Supp. 2d 235, 244 (S.D.N.Y. 2005). Allowing Defendants to evade their detailed and extensive transfer obligations so easily would defeat the purpose of Frontier's bargained-for right to have notice of an approval rights over transfers such as this. This is

---

lease). Here, the Leases and related documents contain bargained-for requirements with respect to assignments.

exactly the type of transaction the transfer notice and consent provisions were written to give Frontier a say in.  SAC ¶ 92.[10]

Even if the Court were to accept Defendants' invitation to apply an "especially narrow reading" of the transfer obligations, their motion should still be denied.  This is because Defendants' argument that "[t]here is no language in these lease agreements that restricts equity transfers made by corporate parents of Accipiter or Vermillion," Defs. Br. at 2, is simply not correct.  Section 20.2(a)(iii) expressly provides that the transferee "of a controlling interest in the Owner Participant" must be a "Permitted Transferee."  Thus, Carlyle, as the ultimate transferee of a controlling interest in owner participants Accipiter and Vermillion, is to be treated like a transferee of the lease.  Because Carlyle is obligated to meet the definition of Permitted Transferee, under even the narrowest possible construction of paragraph 20.2(a), Carlyle can hardly deny that a transfer has occurred.

Finally, Defendants' contention that the transfer was not a transfer must be rejected because their stonewalling and refusal to provide even the most basic information about the transfer violated Defendants' duty of good faith and basic commercial norms that are implicit in aircraft leases as well as all contracts.  When interpreting terms in a contract, a court must adopt the viewpoint of "a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology understood in the particular trade or business."  *Orchard Hill Master Fund Ltd. v. SBA*

---

[10] Defendants' cases about upstream corporate changes in control are not on point.  For example, *MassMutual Asset Fin. LLC v. ACBL River Operations, LLC*, 220 F. Supp. 3d 450 (S.D.N.Y. 2016), involved changes at the corporate "grandparent" level that were more remote than the corporate change in this case.  Moreover, unlike the circumstances here, which involve changes to the servicer and trustee for the Lease Agreements, *MassMutual* did not involve changes to key functions provided under the contract.  *See also DirectTV Latin Am., LLC v. Park 610, LLC*, 691 F. Supp. 2d 405, 431 (S.D.N.Y. 2010) (no restriction on change-in-control of parent company of joint venture member in circumstances where change-in-control did not impact underlying joint venture agreement).  Here, the Carlyle Transaction resulted in a change to the lessor, a change to the Lease Manager, and an entirely new lease management team.

*Commc'ns Corp.*, 830 F.3d 152, 157 (2d Cir. 2016); *see also Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*, 442 F. Supp.3d 576, 586 (S.D.N.Y. 2020) (courts may consider industry customs in specialized industry to interpret unambiguous terms in agreements). The Complaint expressly alleges that the transfer provisions in the Lease Agreements are customarily understood to protect lessees from transfers occurring at different levels of the corporate structure that could impact the lessee's rights and increase its risks. SAC ¶ 54. And because the Lease Agreements contain language requiring that assignments and transfers be in a form "reasonably acceptable" to Frontier, it is necessary to construe that reasonableness requirement in light of norms and practices within the specialized aircraft-leasing market. *See Travelers Ins. Co. v. Buffalo Reinsurance Co.*, 739 F. Supp. 209, 212 (S.D.N.Y. 1990) (finding "reasonableness" requirement in contract among participants in specialized industry requires consideration of industry custom and usage).[11] All Defendants had to do was to provide reasonable information about the transfer. Their failure to do so—presumably motivated by a desire to hide the fraudulent transfers with regard to the Framework Agreement Action—is the essence of bad faith conduct in violation of industry practices and requires rejection of their unduly narrow construction of the Lease Agreements.

### 4. Frontier Has Adequately Pled Breach of Contract Damages.

Defendants' effort to argue that damages have not been adequately pled for violation of the transfer obligations should be rejected. Defendants argue that Frontier is not entitled to recover fees and expenses because the Lease Agreements do not expressly provide for the

---

[11] Defendants' cases are not on point because they concern the general proposition that a Court should not look to extrinsic evidence where a written contract is complete and unambiguous. *See Keiler v. Harlequin Enters. Ltd.*, 751 F.3d 64 (2d Cir. 2014) (extrinsic evidence of contract's meaning not considered because publishing agreement was complete and unambiguous); *Katel Ltd. Liab. Co., v. AT&T Corp.*, 607 F.3d 60 (2d Cir. 2010) (evidence of industry custom rejected in telecommunications agreement where written agreement was complete and unambiguous). Here, the Lease Agreements necessarily contain open-ended requirements that changes incident to assignments and transfers must be reasonably acceptable to Frontier. The meaning of such terms may appropriately be construed based on evidence of industry norms.

recovery of fees and expenses.  But they do.  The Guarantees and Participation Agreements provide for recovery of fees and they are expressly incorporated into the Lease Agreements. SAC ¶¶ 60-62; *see also* Lease Agreement Form 1 § 20.2(a)(v)); Lease Agreement Form 2 § 22.3(ii).  Even without these contractual provisions, because Defendants have breached their obligation to consult with Frontier to demonstrate reasonableness and secure approval of the Carlyle Transaction and Asset Transfers, Frontier's related fees and costs are reasonably foreseeable, and thus recoverable, damages suffered as a result of the breach.  Defendants' argument mistakes Frontier's right to receive costs and fee reimbursement under the Lease Agreements with a general right to recover attorney's fees for costs associated with litigation.

More fundamentally, Defendants no-damages argument ignores the SAC's allegations that Frontier's leasehold interest have diminished in value due to Defendants' breaches.  These allegations are discussed above in Point I (discussing diminution damages with regard to amount-in-controversy requirement) and defeat any argument that no recoverable damages have been pled.[12]

B.    **Frontier Has Properly Pled Claims For Declaratory Relief**

Defendants acknowledge that the availability of declaratory relief is committed to the discretion of this Court.  Defs. Br. at 18.  Under 28 U.S.C. § 2201, declaratory relief is available in a "case of actual controversy," "whether or not further relief is or could be sought."  28 U.S.C. § 2201.  "This text has long been understood to 'confer on federal courts unique and substantial

---

[12] Defendants' cases on damages are inapposite.  *INTL FCStone Markets, LLC v. Intercambio Mexicano de Comercio S.A. de C.V.*, No. 18-cv-1004 (AKH), 2021 WL 5304285, at * 5 (S.D.N.Y. Nov. 15, 2021), involved a brokerage dispute, in which the court ruled that plaintiff had no right to seek refund of a margin call and in which the plaintiff failed to identify the investment fees it sought to recover.  Similarly, in *Miller v. HSBC Bank U.S.A., N.A.*, No. 13-cv-7500 (RWS), 2015 WL 585589, at *4 (S.D.N.Y. Feb. 11, 2015), the complaint at issue said nothing beyond the conclusory, general assertion that plaintiff "suffered damages."  Here, in contrast, plaintiff has specified damages, including fees and costs associated with the improper assignment as well as the diminution in the value of Frontier's leasehold interest.

discretion is deciding whether to declare the rights of litigants.'"  *MedImmune, Inc. v.*

*Genentech, Inc.*, 549 U.S 118, 136 (2007) (citation omitted).  In deciding a motion to dismiss a

claim for declaratory relief, courts consider: "(1) whether the judgment will serve a useful

purpose in clarifying or settling the legal issues involved; and (2) whether judgment would

finalize the controversy and offer relief from uncertainty." *Duane Reade, Inc. v. St. Paul Fire &*

*Marine Ins. Co.*, 411 F.3d 384, 389 (2d Cir. 2005).  Declaratory relief is particularly appropriate

here because the parties are locked in an ongoing commercial relationship involving aircraft

valued at over half a billion dollars, and declaratory relief concerning Frontier's rights following

the Carlyle Transaction will serve to protect Frontier's rights prospectively.  Contrary to

Defendants' argument, damages for breach of contract are insufficient to afford Frontier a

complete remedy, when Frontier's rights are also impacted by the continuing relationship with

the new servicer, *see* SAC ¶¶ 99-105, new trustee, new security assignments, *see id.* ¶¶ 117-123,

and the sufficiency of the guarantor's assets.  Accordingly, the SAC properly seeks declaratory

relief so that these entities will be barred from continuing to deny their obligations as

transferees.[13]

### C.    Frontier Has Pled a Viable Claim For Fraudulent Transfer

Frontier's fourth claim for fraudulent transfer arising out of the Carlyle Transaction

should not be dismissed.[14]  Defendants argue that Frontier cannot bring a claim under the New

---

[13] The cases cited by Defendants in support of their declaratory judgment argument are
inapposite.  *See Mariah Re Ltd. v. Am. Fam. Mut. Ins. Co.*, 52 F. Supp. 3d 601 (S.D.N.Y.
2014)(declaratory relief only concerned prior acts of defendants); *SEC v. Credit Bancorp, Ltd.*,
738 F. Supp. 2d 376, 388-89 (S.D.N.Y. 2010) (same); *EFG Bank AG, Cayman Branch v. AXA
Equitable Life Ins. Co.*, 309 F. Supp. 3d 89, 99 (S.D.N.Y. 2018) (declaration sought same relief
as contract claims and were asserted against same defendants); *Fleisher v. Phoenix Life Ins. Co.*,
858 F. Supp. 2d 290, 302 (S.D.N.Y. 2012) (same).

[14] Frontier's Fifth Claim for constructive fraudulent transfer against Defendant Vermillion
Holdings is not subject to Defendants' Motion because Vermillion Holdings has not appeared or
joined in the Motion.

York Voidable Transfer Act ("NYVTA") because Section 279(b) of the NYVTA requires the claim to be brought under Irish law. Defs. Br. at 21.

Defendants are incorrect that Irish law applies. The Framework Agreement and the Lease Agreements all contain a New York choice-of-law provision that broadly covers all claims arising out of or relating to each respective agreement, including claims, such as a claim under the NYVTA, sounding in tort. Lease Agreement Form 1 § 20.14 ("[T]his Agreement and all matters arising out of or relating in any way whatsoever to this Agreement (whether in contract, tort or otherwise) shall be governed by, the law of the State of New York."); Fisher Decl. Ex. A (Framework Agreement § 8.9) (similar). These provisions are binding on all of the defendants including Maverick. Maverick owns each of the aircraft-owning entities, is the borrower that purported to give a bank a security assignment of the aircraft and the Lease Agreements, SAC ¶ 28, is receiving direct benefits from the Lease Agreements and related documents, *id.* ¶ 36, and was directly involved in the fraudulent transfer of AMCK's assets to entities it controls. Under these facts, Maverick is bound by the broad choice-of-law clauses in the Lease Agreements and the Framework Agreement. *See e.g.*, *LaRoss Partners, LLC v. Contact 911 Inc.*, 874 F. Supp. 2d 147, 159 (E.D.N.Y. 2012) (applying contractual provision to party that was "closely related" to the signatory).[15]

"New York courts should not engage in any conflicts analysis where the parties include a choice-of-law provision in their contract." *Ministers & Missionaries Benefit Bd. v. Snow*, 26 N.Y.3d 466, 473-74 (2015). The Court of Appeals' holding in *Ministers & Missionaries* ruling "obviates the application" not only of "common-law conflict-of-laws principles" but also "statutory choice-of-law directives" such as Section 279 of the NYVTA, "even if [applying the statutory choice-of-law directive] results in the application of the substantive law of another

_____

[15] While *LaRoss* concerned a forum selection clause, its reasoning is applicable to the facts of this case, especially in light of Maverick's fraudulent attempt to escape liability under the Framework Agreement.

state." *Id.* at 918, 923.  Thus, New York law, and the substantive provisions of the NYVTA,

govern Frontier's fraudulent transfer claims, and those claims should not be dismissed.

## CONCLUSION

For the foregoing reasons, Frontier respectfully requests that the Court deny the Motion

in its entirety and grant any such other and further relief as the Court deems appropriate.

Dated:  November 4, 2022                     Respectfully submitted,
        New York, New York

        **BINDER & SCHWARTZ LLP**

        /s/ Eric B. Fisher
        Eric B. Fisher
        Tessa B. Harvey
        366 Madison Avenue, 6th Floor
        New York, New York 10017
        Tel: (212) 510-7008
        Fax: (212) 510-7299
        Email: efisher@binderschwartz.com
        Email: tharvey@binderschwartz.com

        -and-

        **LANE POWELL PC**
        David Schoeggl *(pro hac vice motion forthcoming)*
        601 S.W. Second Avenue
        Suite 2100
        Portland, Oregon 97204
        Telephone: (503) 778-2100
        Email: schoeggld@lanepowell.com

        *Attorneys for Plaintiff Frontier Airlines, Inc.*