# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FRONTIER AIRLINES, INC.,<br><br>               Plaintiff,<br><br>   v.<br><br>AMCK AVIATION HOLDINGS IRELAND LIMITED, ACCIPITER INVESTMENT 4 LIMITED, VERMILLION AVIATION (TWO) LIMITED, ACCIPITER HOLDINGS DAC, CARLYLE AVIATION MANAGEMENT LIMITED, MAVERICK AVIATION HOLDINGS LTD., MANCHESTER AVIATION FINANCE S.a.r.l., VERMILLION AVIATION HOLDINGS LIMITED, WELLS FARGO TRUST COMPANY, N.A., solely in its capacity as OWNER TRUSTEE, and UMB BANK, N.A., solely in its capacity as OWNER TRUSTEE,<br><br>               Defendants. | 22 Civ. 2943 (PAE) |

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTIONS TO DISMISS

Dated: November 28, 2022

Jeff E. Butler
John P. Alexander
Gege Weinberg
CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, New York 10019

*Attorneys for Defendants*

**TABLE OF CONTENTS**

Page

Introduction......................................................................................................................1

Argument .........................................................................................................................2

    I.    THE SAC FAILS TO ALLEGE A RELEVANT MONETARY
        AMOUNT IN EXCESS OF $75,000............................................................2

    II.   THE FIRST CLAIM FOR BREACH OF CONTRACT SHOULD
        BE DISMISSED FOR FAILURE TO STATE A CLAIM. ...................3

    III.  THE SECOND AND THIRD CLAIMS FOR DECLARATORY
        RELIEF SHOULD BE DISMISSED........................................................6

    IV.  THE VOIDABLE TRANSFER CLAIMS SHOULD BE
        DISMISSED. .............................................................................................7

Conclusion .....................................................................................................................10

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Arcadia Biosciences, Inc. v. Vilmorin & Cie*,
  356 F.Supp.3d 379 (S.D.N.Y. 2019) ........................................................ 9

*Black Lives Matter v. Town of Clarkstown*,
  354 F. Supp. 3d 313 (S.D.N.Y. 2018)........................................................ 7

*Geron v. Robinson & Cole LLP*,
  476 B.R. 732 (S.D.N.Y. 2012)................................................................... 8

*Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Markets Corp.*,
  585 F. Supp. 3d 405 (S.D.N.Y. 2022)....................................................... 6

*Harrington v. Crater*,
  No. 17 Civ. 2343, 2017 WL 4621618 (E.D.N.Y. Oct. 7, 2017) ............... 8

*InspiRx, Inc. v. Lupin Atlantis Holdings SA*,
  554 F. Supp. 3d 542 (S.D.N.Y. 2021)....................................................... 5

*LaRoss Partners, LLC v. Contact 911 Inc.*,
  874 F. Supp. 2d 147 (E.D.N.Y. 2012) ...................................................... 9

*Lockheed Martin Corp. v. Retail Holdings, N.V.*,
  639 F.3d 63 (2d Cir. 2011)........................................................................ 6

*MassMutual Asset Fin. LLC v. ACBL River Operations, LLC*,
  220 F. Supp. 3d 450 (S.D.N.Y. 2016)....................................................... 4

*Ministers & Missionaries Benefit Board v. Snow*,
  26 N.Y.3d 466 (2015) ......................................................................... 9, 10

*Rice v. Scudder Kemper Invs., Inc.*,
  No. 01 Civ. 7078, 2003 WL 21961010 (S.D.N.Y. Aug. 14, 2003) .......... 9

*Royal Mortg. Corp. v. F.D.I.C.*,
  20 F. Supp. 2d 664 (S.D.N.Y. 1998)......................................................... 6

*Thomson-CSF, S.A. v. Am. Arb. Ass'n*,
  64 F.3d 773 (2d Cir. 1995)........................................................................ 8

*VTX Commc'ns, LLC v. AT&T Inc.*, No. 19,
  Civ. 269, 2020 WL 4465968 (S.D. Tex. Aug. 4, 2020)............................ 8

**<u>Statutes</u>**

N.Y. Debt. & Cred. Law § 279 ........................................................................................ 9

Defendants AMCK Aviation Holdings Ireland Limited ("AMCK Holdings"), Accipiter Investments Aircraft 4 Limited ("Accipiter"), Vermillion Aviation (Two) Limited ("Vermillion"), Accipiter Holdings DAC ("Accipiter Holdings"), Carlyle Aviation Management Limited ("Carlyle Aviation"), Maverick Aviation Holdings Ltd. ("Maverick"), Manchester Aviation Finance S.a.r.l. ("Manchester"), Vermillion Aviation Holdings Limited ("Vermillion Holdings"), UMB Bank, N.A., not in its individual capacity but solely as Owner Trustee ("UMB"), and Wells Fargo Trust Company, N.A., not in its individual capacity but solely as Owner Trustee ("Wells Fargo") (collectively, "Defendants"), submit this Reply Memorandum of Law in further support of their motions to dismiss.[1]

## Introduction

Frontier's opposition brief confirms that the SAC should be dismissed.  *First*, Frontier fails to identify any monetary benefit to Frontier that would arise from the contract-based claims in this action.  The contract-based claims should be dismissed for this reason alone, both for failure to satisfy the amount-in-controversy requirement and for failure to plead damages as an element of breach of contract.  *Second*, Frontier cannot avoid the plain language of the Lease Agreements, which places conditions only on a transfer by a *lessor* or *owner participant*.  The transactions at issue in this case did not involve a transfer by a lessor or owner participant, and therefore the Lease Agreements do not place any restriction on those transactions.  *Third*, Frontier insists that the New York Uniform Voidable Transactions Act (the "New York UVTA")

---

[1] The Defendants other than Vermillion Holdings moved to dismiss on October 7, 2022.  (*See* Doc. 38.)  Vermillion Holdings had not been served with process at that time, and later filed a separate motion to dismiss on November 10, 2022.  (*See* Doc. 45.)  This reply memorandum is submitted on behalf of all Defendants, including Vermillion Holdings.  Capitalized terms used herein and not otherwise defined have the meaning given them in Defendants' memorandum of law filed on October 7, 2022 ("Defs.' Mem.").

should be applied to transfers by AMCK Holdings, an entity located in Ireland. This is inconsistent with the statutory language, which limits the application of the UVTA to transfers by debtors located in New York.

<u>Argument</u>

## I.    THE SAC FAILS TO ALLEGE A RELEVANT MONETARY AMOUNT IN EXCESS OF $75,000.

Frontier suggests that the amount-in-controversy requirement is satisfied merely because the Lease Agreements concern aircraft worth a great deal of money. (*See* Opp. 1-2.) The issue in this case, however, is the value of Frontier's alleged right to information pursuant to the Lease Agreements, not the value of the underlying aircraft or the leases as a whole. (*See* Defs.' Mem. 10.) Frontier tries to gloss over this reality, stating that "[s]ince the leases are worth more than $500 million, Frontier would only have to show that their value was diminished by 0.015% in order to meet the jurisdictional threshold." (Opp. 14-15.) While this may be true as a mathematical matter, it still begs the question of whether the SAC actually alleges a 0.015% diminution in value. It does not. As emphasized in Defendants' opening brief, Frontier is in the same position today as it was before the Carlyle Transaction. Frontier continues to possess and operate the same leased aircraft, and Frontier continues to make monthly rent payments for each aircraft.

Frontier also points to the alleged "changed" economics concerning its relationships with the lease guarantors. (Opp. 1.) Specifically, Frontier asserts that the value of the Lease Agreements has diminished (again by an unspecified amount) because Defendants have not provided assurances about the guarantors' net worth. (Opp. 14 & n.5.) However, there is no allegation that the guarantors *lack* the required net worth. And there is no reason to believe the guarantors' net worth has changed merely because they now are owned indirectly by an affiliate

of Carlyle Aviation instead of by AMCK Holdings.  Frontier's purely hypothetical concerns are insufficient to satisfy the amount-in-controversy requirement.[2]

That leaves Frontier with nothing more than its claim for unspecified fees and expenses. (Opp. 13, 22.)  Frontier seems to suggest that the legal fees it incurs arguing about the Carlyle Transaction are themselves sufficient to confer subject matter jurisdiction.  This would be an absurd result.  Frontier should not be allowed to bootstrap its way into federal court merely by incurring legal fees.  Otherwise, a party could satisfy the amount-in-controversy requirement simply by hiring suitably expensive attorneys.

## II.    THE FIRST CLAIM FOR BREACH OF CONTRACT SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM.

As set forth in Defendants' opening brief, New York law is clear that contractual limitations on assignment must be read narrowly.  Moreover, even when a contract does restrict assignment, that restriction does not apply to upstream changes in a party's corporate ownership unless there is express language to that effect.  (*See* Defs.' Mem. 14-16.)[3]  Here, the Lease Agreements and Participation Agreements provide that the *lessor* or *owner participant* may transfer or assign their contract rights or obligations provided that certain conditions are met. (Butler Decl. Ex. 1, § 20.2(a); *id.* Exs. 2-3, § 22.3; *id.* Ex. 4, § 1, 3.1(a).)  There is no restriction whatsoever on transfers by other parties.  Because the Carlyle Transaction does not involve a transfer by a lessor or owner participant, the conditions placed on such a transfer do not apply.

---

[2] Similarly, Frontier complains that Defendants have not confirmed that Accipiter Holdings' obligations under a separate Tripartite Agreement (concerning engine maintenance) have been properly assigned.  (Opp. 13-14; SAC ¶ 15.)  This is a red herring.  The SAC does not assert any claim for breach of the Tripartite Agreement.  In any event, there is no allegation that Accipiter Holdings is *not* able to perform such obligations or that there has *not* been such an assignment.

[3] Frontier's efforts, in lengthy footnotes, to distinguish the cases cited by Defendants are unpersuasive.  (*See* Opp. 18 n.9, 20 n.10.)  Tellingly, Frontier cites no authority to the contrary.

Frontier contends that the lease transfer provisions should cover the Carlyle Transaction because "mutual intent" and "industry standards" call for these terms to be construed broadly. (Opp. 2, 16.)  However, the parties' intent is "best found in the words they chose to use (and not use)."  *MassMutual Asset Fin. LLC v. ACBL River Operations, LLC*, 220 F. Supp. 3d 450, 456 (S.D.N.Y. 2016) (dismissing claim that restriction on transfer applied to "upstream change of control").  And because the contracts are unambiguous, there is no reason to consider extrinsic evidence of industry standards.  (*See* Defs.' Mem. 16.)[4]

The only contract language cited by Frontier that addresses corporate ownership of a lessor or owner participant is Section 20.2(a)(iii) of Aircraft Lease Form 1.  Frontier argues that this clause imposes conditions on the transfer of a "controlling interest in the Owner Participant." (*See* Opp. 16, 20.)[5]  This interpretation, however, ignores the critical introductory clause of Section 20.2(a).

The introductory clause of Section 20.2(a) states that the lessor and owner participant may transfer or "otherwise dispose" of their rights and obligations subject to certain conditions listed in subsections (i) to (vi).  (Butler Decl. Ex. 1.)  In other words, subsections (i) to (vi) operate only to qualify the right to engage in a transfer described in the introductory clause of Section 20.2(a).  Because the Carlyle Transaction is not covered by Section 20.2(a)'s introductory clause, subsection (iii)—like the other subsections—does not come into play. Frontier proposes to read subsection (iii) in isolation without reference to the introductory clause.

---

[4] Frontier asserts that market practice may be relevant to determine how much information about the transaction Frontier might deem "reasonably acceptable."  (Opp. 20-21 & n.11.)  This is beside the point.  Because the Carlyle Transaction does not involve transfers by a lessor or owner participant, Frontier is not entitled to *any* information, whether "reasonably acceptable" or otherwise.

[5] There is no comparable language in Aircraft Lease Form 2 or the related Participation Agreements.  (*See* Butler Decl. Exs. 2-4.)

By cherry-picking the language from subsection (iii), Frontier is ignoring the plain language of Section 20.2(a), read as a whole.  This is not permitted.  *See InspiRx, Inc. v. Lupin Atlantis Holdings SA*, 554 F. Supp. 3d 542, 554 (S.D.N.Y. 2021) (noting that contract interpretation requires consideration of "the contract as a whole" and not viewing "sentences or clauses in isolation").

Frontier also argues that Defendants should be "estopped" from denying the applicability of the lease transfer provisions because of their post-transfer conduct.  Specifically, Carlyle Aviation asked Frontier to provide insurance to cover "Carlyle's alleged lenders and purported affiliates," and that this additional coverage would be required only if a lease transfer has occurred.  (Opp. 19.)  This does not follow.  The Lease Agreements require Frontier to obtain various types of insurance that include "Lessor, Owner Participant and each Lender as additional insureds."  (Butler Decl. Ex. 1, §§ 14.3-14.4.)  "Lender" is defined broadly to include any person "notified in writing to Lessee that may from time to time provide financing directly or indirectly to Lessor, Owner Participant or any of its Affiliates . . . ."  Thus, insurance coverage can be required to cover any new lender, regardless of whether a transfer has occurred.

In any event, because the lease transfer provisions are unambiguous, the parties' post-contract conduct is not relevant.  Indeed, it is well-settled that a party "cannot circumvent the parol evidence rule by invoking the term 'equitable estoppel.'"  *Royal Mortg. Corp. v. F.D.I.C.*, 20 F. Supp. 2d 664, 670 (S.D.N.Y. 1998); *see also Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 71 (2d Cir. 2011) ("Because the contract is unambiguous, it was error for the district court to consider extrinsic evidence of the parties' post-contract conduct.").

### III.    THE SECOND AND THIRD CLAIMS FOR DECLARATORY RELIEF SHOULD BE DISMISSED.

Frontier's claims for declaratory judgment (Second and Third Claims) should be dismissed for the same reasons as the breach of contract claim, and also because they are duplicative of the breach of contract claim and because the requested declaratory relief would serve no useful purpose.  (*See* Defs.' Mem. 18-20.)

Frontier asserts that declaratory relief is appropriate because Frontier has a "continuing relationship" with the parties involved in the Lease Agreements.  (Opp. 23.)  However, Frontier fails to identify any situation in which the proposed declaratory relief would be relevant or useful.  For instance, Frontier complains about the appointment of a new lease servicer.  (SAC ¶ 104.)  But, because Frontier has elected to continue the contracts, it must cooperate with the new servicer even if there has been a breach.  (*See* Defs.' Mem. 19.)  Declaratory relief will not change the situation.

Moreover, Frontier completely ignores the argument that AMCK Holdings, Carlyle Aviation, Manchester and Maverick—who are not parties to the relevant contracts—cannot be subject to the declaratory claims concerning those contracts.  (*See* Defs.' Mem. 20.)  Thus, the Second and Third claims against these entities should be dismissed in any event.  *See Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Markets Corp.*, 585 F. Supp. 3d 405, 423 (S.D.N.Y. 2022) ("At the motion to dismiss stage, a plaintiff abandons a claim by failing to respond to defendant's arguments in support of dismissing that claim."); *Black Lives Matter v. Town of Clarkstown*, 354 F. Supp. 3d 313, 328 (S.D.N.Y. 2018) (same).

As to Vermillion Holdings, Frontier argues that the declaratory claims are proper because, even though Vermillion Holdings is not party to any relevant contract, it played an "integral role" in the Carlyle Transaction.  (Opp. to Vermillion Holdings' Motion, at 2-3.)  This

misses the point.  The declaratory claims concern Frontier's rights to information under the Lease Agreements.  Because Vermillion Holdings plays no role with respect to the Lease Agreements, declaratory relief against Vermillion Holdings would serve no useful purpose.

## IV.    THE VOIDABLE TRANSFER CLAIMS SHOULD BE DISMISSED.

The Fourth and Fifth Claims seek relief against Maverick and Vermillion Holdings for alleged voidable transfers.  As to these claims, the SAC invokes the New York UVTA and, alternatively, "Irish law."  (SAC ¶¶ 175-77, 185-87.)  In their opening briefs, Maverick and Vermilion Holdings argued that Section 279 of the New York UVTA requires the application of Irish law because the debtor, AMCK Holdings, is located in Ireland.  Moreover, under Irish law, claims for improper transfer are allowed solely in the context of liquidation proceedings.  (*See* Defs.' Mem. 21-22.)[6]

In response, Frontier now asserts that only New York law and the "substantive provisions" of the New York UVTA should apply—*i.e.*, not Section 279—because the Lease Agreements and the Framework Agreement have New York choice-of-law clauses.  (*See* Opp. 24-25.)  This argument should be rejected as a matter of law.

As an initial matter, Maverick and Vermillion Holdings are not, and never have been, party to any agreement with Frontier.  Thus, the choice-of-law clauses in agreements with Frontier do not apply to these entities.  *See e.g., Geron v. Robinson & Cole LLP*, 476 B.R. 732, 737 (S.D.N.Y. 2012) (on fraudulent transfer claim, ruling that choice-of-law provision did not apply to defendant that "was not a party" to the relevant agreement).

Frontier argues that the choice-of-law clauses in agreements with other parties should

---

[6] In its opposition brief, Frontier ignores this principle of Irish law.  Thus, Frontier has abandoned any argument that its claims can survive under Irish law.

apply, citing cases in which courts have applied choice-of-*forum* clauses to non-parties that are "closely related" to a signatory. (*See* Opp. 15; Opp. to Vermillion Holdings Motion, at 4.)[7] These cases are not on point. There are important differences between choice-of-law and choice-of-forum clauses, and they should not be interpreted in the same way. *See Harrington v. Crater*, No. 17 Civ. 2343, 2017 WL 4621618, at *3 (E.D.N.Y. Oct. 7, 2017) ("A choice-of-law clause and a forum selection clause are not the same, and address different needs and concerns." (internal quotation marks omitted)). In particular, a choice-of-law clause addresses "the parties' substantive rights," while a choice-of-forum clause concerns their "litigation needs." *Id.* An "expansive reading" of forum selection clauses may be appropriate for a number of policy reasons, including "the salutary effect of dispelling any confusion about where suits arising from the contract must be brought and defended . . . ." *Arcadia Biosciences, Inc. v. Vilmorin & Cie*, 356 F.Supp.3d 379, 395 (S.D.N.Y. 2019) (internal quotation marks omitted); *LaRoss Partners, LLC v. Contact 911 Inc.*, 874 F. Supp. 2d 147, 156 (E.D.N.Y. 2012) (internal quotation marks omitted). This rationale does not apply to a choice-of-law clause.[8]

Even assuming—wrongly—that choice-of-law clauses apply to Maverick or Vermillion

---

[7] Frontier cites one case in which a court applied a Delaware choice-of-law clause to non-signatories that were "seeking and obtaining direct benefits" from the contracts at issue. *See VTX Commc'ns, LLC v. AT&T Inc.*, No. 19 Civ. 269, 2020 WL 4465968, at *5 (S.D. Tex. Aug. 4, 2020). This principle of estoppel has no application here. Although Maverick and Vermillion Holdings purchased or sold the assets of AMCK Holdings, this does not mean they are directly benefiting from AMCK Holdings' contracts. *See Thomson-CSF, S.A. v. Am. Arb. Ass'n*, 64 F.3d 773, 779 (2d Cir. 1995) (rejecting application of estoppel doctrine where the alleged benefit "derives directly from [defendant's] purchase of [signatory], and not from the Working Agreement itself").

[8] Even if the "closely related" doctrine were relevant to choice-of-law clauses, it would not apply to Maverick because Maverick was not affiliated with any contracting parties until well after the Lease Agreements and Framework Agreement were entered. *See Arcadia*, 356 F. Supp 3d at 395 (rejecting application of "closely related" doctrine to party that was not affiliated at time relevant contract was entered).

Holdings, an affirmative claim under the New York UVTA must be governed by the terms of that statute. For instance, where a statute has "jurisdictional prerequisites" concerning its territorial scope, a New York choice-of-law clause does not change the statute's reach. *See Rice v. Scudder Kemper Invs., Inc.*, No. 01 Civ. 7078, 2003 WL 21961010, at *5 (S.D.N.Y. Aug. 14, 2003) (dismissing claim under New York Human Rights Law because there was no connection to New York, notwithstanding choice-of-law clause). Here, Section 279(b) may be read as not only a choice-of-law provision, but also as an acknowledgement of the territorial reach of New York substantive law. In effect, Section 279(b) establishes that the New York UVTA applies only to transfers made by a debtor located in New York, and that the statute has no application to transfers made by a debtor located in another jurisdiction. This reflects a policy choice to have a "clear rule" that "eliminates the risk that the laws of multiple jurisdictions might be applicable to a single transfer involving property in multiple jurisdictions or injuring creditors in multiple jurisdictions." N.Y. Debt. & Cred. Law § 279(b), McKinney's cmt. In other words, as a matter of substantive law, the New York UVTA does not support a claim based on a transfer by a foreign debtor.

Frontier cites *Ministers & Missionaries Benefit Board v. Snow ("MMBB")*, 26 N.Y.3d 466, 473-74 (2015) for the proposition that a contractual choice-of-law clause "obviates" the application of "statutory choice-of-law directives." (*See* Opp. 24-25.) However, *MMBB* involved an issue of contractual interpretation, not a *claim* brought under a New York statute. *MMBB* involved the determination of the right beneficiary under a contractual death benefits plan. The plan was governed by New York law, but the decedent passed away in Colorado. The New York Estates, Powers & Trusts Law ("EPTL") provides that the issue should be determined by "the law of the jurisdiction in which the decedent was domiciled at death." *Id.* at 470-71. On

these facts, the Court of Appeals found that New York law should apply—as the chosen law under the contract—rather than the EPTL provision pointing to Colorado law.  The Court reasoned that the EPTL merely codified a conflict-of-laws principle and that, because of the New York choice-of-law clause, there was no need for a conflict-of-laws analysis.  *Id.* at 473-75.

This case, in contrast, does not involve the interpretation of a contract governed by New York law.  It involves a statutory claim under the New York UVTA.  Under these very different circumstances, the statutory language of the New York UVTA should be applied to determine whether a claim exists.

## Conclusion

For the reasons set forth above, Defendants' Motions to Dismiss should be granted.

Dated: November 28, 2022            Respectfully submitted,
      New York, New York

                               s/ Jeff E. Butler

                              Jeff E. Butler
                              John P. Alexander
                              Gege Weinberg
                              CLIFFORD CHANCE US LLP
                              31 West 52nd Street
                              New York, New York 10019

                              *Attorneys for Defendants*