IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FRONTIER AIRLINES, INC.,<br><br>      Plaintiff,<br><br>    v.<br><br>AMCK AVIATION HOLDINGS IRELAND LIMITED, ACCIPITER INVESTMENT 4 LIMITED, VERMILLION AVIATION (TWO) LIMITED, ACCIPITER HOLDINGS DAC, CARLYLE AVIATION MANAGEMENT LIMITED, MAVERICK AVIATION HOLDINGS LIMITED, MANCHESTER AVIATION FINANCE S.A.R.L., VERMILLION AVIATION HOLDINGS LIMITED, WELLS FARGO TRUST COMPANY, N.A., solely in its capacity as OWNER TRUSTEE, and UMB BANK, N.A., solely in its capacity as OWNER TRUSTEE,<br><br>      Defendants. | Case No. 1:22-cv-02943 (PAE) |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION BY ORDER TO SHOW CAUSE FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

# **TABLE OF CONTENTS**

*Page*

TABLE OF AUTHORITIES ............................................................................................................ ii

PRELIMINARY STATEMENT ..................................................................................................... 1

FACTUAL BACKGROUND .......................................................................................................... 2

    I.     Frontier, AMCK, And The Leases ............................................................................ 2

    II.    AMCK's Breach Of The Framework Agreement And Leases ................................. 3

    III.   AMCK Attempts To Avoid Liability By Transferring Ownership Of The Aircraft To Carlyle ...................................................................................................................... 4

    IV.   Carlyle Attempts Another Fraudulent Transfer ....................................................... 5

    V.    Carlyle Declares A Breach Of The Leases ............................................................... 6

ARGUMENT .................................................................................................................................. 7

    I.     Grounding The Aircraft Or Terminating The Leases Would Cause Irreparable Injury To Frontier And Its Customers ................................................................................... 8

    II.    Frontier Can Make A Sufficient Showing On The Merits ....................................... 9

    III.   The Balance of Equities And Hardships And The Public Interest Strongly Favor Frontier's Continued Ability To Deploy The Aircraft ............................................ 10

CONCLUSION ............................................................................................................................. 12

# TABLE OF AUTHORITIES

**Cases** *Page(s)*

*Bakken Res., Inc. v. Edington*,
  No. 1:15-cv-8686, 2018 WL 1353271 (S.D.N.Y. Mar. 15, 2008)............................................11

*Cachillo v. Insmed, Inc.*,
  638 F.3d 401 (2d Cir. 2011)......................................................................................................8

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
  559 F.3d 110 (2d Cir. 2009)......................................................................................................8

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
  481 F.3d 60 (2d Cir. 2007)........................................................................................................8

*Greater Chautauqua Fed. Credit Union v. Marks*,
  600 F. Supp. 3d 405 (S.D.N.Y. 2022)......................................................................................10

*Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*,
  323 F. Supp. 2d 525 (S.D.N.Y. 2004)........................................................................................8

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
  883 F.3d 32 (2d Cir. 2018)........................................................................................................7

*Nat'l Coal. on Black Civic Participation v. Wohl*,
  498 F. Supp. 3d 457 (S.D.N.Y. 2020)....................................................................................7, 9

*Register.com, Inc. v. Verio, Inc.*,
  356 F.3d 393 (2d Cir. 2004)......................................................................................................8

*Rex Med. L.P. v. Angiotech Pharms. (US) Inc.*,
  754 F. Supp. 616 (S.D.N.Y. 2010) ...........................................................................................8

*Rosenbalm Aviation Inc. v. Port Auth. of N.Y. & N.J.*,
  636 F. Supp. 212 (S.D.N.Y. 1986) ...........................................................................................9

*Wisdom Import Sales Co., LLC v. Labatt Brewing Co., Ltd.*,
  339 F.3d 101 (2d Cir. 2003)......................................................................................................8

**Rules**

N.Y. CPLR 5202..............................................................................................................................10

N.Y. CPLR 5230..............................................................................................................................10

Plaintiff Frontier Airlines, Inc. ("Frontier") respectfully files this memorandum of law in support of its application for a temporary restraining order and preliminary injunction, pursuant to Rule 65 of the Federal Rules of Civil Procedure, enjoining defendants Wells Fargo Trust Company, N.A. ("Wells Fargo") and UMB Bank, N.A. ("UMB") as owner trustees (together, "Defendants"), from impounding, grounding and/or deregistering the Aircraft or terminating the Aircraft Lease Agreements ("Lease"), or exercising other default remedies for the 14 aircraft that were the subject of Default Notices served by Defendants on May 26, 2023 (the "Aircraft").

## PRELIMINARY STATEMENT

Frontier has dutifully performed its obligations under each of the Leases, but Carlyle Aviation Management Limited ("Carlyle") and Defendants have nonetheless demanded that Frontier sign its rights away to approve Carlyle's assignments of the Aircraft. When Frontier proposed reasonable conditions on those assignments to protect its rights, Defendants declared a lease default and threatened to ground or repossess the Aircraft – a devastating action not just for Frontier but for the traveling public. A TRO and preliminary injunction should be issued to block Carlyle's strong-arm tactic and to preserve the status quo.

Impounding or otherwise grounding the Aircraft or terminating the Leases would cause irreparable harm to both Frontier and its customers. The Aircraft transport around 12,000 passengers across North America every day. If Frontier loses access to the Aircraft, Frontier would lose substantial good will with its customers – to say nothing of the serious inconvenience to the customers themselves.

Frontier is also likely to succeed in showing it was not required to sign away its right to remedy breaches of the Lease. The Leases protect Frontier from having to acknowledge any assignment that restricts Frontier's rights under the Leases or other applicable agreements. Frontier has objected at every turn to Carlyle's and AMCK's attempts to manufacture the

judgment-proof status of defendants Frontier has been suing for years. Frontier is not required to undermine contractual right to damages or otherwise prejudice its contractual rights by co-signing Carlyle's and AMCK's efforts.

Finally, both the balance of equities and the public interest favor Frontier. Frontier's and the public's interest in the Aircraft completing long-scheduled flights far outweighs Carlyle's interest in coercing acquiescence. This is especially true here, where Carlyle received its alleged property rights in a fraudulent transfer, and so never had them to begin with. Issuing an injunction would merely preserve the status quo, in which Frontier is current on all lease payments and is otherwise in full compliance with the terms of the Leases. The Court should grant the application.

## **FACTUAL BACKGROUND**

### I.     Frontier, AMCK, And The Leases

Frontier operates a fleet of 127 commercial passenger aircraft leased from various aircraft lessors. Declaration of Howard Diamond ("Diamond Decl.") ¶ 2. Frontier flies to destinations in the United States and the rest of North America. *Id.* ¶ 3. The average Airbus A320 aircraft, which makes up a majority of Frontier's fleet, flies an average of 4.5 routes per day, each carrying up to 186 passengers. *Id.* ¶ 4. In total, the Aircraft can carry approximately 12,000 passengers per day. *Id.* Because Frontier's fleet is relatively small compared to other major U.S. airlines, Frontier's inability to use each aircraft in its fleet has an outsized effect on Frontier's operations. *Id.* ¶ 5. Moreover, summer is peak season for Frontier and other U.S.-based airlines, so the impact of any disruptions would be even greater. *Id.*

The 14 Aircraft[1] leased by Frontier were beneficially owned by AMCK Aviation Holdings Ireland Limited and its affiliates (collectively "AMCK")—through Wells Fargo and UMB as

---

[1] AMCK originally leased 15 aircraft to Frontier, but one was later returned by Frontier pursuant to the terms of the lease. Lambert Decl. ¶ 3.

2

owner trustees—at the time of execution of the Leases. Declaration of Paul Lambert ("Lambert Decl.") ¶ 2. All but one Lease followed a common lease format, referred to by the parties as Lease Form 1, whereas the 14th Lease followed a slightly different form, termed Lease Form 2. *Id.* ¶ 4 & Exs. 1-2. As of today, Frontier is current on payment for all of the Leases. Diamond Decl. ¶ 5.

Both Lease Form 1 and Lease Form 2 allow the lessors to transfer or assign ownership of the Aircraft to third parties but contain express protections for Frontier when this occurs. Lambert Decl. ¶ 5. Section 20.2(a)(ii) of Lease Form 1 states that Frontier need not agree to any transfer or assignment that would "result in any restriction . . . on Lessee's rights under this Agreement or the other Lessee's Documents or on Lessee's use or operation of the Aircraft." *Id.* ¶ 6. Section 22.3(v) of Lease Form 2 similarly allows a transfer only if it "will not increase Lessee's obligations, liabilities (financial or otherwise), or risks or diminish Lessee's rights and benefits, in each case under any Operative Document or in respect of the Aircraft." *Id.* ¶ 7. Generally accepted usage within the aviation industry reads references to "transfers" of ownership broadly to capture transactions at different levels of the corporate structure. *Id.* ¶ 8.

**II.    AMCK's Breach Of The Framework Agreement And Leases**

Frontier executed the most recent Framework Agreement for six leases with AMCK in March 2020, which governed the parties' conduct with respect to those leases. *Id.* ¶ 9 & Ex. 3. Almost immediately, AMCK repudiated the Framework Agreement because of the adverse effect the COVID-19 pandemic had on aircraft financing markets. *Id.* ¶ 10. Frontier and AMCK also actively discussed deferring both the delivery of recently leased Aircraft that had not yet been supplied by Airbus, as well as the deferral of associated rent due to pandemic travel restrictions. *Id.* ¶ 11. AMCK granted Frontier this temporary rent deferral while the parties negotiated other commercial details of the deferral, including with other parties like Airbus. *Id.*

AMCK reneged on its agreement to defer rent. *Id.* ¶ 12. On May 8, 2020, without warning, AMCK issued Frontier a Notice of Termination of the Framework Agreement on the ground that Frontier had not paid the rent that AMCK had told Frontier it could defer. *Id.* ¶ 13. Accordingly, AMCK retracted its commitment to purchase five remaining aircraft from Airbus and then lease them back to Frontier, as provided in the Framework Agreement. *Id.* To avoid a default with Airbus, Frontier quickly secured separate sources of financing for the yet-to-be-delivered Aircraft, at substantial loss to Frontier. *Id.* ¶ 14.

On November 18, 2020, Frontier filed suit to recover the losses Frontier sustained because of AMCK's failure to uphold its end of its bargain with Frontier, alleging (among other things) that AMCK anticipatorily repudiated the Framework Agreement. *Id.* ¶ 15 & Ex. 4. AMCK moved to dismiss, which Judge Stanton denied on May 5, 2021. *Id.* ¶ 16 & Ex. 5. Summary judgment motions are now fully briefed and are awaiting decision from Judge Stanton. *Id.* ¶ 17.

### III. AMCK Attempts To Avoid Liability By Transferring Ownership Of The Aircraft To Carlyle

After failing to dismiss Frontier's action against it, AMCK sold its entire aircraft portfolio to Carlyle Aviation Partners and its affiliates. *Id.* ¶ 18. Upon review of publicly available financial statements and other corporate records of relevant entities, Frontier came to understand that AMCK conducted a series of internal transfers that effectively relinquished AMCK Aviation Holdings' valuable assets. *Id.* ¶ 19. Those assets, including companies holding the AMCK subsidiaries that had leased the Aircraft to Frontier, were then contributed to a separate entity and sold to Carlyle for less than fair value, leaving AMCK as an undercapitalized shell entity unlikely to be solvent to pay any judgment obtained by Frontier. *Id.* AMCK did not tell Frontier that it was considering this transfer of ownership, let alone that it was going to achieve that change in ownership by liquidating its own assets. *Id.* ¶ 18. Rather, in January 2022, Frontier discovered a

Carlyle press release stating that Maverick Aviation Partnership LP was scheduled to acquire AMCK's ownership interest in the Aircraft (the "Press Release"). *Id.* & Ex. 6. Through discovery, Frontier learned that AMCK agreed to share with Carlyle any liability arising out of the first action before Judge Stanton. *Id.* ¶ 20.

Frontier was entitled to the transfer protections in Lease Form 1 and Lease Form 2, as discussed in Section I above. Immediately after it discovered the Press Release, Frontier made a written demand on AMCK for documents and information relevant to the sale to Carlyle. *Id.* ¶ 21. Despite its obligations under the Leases, AMCK denied that the sale was a "transfer" under the leases and provided no information. *Id.* AMCK provided the same response to Frontier's second written demand. *Id.* In April 2022, over Frontier's express objections to the sale—to which Carlyle did not respond—AMCK and Carlyle closed their transaction, and Frontier filed this action. *Id.* ¶ 22.

### IV. Carlyle Attempts Another Fraudulent Transfer

In June 2022, Carlyle notified Frontier that it had assigned as security all of its rights under certain Leases to a third-party lender. *Id.* ¶ 23 & Ex. 7. Just as in the transfer from AMCK to Carlyle, Carlyle provided Frontier no notice or opportunity to comment prior to executing that assignment. *Id.* ¶ 23. Subsequently, in November, 2022 the Carlyle Defendants requested that Frontier approve additional security assignments. *Id.* ¶ 24. Collectively, the June and November 2022 transactions resulted in the security assignments of all of the Aircraft. *Id.* Carlyle demanded that Frontier acknowledge these assignments. *Id.* ¶ 25. However, Frontier could not acknowledge the assignment without, among other prejudice and cost to Frontier, abandoning its valuable claims that AMCK had wrongfully transferred the Aircraft to Carlyle in the first instance, undermining Frontier's valuable claims in this action and its ability to collect on a judgment in the other action before Judge Stanton. *Id.* Frontier is not required to acknowledge an assignment that would place

5

Frontier in a worse economic position, including by destroying its right to recover damages, as outlined in Section I above.

To protect against this issue, Frontier attempted to negotiate with Carlyle to secure alternative security from Carlyle. *Id.* ¶ 26. Carlyle rejected Frontier's proposals, but offered that a solvent Carlyle entity guarantee any liability a Carlyle-owned entity is found to have to Frontier in the lawsuit before Judge Stanton. *Id.* Frontier countered that it was willing to accept as security Carlyle's choice of: (i) a letter of credit for $60 million; (ii) a bond in an amount to be determined by the court on a joint application; or (iii) a first lien security interest in 3 of the aircraft. *Id.* ¶ 27. Carlyle refused. *Id.*

Frontier also understands that certain of Carlyle's proposed assignments cannot yet occur even if Frontier were to consent, because a condition of such transfer would be the execution of a new tripartite agreement between CFM, who manufactures the engines used in the Aircraft, Frontier, and the proposed transferees.[2] *Id.* ¶ 28.

## V.  Carlyle Declares A Breach Of The Leases

Despite ongoing negotiations, on April 27, 2023, Carlyle sent Frontier a letter asserting that Frontier had "breached [its] obligations under the Non-Waiver Agreement[3] and each Lease." *Id.* ¶ 29 & Ex. 8. The letter also misrepresented Frontier's position on important issues. For example, the letter states that Frontier had insisted that the new lessor and security trustee subordinate their security rights to Frontier, ignoring that Frontier had been attempting to negotiate alternative security with Carlyle. *Id.* ¶ 31. Frontier responded to this letter on May 3, 2023

---

[2] In the aircraft industry, engines generally are obtained directly from an engine manufacturer separate and apart from the lease of the aircraft in which they are used. *Id.* ¶ 28.
[3] Carlyle and Frontier had executed a Non-Waiver Agreement after the transfer from AMCK to Carlyle so that the parties could continue honoring the Leases in the ordinary course, without continued performance being interpreted as a waiver or abandonment of Frontier's rights to challenge that proper transfers had taken place. *Id.* ¶ 30.

6

correcting the above misstatements and expressing continued willingness to negotiate toward mutually agreeable terms. *Id.* ¶ 32 & Ex. 9.

Carlyle took no further action on its April 27 letter until the afternoon of May 26 – the Friday before Memorial Day weekend. On that day, Carlyle served Frontier with a notice of default on all 14 Leases. *Id.* ¶ 33 & Ex. 10. The sole basis given for the claimed default was Frontier's alleged failure to execute transfer documents as presented by lessor under Section 20.2(b) of Lease Form 1. *Id.*

Under Section 16.1(c) of the Leases, serving notice of default starts a 15-day cure period under Form 1 (30 days under Form 2) after which an Event of Default is triggered. *Id.* ¶ 34. The Notices threaten five actions available under the Aircraft leases following a default by the lessee, two of which are "grounding of the Aircraft" and "cancelation of the leasing of the Aircraft and requiring return of the Aircraft to Lessor . . . ." *Id.* ¶ 35. Accordingly, if Frontier does not acquiesce to Carlyle's improper demands, Defendants could attempt to declare an Event of Default as early as June 10, 2023. *Id.* ¶ 34.

On June 5, 2023, before the end of the cure period, Carlyle filed suit against Frontier in New York Supreme Court, alleging claims of breach of contract and tortious interference with prospective economic advantage arising out of Frontier's failure to provide the requested consents. *Id.* ¶ 35. Frontier removed that action to federal court on June 6, 2023, on the basis of diversity. *Id.*

## ARGUMENT

Preliminary relief is appropriate where the moving party establishes "(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that [the requested relief] is in the public interest." *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 469 (S.D.N.Y.

7

2020) (quoting *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018)). Where, as here, the moving party seeks a "prohibitory injunction seeking only to maintain the status quo," the application of the above factors is more relaxed than the "more stringent" standard for a "mandatory injunction." *Cachillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011) (internal quotation marks omitted). Here, Frontier seeks to preserve the status quo, in which Frontier is able to use the leased Aircraft, continues to pay rent, and complies with all legitimate Lease obligations.

## I. Grounding The Aircraft Or Terminating The Leases Would Cause Irreparable Injury To Frontier And Its Customers

Irreparable harm—"certain and imminent harm for which a monetary award does not adequately compensate," *Wisdom Import Sales Co., LLC v. Labatt Brewing Co., Ltd.*, 339 F.3d 101, 113 (2d Cir. 2003)—is "the single most important prerequisite for the issuance of a preliminary injunction," *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (citations and quotations omitted. The movant must establish that it "will suffer an injury that is neither remote nor speculative, but actual and imminent," if an injunction is not granted. *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (internal quotation marks omitted).

Frontier and its customers would be irreparably harmed by the indefinite impoundment or grounding of the Aircraft, or the termination of the Leases. Restricting Frontier's use of the Aircraft during the busy summer season, in which approximately 12,000 passengers per day fly on the Aircraft, would cause Frontier substantial loss of customer good will and damage to its business reputation. Courts consistently recognize loss of good will and reputational damages as irreparable harm. *See, e.g.*, *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) ("loss of reputation, good will, and business opportunities" constitute irreparable harm); *Rex Med. L.P. v.*

8

*Angiotech Pharms. (US) Inc.*, 754 F. Supp. 616, 621 (S.D.N.Y. 2010) (loss of good will and inability to provide service to customers irreparable harm); *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004) (same). Most poignantly, aircraft operators facing imminent impediments to the operation of their aircraft have previously obtained temporary injunctive relief. *See Rosenbalm Aviation Inc. v. Port Auth. of N.Y. & N.J.*, 636 F. Supp. 212, 215, 218 (S.D.N.Y. 1986). Here, too, Frontier faces the prospect of being unable to operate its aircraft merely because it exercised its contractual rights. While impoundment might be appropriate against an airline that was attempting to move aircraft to rogue jurisdictions beyond the reach of the law, operating its airplanes unsafely, or not paying rent, none of those situations exist here.

The risk of harm is imminent and not speculative: in suing Frontier before the passing of the cure period, Carlyle has shown that it quite literally cannot wait to assert available remedies against Frontier. An injunction is necessary under the circumstances.

## II.     Frontier Can Make A Sufficient Showing On The Merits

The merits prong of an application for a temporary restraining order or preliminary injunction may be satisfied either by a "likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party." *Nat'l Coal. on Black Civic Participation*, 498 F. Supp. 3d at 469. Frontier is likely to succeed on the merits of its request or, at minimum, can raise serious questions on the merits, and the balance of equities and hardships (discussed in Section III below) decidedly favors Frontier.

Frontier was not required to consent to Carlyle's assignments. Under Section 20.2(a) of the Leases, Frontier is required to consent to an assignment or transfer only to the extent certain conditions are met. Section 20.2(a)(ii) allows Frontier to withhold consent to a transaction if that transaction would "result in any restriction, based on the facts and circumstances existing . . . , on

9

Lessee's rights under this Agreement or the other Lessee's Documents . . . ." Here, Frontier had filed litigation to enforce its rights under both the Leases and the Framework Agreement[4] before the first set of transfers to Carlyle by AMCK, let alone the assignments Carlyle now seeks to have Frontier acknowledge. By acknowledging the assignments, Frontier would render itself unable to enforce its judgment against the defendant's property, because Frontier would have acknowledged that Carlyle's assignee has a superior security interest in that property. *See, e.g.*, *Greater Chautauqua Fed. Credit Union v. Marks*, 600 F. Supp. 3d 405, 416 (S.D.N.Y. 2022) ("A judgment creditor . . . can seek in a myriad different ways to enforce a judgment once entered: the judgment may be executed against the debtor's real or personal property . . . .") (citing N.Y. CPLR 5202 & 5230). This would restrict Frontier's bargained-for right to seek remedies under the Lease and other applicable contracts, thus placing it under no obligation to agree to the assignments in the absence of other sufficient security.

### III. The Balance of Equities And Hardships And The Public Interest Strongly Favor Frontier's Continued Ability To Deploy The Aircraft

There is no doubt that the traveling public has a greater interest in Frontier's ability to operate its scheduled flights and fulfill its commitments to its passengers than in the Aircraft beneficial owners' ability to use groundings and lease terminations as leverage to force Frontier to consent to the assignments. Domestic air travel fulfills a critical role both in business and leisure activities—all of which would be interrupted if the Aircraft are allowed to be impounded or grounded for any length of time or if the Leases are terminated. As discussed above, approximately 12,000 passengers per day would be unable to travel if Frontier cannot use its aircraft to fly routes that have been scheduled for months.

---

[4] The Framework Agreement is a "Lessee's Document" incorporated into each of the Leases, per its own terms and the terms of the Leases. *See* Framework Agreement, Lambert Decl. Ex. 3, § 1.3; Lease Form 1, Lambert Decl. Ex. 1, § 1.1. at 10 ("Lessee's Documents" definition).

Granting Frontier's request would also further the public's interest in judicial economy. *See Bakken Res., Inc. v. Edington*, No. 1:15-cv-8686, 2018 WL 1353271, at *6 (S.D.N.Y. Mar. 15, 2008) ("considerations of judicial economy are frequently viewed as relevant to the public interest and weigh against the investment of court resources that may prove to be unnecessary") (internal quotation marks omitted). Forcing Frontier to consent to the assignments without providing the requested guaranty would necessitate yet further legal proceedings to protect Frontier's right to collect on its judgments and address further breaches of the Leases—which is exactly why Frontier was forced to bring this action in the first place.

On the other hand, there is little, if any, public interest in allowing Carlyle to ground or impound the Aircraft. Defendants would retain adequate remedies to address the breach they have declared; in fact, they have already asserted those remedies in the action filed earlier this week. Frontier is current on all rent payments on the Aircraft, Frontier is not seeking an injunction to prevent Defendants from demanding any payments available to them under Section 17 of the Lease Form No. 1 or Section 20.2(a)(iii) of Lease Form No. 2, and Defendants would retain all legal rights and remedies available to them under the Leases, as set forth in Sections 16.2(a) and (g) of Lease Form No. 1 and in Section 20.2(a) of Lease Form No. 2. Moreover, Frontier has already agreed that Carlyle could execute the transactions on the proposed terms by providing the security guarantees Frontier requested. This would not cause unfair prejudice to Carlyle, regardless of the outcome of the case before Judge Stanton: if Defendants prevail, the condition preceding the guarantee would not trigger, and if Frontier prevails, the guarantees would only insure that the defendants pay amounts lawfully owed.

11

Rather than negotiate with Frontier, Defendants simply declared a default. They were not entitled to do so, and should be enjoined from repossessing, impounding, deregistering or grounding the Aircraft or terminating the Leases as a result.

## CONCLUSION

For the foregoing reasons, Frontier respectfully requests that the Court issue a temporary restraining order (i) enjoining Defendants from taking any action to interfere with Frontier's continuing operation of the Subject Aircraft until further order of the Court, (ii) permitting Frontier to seek a preliminary injunction to run through this Court's final judgment on Frontier's Second Amended Complaint, and (iii) affording such other and further relief as the Court deems reasonable and proper under the circumstances.

Dated: June 7, 2023
        New York, NY

Respectfully submitted,

/s/ Eric B. Fisher
Eric B. Fisher
Gregory C. Pruden
**BINDER & SCHWARTZ LLP**
366 Madison Avenue
Sixth Floor
New York, NY 10017
(212) 510-7008
efisher@binderschwartz.com
gpruden@binderschwartz.com

David Schoeggl (*admitted pro hac vice*)
**LANE POWELL PC**
601 S.W. Second Avenue
Suite 2100
Portland, Oregon 97204
Telephone: (503) 778-2100
Email: schoeggld@lanepowell.com

*Attorneys for Frontier Airlines, Inc.*