UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FRONTIER AIRLINES, INC.,

Plaintiff,

-v-

AMCK AVIATION HOLDINGS IRELAND LTD.,
ACCIPITER INVESTMENT 4 LIMITED, VERMILLION
AVIATION (TWO) LIMITED, ACCIPITER HOLDINGS
DAC, WELLS FARGO TRUST COMPANY, N.A., *not in
its individual capacity, but solely as Owner Trustee*, UMB
BANK, N.A., *not in its individual capacity, but solely as
Owner Trustee*, CARLYLE AVIATION MANAGEMENT
LIMITED, MAVERICK AVIATION HOLDINGS LTD.,
MANCHESTER AVIATION FINANCE S.A.R.L., *and*
VERMILLION AVIATION HOLDINGS LIMITED,

Defendants.

22 Civ. 2943 (PAE)

OPINION &
ORDER

---

PAUL A. ENGELMAYER, District Judge:

This action concerns alleged contractual breaches and fraudulent transfers relating to 15

Airbus A320 aircraft. Plaintiff Frontier Airlines, Inc. ("Frontier") is a commercial passenger

airliner based in the United States. Dkt. 35 (the "Second Amended Complaint" or "SAC") ¶¶ 2,

19. Defendants are 10 corporate entities, including aircraft leasing companies and banks, who,

Frontier claims, breached leasing contracts and related security agreements and guarantees. As

alleged, they did so by effectuating a complex corporate transaction that changed the upstream

ownership of some of Frontier's counterparties to the contracts. Frontier alleges that certain

defendants took such action without giving Frontier advance notice, as contractually required.

Defendants dispute that Frontier had a right to notice of these transactions and that it suffered

damages.

Pending now are two defense motions to dismiss, which run to all claims.  For the reasons that follow, the Court grants these motions in part and denies them in part.

## I.     Background

### A.     Factual Background[1]

#### 1.     The Lease Agreements

Frontier relies on "sale and leaseback arrangements" common in the airline industry.  *Id.* ¶¶ 37–38.  Under these arrangements, an airline sells an aircraft asset to a lessor.  *Id.* ¶¶ 37–40.  The airline receives the sale price of the aircraft and simultaneously enters into an agreement to lease back the same aircraft from the lessor.  *Id.*

At issue here are 15 such lease agreements (collectively, the "Lease Agreements"), each for an Airbus A320 aircraft.  *Id.* ¶¶ 4, 5, 21, 24–25, 40.  Frontier is party to each agreement as the "Lessee."  *Id.*

Each Lease Agreement also names a "Lessor" and an "Owner Participant" (the latter also referred to as a "Beneficiary" or a "Owner Trustee").  *Id.* ¶¶ 4, 21, 23 39–40.  Aircraft owner trusts are "widely used in commercial aviation transactions in the United States" and involve foreign leasing companies.  *Id.* ¶ 39.  Foreign leasing companies face "regulatory requirements in the United States" restricting their rights to own or register an aircraft in the United States.  *Id.* To comply with these regulatory requirements, a foreign leasing company develops a trust relationship with a United States–based bank or trust company, which serves as the "Lessor" for

---

[1] The Court draws the facts in this decision principally from the SAC and the contracts and agreements that are incorporated by reference into or integral to the SAC.  *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.").  For purposes of the motion to dismiss under Rule 12(b)(6), the Court accepts all factual allegations in the SAC as true, drawing all reasonable inferences in Frontier's favor.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

the aircraft asset, and which holds the interest in the aircraft asset.  *See id.*  The foreign leasing

company is then designated the "Owner Participant" or "Beneficiary" per the Lease Agreement.

      Frontier's counterparties under the Lease Agreements, as "Lessors," are either defendant

UMB Bank, N.A. ("UMB Bank") or defendant Wells Fargo Trust Company, N.A., ("Wells

Fargo").  *Id.* ¶¶ 4, 21, 24, 25.  Defendant Accipiter Investment 4 Limited ("Accipiter") is the

Owner Participant for 14 leases; Vermillion Aviation (Two) Limited ("Vermillion") is the Owner

Participant for one.  *Id.* ¶¶ 21, 23.  At the time the Lease Agreements were entered, Accipiter and

Vermillion were affiliates of AMCK Aviation Holdings Ireland Limited ("AMCK Holdings").[2]

*Id.* ¶¶ 4, 23.  At one point, AMCK Holdings was an international aircraft leasing company

controlling more than 100 aircraft, including the 15 in the Lease Agreements.  *Id.* ¶ 2.

      The Lease Agreements each name a "Lease Manager" (also called a "Servicer").  *Id.* ¶

45.  The Lease Manager "is authorized to act on behalf of the [L]essor and . . . interfaces with

Frontier on day-to-day leasing matters, including collecting Frontier's monthly rent payments . . .

and communicating with Frontier regarding aircraft operations and maintenance."  *Id.*  AMCK

Holdings served as Lease Manager for the Lease Agreements.  *Id.* ¶ 43.

### 2.    Contracts Related to the Lease Agreements

      The SAC alleges that Frontier "executed" two categories of contracts "in connection with

the Lease Agreements" that "provide further protection in the event of a transfer of interest."  *Id.*

¶ 56.

      First are the 15 "Guarantees," each keyed to one of the 15 Lease Agreements.  *See id.*

¶ 57.  Each Guarantee provides a guarantee of performance for the obligations under the Lease

---

[2] The SAC uses the term "AMCK" to refer AMCK Holdings along with unspecified "affiliates, subsidiaries and owner-trustee entities."  SAC ¶ 2.  The Court adopts the same here, so as to be consistent with the SAC, which does not identify the subsumed entities.

Agreement. *Id.* ¶¶ 56–60. Frontier's counterparties to the Guarantees are Accipiter, Vermillion, or defendant Accipiter Holdings DAC ("Accipiter Holdings"). *See id.* ¶¶ 21–22, 57. For the 14 leases with Accipiter as the Owner Participant, Accipiter is the Guarantor for seven; Accipiter's related entity, Accipiter Holdings, is the Guarantor for the other seven. For the one lease with Vermillion as the Owner Participant, Vermillion is also the Guarantor. *See id.* ¶¶ 23, 56, 132–37.

Second, for each of two Lease Agreements with Accipiter as the Owner Participant, Frontier entered into a "Participation Agreement" with Accipiter and Wells Fargo. *Id.* ¶¶ 56, 61–62. Under these agreements, Accipiter "may sell or transfer its interest only if" certain "conditions are met." *Id.* ¶ 62.

### 3. The Framework Agreement and Subsequent Civil Action

In early 2020, Frontier and AMCK Holdings entered into an agreement (the "Framework Agreement") concerning the purchase and leaseback of six new Airbus aircraft. *Id.* ¶ 6. The SAC alleges that "AMCK breached the Framework Agreement" prompting Frontier, in November 2020, to sue AMCK Holdings (the "Framework Agreement Action") in this District, in a separate action before the Hon. Louis L. Stanton, seeking damages in excess of $50 million, plus interest and fees, arising from the alleged breach and AMCK's related conduct. *Id.* ¶ 6; *see Frontier Airlines, Inc. v. AMCK Aviation Holdings Ir. Ltd. et al.*, No. 20 Civ. 9713 (LLS) (S.D.N.Y.). As of today, that action is ongoing—discovery is complete and a summary judgment motion brought by the defense is pending.

### 4. The Carlyle Transaction

The SAC asserts that the Lease Agreements, Guarantees, and Participation Agreements collectively operated to give Frontier the right to "advance notice," SAC ¶ 157, of a series of corporate transactions (together, the "Carlyle Transaction") involving the ownership of

Accipiter, Vermillion, and Vermillion Aviation Holdings Limited ("Vermillion Holdings").
Frontier, the SAC alleges, was also entitled to "assurances," *see, e.g.*, *id.* ¶ 55, that the Carlyle
Transaction would not impair Frontier's rights.

In December 2021, the SAC alleges, Frontier "became aware through a press release"
that the corporate parent of AMCK Holdings had "entered into an agreement to sell its aviation
assets to" an affiliate of defendant Carlyle Aviation Management Limited ("Carlyle"). *Id.* ¶¶ 63–
64, 66. The SAC alleges that a goal of this sale was to deplete the assets of AMCK Holdings
such that it would be left "with insufficient assets to satisfy AMCK Holdings'[s] liabilities to
Frontier, including a judgment in the Framework Agreement Action." *Id.* ¶ 72.

The Carlyle Transaction proceeded in two parts.

First, in December 2021, before the announcement of the acquisition and the execution of
the sale agreement, "over 98% of AMCK Holdings'[s] assets were transferred out of AMCK
Holdings, with the AMCK Holdings entity intentionally excluded from the Carlyle Transaction."
*Id.* ¶ 67. Specifically, "the day before execution of the sale agreement," AMCK Holdings
"transferred nearly all of its assets to" defendant Manchester Aviation Finance s.a.r.l.
("Manchester"), "and became the sole shareholder (or member) of Manchester." *Id.* ¶ 68. Then,
"promptly after AMCK Holdings became the sole shareholder of Manchester, AMCK Holdings
relinquished its full ownership interest in Manchester to . . . Vermillion Holdings." *Id.* ¶ 69. The
SAC alleges that AMCK Holdings did not receive "fair consideration for that transfer," *id.* ¶ 70;
*see id.* ¶ 75, and was left with less than $10 million in assets, *id.* ¶ 79. The SAC refers to this set
of transactions as the "December 2021 Transfer." *Id.* ¶ 71.

Second, in April 2022, Vermillion Holdings transferred Manchester to Maverick Aviation
Holdings Ltd. ("Maverick"), a Carlyle affiliate. *See id.* ¶¶ 11, 17, 69, 73, 103, 123. At the same

time, another AMCK affiliate transferred Accipiter and Vermillion to Maverick.  *See id.* ¶¶ 63–65.  The SAC refers to this event as the "closing" of the Carlyle Transaction.  *Id.* ¶ 103 (the "April 2022 Transfer").

The SAC alleges that the Carlyle Transaction "raided AMCK Holdings of its assets without fair consideration and to the detriment of Frontier," *id.* ¶ 12, and "changed the beneficial ownership of interests in the aircraft under the Lease Agreements and other [operative [d]ocuments," "constitut[ing] a transfer, novation, or disposal of assets and obligations to Carlyle," *id.* ¶ 13.

### 5.    Frontier's Demand Letters and AMCK's Response

The SAC alleges that AMCK did not disclose the Carlyle Transaction to Frontier.  *Id.* ¶¶ 86–87.  Rather, Frontier learned of the Carlyle Transaction "from public sources."  *Id.* ¶ 88. Thereafter, "Frontier immediately reached out to AMCK for details on the transaction."  *Id.*  On January 4, 2022, Frontier requested that AMCK "provide information and documents" relating to the Carlyle Transaction.  *Id.*  On February 3, 2022, AMCK responded, "refus[ing] to provide any information concerning the acquisition and categorically den[ying] that AMCK owed Frontier any obligations under the aircraft leases in connection with the Carlyle Transaction" or the transfer of assets out of AMCK Holdings.  *Id.* ¶ 89.  On or about March 4, 2022, Frontier sent AMCK "another demand letter," informing AMCK of its breach and requesting, *inter alia*, "information regarding the deal structure and its impact on the entities relevant to the leases."  *Id.* ¶ 90.  On or about March 21, 2022, AMCK responded, "reiterat[ing] AMCK's position that it would not be providing any information concerning the acquisition," *id.* ¶ 91, and stating that the Carlyle Transaction "does not involve any transfer or assignment by a Lessor or an Owner Participant," *id.* ¶ 92.

The SAC alleges that AMCK and Carlyle then attempted to switch the Lease Managers for the Lease Agreements. *See id.* ¶¶ 98–116. On or about March 30, 2022, AMCK notified Frontier in writing that as a result of the Carlyle Transaction, AMCK would cease to be the Lease Manager and that AMCK expected Carlyle or an affiliate to act as the new manager under the Lease Agreements. *Id.* ¶ 98. That letter did not "provide any information regarding the structure of the acquisition and how the impending Carlyle Transaction would satisfy the requirements under each of the Lease[] [Agreements]." *Id.* ¶ 99. It provided only a "vague[] assert[ion]" that AMCK is "confident that Carlyle [Aviation] will have the expertise to continue managing the relevant aircraft and aircraft leases." *Id.* ¶ 102 (internal quotation marks omitted).

On or around April 13, 2022, after the April 2022 Transfer, Carlyle sent Frontier 15 notices, each entitled "Lessee Notice," "purporting to provide notice that Carlyle had acquired the aircraft portfolio and as a result, Carlyle had replaced AMCK Holdings as Lease Manager under . . . the . . . Lease Agreements." *Id.* ¶ 104. The Lessee Notices set forth various insurance requirements upon Frontier, such as obtaining "'tail' insurance coverage for the AMCK entities and AMCK's parent entities previously associated with the Lease Agreements," *id.* ¶ 105 (internal quotation marks omitted), which the SAC alleges are "only required following a 'transfer' that complied with the requirements stated in the Lease Agreements," *id.* ¶ 106.

On April 21, 2022, Frontier wrote Carlyle, "reiterat[ing] Frontier's contractual rights as Lessee" and setting out "a detailed list of questions and demands for Carlyle to answer." *Id.* ¶ 112. The SAC alleges that "Carlyle has provided incomplete responses and has continued to refuse to acknowledge that the lease requirements applicable to transfers applied to the Carlyle Transaction." *Id.* ¶ 114.

### 6.     The Security Assignment

The SAC alleges that Carlyle breached the Lease Agreements by assigning each of the aircraft and leases as security without giving Frontier advance written notice.  The SAC refers to Carlyle's actions as the "Security Assignment."  *Id.* ¶ 117.  On June 1, 2022, Carlyle sent Frontier "a series of notices notifying Frontier that it had effectuated a security assignment of its interest in the Leases and in the fifteen Aircraft and Aircraft Leases."  *Id.*  The SAC alleges that Frontier "was not given prior written notice of the closing nor any opportunity to review any Security Assignment documents that require Frontier's sign-off prior to the closing, in further violation of the Lease Agreements," *id.* ¶ 118, and that the notices given to Frontier lack customary protective language, *id.* ¶ 122.  The SAC also alleges that Carlyle failed to reimburse Frontier's costs and expenses arising from the "wrongful security assignment."  *Id.* ¶ 124.

### B.     Procedural Background

On April 8, 2022, Frontier initiated this action.  Dkt. 1.  On June 24, 2022, Frontier filed an amended complaint.  Dkt. 21 (the "FAC").  On August 26, 2022, all defendants except Vermillion Holdings moved to dismiss the FAC.  Dkt. 31.  On September 16, 2022, Frontier filed a second amended complaint.  Dkt. 35 (the "SAC").  On October 7, 2022, all defendants except Vermillion Holdings moved to dismiss the SAC, under Federal Rules of Civil Procedure 12(b)(1) and (6), Dkt. 38, and filed a supporting declaration, Dkt. 39, and memorandum of law, Dkt. 40 ("Mem.").  On November 4, 2022, Frontier opposed the motion to dismiss.  Dkt. 43 ("Opp.").  On November 10, 2022, Vermillion Holdings moved to dismiss the SAC.  Dkts. 45–46 ("Vermillion Mem.").  On November 22, 2022, Frontier opposed Vermillion Holdings' motion to dismiss.  Dkt. 47 ("Vermillion Opp.").  On November 28, 2022, defendants filed a joint memorandum in support of the motions to dismiss.  Dkt. 48 ("Reply").

## II.      Applicable Legal Standards

### A.      Motion to Dismiss Under Rule 12(b)(1)

Once subject matter jurisdiction is challenged, "[a] plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that jurisdiction exists." *Giammatteo v. Newton*, 452 F. App'x 24, 27 (2d Cir. 2011) (citing *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)).  In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), "the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff," *Nat. Res. Def. Council v. Johnson*, 461 F.3d 164, 171 (2d Cir. 2006), but "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it," *APWU v. Potter*, 343 F.3d 619, 623 (2d Cir. 2003); *see also Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011); *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008), *aff'd on other grounds*, 130 S. Ct. 2869 (2010).  A district court may consider evidence outside the pleadings, such as affidavits and exhibits.  *See Makarova*, 201 F .3d at 113.

### B.      Motion to Dismiss Under Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is properly dismissed where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.  When resolving a motion to dismiss, the Court must assume all well-pleaded facts to be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch*, 699

F.3d at 145.  That tenet, however, does not apply to legal conclusions.  *See Iqbal*, 556 U.S. at

678.  Pleadings that offer only "labels and conclusions" or "a formulaic recitation of the elements

of a cause of action will not do."  *Twombly*, 550 U.S. at 555.

## III.     Discussion

The Court first addresses subject matter jurisdiction and then turns to defendants'

challenges to the contract-based and fraudulent transfer claims.

### A.     Subject Matter Jurisdiction

At the threshold, the Court must determine whether it has subject matter jurisdiction.

"[S]ubject matter jurisdiction is an unwaivable *sine qua non* for the exercise of federal judicial

power."  *Curley v. Brignoli, Curley & Roberts Assocs.*, 915 F.2d 81, 83 (2d Cir. 1990).

Frontier identifies diversity jurisdiction, under 28 U.S.C. § 1332, as its sole basis for

asserting subject matter jurisdiction.  It argues that the Court has such jurisdiction over all

claims.  Opp. at 11–15.  Defendants argue that diversity jurisdiction is lacking except for the

fraudulent transfer claims, which are brought against only Maverick (Count Four) and

Vermillion Holdings (Counts Four and Five).  Mem. at 11.

This dispute turns on the amount in controversy, as it is undisputed that there is complete

diversity of citizenship.  The issue here is whether, as to each defendant, the SAC alleges that

more than $75,000 is at issue.  *See* 28 U.S.C. § 1332(a)(1) ("matter in controversy" must

"exceed[] the sum or value of $75,000, exclusive of interest and costs"); *Chase Manhattan Bank,*

*N.A. v. Aldridge*, 906 F. Supp. 870, 874 (S.D.N.Y. 1995) ("When liability among defendants is

several, a plaintiff cannot aggregate its claims against individual defendants in order to satisfy

the jurisdictional amount in controversy requirement of 28 U.S.C. § 1332.").  Such is clearly so

as to Vermillion Holdings and Maverick, who concede that more than $75,000 is at issue on the claims in Counts 4 and 5.[3]

As to Frontier's claims against the remaining defendants, in determining whether the amount-in-controversy requirement is met, "[t]he sum claimed by a plaintiff will control if it is made in good faith." *Mazzocchi v. Gilbert*, No. 21 Civ. 4959 (PAE), 2021 WL 3773639, at *3 (S.D.N.Y. Aug. 24, 2021); *see St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288 (1938). The SAC expressly claims damages on such claims in excess of $75,000. SAC ¶ 32. The Court thus may dismiss these claims "only if there is "a legal certainty from the [SAC] that [Frontier] cannot recover sufficient damages to invoke [diversity] jurisdiction." *Zacharia v. Harbor Island Spa, Inc.*, 684 F.2d 199, 202 (2d Cir. 1982). "It is not easy to do this. The legal impossibility of recovery must be so certain as virtually to negate [Frontier's] good faith in asserting the claim. Even where the allegations leave grave doubt about the likelihood of a recovery of the requisite amount, dismissal is not warranted." *GW Holdings Grp., LLC v. U.S. Highland, Inc.*, 794 F. App'x 49, 51 (2d Cir. 2019) (alterations and internal citations and quotation marks omitted). "[I]n determining whether a challenged jurisdictional amount has been met, district courts are permitted only to assess the allegations in a complaint and not the validity of any asserted defenses." *Ochoa v. Interbrew Am., Inc.*, 999 F.2d 626, 629 (2d Cir. 1993).

---

[3] Even if the amount in controversy on Frontier's other claims against these two defendants did not exceed $75,000, the Court would elect to exercise supplemental jurisdiction over these claims, as these "form part of the same case or controversy" and "derive from a common nucleus of operative fact." *Briarpatch Ltd., L.P. v. Phx. Pictures, Inc.*, 373 F.3d 296, 308 (2d Cir. 2004) (quoting 28 U.S.C. § 1367(a)) (internal quotation marks omitted); *see Vuona v. Merrill Lynch & Co.*, 919 F. Supp. 2d 359, 393 (S.D.N.Y. 2013).

Frontier has carried its pleading burden under this liberal standard.  In particular, Counts

Two and Three, which seek declaratory relief against all defendants, easily clear the $75,000

threshold.  Defendants dispute this point, on the ground that "[t]he SAC does not allege that the

transactions at issue have in fact caused Frontier to suffer any monetary harm," and that the SAC

principally claims that Frontier was not furnished "sufficient information or assurances about

those transactions."  Mem. at 9.  But when declaratory relief is sought, as under Counts Two and

Three, "it is well established that the amount in controversy is measured by the value of the

object of the litigation."  *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 347 (1977).

This amount in turn "is calculated from [Frontier's] standpoint; the value of the suit's intended

benefit or the value of the right being protected *or the injury being averted* constitutes the

amount in controversy when damages are not requested."  *Correspondent Servs. Corp. v. First

Equities Corp. of Fla.*, 442 F.3d 767, 769 (2d Cir. 2006) (emphasis added) (quotation omitted).

Here, in Count Two, the SAC alleges that "AMCK and its related entities failed to

provide sufficient information to determine whether the . . . Carlyle Transaction satisfies the

requirements of the Lease Agreements, Guarantees, and Participation Agreements."  SAC ¶ 141.

Each security deposit under each Lease Agreement "exceeds $200,000."  *Id.* ¶ 41.  The SAC

further alleges that, "absent confirmation that a Guarantor meets the net worth requirement set

forth in the Lease Agreements and Guarantees, the value of Frontier's leasehold interest is

substantially diminished."  *Id.*  The SAC thus adequately alleges "the value of the consequences

which may result" from resolution of this claim, *Am. Standard, Inc. v. Oakfabco, Inc.*, 498 F.

Supp. 2d 711, 717 (S.D.N.Y. 2007) (quoting *Beacon Constr. Co. v. Matco Elec. Co.*, 521 F.2d

392, 399 (2d Cir. 1975)), as $200,000—well above the jurisdictional requirement.

Similarly, Count One's breach-of-contract claim adequately alleges an amount in controversy exceeding $75,000 as to the remaining defendants—Accipiter, Accipiter Holdings, Vermillion, UMB Bank, and Wells Fargo. It does so based on the attorney's fees sought. "The Second Circuit has held that attorney's fees may be used to satisfy the amount in controversy only where they are recoverable as of right pursuant to statute or contract." *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 166 F. Supp. 2d 740, 755 (E.D.N.Y. 2001). Here, the SAC pleads breaches of several agreements, including the Guarantees and Participation Agreements, that expressly provide for recovery of attorneys' fees incurred in connection with enforcing those agreements. SAC ¶¶ 60–62. And it alleges that "Frontier incurred costs and legal fees in excess of $75,000" to which "Frontier is entitled to reimbursement under the Lease Agreements" *id.* ¶ 115; *see also id.* ¶ 124.

Lastly, plaintiff's claims for voidable transfer—brought against Maverick and Vermillion Holdings—satisfy the amount in controversy requirement, as defendants acknowledge. Mem. at 11. Had the Court lacked diversity jurisdiction over the claims against the other defendants named in Counts One, Two, and Three, there would be a compelling argument to exercise supplemental jurisdiction, given the close relationship between these and the contract-based claims, which form parts of the same case or controversy. *F5 Cap. v. Pappas*, 856 F.3d 61, 77 (2d Cir. 2017) (citing 28 U.S.C. § 1367(a)). The SAC alleges an integrated multiparty scheme to evade contractual obligations and a potential judgment, justifying treating the claims here in a single litigation provided there is a basis for exercising federal jurisdiction over at least one of these claims. *Briarpatch Ltd., L.P. v. Phx. Pictures, Inc.*, 373 F.3d 296, 308 (2d Cir. 2004).

The Court accordingly finds diversity jurisdiction proper over all claims and defendants, and alternatively that even if diversity jurisdiction were proper as to only some claims,

supplemental jurisdiction would properly be exercised over the balance. The Court thus denies defendants' motion to dismiss based on Rule 12(b)(1).

### B. Frontier's Claim for Breach of Contract Against Accipiter, Accipiter Holdings, Vermillion, UMB Bank, and Wells Fargo (Count One)

Frontier argues that defendants Accipiter, Accipiter Holdings, Vermillion, UMB Bank, and Wells Fargo breached the Lease Agreements, Guarantees, and Participation Agreements by carrying out the Carlyle Transaction.

To state a claim for breach of contract under New York law,[4] Frontier must allege "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Eternity Glob. Master Fund*, 375 F.3d at 177 (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)). To allege a breach of contract plausibly, a plaintiff must identify "the specific provisions of the contract upon which liability is predicated." *Benihana of Tokyo, LLC v. Angelo, Gordon & Co., L.P.*, 259 F. Supp. 3d 16, 33 (S.D.N.Y. 2017) (citing *Sud v. Sud*, 211 A.D.2d 423, 424 (1995)), *aff'd*, 712 F. App'x 85 (2d Cir. 2018) (summary order).

In moving to dismiss, defendants argue that the SAC does not plead (1) a breach of any contractual agreement; and (2) damages to Frontier resulting from any such breach. Mem. at 12–17. The Court reviews these arguments in turn.

#### 1. Breach

---

[4] The parties have exclusively discussed the claims for breach of contract under New York law. Where "[t]he parties' briefs assume that New York substantive law governs the issues presented, . . . such implied consent is, of course, sufficient to establish the applicable choice of law." *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009) (quoting *Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 514 n.4 (2d Cir. 2001)); *see Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000). Thus, the Court "follow[s] their lead" and applies New York law to Frontier's claims. *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997).

Count One of the SAC alleges breaches of three categories of contracts: the 15 Lease Agreements, 15 Guarantees, and two Participation Agreements. These contracts relate to 15 aircraft. For each aircraft, there is a Lease Agreement and a Guarantee. Two aircraft also have Participation Agreements.

Of the 15 Lease Agreements, 13 are in substantially similar form ("Aircraft Lease Form 1"), and the other two are in a different form but similar to each other ("Aircraft Lease Form 2"). SAC ¶¶ 52–53. Frontier's counterparties under the Lease Agreements are UMB Bank or Wells Fargo. *Id.* ¶¶ 24–25.

Section 20.2(a) of Aircraft Lease Form 1, titled "Benefit of Agreement," provides in relevant part:

(a) *Lessor Transfer.* Each of Lessor[5] and Owner Participant[6] (and any subsequent permitted assignee or transferee) shall have the right at any time, at its own expense and upon prior written notice to Lessee,[7] to transfer ownership or beneficial ownership, as applicable, of the Aircraft, or to assign (including to assign as security), mortgage, novate, transfer, grant participations in, or otherwise dispose of its rights and obligations under this Agreement and the other Operative Documents, to any other person by outright transfer or assignment or collateral assignment or by operation of law and Lessee hereby consents to any such transfer or assignment; **provided that**:

(i) Lessee shall have no greater financial obligation or liability under this Agreement and the other Lessee Documents as a result of such transfer based on the facts and circumstances existing and applicable laws in effect at the time of such transfer, than it would have had if such transfer had not taken place . . . .;

---

[5] The contract defines this party as UMB Bank or Wells Fargo, depending on the particular Lease Agreement.

[6] The contract defines this party as Accipiter or Vermillion, depending on the particular Lease Agreement.

[7] The contract defines this party as Frontier for all 13 Lease Agreements using Aircraft Lease Form 1.

(ii) such transfer shall not result in any restriction, based on the facts and circumstances existing and applicable laws in effect at the time of such transfer, on Lessee's rights under this Agreement or the other Lessee's Documents or on Lessee's use or operation of the Aircraft;

(iii) in the case of a sale of the Aircraft by Lessor or transfer of the beneficial interest of Owner Participant in the Aircraft or a transfer (other than to an Affiliate of the Lessor Guarantor) of a controlling interest in the Owner Participant, any such assignee or transferee shall be a Permitted Transferee and shall unconditionally guaranty the obligations of Lessor under this Agreement pursuant to a Guarantee in form substantially similar to the Guarantee executed by Owner Participant in favor of Lessee unless the existing Lessor Guarantee will remain in full force and effect following such transfer.[8]

(iv) in the case of an assignment as security by Lessor, any such assignee or transferee shall have delivered to Lessee an executed copy of a quiet enjoyment letter substantially in the form of Schedule 11, but in any event on terms not less favorable to Lessee;

(v) Lessor shall have reimbursed to Lessee (or shall have agreed in writing to promptly reimburse to Lessee following such assignment, transfer or novation) Lessee's reasonable and invoiced out-of-pocket costs and expenses incurred in connection with its cooperation;

. . . .

*See, e.g.*, Dkt. 39-1 at 93–94 (emphasis in original).

The decisive questions, in sequence, thus are whether (1) the Carlyle Transaction falls within the transactions contemplated by Section 20.2(a); and (2) if so, whether the SAC adequately pleads that defendants breached their obligations under Section 20.2(a), to wit, to give "prior written notice" to Frontier and ensure that, following the transaction, Frontier has "no greater financial obligation or liability" under the Lease Agreement. "On a motion to dismiss, the Court may resolve issues of contract interpretation when the contract is properly before the

---

[8] The SAC incorrectly reproduces the final punctuation mark of Section 20.2(a)(iii) as a semicolon, not a period, as correctly shown here. No party argues that there is consequence, for purposes of contract interpretation, to this nuance.

Court, but must resolve all ambiguities in the contract in [p]laintiffs' favor." *Serdarevic v. Centex Homes, LLC*, 760 F. Supp. 2d 322, 328 (S.D.N.Y. 2010).

The Court finds, with Frontier, that (1) the Carlyle Transaction is covered by Section 20.2(a) (and is specifically contemplated by Section 20.2(a)(iii)); and (2) the SAC adequately pleads that defendants failed to meet their disclosure and guarantee obligations under Section 20.2(a).

The parties' disagreement on these points centrally turns on their different views as to the relationship between Section 20.2(a)'s introductory clause and its subsections. *See* Mem. at 12–17; Opp. at 15–21. The introductory clause describes the Lessor's and Owner Participant's rights to transfer or assign rights under the Lease Agreement. *See* Dkt. 39-1 at 93 ("Each of Lessor and Owner Participant (and any subsequent permitted assignee or transferee) shall have the right at any time, at its own expense and upon prior written notice to Lessee,[9] to transfer ownership or beneficial ownership, as applicable, of the Aircraft, or to assign (including to assign as security), mortgage, novate, transfer, grant participations in, or otherwise dispose of its rights and obligations under this Agreement and the other Operative Documents, to any other person by outright transfer or assignment or collateral assignment or by operation of law. . . ."). It concludes with the phrase "provided that," underneath which several subsections—including 20.2(a)(iii)—appear indented.

Defendants read the introductory clause to cover transfers *by* the Owner Participants, not transfers *of* the Owner Participants. They contend: "[S]ubsections (i) to (vi) operate only to qualify the right to engage in a transfer described in the introductory clause of Section 20.2(a)."

---

[9] The contract defines this party as Frontier for the 13 Lease Agreements using Aircraft Lease Form 1.

Reply at 4–5.  Because the Carlyle Transaction is not covered by Section 20.2(a)'s introductory clause, they contend, subsection (iii), which describes "a transfer (other than to an Affiliate of the Lessor Guarantor) of a controlling interest in the Owner Participant," Dkt. 39-1 at 93, does not come into play (and nor would the other subsections).  Frontier, in contrast, contends that the subsections describe further protections afforded to it, as the Lessee, under particular scenarios of transfer entailing the "dispos[al] of [the Lessor's and Owner Participant's] rights and obligations under this Agreement" as stated in the introduction.  *Id.*

The "words and phrases [in a contract] should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *LaSalle Bank Nat'l Ass'n v. Nomura Asset Cap. Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (internal quotation marks and ellipsis omitted).  Any interpretation of a contract that "has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible."  *Id.* (citation omitted).

Frontier's reading is superior.  Reading "the contract as a whole"—as defendants urge, *see* Reply at 4–5 (citing *InspiRx, Inc. v. Lupin Atlantis Holdings SA*, 554 F. Supp. 3d 542, 554 (S.D.N.Y. 2021))—the subsections do *not* contemplate transactions outside the scope of the introductory language.  The contract is not properly read to exclude the "the case of . . . a transfer (other than to an Affiliate of the Lessor Guarantor) of a controlling interest in the Owner Participant" outlined in Section 20.2(a)(iii) from the transfers and rights-disposal scenarios contemplated by the introductory language.  Quite the contrary, read in totality, the subsections shed light on transfer and rights-disposal scenarios within the scope of the introductory section.  They do so by adding obligations in these scenarios upon the Lessor and Owner Participant.  The

phrase "provided that" accordingly is best read to develop the obligations upon the Lessor and Owner Participant in these situations, rather than limiting those obligations.

Indeed, read naturally, each subsection under Section 20.2(a) requires *more*, not less, of the Lessor and Owner Participant. For example, Section 20.2(a)(i) requires that any transfer not impose greater financial obligation or liability upon the Lessee; Section 20.2(a)(iv) requires that the Lessee receive particular documents "in the case of an assignment as security by Lessor"; and Section 20.2(a)(v) requires the Lessor to reimburse certain fees and expenses imposed on the Lessee by any transfer. Defendants' alternative reading of Section 20.2(a)(iii) as a "carveout" to impose obligations on these entities in connection with a universe of transactions *not implicated* under Section 20.2(a), is, in contrast, oddly placed and unnatural. *Analect LLC v. Fifth Third Bancorp*, 380 F. App'x 54, 57 (2d Cir. 2010) (summary order) ("A written contract will be read as a whole, . . . every part will be interpreted with reference to the whole[,] and if possible it will be so interpreted as to give effect to its general purpose." (internal citation and quotation marks omitted)); *Hillside Metro Assocs., LLC v. JP Morgan Chase Bank*, No. 10 Civ. 1772 (JG) (SMG), 2011 WL 5008368, at *9 (E.D.N.Y. Oct, 20, 2011) (in interpreting a contract, court must "consider the contract as a whole . . . and attempt to harmonize all of its terms"). Accordingly, the Court holds, under the plain language of the contract, "a transfer (other than to an Affiliate of the Lessor Guarantor) of a controlling interest in the Owner Participant," Dkt. 39-1 at 93, triggers the disclosure obligations in Section 20.2(a), including, as relevant here, to provide "prior written notice" of the transaction to Frontier.

The SAC adequately pleads that defendants breached this obligation, in that they did not "provide written notice" that Accipiter and Vermillion had been sold to an affiliate of Carlyle. *See, e.g.*, SAC ¶¶ 86–88. As pled, Frontier instead learned of the Carlyle Transaction from

public sources. *Id.* ¶ 88. Defendants appear to concede the adequacy of this factual averment, relying instead, in moving to dismiss, on their construction above of Section 20.2(a). *See* Mem. at 1 ("Accipiter and Vermillion were sold to an affiliate of defendant Carlyle Aviation."); 7 ("After learning about the Carlyle Transaction from public sources, Frontier began sending agitated letters to AMCK Holdings, demanding detailed information about the deal.").

The SAC therefore adequately pleads a breach of the 13 lease agreements using Aircraft Lease Form 1. In each instance, it adequately pleads, the sale of Accipiter and Vermillion to an affiliate of Carlyle was "a transfer (other than to an Affiliate of the Lessor Guarantor) of a controlling interest in the Owner Participant[s]," Dkt. 39-1 at 93, and defendants did not provide prior written notice of that transaction, as required by Section 20.2(a).

The analysis of the two lease agreements using Aircraft Lease Form 2 is different. Section 22.3 of that agreement, which appears under a section titled "Assignment and Transfer," provides in relevant part:

> Transfer by Lessor. Lessor may sell, assign, novate or otherwise transfer its right, title and interest in the Aircraft or this Lease without Lessee's consent (a "**Transfer**"), subject to the following conditions:
>
> (i) the proposed purchaser, assignee or transferee (the "**Transferee**") shall enter into an agreement, reasonably satisfactory to Lessee, assuming all obligations of Lessor under this Lease and the other Operative Documents and of Beneficiary under the Participation Agreement and other Operative Documents;
>
> (ii) Lessor shall be responsible for Lessee's reasonable legal fees and other reasonable costs and expenses incurred in respect of such Transfer and shall pay such costs and expenses promptly upon demand therefor;
>
> . . .
>
> (v) Lessee's obligations, liabilities (financial or otherwise), or risks or diminish Lessee's rights and benefits, in each case under any Operative Document or in respect of the Aircraft (to be determined in each case as at the time of such Transfer by applying all applicable laws as are enacted

20

>       and/or in effect on the effective date of such Transfer), it being
>       acknowledged by Lessee that the inclusion of the Transferee as an
>       Indemnitee and as an Additional Insured will not constitute an increase in
>       Lessee's obligations, liabilities or risks;
>
>       . . . .

*See, e.g.*, Dkt. 39-2 at 49–50 (emphasis in original).

The SAC excerpts from this agreement, *see* SAC ¶ 53, but it does not specify the provision that it contends defendants breached. The closest it comes is in a reference to industry norm and practice. The SAC states that "Lessees in the aircraft leasing market are permitted to examine any proposed transaction, pursuant to which interests in the lease are to be transferred, to confirm that the transfer preconditions under the lease are satisfied, and to receive assurances from the existing lessor parties as well as documentary evidence." *Id.* ¶ 55.

Such pleading is inadequate to state a claim. "A breach of contract claim will be dismissed . . . as being too vague and indefinite, where the plaintiff fails to allege, in nonconclusory fashion, the essential terms of the parties' purported contract, *including the specific provisions of the contract upon which liability is predicated*." *Highlands Ins. v. PRG Brokerage, Inc.*, No. 01 Civ. 2272, 2004 WL 35439, at *8 (S.D.N.Y. Jan. 6, 2004) (emphasis added) (quoting *Sud*, 211 A.D.2d at 424). The general industry norm to which the SAC adverts does not appear in the text of Aircraft Lease Form 2, which, unlike Aircraft Lease Form 1, lacks explicit language imposing a duty of disclosure or prior review of a transaction. It does state that the agreement consummating the transaction must be "reasonably satisfactory to Lessee," but the SAC does not plead a breach of this provision. In any event, the SAC's contract breach claims as to Aircraft Lease Form 2 are faulty for a separate reason: the Carlyle Transaction (as well as the subsumed transfers) are not pled to fall under the scope of the language setting forth covered transactions.

However, although a breach of Aircraft Lease Form 2 is not adequately pled, the SAC does plead a breach of two contracts related to it—the Participation Agreements. The SAC explicitly references provisions of these agreements as having been breached. These appear in a section titled "Assignment or Transfer of Interests" and a subsection titled "Transfer of Owner Participant's Interest":

> (a) Owner Participant may sell, assign or transfer (whether directly or indirectly through an operation of law transfer such as a merger, consolidation or sale of membership interests) all or any of its rights under the Owner Participant Agreements, including, without limitation, Owner Participant's rights, title and interests in and to the Aircraft and the Estate (an "OP Transfer"), only if it complies with the following conditions:

> > (1) the proposed purchaser, assignee or transferee (the "OP Transferee") shall confirm in writing, in a form reasonably satisfactory to Lessee, its undertaking to perform the obligations of Owner Participant in a form substantially similar to this Agreement;

> > (2) Owner Participant shall be responsible for Lessee's reasonable legal fees and other reasonable costs and expenses incurred in respect of such OP Transfer and shall pay such costs and expenses promptly upon demand therefor;

> > (3) the OP Transferee shall (i) not be an airline, aircraft operator, freight forwarder, or an Affiliate thereof and (ii) have (or be guaranteed, through a guarantee agreement reasonably acceptable to Lessee, by a person having) a minimum tangible net worth of [redacted] as determined by IFRS as of the time of and immediately after giving effect to such OP Transfer;

> > (4) the OP Transferee must be a "citizen of the United States" under Section 40102(a)(15) of Title 49 of the U.S.C. or must otherwise permit Lessor to qualify for the continued United States registration of the Aircraft without restriction as to use;

> > (5) the OP Transfer will not increase Lessee's obligations, liabilities (financial or otherwise), or risks or diminish Lessee's rights and benefits, in each case under any Operative Document or in respect of the Aircraft (to be determined in each case as at the time of such OP Transfer by applying all applicable laws as are enacted and/or in effect on the effective date of such OP Transfer), it being acknowledged by Lessee that the inclusion of the OP Transferee as an Indemnitee and as an Additional Insured will not constitute an increase in Lessee's obligations, liabilities or risks; and

(6) the OP Transfer shall not affect the U.S. registration of the Aircraft (assuming the Aircraft is registered in the U.S. at the time of the transfer) or the registration of the Aircraft in any other country where the Aircraft may be registered at the time of such OP Transfer.

*See, e.g.*, Dkt. 39-4 at 6–7.

For substantially the same reasons that the SAC pleads a breach of Aircraft Lease Form 1, the SAC pleads a breach of the Participation Agreements. The definition in these of a covered transaction (one which "sell[s], assign[s] or transfer[s] (whether *directly or indirectly* through an operation of law transfer such as a merger, consolidation or sale of membership interests)"), *id.* (emphasis added), plausibly covers the Carlyle Transaction and related transactions. And the SAC pleads that defendants did not "confirm in writing" that Accipiter and Vermillion had been sold to an affiliate of Carlyle. The SAC thus adequately pleads a breach relating to the final two Lease Agreements, albeit with respect to the associated Participation Agreements, not Aircraft Lease Form 2 itself.

The SAC identifies a third and final category of contracts related to the 15 Lease Agreements: the 15 Guarantees, each executed in connection with a lease agreement. *See* SAC ¶ 56 ("The guarantees . . . executed in connection with the Lease Agreements provide further protection in the event of a transfer of interest."). Salient here, the Guarantees guarantee performance for the obligations under the Lease Agreement, such that the Guarantors are responsible to perform and fulfill the Lessor's or Owner Participant's obligations under the leases in the event of a default or breach. *Id.* ¶¶ 41, 95. The Guarantors must also represent and warrant that they have a specific net worth. *Id.*

Insofar as the SAC adequately pleads breaches of 13 Lease Agreements and two Participation Agreements, the Guarantees associated with these agreements are implicated. And

the SAC pleads that Guarantors Accipiter, Accipiter Holdings, and Vermillion have not met their obligations under the Guarantees relative to the alleged breaches. *Id.* ¶¶ 85, 132–37.  The SAC thus plausibly pleads a breach of the Guarantees, too.  *See Greenlight Reinsurance, Ltd. v. Appalachian Underwriters, Inc.*, 958 F. Supp. 2d 507, 522 (S.D.N.Y. 2013).

In sum, the SAC pleads a breach as to the 13 Lease Agreements relying on Aircraft Lease Form 1 (UMB Bank and Wells Fargo); the Participation Agreements (Accipiter and Wells Fargo); and the Guarantees (Accipiter, Vermillion, and Accipiter Holdings).

### 2.    Damages

Defendants argue that even if the SAC has plausibly pled a breach, it fails to allege resulting damages.  In so arguing, defendants largely make the same arguments as in asserting a lack of subject matter jurisdiction.  *See* Mem at 8–12, 17.  Frontier disagrees.  Opp. at 21–22.  The Court finds the SAC to adequately plead damages.

A mere "allegation that defendant 'suffered damages' without particular facts as to how she was damaged does not satisfy *Twombly* and *Iqbal*."  *Int'l Bus. Machines Corp. v. Dale*, No. 11 Civ. 951 (VB), 2011 WL 4012399, at *2 (S.D.N.Y. Sept. 9, 2011); *see Miller v. HSBC Bank U.S.A., N.A.*, No. 13 Civ. 7500 (RWS), 2015 WL 585589, at *4 (S.D.N.Y. Feb. 11, 2015) (plaintiff's "unsupported claim that she 'suffered damages'. . . is not enough to properly plead the damages element of a breach of contract claim"); *Jinno Int'l Co. v. Premier Fabrics, Inc.*, No. 12 Civ. 07820 (LGS), 2013 WL 4780049, at *3 (S.D.N.Y. May 24, 2013) (breach of contract claim stating only that counterclaimant "'suffered damages in a sum to be determined at trial' . . . fail[ed] to support an inference that [counterclaimant] has actually suffered damages as a result of [plaintiff's] breach"); *Comfort Inn Oceanside v. Hertz Corp.*, No. 11 Civ. 1534 (JG), 2011 WL 5238658, at *8 (E.D.N.Y. 2011) ("A claim for breach of contract must rest on more

than a conclusory allegation that the defendant's breach caused damages, even where the exact amount of damages is alleged.").

Here, however, construing the SAC in the light most favorable to Frontier, it concretely pleads damages resulting from defendants' alleged breach.

First, the SAC alleges that the value of its leasehold interests and rights is "significantly diminished," given the absence of confirmation following the Carlyle Transaction that the Guarantors have a net worth sufficient to ensure repayment, at the end of the lease term, of Frontier's $200,000 security deposit. SAC ¶ 41; *see also id.* ¶ 95 ("The value of [Frontier's] leasehold interests has been significantly diminished due to the failure to provide the required confirmation that the obligations of the lessors are guaranteed by entities that satisfy the net worth requirement."). The SAC specifies these damages to exceed $75,000. *Id.* ¶ 95. On this theory, the SAC "provides at least some indication of how [defendants'] alleged breach resulted in damages," *Comfort Inn Oceanside*, 2011 WL 5238658, at *8, including by interfering with Frontier's right and ability to verify the Guarantors' net worth statuses, SAC ¶ 58, and calling into question the Guarantors' capacity to meet their obligations. And as to the Security Assignments, "Frontier's right to recover its security deposit and any maintenance cost sharing and insurance proceeds may now be trumped by the lenders' priority right to collect against the lessor because the security assignment notices fail to include customary language that would have prevented this exact situation—language that Frontier would have required be added to the assignments if it had been given the contractually required notice." *Id.* ¶ 144. Defendants fault the SAC for not quantifying "the alleged diminishment of the value of any lease" or specifically alleging that "the Carlyle Transaction actually has resulted in the reduction of any guarantor's net worth." Mem. at 10. "But such questions are appropriately handled at summary judgment

25

on trial, not on a motion to dismiss." *Xpedior Creditor Tr. v. Credit Suisse First Bos. (USA) Inc.*, 341 F. Supp. 2d 258, 272 (S.D.N.Y. 2004); *see id.* (plaintiff "need only allege that it was damaged; it is not required to specify the measure of damages nor to plead proof of causation").

Second, the SAC pleads that that the alleged breaches have caused Frontier to "incur costs and expenses." SAC ¶ 138. Specifically, "[a]s a result of deficient notices issued by both AMCK and Carlyle [Aviation] in connection with their transfers," *id.* ¶ 115, and "in connection with the wrongful security assignment," *id.* ¶ 124, "Frontier incurred costs and legal fees in excess of $75,000, and Frontier is entitled to reimbursement under the Lease Agreements" *id.* ¶ 115; *see also id.* ¶ 124. And the Guarantees and Participation Agreements provide for recovery of fees incurred in connection with enforcing those agreements. *Id.* ¶¶ 60–62. These allegations independently adequately plead damages. *See, e.g.*, *Empire Merchants, LLC v. Merinoff*, No. 16 Civ. 9590 (JMF), 2017 WL 5176384, at *6 (S.D.N.Y. Nov. 8, 2017) (plaintiff's "boilerplate allegations" that it suffered damages as a result of defendant's breach of a forum selection clause were sufficient, because the only "damages" that plaintiff could have suffered as a result of the breach were the attorneys' fees and costs it incurred as a result); *Korpak, Ltd. v. Williams Lea Inc.*, No. 20 Civ. 6880 (KPF), 2022 WL 375543, at *4 (S.D.N.Y. Feb. 7, 2022) (same, where complaint "refer[s]to the 'attorneys' fees incurred in defending this lawsuit'" (internal citations omitted)). And defendants' case authority is inapposite. *See* Mem. at 17. In *INTL FCStone Markets, LLC v. Intercambio Mexicano de Comercio S.A. de C.V.*, No. 18 Civ. 1004 (AKH), 2021 WL 5304285, at *5 (S.D.N.Y. Nov. 15, 2021), the defendant, in its counterclaim, did not specify "how damages could . . . result." Here, however, as reviewed above, the SAC plausibly pleads how Frontier's leasehold interests have diminished in value as a result of defendants' denial to Frontier of the information and assurances that would enable it to assess whether the

Carlyle Transaction comports with the Lease Agreements.  *Miller* is also inapposite, because there, the plaintiff merely pled that "she 'suffered damages,' without any further factual enhancement."  2015 WL 585589, at *4.  Frontier's SAC pleads substantially more.

Accordingly, Frontier has adequately pled a breach of contract claim against Accipiter, Accipiter Holdings, Vermillion, UMB Bank, and Wells Fargo.  The Court denies defendants' motion to dismiss Count One for failure to state a claim.

### C.  Frontier's Claims for Declaratory Judgment Against All Defendants (Counts Two and Three)

The SAC brings two claims seeking declaratory relief based on the same alleged breaches of contract.  SAC ¶¶ 140–50, 152–61.  It seeks declarations that Frontier is entitled to (1) "sufficient information" regarding the Carlyle Transaction, *id.* ¶ 149; (2) "advance written notice of any security assignment," *id.* ¶ 150; and (3) "reimbursement of reasonable costs and expenses," *id.* ¶ 161, incurred as a result of the alleged breaches.  Defendants contend that the claims for declaratory relief "serve no useful purpose" because Frontier seeks only "backward-looking" relief.  Mem. at 18–19.  Further, they note, some defendants on these claims—AMCK Holdings, Carlyle, Manchester and Maverick—"are not party to any relevant agreement."  *Id.* at 20.

Under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), a court "may declare the rights and other legal relations of any interested party seeking such a declaration" in "a case of actual controversy."  An "actual controversy" exists if there is a "substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 388 (2d Cir. 2005) (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).  The controversy between the parties must "have taken on fixed and final shape so that a

court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them." *Jenkins v. United States*, 386 F.3d 415, 418 (2d Cir. 2004) (quoting *Pub. Serv. Comm'n v. Wycoff Co.*, 344 U.S. 237, 244 (1952)). "Even where an actual controversy has been established, a court must still decide whether it will exercise its discretion to entertain a request for declaratory judgment." *Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 301, 311 (S.D.N.Y. 2010). The Declaratory Judgment Act thus "confers a discretion on the courts rather than an absolute right upon the litigant." *Wycoff*, 344 U.S. at 241.

"[D]eclaratory relief is intended to operate prospectively. There is no basis for declaratory relief where only past acts are involved." *Adirondack Cookie Co. Inc. v. Monaco Baking Co.*, 871 F. Supp. 2d 86, 94 (N.D.N.Y. 2012) (internal quotation marks omitted) (cleaned up); *see KM Enterprises, Inc.*, 2012 WL 4472010, at *19 ("The main barrier in a declaratory judgment action is that it cannot be used solely to adjudicate [a defendant's] past conduct.") (alteration in original); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. Int'l Wire Grp., Inc.*, No. 02 Civ. 10338 (SAS), 2003 WL 21277114, at *5 (S.D.N.Y. June 2, 2003) (same).

"In deciding whether to exercise its permissive jurisdiction, a district court may consider 'equitable, prudential, and policy arguments,'" *Cont'l Bldg. Prods. Operating Co., LLC v. Lafarge N. Am., Inc.*, No. 17 Civ. 2599 (AJN), 2018 WL 1583309, at *6 (S.D.N.Y. Mar. 27, 2018) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 136 (2007)), and must examine the situation in its entirety, *Great Am. Ins. v. Houston Gen. Ins.*, 735 F. Supp. 581, 585 (S.D.N.Y. 1990). A court also must consider "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would

finalize the controversy and offer relief from uncertainty." *Amusement Indus.*, 693 F. Supp. 2d at 311 (quoting *Duane Reade*, 411 F.3d at 389).

   As to these claims, defendants have the better of the argument.  The SAC's "breach-of-contract claim[ ] provide[s] [Frontier] with an adequate remedy in this case," making its claim based upon declaratory relief "unnecessary and inappropriate." *J.C. Penney Corp., Inc. v. Carousel Ctr. Co., L.P.*, 635 F. Supp. 2d 126, 135 (N.D.N.Y. 2008) (citation omitted); *see Harbor Distrib. Corp. v. GTE Operations Support Inc.*, 176 F. Supp. 3d 204, 213 (E.D.N.Y. 2016); *see also Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 249–50 (S.D.N.Y. 2006) ("Plaintiffs' declaratory judgment claim seeks resolution of legal issues that will, of necessity, be resolved in the course of the litigation of the other causes of action."); *Camofi Master LDC v. Coll. P'rship, Inc.*, 452 F. Supp. 2d 462, 480 (S.D.N.Y. 2006) (dismissing claims for declaratory relief as duplicative of breach of contract claim).  And the SAC does not plausibly allege why the ongoing business relationship between Frontier and defendants demands declaratory relief.  While the parties continue to transact business pursuant to the Lease Agreements and other contracts, *see* SAC ¶¶ 99–105, 117–23, "[a]ny 'cloud of uncertainty' regarding the scope and enforceability of the [Lease Agreements and other contracts] will be dispelled in litigation of the breach of contract claim, which also provides for damages." *Intell. Cap. Partner v. Institutional Credit Partners LLC*, No. 08 Civ. 10580 (DC), 2009 WL 1974392, at *6 (S.D.N.Y. 2009).  And insofar as the SAC addresses the consummated Carlyle Transaction, "[t]here is no basis for declaratory relief where only past acts are involved." *Associated Elec. & Gas Ins. Servs. Ltd.*, 2014 WL 12717669, at *7; *see KM Enters., Inc. v. McDonald*, No. 11 Civ. 5098 (ADS) (ETB), 2012 WL 4472010, at *19 (E.D.N.Y. 2012); *U.S. Bank Nat. Ass'n ex rel.*

*Lima Acquisition LP v. PHL Variable Ins.*, No. 12 Civ. 6811 (CM) (JCF), 2014 WL 998358, at *9 (S.D.N.Y. Mar. 14, 2014).

Accordingly, Frontier has an adequate alternative remedy in its breach-of-contract claim. The Court grants defendants' motion to dismiss Counts Three and Four.[10]

### D.   Frontier's Fraudulent Transfer Claims Against Vermillion Holdings and Maverick (Counts Four and Five)

The SAC brings two claims for fraudulent transfer.  Count Four alleges fraudulent transfer, in violation of § 273 of the New York Uniform Voidable Transactions Act ("UVTA"), N.Y. Debt. & Cred. Law § 273, against Vermillion Holdings and Maverick for the December 2021 Transfer and the events thereafter in which Carlyle purchased Vermillion Holding's assets. *See* SAC ¶¶ 162–178.  Count Five alleges constructive fraudulent transfer, in violation of § 274[11] of the UVTA against Vermillion Holdings, based on the same events.  *See id.* ¶¶ 179–88.

Defendants move to dismiss both claims, *see* Mem. at 21–22; Vermillion Mem. at 2–3, on the ground that the UVTA does not apply to transfers by AMCK Holdings.  Even construing the SAC in the light most favorable to Frontier, defendants' critique is correct.

The UVTA provides that "[a] claim for relief in the nature of a claim for relief under this article is governed *by the local law of the jurisdiction in which the debtor is located* when the transfer is made or the obligation is incurred."  N.Y. Debt. & Cred. Law § 279(b) (emphasis added).  The UVTA also provides rules to determine a debtor's—here, AMCK Holdings's— location.  "A debtor that is an organization and has only one place of business is located at its

---

[10] The Court thus does not have occasion to reach defendants' alternative argument that a subset of defendants are not parties to contracts with Frontier, so as not to be reachable by a claim for declaratory relief.

[11] Sections 273 and 274 of the UVTA differ insofar as § 273 covers transactions voidable by present and future creditors, while § 274 covers transactions voidable by only present creditors.

place of business," and "[a] debtor that is an organization and has more than one place of business is located at its chief executive office."  *Id.* § 279(a)(1)–(2).

Relevant to the choice-of-law analysis prescribed by the UVTA, the SAC pleads that "AMCK Holdings is a company incorporated in Ireland and is headquartered in Dublin, Ireland." SAC ¶ 20.  In light of that allegation, the statutory text dictates that Ireland's law governs the fraudulent transfer claims.  However, as defendants note, the SAC does not plead, other than conclusorily, that the transfers at issue violated Irish law.  On this point, the SAC does no more than summarily state—"[i]n the alternative" to its incorrect premise that New York fraudulent transfer law governed—that the Carlyle Transaction and its related transactions "constitute[] a fraudulent transfer under Irish law."  *Id.* ¶ 177; *see also id.* ¶ 187.  It does not elaborate on this conclusion.  It does not specify any provision of Irish law violated by the transfers at issue, let alone the elements of such a law or in what manner the law was breached.  Lacking any such allegations, the SAC fails to plead a UVTA claim under Irish law.

Plaintiffs argue that New York law should apply here based on choice-of-law clauses favoring New York in the Lease Agreements, *see, e.g.*, Lease Agreement Form 1 § 20.14, as well as in other agreements.  For multiple reasons, that is unpersuasive.  First, "[t]he mere fact that an agreement, and disputes arising thereunder, are governed by the law of a particular jurisdiction does not transform all statutory requirements that may otherwise be imposed under that body of law into contractual obligations."  *Skanska USA Bldg. Inc. v. Atl. Yards B2 Owner, LLC*, 31 N.Y.3d 1002, 1007 (2018).  Plaintiffs have not cited authority permitting parties, by private agreement, to override the UVTA's jurisdictional prerequisites.  *See Rice v. Scudder Kemper Invs., Inc.*, No. 01 Civ. 7078 (RLC), 2003 WL 21961010, at *5 (S.D.N.Y. Aug. 14, 2003).  And the UVTA's use of the debtor's location at the time of the transfer—and not inviting arguments

as to the effect of contractual provisions whose application may be debatable—has the virtue of putting in place a "clear rule" that "eliminates the risk that the laws of multiple jurisdictions might be applicable to a single transfer involving property in multiple jurisdictions or injuring creditors in multiple jurisdictions."  N.Y. Debt. & Cred. Law § 279(b), McKinney's cmt; *see also Quinio v. Aala*, 603 F. Supp. 3d 50, 54 (E.D.N.Y. 2022) (noting that the UVTA "changed some of the substantive provisions of the New York Debtor and Creditor Law, and also added a choice-of-law provision, whereby certain fraudulent conveyance claims are governed by the jurisdiction where the debtor was located at the time the transfer was made").[12]

Second, Maverick and Vermillion Holdings (the defendants in Counts Four and Five) were not parties to the agreements containing the choice-of-law provisions.  Frontier seeks to bind non-signatories, on the ground that they are closely related to the parties to the Lease Agreement and the Framework Agreement.  Vermillion Opp. at 4.  But this argument, unsupported by case authority, is unpersuasive.  Maverick was not affiliated with any contracting parties until well after the Lease Agreements and Framework Agreement were entered.  *See VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 130 (2d Cir. 2001).  And the SAC does not plead facts making Vermillion Holdings an agent, assignee, or alter ego of a signatory to either agreement, notwithstanding the "axiom[] that a contract cannot bind a non-party unless the contract was signed by the party's agent, the contract was assigned to the party, or the signatory is in fact the 'alter ego' of the party."  *Arcadia Biosciences, Inc. v. Vilmorin & Cie*, 356 F. Supp. 3d 379, 390 (S.D.N.Y. 2019) (cleaned up).  The few cases that depart from this axiom concern

---

[12] As one commentary notes, by applying the law of the place where the debtor is located, the UVTA "minimizes unnecessary litigation regarding choice of law rules," and replaces courts' former approach to deploy "a common law multi-factor test to the choice of law analysis that often resulted in costly litigation and unpredictable outcomes."  Guide to New York's Uniform Voidable Transactions Act, Practical Law Practice Note w-030-0994.

forum selection clauses.  *See, e.g.*, *LaRoss Partners, LLC v. Contact 911 Inc.*, 874 F. Supp. 2d 147, 159 (E.D.N.Y. 2012); *Diamond v. Calaway*, No. 18 Civ. 3238 (KPF), 2018 WL 4906256, at *5 (S.D.N.Y. Oct. 9, 2018).  Frontier proposes to extend these cases, but it does not cite authority supporting their application here, Reply at 24 n.15, let alone show how Vermillion Holdings is "so closely related to either the parties to the contract or the contract dispute itself that enforcement of the clause against [Vermillion Holdings] is foreseeable," *In re Platinum-Beechwood Litig.*, 427 F. Supp. 3d 395, 460 (S.D.N.Y. 2019).

Accordingly, the Court dismisses Counts Four and Five for failure to state a claim.

## CONCLUSION

For the foregoing reasons, the Court grants the defendants' motions to dismiss as to the declaratory judgment (Counts Two and Three) and fraudulent transfer claims (Counts Four and Five), and denies the motion to dismiss as to the breach of contract claim (Count One).

The Clerk of Court is respectfully directed to terminate all pending motions.  This litigation will proceed on the one surviving claim, which is brought against defendants Accipiter, Accipiter Holdings, Vermillion, UMB Bank, and Wells Fargo. The parties are directed to file, by June 15, 2023, a joint case management plan in accordance with the Court's Individual Rules and Practices.

SO ORDERED.

*Paul A. Engelmayer*
Paul A. Engelmayer
United States District Judge

Dated: June 7, 2023
       New York, New York