## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FRONTIER AIRLINES, INC.,<br><br>                  Plaintiff,<br><br>     v.<br><br>AMCK AVIATION HOLDINGS IRELAND LIMITED, ACCIPITER INVESTMENT 4 LIMITED, VERMILLION AVIATION (TWO) LIMITED, ACCIPITER HOLDINGS DAC, CARLYLE AVIATION MANAGEMENT LIMITED, MAVERICK AVIATION HOLDINGS LIMITED, MANCHESTER AVIATION FINANCE S.A.R.L., VERMILLION AVIATION HOLDINGS LIMITED, WELLS FARGO TRUST COMPANY, N.A., solely in its capacity as OWNER TRUSTEE, and UMB BANK, N.A., solely in its capacity as OWNER TRUSTEE,<br><br>                 Defendants. | Case No. 1:22-cv-02943 (PAE)<br><br>[Rel. 1:23-cv-04774 (PAE)] |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S APPLICATION TO CONVERT TEMPORARY RESTRAINING ORDER TO PRELIMINARY INJUNCTION

# <u>TABLE OF CONTENTS</u>

*Page*

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................... 1

FACTUAL BACKGROUND .............................................................................................. 2

    I.    Frontier's Operations ................................................................................... 2

    II.    Frontier's Leases With AMCK ................................................................... 3

    III.    AMCK's Breach Of The Framework Agreement And Leases .............................. 3

    IV.    AMCK Attempts To Avoid Liability By Transferring Ownership Of The Aircraft To Carlyle ................................................................................. 4

    V.    Carlyle Attempts Another Fraudulent Transfer ......................................... 5

    VI.    Negotiations Over The Transfer And Carlyle's Proposed Guaranty ..................... 6

    VII.    Carlyle Declares A Breach Of The Leases ................................................. 8

ARGUMENT ..................................................................................................................... 10

    I.    Frontier Is Likely To Succeed On The Merits Or, At Minimum, Can Raise Serious Questions On The Merits ........................................................ 11

        A.    Carlyle Was Not Entitled To Declare Default Because Its Requests Of Frontier Were Not Reasonable Under The Circumstances ...................... 12

        B.    The Proposed Transfers Did Not Comply With The Conditions On Transfer Under The Leases And Framework Agreement ......................... 13

            1.    Frontier Has Relevant Contract And Property Rights In The Aircraft ................................................................................. 14

            2.    The Proposed Transfers Would Restrict Frontier's Rights ........... 14

            3.    Carlyle's Guaranty Does Not Reasonably Protect Frontier's Rights ............................................................................... 15

        C.    Carlyle Failed To Comply With Additional Conditions For Transfer, Suspending Frontier's Obligation To Perform ......................... 16

    II.    Grounding The Aircraft Or Terminating The Leases Would Cause Irreparable Injury To Frontier And Its Customers ........................................... 17

    III.    The Balance of Equities And Hardships And The Public Interest Strongly Favor Frontier's Continued Ability To Deploy The Aircraft ....................... 18

CONCLUSION .................................................................................................................. 20

# TABLE OF AUTHORITIES

**Cases**                                                                                    *Page(s)*

*A.W. Duckett & Co. v. United States,*
   266 U.S. 149 (1924)..................................................................................................14

*Bakken Res., Inc. v. Edington,*
   No. 1:15-cv-8686, 2018 WL 1353271 (S.D.N.Y. Mar. 15, 2008)...........................19

*Faiveley Transp. Malmo AB v. Wabtec Corp.,*
   559 F.3d 110 (2d Cir. 2009)....................................................................................17

*Grand River Enter. Six Nations, Ltd. v. Pryor,*
   481 F.3d 60 (2d Cir. 2007)......................................................................................17

*Greater Chautauqua Fed. Credit Union v. Marks,*
   600 F. Supp. 3d 405 (S.D.N.Y. 2022)....................................................................15

*Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.,*
   323 F. Supp. 2d 525 (S.D.N.Y. 2004)....................................................................18

*Lonninge v. Berzak,*
   692 N.Y.S.2d 330 (1st Dep't 1999) .......................................................................15

*Misano di Navigazione, SpA v. United States,*
   968 F.2d 273 (2d Cir. 1992)....................................................................................12

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.,*
   883 F.3d 32 (2d Cir. 2018)......................................................................................11

*Nat'l Coal. on Black Civic Participation v. Wohl,*
   498 F. Supp. 3d 457 (S.D.N.Y. 2020)....................................................................10

*Register.com, Inc. v. Verio, Inc.,*
   356 F.3d 393 (2d Cir. 2004)....................................................................................17

*Rex Med. L.P. v. Angiotech Pharms. (US) Inc.,*
   754 F. Supp. 616 (S.D.N.Y. 2010) .........................................................................17

*Rosenbalm Aviation Inc. v. Port Auth. of N.Y. & N.J.,*
   636 F. Supp. 212 (S.D.N.Y. 1986) .........................................................................18

*Rubinstein v. Rubinstein,*
   244 N.E.2d 49 (N.Y. 1968)......................................................................................14

*Sharp v. Kosmalski,*
   351 N.E.2d 721 (N.Y. 1976)....................................................................................15

*Teachers Ins. and Annuity Ass'n of Am. v. Ocwen Fin. Corp.*,
No. 98 Civ. 7137 (BSJ), 2002 WL 237836 (S.D.N.Y. Feb. 19, 2002) ...........................12, 13

*Wisdom Import Sales Co., LLC v. Labatt Brewing Co., Ltd.*,
339 F.3d 101 (2d Cir. 2003) ...................................................................................................17

**Statutes**

N.Y. U.C.C. § 2A-402 ...............................................................................................................16

**Rules**

N.Y. CPLR 5202 .........................................................................................................................15

N.Y. CPLR 5230 .........................................................................................................................15

**Treatises**

Restatement (Second) Contracts § 228 .....................................................................................12

Plaintiff Frontier Airlines, Inc. ("Frontier") respectfully files this memorandum of law in support of its application to convert the Court's temporary restraining order dated June 8, 2023 ("TRO") to a preliminary injunction, pursuant to Rule 65 of the Federal Rules of Civil Procedure, enjoining defendants Wells Fargo Trust Company, N.A. ("Wells Fargo") and UMB Bank, N.A. ("UMB"), as owner trustees (together, "Defendants"), from impounding, grounding and/or deregistering the Aircraft or terminating the Aircraft Lease Agreements ("Lease") for the 14 aircraft that were the subject of Default Notices served by Defendants on May 26, 2023 (the "Aircraft").

## PRELIMINARY STATEMENT

Frontier has diligently worked to accommodate Carlyle's stated interest in transferring ownership rights in the Aircraft while protecting its own legitimate rights. But it takes two to tango. Carlyle refused for months to acknowledge that Frontier had any rights with regard to past contractual breaches, including protecting its ability to recover in the pending litigations. Then, when it finally acknowledged Frontier's legitimate concerns, Carlyle proposed to Frontier unreasonable and inadequate protections in light of the circumstances. Finally, Carlyle prematurely pulled the plug on the parties' negotiations by declaring an unsubstantiated default and threatening in its default notices to restrict Frontier's use of the Aircraft.

A preliminary injunction is needed to protect Frontier from the potentially dire consequences of Carlyle's aggressive intransigence. Frontier is likely to succeed in showing that it was not required to acknowledge the proposed transfers on the terms offered by Carlyle. Carlyle's requests of Frontier were not reasonable under the circumstances to protect Frontier's right to meaningful recovery in already pending litigations. Frontier would be irreparably harmed by its inability to deploy the 14 Aircraft, which account for nearly 10% of Frontier's fleet and which would take Frontier over a year to replace. Finally, the balance of the equities and the public

interest counsel strongly in favor of an injunction to ensure that air travel is not disrupted for many thousands of passengers. For these reasons, which are set forth in further detail below, the Court's TRO should be converted to a preliminary injunction.

## FACTUAL BACKGROUND

### I.    Frontier's Operations

Frontier operates a fleet of 127 commercial passenger aircraft leased from various aircraft lessors. Declaration of Howard Diamond ("Diamond Decl.") ¶ 2. Frontier flies to destinations in the United States and the rest of North America. *Id.* ¶ 3. The average Airbus A320 aircraft, which makes up a majority of Frontier's fleet, flies an average of 4.5 routes per day, each carrying up to 186 passengers. *Id.* ¶ 4. In total, the 14 Aircraft can carry approximately 12,000 passengers per day. *Id.* Summer is peak season for Frontier and other major U.S.-based airlines, so Frontier's fleet is currently operating at its fullest capacity. *Id.* ¶ 5.

Because Frontier's fleet is relatively small compared to other major U.S. airlines, Frontier's inability to use each aircraft in its fleet has an outsized effect on Frontier's operations. *Id.* Frontier has only between one and three spare aircraft in its fleet at any given time, which are regularly placed into use to replace aircraft taken out of service for unscheduled maintenance or mechanical issues. Declaration of Paul Lambert dated June 12, 2023 ("Lambert Decl.") ¶ 48. As a result, if the Aircraft were taken out of service, Frontier would be able to replace the carrying capacity of, at most, three of the Aircraft in the short term. *Id.* Further, current market and manufacturing constraints for commercial aircraft make it unfeasible for Frontier to arrange to lease or purchase additional aircraft without considerable lead time. *Id.* ¶ 49. It would likely take a minimum of 12 to 18 months to replace the lost capacity from the 14 aircraft were Frontier to become unable to deploy them in the ordinary course. *Id.* In other words, were Frontier to become unable to use the

Aircraft, it would have to cancel the flights of nearly all of the 12,000 passengers that would normally fly on the Aircraft each day for a period of at least a year. *Id.* ¶¶ 50-51.

## II.    Frontier's Leases With AMCK

The 14 Aircraft[1] leased by Frontier were beneficially owned by AMCK Aviation Holdings Ireland Limited and its affiliates (collectively "AMCK")—through Wells Fargo and UMB as owner trustees—at the time of execution of the Leases. *Id.* ¶ 2.  All but one Lease followed a common lease format, referred to by the parties as Lease Form 1, whereas the 14th Lease followed a slightly different form, termed Lease Form 2. *Id.* ¶ 4 & Exs. 1-2.  As of today, Frontier is current on payment for all of the Leases.  Diamond Decl. ¶ 5.

Both Lease Form 1 and Lease Form 2 allow the lessors to transfer or assign ownership of the Aircraft to third parties but contain express protections for Frontier when this occurs.  Lambert Decl. ¶ 5.  Section 20.2(a)(ii) of Lease Form 1 states that Frontier need not agree to any transfer or assignment that would "result in any restriction . . . on Lessee's rights under this Agreement or the other Lessee's Documents or on Lessee's use or operation of the Aircraft." *Id.* ¶ 6.  Section 22.3(v) of Lease Form 2 similarly allows a transfer only if it "will not increase Lessee's obligations, liabilities (financial or otherwise), or risks or diminish Lessee's rights and benefits, in each case under any Operative Document or in respect of the Aircraft." *Id.* ¶ 7.  Generally accepted usage within the aviation industry reads references to "transfers" of ownership broadly to capture transactions at different levels of the corporate structure. *Id.* ¶ 8.

## III.    AMCK's Breach Of The Framework Agreement And Leases

Frontier executed the most recent Framework Agreement for six leases with AMCK in March 2020, which governed the parties' conduct with respect to those leases. *Id.* ¶ 9 & Ex. 3.

---

[1] AMCK originally leased 15 aircraft to Frontier, but one was later returned by Frontier pursuant to the terms of the lease.  Lambert Decl. ¶ 3.

Almost immediately, AMCK repudiated the Framework Agreement because of the adverse effects of the COVID-19 pandemic on aircraft financing markets. *Id.* ¶ 10. Frontier and AMCK also actively discussed deferring both the delivery of recently leased Aircraft that had not yet been supplied by Airbus, as well as the deferral of associated rent due to pandemic travel restrictions. *Id.* ¶ 11. AMCK granted Frontier this temporary rent deferral while the parties negotiated other commercial details of the deferral, including with other parties like Airbus. *Id.*

AMCK reneged on its agreement to defer rent. *Id.* ¶ 12. On May 8, 2020, without warning, AMCK issued Frontier a Notice of Termination of the Framework Agreement on the ground that Frontier had not paid the rent that AMCK, on behalf of each of the lessors, had told Frontier it could defer. *Id.* ¶ 13. Accordingly, AMCK retracted its commitment to purchase five remaining aircraft from Airbus and then lease them back to Frontier, as provided in the Framework Agreement. *Id.* To avoid a default with Airbus, Frontier quickly secured separate sources of financing for the yet-to-be-delivered Aircraft, at substantial loss to Frontier. *Id.* ¶ 14.

On November 18, 2020, Frontier filed suit to recover the losses Frontier sustained because of AMCK's failure to uphold its end of its bargain with Frontier, alleging (among other things) that AMCK anticipatorily repudiated the Framework Agreement. *Id.* ¶ 15 & Ex. 4. AMCK moved to dismiss, which Judge Stanton denied on May 5, 2021. *Id.* ¶ 16 & Ex. 5. Summary judgment motions are now fully briefed and are awaiting decision from Judge Stanton. *Id.* ¶ 17.

### IV.    AMCK Attempts To Avoid Liability By Transferring Ownership Of The Aircraft To Carlyle

After failing to dismiss Frontier's action against it, AMCK sold its entire aircraft portfolio to Carlyle Aviation Partners and its affiliates. *Id.* ¶ 18. Upon review of publicly available financial statements and other corporate records of relevant entities, Frontier came to understand that AMCK conducted a series of internal transfers that effectively relinquished AMCK Aviation

Holdings' valuable assets. *Id.* ¶ 19. Those assets, including companies holding the AMCK subsidiaries that had leased the Aircraft to Frontier, were then contributed to a separate entity and sold to Carlyle for less than fair value, leaving AMCK as an undercapitalized shell entity unlikely to be solvent to pay any judgment obtained by Frontier. *Id.* AMCK did not tell Frontier that it was considering this transfer of ownership, let alone that it was going to achieve that change in ownership by liquidating its own assets. *Id.* ¶ 18. Rather, in January 2022, Frontier discovered a Carlyle press release stating that Maverick Aviation Partnership LP was scheduled to acquire AMCK's ownership interest in the Aircraft (the "Press Release"). *Id.* & Ex. 6. Through discovery, Frontier learned that AMCK agreed to share with Carlyle any liability arising out of the first action before Judge Stanton. *Id.* ¶ 20.

Frontier was entitled to the transfer protections in Lease Form 1 and Lease Form 2, as discussed in Section I above. Immediately after it discovered the Press Release, Frontier made a written demand on AMCK for documents and information relevant to the sale to Carlyle. *Id.* ¶ 21. Despite its obligations under the Leases, AMCK denied that the sale was a "transfer" under the leases and provided no information. *Id.* AMCK provided the same response to Frontier's second written demand. *Id.* In April 2022, over Frontier's express objections to the sale—to which Carlyle did not respond—AMCK and Carlyle closed their transaction, and Frontier filed this action. *Id.* ¶ 22.

## V.    Carlyle Attempts Another Fraudulent Transfer

In June 2022, Carlyle notified Frontier that it had assigned as security all of its rights under certain Leases to a third-party lender. *Id.* ¶ 23 & Ex. 7. Just as in the transfer from AMCK to Carlyle, Carlyle provided Frontier no notice or opportunity to comment prior to executing that assignment. *Id.* ¶ 23. Subsequently, in November 2022 Robert Korn, the President of Carlyle Aviation, informed Frontier that Carlyle wanted to sell four of its aircraft to two separate third

parties. *Id.* ¶ 24.  At around the same time, Carlyle, through its counsel, contacted Frontier about conducting security assignments of all 14 Aircraft. *Id.* ¶ 26.  Carlyle did not clearly explain how these security assignments related to the other contemplated transactions. *Id.*  Nonetheless, Carlyle demanded that Frontier acknowledge these assignments. *Id.*  However, Frontier could not acknowledge the assignment without, among other prejudice and cost to Frontier, abandoning its valuable claims that AMCK had wrongfully transferred the Aircraft to Carlyle in the first instance, undermining Frontier's valuable claims in this action and its ability to collect on a judgment in the litigations that had already been filed.

### VI.    Negotiations Over The Transfer And Carlyle's Proposed Guaranty

In order to address Frontier's concerns that the proposed transfers would materially impair Frontier's ability to recover on its two already-filed lawsuits, Frontier engaged with Carlyle to negotiate an appropriate commercial solution.  On November 23, 2022, Frontier sent Carlyle a letter asking for additional details about the transfers. *Id.* ¶ 25.  Just hours later on the same day, Carlyle, through its counsel, sent Frontier proposed security assignments for all of the Aircraft without responding to or even acknowledging Frontier's letter. *Id.* ¶ 26.  Nor did Carlyle otherwise address Frontier's concerns about the impact of the proposed transactions on Frontier's right to recovery in the two litigations. *Id.*

Frontier and Carlyle held a counsel call on December 5, 2022 to discuss these communications. *Id.* ¶ 27.  On that call, Carlyle reiterated its intent to proceed with the transactions it had previously proposed. *Id.*  Frontier again asked Carlyle to clarify how it intended to complete the proposed transactions without diminishing Frontier's right to recover in the pending litigations. *Id.* ¶ 28.  To facilitate these discussions, Carlyle committed to provide a detailed chart setting out the proposed structure and timing of the transactions, including information about the identity and corporate relationship of each party to the transactions. *Id.*  However, the chart that Carlyle

provided did not explain the corporate relationship between the parties, contained only vague assertions about transaction timing, and did not contain relevant information about the transaction parties. *Id.* ¶ 29 & Ex. 10.

In subsequent communications between December 2022 and early February 2023, Carlyle continued to provide incomplete information about the identities of all relevant parties to the transactions, frustrating Frontier's attempts to understand the net effect of those transactions on all of Frontier's rights. *Id.* ¶¶ 31-33. Carlyle also continued to deny that Frontier had any basis to protect its rights in connection with the proposed transfers because, in Carlyle's view, the pending litigation was meritless. *Id.* ¶ 33. Frontier proposed that the transaction documents acknowledge Frontier's right to recover in the pending litigations and protect Frontier's right to execute against the Aircraft should the defendants be otherwise unable to satisfy a judgment against them. *Id.* ¶ 31.

Frontier also understood—and expressed to Carlyle on the December 5, 2022 counsel call—that certain of Carlyle's proposed assignments could not move forward even with Frontier's consent, because a condition of such transfer would be the execution of a new tripartite agreement between CFM, who manufactures the engines used in the Aircraft, Frontier, and the proposed transferees.[2] *Id.* ¶ 30. Carlyle readily acknowledged that no new tripartite agreement was in place, nor did Carlyle have a definitive timeline for the negotiation of a new agreement. *Id.* Frontier understands that, to date, Carlyle still has not negotiated a revised tripartite agreement with CFM. *Id.*

On February 9, 2023, Carlyle acknowledged for the first time that Frontier's rights in connection with the pending lawsuits should be addressed in the transaction documents. *Id.* ¶ 34.

---

[2] In the aircraft industry, engines generally are obtained directly from an engine manufacturer separate and apart from the lease of the aircraft in which they are used. *Id.* ¶ 28.

However, the extent of that proposal was a conclusory statement that the assignments would not be "a waiver of any contractual or extra contractual right or as a waiver of any claim, right or defense by any person, trust or other entity in connection with" the pending litigations. *Id.* The proposal contained no affirmative protections of Frontier's right to an adequate remedy in the pending litigations. *Id.* Although Carlyle continued to deny that Frontier's right to seek recovery in the pending lawsuits was contractual, it did finally acknowledge on February 28, 2023 that Frontier had such a right. *Id.* ¶ 35.

Carlyle did not budge from its position that Frontier needed to consent to the proposed transfers without any protections on a prospective remedy. *Id.* Carlyle offered only to provide a separate unsecured guaranty from a solvent Carlyle entity. *Id.* ¶ 36 & Ex. 14. The guaranty would cover only the liability that a Carlyle-owned entity would have to Frontier in the lawsuit for as long as they were owned by Carlyle. *Id.* Frontier rejected the proposal on the ground that the proposed guaranty did not include liability coverage for AMCK, the owner trustees, or any liability against any entity not owned by Carlyle, and that any failure to comply with the proposed guaranty would necessitate that Frontier file another litigation to enforce the contract. *Id.* ¶ 37. Frontier made a counteroffer to address these concerns, which Carlyle rejected without materially changing its initial guaranty proposal. *Id.* ¶¶ 37-38 & Exs. 15-16.

### VII.    Carlyle Declares A Breach Of The Leases

Despite ongoing negotiations, on April 27, 2023, Carlyle sent Frontier a letter asserting that Frontier had "breached [its] obligations under the Non-Waiver Agreement[3] and each Lease." *Id.* ¶ 39 & Ex. 17. Far from attempting to further negotiations with Frontier, the letter did no more

---

[3] Carlyle and Frontier executed a Non-Waiver Agreement after the transfer from AMCK to Carlyle so that the parties could continue honoring the Leases in the ordinary course, without continued performance being interpreted as a waiver or abandonment of Frontier's rights to challenge that proper transfers had taken place. *Id.* ¶ 30.

than accuse Frontier of "putting the Transactions at risk," threaten that "Frontier will be held responsible for [Carlyle's] losses," which in Carlyle's view could only be avoided if "Frontier complie[d] with its obligations to act reasonably in the negotiations related to the Transactions," and then ominously closing with "[a]ll rights are reserved." Ex. 17 at 2. The letter also misrepresented Frontier's position on important issues. For example, the letter states that Frontier had insisted that the new lessor and security trustee subordinate their security rights to Frontier, ignoring that Frontier had been attempting to negotiate alternative security with Carlyle. *Id.* ¶ 41. Frontier responded to this letter on May 3, 2023, correcting misstatements in Carlyle's letter. *Id.* ¶ 42 & Ex. 18. Frontier also reiterated to Carlyle that it had and would continue to "reasonably cooperate[] in facilitating the proposed transfers" by accepting many edits Carlyle proposed and continuing to negotiate with counsel for Carlyle. Ex. 18. Frontier requested that Carlyle commit to pay Frontier's costs incurred in connection with the proposed transfers, which Carlyle was required to do under Section 20.2(a)(v) of Lease Form 1 and Section 22.3(ii) of Lease Form 2. *Id.* In contrast to Carlyle's approach, Frontier closed its letter by reaffirming that it "remains committed to working with Carlyle on resolving our existing disputes and finding a commercial solution that is fair and mutually agreeable." *Id.*

Carlyle took no further action on its April 27 letter until the afternoon of May 26, 2023 – the Friday before Memorial Day weekend. On that day, Carlyle served Frontier with a notice of default on all 14 Leases. *Id.* ¶ 44 & Ex. 19. The sole basis given for the claimed default was Frontier's alleged failure to execute transfer documents as presented by lessor under Section 20.2(b) of Lease Form 1. *Id.* The default notice reminded Frontier that, among other remedies available to Carlyle, and Event of Default would entitle Carlyle to "(iii) ground[] of the Aircraft; [or] (iv) cancel[] the leasing of the Aircraft and requiring return of the Aircraft to Lessor." Ex. 19

at 2. Carlyle has still never agreed to pay or paid Frontier's expenses incurred in connection with the proposed transfers. *Id.* ¶ 43.

Under Section 16.1(c) of the Leases, serving notice of default starts a 15-day cure period under Form 1 (30 days under Form 2) after which an Event of Default is triggered. *Id.* ¶ 45. The Notices threaten five actions available under the Aircraft leases following a default by the lessee, two of which are "grounding of the Aircraft" and "cancelation of the leasing of the Aircraft and requiring return of the Aircraft to Lessor . . . ." *Id.* ¶ 46. Accordingly, if Frontier does not acquiesce to Carlyle's improper demands, Defendants could attempt to declare an Event of Default as early as June 10, 2023. *Id.* ¶ 45.

On May 31, 2023, before the end of the cure period, Carlyle filed suit against Frontier in New York Supreme Court, alleging claims of breach of contract and tortious interference with prospective economic advantage arising out of Frontier's failure to provide the requested consents. *Id.* ¶ 51. Frontier removed that action to federal court on June 6, 2023, on the basis of diversity. *Id.* ¶ 52. The Court accepted assignment of this removed action as related to the above-captioned proceeding on June 7, 2023. *Id.*

On June 8, 2023, following a telephonic hearing, the Court granted Frontier's application for a temporary restraining order pending additional briefing and a fuller hearing on the extension of the TRO to a preliminary injunction. The Court set a hearing on the preliminary injunction application for June 20, 2023. *See* ECF No. 68.

## <u>ARGUMENT</u>

The legal standard for a preliminary injunction is identical to that of a temporary restraining order. Both require the moving party to establish "(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that [the requested relief] is in the public interest." *Nat'l Coal.*

10

*on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 469 (S.D.N.Y. 2020) (quoting *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018)).

## I.     Frontier Is Likely To Succeed On The Merits Or, At Minimum, Can Raise Serious Questions On The Merits

Frontier did not need to acknowledge the transfers under the terms proposed by Carlyle under either Lease Form 1 or Lease Form 2.  Section 20.2(a)(ii) allows Frontier to withhold consent if a transaction would "result in any restriction, based on the facts and circumstances existing . . . , on Lessee's rights under this Agreement or the other Lessee's Documents[4] . . . ."  Frontier has similar protections under Lease Form 2, regardless of whether the transactions are considered "assignments" or "transfers."  Section 22.2(3) states that the Lessor may only proceed with an assignment where "none of Lessee's rights and benefits in respect [of this Agreement or any other Operative Document] shall be diminished as a result of" the assignment.  Section 22.3(v) provides that proposed transfers shall not "increase Lessee's obligations, liabilities (financial or otherwise), or risks or diminish Lessee's rights and benefits, in each case under any Operative Document or in respect of the Aircraft."

In other words, all of the Leases protect Frontier from any diminishment of its rights under the Lease or associated documents (including the Framework Agreement).  As discussed in further detail below, Frontier's rights under the parties' agreements include its contractual right to enforce the benefit of its bargain secured under those agreements, as well as property interests in the leased Aircraft.  As a result of circumstances that Carlyle and the Defendants themselves helped to create, the proposed transfers diminish these rights, even when the terms of the guaranty offered to

---

[4] The Framework Agreement is a "Lessee's Document" incorporated into the Leases per its own terms and the terms of the Leases.  *See* Framework Agreement, Lambert Decl. Ex. 3, § 1.3; Lease Form 1, Lambert Decl. Ex. 1, § 1.1. at 10 ("Lessee's Documents" definition).

Frontier are taken into account.  Accordingly, Defendants were not entitled to declare a breach, and Frontier is likely to succeed on the merits.

### A. Carlyle Was Not Entitled To Declare Default Because Its Requests Of Frontier Were Not Reasonable Under The Circumstances

Section 20.2(b) of Lease Form 1[5] states that "Lessee [i.e., Frontier] shall comply with all reasonable requests of Lessor or Owner Participant, and at the expense of Lessor, to cooperate in effecting" any "transfer, novation, assignment, mortgage, grant or other disposition referred to in paragraph (a) above and will execute any and all consents, agreements, amendments or other instruments . . . in form and substance *reasonably satisfactory* to Lessee . . . ."  Lambert Ex. 1 § 20.2(b) (emphasis added).  This provision is the basis for Carlyle's notice of default.  But Carlyle's request was not a reasonable one because Carlyle failed to propose terms that would preserve Frontier's economic rights with respect to a potential judgment in Lawsuit 1.  And Carlyle failed to agree to consents that were reasonably satisfactory in form or in substance to Frontier because Carlyle refused to accept terms reasonably proposed by Frontier to protect their rights under the unique circumstances of this case.  *See* Restatement (Second) Contracts § 228 & Comment (a); *Misano di Navigazione, SpA v. United States*, 968 F.2d 273, 274–75 (2d Cir. 1992); *see also Teachers Ins. and Annuity Ass'n of Am. v. Ocwen Fin. Corp.*, No. 98 Civ. 7137 (BSJ), 2002 WL 237836, at *10 (S.D.N.Y. Feb. 19, 2002) (where seller was required to provide assurances "satisfactory" to mortgage purchaser, purchaser acted reasonably in demanding additional assurances after learning lease securing mortgage may soon default).

*Ocwen* is instructive.  There, the defendant was a prospective purchaser of a mortgage loan that was secured in part by a Master Lease with valuable retail tenant leases.  *Id.*  Under Section 3.9 of the parties' purchase agreement, plaintiff was required to provide assurances "satisfactory

---

[5] Section 22.2 of Lease Form 2 contains functionally equivalent language.  *See* Lease Form 2, Lambert Ex. 2, § 22.2.

to [Ocwen]" that the retail tenant leases would not be terminated. *Id*. at *3. When Ocwen learned that the Master Lease may soon be terminated, Ocwen informed plaintiff that it would require additional assurances in order to protect its economic interests in the mortgage; in particular, it would require the retail tenants execute non-disturbance agreements ("NDAs") to guard against a broken chain of privity. *Id*. The court held that the parties agreed that Section 3.9 required the delivery of the NDAs, *id*. at *8, but even if they did not, Ocwen acted reasonably in refusing to close without the NDAs. *Id*. at *10. In making its determination, the court considered the circumstances Ocwen was in as a potential "purchaser of a $116 million mortgage loan secured in part by a defaulted, soon-to-be terminated Master Lease and valued in part based upon the existing Retail Tenant Leases." *Id*. Under the unique circumstances, Ocwen's demand for NDAs from the retail tenants was more than reasonable. So, too, are Frontier's demands here. Frontier proposed reasonable terms designed to protect Frontier's economic interest in its claims, as it is entitled to do under Section 20.2(b).

### B. The Proposed Transfers Did Not Comply With The Conditions On Transfer Under The Leases And Framework Agreement

Under both Lease Form 1 and Lease Form 2, Frontier is only required to consent to transfers that would not restrict its rights under the applicable agreements. Section 20.2(a)(ii) of Lease Form 1 states that Frontier need not agree to any transfer or assignment that would "result in any restriction . . . on Lessee's rights under this Agreement or the other Lessee's Documents or on Lessee's use or operation of the Aircraft." Section 22.3(v) of Lease Form 2 similarly allows a transfer only if it "will not increase Lessee's obligations, liabilities (financial or otherwise), or risks or diminish Lessee's rights and benefits, in each case under any Operative Document or in respect of the Aircraft." As detailed below, Frontier had contract and property rights in the Aircraft

under the Leases and other applicable agreements, which would be restricted in the event of a transfer and would not be adequately protected by Carlyle's proposed guaranty.

> 1.    Frontier Has Relevant Contract And Property Rights In The Aircraft

The Leases and Framework Agreement grant both contractual and property rights to Frontier, which the proposed transfers would impair. *First*, every contract contains the inherent right to seek common law remedies to enforce the benefit of the non-breaching party's bargain unless the contract specifically states otherwise. *See, e.g.*, *Rubinstein v. Rubinstein*, 244 N.E.2d 49, 51-52 (N.Y. 1968) (allowing plaintiff to seek common law remedy of specific performance because liquidated damages provision did not specifically prohibit it). *Second*, the Leases grant Frontier a leasehold interest in the Aircraft. *See* Lambert Decl. Ex. 1, Lease Form 1 § 20.11(b)(ii); Lambert Decl. Ex. 2, Lease Form 2 § 23.16(ii). Courts recognize that a leasehold interest grants the lessee substantive property rights in the leased premises under the economic terms of the lease: in the event of a taking, for example, a leasehold interest grants the lessee constitutionally protected property rights in the *res*, and the lessee is entitled to just compensation for the loss of its possessory interest. *See A.W. Duckett & Co. v. United States*, 266 U.S. 149, 151 (1924). In other words, contract and property rights equally recognize and protect the lessee's economic right to enforce the terms of its lease, as set forth in the Lease itself along with any other applicable agreements.

> 2.    The Proposed Transfers Would Restrict Frontier's Rights

In the case currently pending before Judge Stanton, Frontier has claimed that the defendants—who overlap substantially with the defendants in this action and the plaintiffs in the removed state court action—breached the Leases and Framework Agreement, which deprived Frontier of the benefit of its bargain. Because of the structure of the transactions between Carlyle

and AMCK, which had the effect of stripping AMCK of nearly all of its assets, Frontier has substantial reason to believe that it will be unable to recover funds in satisfaction of any judgment. However, at present, Frontier would have other options to enforce its judgment for equivalent value. First, Frontier could avail itself of its ability to execute its judgment against the judgment debtors' property – the Aircraft. *See, e.g.*, *Greater Chautauqua Fed. Credit Union v. Marks*, 600 F. Supp. 3d 405, 416 (S.D.N.Y. 2022) ("A judgment creditor . . . can seek in a myriad different ways to enforce a judgment once entered:  the judgment may be executed against the debtor's real or personal property . . . .") (citing N.Y. CPLR 5202 & 5230).  Second, Frontier could seek to establish a constructive trust over the Aircraft by virtue of its leasehold interest in the Aircraft, the transfer of the Aircraft to Carlyle, and the unjust enrichment of defendants, who caused damage to Frontier and then structured transactions to avoid paying Frontier damages.  *See, e.g.*, *Sharp v. Kosmalski*, 351 N.E.2d 721, 723 (N.Y. 1976) ("Generally, a constructive trust may be imposed when property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest.") (internal alterations and quotation marks omitted); *Lonninge v. Berzak*, 692 N.Y.S.2d 330, 331 (1st Dep't 1999).  Frontier's ability to seek either remedy would be frustrated by an acknowledgment that an unrelated third party has superior security interest in the Aircraft.  Any security interest that Frontier acquires through the methods set forth above would be made less valuable by the fact that Frontier had already agreed that any such interest is subordinated to the new, third-party transferee.

### 3.    Carlyle's Guaranty Does Not Reasonably Protect Frontier's Rights

Carlyle's proposed Guaranty does not change the calculus, because it does not reasonably protect Frontier's economic interests as a prospective judgment creditor for several reasons.  First, the Guaranty only covers "amounts that are owed (if any) by a Maverick Defendant," which is in

turn defined as "direct or indirect subsidiary of Maverick Aviation Partnership LP." Lambert Decl. Ex. 16 ¶ 1(a). Notably, the Guaranty does not cover a judgment Frontier may obtain against AMCK, and arguably does not cover a judgment Frontier obtains against any party who is not a subsidiary of Maverick Aviation Partnership at the time of judgment. To protect against this risk, Frontier reasonably asked for the Guaranty to cover any judgment Frontier obtained in the existing lawsuits, which Carlyle refused. Second, the Guaranty is a general unsecured contractual obligation, rather than property that may be used as security. Therefore, to the extent Carlyle breaches the Guaranty, Frontier's only recourse would be to file and win another substantive action—during which the guarantor could potentially fall below the required capitalization—rather than simply execute its judgment against property already in its possession. To protect against this risk, Frontier reasonably asked for a confession of judgment along with the Guaranty, which Carlyle refused. Third, the Guaranty would terminate entirely if Frontier, at any point, breached "any of its obligations under any of the Leases," regardless of whether such breach bore any relation to either the proposed transfers or the existing lawsuits. In other words, even Carlyle's most recent proposal would have diminished Frontier's prospect of collecting on its existing lawsuits. Frontier was therefore under no obligation to accept it and did not act unreasonably.

### C.    Carlyle Failed To Comply With Additional Conditions For Transfer, Suspending Frontier's Obligation To Perform

Further, Carlyle failed to comply with several other prerequisites for the transfer to occur under the terms of the Leases, meaning that the declared default was at least premature, and at most wholly improper. Under Section 402 of Article 2A (Leases) of the Uniform Commercial Code, a lessor's failure to comply with its obligations under a lease suspends any contractual obligation to perform on the part of the lessee. N.Y. U.C.C. § 2A-402. Carlyle failed to comply with several additional aspects of the Leases. First, Carlyle was only entitled to "transfer

ownership or beneficial ownership" in the Aircraft "upon prior written notice to Lessee."  Lambert Decl. Ex. 1 § 20.2(a).  By forgoing such notice, Carlyle violated the Leases, relieving Frontier of its obligation to perform.  Second, Carlyle has never agreed to pay "Lessee's reasonable and invoiced out-of-pocket costs and expenses incurred in connection with its cooperation with Lessor under this Clause 20.2(a), including reasonable legal fees."  *Id.* § 20.2(a)(v).  Third, Carlyle has failed to facilitate negotiation of a new tripartite agreement including the new owner(s) of the Aircraft, which is necessary to preserve Frontier's ability to operate the Aircraft using the presently installed engines.  *See id.* § 20.2(a)(i)-(iii).  Carlyle was not entitled to hold Frontier's failure to consent against it until it removed these barriers to the proposed transfers.

## II.    Grounding The Aircraft Or Terminating The Leases Would Cause Irreparable Injury To Frontier And Its Customers

Irreparable harm—"certain and imminent harm for which a monetary award does not adequately compensate," *Wisdom Import Sales Co., LLC v. Labatt Brewing Co., Ltd.*, 339 F.3d 101, 113 (2d Cir. 2003)—is "the single most important prerequisite for the issuance of a preliminary injunction," *Faiveley Transp. Malmo AB v. Wabtec Corp.,* 559 F.3d 110, 118 (2d Cir. 2009) (citations and quotations omitted).  The movant must establish that it "will suffer an injury that is neither remote nor speculative, but actual and imminent," if an injunction is not granted. *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (internal quotation marks omitted).

Frontier and its customers would be irreparably harmed by the indefinite impoundment or grounding of the Aircraft, or the termination of the Leases.  Courts consistently recognize loss of good will and reputational damages as irreparable harm.  *See, e.g.*, *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) ("loss of reputation, good will, and business opportunities" constitute irreparable harm); *Rex Med. L.P. v. Angiotech Pharms. (US) Inc.*, 754 F. Supp. 616, 621

(S.D.N.Y. 2010) (loss of good will and inability to provide service to customers irreparable harm); *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004) (same).  Most poignantly, aircraft operators facing imminent impediments to the operation of their aircraft have previously obtained temporary injunctive relief.  *See Rosenbalm Aviation Inc. v. Port Auth. of N.Y. & N.J.*, 636 F. Supp. 212, 215, 218 (S.D.N.Y. 1986).

Here, too, Frontier faces the prospect of being unable to operate its aircraft merely because it exercised its contractual rights.  As set forth in the Declaration of Howard Diamond, the Aircraft carry almost 12,000 Frontier passengers each day during the busy summer season.  Were Defendants to restrict Frontier's use of the Aircraft by exercising their right to impound, ground, or deregister the Aircraft under the breach they declared, Frontier would be forced to cancel the flights of nearly all of those 12,000 passengers.  Frontier generally keeps only one or two spare aircraft in its fleet, which are frequently called into service to replace aircraft with mechanical issues.  That is to say, the current spare aircraft in Frontier's fleet could to replace at most two, and often fewer, of the fourteen Aircraft at issue.  Nor could Frontier seasonably procure other aircraft as replacements.  Because of industry-standard lead times on leased aircraft, it could be over a year before Frontier could secure alternative arrangements, at great cost to Frontier.  In the meantime, Frontier would be forced to endure loss of goodwill from nearly 12,000 passengers each day.  That is clearly irreparable harm, and supports the conversion of the temporary restraining order to a preliminary injunction.

### III.    The Balance of Equities And Hardships And The Public Interest Strongly Favor Frontier's Continued Ability To Deploy The Aircraft

There is no doubt that the traveling public has a greater interest in Frontier's ability to operate its scheduled flights and fulfill its commitments to its passengers than in the Aircraft beneficial owners' ability to use groundings and lease terminations as leverage to force Frontier to

consent to the assignments.  Domestic air travel fulfills a critical role both in business and leisure activities—all of which would be interrupted if the Aircraft are allowed to be impounded or grounded for any length of time or if the Leases are terminated.  As discussed above, approximately 12,000 passengers per day would be unable to travel if Frontier cannot use its aircraft to fly routes that have been scheduled for months.

Granting Frontier's request would also further the public's interest in judicial economy.  *See Bakken Res., Inc. v. Edington*, No. 1:15-cv-8686, 2018 WL 1353271, at *6 (S.D.N.Y. Mar. 15, 2008) ("considerations of judicial economy are frequently viewed as relevant to the public interest and weigh against the investment of court resources that may prove to be unnecessary") (internal quotation marks omitted).  Forcing Frontier to consent to the assignments without providing the requested guaranty would necessitate yet further legal proceedings to protect Frontier's right to collect on its judgments and address further breaches of the Leases—which is exactly why Frontier was forced to bring this action in the first place.

On the other hand, there is little, if any, public interest in allowing Carlyle to ground or impound the Aircraft.  Defendants would retain adequate remedies to address the breach they have declared; in fact, they have already asserted those remedies in the action filed earlier this week.  Frontier is current on all rent payments on the Aircraft, Frontier is not seeking an injunction to prevent Defendants from demanding any payments available to them under Section 17 of the Lease Form No. 1 or Section 20.2(a)(iii) of Lease Form No. 2, and Defendants would retain all legal rights and remedies available to them under the Leases, as set forth in Sections 16.2(a) and (g) of Lease Form No. 1 and in Section 20.2(a) of Lease Form No. 2.  Moreover, Frontier has already agreed that Carlyle could execute the transactions on the proposed terms by providing the security guarantees Frontier requested.  This would not cause unfair prejudice to Carlyle, regardless of the

outcome of the case before Judge Stanton:  if Defendants prevail, the condition preceding the guarantee would not trigger, and if Frontier prevails, the guarantees would only insure that the defendants pay amounts lawfully owed.

Rather than negotiate with Frontier, Defendants simply declared a default.  They were not entitled to do so, and should be enjoined from repossessing, impounding, deregistering or grounding the Aircraft or terminating the Leases as a result.

## **CONCLUSION**

For the foregoing reasons, Frontier respectfully requests that the Court convert the existing temporary restraining order to a preliminary injunction running through this Court's final judgment on Frontier's Second Amended Complaint and/or full adjudication of the removed state court action, as well as affording Frontier such other and further relief as the Court deems reasonable and proper under the circumstances.

Dated: June 12,  2023
      New York, NY

Respectfully submitted,

/s/ Eric B. Fisher
Eric B. Fisher
Gregory C. Pruden
Tessa B. Harvey
**BINDER & SCHWARTZ LLP**
366 Madison Avenue
Sixth Floor
New York, NY 10017
(212) 510-7008
efisher@binderschwartz.com
gpruden@binderschwartz.com
tharvey@binderschwartz.com

David Schoeggl (*admitted pro hac vice*)
**LANE POWELL PC**
601 S.W. Second Avenue
Suite 2100
Portland, Oregon 97204
Telephone: (503) 778-2100
Email: schoeggld@lanepowell.com

*Attorneys for Frontier Airlines, Inc.*