DocuSign Envelope ID: 2FD017C0-8FE5-479B-B7CE-9C91B26CE401

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FRONTIER AIRLINES, INC.,<br><br>                Plaintiff,<br><br>     v.<br><br>AMCK AVIATION HOLDINGS IRELAND LIMITED, ACCIPITER INVESTMENT 4 LIMITED, VERMILLION AVIATION (TWO) LIMITED, ACCIPITER HOLDINGS DAC, CARLYLE AVIATION MANAGEMENT LIMITED, MAVERICK AVIATION HOLDINGS LTD., MANCHESTER AVIATION FINANCE S.a.r.l., VERMILLION AVIATION HOLDINGS LIMITED, WELLS FARGO TRUST COMPANY, N.A., solely in its capacity as OWNER TRUSTEE, and UMB BANK, N.A., solely in its capacity as OWNER TRUSTEE,<br><br>                Defendants. | Case No. 1:22-cv-02943 (PAE) |

## DECLARATION OF PAUL LAMBERT

I, Paul Lambert, declare as follows:

1. I am a shareholder at the law firm of Lane Powell P.C., outside counsel for Plaintiff Frontier Airlines, Inc. ("Frontier") for its aircraft fleet management matters. I have represented various airlines in their aircraft fleet transactions since 2001, and have handled the legal work for Frontier's aircraft fleet transactions since 2014. I have personal knowledge of the matters set forth herein.

2. AMCK Aviation Holdings Ireland Limited and its affiliates (collectively, "AMCK") beneficially owned 15 aircraft for which Wells Fargo Trust Company, N.A. ("Wells Fargo") or UMB Bank, N.A. ("UMB") acted as owner trustee (together, the "AMCK Lessors"),

and which the AMCK Lessors leased to Frontier.

3. The 15th aircraft was later returned by Frontier to the lessor under the terms of the lease.

4. Of the 14 aircraft still leased by Frontier, 13 have leases that follow a common format, referred to by the parties as Lease Form 1. The other aircraft's lease followed a slightly different form, termed Lease Form 2. A true copy of Lease Form 1 is attached as **Exhibit 1**, and a true copy of Lease Form 2 is attached as **Exhibit 2**.

5. Both Lease Form 1 and Lease Form 2 contain express protections for Frontier in the event the lessors transfer beneficial ownership of or collaterally assign the aircraft.

6. Among other protections, Section 20.2(a)(ii) of Lease Form 1 states that Frontier need not agree to any transfer or assignment that would "result in any restriction . . . on Lessee's rights under this Agreement or the other Lessee's Documents or on Lessee's use or operation of the Aircraft." Per Section 20.2(a)(i) of Lease Form 1 this transfer or assignment requirement is specifically to be evaluated "based on the facts and circumstances existing and applicable laws in effect at the time of such transfer."

7. Among other protections, Section 22.3(v) of Lease Form 2 allows a transfer or assignment only if it "will not increase Lessee's obligations, liabilities (financial or otherwise), or risks or diminish Lessee's rights and benefits, in each case under any Operative Document or in respect of the Aircraft." The Participation Agreement for the aircraft covered by Lease Form 2 contains similar restrictive language.

8. Generally accepted usage within the aviation industry reads references to "transfers or assignments" of ownership broadly to capture transactions at different levels of the corporate structure.

9. Frontier executed the most recent Framework Agreement in March 2020, under which AMCK agreed to finance the purchase of six new A320NEO aircraft and to lease them to Frontier through a sale-leaseback structure. A true copy of the Framework Agreement is attached as **Exhibit 3**.

10. Almost immediately after signing the most recent Framework Agreement, AMCK told Frontier that it wanted to repudiate the Framework Agreement because of the adverse effects of the COVID-19 pandemic on aircraft financing markets.

11. Frontier and AMCK then actively discussed deferring both the purchase and leasing of the upcoming Aircraft that had not yet been supplied by Airbus, as well as the deferral of rent on existing leased aircraft due to pandemic travel restrictions. AMCK granted Frontier a temporary rent deferral while the parties negotiated other commercial details of the deferral, including with other parties like Airbus.

12. AMCK reneged on its agreement with Frontier to temporarily defer rent.

13. On May 8, 2020, without warning, AMCK issued Frontier a Notice of Termination of the Framework Agreement on the ground that Frontier had not paid the rent that AMCK had told Frontier it could defer. Accordingly, AMCK retracted its commitment to purchase the five remaining aircraft from Airbus and then lease them back to Frontier, as provided in the Framework Agreement.

14. To avoid a default with Airbus, Frontier quickly secured separate sources of financing for the yet-to-be-delivered Aircraft, at substantial loss to Frontier.

15. On November 18, 2020, Frontier filed a lawsuit against AMCK and other defendants bearing the case number 1:20-cv-09713 ("Lawsuit No. 1"). In Lawsuit No. 1 Frontier alleges several breaches of both the leases and the Framework Agreement, including that AMCK

anticipatorily repudiated the Framework Agreement, as well as breach of quiet enjoyment, promissory estoppel, and fraud. A true copy of the complaint filed in Lawsuit No. 1 is attached as **Exhibit 4**.

16. On January 29, 2021, the defendants filed a partial motion to dismiss in Lawsuit No. 1. On May 5, 2021, the court denied the motion in its entirety. A true copy of Judge Stanton's order denying the motion to dismiss is attached as **Exhibit 5**.

17. Discovery in Lawsuit No. 1 has closed and the defendants' summary judgement motions are fully briefed and are awaiting a decision from Judge Stanton.

18. AMCK reached an agreement to sell its entire aircraft portfolio to Carlyle Aviation Partners and certain other affiliated entities in or around December 2021. A December 2021 press release from Carlyle (the "Press Release") announced the sale, which Frontier discovered in January 2022. A true copy of the Press Release is attached as **Exhibit 6**. AMCK never informed Frontier that it intended to sell or had signed an agreement to sell its aircraft portfolio to Carlyle. Rather, Frontier only learned of the sale when it discovered the Press Release.

19. Upon review of publicly available financial statements and other corporate records of relevant entities, Frontier came to understand that AMCK conducted a series of internal transfers that effectively relinquished AMCK's ownership of valuable assets, including companies holding the AMCK subsidiaries that had leased the Aircraft to Frontier. Those assets were then contributed to a separate entity and sold to Carlyle for less than fair value. This sale left AMCK Aviation Holdings as an undercapitalized shell entity that, based on Frontier's review of financial statements, no longer owned over 98% of its former assets. Accordingly, Frontier determined that AMCK Aviation Holdings was unlikely to be solvent to pay any judgment obtained by Frontier in the lawsuit described above.

20. Frontier learned in discovery in Lawsuit No. 1 that AMCK and Carlyle had entered into a private agreement to apportion liability between them for any judgment in the action before Judge Stanton. Frontier does not know the details of this arrangement.

21. On January 4, 2022, Frontier made a written demand on AMCK for documents and information relevant to the transfer of ownership interests to Carlyle. Despite its obligations under the leases, AMCK denied that the sale was a "transfer" under the leases and provided no information. AMCK responded similarly to a second written demand from Frontier.

22. On April 13, 2022, Carlyle notified Frontier that its transaction with AMCK had closed and Carlyle had taken over as the new Servicer with respect to the aircraft leased to Frontier. Frontier objected to the transactions, Carlyle did not respond, and then Frontier filed the above-captioned action.

23. In June 2022, Carlyle delivered to Frontier a Notice of Security Assignment and Notices of Effective Date for certain of the leased aircraft. A true copy of one of the notices is attached as **Exhibit 7**. Carlyle provided Frontier no advance notice of this transaction or the security assignments described therein.

24. In November 2022, Robert Korn, President of Carlyle Aviation, emailed Robert Fanning, Frontier's Vice President of Fleet, to inform him that Carlyle wanted to sell four of the aircraft to two separate third parties. Mr. Fanning forwarded that email to me.

25. Upon learning of Mr. Korn's email to Mr. Fanning, I sent a letter to Carlyle Aviation's outside deal counsel, Freyda Mechlowicz of Milbank LLP, at around 10:30 AM Pacific Standard Time on November 23, 2022. The letter requested additional information about the proposed transfers to allow Frontier to determine, at least as a preliminary matter, whether those transfers would comply with the transfer conditions in the relevant leases. A true copy of my

November 23, 2022 letter to Ms. Mechlowicz is attached as **Exhibit 8**.

26. At around 12:30 PM Pacific Standard Time that same day, Carlyle Aviation, through Ms. Mechlowicz, contacted me about consenting to new security assignments on all 14 aircraft. Ms. Mechlowicz also informed me of Carlyle Aviation's intent to first transfer legal ownership of 3 of the 4 aircraft to be sold to third parties from Wells Fargo Trust Company to UMB Bank as the new owner trustee, and to transfer beneficial ownership for those same 3 aircraft to another affiliate of Carlyle. Carlyle did not explain how these transactions related to one other. Ms. Mechlowicz also did not respond to (or even refer to) my letter from earlier that morning, nor did she otherwise address Frontier's concerns about how the structure of the proposed transfers would violate the conditions on transfer in the relevant leases. A true copy of this November 23, 2022 email from Ms. Mechlowicz is attached as **Exhibit 9**.

27. Ms. Mechlowicz and I had our first call to discuss the November 23, 2022 communications after the Thanksgiving holiday, on December 5, 2022 (the "December 5 Call"). On that call, Ms. Mechlowicz told me that Carlyle sought to complete the proposed transfers in multiple steps, the first of which would be to complete a security assignment of all 14 aircraft. In connection with that proposed assignment, Carlyle Aviation also sought to transfer both legal and beneficial ownership of the 3 aircraft mentioned above to a new lessor and new owner participant. The new owner participant was not related to the current owner participant and had no involvement in any of the facts alleged in either of the then-pending lawsuits. I was told that, upon completion of these initial transfers, Carlyle then intended to sell the four aircraft to two different third party lessors.

28. On the December 5 Call, I raised the same concerns to Ms. Mechlowicz stated in my letter of November 23: that Frontier did not understand how Carlyle sought to complete these

6

transfers without diminishing Frontier's rights under the leases in light of, among other things, the two pending litigations and told her she had not given us necessary or customary information on the proposed transactions. Ms. Mechlowicz agreed only to provide Frontier with a chart setting forth the structure and timing of each of the proposed transactions, including information about the identity of and relationships between the corporate entities that would be parties to the transactions.

29. Following the December 5 Call, Ms. Mechlowicz sent me a chart that purported to explain the deal structure and timing. But contrary to what we had discussed on the call, the chart did not set forth the corporate relationship between all of the transaction parties, detail regarding the specific timing of each transaction, or contain relevant information about the new guarantors, such as their creditworthiness to support provided guarantees. A true copy of this communication from Ms. Mechlowicz is attached as **Exhibit 10**.

30. I also told Ms. Mechlowicz on the December 5 Call that certain of Carlyle's proposed assignments would require the execution of a new tripartite agreement among CFM, who manufactures and services the engines used in the Aircraft, Frontier, and the proposed transferees. In the commercial airline industry, engines are often serviced by a third party, like the manufacturer of the engines. These tripartite agreements are an integral part of the leasing arrangements for aircraft because they set forth Frontier's financial obligation to the engine manufacturer/servicer as well as the aircraft owner's access to critical engine maintenance benefits. Ms. Mechlowicz readily acknowledged that no new tripartite agreement was in place, nor did she have a definitive timeline of when one would be negotiated. To date, to my knowledge, Carlyle Aviation has still not negotiated new tripartite agreements between CFM, Frontier and the prospective owners of the aircraft.

31.     Frontier provided Carlyle with comments and revisions to the proposed security assignment documents on December 10, 2022.  Most importantly, Frontier proposed that the transaction parties acknowledge Frontier's rights with respect to the previously filed litigations, including Frontier's right to use the value of the aircraft to collect on any judgment it might obtain.  A true copy of Frontier's December 10, 2022 revisions to the draft and the accompanying cover email are attached as **Exhibit 11**.

32.     Carlyle responded on January 3, 2023 that it would not accept Frontier's proposal outlined above because "it is not language ordinarily included in a security assignment notice or consistent with the lease."  Carlyle also again failed to provide the background information on the parties to the transaction that I had first requested in my November 23, 2022 letter.  Frontier continued to request that Carlyle provide that information so that it could properly assess the net impact of the proposed transactions.  Carlyle continued to provide incomplete and evasive responses.  A true copy of these January 2023 email communications is attached as **Exhibit 12**.

33.     I again spoke with Ms. Mechlowicz at 11:00 AM Pacific Standard Time on February 1, 2023.  On that call, Ms. Mechlowicz reiterated Carlyle's position that Frontier had no right to an acknowledgment of any of the pending litigations or preserve any of its rights to collect in the proposed transfer documents.  Ms. Mechlowicz's stated basis for Carlyle's position was that Frontier's second lawsuit was meritless.  I referred Ms. Mechlowicz to the relevant lease provisions set forth above, which state that Frontier only needed to consent to proposed transactions to the extent they did not restrict any of Frontier's rights under the leases and other applicable contracts.  I also told Ms. Mechlowicz that Frontier would propose alternative provisions in the draft transfer documents that would preserve Frontier's right to recover on the existing lawsuits, which Frontier then did.

34. On February 9, 2023, Carlyle proposed a confidential redacted schedule be attached to the assignment documents acknowledging the pending lawsuits. Although the proposed Carlyle revision stated in conclusory fashion that the assignment would not be "a waiver of any contractual or extra contractual right or as a waiver of any claim, right or defense by any person, trust or other entity in connection with" the pending litigations, the proposal did not contain any actual mechanism that would preserve Frontier's ability to execute on its judgment through the aircraft as the defendants' property or otherwise provide Frontier with functionally equivalent consideration. A true copy of this February 9, 2023 proposal is attached as **Exhibit 13**.

35. Frontier and Carlyle continued to negotiate the proposed transfers. Ms. Mechlowicz and I had another call on February 28, 2023. We agreed that the main outstanding issue was the proper way to protect Frontier's right to recovery in the two pending litigations. Ms. Mechlowicz conceded that Frontier has a right to recover if it were to prevail in the pending litigations, but refused to acknowledge that such recovery right was a contractual right under the leases. Ms. Mechlowicz thus insisted that Frontier consent to the transfers now—without resolving the issue—without prejudice to Frontier's ability to raise the issue later were it to prevail on its claims. I told Ms. Mechlowicz that Frontier could not consent to the proposed transactions without a commercial resolution of this issue because the mere fact of the transfers would restrict Frontier's rights.

36. On March 24, 2023, Carlyle offered to provide a new separate unsecured guaranty from a solvent Carlyle entity to cover any liability a Carlyle-owned entity is found to have to Frontier in the lawsuit in front of Judge Stanton. A copy of Carlyle's March 24, 2023 guaranty proposal is attached as **Exhibit 14**.

37. Frontier made a counterproposal on April 7, 2023. Frontier sought to secure

9

alternative security for the new guaranties proposed by Carlyle to support the claims Frontier had already asserted. Frontier told Carlyle that it was willing to accept as security, at Carlyle's choice, any of: (i) a letter of credit for $60 million; (ii) a bond in an amount to be determined by the court on a joint application; or (iii) a first lien security interest in 3 of the aircraft. Carlyle refused. The proposal addressed key deficiencies in Carlyle's proposal, such as that the proposed guaranty did not include liability coverage for AMCK, the owner trustees, or any liability against any entity not owned by Carlyle. Without such coverage, the transfers would still leave Frontier in a worse position to recover any possible judgment, and would thus restrict Frontier's rights. A true copy of Frontier's counterproposal is attached as **Exhibit 15**.

38. On April 24, 2023, Carlyle rejected Frontier's counteroffer and proposed only non-material revisions to its March 24 proposal. Carlyle's counteroffer is attached as **Exhibit 16**.

39. On April 27, 2023, despite the fact that Frontier and Carlyle continued to negotiate the relatively narrow remaining issue of a suitable guaranty, Carlyle sent Frontier a letter asserting that Frontier had breached its obligations under the Leases and the Non-Waiver Agreement executed by Frontier and Carlyle. A true copy of that letter is attached as **Exhibit 17**.

40. The purpose of the Non-Waiver Agreement was to allow Frontier to continue honoring the Leases in the ordinary course, without continued performance being interpreted as a waiver or abandonment of Frontier's rights to challenge that proper transfers had taken place.

41. The April 27 letter misrepresented several of Frontier's positions. For example, the letter states that Frontier insisted the new lessor and security trustee subordinate their security rights to Frontier, ignoring that Frontier had been attempting to negotiate alternative security with Carlyle without the need for subordination.

42. Frontier responded to this letter on May 3, 2023 correcting the above misstatements

and expressing continued willingness to negotiate toward mutually agreeable terms. A true copy of Frontier's response is attached as **Exhibit 18**.

43. Under both lease forms, Carlyle is contractually required to pay Frontier's costs incurred in connection with the proposed transfers. The payment of such costs is a condition to transfer under Section 20.2(a)(v) of Lease Form 1 and Section 22.3(ii) of Lease Form 2. To date, Carlyle has not paid or agreed to pay Frontier's costs incurred in connection with the proposed transfers.

44. On the afternoon of Friday, May 26, 2023, despite ongoing negotiations and Carlyle's refusal to agree to pay Frontier's costs, Carlyle served Frontier with notices of default on all 14 aircraft leases. True copies of those default notices are attached as **Exhibit 19**. The sole basis given for the claimed default was Frontier's alleged failure to execute transfer documents as presented by lessor under Section 20.2(b) of Lease Form 1.

45. Under Section 16.1(c) of the Leases, serving notice of default starts a 15-day cure period under Form 1 (30 days under Form 2) after which an Event of Default is triggered. The 15-day cure period would expire on June 10, 2023.

46. The Notices threaten five actions available under the Aircraft leases following a default by the lessee, two of which are "grounding of the Aircraft" and "cancelation of the leasing of the Aircraft and requiring return of the Aircraft to Lessor . . . ."

47. Frontier's fleet is small relative to other major U.S. airlines and Frontier does not have excess capacity in its fleet to accommodate the grounding of fourteen of its aircraft. As a result, Frontier's inability to use each aircraft in its fleet would have a significant and disproportionate impact on Frontier's operations.

48. Typically, Frontier typically has only between one and three spare aircraft in its

fleet at a given time, and these spare aircraft are regularly placed into use as replacements for aircraft taken out of service for unscheduled maintenance or repair.

49. Further, current market conditions, parts and engineering supply chain constraints, and shop capacity and manufacturing constraints for commercial Airbus aircraft make it unfeasible for Frontier to arrange to lease or purchase additional aircraft for addition to operations in Frontier's fleet in the short term. Based on my 22 years of experience in the commercial airline industry, I estimate that it would take a minimum of 12 to 18 months to replace the lost operational capacity from the 14 aircraft were Frontier to become unable to deploy them for use in its fleet in the ordinary course.

50. As a result, if Frontier were unable to operate the aircraft that are the subject of this action, Frontier likely would have to cancel the vast majority of the flights that those aircraft otherwise would complete over at least the coming 12 to 18 months.

51. On May 31, 2023, Carlyle filed an action against Frontier in the Supreme Court of the State of New York, County of New York, and served Frontier on June 5, 2023. A true copy of that complaint—as filed with redactions—is attached as **Exhibit 20**. The action was filed during the notice and cure periods provided in the leases and before any of the alleged defaults had even matured to events of default.

52. On June 6, 2023, Frontier removed the action to federal court on the basis of diversity. I understand that the Court has accepted assignment of the removed action as related to this action.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 12, 2023

DocuSigned by:

*Paul Lambert*
5E536831DE89403...
Paul Lambert