N68BFROH

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  FRONTIER AIRLINES, INC.,

4                   Plaintiff,

5           v.                          22 Civ. 2943 (PAE)

6  CARLYLE AVIATIONS MANAGEMENT
   LIMITED, et al,
7
                 Defendants.
8                                       Telephone Conference
   ------------------------------x
9                                       New York, N.Y.
                                        June 8, 2023
10                                      3:00 p.m.

11 Before:

12                 HON. PAUL A. ENGELMAYER,

13                                      District Judge

14                       APPEARANCES

15 BINDER & SCHWARTZ, LLP
        Attorneys for Plaintiff
16 BY:  ERIC FISHER
        GREGORY PRUDEN
17        -And-
   LANE POWELL, PC
18      Attorneys for Plaintiff
   BY:  DAVID SCHOEGGL
19

20 MILBANK, LLP
        Attorneys for Defendants
21 BY:  JED SCHWARTZ
        SAMANTHA LOVIN
22      EMILY WERKMANN
          -And-
23 CLIFFORD CHANCE US, LLP
        Attorneys for Defendants
24 JEFF E. BUTLER
   JOHN P. ALEXANDER

25

N68BFROH

1          THE COURT:  I'm calling the case of *Frontier Aviation*

2    *v. AMCK Aviation Holdings, et al*, 22 Civil 2943.

3          For Frontier, I'm just going to go in order, do I have

4    Eric Fisher on the line?

5          MR. FISHER:  Yes, I'm here, your Honor.

6          THE COURT:  Do I have Gregory Pruden on the line?

7          MR. PRUDEN:  Yes, your Honor.  Good afternoon.

8          THE COURT:  And do I have David Schoeggl on the line?

9          MR. SCHOEGGL:  Yes, your Honor.  Good afternoon.

10          THE COURT:  Mr. Fisher, I understand from my law clerk

11    that you will be taking the lead for the plaintiff today?

12          MR. FISHER:  That is correct.

13          THE COURT:  For the defendants, I understand there are

14    five lawyers in two different categories.  Is Jed Schwartz on

15    the line?

16          MR. SCHWARTZ:  Yes.  Good afternoon, your Honor.

17          THE COURT:  Good afternoon. Is Samantha Lovin on the

18    line?

19          MS. LOVIN:  Yes, your Honor.

20          THE COURT:  Good afternoon.  And is Emily Werkmann on

21    the line?

22          MS. WERKMANN:  Yes, your Honor.  Good afternoon.

23          THE COURT:  Good afternoon.  Before moving farther,

24    Mr. Schwartz, I understand that the three of you whose names I

25    just mentioned represent Wells Fargo and UMB in the related

N68BFROH

1   case that I accepted yesterday; but more relevant now for the

2   purposes of the existing case's docket number I read a moment

3   ago, I take it that for today's purposes you are representing

4   those same two defendants?

5          MR. SCHWARTZ:  That's correct, your Honor.

6          THE COURT:  Are you also representing Carlyle?

7          MR. SCHWARTZ:  Yes, I am.  Although, I don't know that

8   we filed a notice of appearance for Carlyle because I don't

9   think Carlyle was subject to the order to show cause.

10         THE COURT:  No sweat.  That's not a problem. But I

11  just wanted to make sure, as I understood from my law clerk,

12  that you would be speaking for the defense today; that to the

13  extent that there are, if you will, Carlyle-focused questions,

14  you are empowered to represent them on this call?

15         MR. SCHWARTZ:  Yes, your Honor.

16         THE COURT:  Moving on.  Is Jeff Butler on the line?

17         MR. BUTLER:  Yes, your Honor.  Good afternoon.

18         THE COURT:  Good afternoon. And is John Alexander on

19  the line?

20         MR. ALEXANDER:  Yes, your Honor.  Good afternoon.

21         THE COURT:  Good afternoon.  And, Mr. Butler, I

22  understand that you and Mr. Alexander, who are from the

23  Clifford Chance firm, represent and have long-represented all

24  the named defendants in this case.  Is that correct?

25         MR. BUTLER:  Correct.

N68BFROH

1          THE COURT:  Okay.  Very good.  Let me begin with just

2    a few housekeeping notes. To begin with big picture, I just

3    want to thank all counsel for very, very able briefing

4    accomplished in an extremely accelerated time period, so thank

5    you for that.  It's always worth acknowledging high quality.

6    And I'll ask the lead counsel on the line as well to please

7    make a point of thanking and acknowledging the junior members

8    of the team, who particularly in the case of the defense, may

9    well have had very late nights last night, and I don't want

10   their hard work to go un-acknowledged, so please let them know

11   that the Court is grateful for all that.

12         Second of all, there's a motion at Dkt. 65 by the

13   plaintiff to seal Exhibit 3, which I understand to be the

14   framework of the agreement.  I will grant the motion to seal,

15   of course that's without prejudice to the right of any party to

16   ask me to revisit it down the road.  But for the purpose of

17   effectively the emergency hearing today, it is of course

18   sensible to err on the side of care, so I'm going to grant that

19   motion without prejudice.  I next want to explain why we're

20   doing this by phone.  I have a very, very strong view that

21   hearings should be in person unless they are strictly

22   logistical and mechanical, and this is substantive.  The reason

23   we're doing it by phone is that Frontier's request for

24   emergency came in literally as I was about an hour from leaving

25   my chambers yesterday to go to an out-of-state judicial

N68BFROH

1    conference committee meeting where I am today and where I will

2    be tomorrow.  As a result, the only way for you to get a claim

3    on my time was for me to do this telephonically.  And the only

4    time available I had was the window of time when my committee

5    was not sitting.  So I felt I owed you an explanation for why

6    we're doing this the second best way, which is by phone.

7    That's the reason why.  And I made the judgment given my

8    familiarity with the case, including on account of the motion

9    to dismiss decision, which coincidentally was getting ready for

10   issuance yesterday when the request for emergency relief came

11   in, it made far more sense for me to take this by phone than

12   for another judge, likely the Part One judge who would be

13   unfamiliar with these proceedings to take it up if possible at

14   all in person.  And obviously given the content sensitivity

15   stated, it was not viable to put this off until next week.

16          As to mechanics for this call.  I learned this

17   repeatedly during the pandemic when so much was done remotely.

18   Do not interrupt. I will call on each side to speak, and I will

19   give everyone an opportunity to do so, but do not interrupt.

20   It's impossible for me to follow the overlapping voices.  More

21   important, it's impossible for the court reporter to talk. If

22   you hear me speaking, because I may try to cut in to follow-up

23   on something that a lawyer is saying, please stop speaking.  So

24   if you hear that, I appreciate it.  Please speak a little more

25   slowly than usual also just given the telephonic format's

N68BFROH

1    limitations.  It is not out of the question you may hear my law

2    clerk speak up, and if so it maybe because I have emailed her

3    because I've gotten disconnected.  So if you hear my law clerk

4    speaking, please immediately silence yourself.  This means

5    almost certainly that I'm off the line and we're going to have

6    to circle back when I can get back on the line. I'm hearing

7    good acoustics right now, but stranger things have happened.

8         So having taken care of those preliminaries, I've read

9    both sides' briefs as you can tell, and I want to begin with

10   plaintiff, with you Mr. Fisher.  And I want to begin with a

11   tight focus on irreparable harm and balance of the equities.

12   So for the time being, put aside merits issues and let's just

13   focus on irreparable harm.  The defense says in effect that

14   were Frontier to be denied usage effectively of the 14 planes,

15   that is a surmountable problem in effect because Frontier has

16   many multiple planes.  Walk me through from your perspective

17   concretely what would happen if Frontier were to be unable to

18   use the 14 planes.

19        MR. FISHER:  Sure, your Honor.  Eric Fisher for

20   Frontier Airlines.  And thank you, your Honor, for making

21   yourself available on such short notice for this hearing,

22   particularly given that your Honor is out of state.

23        As set forth in the Power Diamond declaration, if

24   Carlyle exercises the remedies that it claims it's entitled to

25   exercise, it would be entitled to do so already on Saturday, at

N68BFROH

1    least as to 13 of the 14 aircraft. And the irreparable harm to

2    Frontier, your Honor, is that this could effect up to 10

3    percent of Frontier's entire fleet.  It would mean the

4    grounding of 10 percent of the fleet, which as set forth in

5    that same declaration means up to 12,000 passengers per day

6    could be effected.  As a result, since Frontier is a commercial

7    airline and its entire business is commercial flight, it would

8    cause irreparable harm to Frontier's good will in a way that

9    could not possibly be quantified with money damages, not to

10   mention the havoc it would wreak for all of those passengers

11   affected by the impoundment or grounding of those aircraft.

12          THE COURT:  Pause there.  I have no doubt that if one

13   starts from the premise that 12,000 passengers wouldn't be able

14   to make their planes, that what you say is correct.  It's the

15   premise that leads there that I'm trying to pushback on.  How

16   big is the fleet?  Let me go step by step here. How big is the

17   fleet?

18          MR. FISHER:  Just a moment, your Honor.

19          THE COURT:  You said it's up to 10 percent, so I'm

20   assuming the fleet is about 140.  You tell me.

21          MR. FISHER:  Yes, it's 127 commercial passenger

22   aircraft, your Honor.

23          THE COURT:  On any given day, how many of them are in

24   the air?

25          MR. FISHER:  I don't know the answer to that question,

N68BFROH

1  your Honor.

2          THE COURT:  Sorry, somebody's interrupting.  Let me

3  just stay with Mr. Fisher.  I ask that there not be an

4  interruption.  Mr. Fisher, sticking with you.  Look, I'm trying

5  to understand this.  If what you're saying is, if you can

6  explain to me granularly why it is that taking 13 or 14 out of

7  127 effectively means that flights get shut down, I'm open to

8  hearing that.  It's not unintuitive. It's entirely plausible

9  that's the case.  I can't take a conclusory statement like that

10  without burying underneath to understand why that is so.  Is it

11  the case that essentially the fleet is so -- the capacity is so

12  thoroughly used each day that there isn't play in the joints if

13  13 or 14 planes were snowed in or something like that.  Explain

14  to me why what you're saying is true.

15          MR. FISHER:  Right, your Honor.  So the declaration

16  that was submitted, it's from the corporate senior vice

17  president and general counsel of Frontier Alliance.  And I

18  believe, your Honor, it is exactly as you suggested which is

19  that the fleet is so tight; that to take 10 percent of the

20  aircraft out of commission means that 10 percent of the daily

21  flights will be disrupted.

22          Your Honor, the interruption that you heard is

23  actually my co-counsel from Lane Powell David Schoeggl, and

24  Mr. Schoeggl has represented Frontier Airlines for many years

25  in many different areas.  And if your Honor will indulge, I

N68BFROH

1    might want to just defer to him for the specific answer to your

2    Honor's question about the flights.

3        THE COURT:  Fair enough.  Mr. Schoeggl, in the future,

4    don't do that.  You can send an email to Mr. Fisher if you need

5    to.  I literally 60 seconds before told you not to do that.

6    Now, Mr. Schoeggl, that being said, you may well be the right

7    person to answer the question.  Mr. Fisher has handed the baton

8    to you.  Mr. Schoeggl, just focusing on the specific mechanical

9    question, Why is it that grounding indefinitely 10 percent of

10   the fleet would create the disruption that Mr. Fisher

11   described?

12       MR. SCHOEGGL:  And I apologize for violating the

13   Court's rule in the first minute, and I promise I won't do it

14   again.  Your Honor, typically Frontier would have one to two

15   spare airplanes at one of its headquarters locations that can

16   be used in the event of mechanical breakdown.  About half the

17   time I believe those sparer planes are used because of other

18   airplanes that have mechanical problems, so there's essentially

19   no flexibility to substitute other aircraft. There are usually

20   five to 10 percent of the airplanes of 127 that are down for

21   maintenance.  It's sometimes possible to bring those back for

22   maintenance early, but usually not because right now the

23   maintenance schedules are very tight.  And if anything, they

24   have more airplanes in maintenance than scheduled rather than

25   less.  So my understanding is that there is essentially no

N68BFROH

1   excess capacity in general.  On certain given days, it's

2   possible to free up airplanes to do just a few additional

3   flights per day.  But the vast majority if not all of the

4   flights done by these 14 airplanes would simply have to be

5   canceled.

6           THE COURT:  Okay.  Let me ask you this question,

7   Mr. Schoeggl.  First of all, I take it what you just proffered

8   to me is based on the familiarity with a longstanding client?

9           MR. SCHOEGGL:  That is correct.  I'm not testifying to

10  fact, but that is my understanding that we could verify with a

11  subsequent declaration.

12          THE COURT:  Let me continue on with you then just for

13  a moment.  Let's suppose just for argument sake that there came

14  a point in which Frontier was shown on the merits to not have

15  an entitlement to the planes, which is a bore way of saying,

16  suppose you lose this case; or there comes some point at which,

17  at whatever stage in the proceeding, whoever the decider is,

18  court or jury, says, you lose.  Planes are out of here. You

19  can't use them anymore.  How long does it take for Frontier to

20  adapt to that?  Presumably, you've got a back-up plan, what is

21  it?

22          MR. SCHOEGGL:  Well, your Honor, to get other

23  airplanes in, especially given the tight market conditions, it

24  would be weeks or months.  And we do have a back-up plan.  The

25  back-up plan is based on the remedies that the plaintiffs are

N68BFROH

1    seeking, and the reason they're seeking the remedy. I'm sorry.

2    I said plaintiffs.  The remedies that the defendants are

3    seeking.  Essentially, they want Frontier to agree to

4    conditions that we believe would impair Frontier's rights.  And

5    so if we're not able to guarantee that we'll have use of the

6    airplanes, we'll simply have to agree to the conditions and

7    give up our rights, because it would be so devastating as a

8    company to lose the airplanes that we just can't risk that.

9              THE COURT:  In other words, let me see if I've got

10   this right.  For you, the alternative to "winning" is a loss in

11   which you accede to the conditions you contend are

12   extra-contractual, such that you can still use the planes, just

13   under conditions you regard as contractually wrong?

14             MR. SCHOEGGL:  That's correct, your Honor.  And it's

15   the case within an airline such as Frontier -- oh, sorry.

16             THE COURT:  In other words, do you have a back-up plan

17   under which if for some reason events un-spooled in a different

18   way in which you not only lost, but the nature of the lost

19   meant that the defendants were able to go a separate direction

20   with the planes, just indulge the hypothetical, what would

21   Frontier do?

22             MR. SCHOEGGL:  Well, first, your Honor, I think -- and

23   I think even the lessor's counsel would agree to this that that

24   would just be unprecedented in the aircraft leasing market.

25   And I think it would tarnish the lessor's reputation so badly

N68BFROH

1    that they would be drummed out of the marketplace so they would

2    never do that.  But assuming that it were, we would have to

3    simply cancel all the flights scheduled for these 14 airplanes

4    until we could bring substitutes online, which depending on

5    market conditions can range from a few weeks to a few months.

6        THE COURT:  All right.  Thank you, Mr. Schoeggl.  I'm

7    going to go back to Mr. Fisher now.  Thank you though. That was

8    helpful. Mr. Fisher, let me come back though I'm still focusing

9    on irreparable harm this question.  If ultimately Mr. Schoeggl

10   is right and that one way or the other Frontier is going to get

11   access to these planes, it's just a question of whether it has

12   to do so on terms that it doesn't like and that it believes are

13   not contractually authorized.  Why is Frontier's acceding to

14   contractually unauthorized terms than something that does it

15   irreparable as opposed to irreparable harm?

16       MR. FISHER:  Your Honor, at bottom the lease rights

17   that are being harmed by the terms that Carlyle is trying to

18   pose upon us here go to the very heart of our leasehold

19   interest in these aircraft, and our ability to rely on that

20   leasehold interest to recover any money whatsoever with respect

21   to the pending litigation.

22       THE COURT:  I don't understand.  You're going to need

23   to explain that.  Do it again.  It is conclusory -- and maybe I

24   just don't understand the dispute well-enough.  But you're

25   contending that certain assignments are impermissible.  On the

N68BFROH

 1    other hand, your co-counsel says, you still get to use the

 2    planes, it's just that the ownership or whatnot would be

 3    assigned to somebody else.  Why is it that the assignment -- if

 4    it's not ultimately the use of the plane, but it's the

 5    assignment that's at issue, which is what Mr. Schoeggl says,

 6    how come that is something that does an irreparable harm to

 7    you?  We can litigate that here.  And if the assignment turned

 8    out to be ultra vires, wind it back again or something.  But if

 9    you at all times, as Mr. Schoeggl says, been able to use the

10    plane, where's the irreparable harm?

11         MR. FISHER:  Your Honor, it's somewhat circular.

12    We're only entitled to use the plane if we agree to the terms

13    that have been presented for the transfer of these aircraft.

14    And the effect of that transfer would mean that there'd now be

15    a third-party transferee, who would be the owner of the

16    aircraft.  And in any situation where we recover money damages,

17    we would not be able to, or at risk at least of not being able

18    to enforce that judgment against our leasehold interest in the

19    aircraft because that third-party transferee would claim that

20    it is the owner of the aircraft, not any of the defendants in

21    the lawsuit.

22         THE COURT:  So, wait.  I think what you're saying to

23    me is that your ability to get money damages would be -- let me

24    back up.  I think what you're saying to me is that if you

25    accede to the transfer while challenging it in court, and

N68BFROH

1    ultimately are harmed in someway, you're less likely to recover

2    money damages from the transferee than from the current owners?

3         MR. FISHER:  Not only less likely, we arguably would

4    not have any claim against that third-party transferee because

5    the ownership interest in the aircraft would have been

6    transferred, and I don't think that that's something that could

7    be unwound, your Honor.

8         THE COURT:  In other words, your theory is you're

9    entitled to block if you will -- my words here, the transfer of

10   ownership.  And the fact that the new owner would be somebody

11   else is doing you harm because why?  I'm just trying to

12   understand.  Look, in other words, let's suppose for argument

13   sake the agreement was crystal clear that you have a right to

14   veto a change of ownership, just assume correctness on the

15   merits.  And let's suppose that the defendants breach by in

16   face of that effecting such a transfer.  The injury to you from

17   that is no doubt a contract breach on my hypothetical facts,

18   but what's the practical injury to you, and what remedy would

19   you seek from it?

20        MR. FISHER:  The injury would be a total inability

21   potentially, your Honor, to collect on that judgment.  And to

22   be clear, I understand that if the defendants' characterization

23   that we're trying to block the transfer, but really what has

24   precipitated this emergency, which did not need to be an

25   emergency, was that we were in the course of negotiating the

N68BFROH

1   terms of the transfer.  And we were trying to negotiate an

2   arrangement that would provide us with sufficient security so

3   that we were not contracting away our potential judgment

4   enforcement rights.

5        THE COURT:  Look, I'm focusing on irreparable harm.

6   So suppose it's a breach to transfer the ownership and you

7   prevail in a later lawsuit on that, what does relief look like

8   for that?  Does it look like monetary damages or something

9   else?

10       MR. FISHER:  The rights that we are trying to protect

11  here is the bundle of our economic rights under the lease,

12  which would be impaired by the transfers if they're done

13  according to the terms that Carlyle has proposed here.

14       THE COURT:  But is your point that whatever you're

15  getting by having a say in the ownership is not quantifiable?

16  In other words, you really prefer the current owners -- and

17  I'll probe this in a moment -- but for some reason the proposed

18  or the successor owners are sufficiently problematic or

19  second-rate, but not in a way that can be quantified, that

20  there's some intangible injury to you?  I'm just trying to get

21  it better.

22       MR. FISHER:  I appreciate, your Honor, that you're

23  asking these questions in the context of irreparable harm, but

24  I think that it does spill over into the question of the merits

25  of the case and success on the merits.  We should not be

N68BFROH

1   required to consent to transfers under threat of having 10

2   percent of our fleet grounded when those transfers violate the

3   lease provisions.

4          THE COURT:  Right.  I'm trying to understand -- let me

5   try it this way.  Why did that provision about who the owner

6   was and consent to the owner, why did it matter to your client?

7          MR. FISHER:  Because one of the most valuable rights

8   that we have -- in a situation where, for example, we get a

9   judgment in what's been called lawsuit number one, the case

10  pending before Judge Stanton under the framework agreement.  We

11  know we have alleged in the complaint in the action before your

12  Honor that the original owner of the aircraft, AMCK Holdings,

13  does not have any assets anymore, and has essentially through

14  the Carlyle transactions rendered itself judgment proof, which

15  is what of course prompted us to file this second lawsuit

16  before your Honor.

17         If we get a judgment in that first lawsuit, we know we

18  can't enforce it, and we can't collect against AMCK Holdings.

19  They don't have any assets anymore.  And then if we tried to

20  collect in the way that would be most typical by taking

21  advantage of the fact that we have a property interest in the

22  aircraft through our lease, the new owner of the aircraft would

23  say, well, you can't enforce that against us because we had

24  nothing whatsoever to do with either of the two litigations.

25  And that's the harm, your Honor, that we're trying to protect

N68BFROH

1   against here.

2          THE COURT:  Is there incremental risk to you?  If the

3   ownership is transferred of your lost of control of the

4   aircraft where we started this irreparable harm discussion; or

5   is the sole harm that you might not have any party against whom

6   you have a viable claim that still has money?

7          MR. FISHER:  To my knowledge, your Honor, it's the

8   latter.  It's that we would have an uncollectible judgment, and

9   the defendants here would have effectively succeeded in what we

10  claim to be their scheme of rendering AMCK Holdings judgment

11  proof, and then further interfering with our rights to ever

12  collect in that lawsuit.

13         THE COURT:  And what would the amount of the judgment

14  if you will be in that circumstance?  How would one assess it?

15         MR. FISHER:  So, your Honor, I'm not counsel in

16  lawsuit number one, but my understanding is that damages there

17  if we succeed in proving them are in the neighborhood of $60

18  million.

19         THE COURT:  OK. There's been some red made in the

20  course of the negotiations that would implicate your ability to

21  continue to use the planes.  I take it that if you don't

22  consent to what you contend to be an illegal transfer, you will

23  be denied the use of the plane. That's where the use of the

24  plane comes in.  Is that right, Mr. Fisher?

25         MR. FISHER:  Yes, that's exactly right, your Honor.

N68BFROH

1          THE COURT:  Because the planes do ultimately get

2     implicated because the price from your perspective of your

3     refusal to accede to a contract breach is real irreparable harm

4     which is access to the plane.  If that's the case, unpack for

5     me slowly the context in which the threat to yank the planes

6     from Frontier's control occurred.

7          MR. FISHER:  Sure.  Your Honor, there have been

8     ongoing negotiations with the Carlyle party to transfer these

9     aircraft to this third-party.  And those negotiations are

10     described in the declaration of Paul Lambert.  In essence,

11     we -- and defendants in their opposition papers filed this

12     morning include examples of two red lines which are indicative

13     of the substance of the negotiations.  We at Frontier have been

14     trying to get to "yes" with Carlyle.  And getting to "yes" for

15     us means assuring that these transfers do not impair rights

16     that we have under the leases.  And so currently we have --

17          THE COURT:  Pause.  Mr. Fisher, for some reason you

18     are fading out a little bit on the phone, so maybe speak louder

19     but closer to whatever phone you're using.  Go ahead.

20          MR. FISHER:  Of course.  Sorry about that.  We have

21     been negotiating over the circumstances of the transfer, and

22     the exhibits to the declarations, including the red line

23     submitted by the defendants indicates that we have been

24     speaking to put ourselves in a position that would be similar

25     to our rights under the lease if the transfer had not occurred.

N68BFROH

1   And chiefly the negotiations broke down over the question of

2   securing our interest in the aircraft.  Carlyle proposed a $60

3   million guarantee in connection with the transfer, but Carlyle

4   was unwilling to offer us a kind of assurance that the

5   guarantor entity would itself have sufficient assets to meet

6   the guarantee.  And so we engaged in negotiations to try to get

7   that guarantee secured, for example, by the posting of a letter

8   of credit.

9         While those negotiations were occurring, we were

10   served with the notices of default on May 26.  And those, your

11   Honor, notices of default are of course the immediate reason

12   that we're before the Court today, because 15 days after their

13   service, Carlyle is entitled to -- claims it's entitled to

14   pursue drastic remedies under the lease which include grounding

15   the aircraft, cancellation of the leases, impoundment of the

16   aircraft and so on.

17         THE COURT:  Your point -- OK. Thank you.  That unpacks

18   it better for me.  It's that in effect Carlyle is holding over

19   you, your client, the threat ultimately of grounding as a lever

20   to get you to consent to something that you believe you're not

21   contractually obliged to consent to.  That's the short of it?

22         MR. FISHER:  That is the short of it, your Honor.  And

23   just a few very quick points on that.  Carlyle, as you now know

24   because of their renewed action which you've accepted as a

25   related case, jumped the gun and suited up in state court with

N68BFROH

 1   respect to these notices of default even before the cure period

 2   that we're entitled to under the lease expired.  Before coming

 3   to your Honor with this emergency relief, we asked Carlyle to

 4   temporarily agree to refrain from exercising the most drastic

 5   of these remedies so that all the parties could have some more

 6   space to try to work this out to everyone's satisfaction.  They

 7   refused.  And all of that is what --

 8           THE COURT:  Who from Carlyle -- I want a name --

 9   refused to refrain from exercising the remedies that go to the

10   aircraft?

11           MR. FISHER:  So, your Honor, this was a communication

12   I have.  This was between counsel.

13           THE COURT:  I want a name.  I want to know who said

14   that to you.

15           MR. FISHER:  Oh, sure.  It was in email communications

16   with Mr. Schwartz and Mr. Butler.

17           THE COURT:  One of them you're saying in an email

18   declined to give you ironclad protection against the grounding

19   if you will of the airplanes?

20           MR. FISHER:  Exactly, yes, absolutely.

21           THE COURT:  From your perspective if you had that

22   protection, the irreparable harm I take it would go away during

23   the pendency of the contract negotiations?

24           MR. FISHER:  It would, your Honor.  And also to be

25   clear, we've tried to tailor the relief here, the injunctive

N68BFROH

1    relief narrowly to only enjoin Carlyle from pursuing the most

2    drastic of these remedies, which are the remedies that would

3    cause us irreparable harm.  Carlyle, if they think that they're

4    right about these notices of default, not only are they free to

5    pursue money damages, they have already in these lawsuits that

6    they filed in state cause.  So no one is trying to prevent them

7    from getting damages in contract remedies.

8            THE COURT:  Let me turn to the balance of the equities

9    just for a second with you, Mr. Fisher.  Suppose you're wrong

10   about this.  Suppose that I grant the relief that you're

11   seeking, and it turns out that your read of the contract rights

12   is proven to be wrong, what is the damages verdict against your

13   client look like?

14           MR. FISHER:  Well, your Honor, I think that the

15   damages have not yet been quantified, but they are

16   relatively -- considering that this is a complicated commercial

17   dispute, but they are relatively small because I believe that

18   the damages would simply be the delay that Carlyle experienced

19   in transferring these assets during the period of time when

20   they were enjoined from going forward with the impoundment of

21   the aircraft, which of course we could never tolerate and we

22   would have to accede to their terms.

23           THE COURT:  What does Frontier's balance sheet look

24   like?  How much does it have an ability to pay assuming a worst

25   case scenario?

N68BFROH

1          MR. FISHER:  Your Honor, based upon the numbers that
2     I've seen in the state court complaint, and certainly the
3     numbers in the opposition brief this morning suggesting that
4     damages could be in the neighborhood of $2 million, Frontier is
5     a judgment-worthy party effort I think any amount of damages
6     that's at issue here.

7          THE COURT:  Okay.  So may I assume then that to the
8     extent that a bond is a component of relief that is sought,
9     posting a $2 million bond, which I took from my review to be
10    what was floated, that would not present a problem?  You could
11    do it?

12         MR. FISHER:  Yes, that's right, your Honor.  But I
13    think that the amount of the bond was stated in a conclusory
14    way, and the defendants themselves acknowledge that there
15    wasn't much backup to support the computation of that amount.

16         THE COURT:  No doubt that's because you filed this
17    yesterday, and the reclaiming of the plane could take place on
18    Saturday.  It's hard to fault it.  Defendants were operating
19    under a severe time done at my hand.  So at some level, I have
20    to give them some slack as to the backup for the $2 million.
21    It doesn't sound like you're contending.  You may disagree, but
22    it doesn't sound like it's an outlandish proffer.

23         MR. FISHER:  Your Honor, yes, and I certainly
24    wasn't -- I didn't mean to blame them for the lack of backup,
25    but merely to reserve my right on behalf of Frontier to contest

N68BFROH

1    the amount once there's more information.

2              THE COURT:  Let me try it this way, Mr. Fisher.  Given

3    the speed with which events have developed, the most you're

4    going to get out of a hearing today is going to be a TRO, which

5    would then result in a fuller more flushed out hearing within

6    the 14-day period for which a TRO is ordinarily authorized.

7    And so the issue really would be as to a bond.  If you're

8    seeking the relief you're seeking, I'm assuming you're willing

9    to put up a $2 million bond, understanding that if it somehow

10   it hasn't resolved itself by the end of that period, and we

11   have to turn to converting the TRO or modifying the TRO, but in

12   someway becoming a PI; you at that point, everyone would have

13   an opportunity to do the math and address more rigorously the

14   amount of a bond if there were to be longer term relief.

15             But I think where I'm trying to go just to move on in

16   the conversation is, for the purposes of the temporary relief

17   you're seeking, without conceding anything, you're not

18   resisting the idea that $2 million is within the realm of the

19   reasonable?

20             MR. FISHER:  Your Honor, to be direct, I'm certainly

21   not contesting that Frontier could post a bond in that amount.

22   In light of your Honor's clarification, we're simply saying

23   that that seems to be a high bond amount if we're talking about

24   up to two weeks.

25             THE COURT:  Okay.  Fair enough.  I want to turn to the

N68BFROH

1   defense because the heart of this to me -- I read enough about

2   the merits to get a sense of it.  I may or may not come back to

3   that, but I really want to focus on irreparable harm.

4           Mr. Schwartz, I'm going to turn the floor to you.  Yes

5   or no, did somebody affiliated with the defendants raise the

6   specter in any way inhibiting Frontier's use of the airplanes?

7           MR. SCHWARTZ:  Your Honor, if the question is did

8   Mr. Fisher ask if we would agree to defer the remedy of

9   grounding or repossessing the aircraft --

10          THE COURT:  No, the question is what I asked you.  Did

11  you in any way, anyone from your side in any way say anything

12  suggesting that the defendants might interfere in any way with

13  Frontier's access to the airplanes?

14          MR. SCHWARTZ:  No, your Honor.

15          THE COURT:  Are you promising on behalf of all the

16  defendants that between now and the next 14 days you will do

17  nothing that in any way interferes with Frontier's use of the

18  aircraft?

19          MR. SCHWARTZ:  Your Honor, I don't have the authority

20  to make that promise today.

21          THE COURT:  Just to be clear, yes or no, does the risk

22  hang over Frontier that one of the defendants in this case

23  could take action that compromises its ability to use the

24  aircraft?

25          MR. SCHWARTZ:  Yes, your Honor.

N68BFROH

1          THE COURT:  How would that work?  Look, I don't mean

2     to be difficult, but the heart of the irreparable harm issue

3     here concerns Frontier in its use of the aircraft.  You can

4     understand that.  And so I'm trying to understand, because it

5     arises in a somewhat unusual posture, apparently in the course

6     of negotiation, I'd like you to unpack for me the way in which

7     that specter or that situation from your perspective has

8     arisen?

9          MR. SCHWARTZ:  Yes, your Honor.  I'll try to be brief,

10     but the issue has arisen because there are these -- this other

11     litigation before Judge Stanton where a claim was asserted,

12     it's a claim for money.  And there's the separate transaction

13     in which Carlyle, which your Honor is aware of, which Carlyle

14     took over managing the aircraft and the transfer which is the

15     subject of your opinion yesterday.

16          The parties recognize that they had an ongoing

17     business relationship despite the fact that there was this

18     other litigation pending before them.  And so in recognition of

19     that, the parties signed an agreement trying to cooperate to do

20     things that are ordinary course for owners and managers of

21     aircraft, like refinancing, selling the aircraft.  And from our

22     perspective, we have been engaging with Frontier for months

23     trying to solve the issue that I think really was -- a fine

24     point was put on it before, which is a collectability issue.

25          Frontier wants to make sure that they have an entity

N68BFROH

1    that's creditworthy to collect against; when, and if I should

2    say, there's a judgment in that first litigation.  Now that

3    itself is totally extra-contractual.  There's no right under

4    the leases for them to have a judgment credit where the entity

5    for any judgment that they might get under the leases.  There

6    are guarantors under the leases, and those guarantors are still

7    there.  They are attempting to ask for something that they're

8    not entitled to under the leases.  We have been negotiating

9    with them trying to come to a resolution on a reasonable path

10   forward to give them the thing that they're asking for in an

11   efficient way as possible.

12        So, your Honor, one of the things that was briefly

13   mentioned by my colleague is that we did offer to provide them

14   with a creditworthy guarantor that would have -- that would

15   represent and warrant that it would maintain a net worth of at

16   least $65 million, which is I think well in excess of what a

17   reasonable judgment would be in that first litigation, and it's

18   in excess of what Mr. Fisher said the claim damages are here

19   today.  So we've been trying to negotiate with the plaintiffs

20   here to be able to exercise our contractual rights, which are

21   contained in the leases which allow us to in the ordinary

22   course transfer or refinance the aircraft.  And these are

23   ordinary course actions that happen everyday that facilitate

24   the airline industry.  And so at some point when it just became

25   clear to us what Frontier was doing was not actually trying to

N68BFROH

1   negotiate in good faith with us, but was trying to use the

2   position of the claimed blocking right to try to get leverage

3   in the other litigation, that's when we determined to declare a

4   default, and that's what happened in May.

5       THE COURT:  What does it mean though, coming back to

6   the point.  I appreciate your giving me that context, but I'm

7   trying to understand.  When you declare a default, the

8   plaintiffs say, what follows from that is your ability -- and

9   I'm not sure which of the defendants specifically that would

10  be, but be that as it may, a defendant's ability to deny

11  Frontier the use of the aircraft, grounding it, whatever, the

12  time that follows from the default?

13      MR. SCHWARTZ:  Yes, your Honor.  That's one of the

14  specific negotiated remedies that Frontier agreed to under the

15  leases; which is if there's an event of default, then we're

16  able to exercise a number of remedies, including those.

17      THE COURT:  And the default that you're claiming, the

18  event of default that you have declared, what is the event of

19  default if you will?

20      MR. SCHWARTZ:  Your Honor, under the leases that are

21  implicated, Section 20.2A allows us to make certain transfers

22  or assignments and provide mortgages.  And 20.2B requires that

23  the lessee, here Frontier, cooperate with us, and everything is

24  subject to reasonableness.  But our view is that the roadblocks

25  that have been thrown up are completely unreasonable in light

N68BFROH

1    of some of the things that we offered, which I mention we

2    weren't required to do.  So the default is their failure to

3    comply with their obligations under Section 20.2B of the lease.

4         THE COURT:  You're saying essentially what it is that

5    they are refusing to do is, they're refusing to allow you to

6    transfer the ownership?  I'm just trying to understand what it

7    is that you contend was unreasonable.

8         MR. SCHWARTZ:  Two things.  So to either sell the

9    aircraft or to refinance them, there are certain consents or

10   acknowledgments that we need from Frontier as the lessee; for

11   example, a consent to a security assignment.  That is the kind

12   of thing that we bargained for the right for them to cooperate

13   both in the lease, and I should also say in the non-waiver

14   agreement which we executed separately.  And their refusal to

15   do that is what is the default.

16        THE COURT:  I see.  And so from your perspective,

17   without getting too much in the middle of the negotiations, but

18   they are alas what brought us here, so I think I need to, from

19   your perspective, as long as you can give Frontier the economic

20   protection enough to capture any money damages claim if you

21   will, it would be unreasonable for them to decline to consent

22   to the transfers you have in mind.  And because you feel

23   they're being unreasonable in turning away your attempts to

24   give them economic assurance, that's why you declared the

25   default.  Am I roughly getting that right?

N68BFROH

1          MR. SCHWARTZ:  That's correct, your Honor.  And if I

2     could just add one thing.  The leases themselves don't, for

3     example, give Frontier priority right to enforce a judgment

4     against the subject aircraft.  So they would be an unsecured

5     judgment creditor just like anyone else would.  So trying to

6     tie their right to execute on any potential judgment they may

7     get to the transfer of the aircraft or consenting to the

8     assignment of the aircraft is unreasonable.

9          THE COURT:  Okay.  I think I understand that.

10    Mr. Schwartz, I think it's appropriate for me to get a little

11    more into the negotiations here, even though ordinarily as the

12    judge presiding over a litigation, I'm weary of doing that

13    unless people want me to be a settler, which is not my role

14    here. But I think unavoidably it's mixed up with the issue of

15    irreparable harm, so I take it you're not going to block if I

16    push this a little deeper, right?

17         MR. SCHWARTZ:  No, your Honor.

18         THE COURT:  All right.  Look, if the threat of taking

19    away the aircraft hangs over the plaintiff, you can understand

20    just in a real world way why that would have potentially

21    dispositive impact on negotiation.  Frontier doesn't want to

22    become Southwest.  Let me put it that way.  And if you take

23    away, even because you believe you have a contractual right to

24    do so, their access to these planes and ultimately you've got

25    the imagery that we saw last Christmas with Southwest with

N68BFROH

1    Frontier or anything like it, you can understand why that

2    brings them to the table basically surrendering promptly.

3    Pause right there.  I may have been a little bit overdramatic

4    in imagery, but you get the point.  It's not unreasonable to

5    say from their perspective, whether or not you're behaving --

6    whether or not you're appearing on the merits is right, the

7    effect of the threat of taking away the aircraft is a massive

8    maybe existential threat for Frontier, right?  Is there

9    something wrong with that portrait?

10    MR. SCHWARTZ:  Your Honor, I don't think you're using

11    "threat" pejoratively.  I just want to make clear, we didn't

12    come to this decision lightly.

13    THE COURT:  No. No. I know.  Look, I use to have

14    clients too, and I totally understand that "threat" is not

15    meant pejoratively, but if default carries with it the right to

16    take away the aircraft, whatever we use instead of threat, the

17    specter in the scenario, whatever you call it, as a practical

18    matter, that's something Frontier effectively has to avoid.  Is

19    that an unreasonable way for me to perceive that piece of the

20    situation?

21    MR. SCHWARTZ:  Your Honor, based solely on what I've

22    heard from Mr. Fisher and Mr. Schoeggl, it sounds like that's

23    the case.  What I would say is, that's the right that they

24    specifically bargained for to give us.  These are sophisticated

25    parties who agreed.

N68BFROH

1      THE COURT:  Let me ask you this question, supposing

2  that for argument sake during the limited period defined by a

3  TRO, you are disabled from that remedy and that remedy alone;

4  in other words, the access to the planes would be unimpeded,

5  but I wouldn't be meddling in any other way; but with Frontier

6  understanding that the effectiveness now being a justiciable

7  issue, litigation on this may quicken, how realistic is it do

8  you think that the parties can get the "yes" during the next

9  couple of weeks, assuming that the threat during those couple

10  of weeks to the airplanes goes away?

11      MR. SCHWARTZ:  Your Honor, what I would say is,

12  without saying anything about the specifics, I do understand

13  that there had been in the past some settlement discussions

14  that I was not part of.  I would imagine there would be

15  willingness to try to work it out, but I haven't had a chance

16  to talk to my client about that.

17      THE COURT:  All right.  Mr. Schwartz, there is an

18  illusion in your papers to the possibility that -- let me start

19  that again.  I believe your papers suggested that the relief

20  that Frontier seeks in the TRO is overbroad insofar as in

21  theory there could be some independent default that is

22  unimpeded that really doesn't arise out of these circumstances;

23  and the relief sought of categorically precluding interference

24  with the airplanes might not capture that sort of situation if

25  you get what I'm saying.

N68BFROH

1    I take the point in theory, but realistically is there

2    some other default you have in mind beyond the theoretical

3    possibility that a completely independent default could occur?

4    MR. SCHWARTZ:  No. And, your Honor, candidly, I wasn't

5    clear if we were appearing today solely on a TRO or if this is

6    going to be potentially a preliminary injunction hearing or

7    what it might be.  What I was concerned about is some extended

8    order that may go on for however long that doesn't account for

9    what could happen in the future.  I think the chance that of it

10   happening in 14 days is significantly lessened.

11   THE COURT:  OK. That might be a down the road issue.

12   All right.  Let me come back to you, Mr. Fisher, with just one

13   discrete issue with respect to the merits.  The defense said

14   that, in its papers, that insofar as the lawsuit before me was

15   filed in 2022 -- somebody should mute their phone.  I'm hearing

16   an ambulance or something like that in the background.

17   The defense says, Mr. Fisher, that in effect the

18   default notices aren't really part of the lawsuit filed before

19   me in 2022.  The relief that's sought here is, seems the scope

20   in effect of the litigation.  What's your brief response to

21   that?

22   MR. FISHER:  Your Honor, two points.  We brought this

23   emergency relief before the Court in the pending action

24   22 Civ. 02943 because it involves the same parties, the same

25   aircraft and the very same lease provisions that were the

N68BFROH

1   subject of your Honor's decision yesterday.  We thought for

2   practical reasons that made the most sense rather than going to

3   a part one judge who's entirely unfamiliar with the parties and

4   the issues.  These are related issues that are related to the

5   issues before your Honor.  And I would add that the fact that

6   Carlyle filed a separate action specifically on the question of

7   the validity of the notices of default and the implications of

8   the notices of default which has been removed and which your

9   Honor accepted as a related case makes it appropriate for this

10  Court to be the Court to address this motion and the relief

11  requested.

12          THE COURT:  Let me ask you this, supposing that your

13  claim in the existing case before me of a contract breach were

14  validated, that it turned out that you were right about that,

15  would it necessarily follow that the defaults that have been

16  claimed by the defense are invalid?

17          MR. FISHER:  It would not necessarily follow, your

18  Honor.  I do appreciate that these are events that developed

19  since the amended complaint before the Court.  I think that we

20  very well could have and likely would have thought leave to

21  amend the pending complaint in order to bring before the Court

22  claims related to these notices of default.  And frankly before

23  we could even do that, Carlyle filed an independent lawsuit in

24  state court raising all of those issues.

25          THE COURT:  OK. And with that now before me, I take

N68BFROH

1    it, although they are the plaintiff, if you will, in the new

2    removed related case, it's safe to assume that putting aside

3    whatever might happen injunctively, either that case on its own

4    terms or a marriage-imaged declaratory counterclaim effectively

5    brings these same issues before me?

6            MR. FISHER:  Absolutely, your Honor.  As I read their

7    complaint, there's no way to adjudicate the issues in that

8    complaint without deciding whether or not Carlyle properly

9    issued these notices of default.

10           THE COURT:  OK. Mr. Schwartz, let me come back to you

11   just on a balance of the equities issue.  Now that you

12   understand that I perceive the Ask here as limited to a TRO.

13   There's literally no way, folks, that I'm going to grant a PI

14   in the timeframe here over the phone with the limited

15   opportunity the defense in particular has had to brief this.

16   We're really talking about a TRO-type window here.

17           With that understanding, Mr. Schwartz, what's the harm

18   on your side of the house, if I'm talking about the balance of

19   the equities?  I've had an extensive discussion with both of

20   you about what might happen to Frontier.  During this 12-14 day

21   window, depending on when the hearing would be, is there

22   irreparable harm to you?

23           MR. SCHWARTZ:  Your Honor, I think if it's truly a

24   narrow window of 10 to 14 days, I don't think any harm would be

25   irreparable.  We would continue to be harmed economically, but

N68BFROH

1  I don't think it's irreparable.

2          THE COURT:  And I take it you're not disputing that

3  whatever harm economically you might suffer during the

4  hypothetical two-week period, Frontier's got the deeper pockets

5  to pay?

6          MR. SCHWARTZ:  I will take Mr. Fisher at his word.  I

7  don't have a basis to dispute that.

8          THE COURT:  Counsel, here's what I'm going to do.

9  We've been on the phone for a while.  I want to take about 30

10  minutes just to collect my thoughts and then come back on the

11  line.  But I want to just pause and say a couple of things.

12  First of all, this has been an exceedingly helpful discussion

13  for me in clarifying what's going on here.  Both of you are to

14  be commended just for your responsiveness, and I want to say a

15  special thank you to you, Mr. Schwartz, because in several

16  points in the last exchange, your candor with the Court has

17  been noted and really appreciated.

18          I'm trying to solve a problem here and do it in a way

19  that is consistent with everybody's interest.  I'm trying to

20  exercise such authority as I have here in a narrow judicious

21  way, but I'm always assisted when I have counsel who respond

22  with nuance and care.  And I appreciate the acknowledgments

23  you've made about what the scope of the damage to your client

24  if a remedy here were conceived of as a two-week remedy or

25  less.  That has been helpful to me, and I don't always have

N68BFROH

1    counsel who are as candid as you've been and I want to give you

2    a shout out and thank you for that.

3           Counsel, here's what I'd like to do.  It's 4:10 p.m.

4    Why don't counsel get on the line again at about 4:35 p.m. I'm

5    likely to be about five minutes later so that my law clerk can

6    take the role.  Everyone including the court reporter should be

7    back on the line at 4:35, and I will likely join five minutes

8    later.  Thank you all.  I will remotely see you shortly.  Thank

9    you.  We stand adjourned.

10          (Recess)

11          THE COURT:  Welcome back, counsel.  This is Judge

12   Engelmayer.  This is the case of *Frontier Airlines, Inc. v.*

13   *AMCK Aviation Holdings, et al*, 22 Civil 2943.

14          Mr. Fisher, are you and your team on for Frontier?

15          MR. FISHER:  Yes, we're here, your Honor.

16          THE COURT:  Mr. Schwartz, are you and your team on for

17   the defendant?

18          MR. SCHWARTZ:  Yes, your Honor.

19          THE COURT:  And perhaps most important of all, is our

20   court reporter back on the line?

21          COURT REPORTER:  Yes, your Honor.  I'm here.

22          THE COURT:  Very good.  Counsel, here it goes.

23          I am now prepared to rule.  For your planning

24   purposes, there will not be a written decision.  I will instead

25   issue a bottom-line order reflecting the Court's resolution of

N68BFROH

1    plaintiff's motion.  To the extent the Court's reasoning is

2    significant to counsel, you will need to order the transcript

3    of this hearing.

4           As background, this case was filed and assigned to me

5    in April 2022.  After amending its initial pleadings twice,

6    Frontier brought three sets of claims against numerous

7    defendants, only some of whom are named in the petition for

8    emergency relief.  These claims related to lease agreements and

9    other contracts for 15 commercial aircraft.  Defendants moved

10   to dismiss all claims.

11          In an opinion issued late yesterday, the Court

12   resolved those motions to dismiss.  The Court granted the

13   motions to dismiss plaintiff Frontier Airlines' declaratory

14   judgment and fraudulent transfer claims, but denied the motion

15   to dismiss as to the breach of contract claim.  As stated in

16   that decision, the parties are to submit to the Court a case

17   management plan by June 15, 2023.

18          Yesterday before that opinion was issued, Frontier

19   filed a petition for a temporary restraining order and

20   preliminary injunction, pursuant to Rule 65 of the Federal

21   Rules of Civil Procedure.  The TRO or PI would enjoin

22   defendants Wells Fargo Trust Company, N.A. ("Wells Fargo") and

23   UMB Bank, N.A. ("UMB") as owner trustees, from impounding,

24   grounding, and/or deregistering the 14 aircraft that were the

25   subject of default notices served by defendants on May 26,

N68BFROH

1  2023, or from terminating the aircraft lease agreements or

2  exercising other default remedies for those 14 aircraft.

3       Yesterday afternoon, the Court ordered that until

4  Frontier's application for an injunction is decided by this

5  Court, defendants were restrained from impounding, and/or

6  deregistering the 14 aircraft, or terminating the lease

7  agreements for any of the 14 aircraft.  The Court

8  simultaneously scheduled this telephonic conference and

9  directed defendants to file any opposition to the petition this

10 morning and the defendants did so.

11      Also yesterday afternoon, the Court accepted as

12 related to this case, another case, between Carlyle and

13 Frontier, alleging claims of breach of contract and tortious

14 interference with prospective economic advantage arising out of

15 Frontier's refusal to provide the requested consents. The Court

16 held a telephonic conference this afternoon, at which the Court

17 largely put questions to counsel about the application to the

18 facts here of the standards for emergency relief.

19      The following is my ruling:  To justify a preliminary

20 injunction under Federal Rule of Civil Procedure 65, Frontier

21 must demonstrate: (1) irreparable harm absent injunctive

22 relief; (2) either a likelihood of success on the merits, or a

23 sufficiently serious question going to the merits to make them

24 a fair ground for trial, with the balance of hardships tipping

25 decidedly in its favor; and (3) that the public's interest

N68BFROH

1    weighs in favor of granting the injunction.

2          Here, as I presently understand the situation,
3    Frontier seeks to preserve the status quo.  That is so insofar
4    as Frontier is seeking to continue to be able to use the leased
5    aircraft, while it continues to pay rent and comply with all
6    lease obligations.  I say that understanding that there is
7    unresolved and genuine disputes between the parties as to
8    whether Frontier conduct is reasonable and therefore consistent
9    with the parties' agreement in attaching conditions to its
10   consent to the transfers of the aircraft that defendants
11   propose.  The point here, for legal terms governing the
12   standards is that Frontier is seeking a prohibitory injunction
13   seeking only to maintain the status quo, such that the
14   application of the above factors is more relaxed than the "more
15   stringent" standard for a "mandatory injunction."  I cite for
16   the proposition on those standards, *Cachillo v. Insmed, Inc.*,
17   638 F.3d 401, 406 (2d Cir. 2011), *Metropolitan Taxicab Board of*
18   *Trade v. City of New York*, 615 F.3d 152 (2d Cir. 2010), and *New*
19   *York Civil Liberties Union v. New York City Transit Authority*,
20   684 F.3d 286 (2d Cir. 2012), for these familiar standards.

21         Briefly as to the factual background, I have reviewed
22   in detail the parties' memoranda of law, supporting
23   declarations, and the materials attached to those declarations.
24   Those include plaintiff's memo at Dkt. 53 and defendants' memo
25   at Dkt. 63.  The relevant facts include the follows: Frontier

N68BFROH

1    and Carlyle have been in ongoing negotiations after the June

2    and November 2022 transactions that resulted in the security

3    assignments of the aircraft.

4        Frontier claims that it could not acknowledge the

5    assignments without prejudice and costs. It claims that were it

6    to acknowledge the assignments, it would be, in effect,

7    abandoning its existing claims that AMCK had earlier wrongfully

8    transferred the aircraft to Carlyle in the first instance, that

9    doing so would undermine Frontier's perceive to be its valuable

10   claims in this action and its ability to collect on a judgment

11   in another action pending before Judge Stanton.  And Carlyle

12   have exchanged various offers to protect against this issue,

13   but their negotiations have failed to reach fruition.

14       While these negotiations were ongoing, on April 27,

15   2023, Carlyle sent Frontier a letter asserting that Frontier by

16   not assenting to the transfers had breached its obligations

17   under each lease and an agreement executed after the transfer

18   from AMCK to Carlyle.  On May 3, 2023, Frontier responded

19   correcting what it contended were misstatements in Carlyle's

20   letter, in its view, correcting what it contended were

21   misstatements in Carlyle's letter and expressing an interest in

22   continued negotiate towards mutually agreeable terms. On May

23   26, 2023, Carlyle served Frontier with a notice of default on

24   all 14 leases.  That began a 15-day cure period after which

25   default can be formally be declared by defendants.  This

N68BFROH

1    Saturday, June 10, 2023, would be the final day of that cure

2    period.  On June 5, 2023, three days ago, Carlyle filed suit

3    against Frontier in New York Supreme Court.  Frontier again

4    removed that to federal court on the basis of diversity

5    jurisdiction, and again I have accepted that case as related.

6    So that's the broad strokes 30,000 foot background.

7         Turning to the injunctive standards, and I'll begin

8    with irreparable Harm.  Frontier has met its burden to

9    establish irreparable harm with respect to certain of the

10   possible actions available to the lessor under the aircraft

11   leases following a default by the lessee. Two of these possible

12   actions are: "grounding of the Aircraft" and "cancelation of

13   the leasing of the Aircraft and requiring return of the

14   Aircraft to Lessor."

15        Frontier has represented, and I for the purpose of

16   this ruling credit, that the aircraft represents about 10% of

17   its fleet.  It estimates that about 12,000 people in total fly

18   on the 14 aircraft everyday during the summer months.  The

19   Court is persuaded that grounding the aircraft -- and

20   presumably canceling hundreds of flights -- would irreparably

21   damage Frontier's reputation, good will, and business

22   opportunities.

23        From my colloquy with Mr. Schoeggl in particular, I am

24   persuaded that Frontier could not accommodate the flights that

25   would take place on those 14 aircraft with the existing fleet

N68BFROH

1   and then alternative aircraft are not readily available to

2   Frontier.  So were Frontier denied access to 14 aircraft by

3   virtue of defendants exercising their rights under the default

4   notices, there could be existential disaster for Frontier, with

5   thousands of injured, presumably enraged passengers protesting,

6   and on the media during the summer months, whom Frontier would

7   under that circumstance have either canceled upon and/or

8   stranded, Frontier could have what we all understand could be a

9   Southwest Airlines situation on its hands.

10          Even if that problem got solved quickly, it is

11  reasonable to infer that the reputational harm would linger.

12  And the situation would also potentially inconvenience

13  thousands of Frontier's customers who have purchased tickets,

14  who have vacations or other important things to go to, and who

15  are presumably relying on the imminent scheduled flights for

16  their travel.  And although as a legal matter the impact on the

17  customers on its own terms speaks really to the public's

18  interest, and not directly to the aspect of the equation,

19  indirectly it speaks to irreparable harm, insofar as damage to

20  Frontier's goodwill with customers stands to hurt Frontier, I

21  find, irreparably.  I also find that the harm is sufficiently

22  imminent.  Defendants have not, sermon like, foresworn the

23  default remedies to ground or retake the aircraft, and

24  defendants therefore could do so as early as this weekend.

25  Bottom line, this is not a close question as to irreparable

N68BFROH

1    harm.  It's a case in which irreparable harm has clearly been

2    shown by the movant, Frontier.

3            I also find that the balance of equities and hardships

4    weighs not just tipingly, but decisively in Frontier's favor.

5    On the Frontier side of the equation, absent relief, Frontier

6    faces a reputational and economic disaster with implications

7    for years to come were defendants to carry through on the

8    threat that is explicit in the default notices.

9            On defendants' side of the equation, provided that the

10   injunction were short-term, as in limited to the span of a TRO,

11   which is limited by statute to 14 days, defendants candidly

12   acknowledge that the impact on them would be, during a TRO

13   length, purely economic.  It is undisputed further that

14   Frontier has the ability to pay.  And to the extent there's any

15   doubt about it, the bond that the Court has been asked to

16   impose would provide a reassurance.  I therefore find that the

17   prospective potential injury to Frontier by way of the fallout

18   from likely flight cancellations quite significantly outweighs

19   the injury to defendants from the grant of a short-term

20   emergency relief.

21           Now, as to the likelihood of success.  Based on the

22   very limited portrait I have been given, I cannot find a

23   likelihood of success on Frontier's part.  Frontier may or may

24   not have a winner of a claim for historic economic damages

25   either in the surviving portion of the case before me or before

N68BFROH

1    Judge Stanton.  Frontier may or may not have a winner of a

2    claim that the demands it's making as a condition of assenting

3    to the transfers are reasonable.

4         It is simply premature for me to make a firm

5    assessment of that.  The best assessment I can give you -- and

6    again my visibility -- given the weather outside in New York

7    this metaphor is particularly apt, my visibility here is very

8    limited, so this should not be taken as a durable assessment at

9    all, it is that each side has articulated plausible arguments

10   that suggest that these claims could be resolved either way.

11   That does not mean that one of you doesn't have a clearly

12   better argument.  It's that based on where things stood before

13   me at this early stage, I'm unable to see that, and therefore

14   with limited visibility size this up as a case that could come

15   out either way.  It is entirely possible that by the time we

16   got to a preliminary injunction hearing with fuller briefing

17   and more opportunity for assessment and reflection, I would

18   assess this as different.  Where I sit now, this is a fair

19   question for the merits.

20        I am not persuaded though for the record by

21   defendant's argument that the request for emergency relief is

22   too far afield from the existing claims in this or the related

23   case to be viable.  In particular, the validity of the default

24   notice is squarely implicated by the related case, which may

25   well in time come to include counterclaims about these very

N68BFROH

1    notices brought by Frontier.  Bottom line, I find as to

2    likelihood of success on the merits a fair question on the

3    merits that could come out either way.

4         Finally as to the public interest.  The public has an

5    obvious clear interest in favor of the grant of emergency

6    relief to prevent the planes from being de-accessed by

7    Frontier.  Domestic air travel is vitally important to the

8    national economy. It's also vitally important to the people on

9    the planes and to their loved ones.  Thousands of members of

10   the public would be impacted by flight cancellations standing

11   from impoundment of the 14 Aircraft.  To say the least, the

12   Court is unpersuaded by the defendants' argument that "because

13   airline passengers are already familiar with flight delays and

14   cancellations, which are routine in the age of air travel," the

15   public lacks an interest in favor of the injunction.  Just

16   because a person's been punched in the face once, doesn't mean

17   they don't have an interest of not being punched in the face a

18   second time.  The public has an obvious interest in not being

19   subjected to cancellations, especially where brought about by

20   what have arguably been contended to be breaches of contract.

21        Bottom line putting all the factors together, I find

22   the standard for temporary restraining order met, and I will

23   therefore grant Frontier's relief consistent with the limited

24   life cycle of a TRO, which is up to 14 days.  And specifically

25   I intend the TRO to last until our next conference, which I'm

N68BFROH

going to schedule in 12 days, not 14.  And that is because, as

you'll appreciate, 14 days would put us in the middle of

another telephonic hearing, because that would land smack-dab

in the middle of the Second Circuit judicial conference. I'm

hopeful that counsel would resolve the matter before then. But

if not, we're going to be meeting in person, and here is the

schedule on which we will be meeting.

Specifically if the case has not resolved itself by

then, or at least the need for emergency relief, the Court will

hold an in-person hearing in my courtroom, courtroom 1305 in

the Thurgood Marshall courthouse at Foley Square, New York, New

York 10007 at 9:30 a.m. on Tuesday, June the 20th.  And to

assist the Court on the preliminary injunction determination,

because that would then be the question, whether to extend or

modify the TRO or to turn it into a preliminary injunction, I'm

going to commission briefing on the following schedule.  And

I've chosen the dates here so as not to interfere with

anybody's Father's Day and not to have any brief due on

Juneteenth.

Frontier's opening brief is due Monday, June 12th at 5

p.m.  Defendant's response is due Thursday, June 15th at 5 p.m.

That also is the day in which the proposed joint case

management plan is due.  And Frontier's reply is due Saturday,

June 17th at 5 p.m.  Again, I'm giving you, Frontier, only two

days for the reply because I'm thinking of the fathers, and

N68BFROH

1    procedurally those of the younger lawyers on the case.  I want

2    to make sure that we're not interfering with anybody's Father's

3    Day.

4           The Court will use the conference on June 20th to rule

5    on the preliminary injunction, as well as for the purposes of

6    an initial pretrial conference.  Insofar as the Court in the

7    original case before me has now resolved the motion to dismiss,

8    even had we not had the intervening application for emergency

9    relief, we would be meeting in short order to set a discovery

10   schedule.  It stands to reason, counsel, if you are unable to

11   resolve the emergency relief request, you should assume that

12   I'm going to be setting a very rapid schedule in the case.  You

13   should also assume that I will want to use the conference to

14   rope in all claims, including amended complaints in the case.

15   And I'm assuming that in the context of the new case, but not

16   the existing one, in the new case dealing with the default

17   notices.  I'm assuming there's some likelihood that one or both

18   parties may want to amend.  I'm going to ask all of you to work

19   together to come up with a rationale schedule for all that.

20          The point I'm trying to make here is that while we're

21   all here together, we ought to get the business of case

22   management done, and it will be important for me to get an

23   understanding of the full shape of the case at that conference.

24   The scope of the injunction is essentially intended to track

25   exactly what was in the order I issued yesterday, in that it's

N68BFROH

1   going to prevent the defendants from grounding, impounding

2   and/or deregistering the aircraft or terminating the leases for

3   the aircraft.

4         And I'm going to order as well that Frontier post a $2

5   million bond, recognizing that Frontier is not likely to go

6   under in the next several days, I will give Frontier till next

7   Tuesday to do that.  I think the defendants can live with the

8   risk presented by not having a bond in place by next Tuesday.

9   All right.  That ends the ruling.  I wanted to now pivot to

10  what I would submit is really the real issue here, which is

11  getting you to settle this thing.

12        First of all, I want to remind you that you have

13  Magistrate Judge Sarah Netburn assigned to this matter.  Judge

14  Netburn has successfully settled cases way more complicated

15  than this before me, and she is a fantastic settler.  You're at

16  liberty to try to settle this yourselves.  You're at liberty to

17  try to use a third-party, but she is assigned to the case and

18  is a wiz at settling cases.

19        I will ask you in a moment, counsel, whether you are

20  interested in my referring this to Judge Netburn for settlement

21  purposes.  If there's mutual interest in doing that, either on

22  the phone now or in a follow-up note to me, to my chambers, I

23  will immediately refer to this to Judge Netburn for settlement

24  purposes.  Beyond that, speaking as the neutral on the call, I

25  have to say to you, counsel, that this presents as an

N68BFROH

1    unbelievably settleable case.  There do not appear to be a lot

2    of variabilities here.  I am not hearing Frontier saying that

3    the identity of the entities to be transferred is somehow

4    noxious or not being asked to associate with people whose

5    ideologies or world views or ability to pay are problematic.

6    There's no suggestion that the safety of the aircraft is

7    implicated.

8         Frontier's principal interest here appears to be

9    assuring that it's ultimately able to collect a judgment on

10    what amount to what it contends are historical law.  There's a

11    way to resolve that, counsel.

12         And from the perspective of defendants, they have from

13    their perspective an interest in the ability to freely alienate

14    the aircraft here, to transfer them. I am not your settler

15    here, but I am trying to take advantage of my presence here to

16    say to you that, while I'm sure it's a little more to it than

17    that, when all is said and done, each side at least in the

18    papers and on the call has articulated a complete

19    understandable interest.  And rationale and mature counsel

20    should be able to work this out.

21         If you're unable to work it out, you're going to wind

22    up in a situation where 12 days from now when we meet,

23    depending on the briefing I get, this could come out in either

24    direction.  It could come out in defendants from your

25    perspective, what you don't want, which is a more longer term

N68BFROH

1  prohibition on grounding the aircraft and so forth.  And

2  Frontier from your perspective, it could result in the

3  elimination and non-extension of the TRO.  I can't forecast

4  that, but each of you has a downside that you don't want here.

5          In your hands more than mine is the ability to resolve

6  this.  I'm suggesting to you that with the benefit of almost 12

7  years experience on the beach, there are cases that leap off

8  the page as capable of settlement bond for clients. And I'm

9  counting on you, Mr. Fisher, and your team, and you,

10  Mr. Schwartz, on your team to grab your respective clients by

11  the lapel and tell them that the judge's regarding this of a

12  case that ought to be settled.  And that it would be a waste

13  of -- it would be regrettable, not to mention a waste of

14  lawyering fees and quite a needless risk taken for this not to

15  be resolved, the request at least of emergency relief as of our

16  conference.

17          So I'm going to ask counsel to undertake hopefully

18  guided by yesterday's decision, and most of all today's

19  remarks, to try to resolve this.  Whatever the merits of the

20  underlying dispute for money, the dispute that's brought us

21  here together involving the threat to reclaim the aircraft,

22  this is one that mature clients ought to resolve.  I want you

23  to please drive home to your clients that the Court feels with

24  considerable strongness that if this case doesn't resolve

25  itself within 12 days, something has gone dreadfully wrong.

N68BFROH

1          With that let me just ask you, Mr. Fisher, whether

2    you're prepared to say now whether your client wants me to

3    refer the case to Magistrate Judge Netburn for settlement?

4          MR. FISHER:  Your Honor, we appreciate and take to

5    heart the admonition to work hard, and we will.  I would really

6    need to consult with my client before I can agree to a referral

7    to Magistrate Judge Netburn, although I personally think it

8    would be a very good idea.  I don't have my client's authority.

9          THE COURT:  Fair enough.  Mr. Schwartz, same answer?

10          MR. SCHWARTZ:  Yes.  And, your Honor, may I suggest

11    that we each confer with our clients and then submit a letter

12    to the Court no later than tomorrow.

13          THE COURT:  That's fine.  And needless to say, while I

14    hope you'll both agree to it, or alternatively have some other

15    settler in mind, if you want to choose a private settler,

16    that's great too. I just want you to have somebody to help you

17    get over the goal line here.  If by chance there's some

18    disagreement as to referring this to Judge Netburn, I don't

19    want to know who declined.  Just write me a letter to say that

20    there is not mutual interest, but don't shame the person who

21    didn't assent. That's not information that's useful to me, and

22    it's not behavior I like.

23          Let me go around the horn and see if there's any other

24    way I can be useful to you.  Mr. Fisher.

25          MR. FISHER:  Yes, your Honor.  Two issues.  One is

N68BFROH

1    scheduling accommodation.  I am a Sabbath observer.  For that

2    reason, the June 15th, 5 p.m. deadline for our reply brief

3    poses a problem.

4              THE COURT:  June 17th.

5              MR. FISHER:  I'm sorry, June 17th, a Saturday.  I'm

6    sorry.  Yes, I misspoke.

7              THE COURT:  Nonetheless, I take the point.  Look, I

8    mean, here's the question.  The problem is that the next day is

9    Father's Day.  I was trying to be nice and avoid Father' Day

10   and so forth, and I want to be.  What are you proposing?

11             MR. FISHER:  Your Honor, I very much appreciate that.

12   I would suggest the Sunday of Father's Day at 10 a.m. or 12

13   p.m. I have a team, but I won't be able to review the brief.

14             THE COURT:  Look, I will let you file it at 10 a.m. on

15   Father's Day on June 18th instead.  I'll change that, but I'm

16   deliberately making that a hard stop because I have some sense

17   of what life in a big firm is like, and I do not want a bunch

18   of people grinding on a brief on Father's Day that could have

19   been knocked out earlier. If you get it in at 10 a.m., at least

20   everyone can have a good day.  Does that do the trick?

21             MR. FISHER:  Yes, I will make sure that happens of

22   course.  And the other, I hope that the Court will take in the

23   spirit in which it is intended.  I wanted to address the bond

24   very briefly because during --

25             THE COURT:  Mr. Fisher, you need to speak a little

N68BFROH

1    more close to the phone.  You're fading in and out.

2            MR. FISHER:  My apologies. I wanted to very briefly if

3    your Honor will entertain it address the amount of the bond.

4            THE COURT:  No.  No.  Mr. Fisher, no.  I've

5    accommodated you in holding this conference today in a host of

6    ways.  I engaged with you.  You may have something else you'd

7    like to say.  Frontier Airlines can post a $2 million bond, and

8    I'm not going to chew up more time about that.  You had a

9    chance to speak with me about it.  Enough.

10           MR. FISHER:  Understood, your Honor.  Nothing further.

11           THE COURT:  Look, I don't doubt that if we went into

12    it in more detail, you'd have more to say, but at some point

13    the conversation needs to end, and that is not ultimately --

14    we're talking about the posting of a bond, not the

15    relinquishment of $2 million.  Frontier can pay for the

16    privilege.

17           MR. FISHER:  Understood, your Honor.

18           THE COURT:  All right.  Anything further, Mr. Fisher?

19           MR. FISHER:  Nothing from me.

20           THE COURT:  How about you, Mr. Schwartz?

21           MR. SCHWARTZ:  Nothing, your Honor.  Thank you for

22    your time.

23           THE COURT:  Of course.  Look, I do want to again just

24    pause again and by complimenting the lawyering, both in writing

25    and on the phone today did an excellent job by your clients and

N68BFROH

1    they're lucky to have you.  I want to make sure that you are

2    conveying to your clients in no uncertain terms that this is a

3    case that should settle.

4          And in a rationale world -- and again, I'm focusing on

5    the emergency aspect of it, not the underlying backwards

6    looking monetary claims.  This ought to be a resolvable piece.

7    And I want your clients to understand that the Court would look

8    with considerable dismay at intransigent by clients that

9    prevent readily, settleable, resolvable disputes, that which is

10   given rise to emergency relief being requested.  I would regard

11   that as incredibly regrettable, and I want you to convey that

12   in no uncertain terms to the clients. I know lawyers sometimes

13   get that sort of piece in a way that clients don't, that's why

14   I'm highlighting it emphatically as I can.  Be well, everyone,

15   and I look forward to seeing you all, in any event, for our

16   case management conference on June 20th.  Even if the emergency

17   relief part is done, I'll still meet with you to talk about the

18   trajectory of the litigation going forward unless you are able

19   to resolve that as well, which of course will be wonderful.  Be

20   well.  I see you soon. We stand adjourn.

21         (Adjourned)

22

23

24

25