## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

FRONTIER AIRLINES, INC.,

        Plaintiff,

v.

AMCK AVIATION HOLDINGS IRELAND
LIMITED, ACCIPITER INVESTMENT 4
LIMITED, VERMILLION AVIATION (TWO)
LIMITED, ACCIPITER HOLDINGS DAC,
CARLYLE AVIATION MANAGEMENT
LIMITED, MAVERICK AVIATION
HOLDINGS LIMITED, MANCHESTER
AVIATION FINANCE S.A.R.L., VERMILLION
AVIATION HOLDINGS LIMITED, WELLS
FARGO TRUST COMPANY, N.A., solely in its
capacity as OWNER TRUSTEE, and UMB
BANK, N.A., solely in its capacity as OWNER
TRUSTEE,

        Defendants.

Case No.: 1:22-cv-02943 (PAE)

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S APPLICATION TO CONVERT TEMPORARY <u>RESTRAINING ORDER TO PRELIMINARY INJUNCTION</u>

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................... 1

BACKGROUND ...................................................................................................... 4

    I.     THE LEASES .............................................................................................. 4

    II.    LITIGATION 1 .......................................................................................... 7

    III.   THE COOPERATION AGREEMENT ....................................................... 8

    IV.   FRONTIER DEFAULTS UNDER THE LEASES ...................................... 9

    V.    PROCEDURAL HISTORY RELEVANT TO FRONTIER'S MOTION ................. 16

ARGUMENT ......................................................................................................... 17

    I.     LEGAL STANDARD ............................................................................... 17

    II.    PLAINTIFF HAS NOT DEMONSTRATED A LIKELIHOOD OF SUCCESS ON
          THE MERITS ........................................................................................... 17

    III.   PLAINTIFF HAS NOT DEMONSTRATED IMMINENT IRREPARABLE HARM IF
          THE SOUGHT RELIEF IS DENIED, AND THE BALANCE OF THE EQUITIES TIP
          IN DEFENDANTS' FAVOR ...................................................................... 23

    IV.   ANY INJUNCTION SHOULD BE NARROWLY TAILORED ............................. 25

    V.    FRONTIER'S BOND MUST BE CONTINUED ...................................... 25

CONCLUSION ...................................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Fed. Ins. Co. v. Metro. Transp. Auth.*,
No. 17-cv-3425 (JFK), 2017 WL 2929471 (S.D.N.Y. July 10, 2017) ...................................17

*In re Pandeff*,
201 B.R. 865 (Bankr. S.D.N.Y. 1996) ...................................................................................19

*Saada v. Master Apts. Inc.*,
579 N.Y.S.2d 536 (N.Y. Sup. Ct. 1991) ...............................................................................19

*Shaw Cablesystems G.P. v. TV Guide Int'l, Inc.*,
No. 19-cv-3698, 2019 WL 13193712 (S.D.N.Y. May 10, 2019) ...........................................17

**Other Authorities**

Fed. R. Civ. P. 64 ...................................................................................................................20

Fed. R. Civ. P. 65(c) ..............................................................................................................25

Defendants Wells Fargo Trust Company, N.A., solely in its capacity as Owner Trustee ("Wells Fargo"), and UMB Bank, N.A., solely in its capacity as Owner Trustee ("UMB"), respectfully submit this memorandum of law in opposition to Plaintiff Frontier Airlines, Inc.'s ("Plaintiff" or "Frontier") Application to Convert Temporary Restraining Order to Preliminary Injunction (ECF No. 71) (the "PI Motion").[1]

## PRELIMINARY STATEMENT

Cooperation between airlines, which lease aircraft, and the owners/lessors of those aircraft—which provide airlines with the financing that allows them to fly the aircraft in the first place—is a foundation of the aviation finance industry. More than half of the commercial aviation fleet is leased. Without cooperation, the owners and lessors of the aircraft are unable to transfer their ownership interests in the aircraft, or assign security interests in their rights and interests in the aircraft and leases as they wish, making the aircraft significantly less valuable. Accordingly, aircraft leases commonly contain detailed provisions regarding a lessee's obligations to cooperate. In this case, the importance of that obligation was reinforced when, at Frontier's request, the parties entered into a separate Cooperation Agreement (defined below) in which Frontier committed to cooperate with Defendants regarding, among other things, "aircraft/lease financings" and "Aircraft sales (and related transfers, notices and acknowledgments, replacement of lessor guarantees, updated insurance certificates and matters ancillary thereto)."

But for months, Frontier has refused to comply with its contractual obligations, both under the applicable Leases (defined below) and the Cooperation Agreement. Frontier's justification for doing so is that it has sued Defendants and another entity called AMCK Aviation Holdings Ireland Limited ("AMCK"), and that Frontier might someday have a judgment in that completely separate

---

[1] Unless otherwise specified, Electronic Case Filing citations are to *Frontier Airlines, Inc. v. AMCK Aviation Holdings Ir. Ltd. et al.*, Case No.: 1:22-cv-02943 (PAE) (S.D.N.Y.).

case, unrelated to the instant matter, which Frontier wants to secure. And, so, rather than cooperate, Frontier has insisted that Defendants provide Frontier with "security" for that contingent litigation claim, such as a first lien on aircraft subject to the Leases, or even posting a letter of credit. But ***nothing in the Leases or elsewhere gives Frontier any such rights***. Indeed, the Leases explicitly prohibit Frontier from placing any liens on the relevant aircraft. Frontier is flouting its contractual obligations in the hope that its actions will be so damaging to Defendants that Defendants will have no choice but to either accede to Frontier's demands (or, more likely, to force a settlement in the first action, resulting in an unwarranted "pay day" for Frontier).

And what makes Frontier's actions even more brazen is that its claim in that unrelated litigation does not even arise from the Leases; it relates to an entirely separate agreement called the Framework Agreement (defined below). On July 6, 2023, Judge Stanton, who presides over that separate case, largely granted summary judgment against Frontier, dismissing the bulk of their claims and legal theories. (*See* Opinion and Order, *Frontier Airlines, Inc. v. AMCK Aviation Holdings Ir. Ltd. et al.*, No. 20-cv-9713 (LLS) (S.D.N.Y. July 6, 2023), ECF No. 123 ("Summary Judgment Order").) Importantly, Judge Stanton dismissed Frontier's claims for breach of the Leases. (*Id.* at 34-35.) The only claim remaining for trial is the claim for breach of contract arising from AMCK's express termination of the Framework Agreement on May 8, 2020. (*Id.* at 38.)

The Court should not allow Frontier to continue to exercise this self-help, particularly in light of the extraordinary lengths to which Defendants have gone to try to placate Frontier. Most pertinently, even though nothing in the Leases or any other relevant document entitles Frontier to a guaranty for any judgment that it might obtain against AMCK (or any Defendant), Defendants have offered to provide Frontier with a guaranty covering such a judgment from an entity with hundreds of millions of dollars in net worth. But Frontier rejected that offer, instead asking

Defendants to either post a letter of credit (which is a substantial expense) or to allow Frontier to place a priming lien on three of Defendants' Aircraft, in effect making those Aircraft unsalable and unable to be subject to a secured financing.

As explained below, Frontier's justifications for refusing the guaranty are meritless. But regardless, Frontier's recent actions show its objections were simply pretextual. On July 3, 2023, Defendants offered Frontier a revised guaranty proposal, addressing each of Frontier's purported concerns. As of the date of this submission, Frontier has refused to respond to that proposal.

Accordingly, the probability of success on the merits falls decisively in Defendants' favor, and the court should deny the PI Motion on that basis. But the equities favor Defendants, too.

For example, during the June 8, 2023 hearing on Frontier's motion for a temporary restraining order ("TRO Motion"), Frontier argued that it would be irreparably harmed if Defendants were not enjoined from exercising their contractual rights given Frontier's defaults under the Leases, including Defendants' ability to ground the subject aircraft. But in the same hearing, Frontier conceded that ***it will not allow the aircraft to be grounded***, but rather would instead cooperate under the Leases and provide Defendants with the documents they need to sell and refinance the aircraft. Consequently, ***there will be no irreparable harm to anyone***—not Frontier and not the public. All that will happen is that Frontier will cooperate as required under the Leases, instead of refusing to cooperate as a strategy to damage Defendants to extract leverage for a settlement in an unrelated litigation. And in exchange for complying with its obligations, Frontier will not be harmed at all. Rather, it will just have to "give up" a right that does not exist and that it invented out of whole cloth, *i.e.*, Frontier's assertion that it can use the aircraft it leases from certain Defendants to secure its litigation claim in the unrelated litigation. Put another way, there will never be a "Southwest Airlines situation" because Frontier will not allow that to happen.

Defendants, on the other hand, continue to be harmed every day that Frontier persists in breaching its obligations because Defendants are being prevented from exercising their rights of ownership of the Aircraft, which are worth hundreds of millions of dollars.[2]   And given the prevalence of leasing in the aviation industry, a ruling in favor of Frontier could make it difficult for airlines to finance aircraft in the future.   As explained below, the Court should deny the PI Motion and vacate the currently pending temporary restraining order.

## BACKGROUND

### I.    THE LEASES

#### A.    Background:  The Leases and the Carlyle/CK Transaction

Frontier is a commercial airline and party to individual lease agreements (the "Leases") for fourteen (14) Airbus A320 passenger aircraft (the "Aircraft") that it uses in its business from certain Defendants.  Each of the 14 Aircraft Leases was signed by Frontier as the "Lessee" and either Wells Fargo or UMB as the "Lessor."  (Mechlowicz Decl. ¶¶ 3-4.)  As signatories to the Leases, Wells Fargo and UMB act not in each of their individual capacities, but solely as "Owner Trustees" under the terms of a related trust agreement.  (*Id*. ¶ 4.)  Under each Lease, the Lessor acts for the beneficial owner of the Aircraft, known as the "Owner Participant."  (*Id.*)  Each Lease designates either Accipiter Investments Aircraft 4 Limited ("Accipiter") or Vermillion Aviation (Two) Limited ("Vermillion") as the Owner Participant.  (*Id.*)  The Owner Trustee (UMB or Wells Fargo) legally owns the Aircraft, whereas the Owner Participant (Accipiter or Vermillion) is the beneficial owner of the Aircraft.  (*Id.*)  At the time the Leases were executed, both Accipiter and Vermillion were affiliates of AMCK.  (*Id.*)

---

[2] Defendants have filed a separate action seeking to recoup their substantial and ongoing damages resulting from Frontier's breaches of its obligations.  *See* Compl., *Carlyle Aviation Mgmt. Ltd., et al v. Frontier Airlines, Inc.*, 1:23-cv-04774 (PAE), (June 6, 2023), ECF No. 1.

In December 2021, CK Asset Holdings Limited (then the ultimate indirect corporate parent and indirect majority shareholder of AMCK, Accipiter, and Vermillion) announced an agreement to sell AMCK's aircraft portfolio to Maverick Aviation Holdings Ltd. ("Maverick"), an entity managed by Carlyle Aviation Partners. (*Id.* ¶¶ 1, 5.) AMCK transferred its ownership in numerous corporate entities—including Vermillion—to Manchester Aviation Finance S.à r.l. ("Manchester"), and transferred its ownership interest in Manchester to Vermillion Holdings. (*Id.* ¶¶ 1, 5.) The transaction included AMCK's portfolio of over 100 aircraft, but did not include its leasing platform, which remained with AMCK. In April 2022, Vermillion Holdings transferred Manchester and another company that was the shareholder of Accipiter Holdings DAC to Maverick (the "Carlyle/CK Transaction"). (*Id.* ¶ 5.)

As a result, AMCK no longer indirectly owned Accipiter and Vermillion, the Owner Participants of the Aircraft leased by Frontier; they were instead indirectly owned by Maverick. (*Id.*) However, the ownership of the Aircraft did not change—the Owner Trustees in each case remained Wells Fargo or UMB, and the Owner Participants remained Accipiter or Vermillion. (*Id.* ¶¶ 4, 5.) After the closing of the Carlyle/CK Transaction, Carlyle Aviation Management Limited ("CAML") became servicer of the Leases, and in this capacity, manages the sale, lease, and financing of the Aircraft. (*Id.* ¶ 3.)

The Frontier Aircraft were not the only ones that were owned by entities involved in the Carlyle/CK Transaction. Rather, entities involved in that transaction owned over 100 aircraft leased to more than 30 different airlines. (*Id.*) None of those other airlines raised any objection to the Carlyle/CK Transaction. (*Id.* ¶ 10.)

### B.    Transfer and Cooperation Provisions Under the Leases

Thirteen of the Leases contain substantially similar terms ("Lease Form 1")[3] (*See, e.g.*, Ex. 1)[4] and one Lease contains slightly different, but similar terms to Lease Form 1 ("Lease Form 2")[5] (Ex. 2) (together, the "Lease Forms").  (Mechlowicz Decl. ¶ 6.)  Each of the Lease Forms contains provisions that allow for the transfer of ownership of the Aircraft pursuant to certain conditions. (*Id.* ¶ 7.)  These provisions govern transfers by the Lessors (UMB or Wells Fargo) or Owner Participants (Accipiter or Vermillion).  (*Id.*)

Section 20.2(a) of Lease Form 1 states that "[e]ach of Lessor [*i.e.*, UMB or Wells Fargo] and Owner Participant [*i.e.*, Accipiter or Vermillion] (and any subsequent permitted assignee or transferee) shall have the right at any time . . . to transfer ownership or beneficial ownership, as applicable, of the Aircraft or to assign (including to assign as security), mortgage, novate, transfer, grant participations in, or otherwise dispose of its rights and obligations under [the Lease documents], to any other person by outright transfer or assignment or collateral assignment . . . ." (Ex. 1 § 20.2(a).)

Lease Form 1 also contains a cooperation provision, which Defendants bargained for to ensure that they could exercise their transfer rights with respect to transfers under Section 20.2(a). Accordingly, Section 20.2(b) of Lease Form 1 states that "Lessee [*i.e.*, Frontier] shall comply with all reasonable requests of Lessor or Owner Participant, and at the expense of Lessor, to cooperate in effecting" any "transfer, novation, assignment, mortgage, grant or other disposition referred to

---

[3] Those thirteen Leases relying on Lease Form 1 are for the aircraft bearing the following manufacturer's serial numbers: 8102, 8239, 8357, 8307, 8402, 8766, 8857, 8913, 8977, 9026, 9068, 9177, and 10038.

[4] Numerical exhibits referenced in this Memorandum are exhibits to the Declaration of Freyda Mechlowicz submitted contemporaneously herewith ("Mechlowicz Decl.").

[5] The one Lease relying on Lease Form 2 is for the aircraft bearing the following manufacturer's serial number: 7524.

in paragraph (a) above and will execute any and all consents, agreements, amendments or other instruments . . . in form and substance reasonably satisfactory to Lessee . . . ."  (Ex. 1 § 20.2(b).)

With respect to Lease Form 2, Section 22.3 allows Lessor to "sell, assign, novate or otherwise transfer its right, title and interest in the Aircraft or this Lease without Lessee's consent," provided certain conditions are met.  (Ex. 2 § 22.3.)  Like Lease Form 1, Lease Form 2 contains cooperation provisions.  Under Section 22.2 of Lease Form 2, Frontier must "promptly execute (or cause to be executed) all documents reasonably requested by Lessor [*i.e.*, Wells Fargo] to effect, perfect, record or implement" certain assignments, and to "comply with any other reasonable requests of Lessor, its successors and assigns in respect of any such . . . assignment," provided that certain conditions are met.  (*Id.* § 22.2.)  Section 10.10 of Lease Form 2 further states that "Lessee acknowledges that Lessor may at any time during the Lease Period grant Security Interests over the Aircraft . . . as collateral security for Lessor's obligations to the Financing Parties" and "Lessee undertakes to provide all reasonable assistance and cooperation to Lessor and the Financing Parties . . . in connection with the perfection and maintenance of such Lessor Liens . . . ."  (*Id.* § 10.10.)[6]

The transfer provisions contained in the Leases are not unique to Defendants' contracts with Frontier; they are also contained in substantially similar form in a number of Defendants' leases with other airlines.  Frontier is the only one of these airlines to have raised an issue with the transfer provisions.  (Mechlowicz Decl. ¶ 10.)

## II.    <u>LITIGATION 1</u>

In November 2020, Frontier sued AMCK and others, alleging, among other things, that AMCK breached the Framework Agreement to which Frontier and AMCK were party.  *See*

---

[6] Section 10.9 of Lease Form 2 also establishes that "Lessee shall at all times during the Lease Period . . . not create or permit to exist any Security Interest (other than Permitted Liens) upon the Aircraft, any Engine or any Part . . . ."  (Ex. 2 § 10.9.)

*Frontier Airlines, Inc. v. AMCK Aviation Holdings Ir. Ltd. et al.*, No. 20-cv-9713 (LLS) (S.D.N.Y.) ("Litigation 1"). In that case, Frontier claims damages ranging from $36 million to $44 million. (Ex. A[7] ¶¶ 70-72, Tables 17 & 18.)[8] As the expert report that Frontier submitted in that case makes clear, ***those claimed damages arise exclusively from the termination of the Framework Agreement, which is not at issue in this case***. (*Id.* ¶¶ 4, 21, 22.) On July 6, 2023, Judge Stanton denied the Motion for Summary Judgment filed by the defendants in Litigation 1 as to claims against AMCK, Accipiter, and Vermillion under the Framework Agreement, but granted the motion as to all other claims and defendants, including claims for breaches of the Leases.[9]

## III.    THE COOPERATION AGREEMENT

As the Court is aware, on April 8, 2022, Frontier commenced this litigation ("Litigation 2"), ultimately asserting claims for breach of contract, fraudulent transfer, and declaratory relief. (ECF No. 1). Frontier's claims arose from the Carlyle/CK Transaction. Despite the pending litigations between Frontier and certain Defendants, the parties needed to continue working together to conduct business. At Frontier's request, in mid-2022, CAML began engaging with Frontier to facilitate ordinary course activities relating to the Aircraft, including the sale or refinancing of the Aircraft leased by Frontier. (Mechlowicz Decl. ¶¶ 15-16.)

Sales and financings of aircraft are typical and ordinary course transactions and have nothing to do with any litigations pending between the parties. To ensure that ordinary course business would continue without interruption, and to make clear that Defendants were not trying

---

[7] Alphabetical exhibits referenced in this Memorandum are exhibits to the Declaration of Jed M. Schwartz submitted contemporaneously herewith ("Schwartz Decl.").

[8] Frontier has offered some larger figures in its expert report, but those figures seem to be an attempt to inflate its potential damages by arguing that any compensatory damages that it receives should be "grossed up" to account for taxes.

[9] Although Accipiter and Vermillion are not parties to the Framework Agreement, Judge Stanton held that it was an issue of fact as to whether they could be held liable for the alleged breach. (Summary Judgment Order at 30.)

to seek any advantage in the pending litigation, at Frontier's request, Defendants executed an agreement on October 21, 2022, which would allow the parties to continue working together on commercial and sale operations, as well as other ordinary course matters, without prejudicing their litigation positions (the "Cooperation Agreement").  (*Id*. ¶ 15; Ex. 3.)

The Cooperation Agreement importantly states that "[d]espite the existence of the [Action filed in 2022] . . . the Parties recognize the mutual operational benefits to the Parties from cooperating with each other in good faith regarding the day-to-day administration of the Lease Agreements and the Aircraft," and "[a]ccordingly, ***the Parties hereby confirm that they will continue to cooperate in good faith regarding all Lease Administration Activities***."  (Ex. 3 ¶ 4 (emphasis added).)  The parties defined Lease Administration Activities to include "consents, lease amendments, aircraft/lease financings, owner trustee and owner participant assignments and Aircraft sales (and related transfers, notices and acknowledgements, replacement of lessor guarantees, updated insurance certificates and matters ancillary thereto), warranty and insurance claims, notices, and the like . . . ."  (*Id.*)

The Cooperation Agreement further states that "unless otherwise agreed to in a writing executed by the relevant Parties, no Party shall be treated as having waived any contractual or extra contractual rights by engaging or participating in any Lease Administrative Activity during the term of this Agreement."  (*Id.* ¶ 5.)

## IV.    FRONTIER DEFAULTS UNDER THE LEASES

Beginning in mid-2022, certain Defendants attempted to engage with Frontier in good faith to negotiate various ordinary course agreements in connection with refinancing or sales of the Aircraft, including security notices and acknowledgments, internal trust transfers, lease assignments, a guaranty, and a guaranty termination.  (Mechlowicz Decl. ¶ 16.)

Currently, four of the Aircraft (MSNs 8357, 8307, 9177, 10038) are subject to purchase

agreements executed between certain Defendants and third-party purchasers, pursuant to which the third-party purchasers have agreed to purchase the Aircraft.  (*Id.* ¶ 18.)  Ten of the Aircraft (MSNs 8102, 8239, 8357, 8307, 8402, 8913, 8977, 9068, 9177, 10038) are subject to financing agreements executed between certain Defendants and third-party financiers, pursuant to which the financier has agreed to finance the Aircraft pursuant to a temporary financing.  (*Id.*)  Six of the Aircraft (including one of the Aircraft subject to a purchase agreement) (MSNs 8102, 8239, 8357, 8402, 8977, 9068) are subject to refinancing agreements executed between certain Defendants and third-party financiers pursuant to a long-term financing.  (*Id.*)  CAML has been unable to close any of these transactions due to Frontier's defaults.  (*Id.* ¶ 19.)

Specifically, Defendants have requested that Frontier consent to a customary security and lease assignment for certain of the Aircraft subject to the Leases in order for Defendants to sell or refinance the aircraft.  (*Id.*)  These security and lease assignments have ***no impact*** on Frontier's operations or interest in the Aircraft.  Such consents are granted as a matter of ordinary course in the airline industry, including by major U.S. air carriers, and have been previously granted by Frontier.  (*Id.* ¶ 20.)

In November 2022, CAML informed Frontier that it had executed letters of intent to sell four leased Aircraft (MSNs 8307, 8357, 9177, and 10038).  (*Id.* ¶ 17.)  In response, Frontier requested additional information, arguing that the transfers of those Aircraft could be void pending the outcome of Litigation 2, but indicated that Frontier could cooperate regarding the sale of those Aircraft if CAML intended to invoke the terms of the Cooperation Agreement, and so long as CAML complied fully with the Leases.[10]  (*Id.* ¶ 17; Ex. 4 at 2.)  Frontier also stated that Aircraft

---

[10] On June 7, 2023, the Court issued its Opinion and Order on Defendants' Motion to Dismiss. (ECF No. 59.) which dismissed, among other claims, Frontier's fraudulent transfer claims. Frontier's assertion that the transfers of the Aircraft could be void is therefore moot.

bearing MSNs 8307 and 8357 were still owned by Wells Fargo as Owner Trustee, and asked CAML to complete owner trustee transfers.  (*Id.* ¶ 21; Ex. 4 at 3-4.)  That same day, CAML's counsel requested that Frontier consent to security assignments for the Aircraft, providing Frontier with draft security assignment notices and acknowledgments for one Aircraft subject to Lease Form 1 and one Aircraft subject to Lease Form 2, and notified Frontier of CAML's intent to transfer three other Aircraft owned by Wells Fargo to new trusts with UMB as the Owner Trustee (one of which was the subject of Frontier's November 23, 2022 transfer request).  (Mechlowicz Decl. ¶ 21.)

Consent to such transfers and assignments is routinely granted by aircraft carriers as a matter of course in the airline industry and, in fact, Frontier itself has provided similar consents in past aircraft lease dealings, without fanfare, including in 2014 for aircraft serviced by CAML and leased to Frontier at such time.  (*Id.* ¶ 20.)  Frontier has not alleged—nor can it—that the security assignments and lease assignments Defendants seek would result in Frontier's loss of possession of the Aircraft, or interfere in any way with Frontier's use thereof in accordance with the Leases. In fact, Frontier specifically ***asked for the lease assignments to be made from Wells Fargo to UMB***.  (Ex. 4 at 3-4.)  Nor has Frontier claimed that the consents and other documents that Defendants have asked Frontier to sign are on non-market terms.  As a result, Defendants were surprised when Frontier continued to withhold consent and instead engaged CAML in a lengthy letter writing campaign over the assignments that stretched from late 2022 into early 2023. (Mechlowicz Decl. ¶¶ 17, 21-23, 33.)

On November 29, 2022, CAML responded to Frontier's November 23 requests for information and reminded Frontier of its obligation under the Cooperation Agreement to cooperate in good faith with the security and lease assignments sought in connection with the anticipated

sales and refinancings under the Leases.  (*Id.* ¶ 22.)  In disregard of its obligations, Frontier responded on December 1, 2022 with a further list of demands for information, stating that it was entitled to "evaluate and assess whether the transfers and security assignments will satisfy the transfer requirements of the [Leases]."  (*Id.* ¶ 23; Ex. 5 at 1.)  Frontier also expressed a concern that Defendants were seeking transfers of ownership that would impact Frontier's hypothetical interest as a potential judgment creditor in the unrelated Litigation 1.  (Ex. 5 at 2.)

On December 5, 2022, CAML's counsel and Frontier's counsel had a phone call regarding the documentation for the security assignments and lease assignments.  (Mechlowicz Decl. ¶ 24.) From December 5, 2022 to January 22, 2023, CAML made several attempts to contact Frontier for comments on or drafts of, as applicable, the security notices and lease assignments.  (*Id.* ¶ 25.) Not only did Frontier stall in providing CAML with the comments and drafts discussed, but also Frontier insisted on adding unreasonable and off-market terms to the security assignment notices related to its status as a potential judgment creditor in connection with Litigation 1.  (*Id.*)

For example, Frontier proposed adding to the security assignment notices language that would require Defendants to subordinate any existing liens and security interests to Frontier's purported interests as a potential judgment creditor:

> Each of the Lessor and the Security Trustee agrees, covenants, represents and warrants for the benefit of the Lessee that the security assignment transaction described hereunder (including any associated liens and encumbrances of Security Trustee) complies with the applicable terms and conditions of Clause 20.2 of the Lease and that pursuant to Clause 20.2(a)(ii) Lessee's rights, including but not limited to Lessee's rights as plaintiff and a judgment creditor (as applicable) arising from or in connection with the pending lawsuits filed in U.S. District Court for the Southern District of New York as case numbers 1:22-cv-02943 and 1:20-cv-09713, including, without limitation, Lessee's right to collect and recover damages, shall not be restricted or otherwise prejudiced as a result of such security assignment transaction.  Any prejudice to or loss of priority of Lessee's rights and interests as a judgement creditor as a result of the security assignment described herein shall be deemed a restriction to the Lessee's rights under the Lease and other Lessee's Documents.  If any such restriction occurs, ***the Lessor and the Security Trustee***

> *shall immediately upon the request of the Lessee subordinate any liens, security interests, encumbrances and collection rights of the Security Trustee against property or assets, including, without limitation, against the Aircraft, the Lease Documents and monies held pursuant the Lease Documents, to the judgment creditor rights of the Lessee.*

(Ex. 6 ¶ 7 (emphasis added).)

Similarly, with respect to the lease assignments to UMB, Frontier insisted on drafting the draft lease assignment itself and sought to include certain language related to its status as a potential judgment creditor in the pending litigations.  (Mechlowicz Decl. ¶¶ 24, 28.)  Frontier refused to share the draft lease assignment with CAML for nearly two months.  (*Id.* ¶¶ 26, 28.)  From early December 2022 to late January 2023, CAML contacted Frontier no fewer than *eight* times to ask for the draft lease assignment.  (*Id.* ¶ 26.)  Frontier did not share the draft with CAML until January 22, 2023.  (*Id.* ¶¶ 26, 28.)  When Frontier finally shared the draft, it included off-market terms that had no business being in a lease assignment, including description of the pending litigations and Frontier's asserted claims.  (*Id.* ¶ 28; Ex. 6; Background Section A.)

Frontier asserts that these and other communications with CAML exemplify Frontier's willingness to negotiate and cooperate with CAML and Defendants.  (*See, e.g.*, PI Motion at 9.)  However, Frontier's correspondence and the unreasonable language it drafted into the security assignment notice and lease assignment show that throughout the negotiations, Frontier continued to stall any progress towards finalizing these documents.   Frontier's proposed language is unreasonable because, among other things, it (i) requires the Lessor to agree that the Leases provide Lessee certain rights or benefits that are not stated in the Leases, including that the Lessee has a right to a particular priority position as a creditor pursuant to the Lease and that the Leases provide that the Lessee's claims in this action and Litigation 1 cannot be prejudiced; (ii) requires the security interest held by Lessor's financier in any of Lessor's assets to be subordinated to the Lessee's judgement creditor rights, and (iii) memorializes that Lessor defaulted under the Leases,

which is inaccurate.  In addition, it is simply not possible to effectuate these transactions on the terms Frontier demands because the proposed financing sources for the Aircraft will not permit subordination of a secured party's claim to Frontier's litigation claim.  (Mechlowicz Decl. ¶ 19.)

Despite Frontier's obvious delay tactics, to ease Frontier's concerns about its ability to collect a potential judgment in the pending litigations, CAML offered to have Maverick Aviation (Ireland) DAC (the "Maverick Guarantor") guarantee Frontier's claims (the "Maverick Guaranty").  (*Id.* ¶¶ 29-30.)  Specifically, CAML offered to have the Maverick Guarantor guarantee "amounts that are owed (if any) by a Maverick Defendant in the two pending actions (the "Actions"), in each case to the extent determined to be owed to Frontier in either such Action pursuant to a final, non-appealable judgment."  (*Id.*; Ex. 7 at 1.)  CAML made Frontier aware that the Maverick Guarantor has a net worth in the hundreds of millions of dollars and, as additional security, offered to have the Maverick Guarantor covenant to "maintain until the Termination Date, a net worth of at least $65 million," which is well in excess of even Frontier's best-case scenario in Litigation 1 at $44 million.  (Ex. 8 at 1; *see also* Ex. A ¶¶ 70-71, Table 17.)  Thus, CAML's proposal more than ameliorated any claimed concern about Frontier's ability to collect on an eventual judgment.

After certain Defendants and Frontier exchanged several proposals for the guaranty, Frontier sent a counterproposal on May 5, 2023.  (Mechlowicz Decl. ¶ 34; Ex. 11.)  In Frontier's response, as opposed to granting Defendants' straightforward request for a consent to a security assignment and lease assignment for certain of the Aircraft, Frontier instead demanded that Defendants provide Frontier with either (i) a $60 million letter of credit for Frontier's benefit or (ii) a first lien mortgage against three of the Aircraft selected by Frontier (with the mortgages to be perfected with filings on the International Registry and the Federal Aviation Administration's

registry).  (Mechlowicz Decl. ¶ 34; Ex. 11 at 2.)  But all monetary obligations under the Leases run from Frontier to Defendants.  (Mechlowicz Decl. ¶ 35.)  Frontier is, in effect, the "borrower" under the Leases and Defendants are the "lenders."  Therefore, Frontier's request is akin to a homeowner demanding that his or her bank post a letter of credit to secure the bank's obligations under a mortgage, which is unreasonable.

CAML, as servicer, sent a letter to Frontier, dated April 27, 2023, detailing Frontier's multiple breaches of the Leases, and attaching notices previously sent to Frontier informing Frontier of certain contemplated transactions regarding the Aircraft (the "April 27 Letter"). (Mechlowicz Decl. ¶ 33; Ex. 9.)  On May 3, 2023, Frontier sent a letter to CAML in response. (Mechlowicz Decl. ¶ 33; Ex 10.)  In that letter, Frontier not only continued to refuse CAML's reasonable requests, which CAML made on its own behalf and on behalf of certain Defendants in this Action, but also incorrectly asserted, among other things, that CAML refuses to provide a guaranty for the proposed transfer.  (Ex. 10 at 2.)

As a result, on May 26, 2023, Wells Fargo and UMB issued notices of default to Frontier under the relevant Leases (the "Default Notices").  (Mechlowicz Decl. ¶ 35.)  Certain Defendants in this Action also filed a complaint under seal in New York State Supreme Court, which Frontier removed to this Court on June 6, 2023 (the "Litigation 3").  *See* Compl., *Carlyle Aviation Mgmt. Ltd., et al v. Frontier Airlines, Inc.*, 1:23-cv-04774 (PAE), (June 6, 2023), ECF No. 1.  Defendants' three claims for relief in Litigation 3 include (i) Frontier's breach of contract of the Leases, (ii) Frontier's breach of contract of the Cooperation Agreement, and (iii) Frontier's tortious interference with prospective economic advantage.  (*Id.*)

On July 3, 2023, Defendants offered Frontier a revised guaranty proposal, addressing each of Frontier's purported concerns.  Among other things, Defendants' revised guaranty proposal:

(i) extends the Maverick Guaranty to amounts owed (if any) by ***any defendant*** in Litigation 1; (ii) ties termination of the Maverick Guaranty to a breach of Frontier's ***payment*** obligations, rather than ***any*** default under the Leases; and (iii) includes an agreement by the Maverick Guarantor to provide Frontier with quarterly certifications that its net worth remains at least $65 million from an officer or other authorized representative. (Mechlowicz Decl. ¶ 36; Ex. 12.) As of the date of this submission, Frontier has refused to respond to that proposal.

## V.    PROCEDURAL HISTORY RELEVANT TO FRONTIER'S MOTION

On June 7, 2023, Frontier filed a proposed order to show cause for a temporary restraining order and preliminary injunction, along with an accompanying memorandum of law, declaration, and exhibits. (ECF Nos. 52-55.) Frontier sought to enjoin Defendants Wells Fargo and UMB from grounding, impounding and/or deregistering any of the 14 Aircraft that are the subject of this lawsuit or terminating the Leases for any of the Aircraft during the pendency of this Action. The Court granted Frontier's TRO Motion, entered the Order to Show Cause and scheduled a hearing. (ECF No. 56.)

Shortly thereafter, also on June 7, 2023, the Court issued its Opinion and Order on Defendants' Motion to Dismiss. (ECF No. 59.) The Court dismissed Frontier's declaratory judgment and fraudulent transfer claims, and declined to dismiss Frontier's breach of contract claim. (*Id.*) As a result, Litigation 2 now proceeds on the one surviving claim for breach of the Leases due to alleged lack of notice against Defendants Accipiter, Accipiter Holdings DAC, Vermillion, UMB, and Wells Fargo.

On June 8, 2023, Defendants submitted their Memorandum of Law in Opposition to Plaintiff's Motion for a Temporary Restraining Order ("TRO Opposition"), and the parties appeared for a telephonic conference before the Court. After hearing oral argument from the parties, the Court could not find that Frontier established a likelihood of success on the merits of

its claims based on the limited record before it.  (Ex. B at 43:21-45:3.)  The Court then granted the TRO for 12 days, ordered Frontier to post a $2 million bond, and set a briefing schedule governing the PI Motion, which was subsequently adjourned with consent of the parties.  (ECF Nos. 68, 75.)

## ARGUMENT

## I.   LEGAL STANDARD

"Preliminary injunctive relief is 'one of the most drastic tools in the arsenal of judicial remedies.'"  *Fed. Ins. Co. v. Metro. Transp. Auth.*, No. 17-cv-3425 (JFK), 2017 WL 2929471, at *2 (S.D.N.Y. July 10, 2017) (citation omitted), *aff'd*, 785 F. App'x 890 (2d Cir. 2019).  A movant seeking preliminary injunctive relief must "establish (1) irreparable harm; [and] (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of [its] claims to make them a fair ground for litigation" in addition to "a balance of the hardships tipping decidedly in favor of the moving party; and (3) that a preliminary injunction is in the public interest."  *Shaw Cablesystems G.P. v. TV Guide Int'l, Inc.*, No. 19-cv-3698 (WHP III), 2019 WL 13193712, at *3 (S.D.N.Y. May 10, 2019) (citation omitted).  Frontier cannot establish any of these elements, and, thus, its motion for preliminary injunctive relief should be denied.

## II.   PLAINTIFF HAS NOT DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS

### A.   Frontier Has No Security Interest in the Aircraft

By unreasonably refusing to consent to the security and lease assignments sought by certain Defendants in connection with the sale and refinancing of the Aircraft, Frontier has breached its obligations to cooperate with Defendants under the Leases and Cooperation Agreement.

Frontier's primary argument justifying its conduct is that it "did not need to acknowledge the transfers under the terms proposed by [CAML] under either Lease Form 1 or Lease Form 2," because doing so would somehow diminish Frontier's rights under the Leases and certain other

documents.  (PI Motion at 11 (internal quotations omitted).)  As support, Frontier points to Section 20.2(a)(ii) of Lease Form 1, which states that a transfer of Aircraft by the Lessor or Owner Participant "shall not result in any restriction . . . on Lessee's rights under this Agreement . . . or on Lessee's use or operation of the Aircraft."  Likewise, Frontier points to Section 22.2(3) of Lease Form 2, which provides that "none of Lessee's rights and benefits in respect [of the Aircraft] shall be diminished as a result of any such Security Interest or assignment" Frontier is otherwise obligated to consent to.

But Frontier's argument is baseless because none of the consents, assignments, or other documents that Defendants have sought from Frontier affect any of Frontier's rights under the Leases.[11]  That is because ***none of the Leases (or any other document) provide Frontier with any***

---

[11] Furthermore, contrary to Frontier's interpretation, the Leases do not permit Frontier to scrutinize and veto collateral assignments such as the security assignment notices that Defendants sought in connection with an anticipated Aircraft sale or refinancing.  Section 20.2(a)(ii) only prohibits a restriction of the Lessee's rights to the extent that such restriction arises from a transfer *by the Lessor or Owner Participant*, as described in the introductory portion of Section 20.2(a).  (Ex. 1, §§ 20.2(a), 20.2(a)(ii).)  This provision does not contemplate collateral assignments, or transfers that may occur at different levels of the corporate structure.

Additionally, and for the avoidance of doubt, Section 22.2, on which Frontier relies, only applies to assignments:  the Lessee must promptly facilitate "any such *assignment*" by the Lessor, so long as certain conditions are met (*e.g.*, so long as the Lessee's rights and benefits remain undiminished).  (*See* Ex. 2, §§ 22.2, 22.2(3) (emphasis added).)  While it is true that Section 22.2 does apply to the lease assignment of one Aircraft (the lone Aircraft leased using Lease Form 2), the lease assignment clearly does not increase Lessee's obligations or diminish Lessee's rights and benefits, and therefore meets the conditions set forth in Section 22.2(3).  Frontier's reliance on Section 22.3(v) of Lease Form 2 is similarly unavailing, as Section 22.3(v) allows for a transfer or assignment so long as it does not increase Lessee's obligations or diminish Lessee's rights and benefits—which the lease assignment clearly does not.  Further, even if there were such a diminishment arising because of Lessee's claims in Litigation 1, such diminishment would be eliminated by the additional protections Defendants extended to Frontier through the Maverick Guaranty.

Finally, Frontier incorrectly states in the PI Motion that the Framework Agreement that is the subject of Litigation 1 is a "Lessee's Document" as referred to in the Leases.  This is not true for any Lease other than the Lease for the only Aircraft purchased pursuant to the Framework Agreement (MSN 10038).  (PI Motion at 11 n.4.)

***right to secure a litigation claim against any party, including AMCK and Defendants, in an unrelated litigation, particularly one arising from a separate agreement***.  In other words, with respect to its litigation claims, Frontier would be in exactly the same position before it provides the required documentation as it would be after it provides the required documentation.

Frontier tries to obfuscate this point by arguing that as a Lessee of the Aircraft, it has a property interest in those Aircraft.  (PI Motion at 14.)  That is neither disputed nor relevant.  None of the documents that Frontier has been asked to sign affect in any way Frontier's rights under the Leases, including its property rights, or Frontier's use and enjoyment of the Aircraft.  Nor does the fact that Frontier has a property interest in the Aircraft give Frontier a security interest in the Aircraft or other property of any Defendant, as Frontier appears to argue.  (*Id.*)  It is a "well respected principle that a lease is not automatically a security agreement . . . ."  *Saada v. Master Apts. Inc.*, 579 N.Y.S.2d 536, 538 (N.Y. Sup. Ct. 1991).  A property right simply does not create a security interest.  *In re Pandeff*, 201 B.R. 865, 872 (Bankr. S.D.N.Y. 1996) ("General principles of the law of secured transactions tell us that possession in and of itself does not create a security interest in the property possessed . . . .").  Moreover, it is nonsensical for Frontier to argue that its status as Lessee of the Aircraft somehow entitles Frontier to use the very Aircraft it leases to secure hypothetical claims it may have against the Lessor in an unrelated litigation under an unrelated contract—much less claims it may have against parties that are not the Lessor (since the Lessor is no longer a party to such unrelated litigation).  In fact, the Leases explicitly ***prohibit*** Frontier from "creat[ing] or permit[ting] to arise or subsist any Lien (other than Permitted Liens) [not applicable here] over the Aircraft or any part thereof . . . ."  (Ex. 1, § 9.2.)  Therefore, Frontier cannot grant itself a security interest in the Aircraft or subordinate the secured claims of other entities by unilaterally inserting language into the security and lease assignments.

Frontier's argument that its "ability to execute its judgment against" the Aircraft or to somehow impose a constructive trust on the Aircraft would be "frustrated by an acknowledgement that an unrelated third party has superior security interest in the Aircraft," simply underscores why Frontier's actions are unjustified.  (PI Motion at 14-15.)  Nothing in the Leases gives Frontier the right to execute on the Aircraft to enforce a potential money judgment in Litigation 1.  There is a procedure available for a plaintiff in federal court to seek pre-judgment attachment in an appropriate case to secure a potential future money judgment.  *See* Fed. R. Civ. P. 64.  Frontier, however, has not asked for that form of relief in Litigation 1.  In effect, Frontier is now asking the Court in Litigation 2 to offer comparable relief in the form of a preliminary injunction.  This end-run around the normal procedure for obtaining pre-judgment attachment should not be allowed.

### B.    CAML's Guaranty Offer Was More Than Sufficient to Protect Frontier's Interest as an Unsecured Judgment Creditor

Because Frontier was never entitled to and does not have a security interest in the Aircraft, CAML was not required to provide Frontier with anything that would help to secure Frontier's potential, unsecured claim in the unrelated Litigation 1.  Nevertheless, even though CAML was under no obligation to provide Frontier with any credit protections regarding its unsecured litigation claim, it offered to provide Frontier with a guaranty from the Maverick Guarantor—a creditworthy entity—which would guaranty "amounts that are owed (if any) by a Maverick Defendant in the two pending actions . . . ."  (Ex. 7 at 1.)  Frontier rejected that guaranty offer, and instead made wildly off-market demands, including giving Frontier a lien on three Aircraft that would prime the rights even of a new owner, and cause the Aircraft to be unfinanceable.

In its PI Motion, Frontier attempts to justify its rejection of the Maverick Guaranty, but none of its arguments hold water.  First, Frontier complains that the Maverick Guaranty is a "general unsecured contractual obligation, rather than property that may be used as security," and

therefore the Maverick Guarantor "could potentially fall below the required capitalization." (PI Motion at 16.)  This concern should be completely dispelled given that CAML offered to have the Maverick Guarantor covenant to "maintain until the Termination Date, a net worth of at least $65 million."  (Ex. 8 at 1.)  This is more than enough to cover Frontier's best-case scenario for recovery under Litigation 1, which Frontier estimates to be at most $44 million.  (Ex. A ¶¶ 70-71, Table 17.)

Second, Frontier complains that the Maverick Guaranty would terminate if Frontier were to breach its obligations under the Leases.  (PI Motion at 16.)  However, Frontier already would be receiving a benefit to which it is not entitled—CAML and the Maverick Guarantor should be under no obligation to relay that benefit if Frontier breaches its contractual obligations.

Third, Frontier complains that only claims against certain "Maverick Defendants" in Litigation 1 are covered by the Maverick Guaranty.  (PI Motion at 15-16.)  But Frontier fails to recognize that CAML has actually offered a broader protection than what Frontier has asked for, *i.e.*, a first mortgage lien against three of the Aircraft.  Any such lien would only secure a judgment against the particular entity that owned the liened Aircraft—entities that are no longer defendants in Litigation 1, whereas the Maverick Guaranty covers all of the Maverick Defendants.

In a good faith attempt to engage Frontier in further negotiations, on July 3, 2023, Defendants sent Frontier a revised guaranty proposal that addresses each of Frontier's purported concerns.  Frontier complained that the prior guaranty proposal "does not cover a judgment Frontier may obtain against AMCK," (PI Motion at 16), so Defendants extended the guaranty to cover amounts owed (if any) by *any defendant* in Litigation 1.  Frontier also complained that the guaranty would terminate if Frontier breached any of its obligations under the Leases, so Defendants revised the proposal to terminate upon a breach of Frontier's *payment* obligations.

And Frontier's complaint that the net worth of the guarantor "could potentially fall below the required capitalization" was addressed through the proposal to provide Frontier with quarterly certifications that the Maverick Guarantor's net worth remains at least $65 million. (Mechlowicz Decl. ¶ 36; Ex. 12.) As of the date of this submission, Frontier has refused to respond.

By demanding unreasonable terms and concessions in connection with the security and lease assignments and the Maverick Guaranty, Frontier has breached Section 20.2(b) of Lease Form 1, which requires Frontier to, among other things, "comply with all reasonable requests of Lessor or Owner Participant, and at the expense of Lessor, to cooperate in effecting" any "transfer, novation, assignment, mortgage, grant, or other disposition of the Aircraft." (Ex. 1, § 20.2(b).) Frontier has also clearly breached Section 22.2 of Lease Form 2, which requires Frontier to "promptly execute (or cause to be executed) all documents reasonably requested by Lessor to effect, perfect, record or implement" certain assignments, and to "comply with any other reasonable requests of Lessor, its successors and assigns in respect of any such . . . assignment," provided that certain conditions are met. (Ex. 2, § 22.2.) In addition, Frontier's bad faith conduct constitutes a breach of the Cooperation Agreement, under which Frontier is required to cooperate in good faith in administering the Leases. (Ex. 3 ¶ 4.) This ongoing interference with the sale and refinancing of the Aircraft constitutes an impermissible intrusion on Defendants' property rights as Owner Trustees, and continues to damage Defendants each day that Frontier's conduct continues. Indeed, Frontier's failure to accept Defendants' revised guaranty proposal demonstrates Frontier's lack of good faith, *i.e.*, its interest not in actually cooperating but rather in using its refusal to cooperate as leverage in trying to extract a settlement in Litigation 1.[12]

---

[12] As discussed in Defendants' opposition to the TRO Motion, Frontier cannot show a likelihood of succeeding on the merits of any claim related to the Default Notices because it does not have any claim in this action related to the Default Notices.

III.   **PLAINTIFF HAS NOT DEMONSTRATED IMMINENT IRREPARABLE HARM IF THE SOUGHT RELIEF IS DENIED, AND THE BALANCE OF THE EQUITIES TIP IN DEFENDANTS' FAVOR**

As discussed in the TRO Opposition, which arguments are incorporated by reference herein, Frontier cannot demonstrate a threat of imminent, irreparable harm because (i) the risk of harm is not imminent, (ii) Frontier's assertion that "its customers would be irreparably harmed" is not relevant to the analysis of whether ***Frontier*** will be harmed, and (iii) Frontier's conclusory assertion that "[r]estricting Frontier's use of the Aircraft . . . would cause Frontier substantial loss of customer good will and damage to its business reputation" (TRO Motion at 8, ECF No. 53), is insufficient.  (TRO Opposition at 12-13, ECF No. 63.)

But more importantly, Frontier has conceded that, practically speaking, there will be no irreparable harm if its request for a preliminary injunction is denied.  During the hearing on Frontier's TRO Motion, Frontier conceded that it will not let the Aircraft be grounded.  (Ex. B at 21:20-22 (stating that Frontier "of course . . . could never tolerate [impoundment of the Aircraft] and we would have to accede to [Defendants'] terms.").)  Rather, it will comply with its obligations under the Leases.  Frontier characterizes that as giving up its "right" to security for a potential judgment in Litigation 1.  (*See id.*)  But, as established above, ***Frontier has no such right***. Therefore, Frontier has effectively conceded that it will suffer no true harm—let alone irreparable harm.  Denying the PI Motion will simply require Frontier to give up a right it does not have, but that it has been seeking to obtain through its strongarm tactics.

In addition, the balance of the equities falls in Defendants' favor.  By entering into the Leases with Defendants, Frontier has explicitly consented to the imposition of these very remedies, and preventing Defendants from exercising these remedies would not only be inequitable, but it would also serve to encourage further breaches of the Leases.  In each of the Leases, Frontier, which is a sophisticated commercial airline, agreed that upon the occurrence of an event of default,

the Defendants would have a number of remedies—standard remedies in operating leases that are required, and accepted, by all lessees and that are fundamental to the aircraft leasing industry— including grounding or repossessing the Aircraft.

Frontier now tries to avoid these bargained-for remedies by claiming that it would be irreparably harmed by Defendants' attempt to enforce such remedies. But the time to have made that argument was during negotiation of the Leases, not in opposing Defendants' attempt to enforce the very rights to which Frontier agreed. Crediting Frontier's claim of irreparable harm would effectively make these remedies a nullity across the industry: any time an aircraft lessee breaches its obligations, and the lessor attempts to exercise its impoundment remedies (or, as here, before any such attempt has been made), the airline can claim irreparable harm due to the impact it might have on the airline's passengers (and, thus, the airline's goodwill). It would be very harmful to the aircraft leasing industry (which Frontier also depends on) if aircraft lessors are not permitted to exercise their express rights and remedies under leases. As the risk of doing business increases, aircraft leases would inevitably become more expensive, and these hazard costs would likely be passed onto customers.

Indeed, following Frontier's view of irreparable harm to its logical conclusion creates a perverse and unacceptable result: the greater the number of aircraft at issue (*i.e.*, the more leases under which an airline has defaulted), the **less** likely it is that a lessor would be able to exercise its remedies against those aircraft. For example, here, Frontier has argued that it would be harmed because 14 of its 127 Aircraft are subject to potential grounding. (PI Motion at 17-18.) But if only one Aircraft were subject to potential grounding, Frontier would not be able to make the same arguments regarding the impact on its business. Accordingly, Frontier is asking this Court to prevent Defendants from exercising their contractual remedies because ***Frontier has defaulted***

*under too many of its Leases*.  That is inequitable, as it encourages lessees to act contrary to their lease obligations, and should be rejected by the Court.  Moreover, Frontier's delay and obstruction tactics, in violation of the Leases and Cooperation Agreement, have resulted in millions of dollars in costs and lost profits for Defendants.

## IV.    ANY INJUNCTION SHOULD BE NARROWLY TAILORED

If the Court decides to grant a preliminary injunction, that injunction should be narrowly tailored.  Frontier has requested that Defendants be enjoined "during the pendency of this Action from grounding, impounding and/or deregistering any of the fourteen Aircraft that are the subject of this lawsuit (the 'Aircraft') or terminating the lease agreements for any of the Aircraft."  (ECF No. 56.)  But such an order would, for example, allow Frontier to cease making its payments under the Leases, while still blocking Defendants from exercising their bargained-for remedies.

Accordingly, any injunction should only prevent Defendants from grounding, impounding and/or deregistering the Aircraft, or terminating the Leases for the Aircraft based solely on the defaults asserted in the Default Notices.

## V.    FRONTIER'S BOND MUST BE CONTINUED

Under Federal Rule of Civil Procedure 65(c), the Court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Defendants request that the $2 million bond be continued.

### CONCLUSION

For the reasons set forth herein, the Court should deny Plaintiff's application to convert the temporary restraining order to a preliminary injunction.

Dated:  July 7, 2023
   New York, New York

**MILBANK LLP**

/s/  *Jed M. Schwartz*

Jed M. Schwartz
Samantha A. Lovin
Emily Werkmann
55 Hudson Yards
New York, New York 10001
Tel: (212) 530-5000
JSchwartz@milbank.com
SLovin@milbank.com
EWerkmann@milbank.com

*Attorneys for Defendants Wells Fargo Trust
Company, N.A., solely in its capacity as Owner
Trustee, and UMB Bank, N.A., solely in its capacity
as Owner Trustee.*