# EXHIBIT 2

EXECUTION VERSION

# AIRCRAFT OPERATING LEASE AGREEMENT

dated as of February 19, 2016

between

**WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION**,
not in its individual capacity, but solely as trustee under the Trust Agreement,
as Lessor

and

**FRONTIER AIRLINES, INC.**,
as Lessee

_____

Relating to the leasing of one ex-factory new Airbus A321-211
Scheduled for Delivery in 2017

_____

THIS LEASE HAS BEEN EXECUTED IN SEVERAL COUNTERPARTS.  TO THE EXTENT, IF ANY, THAT THIS LEASE CONSTITUTES CHATTEL PAPER (AS SUCH TERM IS DEFINED IN THE UNIFORM COMMERCIAL CODE AS IN EFFECT IN ANY APPLICABLE JURISDICTION), NO SECURITY INTEREST IN THIS LEASE MAY BE PERFECTED THROUGH THE TRANSFER OR POSSESSION OF ANY COUNTERPART HEREOF OTHER THAN THE ORIGINAL EXECUTED COUNTERPART HEREOF CONTAINING THE RECEIPT THEREFOR EXECUTED BY LESSOR OR, IF LESSOR HAS ASSIGNED ITS RIGHTS TO A THIRD PARTY IN ACCORDANCE WITH THIS LEASE, SUCH THIRD PARTY, IN EACH CASE ON THE SIGNATURE PAGE THEREOF.

# TABLE OF CONTENTS

| | | Page |
|---|---|---|
| **Section 1** | Interpretation | 1 |
| 1.1 | Definitions | 1 |
| 1.2 | Construction | 1 |
| 1.3 | Sections and Schedules | 1 |
| **Section 2** | Agreement to Lease | 1 |
| **Section 3** | Delivery | 1 |
| 3.1 | Delivery | 1 |
| 3.2 | Delayed Delivery or Non-Delivery | 2 |
| 3.3 | Termination for Non-Delivery | 2 |
| 3.4 | Inspection | 2 |
| **Section 4** | Lease Period | 2 |
| 4.1 | Lease Period | 2 |
| 4.2 | Expiry Date | 3 |
| 4.3 | Risk | 3 |
| **Section 5** | Rent | 3 |
| 5.1 | Rent Periods | 3 |
| 5.2 | Rent | 3 |
| 5.3 | Fixed Rent | 4 |
| 5.4 | Cost Sharing | 4 |
| **Section 6** | Security Deposit | 4 |
| 6.1 | Payment | 4 |
| 6.2 | Concerning the Security Deposit | 4 |
| 6.3 | Additional Requirements for Credit Security Deposit | 5 |
| **Section 7** | [Reserved] | 5 |
| **Section 8** | Payments | 5 |
| 8.1 | Account for Lessee Payments | 5 |
| 8.2 | Default Interest | 5 |
| 8.3 | Absolute Obligations | 6 |
| 8.4 | Application of Payments by Lessor | 7 |
| 8.5 | Currency | 7 |
| 8.6 | Lessor's Determination of Amounts Due | 7 |
| 8.7 | Time for Payments | 7 |
| **Section 9** | Lessor Covenants | 7 |
| 9.1 | Quiet Enjoyment | 7 |
| 9.2 | Letter to Maintenance Provider | 7 |
| 9.3 | Lease Amendment | 8 |

# TABLE OF CONTENTS
### (continued)

Page

| | | |
|---|---|---|
| **Section 10** | Lessee Covenants – General | 8 |
| 10.1 | Duration | 8 |
| 10.2 | Information | 8 |
| 10.3 | Operation of the Aircraft | 10 |
| 10.4 | Records | 11 |
| 10.5 | Inspection | 13 |
| 10.6 | Air Navigation, Airport and Other Fees and Charges | 13 |
| 10.7 | Outgoings | 14 |
| 10.8 | Registration, Title, Further Assurances | 14 |
| 10.9 | No Security Interests | 17 |
| 10.10 | Lessor's Financing | 17 |
| 10.11 | General | 18 |
| **Section 11** | Possession and Subleasing | 19 |
| 11.1 | Possession | 19 |
| 11.2 | Limitations on Subleasing or Other Relinquishment of Possession | 22 |
| 11.3 | Civil Reserve Air Fleet | 23 |
| 11.4 | Operating Certificates | 24 |
| **Section 12** | Maintenance and Repair; Equipment Changes | 24 |
| 12.1 | Maintenance and Repair | 24 |
| **Section 13** | Manufacturers' and Vendors' Warranties | 24 |
| 13.1 | Warranties | 24 |
| 13.2 | Warranties for Work Performed During Lease Period | 24 |
| 13.3 | Reassignment | 25 |
| 13.4 | Warranty Claims | 25 |
| **Section 14** | Certain Agreements Regarding Engine Swaps | 25 |
| **Section 15** | Indemnities | 27 |
| 15.1 | General | 27 |
| 15.2 | Notification | 29 |
| 15.3 | Duration | 29 |
| 15.4 | Contest | 29 |
| 15.5 | Subrogation | 30 |
| **Section 16** | Insurance | 31 |
| 16.1 | Lessee's Obligation to Insure | 31 |
| 16.2 | Insurance for Own Account | 31 |
| 16.3 | Indemnification by Government in Lieu of Insurance | 31 |
| 16.4 | Application of Insurance Proceeds | 31 |
| 16.5 | Application of Payments During Existence of a Specified Default or Event of Default | 31 |

## TABLE OF CONTENTS
(continued)

**Section 17**  Loss, Damage and Requisition ............................................................ 32
17.1  Total Loss prior to Delivery .................................................................. 32
17.2  Total Loss after Delivery ...................................................................... 32
17.3  Total Loss of Engine(s) ........................................................................ 33
17.4  Requisition ............................................................................................ 34

**Section 18**  DISCLAIMERS ...................................................................................... 35
18.1  Exclusion ............................................................................................... 35
18.2  Waiver ................................................................................................... 36
18.3  Disclaimer of Consequential Damages .................................................. 36
18.4  Confirmation ......................................................................................... 36

**Section 19**  Redelivery Conditions. ........................................................................ 36
19.1  Redelivery ............................................................................................. 36
19.2  Aircraft Inspection; Documentation Review ......................................... 37
19.3  [Reserved] ............................................................................................. 38
19.4  Non-Compliance .................................................................................... 38
19.5  Acknowledgment ................................................................................... 38
19.6  Bridging ................................................................................................ 38
19.7  Redelivery Maintenance Payment Adjustments .................................... 38
19.8  Cooperation with Remarketing ............................................................. 38

**Section 20**  Events of Default .................................................................................. 39
20.1  Events .................................................................................................... 39
20.2  Lessor Rights and Remedies ................................................................. 41

**Section 21**  Taxation ................................................................................................ 43
21.1  Withholding ........................................................................................... 43
21.2  Tax Indemnity ....................................................................................... 44
21.3  Payments; Tax Reports; Information. .................................................... 45
21.4  Indemnities to be Paid on an After-Tax Basis ...................................... 46
21.5  Contest; Survival ................................................................................... 47
21.6  Withholding Tax Exemption Certificates .............................................. 49
21.7  Review by Independent Accountants ..................................................... 49

**Section 22**  Assignment and Transfer ...................................................................... 50
22.1  By Lessee ............................................................................................... 50
22.2  Assignment by Lessor ........................................................................... 50
22.3  Transfer by Lessor ................................................................................ 50

**Section 23**  Miscellaneous Provisions ...................................................................... 51
23.1  Rights Cumulative, Waivers .................................................................. 51
23.2  Delegation ............................................................................................. 52
23.3  Lessor's Right to Remedy ...................................................................... 52

# TABLE OF CONTENTS
(continued)

| | | Page |
|---|---|---|
| 23.4 | Expenses | 52 |
| 23.5 | Liability of Lessor Limited | 53 |
| 23.6 | Time of Essence | 53 |
| 23.7 | Entire Agreement | 53 |
| 23.8 | Indemnitee as Third Party Beneficiary, etc. | 53 |
| 23.9 | Lessor on Behalf of Indemnitee | 53 |
| 23.10 | Counterparts | 53 |
| 23.11 | Language | 53 |
| 23.12 | Confidentiality | 53 |
| 23.13 | Variation | 54 |
| 23.14 | Invalidity of any Provision | 54 |
| 23.15 | Survival | 55 |
| 23.16 | True Lease | 55 |
| 23.17 | Section 1110 | 55 |
| **Section 24** | Notices | 55 |
| 24.1 | Notices | 55 |
| **Section 25** | Governing Law and Jurisdiction | 56 |
| 25.1 | Governing Law | 56 |
| 25.2 | Jurisdiction | 56 |

| SCHEDULE 1 | DEFINITIONS AND CONSTRUCTION |
| SCHEDULE 2 | REPRESENTATIONS AND WARRANTIES |
| SCHEDULE 3 | CONDITIONS PRECEDENT |
| SCHEDULE 4 | ECONOMIC VARIABLES |
| SCHEDULE 5 | RENT ADJUSTMENT FACTORS |
| SCHEDULE 6 | REDELIVERY MAINTENANCE PAYMENT ADJUSTMENTS |
| SCHEDULE 7 | INSURANCE REQUIREMENTS |
| SCHEDULE 8 | DESCRIPTION OF AIRCRAFT |
| SCHEDULE 9 | |
| PART 1 | FORM OF AVIATION AUTHORITY AND AIRPORT AUTHORITY LETTER |
| PART 2 | FORM OF MAINTENANCE PROVIDER LETTER |
| SCHEDULE 10 | AIRCRAFT DOCUMENTS |
| SCHEDULE 11 | RETURN CONDITIONS |
| SCHEDULE 12 | |
| PART 1 | FORM OF LESSEE'S CERTIFICATE |
| PART 2 | FORM OF LESSOR'S CERTIFICATE |
| SCHEDULE 13 | FORM OF ACCEPTANCE CERTIFICATE |
| SCHEDULE 14 | FORM OF MONTHLY REPORT |
| SCHEDULE 15 | [RESERVED] |
| SCHEDULE 16 | FORM OF LEASE SUPPLEMENT |
| SCHEDULE 17 | FORM OF REDELIVERY CERTIFICATE |

iv

Aircraft Operating Lease Agreement

SCHEDULE 18        COST SHARING
SCHEDULE 19        MAINTENANCE; PARTS; MODIFICATIONS; ETC.
SCHEDULE 20         PARTICIPATION AGREEMENT

**THIS AIRCRAFT OPERATING LEASE AGREEMENT** (this "**Agreement**") is made as of February 19, 2016 between **WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION**, a national banking association formed under the federal laws of the United States of America, not in its individual capacity (except when referred to as "**WFB**"), but solely as trustee under the Trust Agreement (as defined below) (the "**Lessor**"); and **FRONTIER AIRLINES, INC.**, a corporation incorporated under the laws of Colorado (the "**Lessee**").

**IT IS AGREED** as follows:

**Section 1** Interpretation.

1.1    Definitions.  In this Agreement, unless the context otherwise requires, capitalized words and expressions shall have the respective meanings given to them in paragraph 1 of Schedule 1.

1.2    Construction.  The conventions on construction and usage set out in paragraph 2 of Schedule 1 shall apply to this Agreement.

1.3    Sections and Schedules.  References in this Agreement to Sections or Schedules are, unless otherwise specified, references to Sections of and Schedules to this Agreement and together the Sections and Schedules shall constitute this Agreement.  Certain provisions including (without limitation) Conditions Precedent and representations and warranties have been placed in the Schedules but shall take effect as part of this Agreement as if fully set forth herein.

**Section 2** Agreement to Lease.  Subject to and in accordance with the terms and conditions of this Agreement, Lessor agrees to lease the Aircraft to Lessee and Lessee agrees to take the Aircraft on lease from Lessor, in each case for the Lease Period.

**Section 3** Delivery.

3.1    Delivery.  Subject to the terms and conditions of this Agreement, Lessor shall deliver and Lessee shall accept the Aircraft on lease on the Scheduled Delivery Date or such other date as the parties may agree.  Lessee shall promptly notify Lessor of the date that Airbus advises Seller is the exact planned date of delivery of the Aircraft pursuant to the Aircraft Purchase Agreement.  On the Delivery Date, pursuant to the Aircraft Purchase Agreement and Aircraft Purchase Agreement Assignment, Seller shall cause Airbus to convey title to Lessor and Lessee shall convey title to the Buyer Furnished Equipment to Lessor.  Immediately following the transfer of title to the Aircraft to Lessor by Airbus pursuant to the Aircraft Purchase Agreement and Aircraft Purchase Agreement Assignment and the Buyer Furnished Equipment by Lessee to Lessor pursuant to the Aircraft Purchase Agreement, Lessor shall tender delivery of the Aircraft to Lessee under the Lease.  Upon such tender of delivery of the Aircraft by Lessor to Lessee, Lessee shall accept delivery of the Aircraft under the Lease, **as is, where is, in its then condition**.  Lessee shall effect acceptance of the Aircraft by execution and delivery to Lessor of the Lease Supplement.  Execution and delivery of the Lease Supplement shall be conclusive evidence that the delivery and acceptance of the Aircraft under this Agreement have taken place.  Lessee's acceptance pursuant to the Lease Supplement shall be absolute, unconditional and irrevocable.  Lessee shall not be entitled for any reason whatsoever to refuse to accept delivery

of the Aircraft or any part thereof under this Agreement once the same has been accepted by Lessor under the Aircraft Purchase Agreement and the Aircraft Purchase Agreement Assignment.

      3.2    <u>Delayed Delivery or Non-Delivery</u>.

      (a)    Lessee acknowledges Lessor will not be able to deliver the Aircraft under this Agreement unless Airbus has delivered the Aircraft to Lessor pursuant to the Aircraft Purchase Agreement and the Aircraft Purchase Agreement Assignment and pursuant to the terms and conditions of the Airbus Participation Agreement.

      (b)    If Airbus delays in delivering, or fails to deliver, the Aircraft to Lessor for any reason, Lessor shall not be responsible for any Losses incurred by Lessee in connection with that delay or failure (including any delay or failure arising from a delay in the delivery of the Aircraft and any Buyer Furnished Equipment by the relevant manufacturer, supplier or vendor) other than costs arising from the gross negligence, willful misconduct or reckless disregard of Lessor.

      3.3    <u>Termination for Non-Delivery</u>.  The parties agree that if delivery of the Aircraft will not occur on or before the Final Delivery Date because of any delay in delivery of the Aircraft by Airbus (including any failure arising from a delay in the delivery of the Aircraft and/or Buyer Furnished Equipment by Airbus or any relevant supplier or vendor), either party may, by giving written notice to the other party (the "**Termination Notice**"), terminate this Agreement, provided that if the other party so requests in writing prior to the termination, the parties shall consult in good faith for a period of one (1) week from the date of such request to determine whether a mutually acceptable delivery date can be agreed.  If an alternative delivery date is not agreed upon during such consultation period, this Agreement shall terminate, and neither party will have any further obligations or liability under this Agreement other than pursuant to Section 23.4 except that Lessor will repay the amount of any Security Deposit received by Lessor within five (5) Business Days of the date of such termination.

      3.4    <u>Inspection</u>.

      (a)    Lessee shall procure that Lessor or Lease Manager (or its representatives) is included in any pre-delivery inspections, consultations and approvals relating to the Aircraft involving the Manufacturers and Lessor shall be entitled to participate with Lessee in the pre-acceptance inspection of the Aircraft, including participating in the Manufacturers' technical acceptance process (in respect of which Lessor shall be entitled to designate up to two (2) representatives to participate in the Manufacturer's acceptance flight as observers, pursuant to the terms and conditions of the Airbus Participation Agreement).

**Section 4** <u>Lease Period</u>.

      4.1   <u>Lease Period</u>.  The Lease Period shall commence on the Delivery Date and end on the Expiry Date.

4.2     Expiry Date.  The Expiry Date shall be the day falling 144 months after the Delivery Date, subject to the following provisions:

(a)     if the Aircraft or Airframe suffers a Total Loss following the Delivery, the Expiry Date shall be the date that leasing of the Aircraft hereunder terminates as determined in accordance with  Section 17.2(c);

(b)     if Section 19.4 becomes applicable, the Expiry Date shall be extended as set forth therein; and

(c)     if Section 17.4(b) becomes applicable, the Expiry Date shall be extended until the date determined in accordance with Section 17.4.

4.3     Risk.  Throughout the Lease Period and until redelivery of the Aircraft in accordance with the terms of this Agreement or repossession by Lessor in accordance with the terms of this Agreement, Lessee shall be responsible for all risks associated with any loss of or damage to the Aircraft.

**Section 5** Rent.

5.1     Rent Periods.

(a)     The Lease Period shall be divided into successive periods of one month in duration (each a "**Rent Period**") in respect of which Rent shall accrue and be payable. Each Rent Period shall include both the first day and the last day thereof.

(b)     The first Rent Period shall commence on the Delivery Date and end one (1) month thereafter.  The Rent payable for the first Rent Period shall be as set forth in Annex A to the initial Lease Supplement.

(c)     Each subsequent Rent Period shall commence on the date immediately succeeding the last day of the previous Rent Period.

5.2     Rent.

(a)     Lessee shall pay Rent to Lessor (or to whomever Lessor shall designate in writing to Lessee at least seven (7) Business Days prior the applicable Rent Date) in advance on each Rent Date.

(b)     If a Rent Date is not a Business Day, the Rent shall be due and paid on the Business Day immediately succeeding such Rent Date (and no interest shall accrue on the amount of such payment of Rent from and after such scheduled date to such next succeeding Business Day) unless such Business Day falls in another calendar month, in which case the date for payment thereof shall be the first Business Day immediately preceding the Rent Date at issue.  If the Rent Date is the 29th, 30th or 31st of the month and in any given month during the Lease Period there is no such date, Rent will be due and payable on the last Business Day of such month.

5.3     Fixed Rent.  For purposes of determining amounts of Rent under this Section 5, the Rent shall be fixed during the Lease Period as provided in Schedule 5 hereto, but subject to the Rent Adjustment Factors set forth on Schedule 5 hereto prior to the Delivery Date. The amount of the fixed Rent shall be as set forth in Annex A to the Lease Supplement.

5.4     Cost Sharing.  The parties hereto agree that certain agreements pertaining to the sharing of the costs of performing Airworthiness Directives to the Aircraft are set forth in Schedule 18.

**Section 6** Security Deposit.

6.1     Payment.  Lessee shall pay or provide, as applicable, to Lessor the Security Deposit as set forth below:

(a)     on the date of this Agreement, Lessee shall deliver to Lessor by wire transfer the first installment of the Security Deposit in an amount equal to that set out in Schedule 4 hereto; and

(b)     no later than two (2) Business Days prior to the Delivery Date, Lessee shall deliver the remaining amount of the Security Deposit in full by wire transfer to the Lessor account described in Section 8.1.

6.2     Concerning the Security Deposit.  Lessor shall retain sole and exclusive control of the Security Deposit during the Lease Period to ensure that Lessee duly and faithfully performs all of its obligations under the Operative Documents during the Lease Period and Lessee hereby grants a Security Interest in the Security Deposit to Lessor as security for the due and faithful performance of all of Lessee's obligations under the Operative Documents during the Lease Period.  Subject to Section 6.1, Lessee may elect to satisfy its Security Deposit obligations through a Cash Security Deposit or, so long as no Event of Default has occurred and is continuing, a Credit Security Deposit, provided that such Credit Security Deposit (and any replacement thereof) is in a form acceptable to Lessor in its reasonable discretion and satisfies the other requirements of Section 6.3.  Upon delivery of any Credit Security Deposit to Lessor that satisfies the foregoing requirements, Lessor shall immediately return to Lessee an amount equal to the then outstanding balance of the Security Deposit held by Lessor in cash as well as any other Credit Security Deposit then held by Lessor.  Upon delivery of any Cash Security Deposit to Lessor, Lessor shall immediately return to Lessee any Credit Security Deposit then held by Lessor.  Lessor may, but shall not be obliged to, while an Event of Default shall have occurred and be continuing, apply the Security Deposit in whole or in part for the payment of any amounts owing from time to time by Lessee under the Operative Documents and not paid by Lessee when required hereunder or thereunder or utilize the Security Deposit in whole or in part to perform any of Lessee's obligations not timely performed by Lessee under the Operative Documents or otherwise remedy any Event of Default, including, without limitation, in the redelivery condition for the Aircraft, without prejudice to any other remedy of Lessor.  Upon the application by Lessor of any part of the Security Deposit to the payment of any obligation of Lessee under this Lease following an Event of Default, within five (5) Business Days of Lessor's demand therefor, Lessee shall pay over to Lessor an amount sufficient to restore the Security Deposit to its original amount, cause any Credit Security Deposit to be reinstated to its original

4

amount or cause a replacement Credit Security Deposit to be issued in the total amount of the Security Deposit, and no such application of funds or reinstatement or replacement of any Credit Security Deposit shall be deemed to cure such Event of Default unless such Event of Default was solely in respect of the nonpayment of any sum which has subsequently been paid by Lessee pursuant to the terms hereof.  Lessor shall have no obligation to hold the Security Deposit in a separate account or to pay any interest accrued thereon to Lessee and may commingle the Security Deposit with its general or other funds.  Upon the later of the Expiry Date, the date that Lessee redelivers the Aircraft in compliance with this Agreement, if applicable, and the date that Lessor receives all sums then due and payable under the Operative Documents, Lessor shall return to Lessee (a) the then-existing balance (if any) of any Cash Security Deposit and (b) any Credit Security Deposit as well as any cash proceeds from a drawing of any Credit Security Deposit that have not previously been used, applied or set off against.

      6.3    <u>Additional Requirements for Credit Security Deposit</u>.  In addition to the requirements in Section 6.2, any Credit Security Deposit shall: (a) be issued in favor of Lessor (or a Financing Party if requested by Lessor) by either (i) a bank headquartered or having a branch office for deposits in New York, New York U.S.A. or (ii) a bank outside of New York, New York U.S.A. and confirmed by a bank headquartered or having a branch office for deposits in New York, New York U.S.A.; (b) be issued and confirmed by an issuing and confirming bank that each is a first class international bank and has a credit rating not lower than A- from Standard and Poor's or A3 from Moody's; (c) be denominated and drawable in U.S. dollars in New York; (d) be freely transferable to any transferee of Lessor without the consent of the issuing bank or Lessee and without charge to Lessor; (e) at all times have a stated amount available for drawing equal to the Security Deposit; (f) shall have a stated expiration date of no sooner than the earlier of (i) one year after the date of issuance or any extension or renewal thereof  and (ii) 30 days after the Expiry Date; (g) be irrevocable and drawable on demand; and (h) be drawable if an Event of Default has occurred and is continuing or if it is not extended or renewed, or replaced by a new Credit Security Deposit satisfying the requirements of Section 6.2 and this Section 6.3, at least 15 Business Days prior to its stated expiration date.

    **Section 7**  <u>[Reserved]</u>.

    **Section 8**  <u>Payments</u>.

      8.1    <u>Account for Lessee Payments</u>.  All payments by Lessee to Lessor under this Agreement and the other Operative Documents will be made for value on the due date in dollars and for value in immediately available funds by SWIFT or wire transfer to such account of Lessor in the continental United States as Lessor may from time to time notify Lessee in writing at least seven (7) Business Days prior to the date such payment is due.

      8.2    <u>Default Interest</u>.  If Lessee fails to pay any amount payable under this Agreement and the other Operative Documents on the due date, Lessee shall pay to Lessor on demand from time to time interest at the Default Rate (both before and after judgment) on that amount, from the due date to the date of payment in full by Lessee to Lessor.  All such interest will be compounded monthly and calculated on the basis of the actual number of days elapsed and a 360-day year.  Interest payable pursuant to this Section 8.2 which is unpaid at the end of

each such monthly period shall thereafter itself bear interest at the rate provided in this Section 8.2.

    8.3    <u>Absolute Obligations</u>.

    (a)    <u>This Agreement is a Net Lease</u>.  Lessee shall be responsible for all costs associated with the delivery, possession, use, operation, ownership, management and return of the Aircraft, including, but not limited to, maintenance, insurance, import/export clearances and compliance with applicable laws and Airworthiness Directives (but excluding Taxes, which shall be governed by Section 21 of this Agreement, Lessor's contribution towards the costs of Airworthiness Directives as set forth in Schedule 18 and certain other amounts to be paid by Lessor as set forth herein).  Lessee's obligations under this Agreement and the other Operative Documents are absolute and unconditional, irrespective of any contingency or circumstance whatsoever, including (but not limited to):

    (i)    any right of set-off, counterclaim, recoupment, reimbursement, defense or other right which Lessor or Lessee may have against the other or against any other person;

    (ii)    any unavailability of the Aircraft for any reason, including, but not limited to, requisition of the Aircraft or any prohibition or interruption of or interference with or other restriction against Lessee's use, operation or possession of the Aircraft;

    (iii)    any lack or invalidity of title or any other defect in title, airworthiness, merchantability, fitness for any purpose, condition, design, or operation of any kind or nature of the Aircraft for any particular use or trade, or for registration or documentation under the laws of any relevant jurisdiction, or any Total Loss in respect of or any damage to the Aircraft;

    (iv)    any insolvency, bankruptcy, reorganization, arrangement, readjustment of debt, dissolution, liquidation or similar proceedings by or against Lessor or Lessee or any other person;

    (v)    any invalidity, unenforceability, disaffirmance or lack of due authorization of, or other defect in, this Agreement or any other Operative Document; and

    (vi)    any other cause or circumstance which (but for this provision) would or might otherwise have the effect of terminating or in any way affecting any obligation of Lessee under this Agreement or any other Operative Document.

    (b)    Lessee hereby waives, to the extent permitted by applicable law, any and all rights which it may now have or which may at any time hereafter be conferred upon it (by law or otherwise) to terminate, cancel, quit or surrender this Agreement or any obligations imposed upon Lessee under this Agreement except as expressly provided in this Agreement.

(c)     The provisions of this Section 8.3 shall not limit Lessee's right to take such legal action as Lessee shall deem appropriate as a consequence of a breach by Lessor or any other person of its obligations to Lessee under this Agreement, applicable laws or otherwise.  Nothing contained in the preceding sentence shall relieve Lessee of its obligations under the Operative Documents while pursuing any such legal action.

8.4     Application of Payments by Lessor.  If any sum paid to Lessor or recovered by Lessor in respect of the liabilities of Lessee under this Agreement is less than the amount then due, Lessor may apply that sum to amounts then due and owing under this Agreement in such proportions and order and generally in such manner as Lessor may determine.

8.5     Currency.  All amounts payable under this Agreement shall be payable in United States dollars.

8.6     Lessor's Determination of Amounts Due.  Any certificate or determination by Lessor as to any rate of interest or as to any other amount payable under this Agreement or any other Operative Document shall be (1) calculated as required by this Agreement in good faith by Lessor, (2) evidenced by a certificate of Lessor, if requested by Lessee, setting forth the relevant calculations and (3) in the absence of manifest error, conclusive and binding on Lessee.

8.7     Time for Payments.  If any payment due under this Agreement or any other Operative Document (other than a payment of Rent) would otherwise be due on a day which is not a Business Day, it shall be due on the next succeeding Business Day (and no interest shall accrue on the amount of such payment from and after such scheduled date to such next succeeding Business Day), or, if that Business Day falls in the following month, or after the Expiry Date, on the preceding Business Day.

**Section 9** Lessor Covenants.

9.1     Quiet Enjoyment.  Lessor agrees that provided no Event of Default has occurred and is continuing, neither Lessor, any Financing Party, nor any person lawfully claiming through or under Lessor or any Financing Party shall interfere with the quiet use, possession and enjoyment of the Aircraft by Lessee or any Permitted Sublessee during the Lease Period, provided, that if any of the insurance coverages required by Section 16 are not in effect, Lessor may require that the Aircraft be grounded during the period while such insurances are not in effect.  The lawful exercise by Lessor of its rights in accordance with this Agreement or any other Operative Document will not constitute such an interference.  Lessee agrees that its only right with respect to a default by Lessor under this Agreement, including a breach of the foregoing covenant, is to make a claim against Lessor for injunctive relief and/or actual damages resulting directly therefrom, all the foregoing in any event subject to Section 18.3 hereof.

9.2     Letter to Maintenance Provider.  Lessor agrees it shall hold in escrow the letter delivered to it pursuant to Section 1(b)(viii) of Schedule 3 and may only deliver it to the relevant maintenance provider after an Event of Default shall have occurred and while such Event of Default shall be continuing and this Agreement shall have been declared in default (except in the case of an Event of Default under Section 20.1(g), in which case no such declaration is necessary).

9.3     Lease Amendment.  On the Delivery Date, Lessor and Lessee shall execute the 6184 Amendment, which following full execution by both parties shall be filed with the FAA.

**Section 10**     Lessee Covenants – General.

10.1     Duration.

(a)     Lessee shall perform and comply with its undertakings and covenants in this Agreement and the other Operative Documents at all times during the Lease Period and until redelivery or repossession of the Aircraft in accordance with the terms of this Agreement or payment of the Stipulated Loss Value.  All such undertakings and covenants shall, except where expressly otherwise stated, be performed at the expense of Lessee.

(b)     Lessee shall remain liable to Lessor for all of Lessee's obligations and liabilities under the Operative Documents notwithstanding any delegation by Lessee to another person of any such obligations or liabilities or any reliance by Lessee on another person to perform or discharge any such obligations or liabilities, whether or not such sub-delegation or reliance is permitted or contemplated by any other Operative Document (provided that to the extent any such obligation or liability is actually performed or discharged by such other person on Lessee's behalf, such performance or discharge shall constitute performance or discharge of the corresponding obligation or liability of Lessee).

10.2     Information.  Lessee shall:

(a)     subject to any public disclosure limitations imposed by law, immediately (and no later than when public disclosure is required) upon the Treasurer of Lessee becoming aware of the existence of an Event of Default provide written notice to Lessor and the Financing Parties specifying the nature of the Event of Default and what action Lessee is taking or proposes to take with respect thereto;

(b)     furnish to Lessor and Financing Parties (to the extent not otherwise available through Lessee's website or via EDGAR, including as part of any 10-K or 10-Q filing):

(i)     Quarterly Statements - As soon as practicable after the end of the first, second, and third quarterly fiscal periods in each fiscal year of Lessee, and in any event within 60 days thereafter, duplicate copies of:

(1)     a consolidated balance sheet of Lessee as at the end of such quarter setting forth in comparative form the amount for the end of the corresponding period of the preceding fiscal year,

(2)     consolidated statements of income and retained earnings of Lessee for such quarterly period, setting forth in comparative form the amount for the corresponding period of the preceding fiscal year, and

8

(3)     consolidated statements of cash flow of Lessee for the portion of the fiscal year ending with said quarter, setting forth in comparative form the amount for the corresponding period of the preceding fiscal year;

(ii)     Annual Statements - As soon as practicable after the end of each fiscal year, and in any event within 120 days thereafter, duplicate copies of:

(1)     a consolidated balance sheet of Lessee and/or its parent as at the end of such year, and

(2)     consolidated statements of income and retained earnings and of cash flow of Lessee and/or its parent for such year,

prepared in accordance with GAAP setting forth in each case in comparative form the figures for the previous fiscal year and, in the case of statements delivered under 10.2(b)(ii) accompanied by an auditor's report of a firm of independent certified public accountants of recognized standing in the U.S. (which report may be adverse, qualified or disclaim an opinion);

(c)     promptly upon Lessor's request, furnish to Lessor (i) all information which Lessor may from time to time reasonably request regarding the Aircraft, any Engine, any Part or the Aircraft Documents, and the use, location and condition of the Aircraft, including, without limitation, the hours remaining on the Aircraft and any Engine until the next scheduled check, inspection, performance restoration or shop visit, as the case may be, and (ii) the make, model, manufacturer serial number and title holder (including contact details for such title holder) with respect to any engine installed on the Airframe;

(d)     promptly upon Lessor's request, furnish to Lessor reasonable evidence that all amounts payable by Lessee pursuant to Sections 10.7 and 21 have been paid and discharged in full within the periods permitted by the relevant Government Entity for payment of the same, including, without limitation, copies of any available receipts from the relevant tax authorities or other Governmental Entities for payment of any charges, withholding taxes, VAT, customs duties or other applicable Taxes;

(e)     furnish to Lessor within ten (10) days after the end of every month during the Lease Period a report on the Aircraft, each Engine and the APU substantially in the form of Schedule 14 and which shall also note shop visits of any Engine, provided that the report relating to the last month (or portion thereof) of the Lease Period shall be furnished to Lessor on the Expiry Date;

(f)     furnish to Lessor upon its request the time and location of any scheduled "C" Check or higher level check (including without limitation the final check required pursuant to the Return Conditions); and

(g)     promptly notify Lessor of any loss, theft, or destruction of the Aircraft, any Engine or any Part, or any damage or modification to the Aircraft if the potential cost

of repair of such damage or reversal of such modification may exceed the Damage Notification Threshold.

(h)     promptly notify Lessor of any modification to the Aircraft if the potential cost of such modification is expected to exceed the Major Modification Threshold.

10.3     Operation of the Aircraft.  Lessee shall:

(a)     comply with the law for the time being in force in any country or jurisdiction which may for the time being be applicable to the Aircraft or, so far as concerns the use and operation of the Aircraft, Lessee, any Permitted Sublessee, or Lessor ("**Applicable Jurisdiction**"), and ensure that the Aircraft is not used for any illegal purpose or in violation of any law of any government or governmental authority (domestic or foreign) in any Applicable Jurisdiction, or in violation of any certificate, license, permit or authorization (including, without limitation, airworthiness certificate, license or registration) relating to the Aircraft issued by any such authority except (i) unanticipated minor violations or non-recurring violations in each case not involving any material risk of the sale, forfeiture or loss of the Aircraft, the Airframe, any Engine, or Lessor's interest therein, if such violation ceases promptly after discovery thereof by Lessee or if Lessee or any Permitted Sublessee is contesting in good faith and by appropriate proceedings such violation without material risk of the sale, forfeiture or loss of the Aircraft, the Airframe or any Engine, or Lessor's interest therein, and (ii) Lessee may contest in good faith the validity or application of any such law, rule, regulation, treaty, order, certificate, license or registration, so long as there is no material risk of the sale, forfeiture or loss of the Aircraft, the Airframe or any Engine, or Lessor's interest therein;

(b)     not use or suffer or permit the Aircraft to be used in any manner that would invalidate manufacturer warranties or be contrary to any requirement or regulation of the Aviation Authority or for any purpose for which the Aircraft is not designed or reasonably suitable or for any purpose other than primarily in passenger service and in passenger configuration (except for freight transportation not inconsistent with such service and passenger configuration);

(c)     ensure that the flight crew and maintenance engineers employed by Lessee in connection with the operation and maintenance of the Aircraft hold the licenses required by the Aviation Authority and applicable law in any Applicable Jurisdiction;

(d)     use the Aircraft solely in commercial or other operations for which Lessee is duly authorized by the Aviation Authority and applicable law in any Applicable Jurisdiction;

(e)     not use the Aircraft for the carriage of any goods, materials, livestock or items of cargo which could reasonably be expected to cause damage to the Aircraft or which would not be adequately covered by the insurance required to be maintained pursuant to Section 16, or any item or substance whose possession or carriage is illegal under any applicable law;

(f)     not use the Aircraft for purposes of training, qualifying or re-confirming the status of cockpit personnel except for the benefit of Lessee's cockpit personnel, and then only if the use of the Aircraft for such purpose is not disproportionate to the use for such purpose of other aircraft of the same type operated by Lessee;

(g)     obtain and maintain in full force all certificates, licenses, permits and authorizations for the time being required for the use and operation of the Aircraft for its intended purpose, and for the making of payments required by, and the compliance by Lessee with its other obligations under this Agreement;

(h)     not use, operate, or locate the Aircraft or suffer or permit the Aircraft to be used, operated or located (x) in any manner not covered by the insurance required to be maintained pursuant to Section 16 or (y) (A) in any area excluded from coverage by such insurance, or (B) in any area specifically excluded by this Agreement, or (C) in any country engaged in armed conflict with the armed forces of the United States, unless, in any case under this clause (y), the Aircraft is covered by such insurance (or indemnification by the United States government or other government of registry); provided that failure of Lessee to comply with the geographic requirement of this clause (y) will not result in any Event of Default if such failure is temporary and attributable to circumstances not within Lessee's control (including, but not limited to, hijacking, medical emergency, equipment malfunction, weather condition, or navigational error), or (z) in any manner which would prejudice the interests of the Indemnitees in such insurance, the Aircraft, any Engine or any Part; and

(i)     not operate, maintain, modify, insure or deal with the Aircraft or any Engine or Part in a manner which adversely discriminates against the Aircraft or such Engine or Part based on the Aircraft's status as a leased aircraft or based on the Aircraft's pending return hereunder, when compared with the manner in which Lessee operates, maintains, modifies, insures or deals with similar aircraft, engines or parts in Lessee's fleet.

10.4    <u>Records</u>.  Lessee shall:

(a)     procure that accurate, complete and current records are kept in accordance with the Approved Maintenance Program.  Such records will form part of the Aircraft Documents;

(b)     maintain in English (with an appropriate revision service) and in accordance with the Approved Maintenance Program and Aviation Authority requirements, the records, logs, and other materials required to be maintained in respect of the Aircraft (which may be, to the extent permitted by the Aviation Authority, in electronic form, provided that a copy of any hard copy records actually maintained by Lessee will be provided to Lessor at redelivery);

(c)     retain historical records of all structural inspection checks as well as records of all Engine shop visits during the Lease Period and all other check records for

the periods required by the Aviation Authority and FAA until the check contents are repeated;

(d)     retain such Aircraft Documents as provided for in this Section 10.4 at a location approved by the FAA, in fire proof storage containers in an area free from any risk of flooding and not permit any other person to have possession of or control over the same without Lessor's prior written consent;

(e)     keep all the records necessary to show that all requirements for the issuance of an airworthiness release under the Approved Maintenance Program have been met;

(f)     keep records containing the following information:

(i)     the total time in service of the Airframe;

(ii)     the current status of Life Limited Parts of the Airframe and each Engine;

(iii)     the time since last shop visit of all items installed on the Aircraft which are required by the Approved Maintenance Program to be inducted for maintenance on a specified time basis;

(iv)     the identification of the current inspection status of the Aircraft, including the time since the last inspections required by the Approved Maintenance Program;

(v)     the current status of applicable Airworthiness Directives, including the method of compliance, if applicable; and

(vi)     a list of current "major alterations" (as such term is defined by the Aviation Authority) to the Airframe, each Engine and Part;

(g)     retain the records required to be kept by this Section for the following periods:

(i)     except for the records of the last complete shop visit event of the Airframe and each Engine and Part, the records specified in paragraph (e) of this Section shall be retained as required by the Approved Maintenance Program;

(ii)     the records of the last complete shop visit event of the Airframe and each Engine and Part shall be retained in accordance with the Approved Maintenance Program;

(h)     retain the records specified in paragraph (f) of this Section and transfer the same to Lessor with the Aircraft at the same time the Aircraft is returned to Lessor; and

(i)     return the records as required under this Section 10.4 on the Expiry Date.

10.5    Inspection.

(a)    Upon Lessor giving reasonable notification (including the names of the Persons authorized to conduct the inspection and whether the inspection will encompass the Aircraft Documents, the Aircraft or both) but in no case less than ten (10) days' prior written notice to Lessee (unless a Specified Default and/or an Event of Default shall have occurred and be continuing or unless necessary to verify the rectification of deficiencies shown to require repair on a previous inspection), Lessor and/or any Financing Party, and/or its duly authorized representatives, may at any reasonable time visit, inspect and survey the Aircraft and the Aircraft Documents provided that (x) Lessor and the Financing Party, and its duly authorized representatives, as applicable, shall not disclose the same to any person any information or documents deemed confidential by Lessee, except to extent that a disclosure of confidential information would be permitted under Section 23.12 and (y) such inspections shall be conducted so as not to cause interference with or disrupt Lessee's (or any Permitted Sublessee's) normal operation, maintenance and use of the Aircraft and, so long as no Specified Default or Event of Default shall have occurred and be continuing, such inspections shall be conducted no more than once in any 12-month period (and no more than twice during the period commencing 365 days prior to the Expiry Date, one of which shall be the final inspection upon redelivery of the Aircraft, except with Lessee's prior written consent to any additional inspections).

(b)    Any inspection of the Aircraft shall be subject to Lessee's (or any Permitted Sublessee's) and all Government Entity's safety and security rules applicable to the location of the Aircraft and shall be a visual, walk-around inspection which may include going on board the Aircraft, but shall not include any intrusive inspections such as an Engine or APU borescope or opening any panels, bays or the like.  Any inspection of the Aircraft Documents shall occur only at a facility designated by Lessee during normal business hours.

(c)    All inspections, visits and surveys conducted under this Section 10.5 shall be at Lessor's risk and expense, unless a Specified Default and/or an Event of Default shall have occurred and then be continuing, in which case Lessee shall pay the reasonable out-of-pocket expenses to Lessor of such inspection promptly after written demand to Lessee therefor (which demand shall include reasonable written evidence of such expenses).

(d)    Lessor will have no duty to make any visit, inspection or survey, and shall have no liability arising out of the failure to make any such visit, inspection or survey or the failure to identify discrepancies in the condition of the Aircraft.

10.6    Air Navigation, Airport and Other Fees and Charges.

(a)    Lessee shall promptly pay or cause to be paid within such period as may be agreed between Lessee and the relevant Government Entity all license, registration, navigation and airport fees and charges assessed and demanded by any Government Entity relating to the Aircraft, or, to the extent Lessee's failure to pay can result in seizure of the Aircraft or any other consequence materially affecting the use or operation of the

Aircraft, other aircraft operated by Lessee or associated with the purchase, ownership, delivery, leasing, possession, use, operation, redelivery of or transfer of title to the Aircraft.

(b)      In the event that the Aircraft is detained or arrested as a result of outstanding charges incurred by Lessee or any Permitted Sublessee during the Lease Period in connection with (i) the furnishing, issue or provision of information, directions and other facilities in connection with the navigation or movement of aircraft (including the control or movement of vehicles in any part of an airport used for the movement of aircraft), or (ii) the landing, parking or taking off of aircraft at airports or for the use of, or services provided at, airports, then, without prejudice to Lessor's rights under Section 22, Lessee agrees that it shall promptly discharge such charges and procure that such detention or arrest is lifted.  Neither Lessor nor any Financing Party shall have any liability whatsoever as a result of any detention or arrest of the Aircraft in respect of any such charges or in relation to such detention or arrest or the lifting thereof.

10.7      Outgoings.  As between Lessor and Lessee, Lessee shall be responsible for all costs, expenses, charges and other outgoings (other than Taxes, which shall be governed by Section 21 of this Agreement) related to the operation of the Aircraft, and shall promptly pay:

(a)      all license and registration fees and other amounts of any nature validly imposed by any Government Entity with respect to the Aircraft, including without limitation the purchase (other than the original purchase of the whole Aircraft by Lessor), ownership (but only to the extent relating to or arising as a result of the leasing, possession, operation, use or maintenance of the Aircraft), delivery, leasing, possession, use, operation, return, sale or other disposition of the Aircraft (other than as provided for by Section 22.3 herein); and

(b)      all rent, fees, charges and other amounts validly charged to Lessee in respect of any premises where the Aircraft or any Part thereof is located from time to time.

10.8      Registration, Title, Further Assurances.  Lessee shall (or shall cause any Permitted Sublessee to):

(a)      do all such acts and things as may be necessary to register and maintain the registration of the Aircraft with the Aviation Authority of the United States of America, or if Lessor consents in writing to a change in registration of the Aircraft under Section 10.8(e), the Aviation Authority of the relevant country of registration reflecting (so far as permitted by applicable law) the interests of Lessor (or, if such registration cannot be maintained in the name of Lessor, on a basis which reflects the interests of Lessor to the greatest extent permitted by applicable law) and not do or suffer to be done anything which would reasonably be expected to adversely affect such registration, provided that Lessor shall execute and deliver all such documents as Lessee (or any Permitted Sublessee) may reasonably request and require for the purpose of effecting and continuing the registration requirements of this Section 10.8(a);

(b) following the written request of Lessor, do all such acts and things as may be necessary (including, without limitation, making any filing or registration with the Aviation Authority or any other Government Entity or as required to comply with the Geneva Convention where applicable) and execute and deliver all documents (including, without limitation, any amendment of this Agreement that does not diminish any of the rights or increase any of the costs, obligations, risks or liabilities of Lessee hereunder) as may from time to time be necessary:

(i) following any change or proposed change in the beneficial ownership or financing of the Aircraft which is permitted pursuant to Section 10.10 or Section 22 or in the manner of securing Lessor's obligations to the Financing Parties, in each case at the cost of Lessor; or

(ii) following any modification of the Aircraft, any Engine or any Part or the permanent replacement of any Engine or Part in accordance with this Agreement, so as to ensure that the rights of Lessor as owner of the Aircraft and under this Agreement apply with the same effect as before; or

(iii) to establish, maintain, preserve, perfect and protect the rights of Lessor, including its rights in the Aircraft, under this Agreement and, at the cost of Lessor, the rights of the Financing Parties under any Security Interest or assignment permitted hereunder in respect of the Aircraft or this Lease and in particular (without limitation), if in the State of Registration there shall be, or shall be brought into force, any legislative or other provisions giving effect to the Geneva Convention or otherwise relating to recognition of rights in aircraft, Lessee shall at its own cost forthwith do all such acts as may be necessary to perfect recognition of Lessor's title to and interest in the Aircraft and, at the cost of Lessor, the rights of the Security Trustee or other mortgagee and/or assignee permitted hereunder in accordance with such legislative or other provisions, provided that Lessor and any other relevant party shall execute such documents and take such actions as may be necessary to effectuate the provisions of this Section 10.8(b)(iii);

(c) if the state in which Lessee is situated has, or at any time brings into force, any legislative or other provisions giving effect to the Convention on International Interests in Mobile Equipment (the "**Convention**") and/or the Protocol to the Convention on International Interests in Mobile Equipment on Matters Specific to Aircraft Equipment (the "**Protocol**"), Lessee at its own cost and expense shall from time to time, do or cause to be done any and all acts and things which may be requested by Lessor to ensure that Lessor and (at Lessor's expense) the Financing Parties (if any) have the full benefit of the Convention and the Protocol in connection with the Aircraft and any Engine, including (but not limited to):

(A) any matters necessary in order to register, perfect, or preserve any international interest(s) vested in Lessor and/or the Financing Parties with respect to the Aircraft and/or any Engine and constituted by this Agreement; and

(B)  entry into agreements (subordination or otherwise) to protect the priority of any international interest(s) referred to in the foregoing paragraph (A).

Notwithstanding the foregoing, Lessor acknowledges that the Protocol does not provide for an IDERA to be provided by Lessee, and as such, Lessor shall not request an IDERA from Lessee.

In this clause the following terms have the following meanings:

**"IDERA"** means an Irrevocable De-Registration and Export Request Authorization;

"**international interest**" has the meaning as expressed in the Convention and Protocol;

"**state**" has the meaning as expressed in the Convention and Protocol; and

"**state in which Lessee is situated**" shall be construed in accordance with the expression "state in which the debtor is situated in" as set out in Article 4 of the Convention.

(d)  if at any time subsequent to the initial FAA and UCC filings made pursuant to the terms of this Agreement, any other filing or any recording or other act is necessary to perfect, protect and preserve the rights and interests of Lessor hereunder and in the Aircraft and the Security Deposit, including without limitation the filing of continuation statements with respect to filed UCC financing statements, upon written direction of Lessor procure, to the extent Lessee is able, that such filings, recordings and acts are done pursuant to the applicable laws of any Applicable Jurisdiction.  Lessee hereby authorizes Lessor to make any filings or recordings referred to in this paragraph;

(e)  not without the prior written consent of Lessor change the State of Registration;

(f)  not do or permit to be done or omit or permit to be omitted to be done any act or thing which might reasonably be expected to jeopardize the rights of Lessor in or to the Aircraft or the Financing Parties under any Security Interest or assignment in respect of the Aircraft or of either of Lessor or the Financing Parties as an additional insured, contract party or loss payee under the insurance required to be maintained pursuant to Section 16;

(g)  on all occasions when the ownership of the Aircraft, any Engine or any Part is relevant, not represent or hold itself out as having title to the Aircraft;

(h)  not at any time (i) represent or hold out Lessor, Lease Manager, Beneficiary, the Financing Parties or the Security Trustee (if any) as an operator of the Aircraft (whether for hire or reward or gratuitously) which may be undertaken by Lessee; or (ii) pledge the credit of Lessor, Lease Manager, Beneficiary, the Financing Parties or the Security Trustee (if any);

(i)  ensure that no later than thirty (30) days following the Delivery Date there is affixed, and not subsequently removed (unless removed and immediately replaced

thereafter, or removed and replaced during a shop visit) or permitted to be obscured, a fireproof plate (having dimensions of not less than 10 cm. x 4.9 cm.) in a reasonably prominent position on each Engine and in the cockpit of the Aircraft adjacent to the certificate of airworthiness stating:

> "THIS AIRCRAFT IS OWNED BY AND LEASED FROM WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION, AS OWNER TRUSTEE AND LESSOR";

and promptly following notice from Lessor of any Financing Party, Lessee shall cause such plate to contain the following additional inscription:

> "[AND IS SUBJECT TO A MORTGAGE IN FAVOR OF [IDENTIFY SECURED PARTY]";

(j)     not do or permit to be done anything outside of normal operations or as otherwise permitted pursuant to this Agreement which may reasonably be expected to expose the Aircraft, any Engine or any Part to penalty, forfeiture, impounding, detention, appropriation, damage or destruction and (without prejudice to the foregoing), if any such penalty, forfeiture, impounding, detention or appropriation, damage or destruction occurs, give Lessor notice thereof and use best efforts to procure the immediate release of the Aircraft, any Engine or the Part, as the case may be;

(k)     not abandon the Aircraft, the Engine or any Part; and

(l)     not attempt, or hold itself out as having any power, to sell, lease or otherwise dispose of the Aircraft, any Engine or any Part (without prejudice to Lessee's rights with respect to Parts as provided for under Schedule 19).

10.9    <u>No Security Interests</u>.  Lessee shall at all times during the Lease Period:

(a)     not create or permit to exist any Security Interest (other than Permitted Liens) upon the Aircraft, any Engine or any Part;

(b)     promptly at Lessee's expense, take or procure the taking of such action as may be necessary to discharge any such Security Interest (other than Permitted Liens) if the same shall exist at any time; and

(c)     pay and discharge or cause to be paid and discharged when due and payable or make adequate provision by way of security or otherwise for all debts, damages, claims and liabilities which give rise to a Security Interest (other than Permitted Liens) over or affecting the Aircraft, any Engine or any Part.

10.10   <u>Lessor's Financing</u>.  Lessee acknowledges that Lessor may at any time during the Lease Period grant Security Interests over the Aircraft and the benefit of the Operative Documents to the Financing Parties as collateral security for Lessor's obligations to the Financing Parties.  Subject to the terms of this Agreement, Lessee undertakes to provide all reasonable assistance and cooperation to Lessor and the Financing Parties and their respective

representatives and advisers (at Lessor's cost) in connection with the perfection and maintenance of such Lessor Liens, including (without limitation) the effecting of all necessary filings and registrations in the State of Registration.

10.11 <u>General</u>. Lessee will:

(a)    (i) do or cause to be done all things necessary to maintain its business as a regularly scheduled, commercial airline, (ii) preserve its corporate existence (other than as permitted in Section 10.11(e) below) and (iii) maintain such of its rights, privileges, licenses and franchises as are required to perform its obligations under this Agreement;

(b)    not change its location (as determined pursuant to Section 9-307 of the UCC) to any place in the United States other than the location described in the first paragraph of this Agreement, or change its jurisdiction of incorporation from Colorado, except upon 30 days' prior written notice thereof to Lessor;

(c)    remain a Certificated Air Carrier and maintain its status so as to fall within the purview of Section 1110 of Title 11 of the United States Code or any analogous statute;

(d)    remain a "citizen of the United States" as defined in Section 40102(a)(15)(c) of Title 49 of the United States Code; and

(e)    not consolidate with or merge into any other Person (unless Lessee is the surviving entity following any such consolidation or merger) or convey, transfer or lease in one or more related transactions substantially all of its assets to any Person (a "**Merger Transaction**") without the written consent of Lessor (which consent shall not be unreasonably withheld), unless:

(i)    the Person formed by such consolidation or into which Lessee is merged or the Person which acquires by conveyance, transfer or lease substantially all of the assets of Lessee (the "**Successor**") shall make such filings and recordings, including any filing or recording with the FAA pursuant to the Act, as shall be necessary to evidence such consolidation, merger, conveyance, transfer or lease with or to the Successor;

(ii)    the Successor shall execute and deliver to Lessor a duly authorized, valid, binding and enforceable agreement in form and substance reasonably satisfactory to Lessor containing an assumption by the Successor of the due and punctual payment of the Rent due and to become due under this Lease and the due and punctual performance and observance of each other covenant and condition of the Operative Documents to be performed or observed by Lessee;

(iii)    immediately after giving effect to such transaction, no Event of Default shall have occurred and be continuing;

(iv)    Lessee shall have delivered to Lessor a certificate signed by the President or the Chief Financial Officer or the Treasurer or any Vice President and by the

Secretary or an Assistant Secretary of Lessee, or an opinion of counsel (which may be Lessee's General Counsel) reasonably satisfactory to Lessor, stating that such consolidation, merger, conveyance, transfer or lease and the assumption agreement mentioned in clause (ii) above comply with this Section; and

(v)     the Successor shall (a) be the holder of a Part 121 Certificate, and (b) be a "U.S. citizen" (as defined in Section 40102(a)(15) of Title 49 of the United States Code) holding an air carrier operating certificate issued by the Secretary of Transportation pursuant to Chapter 447 of the Act.

Upon any consolidation or merger, or any conveyance, transfer or lease of substantially all of the assets of Lessee as an entirety in accordance with this Section, the Successor shall succeed to, and be substituted for, and may exercise every right and power of, Lessee under this Agreement with the same effect as if such Successor had been named as Lessee herein.  No such conveyance, transfer or lease of substantially all of the assets of Lessee shall have the effect of releasing Lessee or any Successor which shall theretofore have become such in the manner prescribed in this Section from its liability in respect of any Operative Documents to which it is a party.

**Section 11**     Possession and Subleasing.

11.1     Possession.  Lessee will not, without the prior written consent of Lessor, sublease or otherwise in any manner deliver, transfer or relinquish possession of the Aircraft, the Airframe or any Engine or install any Engine, or permit any Engine to be installed, on any airframe other than the Airframe; provided, however, subject to the provisions of Section 11.2, so long as no Event of Default shall have occurred and be continuing at the time of such sublease, delivery, transfer or relinquishment, and so long as such action shall not deprive Lessor of title to, or any Financing Party of its interest in, the Aircraft, Airframe or subject to Section 11.1(f), any Engine, Lessee may, without such prior written consent:

(a)     Interchange and Pooling.  Subject (although no Permitted Sublessee shall be permitted to subject without Lessor's prior written consent, which will not be unreasonably withheld) the Airframe or any Engine to normal interchange agreements or pooling agreements or similar arrangements, in each case customary in the commercial airline industry and entered into by Lessee, as the case may be, in the ordinary course of business; provided, however, that (a) no such agreement or arrangement contemplates or requires the transfer of title to the Airframe or any Engine, (b) if Lessor's title to the Airframe or any such Engine is divested under any such agreement or arrangement, then the Airframe or such Engine shall be deemed to have suffered a Total Loss as of the date of such divestiture, (c) the other parties to the interchange or pooling agreements or other similar arrangements are Permitted Air Carriers who are Solvent and not consenting to or seeking relief under the provisions of any bankruptcy or insolvency or other similar law providing for the reorganization or winding-up of corporations and (d) Lessee provides Lessor with notice of such interchange, pooling or other similar arrangement within five (5) days thereafter.

    (b)    <u>Testing And Service</u>.  Deliver or permit any Permitted Sublessee to deliver possession of the Aircraft, Airframe, any Engine or any Part to the manufacturer thereof or to any other Person, for testing, service, repair, modification, maintenance or overhaul work on the Aircraft, Airframe, any Engine or any Part, or, for alterations or modifications in or additions to the Aircraft, Airframe or any Engine to the extent required or permitted by the terms hereof.

    (c)    <u>Transfer To U.S. Government</u>.  As more particularly set forth in Section 11.3 below, transfer or permit any Permitted Sublessee to transfer possession of the Aircraft, Airframe or any Engine to the U.S. Government, pursuant to CRAF or a lease, contract or other instrument, a copy of which shall be provided to Lessor, for a period (including all renewals) not extending beyond the Lease Period (other than as provided in Section 11.3 hereof) in which event Lessee shall promptly notify Lessor in writing of any such transfer of possession and, in the case of any transfer pursuant to CRAF, in such notification shall identify by name, address and telephone numbers the Contracting Office Representative or Representatives for the Military Airlift Command of the United States Air Force to whom notices must be given and to whom requests or claims must be made to the extent applicable under CRAF.

    (d)    <u>Installation of Engines on Owned Aircraft</u>.  Install or permit any Permitted Sublessee to install an Engine on an airframe owned or operated by Lessee (or any Permitted Sublessee) which airframe is free and clear of all Security Interests, except:  (a) Permitted Liens and those which apply only to the engines (other than Engines), appliances, parts, instruments, appurtenances, accessories, furnishings and other equipment (other than Parts) installed on such airframe (but not to the airframe as an entirety), (b) the rights of third parties under interchange agreements which would be permitted under Section 11.1(a), provided that Lessor's title to such Engine shall not be divested as a result thereof and (c) mortgage Security Interests or other security interests, provided, that (as regards this clause (c)), such mortgage Security Interests or other security interests (or, if applicable, another enforceable written agreement governing such mortgage liens or other security interests) effectively provide that such Engine shall not become subject to the Security Interest of such mortgage or security interest, notwithstanding the installation thereof on such airframe.

    (e)    <u>Installation of Engines on Other Airframes</u>.  Install or permit any Permitted Sublessee to install an Engine on an airframe leased to Lessee (or any Permitted Sublessee) or purchased by Lessee (or any Permitted Sublessee) subject to a conditional sale or other security agreement, provided that (a) such airframe is free and clear of all Security Interests, except:  (i) the rights of the parties to the lease or conditional sale or other security agreement covering such airframe, or their assignees, and (ii) Security Interests of the type permitted by Section 11.1(d), and (b) such lease, conditional sale or other security agreement (or, if applicable, another enforceable written agreement governing such mortgage liens or other security interests) effectively provides that such Engine shall not become subject to the Security Interest of such lease, conditional sale or other security agreement, notwithstanding the installation thereof on such airframe.

(f)     Installations of Engines on Financed Aircraft.  Install or permit any Permitted Sublessee to install an Engine on an airframe owned by Lessee or such Permitted Sublessee, leased to Lessee or such Permitted Sublessee, or purchased by Lessee or such Permitted Sublessee subject to a conditional sale or other security agreement under circumstances where neither Section 11.1(d) or 11.1(e) is applicable; provided, however, that any such installation shall be deemed a Total Loss with respect to such Engine, and Lessee shall (or shall cause any Permitted Sublessee to) comply with Section 17.3 hereof in respect thereof.

(g)     Subleasing.  With respect to the Aircraft, Airframe or any Engine, enter into a sublease with any Permitted Air Carrier provided that (a) no such sublease shall be permitted to a sublessee that is subject to a proceeding or final order under applicable bankruptcy, insolvency or reorganization laws on the date the lease is entered into, (b) in connection with any sublease, Lessor, Beneficiary and any Financing Parties receive at the time of such sublease (i) insurance certificates evidencing that the insurance required by Section 16 remains in full force and effect (and applicable to any such sublease) and (ii) executed letters by the Permitted Sublessee to the Aviation Authority in the form of Part I to Schedule 9, as applicable, and (c) no sublessee shall be entitled to further lease or sublease (except pursuant to a Wet Lease) the Aircraft to any Person without the prior written consent of Lessor and Financing Parties.  In addition, (x) the term of any sublease (including all permissible renewals) shall not extend beyond the expiration of the Lease Period, (y) the right to discharge from the International Registry the registration of any international interest arising from such sublease shall be held by Lessor, which Lessor agrees shall be exercised only in those circumstances in which Lessor is entitled to do so under the terms of this Agreement, and (z) in the case of any sublease for a term of more than one year, Lessee shall assign its rights thereunder to Lessor as collateral for its obligations hereunder and the other Operative Documents (which Lessee acknowledges may be further assigned to a security trustee designated by any Financing Parties), such assignment to be effected pursuant to an agreement in form and substance satisfactory to Lessor and duly filed or recorded in all appropriate jurisdictions as reasonably determined by Lessor, provided that any such assignment shall provide that (a) any payments due under such sublease shall be paid by the sublessee directly to Lessee unless an Event of Default shall have occurred and be continuing and the sublessee has been notified by Lessor thereof in writing, in which case such payments shall be paid by the sublessee directly to Lessor or as it may direct for so long as such Event of Default shall be continuing, so long as (i) such payments shall be applied against Lessee's obligations hereunder as and when due and (ii) as such time as there shall not be continuing any Event of Default, such amounts shall be paid to Lessee to the extent not previously applied in accordance with this Section 11.1(g)).

(h)     Wet Leases.  Lessee and any Permitted Sublessee may enter into any Wet Lease with any other Person without the consent of Lessor, provided that if Lessee (or any Permitted Sublessee) shall enter into any Wet Lease for a period of more than one year (including renewal options), Lessee shall provide Lessor written notice of such Wet Lease (such notice to be given prior to entering into such Wet Lease, if practicable, but in any event promptly after entering into such Wet Lease).

(i)  <u>Installation of engines</u>.  Lessee and any Permitted Sublessee may temporarily remove an Engine from the Airframe and install another engine on the Airframe, provided that such other engine is replaced with an Engine on or prior to the Redelivery Date.  Lessor agrees that it will not acquire or claim any right, title or interest in such other engine as a result of its being installed on the Airframe and that such other engine shall not be subject to any Security Interest in favor of Lessor or any Financing Party.

11.2  <u>Limitations on Subleasing or Other Relinquishment of Possession</u>.  Notwithstanding anything to the contrary in Section 11.1:

(a)  The rights of any person that receives possession of the Aircraft or any Engine (other than a transferee when the transfer is of an Engine which is to be a Total Loss) in accordance with Section 11.1 shall be, in respect of the Aircraft or such Engine, as applicable, and during the period of such possession, subject and subordinate to all the terms of this Lease (and any Permitted Sublease shall expressly state that it is so subject and subordinate), and to Lessor's rights, powers and remedies hereunder, including, without limitation (i) Lessor's right to repossess the Aircraft pursuant to Section 20.2(a), (ii) Lessor's right to terminate and avoid such sublease, delivery, transfer or relinquishment of possession upon the occurrence and during the continuance of an Event of Default and (iii) the right to require such person to forthwith deliver the Aircraft, the Airframe and Engines subject to such transfer upon the occurrence of an Event of Default and the declaration (or deemed declaration) of this Lease being in default;

(b)  Lessee shall remain primarily liable hereunder for the performance of all the terms of this Lease to the same extent as if such transfer had not occurred, and no transfer of possession of the Aircraft, the Airframe, any Engine or any Part shall in any way discharge or diminish any of Lessee's obligations to Lessor hereunder or under any Operative Document; provided, however, that Lessee may procure such performance from any Permitted Sublessee pursuant to the relevant Permitted Sublease, and if the relevant Permitted Sublessee performs such obligations in full in accordance with the terms of this Lease, Lessor hereby agrees to accept such performance by such Permitted Sublessee in satisfaction of Lessee's obligations hereunder, subject to all of the requirements and conditions relating to such performance under the Operative Documents;

(c)  Lessee shall ensure that no sublease, delivery, transfer or relinquishment permitted under Section 11.1 shall adversely affect the United States registration of the Aircraft, unless the Aircraft is reregistered with the prior written consent of Lessor under Section 10.8(e);

(d)  Any event that constitutes or would, with the passage of time, constitute a Total Loss under paragraph (c), (d) or (e) of the definition of such term shall not be deemed to violate the provisions of Section 11.1 so long as Lessee is otherwise complying with the applicable provisions of Section 17;

(e)     Any Wet Lease shall not constitute a delivery, transfer or relinquishment of possession for purposes of Section 11.1 and shall not be prohibited by the terms hereof, provided that such Wet Lease shall not extend (including all permissible renewals thereunder) beyond the expiration of the Lease Period;

(f)     Lessor acknowledges that any consolidation or merger of Lessee or conveyance, transfer or lease of all or substantially all of Lessee's assets permitted by the Operative Documents shall not be prohibited or limited by Section 11.1;

(g)     In connection with any Permitted Sublease, all necessary actions (as determined by FAA Counsel) shall be taken by the Lessee at its expense which Lessee is capable of taking and which is required to protect Lessor's and the Financing Parties' interest in the Aircraft, Airframe and Engines, and such Permitted Sublease and all other necessary documents shall be duly filed, registered or recorded in such public offices as may be required to fully protect Lessor's and Beneficiary's interest in the Aircraft, Airframe and Engines and this Lease and the perfection and priority of the security interest of the Financing Parties in the Aircraft;

(h)     Lessee shall reimburse Lessor, the Financing Parties and the Beneficiary for all of their reasonable and documented out-of-pocket fees and expenses, including, without limitation, reasonable and documented fees and disbursements of counsel, incurred by Lessor, the Financing Parties and the Beneficiary in connection with any such sublease; and

(i)     No sublease or transfer of possession otherwise in compliance with this Section 11.2 shall be permitted if such sublease or transfer of possession shall (x) result in any registration or re-registration of the Aircraft, the Airframe or any Engine except to the extent permitted by Section 10.8(e) or (y) permit any action prohibited hereunder.

11.3    <u>Civil Reserve Air Fleet</u>.  Notwithstanding anything to the contrary in Section 11.1 or 11.2, Lessor consents and agrees to the allocation of the Aircraft, the Airframe or any Engine by Lessee to the Civil Reserve Air Fleet Program ("**CRAF**") pursuant to the terms established by the laws and regulations of the government of the United States of America and its agencies (including the transfer of possession of the Aircraft, Airframe or Engines to the government of the United States of America or any instrumentality or agency thereof pursuant to CRAF), provided that Lessor understands that the United States government has the right to activate the CRAF fleet in times of air lift emergency and in such event Lessee may not be able to return the Aircraft at the termination, cancellation or expiration of this Agreement. Accordingly, in the event that CRAF is activated with respect to the Aircraft and, pursuant to the then applicable regulations, Lessee is not permitted to redeliver the Aircraft while CRAF is so activated (the "**CRAF Activation Period**"), the Lease Period shall be deemed extended to 180 days after the end of any such CRAF Activation Period and all terms and conditions of this Agreement shall continue to apply during this extended period, including Lessee's obligation to pay Rent (which shall not be increased to the Default Rate, or otherwise, due to any such CRAF Activation Period).  If at the end of such 180 day period, the Aircraft is still subject to such CRAF Activation Period, an Event of Loss shall be deemed to have occurred on the last day of the Lease Period, as extended, and Section 17.2 hereof shall apply thereto.  Lessee shall give

Lessor prompt notice if the Aircraft is to be allocated to CRAF, which notice shall specify the appropriate United States government official or agency responsible for the Aircraft under CRAF and to whom Lessor should direct any notice of any Event of Default hereunder.  In the event that CRAF activation occurs with respect to the Aircraft, then (i) Lessor will accept indemnification by the United States government in lieu of the insurance required to be maintained pursuant to Section 16, provided that such indemnification is at least substantially equivalent to such insurance, as and to the extent provided in Section 16 and Schedule 7 of this Agreement; and (ii) Lessor shall inform such United States government official or agency identified by Lessee in the notice of CRAF activation if an Event of Default shall occur.

11.4    Operating Certificates.  Lessor hereby authorizes Lessee, at Lessee's sole cost, expense and risk, to act as its agent for the purpose (but only for the purpose) of obtaining any required replacement operating certificates from the FAA.  This authority includes (without expanding in any way the nature of the limited authority granted pursuant to the first sentence of this Section 11.4), but is not limited to, obtaining registration certificates, airworthiness certificates, certificates of sanitary construction and ferry permits.  In particular, this authority includes the ability to make use of Exemption No. 5318 issued by the FAA.  This authority will allow duly authorized personnel of Lessee to sign any application forms required in the process of obtaining such operating certificates, and this authority will also allow such personnel, where necessary and appropriate, to sign certificates as the attorney-in-fact for Lessor.  Nothing in this Section 11.4 shall permit Lessee to deregister the Aircraft or change the country of registry of the Aircraft or take any action other than as expressly set forth in the Operative Documents.

**Section 12**    Maintenance and Repair; Equipment Changes.

12.1    Maintenance and Repair.  Lessee shall at all times during the Lease Period comply with, or cause to be complied with, each of the provisions of Schedule 19, which provisions are hereby incorporated by this reference as if set forth in full herein.

**Section 13**    Manufacturers' and Vendors' Warranties.

13.1    Warranties.  The benefits of the Airframe Warranties Agreement and the Engine Warranty Agreement will vest in each of Lessee, Lessor and the Finance Parties at the times and in the circumstances set out in the Airframe Warranties Agreement and Engine Warranty Agreement (as the case may be).  Lessee will properly and promptly pursue any valid claims it may have against a Manufacturer and others under such warranties with respect to the Aircraft and will promptly provide Lessor with written notice of any major warranty claim of a value greater than the Damage Notification Threshold.  Lessee will not do or permit anything to be done or omit to do anything the omission of which that would or would be likely to prejudice any material right that Lessor, Owner Participant or any Financing Party may have against a Manufacturer or repairer under any agreement in respect of the Aircraft or any Part thereof.

13.2    Warranties for Work Performed During Lease Period.  At the time Lessee has work performed on the Aircraft, an Engine or any Part during the Lease Term, Lessee will obtain the written agreement of Manufacturer, the Engine Manufacturer and any other vendor or repair facility performing such work that the warranties received by Lessee for such work are

assignable to and extend to the benefit of Owner Participant and any future Owner Participant and any subsequent operator of the Aircraft or Engine after the Expiry Date.

13.3    Reassignment.

(a)    On the Expiry Date, the benefit of any warranty assigned by Lessor to Lessee will be reassigned automatically to Owner Participant.  At Lessor's election, Lessee's rights under such warranties (including Lessee's claims and rights to payment thereunder) will revert to Lessor or Owner Participant during any period in which an Event of Default is continuing (and during the continuation of such Event of Default Lessor may recover from Lessee any portion of the proceeds of any claim previously paid to Lessee to the extent that such claim relates to any defect in the Aircraft not fully and completely rectified by Lessee).  Similarly, any additional warranties received by Lessee from Manufacturer, the Engine Manufacturer and any other vendor or repair facility for work performed on the Aircraft, Engine or any Part during the Lease Term will be automatically assigned by Lessee to Owner Participant on the Expiry Date.  Lessee at its own cost and expense will do all such things and execute such documents as may be required for these purposes, including providing assistance to Lessor and Owner Participant following the Expiry Date in seeking and obtaining the benefits of such reassigned warranties to the extent that Lessor and Owner Participant are unable to directly invoke and obtain the benefit thereof (it being agreed that such obligation of Lessee will survive the Expiry Date).

(b)    Where Lessee performs its own maintenance on the Aircraft (as permitted under this Lease), Lessee will provide to Lessor warranties and indemnities that are normally provided to a commercial maintenance customer of Lessee.  Such warranties and indemnities including all claims thereunder (whether or not perfected) together with all training and product support in respect of or related to the Aircraft then available to Lessor will be assignable by Lessor to the next lessee or operator.  Lessee will, at its own cost and expense, do all such things and execute such documents as may be required for this purpose (it being agreed that such obligations of Lessee will survive the Expiry Date).

13.4    Warranty Claims.  Lessee will diligently and promptly pursue any valid claims it may have against Manufacturer and others under such warranties with respect to the Aircraft.

**Section 14**    Certain Agreements Regarding Engine Swaps.

14.1    Subject to the terms of Section 14.2 below, so long as a JSA Person (including any trust the beneficial interest of which is held by a JSA Person) holds title to the Aircraft, prior to return of the Aircraft to Lessor Lessee may replace any Engine with an engine (i) to which an JSA Person (including any trust the beneficial interest of which is held by a JSA Person) holds title, free of all Security Interests expect for Lessor Liens created by such JSA Person, and (ii) that is an original engine from a Related A321 Aircraft, and (iii) that is immediately prior to the return of the Aircraft subject to the terms of a Related A321 Lease (each such engine a "Return Engine").

14.2    No Engine may be replaced by a Return Engine unless the following conditions have been met:

(a)    No Event of Default shall exist and be continuing under this Agreement or any Other Agreement;

(b)    Lessee has provided not less than six (6) months prior notice of its intent to replace such Engine with a Return Engine (the "Swap Notice"), which Swap Notice will indicate the manufacturer's serial number of such Return Engine;

(c)    A JSA Person (including any trust the beneficial interest of which is held by a JSA Person) is the lessor under the Lease and the Related A321 Aircraft Lease at the time of the Swap Notice;

(d)    The Aircraft and the Related A321 Aircraft (and for the avoidance of doubt, the Engine and the Return Engine) are subject to financing arrangements with the same Financing Parties at the time of the swap; and

(e)    The Return Engine that is returned on the Airframe is otherwise in full compliance with the Lease and the Return Conditions.

14.3    If an Engine (or a Return Engine that has previously been notified to Lessor pursuant to subsection (b) above) becomes unserviceable (other than as a result of an Event of Loss) less than six (6) months prior to Return (an "Unserviceable Engine"), the Swap Notice period in subsection (b) above will be waived by Lessor in order to allow Lessee to designate a (or another) Return Engine in place of the Unserviceable Engine.  Any such designated Return Engine (i) will be subject to all other  terms, conditions and requirements set forth in this Section 14 in respect of a Return Engine, and (ii) must not have more Hours or Cycles accumulated since its last Engine Performance Restoration than the Engine (or previously designated Return Engine) such Return Engine is replacing.

14.4    In respect of any Return Engine, Lessee will enter into an agreement or agreements, in form and substance reasonably acceptable to Lessor, appropriately documenting the permanent replacement of the Engine with the Return Engine, for purposes of the Lease and the relevant Related A321 Lease.

14.5    Lessee will enter into any additional documentation reasonably required by Lessor or Security Trustee in relation to the permanent replacement of the Engine with the Return Engine on the Aircraft, for purposes of the Lease and the relevant Related A321 Lease.

14.6    Lessee shall pay all reasonable costs of Lessor incurred in connection with such exchange including:

(a)    releasing any Security Interests over the Return Engine and the Engine;

(b)    transferring title to the Return Engine and Engine to the new owner of such engines; and

(c)     entry into and perfection of all new Security Interests requested by Lessor or Security Trustee in relation to the Engine and Replacement Engine.

**Section 15     Indemnities.**

15.1     <u>General</u>.  Lessee agrees to defend, indemnify and hold harmless each of the Indemnitees on demand and on an After-Tax Basis, from and against any and all Losses of any Indemnitee attributable to acts or events:

(a)     which may at any time be suffered or incurred directly or indirectly as a result of or connected with the possession, delivery, performance, refurbishment, transportation, replacement, exchange, removal, pooling, interchange, subleasing, wet leasing, chartering, importation, exportation, landing, storage, presence, management, ownership, registration, control, maintenance, condition, service, repair, overhaul, leasing, use, operation or redelivery of the Aircraft, any Engine or Part (either in the air or on the ground) whether or not such Losses may be attributable to any defect in the Aircraft, any Engine or any Part or to its design, testing or use or otherwise (furthermore, for the avoidance of doubt, notwithstanding anything herein to the contrary, Lessee shall not be responsible for the trustee fees of Owner Trustee);

(b)     which arise out of any act or omission which invalidates or which renders voidable any of the insurance required to be maintained pursuant to Section 16;

(c)     which arise in relation to preventing or attempting to prevent the arrest, confiscation, seizure, taking in execution, impounding, forfeiture or detention of the Aircraft, or in securing its release;

(d)     which may at any time be suffered or incurred as a consequence of (i) any design, article or material in the Aircraft, any Engine or any Part, including any defect in design and regardless of whether it is discoverable, or (ii) its operation or use constituting an infringement of patent, copyright, trademark, design or other proprietary right or a breach of any obligation of confidentiality owed to any person; or

(e)     which arise out of or relate to the Operative Documents or any of the transactions contemplated thereby, any breach by the Lessee of any of its obligations thereunder or the falsity of any representation or warranty made by the Lessee thereunder or otherwise in connection therewith; but excluding any Loss to the extent such Loss is attributable to acts or events:

(i)     in respect of which such Indemnitee has agreed to not seek reimbursement from Lessee pursuant to an express provision of this Agreement; or

(ii)     that arise as a result of the gross negligence or willful misconduct (other than as may be attributed or imputed solely by reason of its participation in the transactions contemplated by the Operative Documents) of that Indemnitee or any related Indemnitee or a Lessor Lien or an Excluded Tax or the breach by that Indemnitee or any related Indemnitee of any representation, warranty or covenant given by it or to be performed by it under any Operative Document; or

(iii)    that consist of Taxes or arise in relation to any loss of tax benefits or increase in tax liability under any tax law other than amounts necessary to make payments on an After-Tax Basis (but without prejudice to any Indemnitee's rights under Section 21 of this Agreement); or

(iv)    that represent or constitute ordinary and usual operation or overhead expenses of such Indemnitee or any related Indemnitee, except to the extent that the same arise as a result of the occurrence of an Event of Default; or

(v)    which occur after the Expiry Date, except to the extent that any Loss results from, or arises out of, any act, omission or circumstance existing during the Lease Period (unless the Aircraft is not returned in circumstances where return is required by the terms of this Lease or the Aircraft is returned after the date on which it is required to be redelivered hereunder, in which event the foregoing exclusion shall apply only to Losses attributable to acts or events occurring after any such return); or

(vi)    relating to or arising out of the sale or other transfer or disposition (voluntary or involuntary), including any sale, transfer or assignment (including transfers by operation of law), of all or part of any Indemnitee's right, title or interest in the Aircraft, the Airframe, any Engine, any Part, any Operative Document or the "Estate" under the Trust Agreement, other than a sale or other transfer permitted under Section 20.2;

(vii)    arising out of or relating to contemplating entering into or entering into amendments, supplements, waivers or consents with respect to the Operative Documents that are not requested by Lessee and are not required by the Operative Documents;

(viii)    that constitute any fine, Tax, or Loss incurred by any Indemnitee as a result of such Indemnitee's having engaged in a "prohibited transaction" within the meaning of Section 406 of ERISA or Section 4975 of the Internal Revenue Code or any successor provisions thereof;

(ix)    that constitute a cost, fee or expense that is to be borne by any Indemnitee pursuant to the express terms of the Operative Documents; or

(x)    that arise out of or relate to the deregistration or the inability to maintain registration of the Aircraft with the FAA as a result of Lessor not being a citizen of the United States;

For purposes of subclauses (ii) and (iv) above of this Section 15 and Section 21 of this Agreement, a person shall be considered a "related" Indemnitee with respect to an Indemnitee if such person is an Affiliate or employer of such Indemnitee or a director, officer, employee or agent of such Indemnitee or any such Affiliate, or a successor or permitted assignee of any of the foregoing; provided that Lessor shall not be deemed to be related Indemnitees of Beneficiary merely because of their trust or

fiduciary relationships.  Nothing in this Agreement shall be construed as a guaranty by Lessee of the residual value of the Aircraft.

15.2   <u>Notification</u>.  Lessor shall promptly (and in any event within 30 days of the occurrence of the event giving rise to the claim (as defined below)) notify Lessee in writing of any matter for which Lessee is obligated to indemnify under this Section 15 (each a "**Claim**"); provided, however, the delay or failure of Lessor to give notice to Lessee in accordance with this Section 15.2 will not discharge or release Lessee from any of its indemnity obligations under Section 15.1 except, and only to the extent, that Lessee can demonstrate that the delay or failure in providing such notice was unreasonable and resulted in material, additional obligations for Lessee in defending against any suit or proceeding relating to such matter or prejudiced Lessee's conduct of, or precluded Lessee from conducting a meritorious contest of, such claim.  No payment by Lessee to any Indemnitee shall be deemed to constitute a waiver or release of any right or remedy that Lessee may have against such Indemnitee as a result of the failure of such Indemnitee failing to give Lessee the notice required herein.

15.3   <u>Duration</u>.  This Section 15 will continue in full force after the Expiry Date.

15.4   <u>Contest</u>.

(a)   Lessor and Lessee will consult with one another to consider what action may properly be taken to defend or otherwise resist or mitigate any Claim.  Provided no Specified Default or Event of Default shall have occurred and be continuing, Lessee shall, following such consultation, have the right to assume, control and conduct promptly and diligently the defense of the relevant Indemnitee with respect to such Claim, and no Claim will be settled by an Indemnitee without the prior written consent of Lessee (such consent not to be unreasonably withheld or delayed), provided that:

(b)   Lessee shall have consulted, and shall continue to consult, with Lessor as to the appropriate defense and conduct thereof;

(c)   Lessee shall have made, and continue to make, adequate provision or reserve with respect to such Claim and any associated costs and expenses (having regard to the nature and amount of such Claim, cost and expenses), or such Claim shall be fully covered under the policies of insurance maintained by Lessee pursuant to this Lease, and shall have fully indemnified or agreed to indemnify the Indemnitees for all costs, liabilities, expenses or damages arising as a result of such Claim or its defense by Lessee of such Indemnitee pursuant to this Section; provided, however, that Lessee shall not be bound by such an agreement to indemnify to the extent that a final determination by the tribunal in which the indemnified Claim is adjudicated articulates a basis upon which it can be established, in accordance with the terms of this Section 15, that Lessee is not liable to such Indemnitees in respect of such Claim;

(d)   No Indemnitee shall be prevented by this Section 15.4 from settling or paying any Claim immediately if such Indemnitee is required by applicable law to do so but otherwise no Indemnitee shall enter into settlement or other compromise with respect to any Claims without the prior written consent of Lessee, which consent shall not

unreasonably be withheld, conditioned or delayed, provided, however, that if an Indemnitee desires to settle a claim and Lessee shall refuse to consent, then upon request of such Indemnitee, Lessee shall confirm in writing that the Claim that gives rise to the claim for indemnification is covered by the provisions of Section 15.1. Notwithstanding the foregoing, however, an Indemnitee may settle or compromise any Loss without the consent of Lessee even if such consent is required pursuant to the provisions of this paragraph (c) (and, except in the case of clause (i), the indemnity obligation of Lessee under this Section 15 shall remain in full force and effect) if (i) such Indemnitee waives its right to be indemnified with respect to such Losses under Section 15.1 or (ii) an Event of Default or Specified Default has occurred and is continuing or (iii) such Loss involves the imposition of criminal liability on such Indemnitee unless, in the opinion of independent counsel engaged by such Indemnitee, the defense that Lessee proposes to pursue is reasonably likely to succeed and Lessee or its insurer diligently pursues such defense;

(e)      Lessor shall be entitled, upon consultation with and prior written notice to Lessee, to terminate Lessee's participation in the defense of a Claim where an act, delay or omission of Lessee indicates that the interests of any Indemnitee have a reasonable likelihood of being materially adversely prejudiced by Lessee's continued defense of such Claim.

(f)      Each Indemnitee shall supply Lessee with such information documents or testimony reasonably requested by Lessee as is necessary or advisable for Lessee to conduct, control or participate in any proceeding relating to any Loss.

(g)      In addition to its other rights under this Section 15.4, Lessee shall be entitled, at Lessee's sole expense, to participate in any legal action involving the Aircraft, Airframe, Engines, any Part, or any Operative Document so long as such participation would not prejudice any Indemnitee's conduct of such proceedings, as reasonably determined by such Indemnitee.

15.5    Subrogation. Upon payment in full of any Loss, Lessee will automatically be subrogated to any rights and remedies of such Indemnitee in respect of such Loss (other than under insurance policies maintained by such Indemnitee) (a "**Subrogated Claim**") and without warranty as to the enforceability of such rights, and subject to the following provisions:

(a)      such Indemnitee shall, at the sole cost and expense of Lessee, assist Lessee in any manner reasonably requested by Lessee for the purpose of enforcing and obtaining the rights and benefits intended to be conferred by this Section 15.5 upon Lessee; and

(b)      Lessee shall keep Lessor fully informed of any Subrogated Claim by Lessee, and shall consult with Lessor regarding the conduct of such Subrogated Claim.

(c)      In the event that Lessee shall have paid a Loss to or on behalf of an Indemnitee, and such Indemnitee subsequently shall be reimbursed in respect of such indemnified amount from any other Person, such Indemnitee shall promptly pay Lessee the lesser of the amount paid by Lessee for such Expense plus interest and the amount of

such reimbursement, plus interest thereon to the extent actually received by such Indemnitee from the payor thereof, provided that no Specified Default or Event of Default has occurred and is continuing, in which case such amounts shall be paid over to Lessor to hold as security for Lessee's obligations under this Agreement.

**Section 16**    Insurance.

16.1    Lessee's Obligation to Insure.  Throughout the Lease Period and until redelivery or repossession of the Aircraft in accordance with the terms of this Agreement, or payment of the Stipulated Loss Value, Lessee shall comply with, or cause to be complied with, each of the provisions of Schedule 7, which provisions are hereby incorporated by this reference as if set forth in full herein.

16.2    Insurance for Own Account.  Nothing in this Agreement shall limit or prohibit (a) Lessee from maintaining the policies of insurance required under Schedule 7 with higher limits than those specified in Schedule 7, or (b) Lessor or the Beneficiary or any Financing Party from obtaining insurance for its own account (and any proceeds payable under such separate insurance permitted by (a) and (b) shall be payable as provided in the policy relating thereto); provided, however, that no insurance may be obtained or maintained that would limit or otherwise adversely affect the coverage of any insurance required to be obtained or maintained by Lessee pursuant to this Section 16 and Schedule 7.

16.3    Indemnification by Government in Lieu of Insurance.  Lessor agrees to accept, in lieu of insurance against any risk with respect to the Aircraft described in Schedule 7, indemnification from, or insurance provided by, the U.S. Government or any agency or instrumentality thereof the obligations of which are supported by the full faith and credit of the government of the United States of America (including by the FAA), against such risk in an amount that, when added to the amount of insurance (including permitted self-insurance), if any, against such risk that Lessee may continue to maintain, in accordance with this Section 16, shall be at least equal to the amount and terms of insurance against such risk otherwise required by this Section 16.

16.4    Application of Insurance Proceeds.  As between Lessor and Lessee, all insurance proceeds received as a result of the occurrence of a Total Loss with respect to the Aircraft or any Engine under policies required to be maintained (or caused to be maintained) by Lessee pursuant to this Section 16 will be applied in accordance with Section 17.  All proceeds of insurance required to be maintained (or caused to be maintained) by Lessee, in accordance with Section 16 and Section B of Schedule 7, in respect of any property damage or loss not constituting a Total Loss with respect to the Aircraft, Airframe or any Engine will be applied in accordance with Sections B and E of Schedule 7.

16.5    Application of Payments During Existence of a Specified Default or Event of Default.  Except for insurance permitted by Section 16.2(a) and maintained by Lessee for its own account, any amount described in this Section 16 that is payable or creditable to, or retainable by, Lessee shall not be paid or credited to, or retained by, Lessee if at the time such payment, credit or retention would otherwise occur a Specified Default or Event of Default shall have occurred and be continuing, but shall instead be held by or paid over to Lessor as security

for the obligations of Lessee under this Agreement and shall be applied, at the option of Lessor, or upon the written request of Lessee to Lessor, from time to time during the continuance of an Event of Default, to Lessee's obligations under this Agreement as and when due, it being understood that any such application shall be made to such obligations of Lessee as Lessor may determine in its sole discretion, and otherwise in accordance with Section 20. At such time as there shall not be continuing any Specified Default or Event of Default, such amount shall be paid to Lessee to the extent not previously applied in accordance with this Section 16.5.

Section 17    Loss, Damage and Requisition.

17.1    Total Loss prior to Delivery. If a Total Loss occurs prior to Delivery of the Aircraft to Lessee, this Agreement shall immediately terminate, and except as expressly stated in this Agreement neither party will have any further obligation or liability under this Agreement other than pursuant to Section 23.4(a) except that Lessor will repay to Lessee the amount of Security Deposit received by Lessor prior to the date of such Total Loss and not applied prior to the date of such Total Loss in accordance with Section 6.

17.2    Total Loss after Delivery.

(a)    If a Total Loss occurs after delivery of the Aircraft to Lessee (including with respect to the Airframe), Lessee shall:

(i)    notify Lessor as soon as practicable and in any event within five (5) days following the Total Loss Date; and

(ii)    pay or cause to be paid to Lessor the Stipulated Loss Value for the Aircraft not later than the first business day following the earlier of (x) the second business day after receipt of insurance proceeds in respect of such Total Loss (but in no event earlier than the date of Lessee's election) and (y) the 60th day after the occurrence of such Total Loss Date.

(b)    If Section 17.2(a)(ii) becomes applicable, subject to the rights of any insurers and reinsurers or other third parties, upon irrevocable payment in full to Lessor of the Stipulated Loss Value, as set forth in such section, and all other amounts which are due and payable to Lessor under this Agreement, Lessor shall transfer to Lessee all of Lessor's rights, title and interest to the Aircraft, Airframe and Engines, including any Engines and Parts not installed when the Total Loss occurred, on an as-is where-is basis and without recourse or warranty (save as to freedom from Lessor Liens), and Lessor shall execute and deliver such bills of sale and other instruments as Lessee may reasonably request to evidence such transfer, free and clear of all rights of Lessor and Lessor Liens.

(c)    Upon receipt by Lessor of the Stipulated Loss Value under Section 17.2(b), and all other amounts due and payable to Lessor under this Agreement, (x) Rent shall cease to accrue and the leasing of the Aircraft shall thereupon immediately terminate, but without prejudice to any continuing obligations of Lessee (as to payment, indemnity or otherwise) expressly set out under this Agreement, (y) Lessee shall be subrogated to all claims of Lessor, if any, against third parties, for damage to or loss of

the Airframe and any Engines or Parts to the extent of the then insured value of the Aircraft and (z) except to the extent already applied against the obligations of Lessee to Lessor under this Agreement, Lessor shall return any Credit Security Deposit or Cash Security Deposit in accordance with, and subject to the terms of, Section 6.2.

17.3    Total Loss of Engine(s).

(a)    Upon a Total Loss of any Engine not installed on the Aircraft, or a Total Loss of an Engine installed on the Airframe not involving a Total Loss of the Airframe (in either case, a "**destroyed Engine**"), Lessee shall give Lessor prompt written notice thereof (and in any event within 15 days after such Total Loss) and Lessee shall replace the destroyed Engine as soon as reasonably possible (but in any event within 90 days after such Total Loss) by procuring that Lessor acquires, at Lessee's expense, title to a Replacement Engine.  The preceding notwithstanding, if Lessee makes good faith efforts (supported by evidence of such efforts) to procure a Replacement Engine and is not able to obtain a Replacement Engine within 90 days after such Total Loss, Lessor shall not treat such failure to obtain a Replacement Engine within 90 days as a breach under this Agreement, provided that in any event, Lessee shall acquire a Replacement Engine within 180 days.  Such Replacement Engine shall (upon acquisition by Lessor) be an Engine as defined herein.

(b)    Lessee will at its own expense take such action as Lessor may reasonably request in order that any such Replacement Engine shall be the property of Lessor, and leased hereunder on the same terms as the destroyed Engine including, but not limited to procuring the execution of a full warranty bill of sale covering such Replacement Engine, a supplement to this Agreement adding such Replacement Engine to the Aircraft and all such other agreements, evidences, filings, recordations and instruments that are necessary to ensure that Lessee has complied with the requirements set forth in the definition of "Replacement Engine" and that title to such Replacement Engine passes to Lessor and is subject to the security interest of the Financing Parties and such Replacement Engine becomes an Engine as defined herein.  At any time when requested by Lessor, Lessee will also provide evidence to Lessor's reasonable satisfaction (including the provision, if required, to Lessor of legal opinions) that (i) title has so passed to Lessor and is subject to the security interest of the Financing Parties and (ii) the insurance provisions in Section 16 and Schedule 7 have been complied with.  Lessee's obligation to pay Rent shall continue in full force and effect, but an amount equal to the Total Loss Proceeds received by Lessor with respect to the destroyed Engine, less any expenses, taxes or duties incurred in connection with the collection thereof, shall, subject to Lessor's right to deduct therefrom any amounts then due and payable by Lessee under the Lessee Documents, be paid to Lessee upon replacement thereof in accordance with the terms hereof, so long as no Event of Default or Specified Default has occurred and is continuing.

(c)    Immediately upon the effectiveness of such substitution (a) and without further act title to the replaced Engine shall thereupon vest in Lessee, in an as-is, where-is condition, free and clear of all rights of Lessor and Lessor Liens, (b) Lessor shall furnish to or at the direction of Lessee a bill of sale in form and substance reasonably satisfactory

to Lessee (the terms of which shall conform to preceding clause (a) of this paragraph) evidencing such transfer, (c) Lessor shall transfer all claims, if any, against third parties for damages or loss of the Engine subject to such Total Loss, and (d) the replaced Engine shall no longer be deemed an Engine hereunder.

17.4    Requisition.

(a)    During any requisition for use or hire of the Aircraft, any Engine or any Part which does not constitute a Total Loss or an allocation under CRAF:

(i)    the Rent and other amounts payable under this Agreement will not be suspended or abated either in whole or in part, and Lessee will not be released from any of its other obligations under the Agreement;

(ii)    (x) so long as no Specified Default or Event of Default has occurred and is continuing, Lessee shall be entitled to any compensation paid by the requisitioning authority in respect of the Lease Period, (y) while a Specified Default or Event of Default has occurred and is continuing, any such compensation shall be applied against Lessee's obligations hereunder (at the discretion of Lessor) as and when due, and (z) at such time as there shall not be continuing any such Specified Default or Event of Default, such amount shall be paid to Lessee to the extent not previously applied pursuant to clause (y) hereof;

(iii)    Lessee shall, as soon as practicable after the end of any such requisition, cause the Aircraft to be put into the condition required by this Agreement; and

(iv)    Lessor shall be entitled to all compensation payable by the requisitioning authority in respect of any change in the structure, state or condition of the Aircraft arising during the period of requisition, and Lessor shall promptly apply such compensation in reimbursing Lessee for the cost of complying with its obligations under this Agreement in respect of any such change (including, if applicable, its obligation to pay Stipulated Loss Value), provided that, if any Specified Default or Event of Default has occurred and is continuing, Lessor may apply the compensation in or towards settlement of any amounts owing by Lessee under this Agreement.

(b)    If the Aircraft is under requisition for hire at or within two months of the end of the Lease Period (in circumstances where no Total Loss or CRAF Activation Period has occurred) the Lease Period shall, provided no Event of Default or Specified Default has occurred and is continuing, be deemed to be extended until the earlier of (i) thirty (30) days after the date on which the Aircraft ceases to be subject to such requisition for hire, and (ii) the date falling 180 days after the date on which the Lease Period would otherwise have terminated (unless such date is less than thirty (30) days after the date on which the Aircraft ceased to be subject to such requisition for hire).  If at the end of such 180 day period the Aircraft is still subject to requisition for hire, and cannot be redelivered to Lessor in accordance with Section 19, then such failure shall constitute an Event of Loss which shall be deemed to have occurred on the last day of the

Lease Period, as extended, and Section 17.2 hereof shall apply thereto. During any extension of the Lease Period as contemplated by this Section 17.4(b) Lessee shall pay Rent to Lessor in the same amounts and in the same manner as were being paid prior to the commencement of the requisition for hire (pro rata for any period of less than one month), and Lessee shall be entitled to receive and retain any requisition compensation payable. If any Engine or Part is under requisition for hire at the end of the Lease Period (in circumstances where no Total Loss has occurred), Lessee shall replace such Engine or Part with a Part complying with the terms of subsection (b) of Schedule 19 or a Replacement Engine, as applicable.

**Section 18** DISCLAIMERS. LESSOR AND LESSEE AGREE THAT THE DISCLAIMERS, WAIVERS AND CONFIRMATIONS SET FORTH IN SECTIONS 18.1 TO 18.4 SHALL APPLY AT ALL TIMES DURING THE LEASE PERIOD WITH EFFECT FROM LESSEE'S ACCEPTANCE OF THE AIRCRAFT BY EXECUTION OF THE CERTIFICATE OF ACCEPTANCE, WHICH SHALL BE CONCLUSIVE PROOF THAT LESSEE HAS FULLY INSPECTED THE AIRCRAFT AND EVERY PART THEREOF AND THAT THE AIRCRAFT, THE ENGINES, THE PARTS AND THE AIRCRAFT DOCUMENTS ARE TECHNICALLY ACCEPTABLE TO LESSEE AND ARE IN SUITABLE CONDITION FOR DELIVERY TO AND ACCEPTANCE BY LESSEE AND ARE IN EVERY WAY SATISFACTORY TO LESSEE:

18.1 Exclusion. THE AIRCRAFT IS TO BE LEASED AND DELIVERED HEREUNDER "AS IS, WHERE IS", "WITH ALL FAULTS", AND LESSEE AGREES AND ACKNOWLEDGES THAT, SAVE AS EXPRESSLY STATED IN THIS AGREEMENT:

(a) NEITHER LESSOR NOR BENEFICIARY WILL HAVE LIABILITY IN RELATION TO, AND NEITHER LESSOR NOR BENEFICIARY HAS AND WILL BE DEEMED TO HAVE MADE OR GIVEN (WHETHER BY VIRTUE OF HAVING DONE OR FAILED TO DO ANY ACT, OR HAVING ACQUIRED OR FAILED TO ACQUIRE ANY STATUS UNDER OR IN RELATION TO THIS AGREEMENT OR OTHERWISE), ANY WARRANTIES OR REPRESENTATIONS, EXPRESS OR IMPLIED, WITH RESPECT TO, THE AIRCRAFT OR ANY ENGINE OR PART, INCLUDING (BUT NOT LIMITED TO) THE DESCRIPTION, AIRWORTHINESS, COMPLIANCE WITH SPECIFICATIONS, OPERATION, MERCHANTABILITY, FREEDOM FROM INFRINGEMENT OF PATENT OR OTHER PROPRIETARY RIGHTS, FITNESS FOR ANY PARTICULAR USE OR PURPOSE, VALUE, DURABILITY, CONDITION, OR DESIGN, OR AS TO THE QUALITY OF THE MATERIAL OR WORKMANSHIP, THE ABSENCE OF LATENT OR OTHER DEFECTS, WHETHER OR NOT DISCOVERABLE, OR AS TO ANY OTHER MATTER WHATSOEVER, EXPRESS OR IMPLIED (INCLUDING ANY IMPLIED WARRANTY ARISING FROM A COURSE OF PERFORMANCE OR DEALING OR USAGE OF TRADE) WITH RESPECT TO THE AIRCRAFT, ANY ENGINE OR ANY PART; AND

(b) NEITHER LESSOR NOR BENEFICIARY SHALL HAVE ANY OBLIGATION OR LIABILITY WHATSOEVER TO LESSEE (WHETHER ARISING

IN CONTRACT OR IN TORT, AND WHETHER ARISING BY REFERENCE TO NEGLIGENCE OR STRICT LIABILITY OF LESSOR OR OTHERWISE) FOR:

   (i) ANY LIABILITY, LOSS OR DAMAGE CAUSED OR ALLEGED TO BE CAUSED DIRECTLY OR INDIRECTLY BY THE AIRCRAFT OR ANY ENGINE OR BY ANY INADEQUACY THEREOF OR DEFICIENCY OR DEFECT THEREIN OR BY ANY OTHER CIRCUMSTANCE IN CONNECTION THEREWITH;

   (ii) THE USE, OPERATION OR PERFORMANCE OF THE AIRCRAFT OR ANY RISKS RELATING THERETO;

   (iii) ANY INTERRUPTION OF SERVICE, LOSS OF BUSINESS OR ANTICIPATED PROFITS OR ANY OTHER DIRECT, INDIRECT OR CONSEQUENTIAL LOSS OR DAMAGE; OR

   (iv) THE DELIVERY, OPERATION, SERVICING, MAINTENANCE, REPAIR, IMPROVEMENT OR REPLACEMENT OF THE AIRCRAFT, ANY ENGINE OR ANY PART.

  18.2 <u>Waiver</u>.  LESSEE HEREBY WAIVES, AS BETWEEN ITSELF AND LESSOR, ALL ITS RIGHTS IN RESPECT OF ANY WARRANTY OR REPRESENTATION DISCLAIMED PURSUANT TO SECTION 18.1, EXPRESS OR IMPLIED, ON THE PART OF LESSOR AND ALL CLAIMS AGAINST LESSOR HOWSOEVER AND WHENEVER ARISING AT ANY TIME IN RESPECT OF OR OUT OF THE MATTERS REFERRED TO IN SECTION 18.1.

  18.3 <u>Disclaimer of Consequential Damages</u>.  LESSEE AGREES THAT IT SHALL NOT BE ENTITLED TO RECOVER, AND HEREBY DISCLAIMS AND WAIVES ANY RIGHT THAT IT MAY OTHERWISE HAVE TO RECOVER, LOST PROFITS OR REVENUES OR CONSEQUENTIAL DAMAGES (AS DEFINED IN SECTION 2A-520 OF THE UCC OR OTHERWISE) AS A RESULT OF ANY BREACH OR ALLEGED BREACH BY LESSOR OF ANY OF THE AGREEMENTS, REPRESENTATIONS OR WARRANTIES OF LESSOR CONTAINED HEREIN.

  18.4 <u>Confirmation</u>.  LESSEE CONFIRMS THAT THE FOREGOING PROVISIONS OF THIS SECTION 18 HAVE BEEN TAKEN INTO ACCOUNT BY BOTH PARTIES IN NEGOTIATING THE RENT AND OTHER AMOUNTS PAYABLE UNDER THIS AGREEMENT.

  **Section 19** <u>Redelivery Conditions</u>.

  19.1 <u>Redelivery</u>.  On the Expiry Date, Lessee shall (unless a Total Loss has occurred) redeliver the Aircraft and Aircraft Documents (which shall include each of the documents referred to in Schedule 10) to Lessor at Lessee's expense at the Redelivery Location. At the time of such redelivery:

(a)    the Aircraft shall be free and clear of all Security Interests (other than Lessor Liens); and

(b)    the Aircraft shall be in compliance with the Return Conditions.

19.2    Aircraft Inspection; Documentation Review.

(a)    Immediately prior to redelivery of the Aircraft, Lessee shall make the Aircraft available to Lessor for inspection ("**Final Inspection**") in order to verify that the condition of the Aircraft complies with this Agreement.  The Final Inspection shall continue until the date on which the Aircraft is returned to Lessor in the condition required under this Agreement.  Lessor shall promptly notify Lessee of any discrepancies identified by Lessor or its representative during the Final Inspection.  The Final Inspection shall include, and be long enough to permit Lessor to, in the following order in accordance with the provisions of Schedule 11:

(1)    inspect the Aircraft Documents; and

(2)    inspect the Aircraft and uninstalled Parts, including observing functional and operation system checks and performing visual inspection of the Aircraft; provided, however, any inspection by Lessor (and/or its respective representatives) shall not include the opening of any bays, panels and the like of the Aircraft, without the express prior consent of an officer of Lessee).

(b)    Lessor shall begin its review of the Aircraft Documents three (3) months prior to the scheduled dated of the Redelivery.  For the period commencing on the date of the start of Lessor's review of Aircraft Documents pursuant to this clause (b) and continuing until the date on which the Aircraft is returned to Lessor in the condition required by this Lease, Lessee will provide for the review of Lessor and/or its representative all of the Aircraft Documents in one central room with access to telephone, photocopy, fax and internet connections at the Aircraft return location.  Lessor shall promptly notify Lessee of any discrepancies identified by Lessor or its representatives during such inspection of the Aircraft Documents.

(c)    During the period commencing nine (9 ) months before and no less than six (6) months prior to the Expiry Date, Lessee and Lessor agree to schedule a pre-redelivery meeting to review: (a) the full terms of the Return Conditions, planned action items and dates for completion for Lessee to perform the maintenance required to comply with the Return Conditions, and (b) all documentation to be provided by Lessee in preparation for the review of Aircraft Documents described in clause (b) above. Lessee shall also review with Lessor all applicable software related to the Aircraft as of Redelivery which is subject to separate agreements between Lessee and any other party and Lessee shall cooperate with Lessor so as to enable Lessor to access such software, at Lessor's expense.

Aircraft Operating Lease Agreement

19.3    [Reserved]

19.4    Non-Compliance.

(a)    To the extent that, at the time of Final Inspection, the Aircraft is not in compliance with the Return Conditions, Lessee shall at Lessor's option promptly rectify the non-compliance and to the extent that non-compliance extends beyond the Expiry Date, the Lease Period will be automatically extended until the non-compliance has been rectified.

(b)    If the Lease Period is extended pursuant to this Section 19.4, Lessee shall pay to Lessor rent in respect of each day by which the Lease Period is so extended (which rent shall be payable to Lessor at such intervals as Lessor may specify or, in the absence of such specification, daily) and which rent shall be in the amounts equivalent to one hundred fifty percent (150%) of the daily equivalent of the last Rent paid; provided that in the event that such extension is attributable solely to an unforeseeable discrepancy from the Return Conditions and Lessee withdrew the Aircraft from commercial service and started the work required to comply with the redelivery conditions in advance of the Expiry Date which afforded a reasonable amount of time (based on industry standards) to return the Aircraft in compliance with this Lease on the Expiry Date, such rent amount shall remain at the daily equivalent of normal Rent for the first fifteen (15) days of such extension.

(c)    Lessor may elect to accept redelivery of the Aircraft notwithstanding noncompliance with the terms of this Agreement, in which case Lessee will indemnify Lessor as security for that indemnification, in respect of the cost of Lessor of putting the Aircraft into the condition required by this Agreement.

19.5    Acknowledgment.  Provided Lessee has complied with its obligations under this Agreement, following redelivery of the Aircraft by Lessee to Lessor at the Redelivery Location, Lessor shall deliver to Lessee acknowledgment signed Redelivery Certificate in the form attached hereto as Schedule 17 confirming that Lessee has redelivered the Aircraft to Lessor in accordance with this Agreement.

19.6    Bridging.  Prior to the Expiry Date and upon Lessor's request, Lessee shall facilitate the Aircraft's integration into any subsequent operator's fleet by providing Lessor with a cross-reference of Lessee's Approved Maintenance Program to the Manufacturer's Maintenance Planning Document items.

19.7    Redelivery Maintenance Payment Adjustments.  On the Redelivery Date, Lessee shall pay to Lessor the Redelivery Maintenance Payment Adjustments calculated in accordance with Schedule 6.

19.8    Cooperation with Remarketing.  During the last six (6) months of the Lease Period Lessee shall cooperate in all reasonable respects with the efforts of Lessor to lease or sell the Aircraft, including, without limitation, permitting potential lessees or purchasers to inspect the Aircraft and the records relating thereto, provided that the same shall not interfere with Lessee's use or maintenance of the Aircraft or require Lessee to incur out-of-pocket expenses for

which it is not reimbursed.  Upon giving Lessee reasonable notice in writing and subject to mutual agreement of Lessor and Lessee, Lessee shall endeavor to (at Lessor's sole expense) carry out any additional maintenance or modification work beyond that required by this Agreement, provided such work does not cause any planned grounding of the Aircraft to be extended, beyond that required by this Agreement that Lessor may reasonably request to enable the Aircraft to be leased or sold after Redelivery to a new operator and to be registered with such operator's aviation authority (it being acknowledged that Lessor shall also be responsible for the cost of any "fallout items" or additional repairs, inspections or maintenance identified as a result of such work required by Lessor, unless such fallout items are a consequence of the negligence or willful misconduct of Lessee).

**Section 20**    Events of Default.

     20.1    Events.  Each of the following events will constitute an Event of Default and breach of this Agreement by Lessee and each such Event of Default shall continue so long as, but only as long as, it shall not have been remedied or waived:

     (a)    Non-payment.  Lessee fails to (x) make any payment of Rent or restore the Security Deposit when required hereunder, in either case within five (5) Business Days after the same shall have become due or (y) make a payment of Stipulated Loss Value within ten (10) Business Days after the same shall become due; or

     (b)    Other Payments.  Lessee fails to make any other payments required under the Operative Documents within ten (10) days after receipt by Lessee of written notice of such failure from Lessor; or

     (c)    Insurance.  Lessee shall fail to carry and maintain (or cause to be carried and maintained) on or with respect to the Aircraft the insurance required by Section 16 or Schedule 7;

     (d)    Breach.  Lessee fails to comply with any other provision of this Agreement or any other Operative Document and such failure, if capable of being remedied, continues for thirty (30) days after receipt of written notice thereof from Lessor to Lessee; provided, however, that, if Lessee shall be diligently undertaking to remedy any such failure and notwithstanding the diligence of Lessee in attempting to remedy such failure, such failure is not cured within said thirty (30) day period, and in addition, (i) such failure is not capable of being cured within said thirty (30) day period, and (ii) such failure may not be cured by a monetary payment by Lessee, then there shall exist no Event of Default under this Section unless such failure is not remedied within ninety (90) days after such written notice; or

     (e)    Representation.  Any representation or warranty made (or deemed to be repeated on the Delivery Date) by Lessee in or pursuant to this Agreement or in any document or certificate or statement furnished by Lessee in connection herewith is or proves to have been incorrect in any material respect when made or deemed to be repeated and the circumstances giving rise to the breach of such representation or warranty if capable of being remedied are not remedied to the extent of the adverse

impact of such incorrectness within thirty (30) days after Lessee's receipt of notice from Lessor requiring such remedy;

(f)     Cross-Default.  Any  "event of default", howsoever described (after any required notice and the passage of any applicable cure period), occurs  under any Other Agreement;

(g)     Insolvency, etc.

(i)     Lessee consents to the appointment of a custodian, receiver, trustee or liquidator of itself or all or substantially all of Lessee's property or Lessee's consolidated property, or Lessee admits in writing its inability to, or is unable to, or does not, pay its debts generally as they come due, or makes a general assignment for the benefit of creditors, or Lessee files a voluntary petition in bankruptcy or voluntary petition seeking reorganization in a proceeding under any bankruptcy or insolvency laws (as now or hereafter in effect), or an answer admitting the material allegations of a petition filed against Lessee in any such proceeding, or Lessee by voluntary petition, answer or consent seeks relief under the provisions of any other bankruptcy, insolvency or other similar law providing for the reorganization or winding-up of corporations, or provides for an agreement, composition, extension or adjustment with its creditors generally; or

(ii)     an order, judgment or decree is entered by any court appointing, without the consent of Lessee, a custodian, receiver, trustee or liquidator or sequestering all or substantially all of Lessee's property, and any such order, judgment or decree of appointment or sequestration remains in effect, undismissed, unstayed, unterminated and unvacated for a period of ninety (90) consecutive days after the date of entry thereof or at any time an order for relief is granted; or

(iii)     an involuntary petition against Lessee in a proceeding under the United States federal bankruptcy laws or other insolvency laws (as now or hereafter in effect) is filed in a court of competent jurisdiction and is not withdrawn, stayed, vacated or dismissed within 60 consecutive days thereafter or at any time an order for relief is granted in such proceeding, or if, under the provisions of any law providing for reorganization or winding-up of corporations which may apply to Lessee, any court of competent jurisdiction assumes jurisdiction over, or custody or control of, Lessee or of all or substantially all of Lessee's property, and such jurisdiction custody or control remains in effect, unrelinquished, unstayed, undismissed, unvacated and unterminated for a period of 60 consecutive days after an order for relief is granted and entered in such proceeding;

provided, however, that notwithstanding anything to the contrary in Section 20.1(d) or (e) hereof, any failure of Lessee to perform or observe any covenant, condition, agreement or any error in a representation or warranty shall not constitute an Event of Default if such failure or error is caused solely by reason of an event that constitutes an Event of Loss so long as Lessee is continuing to comply with all of the terms of Section 17.

20.2    <u>Lessor Rights and Remedies</u>.

(a)    <u>Remedies</u>.  If any Event of Default shall occur and be continuing, Lessor may, at its option, declare by written notice to Lessee this Agreement to be in default (or, in the case of an Event of Default described in Section 20.1(g), this Agreement shall automatically be deemed to be in default without necessity of such written declaration or any other action) and thereafter at any time and from time to time, so long as any such outstanding Events of Default shall not have been remedied, exercise any one or more of the following remedies as Lessor in its sole discretion shall elect, to the extent permitted by, and subject to compliance with any mandatory requirements of, applicable law then in effect:

(i)    <u>Return and Repossession</u>.  Lessor may cause Lessee, upon giving written notice to Lessee, to return promptly, and Lessee shall return promptly, the Airframe and Engines (including the Aircraft Documents) as Lessor may so demand, to Lessor or its order in the location, manner and condition required by, and otherwise in accordance with, all the provisions of Section 19 as if the Airframe or Engine were being returned at the end of the Lease Period or Lessor, at its option, may enter upon the premises where the Airframe or any Engine, or any Part thereof, are located and peaceably take immediate possession of and remove the same by summary proceedings or otherwise (and, at Lessor's option store the same at Lessee's premises until disposal thereof by Lessor), all without liability accruing to Lessor for or by reason of such entry or taking of possession.

(ii)    <u>Sale and Use</u>.  Lessor may sell the Airframe and/or any Engine (including the Aircraft Documents) at public or private sale, at such times and places, and to such Persons, as Lessor may determine; or Lessor may otherwise dispose of, hold, use, operate, lease to others the Airframe and/or any Engine, as Lessor may determine (and provided that nothing contained herein shall be deemed to negate any obligation of Lessor under applicable law to mitigate damages suffered or incurred by Lessor as a result of the subject Event of Default).

(iii)    <u>Damages</u>.  Whether or not Lessor shall have exercised, or shall thereafter at any time exercise, any of its rights under Section 20.2(a)(i) or 20.2(a)(ii) with respect to the Airframe and/or any Engine, or any Part thereof, Lessor, by written notice to Lessee specifying a payment date may demand Lessee to pay to Lessor, and Lessee shall pay to Lessor, on the payment date so specified and in the manner and in funds of the type specified in Section 8, the following amounts:

(A)    all Rent then due and unpaid and any other amounts that Lessee is obligated to pay under the Operative Documents, which is due and payable prior to the earlier to occur of the date Lessor sells or re-leases the Aircraft or receives payment of the amount calculated pursuant to clause (E) below;

(B)     reasonable, out-of-pocket loss, cost, expense or liability sustained or incurred by Lessor owing to Lessee's failure to redeliver the Aircraft on the date or at the place required by this Agreement;

(C)     without duplication of amounts payable by Lessee under clause (B), and within ten (10) days from the date of Lessee's receipt of written notice from Lessor that such payment is due, all reasonable, out-of-pocket costs and expenses incurred by Lessor and Beneficiary in connection with or as a result of such Event of Default or the exercise of Lessor's remedies with respect thereto, including, without limitation, all storage, maintenance and insurance costs and all reasonable, out-of-pocket costs and expenses incurred in connection with recovering possession of the Airframe or any Engine or in placing such Airframe or Engine in the condition required by Section 19;

(D)     any prepayment fee, or other LIBOR breakage costs, incurred by Lessor relating to Lessor's financing arrangements in respect of the Aircraft; and

(E)     within ten (10) days from the date of Lessee's receipt of written notice from Lessor that such payment is due, an amount equaling the aggregate Rent for the remainder of the Lease Period discounted periodically (equal to installment frequency) to present worth at the Discount Rate, over the period from but excluding the relevant Rent Date to and including the date on which the demand is given, less either (a) in the event that Lessor has re-leased the Aircraft, an amount equaling the aggregate basic rental payments under such re-lease to become due for the period coinciding with the remainder of the Lease Period, discounted at the same rate and frequency as set forth in the introductory phrase of this clause 20.2(a)(iii)(E), or (b) in the event that Lessor has sold the Aircraft or has otherwise not re-leased the Aircraft for a period coinciding with the remainder of the Lease Period, an amount equaling the fair market rental value (as determined in accordance with the Appraisal Procedure) of the Aircraft for the period commencing with the date that Lessor reasonably anticipates that the Aircraft could be re-leased at such rental rate and ending with the date that the Lease Period was scheduled to expire, discounted periodically (equal to installment frequency) at the same rate and frequency as set forth in the introductory phrase of this clause 20.2(a)(iii)(E).

(iv)     Rescission.  Lessor may (a) at its option, rescind, cancel or terminate this Agreement as to the Aircraft, Airframe or any Engine, or any Part thereof, or (b) exercise any other right or remedy that may be available to it under applicable law or proceed by appropriate court action to enforce the terms hereof.

(b)     Limitations Under CRAF.  Notwithstanding the provisions of Section 20.2(a), during any period that the Aircraft, Airframe or any Engine is subject to CRAF in accordance with the provisions of this Agreement and in the possession of the U.S. Government or any agency or instrumentality of the United States, Lessor shall not, as a result of any Event of Default, exercise its remedies hereunder in such manner as to

limit Lessee's control under this Agreement (or any Permitted Sublessee's control under any Permitted Sublease) of the Aircraft, Airframe or such Engine, unless at least sixty (60) days' (or such other period as may then be applicable under CRAF) written notice of default hereunder shall have been given by Lessor by registered or certified mail to Lessee (and any Permitted Sublessee) with a copy to the Contracting Offer Representative or Representatives for the Military Airlift Command of the United States Air Force to whom notices must be given under the contract governing Lessee's (or any Permitted Sublessee's) participation in CRAF with respect to the Aircraft, Airframe or any Engine as provided in Section 11.3 and 11.1(c).

(c)     <u>Right To Perform For Lessee</u>.  During the continuance of any Event of Default, if Lessee (a) fails to make any payment of Rent required to be made by it hereunder or (b) fails to perform or comply with any of its agreements contained herein, Lessor may (but shall not be obligated to) make such payment to the extent that it has still not been paid by Lessee at the time of Lessor's payment thereof or perform or comply with such agreement, and the amount of such payment and the amount of the reasonable, out-of-pocket expenses of Lessor incurred in connection with such payment or the performance of or compliance with such agreement, as the case may be, together with interest thereon at the Default Rate, shall be payable by Lessee upon written demand by Lessor.  No such payment, performance or compliance shall be deemed to cure any Event of Default or otherwise relieve Lessee of its obligations with respect thereto unless, but without limiting the applicability of the preceding sentence and Lessor's right to reimbursement under this Section, the nature of such cure makes it impossible for Lessee to render performance.

(d)     <u>Remedies Cumulative</u>.  Nothing contained in this Agreement shall be construed to limit in any way any right, power, remedy or privilege of Lessor hereunder or under any other Operative Document or now or hereafter existing at law or in equity. Each and every right, power, remedy and privilege hereby given to, or retained by, Lessor in this Agreement shall be in addition to and not in limitation of every other right, power, remedy and privilege given under the Operative Documents or now or hereafter existing at law or in equity.  Each and every right, power, remedy and privilege of Lessor under this Agreement and any other Operative Document may be exercised from time to time or simultaneously and as often and in such order as may be deemed expedient by Lessor. All such rights, powers, remedies and privileges shall be cumulative and not mutually exclusive, and the exercise of one shall not be deemed a waiver of the right to exercise any other.  Notwithstanding the foregoing provisions of this Section 20.2, but subject to Section 23.15, this Agreement shall terminate automatically upon the sale of the Aircraft pursuant to Section 20.2(a)(ii) and Lessee's payment of all other amounts payable hereunder or under the other Operative Documents.

## Section 21     Taxation.

21.1     <u>Withholding</u>.

(a)     All payments by Lessee, or with respect to any obligation of Lessee paid in accordance with the Operative Documents, will be made without setoff or

counterclaim, free and clear of and without deduction or withholding for or on account of any Tax, except to the extent that any such deduction or withholding is required by applicable law with respect to any Tax;

(b)     if any Tax is required by any applicable law to be deducted or withheld from or with respect to any amount payable by Lessee or with respect to any obligation of Lessee payable in accordance with the Operative Documents, to or for the benefit of any Tax Indemnitee, Lessee shall:

(i)     unless such Tax is an Excluded Tax, pay such additional amount as shall be necessary to enable such Tax Indemnitee to receive, after such deduction or withholding (including any deduction or withholding with respect to such additional amount) and after subtracting the net amount of all Taxes (including Excluded Taxes) payable by such Tax Indemnitee as a result of such Tax Indemnitee's receipt or accrual of such additional amount (net of any current reduction in such Tax Indemnitee's liability for Taxes as a result of any Tax Benefit resulting from the payment of such amount), the amount which such Tax Indemnitee would have received if such deduction or withholding had not been required;

(ii)     pay the amount required to be deducted or withheld to the appropriate Government Entity or other taxing authority in a timely and proper manner; and

(iii)     promptly deliver to such Tax Indemnitee an original receipt issued by the relevant Government Entity or other documentation reasonably acceptable to such Tax Indemnitee verifying that the obligation described in subclause (ii) has been timely and properly performed.

21.2     <u>Tax Indemnity</u>.  Lessee shall pay, and on demand shall indemnify, protect, defend and hold harmless each Tax Indemnitee from and against, all Taxes (other than Excluded Taxes) which are imposed upon or with respect to, or are required to be paid in connection with or as a result of the Aircraft, the Airframe, an Engine, any Part or any of the payments or transactions or activities contemplated in the Operative Documents (regardless of how or when such Taxes are imposed, whether imposed upon a Tax Indemnitee, Lessee, the Aircraft or otherwise), including, without limitation, Taxes imposed on or with respect to, or required to be paid in connection with or as a result of any of the following:  (i) the Aircraft, the Airframe, any Engine or any Part or any interest in any thereof, (ii) the manufacture, purchase, acceptance, rejection, delivery, financing, mortgaging, registration, re-registration, de-registration, importation, exportation, ownership, leasing, subleasing, presence, management, control, performance, possession, use, operation, repair, maintenance, condition, refurbishment, service, overhaul, rebuilding, substitution, replacement, pooling, interchange, removal, alteration, improvement, modification, transportation, landing, return, storage, presence, redelivery, repossession, sale, transfer of title or other disposition of or action or event with respect to the Aircraft, any Engine or any Part, or any interest in any thereof or (iii) or any Rent, receipts, gains, earnings, income, insurance proceeds, or other amounts paid or payable or received or receivable with respect to the Aircraft, any Engine or any Part or any interest in any thereof or the transactions contemplated in the Operative Documents, or (iv) any of the Operative

Documents or any amendment or supplement thereto or the execution, delivery, filing, recording, performance or enforcement of any thereof or the transactions contemplated thereby.

        21.3    <u>Payments; Tax Reports; Information</u>.

       (a)    Lessee shall pay each Indemnified Tax (as defined in Section 21.3(b)) in a timely and proper manner directly to the relevant Government Entity, to the extent that direct payment by Lessee is permitted by applicable law, and shall deliver to the Tax Indemnitee for the account of which Lessee paid such Tax the original (or a certified copy of) an official receipt for Lessee's payment of such Tax (if obtainable by Lessee through the exercise of reasonable efforts) or such other documentary evidence of Lessee's payment of such Tax as is reasonably acceptable to such Tax Indemnitee.  If Lessee fails to pay any Indemnified Tax when due to the relevant Government Entity in the time and manner required by the applicable provisions of the Operative Documents, Lessee shall indemnify such Tax Indemnitee for any incremental taxes, interest or penalties that may become payable by the Tax Indemnitee as a result of any such failure.  Any additional amount payable by Lessee directly to any Tax Indemnitee pursuant to Section 21.1 shall be paid together with the payment to which such additional amount relates.  Any amount payable by Lessee directly to any Tax Indemnitee pursuant to Section 21.2 shall be paid in immediately available funds within thirty (30) days after Lessee receives such Tax Indemnitee's written demand therefor (which demand shall include or be accompanied by a description in reasonable detail of the Indemnified Tax and the calculation of the indemnity demanded), provided that Lessee shall not be required to pay any Tax more than five (5) Business Days before the date on which payment of such Tax is due.  In addition, if any Tax Indemnitee receives a written invoice or other documentation from a Government Entity requesting payment of an Indemnified Tax, such Tax Indemnitee will send a copy of such document to Lessee promptly after receipt thereof.

       (b)    <u>Reports</u>.  If any report, return, certification, statement or other document (a "**Tax Document**") is required to be filed by any Tax Indemnitee with respect to any Tax for which Lessee is required to indemnify such Tax Indemnitee pursuant to this Section 21 (an "**Indemnified Tax**"), Lessee shall promptly notify such Tax Indemnitee of such requirement and:

       (i)    if permitted by applicable law, prepare and file such Tax Document in a timely and proper manner (except for any such Tax Document which such Tax Indemnitee notifies Lessee in writing that such Tax Indemnitee intends to prepare, sign and file) and deliver a copy of such Tax Document to such Tax Indemnitee, provided that such Tax Indemnitee promptly delivers to Lessee, at Lessee's timely written request and expense, such information within such Tax Indemnitee's reasonable control as Lessee may reasonably request and as may be reasonably necessary for Lessee to prepare such Tax Document; or

       (ii)    if Lessee is not permitted by applicable law to file such Tax Document, Lessee shall prepare and deliver to such Tax Indemnitee a proposed form of

such Tax Document within a reasonable time prior to the time such Tax Document is required to be filed.

(c)     Information.  Lessee shall furnish to each Tax Indemnitee, promptly after receipt of such Tax Indemnitee's written request therefor, such documents and other information as are maintained by Lessee in the regular course of its business or required to be maintained by it pursuant to applicable law as such Tax Indemnitee may reasonably request to enable such Tax Indemnitee to comply with its Tax reporting, payment, audit and litigation requirements relating to such Tax Indemnitee's participation in the transactions contemplated in the Operative Documents.  In addition, each Tax Indemnitee shall furnish to Lessee such information maintained in the regular course of its business or required to be maintained pursuant to applicable law as is reasonably requested by Lessee in writing and reasonably necessary to enable Lessee to comply with its Tax reporting, payment, audit and litigation requirements relating to the transactions contemplated in the Operative Documents.

(d)     Refunds.  If and to the extent that a Tax Indemnitee receives a refund (in cash, as an offset against any liability for any Tax, or otherwise) of any Indemnified Tax previously paid by Lessee or for which Lessee previously paid an indemnity or any additional amount to any Tax Indemnitee pursuant to Section  15, 21.1, or 21.2 or advanced an amount to any Tax Indemnitee pursuant to Section 21.5(b)(v) (a "**Refund**") or if a Tax Indemnitee realizes a Tax Benefit that has not otherwise been taken into account in calculating the amount payable by Lessee as a result of the payment of an Indemnified Tax, such Tax Indemnitee shall pay to Lessee, the amount of such Refund or Tax Benefit (together with any interest received or credited with respect thereto) minus the net amount of all Taxes payable by such Tax Indemnitee with respect to the receipt or accrual of such Refund (net of all Tax Benefits not previously taken into account by such Tax Indemnitee) with respect to claiming and obtaining such Refund, provided, however, that if an Event of Default exists and is continuing, such Tax Indemnitee may hold the amount then due to Lessee under this Section 21.3(d) until such Event of Default ceases to exist, and provided, further, that in no event shall such payment (other than interest received or credited and net of any Taxes on such interest) exceed (i) the amount of all prior payments by Lessee to such Tax Indemnitee under Section 15,  21.1, 21.2 or 21.5(b)(v) minus (ii) the amount of all prior payments by such Tax Indemnitee pursuant to this Section 21.3(d), but any such excess shall be carried forward and applied as a credit to reduce any future indemnity liability of Lessee under Section 15,  21.1, 21.2, or 21.5(b)(v).  If a Tax Indemnitee pays Lessee any amount under this Section 21.3(d) and if and to the extent that it is subsequently determined by the Government Entity having jurisdiction that such Tax Indemnitee was not entitled to the Refund for which such Tax Indemnitee made such payment to Lessee, such determination shall be treated as the imposition of a Tax for which Lessee is obligated to indemnify such Tax Indemnitee pursuant to the provisions of Section 21.2.

21.4     Indemnities to be Paid on an After-Tax Basis.  Any indemnity or other amount payable by Lessee pursuant to Section 21.1 or 21.2 hereof  shall be paid on an After-Tax Basis.

21.5 <u>Contest; Survival</u>.

(a) <u>Contest</u>. If any Tax Indemnitee receives a written notice from any Government Entity asserting a liability against such Tax Indemnitee for any Tax for which Lessee would be required by Section 21 to indemnify such Tax Indemnitee (a "**Tax Claim**"), such Tax Indemnitee shall give Lessee written notice of such Tax Claim as soon as reasonably practicable, provided that any failure of such Tax Indemnitee to give such notice or any delay by such Tax Indemnitee in giving such notice shall not affect the obligations of Lessee under this Section 21, except, and only to the extent, that Lessee can demonstrate that the failure or delay in providing such notice was unreasonable and resulted in material, additional obligations for Lessee in defending against any suit or proceeding relating to such matter. If Lessee delivers to such Tax Indemnitee within thirty (30) days after the date of receipt of such Tax Indemnitee's notice, a written request that such Tax Indemnitee contest such Tax Claim (or, in the case of a Lessee Controlled Contest, permit Lessee to contest such Tax Claim) and if (and only so long as) the conditions described in Section 21.5(b) are satisfied, such Tax Indemnitee shall, in good faith and at Lessee's expense, contest (or, in the case of a Lessee Controlled Contest, permit Lessee to contest if permitted by applicable law) the validity, applicability or amount (as the case may be) of the Taxes that are the subject of such Tax Claim by (x) resisting payment thereof, (y) not paying such Taxes except under protest if protest is necessary and proper, or (z) if payment is made, using reasonable efforts to obtain a refund thereof in administrative and/or judicial proceedings permitted by applicable law (including all appeals, other than an appeal or petition to the United States Supreme Court). At any time while any Tax Indemnitee is conducting a Tax contest, it shall consult in good faith with Lessee, upon request, regarding the manner of conducting any such contest.

(b) <u>Conditions</u>. A Tax Indemnitee's obligation under Section 21.5(a) with respect to any Tax Claim is subject to the satisfaction of the following conditions at the time the contest is requested and at all times while the contest (if any) is continuing: (i) no Event of Default shall have occurred and be continuing (unless Lessee has provided to the Tax Indemnitee security for its obligations hereunder that is reasonably satisfactory to such Tax Indemnitee), (ii) the amount of the Tax Claim (plus, if the Tax that is the subject of the Tax Claim is a recurring Tax, the aggregate amount of all similar Tax Claims with respect to all relevant subsequent tax periods) shall exceed the Tax Contest Threshold (as set forth in Schedule 4 hereto), (iii) such Tax Indemnitee shall have received (at Lessee's expense) from independent tax counsel selected by Lessee and reasonably acceptable to such Tax Indemnitee a written opinion that there is a Reasonable Basis (within the meaning of Formal Opinion 85-352 of the American Bar Association Standing Committee on Ethics and Professional Responsibility) for such contest, (iv) Lessee shall have agreed to pay, and shall be paying, on demand, all reasonable costs and expenses incurred by such Tax Indemnitee in connection with the contest of such Tax Claim, (v) if the contest is to be conducted in a manner requiring payment of the Tax Claim, Lessee shall have advanced to such Tax Indemnitee, without interest, the amount of the Tax Claim and shall have agreed to indemnify such Tax Indemnitee on an After-Tax Basis for any net adverse Tax consequences of such interest-free advance, (vi) Lessee shall have agreed in writing that the Taxes that are the subject

of the Tax Claim are Indemnified Taxes, provided that Lessee shall not be bound by such acknowledgement to the extent that the final determination of the Tax Claim articulates conclusions of law and fact that demonstrate that the Taxes that are the subject of the Tax Claim are Excluded Taxes, and (vii) Lessor shall have determined in good faith that the action to be taken will not result in any risk of criminal penalty or any material risk of sale, forfeiture or loss of, or the creation of any Security Interest (other than a Permitted Lien) on, the Aircraft, an Engine or any Part (unless Lessee shall have provided security to the Tax Indemnitee that is reasonably satisfactory to such Tax Indemnitee).

(c)     Lessee Controlled Contests.  For the purposes of this Section 21, the words "Lessee Controlled Contest" means a contest pursuant to this Section 21.5 involving only Indemnified Taxes, provided that (i) such contest may be conducted under applicable law in the name of Lessee, (ii) no tax return of the relevant Tax Indemnitee will be held open with respect to which such Tax Indemnitee may be considered to have an actual or potential liability for Taxes that are not Indemnified Taxes, and (iii) the relevant Tax Indemnitee shall not then be contesting the same Tax in the same jurisdiction.  Lessee shall, at its expense, conduct and control any Lessee Controlled Contest and, in the case of any contest involving a claim for one or more Indemnified Taxes and a claim for one or more Excluded Taxes, to conduct and control such contest to the extent that it relates to claims for Indemnified Taxes, but only to the extent that the contest of the claims for Indemnified Taxes may be and are severed from the contest of claims for Excluded Taxes, provided, however, that in no event shall Lessee be permitted, or a Tax Indemnitee be required, to take any action pursuant to this Section 21.5 unless (and only so long as) the conditions described in Section 21.5(b) are satisfied.  With respect to any contest conducted by Lessee, Lessee shall retain control over such contest but shall consult in good faith with the relevant Tax Indemnitee and shall consider in good faith reasonable requests of the relevant Tax Indemnitee, including reasonable requests to participate in such contest.

(d)     Tax Indemnitee Controlled Contests.  The affected Tax Indemnitee shall, at the expense of Lessee, conduct and control any contest (other than a Lessee Controlled Contest) of a Tax Claim pursuant to this Section 21.5, provided, however, that in no event shall the Tax Indemnitee be required to commence or continue any contest pursuant to this Section 21.5 unless (and only so long as) the conditions described in clause 21.5(b) are satisfied.  With respect to any contest conducted by a Tax Indemnitee, the Tax Indemnitee shall have sole control over such contest (including choice of forum) but shall consult in good faith with Lessee and shall consider in good faith reasonable requests of Lessee, including reasonable requests to participate in such contest.

(e)     If a Tax Indemnitee is required to contest a Tax Claim pursuant to Section 21.5(a), no Tax Indemnitee shall settle or compromise any Tax Claim or contest proceeding or (except as permitted by Section 21.5(a)) refrain from appealing any adverse determination with respect thereto without the prior written consent of Lessee, provided that a Tax Indemnitee may in its sole discretion unconditionally waive in writing its right to the indemnification provided for in Section  21.1 or 21.2 with respect to any Tax Claim and refrain from contesting, or continuing the contest of, such claim, in which event:

(i)      Lessee shall have no liability to such Tax Indemnitee with respect to such Tax Claim (and, if the Indemnified Tax that is the subject of such Tax Claim is a recurring Tax, with respect to any corresponding claim with respect to any other taxable period if and to the extent that such failure to contest has a material adverse effect upon the contest of such corresponding claim), and

(ii)      the Tax Indemnitee shall refund to Lessee any amounts theretofore paid or advanced by Lessee with respect to such Indemnified Tax, excluding all contest costs described in Section 21.5(b)(iv) above previously incurred, plus interest at the rate earned on refunds of the relevant Government Entity.

(f)      Upon a final determination of a contest pursuant to this Section 21.5:

(i)      if the amount of the indemnity payable by Lessee pursuant to this Section 21 with respect to the contested Tax Claim exceeds the amount (if any) advanced by Lessee to the Tax Indemnitee pursuant to Section 21.5(b)(v), Lessee shall pay to the Tax Indemnitee the amount of such excess not later than thirty (30) days after the day on which Lessee receives the Tax Indemnitee's written demand for the indemnity payable by Lessee after the date of such final determination; or

(ii)      if the amount (if any) of the advance made by Lessee to the Tax Indemnitee pursuant to Section 21.5(b)(v) exceeds the amount of the indemnity payable by Lessee to the Tax Indemnitee pursuant to this Section 21 with respect to the contested Tax Claim, the Tax Indemnitee shall pay to Lessee the amount of such excess not later than thirty (30) days after the date on which the Tax Indemnitee receives Lessee's written demand therefor after the date of such final determination.

21.6      <u>Withholding Tax Exemption Certificates</u>.  Lessor and each Tax Indemnitee that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code will deliver to Lessee as soon as or prior to the date it becomes a Tax Indemnitee  such forms, certifications and other documents as such Tax Indemnitee is legally entitled to execute and deliver to Lessee and as are required by applicable law to permit Lessee to make any payment to or for the account of such Tax Indemnitee pursuant to this Agreement or any other Operative Document without any withholding Tax that Lessee would be required by any applicable law to withhold in the absence of such document, including two original copies of Internal Revenue Service Form W-9 or W-8-BEN-E (or other applicable Internal Revenue Service forms), properly completed and duly executed, sufficient under applicable law and regulations to permit Lessee to pay Rent and other amounts payable to Lessor under the Lease without withholding United States federal income tax or withholding tax and such forms, certificates or other evidence as may in the future be required by applicable law or regulations for such purpose or whenever a lapse in time or change in circumstances renders any such previously delivered forms, certificates or other evidence obsolete or inaccurate in any material respect.

21.7      <u>Review by Independent Accountants</u>.  In the event that there is a dispute with respect to the calculation of any amount under Section 21, such dispute will be referred to an independent accountant jointly selected by the relevant Tax Indemnitee and Lessee for determination.  The accounting firm shall be instructed to complete its review within 30 days of

receipt of such Tax Indemnitees's computations.  The determination of the independent accountant shall be final, binding and conclusive on Lessee and the Tax Indemnitee and their Related Indemnitees.  Lessee shall pay the fees and expenses of the accounting firm unless the accounting firm determines that (i) the Tax Indemnitee's computations are incorrect and (ii) the Tax Indemnitee's error exceeds the greater of (A) 10% of the amount calculated by the Tax Indemnitee or (B) ████████, in which case the Tax Indemnitee shall pay all of the fees and expenses of the accounting firm.  Lessee and the relevant Tax Indemnitee shall cooperate with such accounting firm and (subject to such accounting firm's execution of a confidentiality agreement reasonably satisfactory to the parties thereto) shall supply such accounting firm with all information reasonably necessary to permit such review and determination.

   **Section 22**    Assignment and Transfer.

   22.1    By Lessee.  Except as permitted under Section 10.11(e), Lessee will not assign, transfer (whether voluntarily or involuntarily, by operation of law or otherwise) or create or permit to exist any Security Interest over, any of its rights under this Agreement.

   22.2    Assignment by Lessor.  Lessee agrees that Lessor may at any time create Security Interests in respect of and assign (as security only) the Operative Documents and/or the Aircraft to the Financing Parties.  Notwithstanding any such Security Interest or assignment, Lessor will remain entitled to the benefit of each indemnity and the liability insurance effected under this Agreement.  Lessee will promptly execute (or cause to be executed) all documents reasonably requested by Lessor to effect, perfect, record or implement any such assignment, and will promptly comply with any other reasonable requests of Lessor, its successors and assigns in respect of any such Security Interest or assignment; provided that (1) such documents, assurances and actions are in a form and of a nature reasonably acceptable to Lessee and the collateral agent for such Financing Party shall agree in writing to comply with the quiet enjoyment covenant set forth in Section 9.1 of this Agreement, (2) Lessor shall pay all reasonable and documented out-of-pocket costs and expenses, including reasonable fees and disbursements of counsel, incurred by Lessee in connection with any such Security Interest or assignment, and (3) except as specifically provided in this Section 22.2, none of the obligations, liabilities, costs or risks of Lessor in the use and operation of the Aircraft or under or in respect of this Agreement or any other Operative Document shall be increased and none of Lessee's rights and benefits in respect thereof shall be diminished as a result of any such Security Interest or assignment.  Lessee acknowledges that the addition of Financing Parties as Indemnitees and Additional Insureds does not constitute an increase in Lessee's obligations, liabilities, costs or risks for purposes of the preceding clause (3).

   22.3    Transfer by Lessor.  Lessor may sell, assign, novate or otherwise transfer its right, title and interest in the Aircraft or this Lease without Lessee's consent (a "**Transfer**"), subject to the following conditions:

   (i)    the proposed purchaser, assignee or transferee (the "**Transferee**") shall enter into an agreement, reasonably satisfactory to Lessee, assuming all obligations of Lessor under this Lease and the other Operative Documents and of Beneficiary under the Participation Agreement and other Operative Documents;

    (ii)      Lessor shall be responsible for Lessee's reasonable legal fees and other reasonable costs and expenses incurred in respect of such Transfer and shall pay such costs and expenses promptly upon demand therefor;

    (iii)     the Transferee shall be a "citizen of the United States" within the meaning of Section 40102(a)(15)(c) of Title 49 of the United States Code or else such Transfer shall be effected in such a manner that the Aircraft shall not become ineligible for registration with the FAA in the name of Lessor under the Federal Aviation Code as a result of such Transfer;

    (iv)     the Transferee shall (i) not be an airline, aircraft operator, freight forwarder, or an Affiliate thereof and (ii) have (or be guaranteed, through a guarantee agreement reasonably acceptable to Lessee, by a person having) a minimum tangible net worth of ███████ (or such amount multiplied by the number of other aircraft operated by Lessee and transferred to Transferee if Transferee is purchasing from Lessor multiple aircraft operated by Lessee) determined in accordance with GAAP as of the time of and immediately after giving effect to the relevant Transfer;

    (v)      any Transfer will not increase Lessee's obligations, liabilities (financial or otherwise), or risks or diminish Lessee's rights and benefits, in each case under any Operative Document or in respect of the Aircraft (to be determined in each case as at the time of such Transfer by applying all applicable laws as are enacted and/or in effect on the effective date of such Transfer), it being acknowledged by Lessee that the inclusion of the Transferee as an Indemnitee and as an Additional Insured will not constitute an increase in Lessee's obligations, liabilities or risks;

    (vi)     any Transfer shall not affect the U.S. registration of the Aircraft (assuming the Aircraft is registered in the U.S. at the time of the transfer) or the registration of the Aircraft in any other country where the Aircraft may be registered at the time of the Transfer;

Upon compliance by Lessor, Beneficiary and Transferee with the foregoing terms and conditions, and at Lessor's cost and expense (as provided herein), Lessee shall execute and deliver in connection with such Transfer such documents and assurances (including a consent to the Transfer) and take such further action as Lessor or Beneficiary may reasonably request to establish or protect the rights and remedies created or intended to be created in favor of the Transferee in connection with such Transfer.

**Section 23**   <u>Miscellaneous Provisions</u>.

    23.1   <u>Rights Cumulative, Waivers</u>. The rights of Lessor and Lessee under this Agreement are cumulative, may be exercised as often as Lessor considers appropriate and are in addition to its rights under the general law. The rights of Lessor against Lessee, of Lessee against Lessor, or in relation to the Aircraft (whether arising under this Agreement or the general law) shall not be capable of being waived or varied otherwise than by an express waiver or

variation in writing; and in particular any failure to exercise or any delay in exercising any of such rights shall not operate as a waiver or variation of that or any other such right; any defective or partial exercise of any of such rights shall not preclude any other or further exercise of that or any other such right; and no act or course of conduct or negotiation on Lessor's or Lessee's part, as applicable, or on its behalf shall in any way preclude it from exercising any such right or constitute a suspension or any variation of any such right.

23.2    Delegation.  Lessor may delegate to any person or persons all or any of its rights, powers or discretions vested in it by this Agreement, and any such delegation may be made upon such terms and conditions and subject to such regulations (including power to sub-delegate) as Lessor in its absolute discretion thinks fit.  Lessor shall remain liable to Lessee for all of Lessor's obligations and liabilities under the Operative Documents notwithstanding any delegation by Lessor to another person of any such obligations or liabilities or any reliance by Lessor on another person to perform or discharge any such obligations or liabilities, whether or not such sub-delegation or reliance is permitted or contemplated by any other Operative Document (provided that to the extent any such obligation or liability is actually performed or discharged by such other person on Lessor's behalf, such performance or discharge shall constitute performance or discharge of the corresponding obligation or liability of Lessor).

23.3    Lessor's Right to Remedy.  If Lessee fails to comply with any provision of this Agreement, Lessor may, without being in any way obliged to do so or responsible for so doing and without prejudice to the ability of Lessor to treat such non-compliance as an Event of Default, effect compliance on behalf of Lessee, whereupon Lessee shall become liable, upon written demand of Lessor therefor, to pay immediately any reasonable sums expended by Lessor together with all reasonable, documented and out-of-pocket costs and expenses (including legal costs) in connection therewith and Lessor shall notify Lessee of its intention to effect such compliance.

23.4    Expenses.

(a)    Each party shall bear its own costs and expenses (including legal expenses) associated with the preparation, negotiation and completion of this Agreement and the other Operative Documents and Lessee shall be responsible for all costs and expenses of FAA counsel.

(b)    Lessee shall pay to Lessor:

(i)    all reasonable, documented and out-of-pocket expenses (including legal, professional, and out-of-pocket expenses) incurred or payable by Lessor in connection with any amendment to or extension of or other documentation requested by Lessee in connection with, or the granting of any waiver or consent under this Agreement; and

(ii)    all expenses (including legal, survey and other costs) payable or incurred by Lessor after a Default has occurred in connection with the enforcement of or preservation of any of Lessor's rights under this Agreement, or in respect of the repossession of the Aircraft.

(c)     Lessee shall bear all reasonable, documented and properly incurred costs associated with perfecting this Agreement in the State of Registration of the Aircraft (and other states as appropriate given the operation of the aircraft) and with otherwise performing its obligations under Section 10.8, including (but not limited to) the provision of legal opinions, stamp duties, translations and registrations, whether required by Lessor or Lessee.

23.5     <u>Liability of Lessor Limited</u>.  It is expressly agreed and understood that all representations, warranties and undertakings of Lessor hereunder shall be binding upon Lessor only in its capacity as trustee under the Trust Agreement, and the institution acting as Lessor shall not be liable in its individual capacity for any breach thereof except in the case of the institution acting as Lessor for breach of its own covenants, representations and warranties contained herein, to the extent covenanted or made in its individual capacity.

23.6     <u>Time of Essence</u>.  The time stipulated in this Agreement for all payments by Lessee to Lessor and for the prompt performance of Lessee's other obligations under this Agreement will be of the essence of this Agreement.

23.7     <u>Entire Agreement</u>.  This Agreement, together with the other Operative Documents, is the sole and entire agreement between Lessor and Lessee in relation to the leasing of the Aircraft and supersedes all previous agreements in relation to that leasing.

23.8     <u>Indemnitee as Third Party Beneficiary, etc</u>.  Any Tax Indemnitee or Indemnitee who is not a party to this Agreement may enforce the terms of this Agreement expressed to be for the benefit of or given by Lessee to or in favor of such Tax Indemnitee or Indemnitee and, provided that such Person shall have agreed, in writing, on or prior to the time that it became a Tax Indemnitee or Indemnitee under this Agreement, to the terms of Section 15 and Section 21 of this Agreement.

23.9     <u>Lessor on Behalf of Indemnitee</u>.  All rights expressed to be granted to each Indemnitee or Tax Indemnitee (other than Lessor) under this Agreement are given to Lessor on behalf of that Indemnitee or Tax Indemnitee but may be varied, amended or otherwise released by an agreement in writing between Lessor and Lessee without reference to or execution by the Indemnitee or Tax Indemnitee.

23.10     <u>Counterparts</u>.  This Agreement may be executed in counterparts each of which will constitute one and the same document.

23.11     <u>Language</u>.  All notices, requests, direction and other communications to be given under this Agreement or any other Operative Document will be in English.  All documents delivered to Lessor pursuant to this Agreement will be in English or, if not in English, will be accompanied by a certified English translation.  If there is any inconsistency between the English version of this Agreement or any other Operative Document and any version in any other language, the English version will prevail.

23.12     <u>Confidentiality</u>.  At all times during the Lease Period, Lessee and Lessor shall, and shall procure that their respective officers, employees and agents shall, keep this Agreement confidential and shall not, without the prior written consent of the other party,

disclose to any third party this Agreement or any of the terms of this Agreement or any documents, materials or information supplied by or on behalf of either party in connection with this Agreement, save that any such party shall be entitled to make such disclosure:

     (a)    in connection with any proceedings arising out of or in connection with this Agreement to the extent that either party may consider necessary to protect its interests; or

     (b)    if required to do so by an order of a court of competent jurisdiction whether in pursuance of any procedure for discovering documents or otherwise or pursuant to any law; or

     (c)    to the extent such information is otherwise publicly available; or

     (d)    to its auditors or legal advisors or other professional advisers (provided they shall be advised of the confidentiality obligations with respect such materials or information); or

     (e)    by Lessor to Beneficiary, the Security Trustee (if any) or any Financing Party, any other financier or prospective financier or any successor Beneficiary or prospective Beneficiary so long as any such person agrees in writing to be bound by the confidentiality provisions hereof or is bound by fiduciary duty; or

     (f)    if required to do so by any applicable law or in order for such party to comply with its obligations under this Agreement.

Notwithstanding anything to the contrary set forth herein or in any other agreement to which the parties hereto are parties or by which they are bound, the obligations of confidentiality contained herein and therein, as they relate to the Operative Documents and the transactions contemplated therein (the "**Transaction**") shall not apply to the U.S. federal tax structure or U.S. federal tax treatment of the Transaction, and each party hereto (and any employee, representative, or agent of any party hereto) may disclose to any and all persons, without limitation of any kind, the U.S. federal tax structure and U.S. federal tax treatment of the Transaction. The preceding sentence is intended to cause the Transaction to be treated as not having been offered under conditions of confidentiality for purposes of § 1.6111-2(c) (or any successor provision) of the Treasury Regulations promulgated under Code § 6111, and shall be construed in a manner consistent with such purpose. In addition, each party hereto acknowledges that it has no proprietary or exclusive rights to the U.S. federal tax structure of the Transaction or any U.S. federal tax matter or U.S. federal tax idea related to the Transaction.

     23.13  <u>Variation</u>.  The provisions of this Agreement shall not be varied otherwise than by an instrument in writing executed by or on behalf of Lessor and Lessee.

     23.14  <u>Invalidity of any Provision</u>.  If any provision of this Agreement becomes invalid, illegal or unenforceable in any respect under any law, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired.

23.15   <u>Survival</u>.  All indemnities and other obligations of Lessee, each Indemnitee and each Tax Indemnitee shall survive, and remain in full force and effect, notwithstanding the expiration or other termination of this Agreement and/or the leasing of the Aircraft hereunder.

23.16   <u>True Lease</u>.  The parties intend and agree that this Agreement:

(i)   constitutes a "true lease" and not a "security interest" as defined in Section 1-201(37) of the UCC; and

(ii)   confers only a leasehold interest on Lessee in and to the Aircraft on and subject to the terms of this Agreement, and no ownership or other interest with respect to the Aircraft is provided to Lessee under this Agreement.

23.17   <u>Section 1110</u>.  Lessee acknowledges that Lessor would not have entered into this Agreement unless it had available to it the benefits of a lessor under Section 1110 of Title 11 of the United States Code ("**Section 1110**").  Lessee covenants and agrees with Lessor that to better ensure the availability of such benefits, Lessee shall support any motion, petition or application filed by Lessor with any bankruptcy court having jurisdiction over Lessee whereby Lessor seeks recovery of possession of the Aircraft under Section 1110 and shall not in any way oppose such action by Lessor unless lessee shall have complied with the requirements of Section 1110 to be fulfilled in order to entitle Lessee to continued use and possession of the Aircraft hereunder.  In the event Section 1110 is amended, or if it is repealed and another statute is enacted in lieu thereof, Lessor and Lessee agree to amend this Agreement and take such other action not inconsistent with this Agreement as Lessor reasonably deems necessary so as to afford to Lessor the rights and benefits that such amended or substituted statute confers upon owners and lessors of aircraft similarly situated to Lessor.

**Section 24**   <u>Notices</u>.

24.1   <u>Notices</u>.  Every notice, request, direction or other communication under this Agreement shall:

(a)   be in writing delivered personally or by first-class prepaid letter (airmail if international) or fax;

(b)   be deemed to have been received:

(i)   in the case of a fax, at the time of dispatch with confirmed transmission report stating the correct facsimile number and number of pages sent and that such transmission is "OK" or equivalent (provided always that if the time of dispatch is not within normal business hours on a business day in the country of the addressee it shall be deemed to have been received at the opening of business on the next business day); and

(ii)   in the case of a letter when delivered personally or five (5) Business Days after it has been put in the post; and

(c)   be sent:

Aircraft Operating Lease Agreement

To Lessor at:

|  |  |
|---|---|
| Address: | Wells Fargo Bank Northwest, National Association, as trustee |
|  | 299 S. Main Street, 5th Floor |

To Lessor at:

Address:     Wells Fargo Bank Northwest, National Association,
             as trustee
             299 S. Main Street, 5th Floor
             MAC: U1228-051
             Salt Lake City, Utah 84111
             Attention:  Corporate Trust Department
             Facsimile:  (801) 246-7142
             Email: ctsleasegroup@wellsfargo.com

with a copy to:

             JSA Aircraft A321-3, LLC, as Beneficiary
             c/o Jackson Square Aviation, LLC
             909 Montgomery Street, Suite 500
             San Francisco, California  94133
             Attention:  General Counsel
             Facsimile:  (415) 821-8350

To Lessee at:

Address:     Frontier Airlines, Inc.
             7001 Tower Road
             Denver, CO  80249
             Attention:  Chief Financial Officer
             Email: Jimmy.Dempsey@flyfrontier.com
             Facsimile: (720) 374-9297

with a copy to:     Frontier Airlines, Inc.
             7001 Tower Road
             Denver, CO  80249
             Attention:  General Counsel
             Facsimile:  (720) 374-9297
             Email: Howard.Diamond@flyfrontier.com

**Section 25**     <u>Governing Law and Jurisdiction</u>.

25.1     <u>Governing Law</u>.  This Agreement is governed by and shall be construed in accordance with New York law.

25.2     <u>Jurisdiction</u>.

(a)     Lessee agrees that the Supreme Court of the City of New York, State of New York and the federal courts of the United States of America sitting in the Southern District of New York are to have jurisdiction to settle any disputes that may arise in

connection with the legal relationships established by this Agreement (including, without limitation, claims for set-off or counterclaim) and any other Operative Document or otherwise arising in connection with this Agreement and any Operative Document. Lessee hereby irrevocably and unconditionally submits to the jurisdiction of the Supreme Court of the City of New York, State of New York and the federal courts of the United States of America sitting in the Southern District of New York. The submission to such jurisdiction shall not (and shall not be construed so as to) limit the rights of any party to take proceedings against any other party in any other court of competent jurisdiction, nor shall the taking of proceedings in any one or more jurisdictions preclude the taking of proceedings in any other jurisdiction, whether concurrently or not.

(b)     Nothing in this Section 25.2 shall limit the right of Lessor or Lessee to bring proceedings against the other in connection with this Agreement or any other Operative Document:

(i)     in any other court of competent jurisdiction; or

(ii)     concurrently in more than one jurisdiction.

(c)     Lessee and Lessor:

(i)     irrevocably waive objection to the Supreme Court of the City of New York, State of New York and the federal courts of the United States of America sitting in the Southern District of New York on grounds of venue or inconvenient forum or otherwise as regards proceedings in connection with this Agreement; and

(ii)     agree that a final (no longer appealable) judgment or order of a court of the State of New York or a federal court of the United States of America sitting in the Southern District of New York in connection with this Agreement is conclusive and binding on it and may be enforced against it in the courts of any other jurisdiction.

(d)     LESSEE AND LESSOR EACH HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY ALL RIGHTS TO A JURY TRIAL IN RESPECT OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, ANY OTHER OPERATIVE DOCUMENT OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY OR THE LESSOR/LESSEE RELATIONSHIP BEING ESTABLISHED, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND OTHER COMMON LAW AND STATUTORY CLAIMS. EACH OF LESSOR AND LESSEE REPRESENTS AND WARRANTS THAT IT HAS REVIEWED AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH ITS LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT OR ANY OTHER OPERATIVE

DOCUMENT.  IN THE EVENT OF LITIGATION, THIS CLAUSE MAY BE FILED
AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

Aircraft Operating Lease Agreement

**IN WITNESS WHEREOF** the parties hereto have executed this Agreement on the date shown at the beginning of this Agreement.

LESSOR:

**WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION**, not in its individual capacity (except when referred to as "**WFB**"), but solely as trustee under the Trust Agreement

By: _____
    Name: **Lane Molen**
    Title: **Assistant Vice President**

LESSEE:

**FRONTIER AIRLINES, INC.**

By: _____
    Name:
    Title:

Aircraft Operating Lease Agreement

**IN WITNESS WHEREOF** the parties hereto have executed this Agreement on the date shown at the beginning of this Agreement.

LESSOR:

**WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION,** not in its individual capacity (except when referred to as "**WFB**"), but solely as trustee under the Trust Agreement

By:_____
    Name:
    Title:

LESSEE:

**FRONTIER AIRLINES, INC.**

By:_____
    Name:
    Title:

James G. Dempsey
Chief Financial Officer

Aircraft Operating Lease Agreement

[CONTAINED IN ORIGINAL COUNTERPART ONLY]

Receipt of this original counterpart of the foregoing Lease is hereby acknowledged on this _____ day of _____, 2016.

[_____]

By: _____
Name:
Title:

## SCHEDULE 1

## DEFINITIONS AND CONSTRUCTION

1.   The following words and expressions have the respective meanings set forth below:

"**Acceptance Certificate**" means a certificate of Lessor substantially in the form set out in Schedule 13;

"**Act**" means part A of subtitle VII of title 49, United States Code;

"**After-Tax Basis**" means, with respect to any amount (an "**Amount**") required by any Operative Document to be paid on an "After Tax Basis" to or for the benefit of any person, such Amount plus an additional amount that will cause the sum of such amounts, after subtracting the amount of all Taxes required to be paid by such person as a result of the receipt (actual or constructive) or accrual of such Amount plus the additional amount payable pursuant to this sentence (net of any current reduction in such person's liability for Taxes as a result of any Tax benefit resulting from the payment of such Amount) to be equal to the amount that such person would receive if such Taxes were not required to be paid by such person;

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with such Person.  For purposes of this definition, "control" means the power, directly or indirectly, to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or by contract or otherwise and "controlling," "controlled by" and "under common control with" have correlative meanings;

"**Agreement**" or "**Lease**" means this Aircraft Operating Lease Agreement together with its Schedules;

"**Airbus**" means Airbus S.A.S., a "Société par Actions Simplifiée" organized and existing under the laws of the Republic of France;

"**Airbus Participation Agreement**" means the participation agreement dated on or about the Delivery date between the Manufacturer, Seller and Lessor in respect of the Aircraft;

"**Aircraft**" means the aircraft described in Schedule 8 (which term includes where the context admits a separate reference to all Engines, Parts and Aircraft Documents);

"**Aircraft Documents**" means the documents, data, manufacturer aircraft manuals and technical records, whether in hard copy or in electronic format, relating to the Aircraft at the time of Delivery which are set out in Schedule 10 and any other documents and records referred to in Section 10.4, and all additions, renewals, revisions and replacements from time to time made thereto in accordance with this Agreement;

"**Aircraft Purchase Agreement**" means the Aircraft Purchase Agreement dated on or about the date hereof between Seller and Lessor;

"**Aircraft Purchase Agreement Assignment**" means the Purchase Agreement Assignment to be dated on or about the Delivery Date among Seller and Lessor, together with the consent thereto of Airbus;

"**Airframe**" means the Aircraft, excluding the Engines and the Aircraft Documents;

"**Airframe Warranties Assignment**" means the Airframe Warranties Agreement to be dated on or about the Delivery Date among Seller, Lessor and Manufacturer;

"**Airworthiness Directive**" means any and all mandatory airworthiness directives issued by the FAA and applicable to the Aircraft, the Airframe, either Engine, any Part or the Aircraft Documents, and any mandatory order issued by the FAA that is incorporated into and becomes an FAA airworthiness directive applicable to the Aircraft, the Airframe, either Engine, any Part or the Aircraft Documents within twelve months following the date such order is issued;

"**Alert Service Bulletin**" means a Service Bulletin whose implementation is stated by the issuer to be mandatory or necessary for airworthiness certification (whether or not such Service Bulletin is or becomes the basis for an Airworthiness Directive) and which has been implemented by Lessee at its discretion in relation to all the other aircraft in its fleet which are of the same type as the Aircraft.

"**AMM**" has the meaning given in Schedule 11.

"**Applicable Jurisdiction**" has the meaning given to it in Section 10.3;

"**Appraisal Procedure**" means the following procedure for determining the "fair market rental value" of the Aircraft or any part thereof pursuant to Section 20.2:  (a) Lessor shall select an independent aircraft appraiser of recognized standing who shall make a determination of "fair market rental value" of the Aircraft; and (b) the fees and expenses of the appraiser shall be paid by Lessee.  "**Fair market rental value**" shall mean the value determined by an appraisal completed by such appraiser on an "as-is" and "where-is" basis and on the basis of the rental value that would be obtained in an arm's-length transaction between an informed and willing lessee under no compulsion to lease and an informed and willing lessor under no compulsion to lease, taking into account customary brokerage and other reasonable out-of-pocket fees and expenses that typically would be incurred in connection with the sale or re-letting of equipment such as the Aircraft or part thereof;

"**Approved Maintenance Performer**" means (a) for all major checks, repairs and maintenance (including any C Check, any shop visit for an Engine or the APU, any Landing Gear Overhaul or the Overhaul of any serialized components) and all Major Modifications, any maintenance facility approved by the FAA which, provided Lessee has the requisite licenses and approvals, may be Lessee or (b) for all lower level checks, repairs and maintenance, any maintenance facility approved by the FAA which, provided Lessee has the requisite licenses and approvals, may be Lessee.

"**Approved Maintenance Program**" means Lessee's FAA-approved maintenance program;

"**APU**" means the auxiliary power unit installed on the Aircraft on the Delivery Date and any replacement auxiliary power unit installed in accordance with this Agreement title to which is transferred to Lessor in accordance with this Agreement;

"**APU Cycle**" means, with respect to the APU, one start and shut down of the airframe on which the APU is installed;

"**APU Hour**" means each hour or part of an hour (measured in minutes) during which the APU is operated;

"**APU Performance Restoration**" means, with respect to the APU, at a minimum, the complete disassembly and rework of the power section and load compressor, according to the Manufacturer's then current workscope planning guide and inspection repair manual;

"**Assignments**" means collectively the Aircraft Purchase Agreement Assignment, the Airframe Warranties Assignment and the Engine Warranties Assignment;

"**Aviation Authority**" means all and any of the authorities, government departments, committees or agencies which under the laws of the State of Registration shall from time to time:

(a)    have control or supervision of civil aviation in that state; or

(b)    have jurisdiction over the registration, airworthiness or operation of, or other matters relating to, the Aircraft;

"**A321**" means Airbus aircraft model A321;

"**Beneficiary**" means JSA Aircraft A321-3, LLC, a Delaware limited liability company with its address at c/o Jackson Square Aviation, LLC, 909 Montgomery Street, Suite 500, San Francisco, California 94133, its successors and permitted assigns;

"**Beneficiary Parent**" means JSA International U.S. Holdings, LLC, a Delaware limited liability company, its successors and assigns;

"**Bill of Sale**" means a bill of sale governed by the law of the State of New York duly executed and delivered by Seller, by which Seller conveys full legal and beneficial title to the Aircraft, free and clear of all Security Interests, to Lessor, pursuant to the Aircraft Purchase Agreement;

"**Business Day**" means: (a) in the case of payments, any day (other than a Saturday or Sunday) on which banks are open for business in Denver, Colorado and New York, New York; and (b) in all other cases, any day (other than a Saturday or Sunday) on which banks are open for business in New York, New York, Denver, Colorado and London, England;

"**Buyer Furnished Equipment**" has the meaning given in the Aircraft Purchase Agreement;

"**C Check**" means a maintenance check on the Airframe under the Approved Maintenance Program consisting of full and complete zonal, systems and structural check and any other maintenance and inspection tasks that are a part of such checks, all in accordance with the Approved Maintenance Program, or if the Approved Maintenance Program permits such structural check to be performed in phases, the performance of such phases shall constitute a complete zonal, systems and structural block "C" check, but in any event not including repairs arising as the result of operational or maintenance mishandling or accidental damage;

"**Cape Town Registrations**" means any registrations with the International Registry;

"**Cash Security Deposit**" means the amount of the Security Deposit, if any, paid by Lessee in cash;

"**Certificated Air Carrier**" means any person (except the United States government) that is a "citizen of the United States" as defined in Section 40102(a)(15)(c) of Title 49 of the United States Code) and holding a Certificate of Public Convenience and Necessity issued under Section 41102 of Title 49 of the United States Code by the Department of Transportation or any predecessor or successor agency thereto, or, in the event such certificates are no longer applicable, any person (except the United States government) that is a "citizen of the United States" as defined in Section 40102(a)(15)(c) of Title 49 of the United States Code) and legally engaged in the business of transporting for hire passengers or cargo by air predominantly to, from or between points within the United States of America, and in either event, operating commercial jet aircraft capable of carrying ten or more individuals or 6,000 pounds or more of cargo, which also is certificated so as to entitle Lessor, as a lessor, to the benefits of Section 1110 of the Title 11 of the United States Code or any analogous statute;

"**Certificate of Airworthiness**" means a full certificate of airworthiness for the Aircraft specifying transport category (passenger), including a valid Airworthiness Review Certificate where required;

"**Claim**" has the meaning given to it in Section 15.2;

"**Conditions Precedent**" means the conditions specified in Schedule 3;

"**Convention**" has the meaning given to it in Section 10.8(c);

"**CPCP**" means corrosion prevention and control program;

"**CRAF**" has the meaning specified in Section 11.3;

"**CRAF Activation Period**" has the meaning specified in Section 11.3;

"**Credit Security Deposit**" means the portion of the Security Deposit, if any, paid by Lessee in the form of a letter of credit;

"**Cycle**" or "**Flight Cycle**" or "**FC**" means one take-off and landing of the Aircraft or, in respect of any Engine or Part temporarily installed on another aircraft, of that other aircraft and for this purpose 1 (one) touch and go shall count as 1 (one) take-off and landing;

"**CSN**" means Cycles Since New;

"**CSO**" means Cycles Since Overhaul;

"**Damage Notification Threshold**" is as set forth on Schedule 4;

"**Default**" means any Event of Default and any condition, event or circumstance which, with the giving of notice and/or lapse of time and/or determination of materiality and/or fulfillment of any other condition, as applicable, would, if such time had elapsed at the time of the occurrence of such condition, event or circumstance, constitute an Event of Default;

"**Default Rate**" means a rate of interest per annum equal to four percent (4%) per annum in excess of the rate announced from time to time by Citibank, N.A. as its prime lending rate, but in no event higher than allowed by law;

"**Delivery**" means delivery of the Aircraft on lease by Lessor to Lessee hereunder as evidenced by Lessee's execution and delivery of the Lease Supplement;

"**Delivery Date**" means the date on which Delivery occurs;

"**Delivery Location**" means Airbus' aircraft delivery facilities in Toulouse, France or Hamburg, Germany;

"**Discount Rate**" means as of the applicable determination date a rate of interest equal to three and a half percent (3.5%) per annum;

"**dollars**" and "**US$**" mean the lawful currency of the United States of America;

"**Engine**" means, whether or not for the time being installed on the Aircraft:

(a)     the engines specified in Schedule 8; or

(b)     any engine which has replaced that engine, title to which has, or should have, passed to Lessor in accordance with this Agreement,

and in each case includes all modules and Parts from time to time belonging to or installed in that engine but excludes any replaced engine title to which has passed to Lessee pursuant to this Agreement;

"**Engine Flight Hour**" means each hour or part thereof an Engine is operated, elapsing from the moment the wheels of an aircraft on which such Engine is installed leave the ground until the wheels of such aircraft next touch the ground;

"**Engine Life Limited Part**" means a part which is flight time and/or cycle controlled as per ATA chapter 05 of the engine manufacturer's manual;

"**Engine Modules**" means any of the six major modules of an Engine, namely:  1) the High Pressure Compressor ("HPC"), 2) High Pressure Turbine ("HPT"), 3) Combustor, 4) Fan Booster/Low Pressure Compressor ("Fan Booster/LPC"), 5) Low Pressure Turbine ("LPT"), and

6.) Gearbox, each of which is comprised of sub-modules, as set forth in the guidelines CFM Workscope Planning Guide.

"**Engine Performance Restoration**" means, in respect of an Engine, the performance of off wing engine maintenance and repair accomplished for that Engine in accordance with the performance or higher workscope sections of the WPG which results in such Engine having, at a minimum, a performance or higher level of work performed on the high pressure compressor module, the combustor module, and  high pressure turbine modules and, if required by the WPG shall also include performance or higher level of work performed on one or more of the other Engine Modules;

"**Engine Warranties Assignment**" means the Engine Warranties Assignment Agreement to be dated on or about the Delivery Date, among Lessor and Seller, together with the consent thereto of CFM International, Inc.;

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and any regulations and rulings issued thereunder;

"**Event of Default**" means any event specified in Section 20.1;

"**Excluded Taxes**" means, in respect of any Tax Indemnitee, any of the following Taxes:

(a)    any Tax imposed (by withholding or otherwise) on, or calculated by reference to, the gross or net income (including any minimum or alternative minimum Tax, any accumulated earnings Tax or personal holding company Tax, or any value added or turnover tax imposed in direct substitution for an income Tax and any income Tax imposed as a result of this Agreement not being treated as a "true lease" for federal income tax purposes), profits (including any excess profits Tax), gains, gross or net receipts, gross transportation income, capital, or net worth, corporate franchise or conduct of business of a Tax Indemnitee or any intangibles Tax that is in the nature of an income tax by any jurisdiction under the laws of which such Tax Indemnitee is incorporated or otherwise organized or in which such Tax Indemnitee is booking the transactions contemplated by the Operative Documents or has an office or other fixed place of business or is engaged in business, provided that "Excluded Taxes" shall not include (i) any Taxes that are, or are in the nature of, sales, use, rental, leasing or property Tax or (ii) any such Tax imposed by any Government Entity authority of any jurisdiction (other than the United States) if and to the extent that such Tax is a result of any one or more of the following:  (A) the registration, use, operation, or presence of the Aircraft, the Airframe, any Engine or any Part in the jurisdiction imposing the Tax, or (B) the incorporation or other organization of Lessee or any Specified Person under the law of the jurisdiction imposing the Tax, or (C) the management, residence, presence, place of business, acts, activities or transactions of Lessee or any Specified Person in the jurisdiction imposing the Tax, or (D) the payment of any amount payable by or for the account of Lessee or any Specified Person pursuant to any Operative Document in or from the jurisdiction imposing the Tax;

(b)    any Tax which is imposed on or with respect to any event or period occurring after the Expiry Date and the payment by Lessee of all amounts then due pursuant to the Operative Documents, other than any Tax imposed on or with respect to any payment by

Lessee pursuant to the Operative Documents or the performance of any other obligation of Lessee pursuant to the Operative Documents;

(c)     any Tax imposed by any Government Entity on or with respect to the sale, assignment, transfer or other disposition (directly, indirectly or by operation of law) of all or any part of (i) such Tax Indemnitee's right, title and interest in the Aircraft, any Engine, any Part, or this Agreement, any other Operative Document, the Estate under the Trust Agreement or the income derived therefrom or (ii) such Tax Indemnitee's interest in itself, in each case other than any sale, assignment, transfer or other disposition that occurs in connection with (w) a Total Loss, or (x) an exercise of remedies after the occurrence and during the continuance of an Event of Default, or (z) the maintenance, modification, improvement, repair or pooling of the Aircraft, the Airframe, any Engine or any Part;

(d)     any Tax caused by the gross negligence or willful misconduct of such Tax Indemnitee or the breach by such Tax Indemnitee of any representation, warranty or covenant given by it or to be performed by it under this Agreement or any Operative Document (other than as may be attributed or imputed solely by reason of its participation in the transactions contemplated by the Operative Documents);

(e)     in the case of a transferee of a Tax Indemnitee, Taxes to the extent that the aggregate amount of such Taxes exceeds the aggregate amount of the Taxes that would have been imposed on or payable by the transferor Tax Indemnitee and for which Lessee would have been required to indemnify the transferor Tax Indemnitee pursuant to Section 21 under applicable laws in effect on the date of transfer;

(f)     any Tax imposed on or payable by a Tax Indemnitee to the extent caused by, and would not have been imposed but for, the existence of a Lessor Lien other than a Security Interest granted to a Financing Party;

(g)     so long as Lessee is complying with Section 21.3(b) hereof, any interest, penalties or additions to Tax imposed on or payable by a Tax Indemnitee to the extent caused by the failure of such Tax Indemnitee to file when due a Tax Document (as defined in Section 21.3(b)) to which Section 21.3(b)(ii) applies, or to pay any Tax when due (if such Tax Indemnitee is required to pay such Tax pursuant to the terms of the Operative Documents), other than where any such failure arises as a result of any breach by Lessee of any provision of, or the default by Lessee in the performance of, its obligations under this Agreement or as a result of any Event of Default occurring or otherwise arising as a result of the willful misconduct or gross negligence of Lessee;

(h)     any United States federal withholding Taxes imposed pursuant to FATCA;

(i)     any Tax to the extent such Tax is the result of, and would not have been incurred but for, any activities of a Tax Indemnitee in the jurisdiction imposing such Tax that are unrelated to such Tax Indemnitee's dealings with Lessee, unrelated to the transactions contemplated in the Operative Documents or unrelated to the use of the Aircraft, the Airframe, any Engine or any Part thereof by Lessee or any Specified Person;

(j)     any Tax to the extent such Tax is the result of, and would not have been incurred but for, an amendment to any Operative Document to which Lessee is not a party unless such amendment (i) is made at Lessee's written request or with Lessee's written approval; (ii) while an Event of Default exists; or (iii) is required by the terms of the Operative Documents;

(k)     any Tax imposed on the Trust Company (or Owner Trustee) in respect of the fees or compensation payable to such Person for services rendered in its capacity as the Owner Trustee;

(l)     any Tax imposed that is excess of the Tax that would have been imposed in the absence of the utilization of a trust arrangement to own or finance the Aircraft;

(m)     [Intentionally Omitted];

(n)     any Tax to the extent such Tax is incurred or increased as the result of, and would not have been payable but for, a transaction between a Tax Indemnitee and any other person for the financing or refinancing (directly or indirectly) of all or part of Lessor's cost of acquisition or continuing ownership of the Aircraft (including any loan, sale and leaseback or other financing arrangement and any swap agreement relating thereto);

(o)     any Tax to the extent that such Tax is imposed or increased as a result of the failure of a Tax Indemnitee or any Financing Party to provide Lessee an any forms, certifications or other documents in conformity with the requirements of Section 21.6 of this Agreement; or

(p)     any Tax incurred or increased as a result of such Tax Indemnitee not being a "United States person" within the meaning of Section 7701(a)(30) of the Code as a result of a particular Tax Indemnitee's participation in the transactions contemplated by the Operative Documents through any office, permanent establishment or other place of business located outside the United States;

"**Expiry Date**" means the date determined in accordance with Section 4;

"**Export Certificate of Airworthiness**" Current Export Certificate of Airworthiness as provided by the Airworthiness Authority of the country of registration at Lease Expiry.

"**FAA**" means the Federal Aviation Administration of the United States of America and any successor thereof;

"**FAA Bill of Sale**" a bill of sale on AC Form 8050-2, or any successor thereto promulgated by the FAA, duly completed with respect to the Aircraft and executed by Airbus, as seller;

"**FAA Counsel**" means Robert M. Peregrin, Esq. of the law firm of Daugherty, Fowler, Peregrin, Haught, & Jenson;

"**FATCA**" means Section 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official

interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"**Final Delivery Date**" means 12 months after the Scheduled Delivery Date;

"**Final Inspection**" has the meaning given to it in Section 19.2(a);

"**Financing Parties**" means such person or persons providing financing to Lessor in respect of its acquisition, ownership or leasing of the Aircraft, whether by way of loan, superior lease or otherwise or acting as agent or security trustee in relation to any such financing; provided, however, in the event that Lessor enters into a securitization or a public or 144A offering of notes or pass-through certificates in relation to the Aircraft, the bond holders, noteholders and pass-through certificate holders (as applicable) in connection with such securitization will not constitute Financing Parties as defined herein;

"**Financing Parties' Representative**" means such person, if any, as may be designated as such from time to time in a written notice from Lessor to Lessee;

"**First Run**" with respect to an Engine means the period from new manufacture of the Engine until completion of the first accomplishment of an Engine Performance Restoration on such Engine since new manufacture.

"**Flight Hour**" or "**FH**" means each hour or part thereof (rounded up to one decimal places) elapsing from the moment the wheels of the Aircraft, or in the case of any Part or Engine temporarily installed on another aircraft the wheels of that other aircraft, leave the ground on take off until the wheels of the Aircraft or that other aircraft (as applicable) touch the ground on landing following such flight;

"**GAAP**" means accounting principles generally accepted under accounting standards of the United States of America;

"**Geneva Convention**" means the Convention on the International Recognition of Rights in Aircraft signed at Geneva, Switzerland on 19 June 1948, and amended from time to time, but excluding the terms of any adhesion thereto or ratification thereof containing reservations to which the United Kingdom does not accede;

"**Government Entity**" means:

(a)     any national, state or local government, political subdivision thereof, or local jurisdiction therein or any possession, territory or taxing authority thereof or therein;

(b)     any instrumentality, board, commission, court, or agency of any thereof, however constituted; and

(c)     any association, organization, or institution of which any of the above is a member or to whose jurisdiction any thereof is subject or in whose activities any of the above is a participant or any international authority;

"**Guarantee**" means a Guarantee from the Beneficiary Parent in respect of Owner Participant's obligations under the Participation Agreement;

"**Indemnitees**" means Lessor, Lease Manager, Beneficiary, Beneficiary Parent, the Financing Parties, Airbus, and their respective successors and permitted assigns, shareholders, subsidiaries, Affiliates, directors, officers, and employees;

"**Internal Revenue Code**" means the United States Internal Revenue Code of 1986;

"**International Registry**" means the registry established pursuant to the Convention and Protocol;

"**JSA Person**" means Beneficiary Parent and any Affiliate of Beneficiary Parent;

"**Landing Gear**" means the complete strut assembly, consisting of the inner and outer cylinders of each main landing gear and nose landing gear and all associated parts that comprise each landing gear assembly, as listed in the Manuals and Technical Records including side struts, braces, and uplock and downlock mechanisms but excluding, without limitation, rotable parts such as wheels, tires, brakes, transducers and switch assemblies;

"**Landing Gear Overhaul**" means an overhaul of a Landing Gear assembly in accordance with the Manufacturer's repair manual that restores such Landing Gear to a "zero time since overhaul" condition in accordance with the Manufacturer's repair manual and is performed in accordance with the Manufacturer's overhaul specifications and operating criteria (excluding any rotable components such as wheels, tires, brakes and consumable items).

"**Lease Manager**" means Jackson Square Aviation, LLC, a Delaware limited liability company, with its address at 909 Montgomery Street, Suite 500, San Francisco, California 94133, or its successors and permitted assigns upon notification of any change of the Lease Manager by Lessor to Lessee;

"**Lease Period**" means the period commencing on the Delivery Date and ending on the Expiry Date;

"**Lease Supplement**" means a Lease Supplement No. 1 to this Agreement substantially in the form of Schedule 16, duly completed and executed by Lessor and Lessee;

"**Lessee Documents**" means the Operative Documents to which Lessee is a party;

"**Lessee's Certificate**" means a certificate in the form of Schedule 12 to be provided by Lessee to Lessor;

"**Lessor Lien**" means:

(a)    any Security Interest on the Aircraft from time to time created by or through or for the benefit of Lessor or any Financing Party or in connection with the financing of the Aircraft;

(b)    any other Security Interest on the Aircraft which results from acts of or claims against Lessor, Lease Manager, Beneficiary or any Financing Party, or any Person lawfully acting by, through or under any of them and which is not related to the transactions contemplated by or permitted under this Agreement; and

(c)    any Security Interest on the Aircraft which results from claims (tax or otherwise) against Lessor which are not indemnified by Lessee, including, without limitation, claims for Excluded Taxes;

"**LIBOR**" means, in relation to any period and any amount in respect of which an interest rate falls to be determined pursuant to this Agreement:

(a)    the offered rate (if any) appearing on the applicable Bloomberg page for dollars for the specified period at 10:00 a.m. on the Quotation Date therefor; or

(b)    if no such rate is available on such page, the rate determined by Lessor to be the arithmetic mean (rounded upwards, if not already such a multiple, to the nearest whole multiple of one sixteenth of one per cent.) of the rates (as notified to Lessor) at which each of the Reference Banks (on the basis that at least two Reference Banks so notify Lessor) was offering to prime banks in the London Interbank Market, on the Quotation Date, deposits in dollars for the specified period;

For the purposes of this definition, **specified period** means the period having a duration equal to or as close as practicable to the relevant period in respect of which LIBOR falls to be determined;

"**Life Limited Part**" or "**LLP**" means any Part that has a pre-determined life limit as mandated by Manufacturer, which requires any such Part to be discarded upon reaching such life limit;

"**Loss**" means any loss, liability, action, claim, proceeding, judgment, penalty, fine, damages, fee, cost or expense which may be imposed on, incurred by or asserted against any Indemnitee or Tax Indemnitee;

"**Major Modifications**" means any modification that (a) alters the fundamental nature of the Aircraft as a passenger and cargo carrying aircraft, (b) alters the structure of the Aircraft, (c) invalidates or impairs any warranty with respect to the Aircraft, the Airframe, any Engine or any Part, (d) adversely affects the eligibility of the Aircraft to obtain an Airworthiness Certificate from the Aviation Authority or FAA, (e) results in a variation from the original type certificate for the Aircraft, but shall exclude (i) any change pursuant to an Airworthiness Directive or a Service Bulletin provided by the Airframe Manufacturer, the Engine Manufacturer or the manufacturer of any part and (ii) any Mandatory Modification.

"**Major Modification Threshold**" is as set forth on Schedule 4;

"**Manuals and Technical Records**" means Manuals and Technical Records required to be maintained by Lessee during the Lease Period to comply with the Approved Maintenance Program and Schedule 10;

"**Manufacturer**" means, in relation to the Aircraft, Airbus or, in relation to the Engines, CFM International, Inc.;

"**Manufacturer's Maintenance Planning Document**" or "**MPD**" means the planning document relating to recommended maintenance of the Aircraft issued by Manufacturer, as the same may from time to time be amended, modified or supplemented;

"**Mature Run**" with respect to an Engine means the period after completion of the first accomplishment of an Engine Performance Restoration on such Engine since new manufacture;

"**Minimum Liability Amount**" is as set forth on Schedule 4;

"**Operative Documents**" means this Agreement, the Aircraft Purchase Agreement, the Participation Agreement, the Assignments and any consents provided in connection therewith, the Netting Letter, the Bill of Sale, the FAA Bill of Sale, the Acceptance Certificate, the Lease Supplement, the Trust Agreement, the Guarantee, the Participation Agreement, together with any schedules, documents, notices or certificates from time to time executed or issued pursuant thereto and any side letters, supplements, amendments or modifications to any of the foregoing from time to time;

"**Other Agreement**" means each aircraft lease agreement entered into or to be entered into between Lease Manager or any Affiliate of Lease Manager and Lessee or any Subsidiary of Lessee; **provided that** if Lease Manager (or any of its Affiliates) is no longer the lessor of an aircraft which is the subject of any Other Agreement, then such Other Agreement shall cease to be an "Other Agreement" for the purpose of this Agreement.

"**Overhaul**" means the full reconditioning of the Landing Gear or Part, as the case may be, in which the item has been fully disassembled into individual piece parts, cleaned, thoroughly inspected and returned to the highest standard specified by the applicable manufacturer's manuals and may include, where defined in the manufacturer's manuals or through an Airworthiness Directive, the replacement of Life Limited Parts.

"**Owner Participant**" means JSA Aircraft A321-3, LLC, a Delaware limited liability company;

"**Part**" means, whether or not for the time being installed on the Aircraft:

(a)    any component, furnishing or equipment (other than a complete Engine) furnished with the Aircraft on the Delivery Date; and

(b)    any other component, furnishing or equipment (other than a complete Engine) title to which has, or should have, passed to Lessor pursuant to this Agreement,

but excludes any such items title to which has, or should have, passed to Lessee pursuant to this Agreement;

"**Participation Agreement**" means that certain Participation Agreement in respect of, inter alia, the Aircraft dated on or about the date hereof among Lessor, Lessee and Owner Participant, substantially in the form of Schedule 20 hereto;

"**Passenger Convenience Equipment**" means components or systems installed on or affixed to the Airframe after the Delivery Date that are used to provide telecommunications services or electronic entertainment to passengers aboard the Aircraft and, in each case, which is not necessary to the operation or navigation of the Aircraft or to maintain its airworthiness certification or compliance with "Type Design" as defined by the Manufacturer;

"**Permitted Air Carrier**" means a Certificated Air Carrier;

"**Permitted Lien**" means:

(a)   any Security Interest for Taxes or Eurocontrol charges not assessed or, if assessed, not yet past due and payable, or being contested in good faith by appropriate proceedings;

(b)   any Security Interest of a repairer, mechanic, carrier, hangarkeeper, airport, air navigation authority or other similar Security Interest arising in the ordinary course of business (including those arising under maintenance agreements entered into in the ordinary course of business) or by operation of law in respect of obligations which are not overdue for a period of more than thirty (30) days or are being contested in good faith by appropriate proceedings;

(c)   any Lessor Lien;

(d)   solely in respect of replacement parts, but not in respect of the Aircraft (or the Airframe, any Engine or any Part) Security Interests arising out of any judgment or award against Lessee (or any Permitted Sublessee) not covered by insurance, unless the judgment secured shall not, within sixty (60) days after the entry thereof, have been discharged, vacated, reversed or execution thereof stayed pending appeal or shall not have been discharged, vacated or reversed within sixty (60) days after the expiration of such stay or there is at any time any risk of any material civil liability or any risk of criminal liability on the part of Lessor;

(e)   Security Interests approved in writing by Lessor;

(f)   this Lease and the respective rights of Lessor as owner of the Aircraft and Lessee as provided herein, the rights of any Permitted Sublessee under a Permitted Sublease, and any other rights of any Person existing pursuant to the Operative Documents; and

(g)   the rights of others under agreements or arrangements to the extent permitted by the terms of Section 11(a) and Schedule 19(c) hereof;

but only if: (i) (in the case of (a) adequate resources have been provided by Lessee, or adequate reserves have been established and are maintained in the accounting records of Lessee in accordance with GAAP, for the payment of such Taxes or obligations; and (ii) in the case of both (a) and (b) such proceedings, or the continued existence of such Security Interest, do not give

rise to any material risk of the sale, forfeiture or other loss of the Aircraft or any interest therein or of criminal liability on Lessor, Beneficiary, any Financing Party or any other Indemnitee;

"**Permitted Sublease**" means a sublease permitted under Section 11.1(g);

"**Permitted Sublessee**" means the sublessee under a Permitted Sublease;

"**Persons**" or "**persons**" means individuals, firms, partnerships, joint ventures, trusts, trustees, Government Entities, organizations, associations, corporations, limited liability companies, government agencies, committees, departments, authorities and other bodies, corporate or incorporate, whether having distinct legal status or not, or any member of any of the same.

"**Pre-Delivery Cap**" is as set forth on Schedule 4;

"**Protocol**" has the meaning given to it in Section 10.8(c);

"**Quotation Date**" means, in relation to any period in respect of which LIBOR is to be determined, the day falling two (2) Business Days before the beginning of such period;

"**Redelivery**" means the physical return of the Aircraft by Lessee to Lessor on the Expiry Date.

"**Redelivery Certificate**" means a certificate signed by Lessor in the form attached as Schedule 17.

"**Redelivery Check**" means the next due maintenance check for the Aircraft under the Approved Maintenance Program, including all lower level multiple maintenance checks ("A" checks and lesser checks) and inspections and all systems/zonal and structures/corrosion checks and inspections or equivalent maintenance or inspections that fall due within the next C Check period in accordance with the Approved Maintenance Program.

"**Redelivery Date**" means the date on which the Aircraft is redelivered by Lessee to Lessor in accordance with the terms of this Agreement;

"**Redelivery Location**" means, with respect to the Aircraft, a location in the continental United States selected by Lessee, or such other location as may be mutually agreed between Lessor and Lessee and, with respect to the Aircraft Documents, an airport in the continental United States designated by Lessee;

"**Redelivery Maintenance Payment Adjustments**" means all adjustments to be made pursuant to Schedule 6;

"**Reference Banks**" means the principal London offices of Citibank, N.A. and DVB Bank AG;

"**Related A321 Aircraft**" means, collectively and individually, the A321-211 aircraft that are leased by any JSA Person to Lessee, other than the Aircraft.

"**Related A321 Lease**" means the aircraft operating lease agreement in respect of a Related A321 Aircraft.

"**Rent**" means all amounts payable pursuant to Section 5;

"**Rent Adjustment Factor**" means the rent adjustment factors set out in Schedule 5;

"**Rent Date**" means the first day of each Rent Period, commencing on the Delivery Date and on the same day in each subsequent month thereafter beginning with the second Rent Period;

"**Rent Period**" means each period ascertained in accordance with Section 5.1(a);

"**Replacement Engine**" means an engine (i) of the same manufacturer, year of manufacture (or later) and model as the Engine to be replaced thereby, or an improved model of the same manufacturer compatible with each other Engine on the Aircraft, (ii) suitable for installation and use on the Airframe, (iii) having a value, utility and remaining useful life (without regard to hours or cycles flown) at least equal to the Engine to be replaced thereby (assuming that such Engine had been maintained in accordance with this Agreement) and (iv) meeting, at the time of installation of such Replacement Engine, the Return Conditions.  The determination of value, utility and remaining useful life shall be based on an evaluation of all relevant factors including modification status, TSN (time since new) and TSR (time since refurbishment);

"**Return Conditions**" means the conditions specified in Schedule 11;

"**SC Check**" means, with respect to the Airframe, a structural check, and shall be construed to imply either the S1 Check or the S2 Check;

"**S1 Check**" means the intermediate Airframe structural, CPCP and zonal inspection of the Aircraft (and resulting repairs), including a C Check, all in accordance with the Approved Maintenance Program and  currently having an interval of six (6) years, and performed concurrently therewith such additional Flight Hour or Cycle controlled MPD structural and zonal tasks (based on Lessee's current utilization).

"**S2 Check**" means the heavy Airframe structural and zonal inspection of the Aircraft (and resulting repairs), including a C Check, all in accordance with the Approved Maintenance Program and currently having an interval of twelve (12) years, and performed concurrently therewith such additional Flight Hour or Cycle controlled MPD structural and zonal tasks (based on Lessee's current utilization).

"**Scheduled Delivery Date**" means the date on which the Aircraft is scheduled by the Manufacturer to be delivered to Lessor under the Aircraft Purchase Agreement Assignment.  The parties acknowledge that such date has not yet been notified and is expected to occur in quarter one of 2017, with more detail to be given by Lessee as soon as practicable;

"**Security Deposit**" means the Cash Security Deposit and/or the Credit Security Deposit, in an aggregate amount set forth in Schedule 4;

"**Security Interest**" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), international interest, prospective international interest, prospective contract of sale, charge or other security interest or any preference, priority or other security agreement (including any conditional sale or other title retention agreement and any capital lease having substantially the same economic effect as any of the foregoing);

"**Security Trustee**" means such person from time to time acting as security trustee or collateral agent in relation to any financing provided by the Financing Parties;

"**Seller**" means Lessee.

"**Solvent**" when used with respect to any person, means that, as of any date of determination, (a) the amount of the "present fair saleable value" of the assets of such person will, as of such date, exceed the amount of all "liabilities of such person, contingent or otherwise", as of such date, as such quoted terms are determined in accordance with applicable federal and state laws governing determinations of the insolvency of debtors, (b) the present fair saleable value of the assets of such person will, as of such date, be greater than the amount that will be required to pay the liability of such person on its debts as such debts become absolute and matured, (c) such person will not have, as of such date, an unreasonably small amount of capital with which to conduct its business, and (d) such person will be able to pay its debts as they mature.  For purposes of this definition, (i) "debt" means liability on a "claim", and (ii) "claim" means any (x) right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or (y) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured or unmatured, disputed, undisputed, secured or unsecured;

"**Specified Default**" means a Default under Section 20.1(a) or (g);

"**Specified Lessor Lien**" means any liens in favor of the Financing Parties with respect to the Aircraft;

"**Specified Person**" means any sublessee or any other person (other than any Indemnitee or Tax Indemnitee) that uses or has the right to use or has possession or custody of the Aircraft, any Engine or any Part, or any shareholder, Subsidiary, Affiliate, partner, contractor, director, officer, servant, agent or employee of any of the foregoing;

"**SRM**" has the meaning given in Schedule 11.

"**State of Incorporation**" means the State of Colorado;

"**State of Registration**" means United States of America or any other country in which the Aircraft is from time to time registered in accordance with Section 10.8;

"**Stipulated Loss Value**" is the agreed value of the Aircraft (including the Engines) as set forth on Annex B to the initial Lease Supplement;

"**Subsidiary**" means:

    (a)   in relation to any reference to accounts, any company whose accounts are consolidated with the accounts of Lessee in accordance with GAAP;

    (b)   for any other purpose, an entity from time to time:

        (i)   of which Lessee has direct or indirect control or owns directly or indirectly more than 50 per cent of the voting share capital; or

        (ii)  which is a direct or indirect subsidiary of Lessee under the laws of the jurisdiction of its incorporation;

"**Tax Benefit**" means any benefits with respect to Taxes (as a result of deductions, credits or other  Tax benefits) which are actually utilized by any Tax Indemnitee and, which are attributable to the incurrence or payment by such Tax Indemnitee of any indemnified Losses or Taxes; provided, that for the purpose of calculating such Tax Benefit, such Tax Indemnitee shall be deemed to have actually utilized a Tax Benefit to the extent that, and at such time as, the amount of Taxes payable by the Tax Indemnitee is actually reduced below the amount of Taxes such Tax Indemnitee would be required to pay but for the incurrence or payment of such Losses or Taxes;

"**Tax Indemnitee**" means each of the following: (i) Lease Manager, (ii) Beneficiary, (iii) Lessor, and (iv) each shareholder, subsidiary, Affiliate, director, officer and employee, successor and permitted assign of any of the persons described in clauses (i), (ii) and (iii) hereof;

"**Taxes**" means all present and future taxes, levies, imposts, duties, fees, licenses or charges of any nature whatsoever, and wheresoever imposed, including (without limitation) value added tax or any similar tax and any franchise, transfer, sales, use, business, occupation, excise, personal property, real property, gross income, personal property, fuel, leasing, occupational, turnover, excess profits, excise, gross receipts, franchise, registration, license, corporation, capital gains, export/import, income, levies, imposts, withholdings or other taxes or duties of any nature whatsoever, now or hereafter imposed, levied, collected, withheld or assessed by any Government Entity, together with any penalties, additions to tax, fines or interest thereon, and Tax and Taxation shall be construed accordingly;

"**Termination Notice**" has the meaning given to it in Section 3.3.

"**Total Loss**" means, with respect to the Aircraft (including for the purposes of this definition the Airframe) or an Engine:

    (a)   the actual or constructive total loss of the Aircraft or any Engine (including any damage to the Aircraft or any Engine which results in an insurance settlement on the basis of a total loss); or

    (b)   the Aircraft or any Engine being destroyed, damaged beyond economic repair or permanently rendered unfit for normal use for any reason whatsoever; or

(c)      the confiscation, condemnation, seizure or requisition of title or any compulsory acquisition of title for any reason of the Aircraft or any Engine by the government of the State of Registration or any other authority (whether de jure or de facto) not reversed within 180 days (other than a requisition of use by any authority or any agency or instrumentality thereof which bears the full faith and credit of the government of the United States of America); or

(d)      the hijacking, theft, disappearance, or requisition for use or hire of the Aircraft or any Engine which deprives any person permitted by this Agreement to have possession and/or use of the Aircraft of its possession and/or use for more than 60 days or beyond the Expiry Date (it being understood that activation of the Aircraft under CRAF as provided in Section 11.3 is not to be regarded as a "confiscation, condemnation, seizure or requisition for use or hire"); or

(e)      as a result of any law, rule, regulation, order or other action by the Aviation Authority or other similar governmental body of the government of the State of Registration having jurisdiction, use of such type of property in the normal course of the business of air transportation shall have been prohibited for a period of twelve (12) consecutive months, unless Lessee, prior to the expiration of such 12-month period, shall have undertaken and shall be diligently carrying forward all steps which are necessary and desirable to permit the normal use of such property by Lessee, provided that no Total Loss shall be deemed to have occurred if such prohibition has been applicable to Lessee's entire fleet of Airbus A321 series aircraft and Lessee, prior to the expiration of such 12-month period, shall have conformed at least one (1) of such aircraft in its fleet and shall have commenced regular commercial use of the same and shall be diligently carrying forward, in a manner which does not discriminate against the Aircraft, all steps which are necessary or desirable to permit the normal use of the Aircraft by Lessee; or

(f)      with respect to any Engine, any divesture of title to such Engine;

"**Total Loss Date**" means:

(a)      in the case of an actual total loss or destruction, damage beyond repair, or being rendered permanently unfit, the date on which Lessee (or the relevant insurers) determines that such loss, destruction, damage or rendition occurred;

(b)      in the case of a constructive, compromised, arranged or agreed total loss, whichever shall be the earlier of (i) the date being 60 days after the date on which notice claiming such total loss is issued to the insurers or brokers, and (ii) the date on which such loss is agreed or compromised by the insurers;

(c)      in the case of a confiscation, condemnation, seizure or requisition for title or compulsory acquisition, the date on which the same takes effect;

(d)      in the case of hijacking, theft, disappearance, confiscation, seizure or requisition for use or hire (other than by State of Registration), the earlier of (i) the last day of the period referred to in paragraph (d) of the definition of Total Loss and (ii) the date on which the insurers make payment on the basis of a Total Loss;

(e)     in the case of any prohibition of use as a result of any rule, regulation, order or other action by the Aviation Authority, the last day of the applicable period referred to in paragraph (e) of the definition of Total Loss;

(f)     in the case of divesture of title to an Engine, the date on which the same takes effect; and

(g)     in the case of installation of an Engine on an airframe as described in Section 11.1(f), the date of installation;

"**Total Loss Proceeds**" means the proceeds of any insurance, or any compensation or similar payment, arising in respect of a Total Loss;

"**Transfer**" has the meaning given to it in Section 22.3;

"**Transferee**" has the meaning given to it in Section 22.3;

"**Trust Agreement**" means the Trust Agreement dated December 23, 2015 between Beneficiary, as trustor, and Wells Fargo Bank Northwest, National Association, as trustee;

"**TSN**" means Time Since New;

"**TSO**" means Time Since Overhaul;

"**Type Certificate Data Sheet**" means the Aircraft Manufacturer document that provides a formal description of the aircraft, including engines, and a listing of limitations and information required for type certification.

"**Unrestricted Cash Balance**" means the sum of the cash and cash equivalents, as such terms are defined by GAAP, held on the date of determination.

"**UCC**" means the Uniform Commercial Code, as enacted by the State of New York;

"**Wet Lease**" means any arrangement whereby Lessee (or any Permitted Sublessee) agrees to furnish the Airframe and Engines or engines installed thereon to a third party pursuant to which the Airframe and such Engines or engines (a) shall at all times be in the operational control of Lessee (or such Permitted Sublessee), and (b) shall in all events be maintained, insured and otherwise used and operated by Lessee in compliance with the terms and provisions of the Lease;

"**WFB**" has the meaning given in the recitals;

"**Work Item**" means, with respect to the Airframe, Engines, Landing, or APU (as applicable), any or all of the following:

(i)     the S1 Check;

(ii)     the S2 Check;

(iii) the Engine Performance Restoration;

(iv) the replacement of Engine LLPs;

(v) a scheduled Overhaul of the Landing Gear;

(vi) the APU Performance Restoration; and

(vii) a scheduled replacement of each APU LLP.

"**WPG**" means the Engine Manufacturer's workscope planning guide for the applicable engine type; and

"**6184 Amendment**" means the amendment to be executed on or prior to the date hereof, with respect to that certain aircraft operating lease agreement dated as of June 9, 2014 for aircraft bearing manufacturer's serial number 6184 between WFB, as owner trustee, as lessor and Lessee, as lessee.

2. (a) References in this Agreement to:

(i) any statutory or other legislative provision shall be construed as including any statutory or legislative modification or re-enactment thereof, or any provision enacted in substitution therefor;

(ii) the word "person" or "persons" or to words importing persons include, without limitation, individuals, partnerships, corporations, government agencies, committees, departments, authorities and other bodies, corporate or unincorporated, whether having distinct legal personality or not;

(iii) "Lessor" or "Lessee" include any assignee or successor in title to Lessor or Lessee respectively (subject to the provisions of Section 22);

(iv) any deed, agreement or instrument shall include any such deed, agreement or instrument as may from time to time be amended, supplemented or substituted;

(v) an "agreement" also include a concession, contract, deed, franchise, license, treaty or undertaking;

(vi) the "assets" of any person shall be construed as a reference to the whole or any part of its business, undertaking, property, assets and revenues (including any right to receive revenues);

(vii) "law" include common or customary law and any constitution, decree, judgment, legislation, order, ordinance, regulation, statute, treaty or other legislative measure in any jurisdiction or any present or future directive, regulation, request or requirement (in each case, whether or not having the force of law but, if not having the force of law, the compliance with which is in accordance with the general

practice of persons to whom the directive, regulation, request or requirement is addressed);

        (viii)   "month" are references to a period which starts on one day in a calendar month and ends on the day immediately preceding the numerically corresponding day in the next calendar month, except that if there is no numerically corresponding day in that next month it shall end on the last day of that next month (and references to "months" shall be construed accordingly).

    (b)    Headings are for ease of reference only.

    (c)    Where the context so admits, words importing the singular number only shall include the plural and vice versa, and words importing neuter gender shall include the masculine or feminine gender.