# Exhibit 1

ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FRONTIER AIRLINES, INC.,

              Plaintiff,

      - against -

AMCK AVIATION HOLDINGS IRELAND LIMITED,
ACCIPITER INVESTMENT 4 LIMITED,
VERMILLION AVIATION (TWO) LIMITED,
WELLS FARGO TRUST COMPANY, N.A., solely
in its capacity as OWNER TRUSTEE, and
UMB BANK, N.A., solely in its capacity
as OWNER TRUSTEE,

              Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/6/23

20 Civ. 9713 (LLS)
OPINION & ORDER

      This case is a stark example of the stresses suffered by
even well-established business relationships when they are
forced to adjust to an unprecedented crisis that suspends
industry operations, closes global supply chains, and freezes
activities which were the sources of its members' earnings.

      Defendant AMCK Aviation Holdings Ireland Limited ("AMCK")
is an aircraft leasing company that, through various
subsidiaries and owner trustee entities, owns and leases to
plaintiff Frontier Airlines, Inc. ("Frontier"), a commercial
passenger airline, multiple aircraft through sale-leaseback
financing arrangements. In late 2019, Frontier entered into its
latest agreement (the "Framework Agreement") with AMCK, whereby
AMCK or an affiliated entity was to purchase six new Airbus

aircraft (model A320-251N) and lease them back to Frontier at a predetermined rate. Because the COVID-19 pandemic, which swept the globe in early 2020, made the economic terms of the deal less advantageous for AMCK, Frontier argues that AMCK contrived an Event of Default in order to create grounds to terminate the Agreement. Frontier brought this action asserting claims for breach of contract, along with a quasi-contract claim and a fraud claim. Defendants now move for summary judgment to dismiss the claims.

For the reasons that follow, defendants' Motion for Summary Judgment dismissing the claims is granted except for the claim for breach of contract of the Framework Agreement.

## **Background**

### **I. Parties**

Frontier is a Colorado-headquartered airline that operates commercial passenger aircraft. Dkt. No. 106 ("Frontier's Response to Defendants' Rule 56.1 Statement ") ¶ 1. AMCK is an aircraft leasing company organized under the laws of Ireland with its principal place of business there. Id. ¶ 4. Accipiter Investments Aircraft 4 Limited ("Accipiter") and Vermillion Aviation (Two) Limited ("Vermillion") are affiliates of AMCK, which operate as the Owner Participants and Guarantors in sale-leaseback arrangements entered into by AMCK. Because of regulatory requirements in the United States that restrict

foreign leasing of domestic aircraft, UMB Bank, N.A. ("UMB") and Wells Fargo Trust Company, N.A., are the Lessors and Owner Trustees under the Agreements.

## II. The Parties' Sale and Leaseback Arrangement

Frontier leases 100% of its fleet though sale-leaseback agreements with various aircraft lessors, a common method used by airlines to finance new aircraft acquisitions. Id. ¶ 4. At the end of 2019, Frontier leased fourteen aircraft from AMCK and its affiliates. Although each aircraft is governed by a separate Lease Agreement, the Agreements are materially similar, obligating UMB and Wells Fargo, as Lessors and Owner Trustees acting for the benefit of the Owner Participant, Accipiter, to lease the crafts to Frontier for $320,000-$360,000 per month per craft and granting Frontier the right to possess and operate the crafts. Id. ¶¶ 5-8.

On September 10, 2019, Frontier and AMCK's affiliate Accipiter Holdings, DAH signed a letter of intent to enter into a sale and leaseback arrangement for six additional aircraft. The sale and leaseback arrangement is bound together by multiple contractual agreements and, as relevant here, works in the following way. First, Frontier has a Purchase Agreement with Airbus, an aircraft manufacturer, to purchase and take delivery of aircraft according to a set schedule, with six crafts due in 2020. Id. ¶¶ 4, 10. Second, rather than outright purchase those

3

six aircraft, Frontier, on March 16, 2020, entered into a sale
and leaseback agreement (the "Framework Agreement") with AMCK,
the aircraft lessor, which obligates AMCK, or an affiliate, to
buy the aircraft and simultaneously lease them back to Frontier.
Id. ¶¶ 4, 9. AMCK is obligated to directly pay Airbus the
purchase price, but, until it does so, Frontier remains fully
responsible to purchase the aircraft under the Purchase
Agreement. Id. ¶ 4. The purchase price and subsequent lease
price of the aircraft are negotiated solely between Frontier and
AMCK. Id. Third, shortly before or on the date of delivery,
Frontier and AMCK are to enter into a Lease Agreement for each
individual aircraft. They did so for the first of the aircraft
set to be delivered, MSN 10038, but never completed their
obligations for the remaining ones.

Under the Framework Agreement, AMCK, through Trust Company/
Lessor UMB, is required to purchase and lease back the six
aircraft according to the following schedule: three in March
2020, one in May 2020, one in June 2020, and one in August 2020.
Dkt. No 116 Ex. 7 ("Framework Agreement"). Under the Framework
Agreement, AMCK is the "Lessor Guarantor" and the "Owner
Participant," as are Vermillion and Accipiter due to their
status as AMCK's "Affiliate." Id. Ex. 7 § 1.1.) AMCK is
obligated to cause the Lessor (UMB) to purchase the aircraft
from Airbus on the delivery date and execute a Lease Agreement

4

with Frontier. Id. §§ 2.1.1, 3.3.1. UMB's performance is guaranteed by Vermillion. Id. §§ 2.1.1, 3.3.1.

Accordingly, on March 16, the same date the parties entered into the Framework Agreement, AMCK, through its affiliate Vermillion, purchased the first of the aircraft, MSN 10038, and executed an aircraft-specific Lease Agreement, Trust Agreement, and Guaranty. Dkt. No. 116 Ex. 10-12. Per the agreements, Vermillion is the Owner Participant and has conveyed all rights, title, interests, and rights in MSN 10038 to UMB, the Lessor and Owner Trustee. Dkt. No. 116 Ex. 11 at 1 §§ 1-2. Vermillion is also the Lessor Guarantor and has agreed to guarantee all of UMB's performance obligations. Id. Ex. 12 at 1 § 1. Per the Framework and resulting lease documents, defendants paid Airbus for MSN 10038 and Frontier began paying them the monthly rent.

The rights and obligations of the parties that arise from the Framework Agreement and lease documents are intertwined. A right can be waived under the Framework Agreement only "by an express waiver or variation in writing. . . and no act or course of conduct or negotiation on the part of such party or on its behalf shall in any way preclude it from exercising any such right or constitute a suspension or any variation of any such right." Dkt. No. 94 Ex. 4 § 8.4.1 ("Framework Agreement"). The Framework Agreement further states that "[t]he provisions of this Agreement shall not be varied otherwise than by an

instrument in writing executed by or on behalf of AMCK Aviation and Frontier." Id. § 8.4.2.

Under the Framework Agreement, a default can occur if "Frontier fails to pay any amount due under any of the Transaction Documents in the currency and in the manner stipulated within five (5) Business Days of written notice of such failure from AMCK Aviation." Dkt. No. 116 Ex. 7 § 6.1.1. Transaction Documents are the Framework Agreement and each "Operative Document" as defined in each Lease Agreement. Id. Ex. 7 § 1.1. Under the Lease Agreement for MSN 10038, an Event of Default occurs when

> Lessee fails to pay (i) any Basic Rent or Security
> when due . . ., or (ii) any other sum due it under
> this Agreement or any other Operative Document . . .
> in the currency and in the manner stipulated within
> five (5) Business Days of written notice of such
> failure from Lessor."

Id. Ex. 10 § 16.1(a). Operative Documents include the 14 original Lease Agreements. Id. § 1.1. It is through this interrelation that AMCK declared Frontier to be in default and subsequently exercised its rights to terminate the Framework Agreement.

### III. Parties' Negotiations over Deferrals

In response to the COVID-19 pandemic, on March 16, 2020, shortly after entering into the Framework Agreement and Lease for MSN 10038, Frontier, as many other airlines did to their lessors, sent a letter to AMCK requesting for all aircraft:

    1. All lease rent payments due between the date of this
       letter and June 30, 2020 will be deferred; and
    2. Return of one month's rent security deposit.
    The above concessions would be documented in a mutually

agreed deferral and concession agreement. Dkt. No. 94 Ex. 8.

    Over approximately the next two months, Frontier and AMCK

negotiated the terms of the potential rent deferral. Frontier

ultimately argues that AMCK agreed to a month-to-month deferral

while the negotiations were ongoing, whereas AMCK denies ever

reaching such a consensus. A timeline of the parties' key

communications is briefly summarized.

    On March 18, 2020, AMCK responded with the following

counteroffer:

    1. Payments on the 1 x A320ceo and 2 x A320neo . . .
    to be current. . .
    2. On the remainder of the aircraft (12 in total) 50%
    rent deferral for 3 months, commencing from 1 April.
    3. No deferral on the remaining 5 x A320neo we are
    scheduled to purchase from Frontier per the recently
    executed Framework Agreement in the coming months
    4. Frontier to pay the deferred amount in equal
    installments over 4 months from the month following
    the lastmonth of rent deferral with 8% interest per
    annum from each of the payment dates.
Dkt. No. 116 Ex. 18.

    On March 22, 2020, Frontier asked AMCK to reconsider its

position and, because no agreement was in place, paid the March

rents due on all aircraft, including two rents that were due

March 24th. Dkt. No. 116 Ex. 23.

    Frontier alleges thereafter that AMCK was solely interested

in getting out of the Framework Agreement because its bank

financing had failed, and it would have to fund the next aircraft delivery itself. Accordingly, on March 26, 2020 AMCK now requested that Frontier make an advanced payment of twelve months of rent for the upcoming aircraft delivery and defer delivery of the remaining four aircraft by three to six months in exchange for a four-month deferral of rent on the fourteen original leases at 8% interest. Id. Ex. 29. On March 31, 2020, AMCK also cautioned that it would not proceed "with closing on the 5 remaining sale & leaseback aircraft if they are going to go straight into storage for an uncertain period of time." Id. Ex. 29.

On April 2, Frontier promptly reached out to Airbus to start negotiations with them.

On April 3, AMCK altered its position slightly, offering to defer rents at a repayment rate of 6% if delivery was deferred for six months. Id. Ex. 32. Frontier never agreed to any of these proposals and negotiations, with both AMCK and Airbus, remained ongoing.

On April 6, 2020, rent was due on two aircraft under the Original Leases. Dkt. No. 106 ¶ 20. Frontier and AMCK had a phone call that day to discuss deferring the payments and AMCK agreed to defer all upcoming rent payments due under the Original Leases for 10 business days. Id. AMCK memorialized the call in an email that day, which read:

8

>    Mindful of the time it might take you to reach
>    agreement with Airbus or to make some other
>    arrangements and therefore of the ability for us to
>    reach a deferral agreement, we can confirm that we
>    won't take any actions or call any defaults linked to
>    non payment of rents on any aircraft where the rent is
>    due from today to 21 April (ie, for the next 10
>    working days).

Dkt. No. 116 Ex. 32.

    On April 7, 2020, Frontier and AMCK again spoke by phone.

This time, the parties dispute what was said. Frontier claims

that on the call AMCK agreed to a month-to-month deferral until

all negotiations were complete and declined to commit to

performing its obligations under the Framework Agreement if

Frontier was unable to convince Airbus to defer delivery. Dkt.

No. 106 ¶ 52. AMCK argues that no rent deferral agreement was

reached. At best, it contests that the parties only discussed

deferring rent until the end of April, not indefinitely, and

never discussed when the rent would be repaid. Dkt. No. 95 Ex.

6.

    On April 9, 2020, AMCK sent a draft forbearance letter to

Frontier stating that it would agree "temporarily to forbear

from exercising its rights and remedies" for the rent owed in

April. Dkt. No. 94 Ex. 16, § 2.1. The deferred rent would have

to be repaid at 6% interest by July 24, 2020. Id. § 2.12.

The Forbearance was conditioned upon Frontier signing an

acknowledgement of the Letter, which never occurred.

9

On April 11 and 13, 2020, Frontier informed AMCK that the longest deferral it could secure with Airbus was for two months. Dkt. No. 116 Ex. 35. Nonetheless, AMCK remained committed to a six-month delivery deferral. Id.

Over the next two weeks, negotiations continued, and on April 30, 2020, AMCK sent its final offer

> (i) that Frontier would "immediately pay outstanding April rents on which we agreed an informal deferral pending agreement with Airbus on delivery delays," and to "pay May, June and July rents and, all beyond, on time;"
> (ii) convince Airbus to move the next aircraft delivery from June to July 2020, such that the next three aircraft would deliver in July 2020; and
> (iii) move the delivery dates of the final two aircraft from September 2020 and October 2020 to February 2021.

Dkt. No. 116 Ex. 44.

Frontier declined to accept the terms, believing they were an overreach, and conveyed that it was willing to become and remain current on rent and perform under the initial terms of the Framework Agreement if the parties could not agree to concessions. Dkt. No. 106 ¶ 65. It sent back its final terms of:

> (i) deferring delivery of the next aircraft until July 2020;
> (ii) prepaying rent for six months on the three aircraft delivering in July 2020,; and
> (iii) repaying the deferred rent from April and May 2020 over the next six months, starting in July;
> (iv) deferring delivery for two aircraft until 2021.

Dkt. No. 116 Ex. 47,48. AMCK never responded to this offer.

Dkt. No. 106 ¶ 67.

On May 8, 2020, AMCK sent Frontier a Notice of Termination letter, purporting to terminate its obligation to purchase and lease the remaining aircraft based on the unpaid rent on the Original Leases and the cross-default provisions in the operative documents. Dkt. No. 106 ¶ 71. Frontier contested the termination and after unsuccessful attempts to have AMCK withdraw the termination, paid all outstanding rents on May 13, 2020, curing any alleged default. Id. ¶¶ 75-76.

During this negotiation period throughout April and May 2020, AMCK ceased sending its customary chase alerts that had historically informed Frontier when rent was past due and needed to be paid immediately. Id. ¶ 54. Additionally, AMCK did not send any rent invoices, except for MSN 10038, which Frontier paid. Id. ¶ 55. After Frontier became current on rent, AMCK reinstated its previous practices.

Following AMCK's termination, Frontier was faced with the imminent delivery of five aircraft without lessor financing and was at risk of having to fully fund their delivery or default on its agreement with Airbus. To avoid either scenario, Frontier entered into sale-leaseback arrangements with CDB Aviation Lease Finance DAC for three of the remaining aircraft and Jackson Square Aviation for the other two. Id. ¶ 83. The terms of these agreements were materially worse for Frontier than the Framework Agreement was, costing Frontier approximately $53 million in

damages ($46.3 million when discounted to present value). Id. ¶ 84. AMCK also offered to enter into new agreements for the aircraft but AMCK's terms were significantly worse than the Framework Agreement and those offered by the alternative lessors. Id. ¶ 82.

Frontier brought this suit alleging that AMCK utilized Frontier's outstanding rent payments as a pretext to terminate its commitments with Frontier when the commitments were no longer financially advantageous. Dkt. No. 1. Specifically, Frontier asserts claims for breach of contract of the Framework Agreement and the Lease Agreements, promissory estoppel, and fraud against AMCK, Accipiter, Vermillion, UMB, and Wells Fargo. Id. Upon a denial of their motion to dismiss, defendant AMCK asserted a crossclaim for Indemnification. Dkt. No. 47. Defendants now move for summary judgment dismissing all the claims. Dkt. No. 93.

**Analysis**

## I.   Legal Standards

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Courts do not "weigh the evidence," but rather "view the facts in the light most favorable to the nonmoving party and resolve all factual ambiguities in its favor . . . to determine whether

there is a genuine issue for trial." <u>Cioffi v. Averill Park</u>
<u>Cent. Sch. Dist. Bd. of Educ.</u>, 444 F.3d 158, 162 (2d Cir. 2006).
"A genuine issue of fact for trial exists when there is
sufficient evidence on which a jury could reasonably find for
the plaintiff." <u>Id.</u>

## II.  Contract and Quasi-Contract Claims

Frontier alleges the AMCK breached the Framework Agreement
and the Lease Agreements for fifteen aircraft. New York law
requires a plaintiff claiming breach of contract to show "(1)
the existence of an agreement, (2) adequate performance of the
contract by the plaintiff, (3) breach of contract by the
defendant, and (4) damages." <u>Eternity Global Master Fund Ltd. v.</u>
<u>Morgan Guar. Trust Co. of N.Y.</u>, 375 F.3d 168, 177 (2d Cir.
2004).  The parties do not dispute that the Framework Agreement
and Lease Agreements were valid contracts. Instead, they contest
whether Frontier failed to uphold its duties under them and,
consequently, whether AMCK's termination of the Framework
Agreement was valid or amounts to a breach.

### 1) March 2020 **Framework Agreement**

### A. Anticipatory Repudiation Breach of Contract Against AMCK (Claim 1)

Frontier claims AMCK breached the Framework Agreement by an
express anticipatory repudiation and by failing to provide
reasonable assurances that it will perform under the Agreement.
The Court disagrees, finding there is insufficient evidence for

13

a reasonable factfinder to find AMCK anticipatorily repudiated the Framework Agreement.

### i.    **Express Anticipatory Repudiation**

"Anticipatory repudiation occurs when, before the time for performance has arisen, a party to a contract declares his intention not to fulfill a contractual duty." Lucente v. Int'l Bus. Mach. Corp., 310 F.3d 243, 258 (2d Cir. 2002). A party is considered to have repudiated if it "attempt[s] to advance an unwarranted interpretation of the contract" or vows to "perform only if certain 'extracontractual' conditions are satisfied." In re Best Payphones, Inc., 432 B.R. 46, 54 (S.D.N.Y. 2010), aff'd, 450 F. App'x 8 (2d Cir. 2011); see also Palazzetti Imp./Exp., Inc. v. Morson, No. 98 Civ. 722, 2001 WL 1568317, at *9 (S.D.N.Y. Dec. 6, 2001). "[A] repudiation can be determined to have occurred only when it is shown that 'the announcement of an intention not to perform was positive and unequivocal.'" DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 112 (2d Cir. 2010) (quoting Tenavision, Inc. v. Neuman, 379 N.E.2d 1166, 1168 (N.Y. 1978).

Generally, whether a particular communication constitutes a repudiation is a question of fact that requires the interpretation of evidence at trial. Id. However, "[a]n exception applies where the repudiation is in writing, in which case the court may resolve the issue of repudiation as a matter of law." Id. Although, if the writing has ambiguous terms, then

the determination of whether it constitutes a repudiation is to be made by the finder of fact. Id.

Frontier argues AMCK repudiated the Framework Agreement when it conditioned its performance thereunder upon Frontier caving to its extracontractual demands. In support of its argument, Frontier points to a string of emails and text messages the parties exchanged over the course of a month. However, none of those written communications contain unequivocal statements that AMCK planned to not perform the Framework Agreement.

The first instance of alleged repudiation occurred on March 26, 2020 when AMCK said in an email:

> [W]e are prepared to make the following offer of short term assistance to Frontier in response to your request, but with certain conditions attached. We will agree to the Frontier request for 3 months' rent deferral, commencing April 2020, in respect of 14 of our 15 delivered aircraft (i.e. excluding the A320neo delivered on 16 March 2020), with such deferred rent to be paid over the subsequent 4 months, subject to the following conditions being met:
> 1. With respect to the SLB aircraft that is scheduled to be delivered in April 2020 (MSN 9549), we will require 12 months' rent to be pre-paid upon closing/leasing commencement, i.e. there will be a "holdback" from the agreed $51M PP of approximately $3M;
> 2. With respect to the remaining 4 SLB aircraft that are scheduled to be delivered in May through July 2020, the delivery schedule will be delayed, between Frontier and Airbus, by 3-6 months; and
> 3. Any failure by Frontier to pay the deferred rent on time will constitute an EOD under the framework agreement and permit AMCK to terminate the delivery obligation for the remaining SLB aircraft; and

4. Deferral interest at 8% will apply to the deferred
   amounts. . .
Please let me know if you would like to discuss today?
Dkt. No. 116 Ex. 29.

Nowhere in that email does AMCK make a positive and
unequivocal statement of its intent to not perform under the
Framework Agreement. Rather the email unambiguously shows that
AMCK is proposing as part of a negotiation that began because
Frontier requested a rent deferral. Within that context, AMCK's
terms are nothing more than a counteroffer; they are not
extracontractual conditions that AMCK is making its performance
under the Framework Agreement contingent upon.

The remaining written communications relied upon by
Frontier also happened within the context of negotiations for a
rent deferral. On March 31, 2020, AMAK emailed, in pertinent
part:

We are not comfortable proceeding with closing on the
5 remaining sale & leaseback aircraft if they are
going to go straight into storage for an uncertain
period of time. We really believe it's in both
parties' interest to defer delivery of these aircraft
by 3-6 months. We can issue the rent deferral draft to
you but it needs to be understood by all that above is
our shareholder position.
Dkt. No. 116 Ex. 29. AMCK thereafter conveyed via an April 3,
2020 email that it would grant the three-month rent deferral
"strictly on the basis that we suspend the SLB for six months."
Dkt. No. 116 Ex. 32. Then, in an April 30, 2020 email, AMCK
proposed extending the leases on twelve other aircraft by four

16

years and removing the early Termination provision from the Framework Agreement and, "for the avoidance of doubt," made clear the proposal was "for discussion purposes only." Dkt. No. 116 Ex. 45

To cast these communications as a repudiation, as Frontier urges the Court to do, would require the Court to read them in isolation and out of the context of the ongoing negotiation to permit Frontier to defer rent. While it is true that the remaining emails and text messages show that AMCK wanted to adjust the terms of the Framework Agreement to minimize their losses, that demand was only linked to AMCK agreeing to defer Frontier's rent. The communications are a quid pro quo that is standard in all negotiations, and they do not approach the level of an unequivocal repudiation.

Even if Frontier had not begun the negotiation by asking for a rent deferral, these communications could not be considered repudiations. In that scenario, these communications are best characterized as offers by AMCK to amend the parties' outstanding obligations. AMCK's statement that it is "not comfortable proceeding" unless Frontier alters its duties to perform is not an unequivocal forecast that AMCK will not perform.

The closest that AMCK gets to conditioning its performance under the Framework Agreement on Frontier agreeing to

extracontractual demands is in an April 25, 2020 text message,
which states:

> [AMCK] need[s] some quid pro quo to fund $250M of
> capex on terms that now appear to be wildly off
> market, and we are seeing many parties walk from 2019
> priced commitments due to the unprecedented crisis we
> are in. Our thinking here is that a QPQ [quid pro quo]
> which would be of value to us is a 4yr lease extension
> of the earlier block of Neo deliveries from Accipiter
> to take those leases to 12 yr[.] Let's chat later
> today if you're available?

Dkt. No. 116 Ex. 31. But even here, this is not an unequivocal
statement of intent to not perform. It reads as an attempt to
negotiate an amendment.

There can be no dispute; the unambiguous written
communications show no repudiation of the Framework Agreement by
AMCK.

### ii. Failure to Give Adequate Assurance

Frontier claims AMCK repudiated the Framework Agreement
when it declined to provide adequate assurances in response to
Frontier's inquiries into whether it was going to perform.
Frontier argues that its communications with AMCK over March and
April 2020 gave it reasonable grounds to fear AMCK would not
purchase the remaining five aircraft as required by the
Framework Agreement.

"When reasonable grounds for insecurity arise with respect
to the performance of either party the other may in writing
demand adequate assurance of due performance." N.Y. U.C.C. Law §

2-609(1). If a party receives a justified demand but does not provide, within a reasonable time not exceeding thirty days, adequate assurance of its performance, the unresponsive party is said to have repudiated the contract. Id. § 2-609(4).

Frontier argues that AMCK's nonresponses were a reasonable basis on which Frontier could fear nonperformance under the Framework Agreement. Between merchants, like the parties are here, the reasonableness of the grounds for insecurity is "determined according to commercial standards." N.Y. U.C.C. Law § 2-609(2). Reasonable grounds for insecurity arise out of the objective conduct of the contracting parties and not from their subjective speculations. Remuda Jet Five LLC v. EMBRAER-- Empressa Brasileira de Aeronautica, S.A., No. 10 CIV. 8369, 2012 WL 1142296, at *12 (S.D.N.Y. Mar. 27, 2012). While it is generally a question of fact whether the grounds were reasonable, there are circumstances "where this issue may be resolved as a matter of law." BAII Banking Corp. v. UPG, Inc., 985 F.2d 685, 702 (2d Cir. 1993).

Here, the events that proceeded Frontier's alleged demands show that the parties were engaged in a negotiation to amend the Framework Agreement, which was initiated unilaterally by Frontier and become quid pro quo bargaining only at the insistence of AMCK. Frontier itself confirmed that understanding in an April 6, 2020 email—

> [Frontier's] reading of [AMCK's] email assumes that
> [AMCK] will only agree [sic] the rent deferral if
> [Frontier] defer[s] aircraft deliveries with Airbus?
> As a result, [Frontier] can only deduce that [AMCK]
> will finance the aircraft deliveries and honour your
> commitment to Frontier if we do not put a rent
> deferral in place.

Dkt. No. 116 Ex. 32.

Frontier puts forward no evidence to show that the dynamics of the negotiations ever flipped such that AMCK was seeking a unilateral concession from Frontier. On April 1, 2020, Frontier asked AMCK via text message: "If we're unable to delay the deliveries and your is [sic] pulling out of the 5 remaining A320s we need to know ASAP[.]" Dkt. No. 116 Ex. 31. AMCK responded to Frontier's request with a phone call and their text messages thereafter show that the parties continued to discuss the arrangement within the context of the original negotiations. The evidence shows that AMCK was consistently willing to provide adequate consideration in exchange for an amendment to delay delivery under the Framework Agreement. AMCK confirmed as much on April 13, 2020, conveying it wanted "to tie the deliveries to having no outstanding deferrals so it would only work if we recast the deferral agreement." Dkt. No. 116 Ex. 35. The parties' email exchange on April 27, 2020 further confirms that AMCK's insistence to delay its performance of the Framework Agreement resulted from its proposed grant of rent deferrals to Frontier. DKt. No. 116 Ex. 43. Based upon this evidence, no reasonable fact finder could find that Frontier had reasonable

grounds to believe AMCK would unilaterally not perform the
Framework Agreement.

Frontier's argument that AMCK anticipatorily repudiated
when it failed to give adequate assurances also fails because
Frontier's requests for assurance were procedurally
insufficient. Frontier's demand on April 7, 2020, to which AMCK
responded that it could not say at this stage what it would do
if the delivery deferrals were not granted, fails as a matter of
law because it was made in a phone call and not in writing. See
N.Y. U.C.C. Law § 2-609(1).

Accordingly, the Court finds as a matter of law that there
were no reasonable grounds to demand assurances and, therefore,
AMCK's alleged failure to give assurances is not a repudiation
of the Framework Agreement.

AMCK did not unequivocally vow to perform the Framework
Agreement only if Frontier conceded to extracontractual terms.
Frontier did not have reasonable grounds to fear nonperformance.
No reasonable fact finder could find that the Framework
Agreement was repudiated. The claim is thus dismissed.

**B. Breach of Contract Against AMCK (Claim 2)**

AMCK argues that its termination of the Framework Agreement
was justified by Frontier's non-payment of April and May 2020
rents, which constituted a cross-default under the MSN 10038
Lease and triggered an Event of Default under the Framework

Agreement. Frontier claims AMCK was not entitled to terminate the Framework Agreement and its unilateral action to do so was a total breach. Frontier's argument is that AMCK waived its right to declare a default arising from the deferred rent, and thus had no grounds on which to terminate the Agreement.

"A party may, by words or conduct, waive a provision in a contract," including the time or performance or time of payment. Oleg Cassini, Inc. v. Couture Coordinates, Inc., 297 F. Supp. 821, 831-32 (S.D.N.Y. 1969); see Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc., 448 F.3d 573, 585 (2d Cir. 2006) ("A breach of contract may be waived by the non-breaching party."). A waiver is "the voluntary abandonment or relinquishment of a known [contract] right." Randolph Equities, LLC v. Carbon Cap., Inc., 648 F. Supp. 2d 507, 516 (S.D.N.Y. 2009) (quoting Jefpaul Garage Corp. v. Presbyterian Hosp., 462 N.E.2d 1176, 1177 (1984)). The party asserting waiver has the burden of proving the non-breaching party expressed a clear manifestation of its intent to relinquish its right. Id. Because it is a question of intent, whether a party waived is generally a matter of fact. Id.

The Framework Agreement mandates that a party may only waive its rights under the Agreement "by an express waiver or variation in writing. . . and no act or course of conduct or negotiation on the part of such party or on its behalf shall in

any way preclude it from exercising any such right or constitute a suspension or any variation of any such right."[1] Dkt. No. 94 Ex. 4 § 8.4.1 ("Framework Agreement"). The parties dispute whether the written requirement applies only to variations or if it is also applies to waivers. Giving life to the plain meaning of the unambiguous text, the Court finds that the written requirement is limited to variations. Generally, in New York,

---

[1] Frontier argues that AMCK's course of dealing during the negotiation period is evidence of AMCK's consent to the rent deferral. Frontier primarily relies on the fact that AMCK ceased sending chase alerts to Frontier to notify it that rent was past due, as AMCK had allegedly done so habitually for all other rents that became due proceeding and following the period of negotiation. Dkt. No. 113 ¶¶ 38, 41, 54-56, 78-79. While a party, in general, "may waive its contractual rights through its subsequent course of conduct," Randolph Equities, 648 F. Supp. 2d at 517, the Framework Agreement expressly forbids a waiver by course of conduct. Frontier's argument thus fails as a matter of law. See Ronis v. Carmine's Broadway Feast, Inc., No. 10 CIV. 3355 TPG, 2011 WL 4444307, at *3 (S.D.N.Y. Sept. 26, 2011) ("[B]y including a "no-waiver" provision in their contract, parties may limit the effect of a waiver of contractual rights through a course of conduct inconsistent with the contract's terms.").

Frontier's argument that AMCK breached the Framework Agreement by continuing to negotiate with it after it allegedly defaulted fares no better. The Framework Agreement says that a negotiation will not waive a party's right, and Frontier provides no authority to override the unambiguous terms of the contract. Instead, Frontier relies on Oleg Cassini, Inc. v. Couture Coordinates, Inc., 297 F. Supp. 821 (S.D.N.Y. 1969) for the proposition that if, during a period of negotiations, a party waives a contractual provision calling for timely payments, then the waving party cannot use the fact that there are outstanding payments as a basis to terminate the contract unless the party provides notice and an opportunity to cure. However, Oleg Cassini has no relevance to this case as the contract before the Court, unlike the contract in Oleg Cassini, excludes relying on negotiations as a basis for finding a party waived its rights.

there is no requirement that the express waiver be in writing.
The express waiver can be "established by affirmative conduct or
by failure to act so as to evince an intent not to claim a
purported advantage." Fundamental Portfolio Advisors, Inc. v.
Tocqueville Asset Mgmt., L.P., 7 N.Y.3d 96, 104, 850 N.E.2d 653
(2006)

There are clear questions of fact whether the parties' oral
and written communications amount to an agreement to suspend
payments through May 15, 2020, or while the parties were
negotiating, or on a month-to-month basis. To begin with, the
parties dispute the central communication Frontier relies upon
in support of its argument for a waiver—a phone call on April 7,
2020 between Frontier's CFO and AMCK's CEO. Frontier argues that
during the call AMCK agreed to the deferral on a month-to-month
basis. However, AMCK acknowledges that while the parties
discussed the deferral on that call, they did not agree on all
material terms (i.e. the repayment period for deferred rent) and
thus could not have reached a binding agreement.  The parties'
internal written communications do not definitively show that an
agreement was reached on that phone call, as both sides' reports
of the conversation differ. Further, the external written
communications between the parties also fail to provide a clear
answer whether an agreement was reached to extend the deferrals
until May 15, 2020. Those emails and text messages often

reference previous phone calls or respond to a written inquiry
with a request for a phone call. The record of the parties'
communications is thus inconclusive, precluding a finding of
summary judgment dismissing the claim. That is a question that
can only be resolved by the finder of fact after an evaluation
of the witnesses' credibility on direct and cross-examination
and after weighing the totality of the parties' communications.

Accordingly, AMCK's motion for summary judgment dismissing
the breach of contract claim is denied.

### C. Breach of Implied Covenant of Good Faith and Fair Dealing Against AMCK (Claim 4)

AMCK argues that Frontier's breach of the implied covenant
claim is based on the same allegations and seeks the same
damages as its claims for breach of contract of the Framework
Agreement and therefore should be dismissed.

Generally, New York law "does not recognize a separate
cause of action for breach of the implied covenant of good faith
and fair dealing when a breach of contract claim, based upon the
same facts, is also pled." Harris v. Provident Life & Acc. Ins.
Co., 310 F.3d 73, 81 (2d Cir. 2002). Such a claim may therefore
survive dismissal if it is "based on allegations different than
those underlying the accompanying breach of contract claim." EUA
Cogenex Corp. v. N. Rockland Cent. Sch. Dist., 124 F. Supp. 2d
861, 873 (S.D.N.Y. 2000). A separate cause of action for breach
of the duty of good faith and fair dealing may be brought "where

one party's conduct, though not breaching the terms of the contract in a technical sense, nonetheless deprived the other party of the benefit of its bargain." Sauer v. Xerox Corp., 95 F. Supp. 2d 125, 132 (W.D.N.Y. 2000), aff'd, 5 F. App'x 52 (2d Cir. 2001); see Butvin v. DoubleClick, Inc., No. 99 CIV 4727 JFK, 2001 WL 228121, at *8 (S.D.N.Y. Mar. 7, 2001), aff'd, 22 F. App'x 57 (2d Cir. 2001) (recognizing a separate cause of action for breach of the implied duty of good faith may survive "in cases involving efforts by one party to a contract to subvert the contract itself"). Nonetheless, "where the relief sought by the plaintiff in claiming a breach of the implied covenant of good faith is 'intrinsically tied to the damages allegedly resulting from the breach of contract,' there is no separate and distinct wrong that would give rise to an independent claim." Toto, Inc. v. Sony Music Ent., No. 12 CIV. 1434 LAK AJP, 2012 WL 6136365, at *14 (S.D.N.Y. Dec. 11, 2012), report and recommendation adopted, No. 12 CIV. 1434 RJS, 2013 WL 163826 (S.D.N.Y. Jan. 15, 2013).

Frontier's claim for breach of the implied covenant of good faith and fair dealing rests on the same facts that comprise the basis of its breach of contract claim. Frontier argues that AMCK breached the covenant when it threatened to not perform the Framework Agreement unless Frontier agreed to extracontractual quid pro quo. This argument carries no weight as the Court has

already found that the evidence shows that AMCK never threatened to not perform the Framework Agreement. Rather, AMCK offered a conditional grant of rent deferrals. AMCK was not depriving Frontier of the benefit of the Framework Agreement and Frontier could have obtained the full benefit if it had promptly paid the rent. What AMCK would have done in response is speculative and theorizing that it would have not performed is insufficient to grant the relief Frontier seeks.

Alternatively, Frontier asserts that AMCK breached the covenant by using the parties' negotiations over rent deferrals as a pretext to subvert the Framework Agreement. Even if Frontier put forward evidence to show that the breach of good faith claims rests on separate facts from the breach of contract claim, the relief Frontier seeks under both (damages in the amount of no less than $53,000,000) is indistinguishable.

Because a purely duplicative claim cannot survive, Frontier's claim for breach of the implied duty of good faith and fair dealing is dismissed.

### D. Breach of Framework Agreement Against Remaining Defendants

Frontier brings the claims arising out of the Framework Agreement (Claims 1, 2, and 4) against Accipiter, Vermillion, UMB, and Wells Fargo.[2] AMCK argues that dismissal of those claims

---

[2] UMB and Wells Fargo are dismissed because, as Frontier says, they are only nominal defendants and dismissal is warranted

against these defendants is warranted because they are not signatories to the Framework Agreement and Frontier has not pled any facts to show they are corporate entities related to AMCK or to pierce their corporate veil. Frontier contests that characterization and counters that it sued Accipiter, Vermillion, UMB, and Wells Fargo in their roles as guarantors, which have rights arising from the contracts at issue.

But Accipiter and Vermillion only guaranteed the due and punctual performance of the Lessors' (UMB and Wells Fargo) obligations under each of the Lease Agreements, not the Framework Agreement. Frontier tries to cure the issue by arguing that the Framework Agreement and Lease Agreements should be considered to form a single transaction and must be read together.

Under New York law, contemporaneous writings are to be read together, even if they are not between the same parties, when they form part of a single transaction, relate to the same subject matter, and are intended to effectuate the same purpose. This Is Me, Inc. v. Taylor, 157 F.3d 139, 143 (2d Cir. 1998); Nau v. Vulcan Rail & Constr. Co., 286 N.Y. 188, 197, 36 N.E.2d

---

when, as here, "a defendant's presence is not necessary to afford all the requested relief." Benson v. RMJ Sec. Corp., 683 F. Supp. 359, 378 (S.D.N.Y. 1988).

106, 110 (1941) (finding those agreements at issue "were executed at substantially the same time, related to the same subject-matter, were contemporaneous writings and must be read together as one."). It is for the jury to determine whether contemporaneous writings were intended to impose on separate parties the same binding obligations, even though the obligations were defined in different documents. TVT Recs. v. Island Def Jam Music Grp., 412 F.3d 82, 89 (2d Cir. 2005).

The Framework Agreement was executed on March 16, 2020 between Frontier and AMCK. The purpose of the Framework Agreement was to secure financing and leasing of six aircraft, including MSC 10038. Specifically, "AMCK Aviation has agreed to cause the relevant Lessor to purchase each Aircraft from the Manufacturer pursuant to the Purchase Agreement Assignment for the purpose of leasing such Aircraft to Frontier pursuant to the relevant Lease Agreement." Dkt. No. 94 Ex. 4. ¶ 2.5; see also id. ¶ 2.1. The Agreement defines Lessor to mean the Trust Company, solely in its capacity as owner trustee, and identifies UMB Bank, N.A. as the Trust Company. Id. ¶ 1.1.

On the same date, Frontier entered into two additional agreements: an Aircraft Lease Agreement with UMB Bank, N.A. as Lessor to lease MSN 10038, Dkt. No. 94 Ex. 6, a Guaranty Agreement for MSN 10038 with Vermillion to guarantee the due and punctual payment and performance of all of the obligations of

Lessor under the Aircraft Lease Agreement, Dkt. No. 94 Ex. 7.
Additionally, Vermillion and UMB Bank entered into a Trust
Agreement for MSN 10038 to convey title to MSN 10038 to UMB.

As the agreements are contemporaneous and related to the
same transaction, the financing and leasing of MSN 10038, there
is sufficient evidence to put before the jury whether the
parties intended the Framework Agreement to be binding on
Vermillion. Therefore, the claims relating to breach of the
Framework Agreement are not dismissed as to Vermillion.

The same can be said for Accipiter. Although Accipiter did
not enter into a Lease Agreement for any aircraft governed by
the Framework Agreement, Accipiter Holdings DAC, a parent
company to Accipiter, Dkt. No. 22 ("Rule 7.1 Corporate
Disclosure Statement"), signed a letter of intent to finance six
aircraft. Dkt. No. 114 Ex. 1. The letter's key terms were then
incorporated into the Framework Agreement. It is thus a question
of fact whether the parties intended the writings to be
construed as one agreement.

Therefore, the claims that are proceeding against AMCK will
also proceed against Accipiter and Vermillion.

### E. Promissory Estoppel (Claim 6)

"In New York, promissory estoppel has three elements: a
clear and unambiguous promise; a reasonable and foreseeable
reliance by the party to whom the promise is made, and an injury

sustained by the party asserting the estoppel by reason of the reliance." Cyberchron Corp. v. Calldata Sys. Dev., Inc., 47 F.3d 39, 44 (2d Cir. 1995).

Frontier alleges that AMCK promised to defer rents on a month-to-month basis. Regardless of the accuracy of that allegation, Frontier's promissory estoppel claim is based on the same course of events that gave rise to its breach of contract claim and thus is precluded because a separate claim may not give rise to liability "unless a legal duty independent of the contract . . . has been violated." Nungesser v. Columbia Univ., 169 F. Supp. 3d 353, 374 (S.D.N.Y. 2016); see also Grossman v. N.Y. Life Ins. Co., 935 N.Y.S.2d 643, 645 (2d Dep't 2011) (holding that "the existence of valid and enforceable written contracts precludes recovery under . . . promissory estoppel" when the contract and promissory estoppel claims "arise out of the same subject matter").

Frontier argues to the contrary that a promissory estoppel claim can be maintained where, as it is here, it is unclear whether a valid contract governs the dispute. In support of its argument, Frontier relies on MBIA Ins. Corp. v. Patriarch Partners VIII, LLC, 842 F. Supp. 2d 682 (S.D.N.Y. 2012) which held that "[b]ecause there is a dispute concerning [defendant's] obligation to use commercially reasonable efforts to seek the ratings, it would be inappropriate to grant [defendant's] motion

for summary judgment on [plaintiff's] claim for promissory
estoppel." Id. at 712. However, that case is inapposite here. It
is an accepted principle that "[p]laintiffs who allege the
existence of a valid contract may nonetheless plead the
alternative theor[y] of promissory estoppel . . . when the
defendant does not concede the enforceability of such contract."
Personal Watercraft Prod. SARL v. Robinson, 2017 WL 4329790, at
*11 (S.D.N.Y. Sept. 1, 2017). But the enforceability of the
Framework Agreement is not at issue here. It is undisputed that
the Framework Agreement is a valid and enforceable contract. The
issue presented is whether AMCK waived its right to assert
nonpayment of April and May rents constituted a default. AMCK's
motion to dismiss the promissory estoppel claim is therefore
granted.

**2) Aircraft Lease Agreements**

Frontier asserts two claims for breach of contract against
AMCK, Vermillion, and Accipiter for breach of the 15 Aircraft
Lease Agreements. Because the evidence cannot sustain either
claim, both are dismissed as a matter of law.

**A. Breach of Contract (Claim Three)**

AMCK, through various subsidiaries and owner trustees, owns
and leases back fifteen aircraft, including MSN 10038, to
Frontier. Each arrangement is governed by a separate Aircraft
Lease Agreement. The Lease Agreement for MSN 10038 states that

an Event of Default occurs when Frontier "fails to pay (i) any Basic Rent or Security when due . . ., or (ii) any other sum due from it under this Agreement or any other Operative Document . . . in the currency and in the manner stipulated within five (5) Business Days of written notice of such failure from Lessor." Dkt. No. 116 Ex. 10 ("MSN 10038 Lease Agreement") § 16.1(a). Operative Documents include the Lease Agreements of the 14 other aircraft. Id. § 1.1. Under the Framework Agreement, an Event of Default occurs when "Frontier fails to pay any amount due under any of the Transaction Documents," which includes each Operative Document as defined In the MSN 10038 Lease Agreement. Dkt. No. 116 Ex. 7 ("Framework Agreement") §§ 1.1, 6.1.1.

Frontier, therefore, argues that the fifteen AMCK-affiliated lessors wrongfully breached their respective Lease Agreements when they declared Frontier's suspension of rents under the 14 Lease Agreements (excluding the MSN 10038 Leases) amounted to an Event of Default that triggered the cross-default provision under the Agreement for MSN 10038 and the Framework Agreement. In other words, Frontier argues that defendants breached the Fifteen Leases Agreements when they wrongfully declared Frontier to be in default of them and used that as a basis to abandon the remaining obligations under the Framework Agreement.

Even assuming Frontier's characterization of the events to be true, there is no evidence that defendants breached the Lease Agreements. A breach of contract "is the unexcused failure" to "carry[ ] out the contract by doing what it requires or permits." Nasdaq, Inc. v. Exch. Traded Managers Grp., LLC, 431 F. Supp. 3d 176, 240 (S.D.N.Y. 2019). Defendants' alleged refusal to finance and lease the five aircraft as specified in the Framework Agreement could constitute a failure to perform under the Framework Agreement, but not under the Lease Agreements. Frontier points to no provision in the Lease Agreements that require defendants to perform under the Framework Agreement. The obligations made under the Lease Agreements and Framework Agreements cannot be conflated and a breach of one cannot be said to be a breach of the other unless such integration is explicitly agreed to by the parties in the contracts.

The only action that defendants took under the Lease Agreement is to declare Frontier to be in default. But a declaration that the opposing party defaulted is alone insufficient to warrant a breach by the non-defaulting party, especially when the non-defaulting party did not use the alleged default as grounds to anticipatorily breach the agreement.

Because there is no underlying failure to perform, there is no evidence that Accipiter or Vermillion breached their

guarantees, which apply only when the lessor fails to make due and punctual payments or perform all its obligations under the Lease Agreement. Dkt. No. 91 Exs. 3, 7 § 1. Because there is no evidence that defendants failed to perform under the Lease Agreements, the claim for beach of them is dismissed as a matter of law.

**B. Breach of the Covenant of Quiet Enjoyment (Claim Five)**

The covenant of quiet enjoyment is the "promise by the lessor that it will not interfere with the rights granted" under a lease. Trans Pac. Leasing Corp. v. Aero Micronesia, Inc., 26 F. Supp. 2d 698, 706 (S.D.N.Y. 1998). "To establish a breach of the covenant of quiet enjoyment, a tenant must show either an actual or constructive eviction." Grammer v. Turits, 706 N.Y.S.2d 453, 455-56 (N.Y. App. Div. 2000). "A constructive eviction occurs where the landlord's wrongful acts substantially and materially deprive the tenant of the beneficial use and enjoyment of the leased premises." Id.

In the Complaint, Frontier alleges that by wrongfully claiming an Event of Default under the Lease Agreements and asserting default remedies, including the termination of the Framework Agreement, defendants improperly interfered with Frontier's use of its entire aircraft fleet, including the existing fifteen AMCK leased aircraft. But there is no evidence that Frontier has been prevented from using or enjoying the

35

fifteen aircraft. Frontier clings to the theory that the lessors might in the future exercise their termination rights under the Lease Agreements, including by repossessing the aircraft. That threat carries no weight. It is unfounded as defendants acknowledge they no longer have the right to terminate the Lease Agreements because Frontier has paid all rent on the aircraft.

In its Opposition to Defendants' Motion for Summary Judgment, Frontier argues for the first time that it was constructively evicted from the five remaining Framework Agreement aircraft. However, as there were no leases for those aircraft, there was no covenant of quiet enjoyment to break. The claim is therefore dismissed.

### III. Fraud

Frontier alleges that AMCK, to cover up its anticipatory breach, devised a scheme whereby it falsely represented that it would consider retracting its repudiations and grant rent deferrals if Frontier would defer the delivery dates in order to induce Frontier into not timely paying rent. AMCK argues that dismissal of the fraud claim is warranted because it is duplicative of the breach of contract claim.

"Under New York law, the five elements of fraud are '(1) a material misrepresentation or omission of fact (2) made by [a] defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff;

and (5) resulting damage to the plaintiff.'" Loreley Fin.
(Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 13 F.4th 247, 259
(2d Cir. 2021). Because alleged fraudulent representations are
in essence restatements of a plaintiff's claim for breach of
contract, "a cause of action for fraud will not arise when the
only fraud charged relates to a breach of contract." Value Time,
Inc. v. Windsor Toys, Inc., 700 F. Supp. 6, 7 (S.D.N.Y. 1988)
(quoting Trusthouse Forte (Garden City) Mgt., Inc. v. Garden
City Hotel, Inc., 483 N.Y.S.2d 216, 218 (1st Dept. 1984). Thus,
for a fraud claim to be maintained alongside a breach of
contract claim, the plaintiff must either "'(i) demonstrate a
legal duty separate from the duty to perform under the contract;
or (ii) demonstrate a fraudulent misrepresentation collateral or
extraneous to the contract; or (iii) seek special damages that
are caused by the misrepresentation and unrecoverable as
contract damages.'" IMG Fragrance Brands, LLC v. Houbigant,
Inc., 679 F. Supp. 2d 395, 409 (S.D.N.Y. 2009) (quoting
Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98
F.3d 13, 20 (2d Cir. 1996)).

Frontier argues that its fraud claim is not duplicative of
its breach of contract claim and can be sustained because AMCK
made a misrepresentation that was collateral to the contract.
But being collateral to the contract is alone insufficient for a
finding of fraud. The statement must also "serve[] as an

inducement for the contract." <u>Rouse v. Elliot Stevens, Ltd.</u>, 2016 WL 8674688, at *5 (S.D.N.Y. June 24, 2016).

Frontier alleges that AMCK made a false representation that it would retract its repudiation of the Framework Agreement if Frontier could achieve extracontractual delivery deferrals with Airbus, and in the meantime, Frontier did not need to pay rent. In other words, Frontier is claiming that it was induced to allegedly breach the Framework Agreement. That is not an inducement extraneous from the contract.

Therefore, the claim for fraud is dismissed as duplicative of the breach of contract claim.

### CONCLUSION

Defendants' motion for summary judgment is denied as to the second claim for breach of the Framework Agreement against AMCK, Accipiter, and Vermillion, but is granted as to all other claims.

So Ordered.

Dated:  New York, New York
        July **6**, 2023

_Louis L. Stanton_
LOUIS L. STANTON
U.S.D.J.