1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   FRONTIER AIRLINES, INC.,

4                   Plaintiff,

5           v.                              22 CV 2943 (PAE)

6   AMCK AVIATION HOLDINGS IRELAND
    LIMITED, *et al.*,
7
                    Defendants.             Hearing
8   ------------------------------x
                                            New York, N.Y.
9                                           July 18, 2023
                                            10:45 a.m.
10
    Before:
11
                    HON. PAUL A. ENGELMAYER,
12
                                            District Judge
13

14                      APPEARANCES

15  LANE POWELL PC
        Attorneys for Plaintiff
16  BY:  DAVID M. SCHOEGGL
        -and-
17  BINDER & SCHWARTZ LLP
    BY:  ERIC B. FISHER
18
    CLIFFORD CHANCE US LLP
19      Attorneys for Defendants
    BY:  JEFF BUTLER
20      -and-
    MILBANK LLP
21  BY:  JED M. SCHWARTZ
        EMILY WERKMANN
22      SAMANTHA LOVIN

23

24

25

```
 1              (Case called)
 2              MR. FISHER:  Good morning, your Honor, Eric Fisher
 3   from the law firm of Binder & Schwartz for Frontier Airlines.
 4              THE COURT:  Good morning.
 5              MR. SCHOEGGL:  Good morning, your Honor, Dave Schoeggl
 6   with Lane Powell for Frontier Airlines.
 7              THE COURT:  Good morning.  You may be seated.
 8              For the defense.
 9              MR. SCHWARTZ:  Good morning, Jed Schwartz from Milbank
10   LLP for the defendants.
11              THE COURT:  Good morning.
12              MS. LOVIN:  Good morning, your Honor, Samantha Lovin,
13   also from Milbank, on behalf of defendants.
14              THE COURT:  Good morning.
15              MS. WERKMANN:  Good morning, your Honor, Emily
16   Werkmann from Milbank LLP on behalf of defendants.
17              THE COURT:  Good morning.
18              MR. BUTLER:  Good morning.  Jeff Butler from Clifford
19   Chance.
20              THE COURT:  Good morning.
21              Good morning as well to the members of the pubic, whom
22   I have a sneaking suspicion may be party affiliated who are in
23   the back.  You may be seated.
24              Counsel, we will proceed in two steps today.
25              As I had my law clerk indicate to you informally, I
```

1    had a bench ruling on the pending application for emergency

2    relief.  And then, having taken care of that, we will turn to

3    the more prosaic matter of initial conference and a case

4    management plan.

5            MR. SCHWARTZ:  Your Honor, before you proceed, may I

6    be heard briefly?

7            THE COURT:  On what subject?

8            MR. SCHWARTZ:  We had prepared a brief presentation

9    when we got your email.

10            THE COURT:  Use the microphone, please.

11            MR. SCHWARTZ:  We had prepared a brief presentation

12    when we got your email.  I understand that the Court is not

13    entertaining oral argument today.  I would ask to be able to

14    just briefly present on that presentation or, if not the

15    entirety of the presentation, there are two points, one which

16    was raised in a reply brief for the first time and another

17    which I think corrects a misstatement of the reply brief that I

18    would ask to be heard on.

19            THE COURT:  If there is a factual misstatement, you

20    can explain in a sentence or two what the factual misstatement

21    was, but I am not going to receive a presentation.  I received

22    lengthy briefs.  They are this thick.  I have gone through

23    them.  I am prepared to rule.  The answer here is clear.  If

24    there is a factual mistake, then I'm happy to hear about that.

25            MR. SCHWARTZ:  Sure, your Honor.  The misstatement is,

1   in the reply brief there was a statement that the leases -- and

2   I think the way that term was defined would apply to all the

3   leases at issue here -- are considered lessees, documents

4   within the meaning of the framework agreement.  That's

5   incorrect.  Only, at most, one of the leases at issue here is a

6   lessees document.

7          THE COURT:  Plaintiff, any response?

8          MR. SCHOEGGL:  Yes, absolutely, your Honor.  The

9   documents are all interrelated.  The lessee documents would

10  include the framework agreement.  Judge Engelmayer found

11  that --

12         THE COURT:  That would be me?

13         MR. SCHOEGGL:  I'm sorry.  You are Judge Engelmayer.

14         Excuse me.  Judge Stanton found that in his order.

15         And, more importantly, the whole premise of the AMCK

16  Carlyle position in case 1 is that these documents are all

17  related because they use alleged failure to pay rent under the

18  leases as an excuse for declaring the defaults.  If these are

19  not related, then we basically automatically --

20         THE COURT:  Your point for these purposes is that the

21  Court need not make a durable ruling, so much as the issue is

22  whether or not that is an issue as to which you have, from your

23  perspective, a fair claim on the merits.

24         MR. SCHOEGGL:  Absolutely.  It's not a factual issue.

25  It's a contract interpretation.

1          THE COURT:  Very good.  Thank you.

2          Mr. Schwartz, I appreciate the offer to do a

3    presentation, but at the end of the day the purpose of the

4    written submissions was to put me in a position to make an

5    informed rule beforehand, and I have on the basis of what I

6    found to be very thoughtful submissions.

7          MR. SCHWARTZ:  Understood, your Honor.

8          THE COURT:  I am now going to issue a ruling on the

9    motion by plaintiff Frontier Airlines, Inc., which I will refer

10   to as Frontier, to convert the operative temporary restraining

11   order into a preliminary injunction.  The defendants whom the

12   injunction would bind are Wells Fargo Trust Company N.A., which

13   I will refer to as Wells Fargo, and UMB Bank N.A., which I will

14   refer to as UMB.  For your planning purposes, there will not be

15   a written decision.  I will instead issue a bottom-line order

16   reflecting the Court's resolution of the motion.  To the extent

17   the Court's reasoning is significant to counsel, you will need

18   to order the transcript.

19          As background, and as counsel are well aware, on June

20   8, after hearing from both parties on an emergency basis via

21   telephonic conference, the Court extended the temporary

22   restraining order that it earlier put in place.  It enjoined

23   the defendants from grounding, impounding, or deregistering the

24   14 A320 Airbus aircraft at issue.  These 14 aircraft were the

25   subject of default notices served by defendants on May 26,

1    2023.  The parties thereafter attempted to resolve this

2    dispute, which appeared to the Court to be readily resolvable,

3    and, I might add, continues to appear to the Court to be

4    readily resolvable.  The TRO therefore was extended until today

5    on consent.  Alas, however, settlement did not occur.  Frontier

6    now moves to convert the TRO to a preliminary injunction.

7         I have reviewed in detail the parties' memoranda of

8    law, supporting declarations, and the materials attached to

9    those declarations.  I want to thank counsel for both sides for

10   their excellent, genuinely excellent submissions, which have

11   been of tremendous assistance to me.

12        The relevant facts here are briefly synopsized as

13   follows:  Frontier had a business relationship with AMCK

14   Aviation Holdings Ireland Limited and its affiliates, to which

15   I will refer collectively as AMCK.  The relationship dated back

16   at least to early 2020.  The arrangement involved

17   sale-and-leaseback arrangements for commercial aircraft under

18   which Frontier, a passenger airline company, leased aircraft.

19   In this arrangement, defendants Wells Fargo and UMB served

20   formally as the aircraft openers, although AMCK and its

21   affiliates are the beneficial owners and, in economic

22   substance, they are Frontier's real counterparties.

23        In March 2020, Frontier and AMCK entered into a

24   binding agreement, the so-called framework agreement, which

25   governed the parties' conduct with respect to several leases.

1    Almost immediately after execution of this agreement, the

2    pandemic disrupted air travel and adversely affected aircraft

3    financing markets.  In response to the crisis, Frontier claims

4    that AMCK granted Frontier temporary rent deferral.  But soon

5    thereafter, Frontier claims, AMCK reneged on the rent deferral

6    and informed Frontier that it would terminate the framework

7    agreement on the basis of unpaid rent.  Frontier claims that it

8    suffered various adverse financial consequences from AMCK's

9    anticipatory repudiation of the framework agreement.  In

10   November 2020, Frontier sued AMCK for breach of various

11   contracts, as well as breach of quiet enjoyment, promissory

12   estoppel, and fraud.  That lawsuit is assigned to Judge

13   Stanton.

14          Frontier separately claims that, while that lawsuit

15   was ongoing, AMCK sold its entire aircraft portfolio to Carlyle

16   Aviation Partners and its affiliates, which I will refer to

17   collectively as Carlyle.  According to Frontier, an effect of

18   these transactions was to denude AMCK of assets, so as to make

19   it "judgment proof" in the lawsuit before Judge Stanton, in

20   which the Court understands Frontier to seek potentially north

21   of $40 million.  That, Frontier claims, violated a term of the

22   parties' lease agreements that protects Frontier in the event

23   of a transfer, in so far as these state that Frontier need not

24   agree to any transfer or assignment of aircraft that would

25   "result in any restriction ... on lessee's rights under the

1    this agreement or the other lessee's documents or on lessee's

2    use or operation of the aircraft."  Frontier also alleges that

3    it did not receive advance notice of the transactions between

4    AMCK and Carlyle.  Such notice, it contends, would have enabled

5    it to determine whether the upstream switch of owners imperiled

6    Frontier's ability to use or operate the planes.  Viewing the

7    transfers as violating its contractual rights, Frontier

8    declined to agree to the transfers.  Frontier contended that

9    although it has an obligation to reasonably cooperate in

10   proposed transfers of the aircraft, such cooperation was not

11   reasonably required here.  That is because, it contends, the

12   transfers, in violation of AMCK's obligations, undermined

13   Frontier's rights, including its ability to collect on its

14   pending claim of contract breach in the suit before Judge

15   Stanton and its ability to use or operate the planes.

16   Nonetheless, in April 2022, over Frontier's express objections,

17   AMCK closed their transaction, and that prompted Frontier to

18   file this action, in which it seeks monetary and declaratory

19   relief.  This action is thus the second lawsuit, the first one

20   being the one before Judge Stanton.

21          The third lawsuit arises from events while this

22   lawsuit was ongoing.  Frontier claims that Carlyle had assigned

23   as security all of its rights under certain leases to a

24   third-party lender, again, allegedly without the required

25   advance notice to Frontier.  Frontier and Carlyle apparently

1    then began negotiations regarding their dispute.  However, in

2    April 2023, while these discussions were ongoing, Carlyle

3    informed Frontier that it had breached the leases and another

4    agreement between the parties.  And in May 2023, Carlyle

5    formally served Frontier with 14 notices of default.  There was

6    one for each of the 14 airplanes.  Carlyle then filed a lawsuit

7    in New York state court, claiming breach of contract and

8    tortious interference with prospective economic advantage.

9    These claims were based on Frontier's failure to provide the

10   requested consents for the transactions involving the aircraft.

11   That case is the third lawsuit, which was removed to this

12   Court.  I have accepted it as related to the second lawsuit.

13          In the first and second lawsuits, Judge Stanton and I

14   have each resolved dispositive motions.  On June 7, I granted

15   defendants' motion to dismiss all claims except for one

16   alleging breach of contract relating to Frontier's right to

17   notice of the transactions involving AMCK, Carlyle, and

18   Maverick.  And on July 6, Judge Stanton resolved a summary

19   judgment motion.  He granted summary judgment to defendants on

20   various claims.  But he left standing the lawsuit's central

21   claim of a breach of contract arising from AMCK's allegedly

22   express termination on May 8, 2020 of the framework agreement.

23          Frontier now seeks injunctive relief in this, the

24   second of the actions.  The relief it seeks is aimed at the

25   consequence of the default notices that allow defendants to

ground, impound, or deregister the 14 aircraft, actions which
Frontier claims would restrict or block altogether Frontier's
ability to deploy the 14 aircraft.

To justify a preliminary injunction under Federal Rule
of Civil Procedure 65, a movant must demonstrate:  (1)
irreparable harm absent injunctive relief; (2) either a
likelihood of success on the merits, or a sufficiently serious
question going to the merits to make them a fair ground for
trial, with the balance of hardships tipping decidedly in its
favor; and (3) that the public's interests weighs in favor of
granting the injunction.  For that proposition I draw on
*Cachillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011);
*Metropolitan Taxicab Board of Trade v. City of New York*, 615
F.3d 152 (2d Cir. 2010); and *New York Civil Liberties Union v.
New York City Transit Authority*, 684 F.3d 286 (2d Cir. 2012).

Frontier contends that it would be irreparably harmed
by its inability to deploy these aircraft.  These, it states,
account for nearly 10 percent of Frontier's fleet and would
take Frontier more than a year to replace.  Frontier contends
that it is likely to succeed in showing that it was not
required to acknowledge the proposed transfers because they
would imperil its rights to recovery in the pending lawsuits,
in violation of its contract rights.  Frontier finally contends
that the public's interest overwhelmingly weighs in favor of
granting the injunction, given the prospect of interrupted air

travel caused by Frontier losing approximately 10 percent of

its fleet.  Defendants take the opposite position on each

point.

         As to the first element of irreparable harm, the Court

finds, as in the ruling of June 8, that Frontier has met its

burden to establish irreparable harm.  The harm is that which

defendants have threatened in the default notices, that is, to

ground, impound, or deregister the 14 A320 Airbus aircraft at

issue.  I am persuaded that, absent injunctive relief, were

defendants to take such action, there would be a serious risk

that Frontier would suffer irreparable damage to its

reputation, goodwill, and business opportunities.  I further

find that, although Frontier may still have the ability to

neutralize this action by consenting to the transfer, and I

assume for present purposes that Frontier's present consent

would vitiate the default notice, it cannot do so without

exposing itself to significant monetary cost that on the

present record may not be recoupable.

         The analysis as to this point is essentially the same

as on June 8.  Frontier has shown that it does not have the

excess airplanes needed to accommodate the flights that would

take place on those 14 aircraft in the existing fleet.  It

represents that it has no more than several airplanes that it

uses to cover for planes that need repairs or are otherwise

grounded.  It also represents that alternative aircraft are not

1    readily available to it.  It has ably demonstrated those facts,

2    and defendants have not credibly contested them.  Were

3    defendants to impound the 14 aircraft and deny Frontier use of

4    them, there could be, as I said last month, an existential

5    disaster for Frontier.  Frontier would likely have to cancel

6    upon, strand, reroute, or delay thousands of passengers during

7    the busy summer travel season.  Apart from economic damages,

8    such would predictably cause reputational damage to Frontier's

9    business.  And it is well settled that a company's "loss of

10   reputation, goodwill and business opportunities" from a breach

11   of contract can constitute irreparable harm.  *See Register.com,*

12   *Inc. v. Verio, Inc.*, 356 F.3d 339, 404 (2d Cir. 2004).  *See*

13   *also*, *e.g.*, *Reuters Limited v. United Press International,*

14   *Inc.*, 903 F.2d 904, 907-08 (2d Cir. 1990), which describes an

15   injury of this sort as "nearly impossible to value" in the

16   context where there is "termination of the delivery of the

17   unique product to a distributor whose customers expect and rely

18   on the distributor for a continuous supply of that product."

19        I note that even if the parties resolved their

20   differences quickly after an impoundment action such that the

21   14 aircraft were promptly returned to Frontier's control, it is

22   reasonable to expect that reputational harm to Frontier would

23   linger.  Experience teaches that airline travelers are a

24   discerning group with long memories.  Travelers who purchased

25   tickets in reliance on the airline's ability to deliver and who

1    are then stood up, or who are then forced to scramble for

2    alternative travel arrangements, whether successful or not, or

3    who even experience the scare of a looming cancellation, are

4    likely not to soon forget those negative experiences.  Putting

5    aside the extent to which the impact on customers bears on the

6    public interest aspect of the equation, the potential lasting

7    damage to Frontier's brand and goodwill and good name with

8    customers stands to hurt it in a way that cannot be readily

9    remedied or measured.

10          The harm is also sufficiently imminent.  Defendants

11   have not foresworn, let alone durably, using the remedies

12   available to them upon default, that is, to ground or retake

13   the aircraft.  They contend that they need not do so in light

14   of a representation that Frontier made to the Court at the

15   telephonic hearing on the TRO.  Frontier there stated that, in

16   the event the Court did not enter temporary relief, its access

17   to the 14 aircraft was so vital, and the harm of losing such

18   access so damaging to it, that it would have no choice but to

19   assent to the ownership transfers.  That is so even though,

20   from Frontier's perspective, declining to assent to those

21   transfers was eminently reasonable, given the transfers'

22   capacity to make AMCK judgment proof and thereby cost Frontier

23   the capacity to recover on its viable contract-breach claims.

24   I'm citing page 21 of the transcript of that hearing.

25   Frontier's counsel there stated that "of course" it "could

1    never tolerate" impoundment of the aircraft and "would have to

2    accede" to defendants' terms.

3         To the extent defendants make that argument, the Court

4    firmly rejects it.  Under the case law in this circuit, it is

5    not a response that a party could avoid a specific type of

6    irreparable harm by diverting course in a way that exposes it

7    to an alternative form of irreparable harm.  The law does not

8    oblige Frontier to commit seppuku to avoid irreparable harm.

9    An instructive analogy comes from Judge McMahon's decision in

10   *Rex Medical L.P. v. Angiotech Pharmaceuticals (US), Inc.*, 754

11   F.Supp.2d 616, 618 (S.D.N.Y. 2010).  There, a company sought an

12   injunction to prevent a distributor, whom it relied on to

13   market and distribute the company's medical device, from

14   canceling the party's agreement.  Judge McMahon did not inquire

15   into whether the company had considered simply paying the

16   distributor more money to induce it to not renege.  Presumably

17   there was some high price at which the distributor would have

18   found it worth its while to reconsider.  But notwithstanding

19   that possibility, Judge McMahon found that irreparable harm

20   would ensue absent preliminary relief, and she granted such

21   relief.  For much the same reasons, courts in this circuit have

22   widely recognized, as my colleague, Judge Gardephe, has put the

23   point, "that a finding of irreparable harm may lie in

24   connection with an action for money damages where the claim

25   involves an obligation owed by an insolvent or a party on the

brink of insolvency." *See Alpha Capital Anstalt v. Siftpixy, Inc.*, 432 F.Supp. 3d 326, 340-41 (S.D.N.Y. 2020) (citing authority).  The point is this.  Where a company faces irreparable harm from conduct it claims is unlawful, it is no answer that the specter of such harm is so dire as to coerce the company to do something else self-destructive, like parting with unrecoverable money, as a means of avoiding that harm. The bottom line is that on the threshold issue of irreparable harm, I find, lopsidedly, for Frontier.

Turning to the likelihood of success on the merits, the issue is whether in this litigation, that is, the second of the three lawsuits, Frontier has raised sufficiently serious questions going to the merits.  I again find that it has done so.

Frontier's claim here is that defendants forced through transfers of ownership with respect to aircraft as to which Frontier's consent was required, but as to which Frontier reasonably withheld consent.  Frontier's basis for withholding consent had to do with the impact of the transfers on its ability to collect in the lawsuit before Judge Stanton.  It claims that the transfers denuded the defendants in that case of the assets to pay out a judgment for breach of contract.

Frontier has identified a plausible contractual basis for its decision to withhold consent.  Section 20.2(a)(ii) of Lease Form 1 states that Frontier need not agree to any

transfer or assignment that would "result in any restriction .

. . on lessee's rights under this agreement or the other

lessee's documents or on lessee's use or operation of the

aircraft." Section 22.3(v) of Lease Form 2 similarly allows a

transfer only if it "will not increase lessee's obligations,

liabilities, financial or otherwise, or risks or diminish

lessee's rights and benefits, in each case under any operative

document or in respect of the aircraft."

On the prediscovery record, the Court cannot determine

definitively whose parties contract construction is correct or

whether in fact the transactions here would have left Frontier

unable to fully recover were it to prevail in the litigation

before Judge Stanton.  But, for present purposes, Frontier has

adduced sufficient evidence and made sufficient arguments as to

the ingredients of that claim to make its assertion

substantial.  It has coherently explained why, were it to

prevail before Judge Stanton, it could be in line for a damages

award exceeding $40 million.  And with Judge Stanton having

ruled that the main claim in the case before him survived

summary judgment, that step is today a step closer than it was

on June 8 to a recovery by Frontier.  Frontier has also adduced

evidence that the transfers of the 14 aircraft left the

defendants in that case without the ability to fully pay out

the judgment that it seeks.  In particular, Frontier viably

contends that by disposing of the aircraft, which were

1    valuable, without receiving offsetting value, defendants

2    denuded themselves of the tangible property that most readily

3    could have been tapped to pay out on a such a judgment.  Again,

4    I'm not remotely prejudging the claims in this lawsuit.

5    Plaintiff's factual contentions may be disproven, and there may

6    well be a variety of strong defenses.  Some may be textual

7    based on the terms of the contract, some may be factual,

8    including about the sellers' remaining assets that Frontier

9    could use to recover.  There may be other defenses.

10        But on the basis of what has been adduced, Frontier

11   has identified a sufficiently serious claim going to the

12   merits.  And on the merits prong of that inquiry, that standard

13   has long sufficed in this circuit to support the entry of

14   preliminary relief where the movant has shown irreparable harm,

15   and where the other injunctive factors support such relief.

16   *See Citigroup Global Markets, Inc. v. VCG Special Opportunities*

17   *Master Fund Ltd.*, 598 F.3d 30, 38 (2d Cir. 2010).

18        Continuing my discussion of the injunctive factor that

19   concerns the likelihood of success on the merits, I note that

20   Frontier earlier separately contended that, at the time of the

21   transfers or assignments, it had not received sufficient

22   information about the transferees to determine whether

23   assigning them the aircraft might inhibit Frontier's "use or

24   operation" of the aircraft.  The party's leases make that a

25   separate potential basis for withholding consent.  For example,

1   Frontier earlier suggested that there might have been

2   regulatory issues associated with a transferee or assignee that

3   could have constrained Frontier's use of the aircraft.  It is

4   not at all clear to me that that is still an issue in this

5   case.  It has not been a prominent part of the most recent

6   round of briefing.  The argument appears to have dropped away.

7   Frontier certainly has not meaningfully pursued it in front of

8   this Court.  Frontier has not significantly developed that

9   argument.  For avoidance of doubt, in today's ruling, I'm not

10  at all relying on this earlier dimension of Frontier's argument

11  for emergency relief, and I regard that dimension as no longer

12  an issue supporting or plausibly supporting temporary relief.

13          Continuing the discussion of the likelihood of success

14  on the merits, defendants, in their papers opposing entry of a

15  preliminary injunction, state that in discussions with Frontier

16  after June 8, they have offered guaranties of various sorts.

17  These, defendants contend, should give Frontier comfort that it

18  could collect on a litigation judgment in its favor.  For the

19  purposes of today's ruling, the Court cannot put weight on

20  offers made and positions taken in settlement discussions.  To

21  state the obvious, unaccepted offers and settlement positions

22  are unenforceable.  They do not bind defendants.  They could

23  evaporate tomorrow.  A binding guarantee that would assure

24  Frontier of full recovery in the event of successful judgment

25  would be a different story altogether, and I will have more to

1    say about this at the conclusion of this ruling.  But for the

2    purposes of the present analysis, Frontier's claim that it

3    reasonably withheld consent on the grounds that the assignments

4    and transfers of the aircraft would "result in a restriction"

5    on Frontier's rights under its agreements, specifically its

6    right to recover under the framework agreement, is one I find

7    sufficiently serious.

8           Turning to the balance of equities and hardships, the

9    balance tips decidedly in Frontier's favor.  Favoring relief is

10   that, were plaintiffs to take action under the default notice

11   to ground the planes and block Frontier from using them,

12   Frontier, for the reasons I have explained, would otherwise

13   face a potential economic and reputational disaster with

14   repercussions stretching out years.  On defendants' side of the

15   equation, at the TRO hearing, defendants candidly acknowledged

16   that the impact on them would solely be economic.  And it is

17   undisputed that Frontier has the ability to pay.  The injury to

18   Frontier, by way of the fallout from likely flight

19   cancellations, vastly outweighs the injury to defendants.

20          As to the final element, the public has a clear

21   interest is in favor of an injunction.  Domestic air travel is

22   important to the national economy, and reliable domestic air

23   travel is important to the many real people who count on

24   airlines to keep their promises and who this summer will count

25   specifically on Frontier to get them from point A to point B

1    for journeys of importance to them.  Thousands of members of

2    the public could be impacted by flight cancellations, stemming

3    from impoundment of the 14 aircraft.  Frontier says it uses

4    these 14 aircraft daily or all but daily.  Defendants notably

5    are silent on the public interest element.  The Court is

6    unaware of any public interest favoring defendants' position.

7            In the end, consistent with this analysis, I find the

8    interests for a preliminary injunction met here.  This

9    injunction, though, will be narrowly tailored, as defendants

10   propose, and as plaintiffs agree is appropriate.

11           Accordingly, the Court will enter a narrow preliminary

12   injunction enjoining defendants from grounding, impounding, or

13   deregistering the 14 A320 Airbus aircraft at issue for the

14   default presently asserted against Frontier under the lease

15   agreements.  The injunction will do no more.

16           Defendants argue that any injunction should not be so

17   broad as to prevent them from grounding or repossessing the

18   aircraft were Frontier to commit future unrelated defaults,

19   such as not paying rent.  On that point, the defendants are

20   correct.  So for avoidance of doubt, this does not bar

21   defendants from exercising contractual remedies in the event of

22   other future defaults by Frontier, such as nonpayment of rent.

23   Frontier also does not object to maintaining the previously

24   ordered $2 million bond throughout the life of the injunction.

25   I will keep that bond in place.

1          Importantly, although I am not putting a sunset date

2     on this injunction, I am going to set a next hearing date for

3     this case for August 10 at 11:30 a.m. in this courtroom.

4     That's three weeks from now.  The purpose of that hearing will

5     be to assess the continued need for injunctive relief.

6          In anticipation of that, I will offer counsel this

7     thought, which I hope will be of some assistance in resolving

8     this dispute.

9          On the basis of the record before me, it should not be

10    that hard for defendants to remedy the one basis which the

11    Court has found that justifies Frontier's continued refusal to

12    consent to the transfers and assignments.  Provided that there

13    is a guarantee in place that assures Frontier a full recovery

14    on its litigation claims, and by that I do not mean an offer or

15    a negotiating position, but a durable ironclad guarantee that,

16    once committed to, is outside of defendants' control and

17    assures a recovery, the Court on the present record would be

18    unaware of any basis on which Frontier could thereafter

19    reasonably deny consent.  And I assume that if Frontier gives

20    consent to the transfers and assignments, defendants would then

21    withdraw the default notices insofar as these were based on the

22    absence of consent.  I would hope that, I would really hope

23    that counsel can work together to put such an arrangement in

24    place well in advance of the next hearing date and to submit to

25    the Court a joint proposal that would, I would imagine, at once

1    vitiate both the default notices and the preliminary

2    injunction.

3              In any event, therein ends the ruling.

4              Let me take a quick pause, and then I want to pivot to

5    the more prosaic matter of a case management plan with respect

6    to this litigation, by which I mean lawsuit number 2.

7              Counsel, you have filed at docket 91 a proposed case

8    management plan which, by and large, looks good to me.

9              Let me begin with this question.  I'm mindful, as you

10   can tell, that this is a second of a trilogy of lawsuits that

11   have some factual relationship.  One question involves the

12   discovery that was made in the lawsuit before Judge Stanton.  I

13   would like to assume that, to the extent relevant, that

14   discovery can be treated as accessible in this lawsuit so as to

15   spare everybody the need to do extra work.

16             Is that something you've considered?

17             That is Mr. Butler?

18             MR. BUTLER:  Yes.

19             Certainly we would consider it.  I am not sure there

20   is that much overlap between the discovery in the Judge Stanton

21   case and the issues in this case, but I can't think offhand of

22   a reason why that discovery couldn't be used.  It is certainly

23   available to both parties.

24             THE COURT:  The parties are substantially the same

25   parties, right?

```
 1                MR. BUTLER:  Correct.

 2                THE COURT:  I am about to ask the same question as to

 3    lawsuit number 3, but what I'm trying to do is just be a force

 4    for efficiency.

 5                Can I assume while there may be a protective order or

 6    related types of issues, fundamentally, you will be able to

 7    work something out such that if there turns out to be discovery

 8    in the case with Judge Stanton that's within the bounds of

 9    what's reasonable sought here, you will be able to reach some

10    agreement under which it is treated as having been produced

11    here.  I am just trying to save clients money.

12                MR. BUTLER:  I believe so, your Honor.  Certainly from

13    our side, that would be feasible.

14                THE COURT:  Mr. Fisher.

15                MR. FISHER:  Yes.  That would be fine with Frontier as

16    well, your Honor.

17                THE COURT:  Turning to the next lawsuit, I'm mindful

18    that that lawsuit was filed by defendants in state court.  It

19    was removed here.

20                Plaintiffs, you have not, I think, even answered yet

21    or you have not even appeared.  Is it your intention to appear

22    soon?

23                MR. FISHER:  Yes, your Honor.  We have agreed on a

24    deadline to answer of July 26.

25                THE COURT:  Here is the question.  Is there going to
```

1    be a motion to dismiss or just an answer?

2              MR. FISHER:  Your Honor, we are not sure yet.

3              THE COURT:  Lawsuit number 2 and lawsuit number 3

4    overlap a lot, do they not?

5              MR. FISHER:  Yes, they do.

6              THE COURT:  Assuming that some or all of lawsuit

7    number 3 survives a motion to dismiss, and without committing

8    myself it's hard to imagine at least some of that lawsuit, and

9    perhaps very likely all of it, surviving, it's hard to image

10    that lawsuit not moving into discovery.

11              I'd like to, in anticipation of that, figure out a way

12    in which such discovery that is taking place here is equally

13    applicable in lawsuit number 3.  It also happens to be before

14    me.  I am not in the business of causing counsel and clients to

15    waste money or time.

16              Have counsel discussed here what discovery might look

17    like in lawsuit number 3, how it relates to the discovery in

18    this lawsuit, and how a sensible case management plan can take

19    account of the overlap?

20              MR. FISHER:  Your Honor, speaking for Frontier, we

21    have generally, I think, acknowledged to one another that there

22    is likely to be substantial overlap between the discovery in

23    the lawsuit 2 and lawsuit 3, and we have agreed to coordinate

24    discovery in the two cases informally.

25              From plaintiff's point of view, I think we envision

 1    something more formal.  We think both cases should be put on

 2    the same discovery schedule and perhaps a more formal

 3    consolidation --

 4           THE COURT:  A formal consolidation can be determined

 5    later on.  The same discovery regime is what matters at this

 6    point.  That's all we need to deal with now.  But I want to

 7    just make sure that there is some rationality to the discovery.

 8           If you were to move to dismiss some claims, would you

 9    be moving to stay discovery in lawsuit number 3, or can I

10    safely assume that discovery in that case would proceed such

11    that it will be easy enough to synch up the discovery

12    schedules?

13           MR. FISHER:  Yes, your Honor.  You can safely assume

14    that discovery -- from our point of view, discovery in both

15    cases should proceed along the same schedule.

16           THE COURT:  Meaning the schedule that you have agreed

17    to in docket 91 in lawsuit number 2.

18           MR. FISHER:  Correct.

19           THE COURT:  Therefore, can I assume then, sticking

20    with plaintiffs for a moment, that in pursuing discovery in the

21    case management plan here, in docket 91, you will also pursue

22    such incremental additional discovery as is germane to lawsuit

23    number 3, notwithstanding that you may be moving to dismiss

24    some part of that lawsuit?

25           MR. FISHER:  Yes.  We want to avoid piecemeal

 1   discovery and having to go back to the same witnesses or ask

 2   for overlapping --

 3           THE COURT:  That's where I was going.

 4           Mr. Butler, are you still the right person to engage

 5   with for the back table?

 6           MR. BUTLER:  I think my colleague, Mr. Schwartz, would

 7   address --

 8           THE COURT:  Very good.

 9           Mr. Schwartz, same issue.  This is just discovery

10   across cases 2 and 3.  What are your thoughts?

11           MR. SCHWARTZ:  Your Honor, I do think there are

12   differences in 2 and 3, particularly time frames.  The issues

13   in case 3 relate to things that happened after the transfer.

14           THE COURT:  No question that there is some nonoverlap.

15   The point is that there is overlap.

16           MR. SCHWARTZ:  From my view, I think there is minimal

17   overlap.  I'm all for efficiency and trying to do this in a way

18   that makes sense.  The order that was negotiated between

19   counsel in the second case I was aware of.  I didn't

20   participate in the negotiation.  If we are going -- I think

21   there should be separate schedules, but coordination, so, for

22   example, there don't have to be multiple depositions of people.

23   To the extent there is motion practice on a particular issue, I

24   think it would make much more sense to have a clear

25   understanding of this relates to case 3 versus this relates to

1    case 2.

2              THE COURT:  Let me push back on that.  It is the

3    defense table in this case that is the plaintiff in case 3.

4              MR. SCHWARTZ:  Correct.

5              THE COURT:  Therefore, you're in the natural position

6    of opposing any stay of discovery pending a motion to dismiss

7    by your adversaries in case number 3.

8              Ordinarily, you would be in favor of either your

9    adversaries in case 3 not moving to dismiss at all, or if they

10   move to dismiss, on as limited basis as possible, or, in any

11   event, to the extent they move to dismiss, not staying

12   discovery.  So I assume if case number 3 existed alone in the

13   world and there were no other related cases, you would be all

14   for moving forward promptly with discovery in case 3, right?

15             MR. SCHWARTZ:  I am all for moving forward promptly in

16   discovery in case 3.

17             My point is two points.  One is, this schedule, given

18   some other prudence, I think is fast for both cases.  I would

19   like a little bit more time.

20             THE COURT:  That's where I was going.  I am trying to

21   work with you.  Here is the thought, which is, directionally

22   this schedule is fine with me.  I have hard-working

23   professionals who, if you can reach a reasonable agreement, I

24   am likely to sign off on your agreement because you know much

25   better than I what the e-discovery and other challenges are

1    presented here.

2          Why isn't the right course for me to talk conceptually

3    about the case management plan with you for a little bit, but

4    to send you back together to work up a modestly modified case

5    management plan that takes into account the needs of both cases

6    on the assumption that you are going to have some common

7    custodians, you are going to have some common timekeepers,

8    potentially common deponents, just to make for the most

9    efficient mousetrap possible.  I am consolidating the cases.  I

10   am just trying to develop a coordinated discovery plan.

11         MR. SCHWARTZ:  Your Honor, from my perspective, I

12   think that would be useful, and any guidance that the Court

13   would provide, obviously, we would account for.

14         THE COURT:  Why don't we do this.  While I want to

15   talk about a couple of issues of case management with you, may

16   I do this.

17         I am not going to sign off on the plan you have in

18   case 2 because it is possible it will be overtaken by the need

19   to coordinate it with case number 3.

20         MR. SCHWARTZ:  That makes sense.

21         THE COURT:  Let me ask, by Friday you will get me a

22   proposed joint case management plan that takes account of the

23   needs of the case.

24         Mr. Schwartz, sticking with you, understanding that

25   there are subsequent events that form the principal basis of

1  the claims in claim 3, those subsequent events essentially

2  arise out of conduct or background in case 2, right?

3          MR. SCHWARTZ:  I don't necessarily agree with that.

4  The background, as you say, is the contract.  But the claim

5  that's at issue is whether they have breached -- Frontier has

6  breached a different provision due to things have happened

7  subsequent to the transfer.  It's really, frankly, about the

8  negotiations back and forth over some of the documents, and it

9  doesn't really relate to the transfer.

10         And the fraudulent transfer, for example, that claim

11 is gone.  That's out of the case.

12         The background is, they have a claim against some

13 defendants in case 1.  I don't think that's disputed.

14         THE COURT:  That's Judge Stanton.

15         MR. SCHWARTZ:  Judge Stanton, correct.  That's not

16 disputed.

17         I don't think the negotiation history or what happened

18 in connection with the transfer to Carlyle is relevant to the

19 third case because the third case really relates to, has

20 Frontier breached its agreement to cooperate by trying to

21 secure, for lack of a better word, their claims in the first

22 case before Judge Stanton.  It doesn't relate to the same

23 issues that are --

24         THE COURT:  Sorry.  I lost that.  Can you slow that

25 down again.  Explain that to me.

1          MR. SCHWARTZ:  The issue that has caused the third

2    dispute is that Frontier is trying to protect their ability to

3    collect on their claim in the first case by refusing to sign

4    the documents that we need to conduct a second transfer, for

5    example, to sell aircraft or to refinance.

6          THE COURT:  And they contend that they were reasonable

7    in withholding and you contend that they were not.

8          MR. SCHWARTZ:  Correct.  That's where the dispute is,

9    not what happened with the transfer from AMCK to Carlyle.

10   That's not relevant to the second case -- to the third case.

11         THE COURT:  Is that right?  Doesn't the reasonableness

12   of their declination, their declining to assent, if that's the

13   right word, to the transfer, doesn't that ultimately implicate

14   the facts as to Carlyle?

15         MR. SCHWARTZ:  No.  Because what -- their whole

16   justification for their declination relates to the case before

17   Judge Stanton, not the original case before your Honor.  It's

18   not that they said --

19         THE COURT:  Right.  But this case before me ultimately

20   relates to the case in front of Judge Stanton, only insofar --

21   as you have heard just from the resolution of the emergency

22   relief motion, and I appreciate that you disagree, but their

23   theory, as you know, is that the transfer prevents them

24   effectively from having a place to go to collect on a maximally

25   successful judgment in front of Judge Stanton.  There is an

1   interlinking here.

2          MR. SCHWARTZ:  That's their theory for why they need

3   security.  It relates to what has happened to AMCK as a result

4   of the transfer.  There may be some discovery that they would

5   seek about assets of AMCK, but I don't think it's the same type

6   of discovery that you would have over the litigation in case

7   number 2, which relates to, did Frontier receive notice, when

8   did Mr. Frontier receive notice, what harm is there to

9   Frontier.  That's all the stuff that is at issue in the second

10  case.  None of that is relevant to the third case.

11         THE COURT:  Nothing may turn on this if you are going

12  to adopt a coordinated schedule.  Your point is only that you

13  perceive less overlap than I thought there was factually.

14         MR. SCHWARTZ:  I think there is some, but limited

15  overlap, which is why, from my perspective, I certainly don't

16  think it's ripe for consolidation.  I think coordination -- of

17  course.  Everybody wants to make sure that we are being

18  efficient.  I do have --

19         THE COURT:  Are there common timekeepers or document

20  custodians?

21         MR. SCHWARTZ:  I'm sure there will be some.

22         What I'm struggling with, for example, is, we get into

23  a deposition, and we start taking testimony.  And obviously

24  nobody is going to be objecting on relevance, but what's the

25  scope of the deposition, and is it one deposition and it's just

1    sort of freewheeling about every case, or do we need to do it

2    in a more thoughtful --

3          THE COURT:  Or do you call the person and have --

4    however you decide the time, whether it's seven hours or more,

5    because it's two cases, do you allocate times to each case.  I

6    am not getting in the middle of that, but it would certainly be

7    good if that individual showed up just once for deposition.

8          MR. SCHWARTZ:  Exactly.  Going back to your Honor's

9    original suggestion, I think there is some discussions that we

10   should have to try to figure this out.

11         THE COURT:  That's fine.  I used to do what you do for

12   a living, and I'm mindful there are complexities that the judge

13   doesn't see, and I want to give you the time to work through

14   that.

15         Do you think, realistically, by the end of the week

16   counsel will be able to come up with a discovery plan that

17   embraces cases 2 and 3 and is sensitive to the type of nuances

18   that you're talking about.  If you need more time, I'll give

19   you more time.

20         MR. SCHWARTZ:  Your Honor, if I could have until

21   Wednesday.

22         THE COURT:  Of next week.  Of course.  I want this to

23   be done right and to be client and economic sensitive, so

24   that's fine.

25         Without binding you, right now the case management

1  plan that you had set for this case anticipated fact discovery

2  running approximately four months, which is, in effect, my

3  default mode in my case management plan, but it's there as a

4  default.  It is not there to bind all cases.  And for

5  complicated cases, with lots of parties, lots of discovery,

6  international dimensions, etc., I am happy for it to be

7  somewhat longer.

8          Without binding you, Mr. Schwartz, do you have a

9  realistic sense, with fact discovery embracing two related

10 litigations, how long the plan might be?  Will it need to

11 expand a little bit on fact discovery?

12         MR. SCHWARTZ:  I think a little bit, your Honor.  We

13 are interested in moving the third case along, so we are not

14 going to be proposing a year of fact discovery.

15         There are some complications that I think frankly both

16 sides will face, particularly because a lot of the negotiation

17 that is relevant to the third case was done between counsel.  I

18 think that would just implicate privilege issues that we will

19 have to deal with in the collection and review.

20         THE COURT:  Privilege as in settlement discussions or

21 something different?

22         MR. SCHWARTZ:  I am thinking more in the

23 attorney-client privilege communications that are as a

24 result -- obviously, it's not -- something we sent to Frontier

25 is not going to be privileged.

```
 1              THE COURT:  It's that same timekeeper is a lawyer

 2   whose internal communications are apt to be privileged.

 3              MR. SCHWARTZ:  That may just increase the burden.

 4              THE COURT:  Of course.

 5              Let me just give this directional.  I have truly

 6   excellent lawyers in front of me.  You should assume solicitude

 7   on my part for you to add to that time.  I want you to build a

 8   correct mousetrap, so nobody should be quoting to the other

 9   that the judge's default rules say four months.  This is a more

10   complicated case and it's really, for discovery purposes, pair

11   of cases, so consider yourself at liberty to do that.

12              The next issue involves expert discovery.  Is it that

13   sort of case?  Do you see a role for expert discovery here?

14              MR. SCHWARTZ:  When you say this case, are we talking

15   about the second case, third case, both?

16              THE COURT:  Fair point.

17              Let's start with case number 2.

18              MR. SCHWARTZ:  I think Mr. Butler --

19              THE COURT:  I am trying to figure out who owns which

20   case.  It sounds like you --

21              MR. BUTLER:  I am Frontier 1 and Frontier 2.

22              THE COURT:  Mr. Butler is the person to look at when

23   we are talking about the first case in front of me, case 2.,

24   and Mr. Schwartz for case 3.

25              Does case 2 implicate expertise?
```

 1              MR. BUTLER:  I am not sure, but I don't think it's

 2     going to involve expert discovery from our point of view.  I

 3     can see that one of the issues in the case is whether Frontier

 4     really suffered any damages from the Carlyle transaction, so

 5     they may well have an expert on damages, but I don't readily

 6     see a subject area --

 7              THE COURT:  As to liability you are not seeing it.

 8              MR. BUTLER:  Correct.

 9              THE COURT:  What about in case number 3?

10              MR. SCHWARTZ:  Your Honor, damages as well.

11              But I think on the liability piece, it may be helpful

12     to the fact finder for testimony about industry practice in the

13     aviation finance industry.

14              As you know from the papers, part of our view is that

15     the things that we have asked for are standard, industry

16     standard, and that may be a subject that we would want to

17     provide expert testimony on.

18              THE COURT:  The reason I'm asking is, it bears a

19     little bit on something that I'll need to decide after getting

20     your plan, which is when to schedule the next conference in the

21     case.

22              In a moment I'm eager to get plaintiff's perspective

23     on this, but you have already put at issue a potential area of

24     expertise that might bear on liability, and here is why I'm

25     pausing on that.

1          Under my practice, the one area in which I insist on

2     having a premotion conference is in advance of summary

3     judgment.  There are a variety of reasons for that.  But, in

4     general, I find that those conferences are very productive in

5     pruning issues in dispute, organizing counsel for summary

6     judgment briefing and so forth.  Ninety percent of the time,

7     summary judgment motions exclusively turn on fact discovery,

8     not on expert discovery, and, therefore, I will set a premotion

9     conference for about a month after the close of fact discovery.

10          There are exceptions:  Antitrust cases, market

11     definition, patent cases, some Lanham Act cases involving

12     likelihood of confusion.  There are some cases where expertise

13     is an ingredient -- expert evidence is an ingredient of

14     determining liability and, therefore, prudence says:  Judge,

15     don't schedule the premotion conference until sometime after

16     the close of expert discovery.

17          So I am trying to figure out, in effect, which this is

18     and when to reengage with you in the expectation that our next

19     conference, putting aside injunctive matters, would be likely a

20     premotion conference in anticipation of somebody moving, in

21     whole or in part, for summary judgment.

22          I take it, Mr. Schwartz, your point here is that, at

23     least as to case number 3, there may be some expert discovery

24     that could inform a summary judgment motion?

25          MR. SCHWARTZ:  I think that's possible, your Honor.

1    We have not made a final decision, but it's at least a

2    possibility at this point.

3            THE COURT:  Whereas for case number 2, Mr. Butler, you

4    don't see that.

5            MR. BUTLER:  Correct.

6            THE COURT:  Let me ask plaintiff, Mr. Fisher, with

7    respect to case number 2, the one that is docket number 2943

8    that was filed in 2022, do you see any expert evidence bearing

9    on liability?

10           MR. FISHER:  Not on liability, your Honor, but on the

11   issue of damages.

12           THE COURT:  But damages are almost never a subject of

13   summary judgment motions, so with that you can go ahead and do

14   discovery on damages while summary judgment on liability is

15   proceeding.

16           MR. FISHER:  In case number 2, I think that's correct,

17   with the one caveat that, depending on how the evidence

18   develops and whether there are ambiguities in the contracts.

19   For example, there may be a need for expert testimony about

20   aircraft leasing industry practices, commercial practices and

21   standards.

22           THE COURT:  But if you got to that point, then you're,

23   in effect, in the same spot as Mr. Schwartz has described case

24   number 3, where, at least on a discrete proposition bearing in

25   one way or another on industry standards, expertise could

 1    infuse the liability analysis.

 2              MR. FISHER:  Right.  For that reason, generally

 3    speaking, to get to where I think your Honor is going, I think

 4    in both cases it would likely be more practical to schedule

 5    that next case management conference for after the close of

 6    expert discovery.

 7              THE COURT:  Does anyone have an objection to my doing

 8    that, to making a note that essentially when we get your

 9    calendar, I will plug in a next case management date that's

10    approximately four weeks after the close of expert discovery.

11              Anyone have an objection to that?

12              MR. BUTLER:  No, your Honor.

13              MR. SCHWARTZ:  No objection, your Honor.

14              THE COURT:  I will plan on doing that.

15              Let me then just take a didactic moment as to what I'm

16    expecting of you with respect to submissions in advance of that

17    conference.

18              Under my individual rules, two weeks after the close

19    of the relevant type of discovery, and in this case we have

20    established that it's expert discovery, any party who intends

21    to move, in whole or in part, for summary judgment is to write

22    me a three-page, single-spaced letter.  It's just a preview.

23    It's not the motion.  And the other side then has a week to

24    respond at comparable length.  Again, it's not an opposition.

25    It's just a motion.

1          But I will study those letters carefully.  And when we

2     meet approximately a week after the responsive letter, in other

3     words, about four weeks after expert discovery, I will have a

4     searching conversation with you about the summary judgment

5     motions you anticipate, and I will tell you that in those

6     conferences, not infrequently, claims or parties go away, it

7     becomes clear that something has, in effect, gone unpursued.

8     Often there are valuable concessions that are made that frankly

9     streamline everybody's briefing.

10         And I will work with you to understand the issues, the

11    spot issues that are on my mind, just to make sure everything

12    is covered once.  And I will put in place a rational schedule

13    that's sensitive to everybody's needs to allow us to litigate

14    thoroughly, but no more thoroughly than is necessary, the

15    motions or, as may be the case, cross-motions for summary

16    judgment.

17         I will also almost certainly at that conference direct

18    you before any opening summary judgment motion is made to file

19    what we call a JSF, or a joined stipulated facts, essentially

20    individually numbered facts or document authenticating

21    propositions that basically establish what's not in dispute.

22         The purpose of that is really to correspondingly thin

23    everybody's 56.1 statements and oppositions, and counsel have

24    repeatedly told me that it helps them a ton in summary judgment

25    briefing to have, where possible, a large number of the facts

1    undisputed, and you don't have to spend all that time with the

2    56.1 statements and oppositions, and it allows you to draw

3    heavily on the JSF for your briefing.  I will add that it is

4    also of considerable assistance to my chambers to get a largely

5    undisputed set of facts.

6           As I look at this case, although there are clearly

7    factual areas in dispute, I have got to believe that a large

8    amount of the chronology of this case is ultimately going to

9    prove undisputed and a large amount of the documents, including

10   the pivotal communications among you, is likely to prove

11   undisputed.  The contracts, I imagine, will be readily

12   authenticated, so I think a lot of the waterfront here at the

13   end of the day will be something that is undisputed, even if

14   there is some core that is disputed.

15          You should expect that to be part of our dialogue many

16   months from now when we sit down at the premotion conference a

17   month after the end of fact discovery.

18          Let me ask you just as to settlement.  To begin with,

19   I am trying to understand -- and I am not really looking for

20   arguments, and I'm not looking for people to share settlement

21   positions that I shouldn't know.

22          But to what degree does the settlement discussions as

23   they occurred with respect to emergency relief, really, are

24   they really coextensive with the merits in case 2?

25          MR. SCHWARTZ:  Your Honor, I won't talk, obviously,

1    about any settlement discussions.

2              One thing, just to make clear, although I think it was

3    clear, the guarantee proposal that was shared with Frontier and

4    which is attached to the brief was specifically done outside of

5    the context of mediation.

6              THE COURT:  I appreciated that you are not in any way

7    violating anything.  On the other hand, because it was a

8    proposal, as opposed to an actionable thing, I felt for the

9    purposes of that ruling I couldn't rely on it.  But there is a

10   very big green light in my ruling that, it seems to me, you

11   have in your hands the wherewithal to move this emergency

12   relief.  I am just saying.

13             MR. SCHWARTZ:  I understood it.  I was going to circle

14   back to that aspect of your ruling.  I think I hear your Honor.

15   That's helpful.

16             The settlement discussions, for better or worse,

17   largely focused on a global resolution of the cases, including

18   the case before Judge Stanton.  We spent a lot of time in a

19   mediation, full day of mediation.  We had follow-up

20   discussions, a number of follow-up discussions really trying to

21   reach a global resolution.  There were a number of sticking

22   points that we thought we were there and couldn't get past.

23             Candidly, we then pivoted to trying to just resolve

24   the emergency issue, which was the impetus for the guarantee.

25   Then there was the response.  In terms of trying to resolve the

1    emergency issue, that's really been the state of settlement

2    discussions.

3            THE COURT:  It may be that some of what I have said

4    today either allows the parties, with or without a settler, to

5    get to yes on those issues.

6            But one of the questions I have is, even if you're too

7    far apart, let's say, on a number before Judge Stanton, it

8    would seem to me that there is likely some way that you can --

9    there ought to be some likelihood that you can resolve what

10   amounts to the case 2 and 3 issues, which, with some guarantee

11   in place, don't depend on a resolution of the case in front of

12   Judge Stanton.

13           Where I am going is, I take it you are going to use a

14   private mediator, whether seeking a global or a more narrowed

15   settlement, as opposed to, for example, the resources I can

16   make available to you in the form of our magistrate judge or

17   the mediation project?

18           MR. SCHWARTZ:  We engaged a private mediator.  He

19   reached out to me, actually, yesterday to see how things were

20   going.  He was great, and we did make progress.  I'd have to

21   talk to my client.  If there was a decision to focus just on

22   sort of the emergency relief aspect of this, we might reengage.

23           Your Honor, one question that I will ask the Court,

24   because I know I am going to get it.  We proposed a guarantee

25   to Frontier.  It was not signed.  It was a proposal.  My client

1    is going to say, if we go ahead and sign that document, is that

2    going to be enough?  I am not asking the Court for an advisory

3    opinion.  But I'm asking the Court for some guidance because

4    there was some back and forth on that guarantee, and it would

5    be hard for me to advise the client to sign something --

6            THE COURT:  I appreciate that.  There is probably a

7    way of doing this, under which you could ultimately say, upon

8    the Court's indicative approval, the client is committed to

9    sign.  There is a way of doing this so that you are not -- I'm

10   happy to approach it in that way because conceivably there is

11   some detail or aspect of the language that creates some agita

12   for the front table.

13           I am here to work with you.  I would like to be able

14   to evaporate the emergency relief, which I realize is an

15   alienation on the free market, and I would rather get rid of

16   that.

17           At the same time, you have heard my reasoning for why.

18   At least as a matter of protecting the ability to collect on a

19   judgment, and enabling the planes to be up in the air, I felt a

20   need to keep this in place.

21           I'm happy to work with you in any workable way to do

22   this.  I don't want to be rendering advisory opinions.  But if,

23   in effect, the request was, we will commit to signing this if

24   the Court finds that it alleviates any well-founded concern on

25   plaintiff's part of being unable to effectuate a judgment, I am

1     happy to proceed in that way.

2          The important thing, obviously, involves the parties

3     taking a look and the plaintiff being able to look at exactly

4     what the guarantee looks like because they are at liberty to

5     litigate and say, wait a minute, there is a hole here.  There

6     is a scenario here under which we stand unprotected.

7          I didn't mean to suggest that you literally have to

8     have the thing signed, but if your commitment to sign it upon

9     my indicating that I would approve it would work for me.  I

10    have not formed a judgment, or even tried, as to whether the

11    particular guarantee that was part of your submissions -- I

12    haven't thought to consider whether or not that makes the

13    grade, and we have not had a fully engaged litigation on that

14    point.

15         MR. SCHWARTZ:  Understood.

16         THE COURT:  Does that help?

17         MR. SCHWARTZ:  Yes, your Honor.

18         THE COURT:  Let me ask you a related question.  Again,

19    I want to be careful about my role here, but I am ultimately

20    trying to be helpful and not be mysterious.

21         Assuming that a satisfactory guarantee was in place

22    that protected the plaintiff, Frontier, against the risk that

23    the judgment they hoped for in the Stanton case would be

24    uncollectible, can I assume that part of this would be your

25    retracting the default notices, to the extent based on -- as

1    thus far issued.  Ultimately, the issue is the planes getting

2    in the air, and I don't want to have a situation where the

3    guarantee is in place and then you say, we still have these

4    default notices because we are still angry at you for what

5    happened in the spring.

6             MR. SCHWARTZ:  Obviously, I need to speak to my

7    client.  They are not looking for a reason to ground planes.

8    They are looking for the ability to use their property as they

9    are entitled to.

10            If we were able to reach a situation where we are able

11   to get the documents we need to sell the planes, refinance the

12   planes, I don't think they would be interested in grounding the

13   planes or deregistering or impounding.

14            THE COURT:  Right.  But you would need to do something

15   to make -- however a commitment like that that binds you,

16   whatever it looks like, without regard to whether some future

17   arising event would separately justify a default notice, you

18   would need to do something to confidently disarm as to the

19   existing default notices.

20            Am I clear?

21            MR. SCHWARTZ:  The way I look at this, we have the

22   claim for damages.  That's separate.  We are just talking about

23   the default notices and whether we would take the remedies

24   provided in the lease for a default, the impound, the

25   grounding, deregistering.

1          My view, subject to speaking to my client, is, if we

2     are able to get to a situation where Frontier provides us the

3     documents that we need, there is no reason --

4          THE COURT:  Meaning the consents.

5          MR. SCHWARTZ:  The consents and the assignments, and

6     there are a number of documents.  There is no reason for us to

7     continue with those default notices, and certainly my personal

8     belief would be that they should be retracted.  Because the

9     issue that caused the default, which is the failure to

10    cooperate and give us those documents, has now been resolved.

11    It may be that there are still damages that we have incurred,

12    so I put that aside as a separate piece.  But the immediate

13    issue, which would deal with the emergency relief, I think

14    would be resolved.

15         THE COURT:  Right.  Or put a little differently, even

16    though you believed and believe that Frontier wrongfully

17    withheld its consents, while you might be pursuing damages, to

18    the extent traceable to that action, or you'd reserve your

19    right to continue to do that, you would not be claiming that

20    that historical defaulting conduct should form the basis for

21    action against the planes' impounding and the like.

22         Do I have that about right?

23         MR. SCHWARTZ:  Yes.  That issue would be resolved.

24         THE COURT:  What I'm trying to do, I really want to

25    work with you.  I hope you will -- I have tried to be clear

1   what the hangup is here to make it easier for you to get to

2   yes.

3          Let me ask plaintiff's counsel.  I have had a very

4   productive exchange with Mr. Schwartz, which I think you should

5   take comfort in.

6          Is there something else you want to raise?

7          MR. SCHOEGGL:  Yes, your Honor.  If I may address

8   this, because I've been involved in the negotiations.

9          We do take comfort in the Court's rulings and in the

10  direction.  I think some of the statements you made are clear

11  directions that will help the parties get to some kind of

12  agreement, and we do agree that the default notices need to be

13  withdrawn, and I don't think that will be controversial.

14         There is one complexity in case this comes up in the

15  future the Court should be aware of, which is that some of the

16  documents that they want us to sign involve third parties.  And

17  the issue has come up, well, what happens if those third

18  parties add additional terms and we can't --

19         THE COURT:  I don't understand what you mean by

20  involves third parties.  Can you explain.

21         MR. SCHOEGGL:  For example, a number of the leases

22  involve -- the engines on the aircraft have maintenance

23  agreements with CFM, the manufacturer of the engines, and there

24  is a document called a tripartite agreement which governs

25  getting parts on the engines.  The tripartite agreement lasts

1    longer than the leases.  If they want these transactions to go

2    through, they have to sign new tripartite agreements with the

3    engine manufacturer that, by their name, you can see, requires

4    the signature of all three parties.

5         And there are some other documents that involve -- the

6    documents that involve some of the buyers.  We understand that

7    Carlyle has not negotiated those agreements with the buyers

8    yet.  So the concern has come up, well, what if these other

9    third parties that weren't party to this lawsuit ask for some

10   new term?  It's hard for us --

11        THE COURT:  Let me hear from Mr. Schwartz on that.  I

12   can't say I fully get the issue, but it sure sounds like a

13   solvable problem.

14        MR. SCHWARTZ:  I think it is.

15        The reason that we have not been able to get to yes

16   with everyone is because there are provisions that are being

17   inserted into these different agreements that Frontier is

18   trying to use to secure its potential claim in the first case.

19   If there is the guarantee, those should be unnecessary.

20        THE COURT:  Right.

21        Let me go back to you then.  That sounds right,

22   Mr. Schoeggl.  Assuming you have a guarantee as to the Stanton

23   case, so that's no part of this discussion, what's different,

24   what's unusual -- an engine is going to be on any plane.

25   What's unusual about the problem here?

1             MR. SCHOEGGL:  I agree with Mr. Schwartz that with the

2     guarantee, that's sufficient and protected and doesn't involve

3     discretion by Carlyle, which is our position, that those issues

4     would go away.  I can't get into, obviously, settlement

5     negotiations.  But let's say that Frontier was being pressed to

6     make an absolute binding commitment to sign any document that

7     was put in front of them that they have not seen yet.

8             THE COURT:  Let me ask you a question.

9             Just move over a bit so I can make eye contact with

10    defense counsel.

11            What stimulated this case was the relationship

12    ultimately with the Stanton litigation and the concern that the

13    transfers would alieve AMCK, etc. judgment proof.  It appears

14    to be a solvable problem.

15            The notion that when a transfer is made the interests

16    of the engine manufacturer or whatnot are implicated, that is

17    presumably inherent in the very concept of a transfer or an

18    assignment.  That has almost nothing to do with the fact that

19    there is this litigation history between the parties here.

20            What's different about the situation here than what I

21    assume would be the garden-variety situation anticipated in

22    this industry into which a transfer is made?  Isn't that the

23    same scenario in which parts manufacturers and engine

24    manufacturers are implicated?

25            When you speak, just move the mic.  You need to speak

1  into the mic.

2       I am not getting why there is something different

3  about this transfer assignment than any other.

4       MR. SCHOEGGL:  Maybe the way to put it is this, your

5  Honor.  This is in the record before the Court.  Frontier is

6  being asked to make some commitments that we think are outside

7  of the leases.  For example, we are being asked to promise to

8  move the aircraft to jurisdictions that have not been disclosed

9  to us for closings, and we have said, well, these airplanes

10 have a schedule determined months in advance.  We just can't

11 fly them anywhere in the world on a moment's notice at the whim

12 of the purchasers.

13      So that would be an example of a contract term that's

14 outside of the whole Judge Stanton issues that so far we have

15 been told that Carlyle will not give us the guarantee until we

16 agree to those.

17      THE COURT:  Is there something that's different from

18 industry standard about those demands?

19      MR. SCHOEGGL:  Yes, absolutely.  It's our position

20 that they are outside of industry standards.

21      THE COURT:  Although there was indeed a reference to

22 this in the papers, I had not understood that to be anything

23 other than collateral here.  I understood the main event to be

24 protecting your client, the ability to collect on this judgment

25 in front of Judge Stanton.

1              Mr. Schwartz, let me come to you.  This problem, such

2    as it is, sounds like it's the sort of one that could adhere in

3    almost any aircraft transfer.  The question is whether, in

4    effect, what's being requested here is different from your

5    garden-variety transfer or assignment situation.

6              MR. SCHWARTZ:  I don't think it is.  And I think my

7    understanding of -- this isn't what I do for a living -- is

8    that it is ordinary course that in connection with a transfer

9    that the claims are flown to certain jurisdictions to

10   consummate the transaction.  I think it's different here,

11   frankly.  The parties are usually much more cooperative with

12   each other and there is some trust, which I think is lacking

13   here.

14             THE COURT:  Would you be able to show, for example,

15   that the terms that are being insisted upon on their face are

16   essentially coextensive with industry standard terms that are

17   entered into in connection with what you've represented is a

18   very frequent process of transferring an assignment?

19             MR. SCHWARTZ:  That's my understanding from the

20   client.

21             THE COURT:  Let me be direct with you, Mr. Schoeggl.

22   I am not ruling on anything here.  Since the conversation has

23   morphed into one of where I'm trying to be of assistance to you

24   in getting across the goal line here, the subjective distrust

25   that may exist because of an existing litigation, without more,

1    is, to my mind, not a persuasive reason to read nefarious

2    intentions into garden-variety industry language.

3           If it is really the case, if you will, that the

4    language that your clients are being asked to buy into is that

5    which is industry standard, I would look with some skepticism

6    at a claim that that should -- that alone should hold up your

7    client's reasonable assent.

8           I appreciate that there is a history here, but

9    Mr. Schwartz has reasonably said his client is not trying to

10   ground the airlines.  That there is a history of adversity

11   litigation, adversity without a lot more, wouldn't persuade me

12   that you're entitled to sort of the plus language protecting

13   you beyond what is customary in the industry.  I offer that for

14   you to bring back to your client.

15          MR. SCHOEGGL:  Thank you, your Honor.

16          Can I just address that briefly?

17          THE COURT:  Sure.

18          MR. SCHOEGGL:  I would agree with that completely.  We

19   don't believe that anything -- we believe that some of the

20   things they have asked for are outside of industry standards.

21   But setting that dispute aside, let me just mention two

22   caveats.

23          One is, Frontier's point of view would be that they

24   typically negotiate leases that give them better than

25   industry-standard terms because they have a fair amount of

1  power in the market.  And so when we say industry standard,

2  what we mean is, consistent with the terms that Frontier has

3  and its sister companies with other leasing companies.

4          THE COURT:  Prior to the events that gave rise to this

5  set of lawsuits, are there agreements that Frontier and AMCK

6  had entered into with respect to transfers and assignments that

7  could be used as some sort of go by or model?

8          MR. SCHOEGGL:  I believe there are, yes.

9          THE COURT:  In candor, the test of that might be --

10 again, I'm out over my skis here, so I'm simply speaking in a

11 way that is not intended to be taken as binding.  A test of

12 that would be what these parties have negotiated in the past.

13 I am just saying.

14          I am offering this because Frontier thus far has

15 prevailed in getting emergency relief.  But at least, based on

16 the ruling I have issued a few moments ago, it is

17 essentially -- it appears to be largely within the defendant's

18 he power, at least as to the guarantee portion of this, to

19 neutralize the one basis under which I have found continued

20 emergency relief to be necessary.

21          I am not ruling out that you have some point with

22 respect to terms with third parties.  I am suggesting that your

23 client should be bending over backwards to resolve that issue,

24 as opposed to continuing to fight about it.  There needs to be

25 closure here and recourse to some industry model; or if you

1    prefer to refine it, a model that your client has signed onto.

2    There ought to be a way to solve this.

3            But assigning nefarious motives to the other side,

4    based on the history here, so as to make tried-and-true

5    language viewed with suspicion by your client does not strike

6    me as productive.

7            MR. SCHOEGGL:  Thank you for that guidance, your

8    Honor.  We don't think that's what's happening, but we

9    certainly appreciate the guidance.

10           Can I just mention a second caveat, because it could

11   come up, which is that Frontier is also being asked to agree in

12   advance to sign some of these three-party agreements,

13   regardless of what terms are in them, in the sense that if

14   third parties add additional terms, we are being asked to make

15   an advance commitment to agree to those without knowing what

16   they are.  And, obviously, that would be difficult for any

17   major airline or company to do.

18           THE COURT:  Mr. Schwartz.

19           MR. SCHWARTZ:  I don't think that's right.  I am not

20   sure exactly what Mr. Schoeggl is referring to.  I think he is

21   straying into discussions we had to try to resolve the things

22   that now are more of a settlement mediation discussion, which

23   weren't that, but we were trying to come up with a framework

24   going forward because these parties are going to have to live

25   with each other, at least for some time.  But it wasn't that.

1            THE COURT:  I think I have gone as far as I can go

2     here.  If there is a point in which I can play a further useful

3     role here, I'm happy to do so.

4            I am also happy to make the magistrate judge

5     available, if that would be useful.  I am trying to give what

6     guidance I responsibly can, just because nobody is benefited by

7     continued mud wrestling about this.

8            Let's just come back to the case management issue.  I

9     am not going to plug in a settler for the case because it

10    appears that even as to the merits of the case, to the extent

11    that you might at some point want to have a third party for the

12    time being, you seem to have a mediator that you're content

13    with.  Just know that our magistrate judges are whizes at

14    getting commercial disputes of this level of complexity and

15    more resolved.  In the event I get a joint request from you,

16    for example, to refer this to the MJ for settlement, I will

17    issue a referral order in a nanosecond.

18           Is there anything else about the case management plan

19    that is vexing you that I can usefully address?

20           Just one moment.

21           MR. FISHER:  Speaking for the plaintiff, no, your

22    Honor.  I think we have very clear guidance on next steps.

23           THE COURT:  Defense.

24           MR. BUTLER:  Same response.

25           THE COURT:  By next Wednesday, let's get me an agreed

1    case management plan.  I am not proposing to consolidate the

2    two cases; merely to coordinate them in a common discovery

3    plan, to be clear.

4         May I ask you what the implications for all this would

5    be of the resolution of the case in front of Judge Stanton.  It

6    sounds like there is not a trial date in that case, and my law

7    clerk has just checked the docket and did not see a trial date.

8         MR. BUTLER:  Correct.  There is no trial date set.

9    There are some deadlines for pretrial submissions, but we are

10   waiting for a trial date.

11        THE COURT:  Realistically, with a joint pretrial order

12   and then motions *in limine* and the like, you're realistically

13   looking at a trial next year, probably.

14        MR. BUTLER:  Probably.

15        THE COURT:  Who knows.  Just projecting.

16        MR. BUTLER:  Correct.

17        THE COURT:  I can't assume that the case in front of

18   Judge Stanton is going to go away any time soon, except by

19   settlement.  It is not going to be litigated away.

20        MR. BUTLER:  I think that's correct, your Honor.

21        THE COURT:  As to the case management dimension of

22   this discussion, I will wait to get an order from you next

23   week, and I have every confidence that I will be happy to sign

24   it, and I'll plug in a next date.  If the date that I choose

25   for our conference turns out to be personally inconvenient for

1    somebody, it's way off in the future.  As things get closer,

2    confer with your adversary.  I'm happy to move it around so as

3    not to inconvenience you.

4           MR. BUTLER:  Your Honor, just a procedural question on

5    the case management plan.  Since we are coordinating here, I

6    assume we will submit separate orders for each case.  They will

7    just have parallel dates.

8           THE COURT:  That's exactly right.

9           Given that that case is at an earlier procedural

10   posture, you should find a way to make crystal clear that the

11   parties both agree that discovery ought to proceed,

12   notwithstanding any potential challenge to the pleadings.

13          MR. BUTLER:  Understood.

14          THE COURT:  As it relates to the injunctive order, I

15   will issue just a top-line order that simply states what I have

16   said as to what the injunction does and then sets the next

17   conference for the date that I gave you in August.

18          But please feel free to reach out to me if there is

19   something that I can do to help you get this done.  I am not

20   happy about having this injunction in place, particularly

21   because it appears to me to be a solvable problem, and I,

22   within the legitimate exercise of my authority, would like to

23   do what I can to help you get past it.

24          Anything further from either of you?

25          MR. SCHOEGGL:  Not from the plaintiff, your Honor.

1  Thank you.

2          MR. SCHWARTZ:  Nothing further, your Honor.

3          THE COURT:  Be well.  Have a good rest of summer.

4          I hope to hear that you have been able to resolve this

5  on your own.  If not, I will see you in three weeks.

6          Thank you.

7          (Adjourned)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25