UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FRONTIER AIRLINES, INC.,<br><br>   Plaintiff,<br><br>v.<br><br>AMCK AVIATION HOLDINGS IRELAND LIMITED, ACCIPITER INVESTMENT 4 LIMITED, VERMILLION AVIATION (TWO) LIMITED, ACCIPITER HOLDINGS DAC, CARLYLE AVIATION MANAGEMENT LIMITED, MAVERICK AVIATION HOLDINGS LIMITED, MANCHESTER AVIATION FINANCE S.A.R.L., VERMILLION AVIATION HOLDINGS LIMITED, WELLS FARGO TRUST COMPANY, N.A., solely in its capacity as OWNER TRUSTEE, and UMB BANK, N.A., solely in its capacity as OWNER TRUSTEE,<br><br>   Defendants. | Case No.: 1:22-cv-02943 (PAE)<br><br>Oral Argument Requested |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO ALTER OR AMEND THE COURT'S JULY 18, 2023 ORDER GRANTING PLAINTIFF'S APPLICATION TO CONVERT TEMPORARY <u>RESTRAINING ORDER TO PRELIMINARY INJUNCTION</u>**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................. 1
BACKGROUND ............................................................................................................................ 2
APPLICABLE STANDARD........................................................................................................... 6
ARGUMENT ................................................................................................................................. 6

I.   FRONTIER'S ACTIONS AND STATEMENTS HAVE CAUSED THE COURT TO MISAPPREHEND THE FACTS, RESULTING IN CLEAR ERROR AND MANIFEST INJUSTICE..................................................................................................................................6

    A.    The Court Looked at the Wrong Question When Analyzing Whether Frontier Had Raised a Serious Question on the Merits of Its Claim............................................ 6

    B.    An Analysis of the Correct Question Shows that Frontier Had No Basis for Its Actions Under the Relevant Contracts.................................................................... 8

        1.    The Sale/Financing Transactions Do Not Violate Lease Form 1 ............ 9
        2.    The Framework Agreement Is Not a Lessee's Document ..................... 10
        3.    The Sale/Financing Transactions Do Not Violate Lease Form 2 .......... 11

    C.    Any Alleged Failure to Notify Frontier of the Carlyle Transaction Did Not Contribute Materially to Frontier's Failure to Uphold its Obligations Under the CAML Leases ................................................................................................... 12

II.   DEFENDANTS' GUARANTY IS NEW EVIDENCE AND REMOVES PLAINTIFF'S JUSTIFICATION FOR THEIR REFUSAL TO COOPERATE .......................................12

CONCLUSION............................................................................................................................. 14

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Baker v. Dorfman*,
   239 F.3d 415 (2d Cir. 2000)..................................................................................................6

*Robbins v. Comprehensive Med. Mgmt., Inc.*,
   No. 3:00-cv-57 (PCD), 2000 WL 502693 (D. Conn. Mar. 21, 2000).......................................8

*Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*,
   956 F.2d 1245 (2d Cir. 1992)..................................................................................................6

*Williams v. N.Y.C. Dep't of Corr.*,
   No. 19-cv-3347 (LCL)(JLC), 2020 WL 7079497 (S.D.N.Y. Dec. 3, 2020) ............................8

**Statutes**

N.Y. U.C.C. § 2A-402 ...............................................................................................................12

**Other Authorities**

Restatement (Second) Contracts § 245 .......................................................................................12

Defendants Wells Fargo Trust Company, N.A., solely in its capacity as Owner Trustee ("Wells Fargo"), and UMB Bank, N.A., solely in its capacity as Owner Trustee ("UMB") (collectively, "Defendants"), respectfully submit this memorandum of law in support of their motion to alter or amend the Court's July 18, 2023 order, ECF No. 92 (the "PI Order"), which granted Plaintiff Frontier Airlines, Inc.'s ("Plaintiff" or "Frontier") Application to Convert Temporary Restraining Order to Preliminary Injunction, ECF No. 71, (the "PI Motion").[1]

## PRELIMINARY STATEMENT

Two grounds support an alteration of the Court's PI Order. *First*, Defendants respectfully submit that, due to Plaintiff's obfuscations of the record, the Court misapprehended key facts when granting Plaintiff's PI Motion. In particular, when the Court determined in granting the PI Order that Frontier had shown a "plausible contractual basis for its decision to withhold consent," satisfying the second prong of the preliminary injunction standard, the Court was under the impression that the consent withheld related to the 2022 transfer that is the subject of this litigation. (Hr'g Tr. ("Tr.") 15:23-24, July 18, 2023;[2] *see also id.* at 16:21-24 (noting that Frontier had "adduced evidence that the transfers for the 14 aircraft left the defendants . . . without the ability to fully pay out the judgment that [Frontier] seeks").)

But it is not Frontier's failure to consent to that transfer, referred to herein as the "Carlyle Transaction," that formed the basis of the defaults that Defendants have asserted against Frontier and that are the subject to the separate litigation before this Court—Frontier had no consent right with respect to the Carlyle Transaction. Those defaults relate to Frontier's ongoing refusal to

---

[1] Unless otherwise specified, Electronic Case Filing citations are to *Frontier Airlines, Inc. v. AMCK Aviation Holdings Ir. Ltd., et al.*, Case No.: 1:22-cv-02943 (PAE) (S.D.N.Y.).

[2] A true and correct copy of the July 18, 2023 hearing transcript is attached to the accompanying Declaration of Jed M. Schwartz as **Exhibit 1**.

provide documentation necessary for Defendants to sell and/or refinance certain of the aircraft on lease to Frontier, which are referred to herein as the "Sale/Financing Transactions." As explained below, there is no plausible contractual basis for Frontier to withhold such documentation needed for the Sale/Financing Transactions, thus explaining why Defendants issued default notices on May 26, 2023 (the "Default Notices"), which the Court has now enjoined Defendants from acting upon. Given the foregoing, the Court should alter the PI Order to lift the injunction.

*Second*, new evidence—in the form of a guaranty—should alter the Court's judgment in any event. The Court stated that "[p]rovided that there is a guarantee in place that assures Frontier a full recovery on its litigation claims . . . a durable ironclad guarantee that, once committed to, is outside of defendants' control and assures a recovery, the Court on the present record would be unaware of any basis on which Frontier could thereafter reasonably deny consent." (Tr. 21:12-19.) Defendants have provided just such a guaranty.

## BACKGROUND

Frontier has intentionally blurred lines to try to collapse three separate litigations into one undifferentiated mass. The distinctions among these three cases—and the separate events to which they each relate—is crucial. Below we respectfully submit a brief overview of each pending case (Litigations 1, 2, and 3) to help clarify the issues.

**Litigation 1:**[3] Litigation 1 is before Judge Stanton. Following Judge Stanton's summary judgment ruling, the only claim left in Litigation 1 is for breach of an agreement between Frontier and non-party AMCK Aviation Holdings Ireland Limited ("AMCK") (the "Framework Agreement"). (*See* Op. & Order, Litigation 1 (July 6, 2023), ECF No. 123.) The parties entered into that agreement on March 16, 2020.

---

[3] *Frontier Airlines v. AMCK Aviation, et al.*, No. 1:20-cv-09713 (LLS) (S.D.N.Y.).

Under the Framework Agreement, Frontier and AMCK were to enter into six sale and leaseback transactions. (*See* Declaration of Paul Lambert ("Lambert Decl.") Ex. 3, ECF No. 72-3.) But only one of those six leases had been entered into when AMCK terminated the Framework Agreement. That is the "MSN 10038 Lease". (Declaration of Jed M. Schwartz ("Schwartz Decl.") Ex. A, ¶ 17, ECF No. 81-1.)

The remaining five leases were never entered into. ***And it is the failure to enter into those five leases and purchase the five related aircraft that is the source of Frontier's claimed damages in Litigation 1***, *i.e.*, that it had to sell the five aircraft, and lease those five aircraft back from, an entity other than AMCK under more expensive terms. (*Id.* ¶¶ 4, 21, 22, 24.) It is these alleged damages, *i.e.*, the damages for an alleged breach of the Framework Agreement, that Frontier has used as its justification for not cooperating with its obligations under the 14 Leases that Frontier has with Defendants, only one of which is a product of the Framework Agreement. Aside from the MSN 10038 Lease, the other 13 Leases that Frontier is breaching all pre-date the Framework Agreement (the "Non-Framework Leases"). Therefore, there is simply no basis to drag these 13 separate Leases and aircraft into Litigation 1, which relates to six specific aircraft.

**Litigation 2:**[4] Litigation 2 involves what Frontier refers to as the "Carlyle Transaction." Pursuant to the "Carlyle Transaction," in December 2021, AMCK transferred its ownership in numerous corporate entities to defendant Manchester Aviation Finance S.à r.l. ("Manchester") (which AMCK owned), and then transferred its ownership interest in Manchester to Vermillion Aviation Holdings Limited ("Vermillion Holdings"), which was an indirect parent of AMCK. In April 2022, Vermillion Holdings transferred Manchester and another company to defendant

---

[4] Litigation 2 refers to the instant action. *Frontier Airlines, Inc. v. AMCK Aviation Holdings Ir. Ltd., et al.*, No. 1:22-cv-02943 (PAE) (S.D.N.Y.).

3

Maverick Aviation Holdings Limited ("Maverick"). Frontier did not consent to the Carlyle Transaction—it had no right to consent to it.

But it is not Frontier's failure to provide consent to the Carlyle Transaction that led to the Default Notices that are now the subject of the preliminary injunction. Nor is it the alleged lack of notice to Frontier regarding the Carlyle Transaction that Frontier has used as a justification for not cooperating under the Non-Framework Leases.

In other words, ***Frontier's claims in Litigation 2 relate to the alleged lack of notice to Frontier regarding the Carlyle Transaction, and such claims have nothing to do with Frontier's failure to cooperate under the Non-Framework Leases, leading to the Default Notices***. The events related to the Default Notices all occurred after the Carlyle Transaction.

**Litigation 3:**[5] Following the Carlyle Transaction, but separate and apart from it, in the ordinary course of its business, Carlyle Aviation Management Limited ("CAML") sought to sell, on behalf of funds it managed, four Airbus A320 passenger aircraft (the "Aircraft") on lease to Frontier to new purchasers, and to refinance other Aircraft with third parties. These are the Sale/Financing Transactions at issue in Litigation 3. (*See* Compl. ¶¶ 34-35, Litigation 3 (June 6, 2023), ECF No. 1-2.) Frontier has an obligation under the Leases, including the Non-Framework Leases, and under the Non-Waiver and Preservation of Rights Agreement ("Cooperation Agreement") to cooperate with the Sale/Financing Transactions. But Frontier has refused to cooperate with the Sale/Financing Transactions by providing documentation required in order to consummate the Sale/Financing Transactions solely so Frontier can, in its view, better its chances of collecting on a judgment in Litigation 1 (because Frontier believes AMCK, a defendant in

---

[5] *Carlyle Aviation Mgmt. Ltd., et al v. Frontier Airlines, Inc.*, No. 1:23-cv-04774 (PAE) (S.D.N.Y.).

4

Litigation 1, will not pay such a judgment). Frontier's disregard of its obligations to cooperate under the Leases will have broad impacts on the flying public. Aircraft lessors and financiers rely on the obligations of Lessees in aircraft leases to cooperate with sales and financings in order to maintain the multi-billion dollar aircraft financing market that allows airlines to continue to have access to commercial aircraft. Increased risk of non-cooperation by Lessees will result in higher costs to lease the aircraft, which will ultimately trickle down to airline flight pricing and related costs.

In sum:

- Litigation 1 involves an alleged breach of the Framework Agreement in 2020.
- Litigation 2 relates to the Carlyle Transaction. In Litigation 2, nearly all of Frontier's claims in the Second Amended Complaint, including its fraudulent transfer claim, have been dismissed pursuant to this Court's Opinion and Order, entered on June 7, 2023 (ECF No. 59).
- Litigation 3 relates to the Sale/Financing Transactions, and not the Carlyle Transaction. Despite this, Frontier is using its failure to cooperate to extract concessions from Defendants to which it is not entitled.

The distinction between these three cases is critical. Each involves a separate transaction. But when the Court issued the PI Order, it collapsed these separate transactions and separate claims.

Specifically, when the Court stated that the second prong of the preliminary injunction standard was satisfied because Section 20.2(a)(ii) of Lease Form 1 and Section 22.3(v) of Lease Form 2 provided Frontier with a "plausible contractual basis for its decision to withhold consent," the Court was under the impression that the consent withheld was the consent to the Carlyle

5

Transaction.  (Tr. 15:23-24.)  ***But that is not the consent that resulted in the Default Notices that Defendants are now enjoined from enforcing***.  Rather, the "consent withheld" that is relevant to the Default Notices and Litigation 3—*i.e.*, the consent that the Court should have considered when determining the appropriateness of preliminary injunctive relief—was Frontier's refusal to provide documentation required by the lessors to complete the Sale/Financing Transactions.

This confusion results primarily from the fact that Frontier chose to seek a temporary restraining order and preliminary injunction in Litigation 2, where it has no claim at all relating to the Default Notices or the Sale/Financing Transactions.[6]

## APPLICABLE STANDARD

A district court "has broad discretion in determining whether to grant a motion to alter or amend the judgment."  *Baker v. Dorfman*, 239 F.3d 415, 427 (2d Cir. 2000).  "The major grounds justifying reconsideration are an intervening change in controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice."  *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (internal quotation marks omitted).

## ARGUMENT

I. **FRONTIER'S ACTIONS AND STATEMENTS HAVE CAUSED THE COURT TO MISAPPREHEND THE FACTS, RESULTING IN CLEAR ERROR AND MANIFEST INJUSTICE**

   A. **The Court Looked at the Wrong Question When Analyzing Whether Frontier Had Raised a Serious Question on the Merits of Its Claim**

The Court's conclusion that there is a sufficiently serious question going to the merits of Frontier's claims turned on the Court's conclusion that "Frontier has identified a plausible contractual basis for its decision to withhold consent," namely Section 20.2(a)(ii) of Lease Form 1 and Section 22.3(v) of Lease Form 2.  (Tr. 15:23-24.)

---

[6] *See* Defs.' Opp'n Mem. 10-11, ECF No. 63.

It is clear from the Court's discussion that followed, however, that the "withhold[ing of] consent" to which the Court was referring was that Frontier did not consent to the Carlyle Transaction. For example, the Court noted that Frontier's "claim here is that defendants forced through transfers of ownership with respect to aircraft as to which Frontier's consent was required, but as to which Frontier reasonably withheld consent. Frontier's basis for withholding consent had to do with the impact of the transfers on its ability to collect in the lawsuit before Judge Stanton." (Tr. 15:15-20.) The Court further noted that Frontier had "adduced evidence that the transfers for the 14 aircraft left the defendants in that case [i.e., Litigation 1] without the ability to fully pay out the judgment that [Frontier] seeks." (Tr. 16:21-24; *see also id.* 16:24-17:3 ("In particular, Frontier viably contends that by disposing of the aircraft, which were valuable, without receiving offsetting value, defendants denuded themselves of the tangible property that most readily could have been tapped to pay out on a such a judgment.").)[7]

Putting aside that Frontier had no right to block the Carlyle Transaction, the granting or withholding of Frontier's consent to the Carlyle Transaction was not the basis for the Default Notices. Rather, the Default Notices were issued because Frontier has refused to consent to the separate, ordinary course requests to sign certain documentation that would allow Defendants to sell four aircraft (sales that have now been lost because of Frontier's actions) and refinance others. CAML negotiated in good faith with Frontier to complete these requests for over eight months and, due to Frontier's unreasonable actions during this extended period, Frontier left Defendants with no alternative but to issue the Default Notices. ***These are totally separate transactions from***

---

[7] The Carlyle Transaction did not involve just the 14 aircraft at issue here. Rather, it involved more than 100 aircraft worth billions of dollars. More than 30 other airlines were involved. None objected besides Frontier. (*See* Declaration of Freyda Mechlowicz ("Mechlowicz Decl.") ¶¶ 3, 10, ECF No. 80.)

*the Carlyle Transaction*. Frontier's choice to seek a temporary restraining order and preliminary injunction in this Litigation 2 concerning actions related to the Default Notices and events leading to the commencement of Litigation 3 has caused this confusion. In this Litigation 2, Frontier has no claim related to the Default Notices. Indeed, the Default Notices were issued on May 26, 2023, nearly nine months after Frontier filed the operative complaint in this case. (Second Am. Compl., ECF No. 35.)[8]

Thus, the question the Court analyzed—whether the Carlyle Transaction would have resulted in a restriction or diminishment of rights within the meaning of namely Section 20.2(a)(ii) of Lease Form 1 and Section 22.3(v) of Lease Form 2, as applicable—was the wrong question.

### B. An Analysis of the Correct Question Shows that Frontier Had No Basis for Its Actions Under the Relevant Contracts

The question the Court needed to analyze was whether the separate Sale/Financing Transactions would run afoul of those contractual provisions. They do not.

*First*, Section 20.2(a)(ii) of Lease Form 1 and Section 22.3(v) of Lease Form 2 only apply to a "transfer" of the Aircraft, and so by their very terms do not apply to any refinancing

---

[8] As argued in Defendants' Opposition to Plaintiff's Motion by Order to Show Cause for a Temporary Restraining Order at 10-11 (ECF No. 63), and as is repeated here for preservation purposes, without a claim challenging the Default Notices, there was no basis for injunctive relief with respect to any actions that might be taken pursuant to the Default Notices. *See, e.g.*, *Robbins v. Comprehensive Med. Mgmt., Inc.*, No. 3:00-cv-57 (PCD), 2000 WL 502693, at *2 (D. Conn. Mar. 21, 2000) (denying motion for temporary restraining order and preliminary injunction and finding that "there is no basis for injunctive relief" where defendant had not filed any action because "there is no underlying claim on which to find a likelihood of success on or serious question going to the merits"). Indeed, "an injunction is a remedy for a violation alleged in a complaint. It is appropriate when the intermediate relief is of the same character as that which relief may be granted finally, but inappropriate where the injunction deals with a matter lying wholly outside the issues in the suit." *Williams v. N.Y.C. Dep't of Corr.*, No. 19-cv-3347 (LCL)(JLC), 2020 WL 7079497, at *2 (S.D.N.Y. Dec. 3, 2020) (cleaned up) (noting that "it is inappropriate for the court to grant a request for injunctive relief that is unrelated to the claims and the defendants in the complaint") (internal quotation marks omitted).

transaction, which does not result in a transfer of the Aircraft. *Second*, the contemplated sales do not run afoul of these provisions in any event.

### 1. The Sale/Financing Transactions Do Not Violate Lease Form 1

Section 20.2(a)(ii) of Lease Form 1 provides that Frontier need not agree to any transfer or assignment that would "result in any restriction . . . on lessee's rights under ***this Agreement*** or the other ***Lessee's Documents*** or on lessee's ***use or operation of the Aircraft***." (Mechlowicz Decl. Ex. 1, § 20.2(a)(ii), ECF No. 80-1.)

Frontier has not provided any evidence that a transfer of the Aircraft ownership from a Defendant to a new owner, or a refinancing for any of the Aircraft, have any impact whatsoever on Frontier's rights under the Leases or its operation of the Aircraft. Nor could it. None of the Leases (or any other document) provide Frontier with any right to secure a litigation claim against any party, including non-party AMCK and Defendants, in an unrelated litigation, particularly one arising from the separate Framework Agreement. So Frontier would be in the same position before the sale or refinancing of the Aircraft as it is now. Tellingly, Frontier has never objected to the identities of the proposed purchasers or financing sources, making clear it has no real objection to those transactions.

The "restriction" on its rights that Frontier points to is its ability to secure its claim in Litigation 1. (*See* Pl.'s Mem. at 6, ECF No. 71 (arguing that "Frontier could not acknowledge the [Sale/Financing Transactions] without, among other prejudice and cost to Frontier, abandoning its valuable claims that AMCK had wrongfully transferred the Aircraft to Carlyle in the first instance, undermining Frontier's valuable claims in this action and its ability to collect on a judgment in the litigations that had already been filed").) But no such right exists in the Leases.

### 2. The Framework Agreement Is Not a Lessee's Document

In an attempt to solve this problem, at the July 18 hearing, Frontier argued that the Framework Agreement is a "Lessee's Document." (Tr. 4:9-10 ("The lessee documents would include the framework agreement.").) But that is another obfuscation by Frontier. The Framework Agreement contemplated that Frontier and AMCK would enter into six leases. (*See* Lambert Decl. Ex. 3, §§ 1.1, ECF 72-3 (definition of "Aircraft" means "each of the six (6) new Airbus A320-251N aircraft scheduled to be delivered under the Purchase Agreement").) Section 1.3 of the Framework Agreement makes clear that the Framework Agreement would be considered a "Lessee's Document" only for these six leases. (*See* Lambert Decl. Ex. 3, §§ 1.1, 1.3, ECF 72-3.)

Only one aircraft was delivered under the Framework Agreement (MSN 10038) before it was terminated. Therefore, at most, the Framework Agreement is a "Lessee's Document" under the MSN 10038 Lease.[9]

With the sole exception of the MSN 10038 Lease, however, the Leases that are implicated in the Sale/Financing Transaction are Non-Framework Agreement Leases, and all pre-date the Framework Agreement. Accordingly, the Framework Agreement is not a "Lessee's Document"

---

[9] But even that does not save Frontier's argument because in Litigation 1, Frontier alleges no damages arising from the MSN 10038 Lease. Nor could it, as Frontier's theory of damages in that case is that it had to enter into replacement leases on less favorable terms, whereas for MSN 10038 the lease contemplated by the Framework Agreement commenced and remains in effect. (Schwartz Decl. Ex. A, ¶¶ 4, 21, 22, 24, ECF No. 81-1.)

While the basis for termination of the Framework Agreement was a failure by Frontier to pay rent on the Non-Framework Agreement Leases, this does not mean that the Framework Agreement is a "Lessee's Document" under the Non-Framework Agreement Leases. Rather, the termination right arose because an event of default under the Non-Framework Agreement Leases (due to Frontier's failure to pay rent thereunder) resulted in an event of default under the MSN 10038 Lease. This occurs under a separate provision of the Leases that does not use the term "Lessee's Document". In turn, that event of default under the MSN 10038 Lease, as one of the leases entered into pursuant to the Framework Agreement, resulted in a termination right under the Framework Agreement.

within the meaning of Section 20.2(a)(ii) of Lease Form 1 for nearly every Lease for which a Default Notice was issued.[10]

### 3. The Sale/Financing Transactions Do Not Violate Lease Form 2

The transaction at issue for the one Aircraft subject to Lease Form 2 is a refinancing, and so involves a security assignment, and not a transfer. Section 22.2 of Lease Form 2 provides the terms applicable to a security assignment, which are set out separately from the transfer requirements set out in Section 22.3 of Lease Form 2. Section 22.2(3) of Lease Form 2 provides "none of Lessee's rights and benefits in respect" of its use and operation of the Aircraft "shall be diminished as a result of any such Security Interest or assignment." (Mechlowicz Decl. Ex. 2, § 22.2(3), ECF No. 80-2.)

Again, there is absolutely no evidence that the refinancing of the lone Aircraft subject to this lease will have any impact on Frontier's rights or benefits under this lease or increase any of its obligations.[11] Nor would it have such an impact under the Framework Agreement.

\*    \*    \*

Put simply, Defendants Wells Fargo and UMB did not issue the Default Notices because of anything to do with Frontier's refusal to consent to the Carlyle Transaction (again, which consent was not required), but because of Frontier's refusal to cooperate with the routine requests Defendants needed to accomplish the Sale/Financing Transactions. Notably, Frontier's actions

---

[10] In its reply brief in support of its motion for a preliminary injunction, Frontier argued for the first time that it was refusing to cooperate on the Sale/Financing Transactions because those transactions would violate Section 20(a)(i) of Lease Form 1. But that section, which states that a transfer should not result in Frontier having a "greater financial obligation or liability . . . as a result of such transfer" is not implicated for the same reasons discussed above.

[11] The Framework Agreement is not an "Operative Document" as defined in the one Lease Form 2 Lease.

have already caused Defendants to lose four sales. And there is no evidence of any negative impact whatsoever that the Sale/Financing Transactions would have on Frontier or the Aircraft.

### C. Any Alleged Failure to Notify Frontier of the Carlyle Transaction Did Not Contribute Materially to Frontier's Failure to Uphold its Obligations Under the CAML Leases

Frontier attempts to excuse its breaches of the Leases by arguing that Defendants' alleged failure to notify Frontier about the Carlyle Transaction "suspends any obligation on Frontier's part to approve new transfers" pursuant to Section 402 of Article 2A (Leases) of the Uniform Commercial Code. (*See* Pl.'s Mem. at 16-17, ECF No. 71; Reply Mem. at 6, ECF No. 83.) Frontier takes this New York law principle out of context. Cases cited by Frontier discuss the "prevention doctrine," which applies where one party seeks to excuse the nonoccurrence of a *condition precedent* due to the other party's conduct. (Restatement (Second) Contracts § 245 (stating "Where a party's breach by nonperformance contributes materially to the non-occurrence of a *condition* of one of his duties, the non-occurrence is excused.").) Defendants' obligation to notify Frontier of the Carlyle Transaction is not a *condition precedent* to Frontier's obligations to cooperate with respect to the Sale/Financing Transaction. Thus, Frontier's arguments are inapposite.

### II. DEFENDANTS' GUARANTY IS NEW EVIDENCE AND REMOVES PLAINTIFF'S JUSTIFICATION FOR THEIR REFUSAL TO COOPERATE

At the July 18, 2023 hearing, the Court stated that "[p]rovided that there is a guarantee in place that assures Frontier a full recovery on its litigation claims . . . a durable ironclad guarantee that, once committed to, is outside of defendants' control and assured a recovery, the Court on the present record would be unaware of any basis on which Frontier could thereafter reasonably deny consent." (Tr. 21:12-19.)

12

There never has been a valid reason for Frontier to refuse to cooperate with the Sale/Financing Transactions. Indeed, since the date of the Carlyle Transaction, CAML has successfully completed dozens of transactions with "sister" airlines of Frontier, and those airlines have never raised an issue regarding the Carlyle Transaction or refused to cooperate, as Frontier has done.[12]

But to remove any doubt, Defendants have provided a guaranty that gives Frontier more than reasonable assurance of recovery on any claim in Litigation 1.[13] Frontier is using this proceeding to get a guaranty to which it is not entitled to under the terms of the Leases or related agreements. Regardless, Defendants will cause the guarantor to execute the guaranty immediately following the dissolution of the Court's injunction.

Accordingly, there is no reason whatsoever for Frontier to continue to refuse to consent to the Sale/Financing Transactions, and the Court should dissolve the preliminary injunction immediately. Defendants are prepared to commit not to exercise any remedies as a result of the defaults alleged in the Default Notices for a period of two weeks so that Frontier can sign all relevant documents. Once Frontier has signed all relevant documents, Defendants will retract the Default Notices.[14]

---

[12] During the July 18 hearing, counsel for Frontier referred to Frontier's "sister" airlines, which Defendants understand to be airlines in which Indigo Partners, LLC has a substantial interest. (Tr. 53:3.)

[13] A true and correct copy of the unexecuted guaranty provided to Frontier on August 1, 2023 is attached to the accompanying Declaration of Jed M. Schwartz as **Exhibit 2**.

[14] The Plaintiffs in Litigation 3 reserve all rights to continue their claims in that case, including to recover the damages that Frontier's contractual breaches have caused.

## CONCLUSION

For the reasons set forth herein, Defendants respectfully request that the Court grant Defendants' motion to alter or amend the PI Order and lift the injunction.

Dated: August 2, 2023
      New York, New York

MILBANK LLP

/s/ *Jed M. Schwartz*

Jed M. Schwartz
Samantha A. Lovin
Emily Werkmann
55 Hudson Yards
New York, New York 10001
Tel: (212) 530-5000
JSchwartz@milbank.com
SLovin@milbank.com
Ewerkmann@milbank.com

*Attorneys for Defendants Wells Fargo Trust Company, N.A., solely in its capacity as Owner Trustee, and UMB Bank, N.A., solely in its capacity as Owner Trustee*