N8A5froC

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    FRONTIER AIRLINES, INC.,

 4                    Plaintiff,              New York, N.Y.

 5             v.                             22 Civ. 2943 (PAE)

 6    AMCK AVIATION HOLDINGS IRELAND
      LTD., et al.,
 7
                      Defendants.
 8
      ------------------------------x
 9
                                             August 10, 2023
10                                           11:30 a.m.

11    Before:

12                    HON. PAUL A. ENGELMAYER,

13                                           U.S. District Judge

14

15                        APPEARANCES

16

17    LANE POWELL PC
           Attorneys for Plaintiff
18    BY:  DAVID SCHOEGGL
             -AND-
19    BINDER & SCHWARTZ, LLP
      BY:  ERIC FISHER
20         GREGORY PRUDEN
           DAVID M. SCHOEGGL
21
      CLIFFORD CHANCE US, LLP
22         Attorneys for Defendants
      BY:  JEFF BUTLER
23           -AND-
      MILBANK LLP
24    BY:  JED SCHWARTZ
           SAMANTHA LOVIN
25         EMILY WERKMANN
```

N8A5froC

```
 1              (Case called)

 2              THE DEPUTY CLERK:  Counsel, starting at the front

 3    table, please state your appearance for the record.

 4              MR. FISHER:  Good morning, your Honor.  Eric Fisher

 5    from Binder & Schwartz for Frontier Airlines.

 6              THE COURT:  Good morning, Mr. Fisher.

 7              MR. PRUDEN:  Good morning, your Honor.  Gregoy Pruden

 8    from Binder & Schwartz for Frontier Airlines.

 9              THE COURT:  Good morning, Mr. Pruden.  You may be

10    seated.

11              For the Defense?

12              MR. BUTLER:  Good morning, your Honor.  Jeff Butler

13    from Clifford Chance for the defendants.

14              THE COURT:  Good morning.

15              MS.. WERKMANN:  Emily Werkmann from Milbank on behalf

16    of the defendants.

17              THE COURT:  Good morning.

18              MS. LOVIN:  Good morning, your Honor.  Samantha Lovin

19    from Milbank on behalf of defendants.

20              THE COURT:  Good morning.

21              MR. SCHWARTZ:  Good morning, your Honor.  Jed Schwartz

22    also from Milbank on behalf of defendants.

23              THE COURT:  I understand from my law clerk that there

24    was a number of people from each side who may be auditing by

25    phone.  Let me ask counsel who are present, rather than opening
```

N8A5froC

1    the phone line, if you know who from your respective clients is

2    auditing.

3             Mr. Fisher?

4             MR. FISHER:  Your Honor, I know that our co-counsel

5    from Lane Powell, David Schoeggl is participating by telephone.

6    I'm not sure whether or not we have a client representative on

7    the line as well.

8             THE COURT:  Very good.

9             And for the defense?

10             MR. SCHWARTZ:  Yes, your Honor; two client

11    representatives, Mr. Bill Hoffman and Mr. Cliff Dameron.

12             THE COURT:  Very good.  Welcome to all of the

13    telephonic participants.  You may all be seated.  I have a

14    brief not a ruling but scene-setting statement which hopefully

15    will help frame where we are at.

16             Good morning, counsel.  The Court scheduled this

17    hearing as status conference with respect to the preliminary

18    injunction that has been in place in this case since July 18.

19    The purpose of the injunction, as counsel will recall, was to

20    protect Frontier against irreparable harm it has shown itself

21    to face based on the default notices that defendants had issued

22    with respect to 14 aircraft on which Frontier relies.

23             Since then, the Court has received submissions from

24    counsel with respect to two issues.  Each issue, depending on

25    how it is resolved, has the capacity to cause the Court to

N8A5froC

1    dissolve the preliminary injunction.

2              The first involves a proposed guaranty by the

3    defendants.  As proposed, defendants would guarantee Frontier's

4    recovery of any monetary damages that Frontier may receive in

5    the pending litigation before Judge Stanton in which Frontier

6    alleges a violation by defendants of the parties' so-called

7    framework agreement.  A satisfactory guarantee would eliminate

8    the stated basis on which Frontier has declined to execute

9    certain transaction documents relating to the assignment of

10   ownership of planes used by Frontier.  Frontier's refusal to

11   execute these documents, which defendants viewed as

12   unreasonable, was the basis on which of the defendants issued

13   default notices.  As proposed, upon the execution of the

14   guaranty, Frontier would sign the transaction documents and

15   defendants, in turn, would retract the default notices.  By

16   definition, defendants' withdrawal of the default notices would

17   eliminate the threatened harm.  And so, the issue before the

18   Court is whether the guarantee, as proposed by defendants, is

19   satisfactory so as to make the harm that Frontier faces

20   reparable at Frontier's hand rather than irreparable.

21             The Court has closely reviewed defendants' proposed

22   guaranty and Frontier has expressed concerns about it in the

23   filings at Docket 116; and most recently defendant's response

24   to Frontier filed late yesterday in the form of a declaration

25   by Javier Meireles at Docket 119.  I commend counsel for

N8A5froC

1    working productively towards a satisfactory guaranty.  My

2    judgment is that the guaranty terms that defendants have put

3    forward are very, very close to clearing the bar.  By that I

4    mean that the offer of the guaranty, as formulated by

5    defendants, is very close to giving plaintiffs relief that

6    would eliminate their claim of irreparable harm.  I do have

7    questions for counsel about some aspects of defendants'

8    proposed guaranty and I will return to that subject in a few

9    moments.

10           The second issue involves defendants' motion, in

11   substance, for reconsideration of the preliminary injunction.

12   The motion is styled as one to "alter or amend" the Court's

13   July 18 order putting in place the preliminary injunction.

14   But, as becomes clear on reading that motion, defendants are

15   arguing that the preliminary injunction never should have

16   issued and now should be withdrawn, because, defendants

17   contend, plaintiff did not show a likelihood of success on the

18   merits or even a fair question going to the merits.  Therefore,

19   as I indicated in my order of August 3, at Docket 113, I am

20   treating this as a motion for reconsideration.  As I indicated

21   there, defendants' argument is colorable.  It raises

22   substantial questions.  It presents defendants' legal

23   objections to a preliminary injunction far more clearly than

24   had defendants' earlier written submissions.

25           In the August 3 order I gave Frontier until next

N8A5froC

 1    Wednesday, August 16, to respond; and defendants until the

 2    following Wednesday, August 23, to reply.  In the event that

 3    the preliminary injunction has not, by then, been dissolved by

 4    virtue of the execution of a guaranty, the Court would then

 5    resolve the motion for reconsideration.  In the event the Court

 6    were to find with defendants, that would result in dissolution

 7    of the preliminary injunction.

 8            So that's a framework, if you will.  For today,

 9    though, the issue before us is just the proposed guaranty and I

10    want to begin by raising some questions with counsel.

11            So, to summarize, plaintiff's stated objections to

12    defendants' proposed guaranty, there really were three.  One is

13    that Maverick is not outside of defendants' control; number two

14    is that defendants' net worth certification raises some

15    questions; and number three, is essentially that plaintiff's

16    enforcement mechanism is to go to court.  What if -- plaintiff

17    says -- Maverick doesn't honor the guaranty?  Let me take care

18    of a couple of items first.

19            To begin with, plaintiff, I am completely unpersuaded

20    by the idea that you have to go to court to enforce a legal

21    right.  Courts are not bad places and, essentially, if you have

22    the functional equivalent of a promissory note or guaranty,

23    this is not going to be the Battle of Verdun as you go to

24    enforce it.  The fact that you have to go to Court to enforce

25    your legal rights is a lame objection that I reject.

N8A5froC

1          Second, with respect to the net worth certification,

2     although I am happy to hear from plaintiffs, I will tell you

3     that I found Mr. Meireles' declaration quite satisfactory in

4     answering those questions.  I don't think there is a

5     substantial argument that could be pursued based on what I am

6     seeing as to the adequacy of the net worth certification.  The

7     real issue here, to my mind, is that there isn't satisfactory

8     mechanism that I can see to guard against the scenario under

9     which, even though there is sufficient net worth now, Maverick

10    might move assets out or put itself in a position where, in the

11    future, it was either judgment-proof or partly judgment-proof.

12    I think this ought to be an easily solvable situation, I think

13    it probably involves some mechanism for advance notice before

14    some action would be taken that would compromise Maverick's net

15    worth.  But, Mr. Schwartz, if you are the right person to take

16    that up with, that seems to me the one outstanding issue.  The

17    fact that Maverick is not outside defendants' control doesn't

18    seem to be a big deal here.  The issue is just making sure that

19    whether it is Maverick or defendants that no action is taken

20    that diminishes the net worth of Maverick to a point where

21    Maverick couldn't be tapped as a guarantor.

22          Mr. Schwartz, your thoughts on that?

23          MR. SCHWARTZ:  Thank you, your Honor.

24          I will put aside the issue about outside of control

25    because I think that was based on a misinterpretation of some

N8A5froC

1  of the Court's statements about what needed to be outside of

2  control.

3          THE COURT:  And my statements probably could have been

4  more fine tuned.

5          MR. SCHWARTZ:  Your Honor, I would like to explain

6  what Maverick is because I think that would probably go -- I

7  think -- all the way to satisfying any concern.

8          Frontier has called Maverick a special purpose entity.

9  It is not that.  In the most recent submission, they point to

10  three special purpose entities owned by a fund that is not

11  Maverick that entered into a transaction that had pre-existing,

12  non-recourse loans, that the lender on those loans then put

13  those entities into bankruptcy and they're trying to equate

14  those three special purpose entities with Maverick, the

15  guarantor here.  They're night and day.

16          So, Maverick is the center of mass here.

17          THE COURT:  Is the?

18          MR. SCHWARTZ:  Center of mass.  Let me just give you

19  the facts.

20          Maverick owns, indirectly, 120 different aircraft that

21  it leases to 33 different airlines.  Maverick has, on order,

22  with aircraft manufacturers, over a billion dollars' worth of

23  aircraft to be delivered to Maverick or its subsidiaries within

24  the next few years.  This is not an entity that can just pack

25  up overnight and disappear on a whim, and certainly is not

N8A5froC

1    going to do something like that to avoid the possible

2    obligation of a potential claim if Frontier wins before Judge

3    Stanton and if AMCK doesn't pay any judgment that is owed.  It

4    is a real entity that has real business relationships and the

5    idea that it would -- I apologize, I'm going a little fast, I

6    will slow down -- the idea that it would risk relationships

7    with literally dozens of airlines, aircraft manufacturers, and

8    denude itself of nearly $2 billion of assets to avoid the, at

9    best, $44 million judgment that Frontier is seeking, it is just

10   not based in reality.

11            I think it is really important for the Court to

12   understand why we think it is such a strong guaranty because

13   this is a credit-worthy guarantor -- and my clients are on the

14   line so I also, your Honor, I would be remiss if I don't say

15   this -- this is not something easily given by my clients, there

16   is no obligation under the lease.  Frontier doesn't even claim

17   that there is an obligation to provide a guarantee, this is a

18   purely commercial decision that my clients are making to try to

19   move past this dispute, to try to stop further injury to my

20   clients.  They've already lost four aircraft sales.  My

21   understanding is if we get this resolved promptly there is a

22   possibility that we could get two of the four back.  Certainly

23   not a guarantee by any means, but that's the scenario we find

24   ourselves in.  And, to get that done, we have gone to what --

25   when I said the center of mass.

N8A5froC

1          THE COURT:  I'm not getting the word.

2          MR. SCHWARTZ:  Mass, M-A-S-S, operations, whatever you

3    want to call it, the entity that is at the center of this --

4          THE COURT:  The various transactions that are causing

5    the agita from the front table, you say, essentially center on

6    Maverick.

7          MR. SCHWARTZ:  No.  No, actually it is not.  Maverick

8    is separate.  What I am saying is the operations of Carlyle as

9    an aircraft leasing entity are centered, to a large part, on

10   Maverick.  That's why I think it is so important.  We are

11   giving you the entity that has the aircraft, has the $2 billion

12   of assets, that has the relationships with almost three dozen

13   airlines.  That's the entity that is giving the guaranty.  So I

14   really don't think the concern that -- especially in light of

15   the fact that we are giving a certification quarterly as to the

16   net worth and giving financial statements, that we are going to

17   get rid of all of the assets and everything that would be

18   required to do that with all of the relationships that I just

19   mentioned with the different airlines, is a realistic

20   possibility.

21         THE COURT:  OK.  Let me ask you, so there is a

22   quarterly certification and a quarterly financial statement

23   that the plaintiffs would get?

24         MR. SCHWARTZ:  Correct.

25         THE COURT:  Maverick is privately held?

N8A5froC

1          MR. SCHWARTZ:  It is an investment -- it is owned by

2     an investment fund, it is not a publicly-traded company if

3     that's the --

4          THE COURT:  In other words, plaintiff's visibility is

5     limited to that which the guaranty provides it, there is not

6     some other way in.

7          MR. SCHWARTZ:  There is no SEC filings that I'm aware

8     of or something like that.  I think the only way they would get

9     visibility -- I am checking with my colleague, yes -- the only

10     way they would get visibility would be the information that we

11     are providing.

12          THE COURT:  Thank you.  That is quite helpful context.

13          Let me turn to you, Mr. Fisher, if you will be taking

14     the lead.  That sounds pretty persuasive.  There is an old

15     metaphor about gift horses and mouths here.  Is there really a

16     reason to be skeptical of that?

17          MR. FISHER:  Your Honor, let me go right to the

18     question on the table which is the creditworthiness of the

19     proposed guarantor.  And just to quickly frame my discussion of

20     that issue, in principle, in light of the guidance that your

21     Honor provided at the July 18 conference, I think we understand

22     fully that where we would like this to go is to be offered an

23     acceptable guaranty, to have the default notices withdrawn,

24     that would make the need for injunctive relief moot and the

25     conjunction could be dissolved.  That's where we are all trying

N8A5froC

1    to get to.  We received the proposed guaranty on August 1, and

2    then it was submitted to the Court along with the motion for

3    reconsideration on August 2.  When we, in order to find out who

4    is this guarantor that is being proposed, the only information

5    really that we have is this single piece of paper that is

6    attached as Exhibit 3 to our letter.  And taking a look at that

7    piece of paper which has been the subject, of course, of the

8    dueling declarations of Mr. Wetzel and then Mr. Meireles.

9         It is not apparent at all that this entity is a center

10   of operations.  All of its assets seem to consist of

11   investments from parent companies.  rather than sitting at the

12   center of operations, it seems to sit at the center of a

13   network of other entities that also are entirely opaque to us.

14   And this balance sheet itself says that, in terms of the

15   description of assets, that's not prepared in compliance with

16   GAAP.

17        THE COURT:  What is wrong with the explanation that

18   Mr. Meireles gave to that?  I appreciated your raising the

19   question but what was wrong with the answer?

20        MR. FISHER:  Your Honor, Mr. Meireles, as I understand

21   it, says that all $1.7 billion of assets that are shown on this

22   balance sheet should fairly be considered as equity investments

23   and not as loans, and then he says that, under Irish law,

24   $500 million of those assets are classified as loans because

25   that's permitted under Irish tax law.  Again, with this as the

N8A5froC

1   only information that we have been supplied about the

2   guarantor, I see $203 million of intercompany interest payable,

3   which seems completely out of whack with the idea that only

4   $500 million of this is --

5           THE COURT:  Look.  At the risk of stating the obvious,

6   the maximum judgment you could get in front of Judge Stanton

7   is -- what -- $44 million?

8           MR. FISHER:  $65 million.

9           THE COURT:  Even treating that as the maximum

10  attainable, I mean, the numbers that we are talking about on

11  the certification vastly outstrip that.  The problem is not

12  that one can't imagine some Oliver Stone-like scenario under

13  which all the money would vanish overnight, it is whether there

14  is a realistic prospect of that and Mr. Schwartz, among other

15  valid points, makes the commercial point that for his client

16  group, if you will, to do that, would carry considerable cost.

17  There comes a point for you at which the ideal can't be the

18  enemy of the very, very good.

19          MR. FISHER:  Understood, your Honor.  I think our

20  genuine concern is that looking at this balance sheet, it

21  appears that the assets really are in the nature of

22  intercompany equity contributions and obligations, and that

23  when we say it is under the control of Carlyle, the

24  Carlyle-controlled parent companies that made those equity

25  contributions could reclassify and completely change the

N8A5froC

1    financial picture of the guarantor entity and those

2    circumstances, even what the assets are, are completely opaque

3    to us without having been supplied with actual financial

4    statements that are audited and tell us what these assets are.

5    It is a piece of paper that says 1.7 --

6           THE COURT:  When is your trial date, or do you have

7    one in front of Judge Stanton?

8           MR. FISHER:  I don't think we have one.

9           THE COURT:  You are through summary judgment so that's

10    the next step.

11           MR. FISHER:  We are waiting for a trial date.

12           THE COURT:  Mr. Schwartz, let me ask you this.

13    Supposing that a quarterly financial statement or certification

14    were to show a consequential change in a bad direction and

15    direction that suggested that, as feared by the plaintiffs,

16    money was leaving quickly enough to put them in some level of

17    concern, what would the remedy be?  Imagine that the

18    certification process suggested along these lines, ideally

19    there would be a way in which this Court or somebody could step

20    in, tighten up some notice requirement, something like that.

21    What is the right solution to that?  If you were at the front

22    table you might be making the same arguments but you would

23    probably find more persuasive the argument that there needs to

24    be some mechanism in the event that money begins to leave

25    quickly.

N8A5froC

1          MR. SCHWARTZ:  Well, your Honor, your Honor has

2     jurisdiction of this case and you will have jurisdiction of

3     this case.  If there is a concern that somehow money is leaving

4     the system, I suppose -- first of all, I would encourage them

5     to ask us.

6          THE COURT:  No, no, no.  You're right, I hear you.

7     Quarterly certification process is the means of getting

8     communication.  Presumably you don't want to have some daily

9     conversation with them.  The question is if that certification

10    shows a lot of money going out, is it that the plaintiff's

11    remedy would be to either reopen this case, if closed, or to

12    pursue some form of injunctive relief then targeted to that

13    problem?  I am trying to figure out, there has to be a

14    mechanism here.

15         MR. SCHWARTZ:  Let me talk about the part of the

16    guaranty that they didn't object to which is -- so, we

17    covenanted so a continuing obligation to maintain a minimum net

18    worth of $65 million.  They didn't object to that, they didn't

19    alter that.  So that's really the bar here.  And I understand

20    Mr. Fisher' view that their best case scenario is 65, that's

21    why it is pegged to that -- I think it is different -- but

22    that's the bar that below that then there is a problem for them

23    and they haven't challenged that.  They have accepted we have

24    to have a minimum net worth of $65 million.

25         THE COURT:  I think Mr. Fisher' concern is suppose

1    that that promise is broken.

2              MR. SCHWARTZ:  Then it goes back to your Honor's first

3    point, if we are breaching the contract then there is a remedy

4    from that:  They can come back to court.  If we are still here

5    that's a pretty simple process.  Or they would file a complaint

6    and seek for emergency relief based on the fact that we have

7    breached our contract.  I am confused by their enforcement

8    mechanism.  We have agreed to the floor and they haven't

9    objected to the floor.  If they have a real concern that the

10   quarterly financial statements are showing something or going

11   in a direction that they don't like, they can have a

12   conversation with us.

13             THE COURT:  What are the legal mechanisms available to

14   the plaintiff if they are concerned that the direction of

15   liquidity or creditworthiness, the direction of assets,

16   holdings, net worth is dropping precipitously; where do they

17   go?

18             MR. SCHWARTZ:  Your Honor, I suppose they could argue

19   we were committing some kind of fraudulent transfer and ask the

20   Court for relief on that.

21             THE COURT:  I mean, in other words, if they've got

22   more than, if Maverick has more than $65 million, there is no

23   breach of the guaranty.

24             MR. SCHWARTZ:  That's right.

25             THE COURT:  On the other hand, if there are large red

N8A5froC

flags, the question is whether they could come to this Court

for relief.  Is there some mechanism that can be built in like

that?  You have, I hope, a not unreasonable audience, but if

there was some question like that, is there an audience they

could go to?

MR. SCHWARTZ:  So, this is what I am struggling with,

because we would be in a situation where we are not in breach,

we are still completely in compliance with the guaranty and the

provision specifically negotiated and agreed to that there is a

minimum net worth.  They would just be saying we don't like

where this is headed.

THE COURT:  Right.

MR. SCHWARTZ:  I don't know what the legal remedy is

for 'we don't like where this is headed' other than if they

think we are doing this to avoid their claim that they would

essentially have a claim for fraudulent transfer that they

could bring.  I mean the point, that's we have a covenant that

we have to maintain that amount to give them comfort and that

is not something that they've pushed back on at all.

THE COURT:  Mr. Fisher, any response?

MR. FISHER:  Yes, your Honor, and this gets to the

Court's understandable skepticism about our criticism of the

lack of an enforcement remedy.

I understand that when someone enters into a

contractual guaranty and then they breached that guaranty, your

N8A5froC

```
 1    recourse is to sue.  I understand that.  We can't go around

 2    asking for guarantees of guaranties.  So I think where our

 3    concern centers is having an enforcement mechanism to ensure

 4    that this guarantor entity, which is not currently before the

 5    Court because it is not a defendant in the pending litigation,

 6    actually maintains enough assets to pay the guaranty.  But the

 7    premise --

 8         THE COURT:  I'm sorry.  This is a credible outfit that

 9    is pledging to keep at least $65 million on hand and has many

10    multiples of it.  In effect you would be, if you will, adding

11    Maverick to the defendants in the Judge Stanton case as

12    sequential or reverse sequence of people to go to should you

13    prevail before Judge Stanton, and with the Judge Stanton case

14    pretty mature in timing, there is every reason to assume that

15    it is going to be litigated in the next 18 months, if not much

16    sooner.  I mean, this isn't an endless time horizon.  I am

17    hearing what you are saying but finding it very theoretical.

18         MR. FISHER:  Your Honor, the concern that brought us

19    here in the first place, the filing of the Maverick lawsuit was

20    a circumstance where Carlyle moved assets out of what was

21    previously a judgment-worthy counterparty to a lease and so we

22    are looking for some assurance that the guaranty that we are

23    being offered is actually a guaranty where, at the end of the

24    day, when we go to collect in the event of a judgment there

25    will be assets there.
```

1          THE COURT:  Anything further from you?

2          MR. FISHER:  Not on that point, your Honor.

3          THE COURT:  Mr. Schwartz

4          MR. SCHWARTZ:  Your Honor, I just wanted, I can't let

5    stand the statement that Carlyle moved assets to make something

6    judgment proof.  There was a transaction between sophisticated

7    commercial parties.  The statement has been made repeatedly

8    that AMCK, which is not Carlyle, is judgment proof.  There has

9    been no evidence of that whatsoever presented to this Court or

10   to Judge Stanton.

11         THE COURT:  Such that if the plaintiffs were to

12   prevail before Judge Stanton to the tune even of $65 million,

13   so far as you understand right now, the defendants are still

14   good for it.

15         MR. SCHWARTZ:  Yes.  And not just that, we are putting

16   our money where our mouth is because we are effectively taking

17   the credit risk on that.

18         THE COURT:  All right.  Mr. Fisher, I think I have

19   heard enough on this one and, with respect, I am persuaded by

20   Mr. Schwartz.  Your follow-up was well taken, it produced a

21   useful clarification by Mr. Meireles, but I think at this point

22   the defendants have reasonably identified a guarantor that has

23   the ability to pay, has committed to having the amount of money

24   available that would be enough to support paying out the

25   maximum judgment envisioned if AMCK was unable to pay it.

N8A5froC

1          Let me turn to a separate issue which is the proposed

2     form of the order that the Court would issue.  Let me back up.

3     Before we get to that, plaintiff, I have reviewed your

4     objections.  I have commented on them.  Is there any other

5     objection that you have to the defendants' proposed guaranty?

6          MR. FISHER:  Your Honor, we put before the Court a

7     form of guaranty that the parties had previously.

8          THE COURT:  It doesn't matter, it is the defendants

9     who are making the offer.  I appreciate that you can put before

10    what you want, but at the end of the day the issue isn't what I

11    might fashion or what you might fashion, it is whether the

12    defendants' guarantee is essentially sufficient to eliminate

13    the irreparable harm in question.  And so, I walked through the

14    chain of events by which that happens, but at the end of the

15    day what I am evaluating is what the defendant haves offered,

16    not the world as you would prefer it.

17         MR. FISHER:  So in comparing what the defendants have

18    offered to the form of guarantee previously agreed to, I think

19    one point that is important and potentially could be worked

20    through is that their form of guarantee says that in the event

21    that there is a payment default or a failure to pay, then

22    they're relieved of the obligations under the guaranty.  Under

23    the leases, in the event that there is a failure to pay, we

24    have a cure period and then it is not until there is an event

25    of default that action can be taken under the leases and we

N8A5froC

```
 1      would simply ask that the guarantee that is proposed to us

 2      track that same protection.

 3              THE COURT:  What is the problem if it doesn't?

 4              MR. FISHER:  Then there could be a technical problem

 5      with the payment such that it arrives a day late and the

 6      guarantors say that they're not relieved of any obligation

 7      under the guaranty.

 8              THE COURT:  Mr. Schwartz?

 9              MR. SCHWARTZ:  Your Honor, a late payment is a late

10      payment but we specifically discussed this issue with with my

11      client and on this particular issue I think the concept that

12      Mr. Fisher is referring to is if there is an event of -- the

13      payment obligation under the guarantee would be suspended while

14      an event of default is continuing and that is the concept that

15      we would be able to agree to would -- and I would be --

16      obviously there is language, but getting rid of the termination

17      of the guaranty if there is a payment default and instead

18      putting in the condition on the payment that there be no

19      event --

20              THE COURT:  In other words there is a tweak that you

21      are prepared to make some adaptation.

22              MR. SCHWARTZ:  That's right, your Honor.

23              THE COURT:  Thank you.

24              Mr. Fisher, you have gotten a bit of relief just

25      there.  Anything else?
```

N8A5froC

1          MR. FISHER:  No, your Honor.

2          THE COURT:  Let me turn for a moment from the terms of

3     the guarantees, the proposed defense guarantee itself, to the

4     proposed form of order that the Court would issue.  I have

5     compared and contrasted the proposed orders that the parties

6     have put before me that would issue, essentially, upon my

7     finding that there is a sufficient guarantee.  The most

8     significant difference, by far, is it appears to be in

9     paragraphs 5 of the plaintiff's proposed order and I will let

10    everyone turn to these, is at Docket 119; Mr. Schwartz' letter

11    of August 8.

12         Paragraph 5 of the plaintiff's proposed Court order

13    would provide that within five business days of the closing of

14    the assignment transactions, the parties shall cause

15    stipulations of dismissal to be filed in this action and in the

16    action that was later removed to this Court, 23 Civ. 4774.  So

17    the plaintiffs are proposing, essentially, that both lawsuits

18    go away in effect upon the, if you will, withdrawal of the

19    default notices of relief here.

20         Defendants, you don't propose that, I imagine you

21    would be quite happy to have the lawsuit that is the lower

22    docket number, 22 civil 2943 brought by the plaintiffs, go

23    away.  Is there a reason why you are not asking that the later

24    action, which you have brought, go away?

25         MR. SCHWARTZ:  Yes, because we have been damaged by

N8A5froC

1    the breach of contract.  As it says, we have lost four sales

2    and have other damages.  And I spoke to Mr. Fisher about this

3    particular paragraph prior to the orders being submitted and I

4    said that we are not willing to dismiss the higher-docketed

5    number case.  I don't think we would have an objection to

6    dismissal of the lower-docketed numbered case.

7        THE COURT:  Let me ask you, Mr. Fisher, there is

8    clearly no reason why this provision has to be in such an order

9    and there is no reason to reach any farther into issues we

10   don't need to reach.  Taking the litigations one by one,

11   providing that a guarantee were entered into and the default

12   notices withdrawn, would you nonetheless be dropping this

13   lawsuit, 22 civil 2943?

14       MR. FISHER:  No, your Honor.  Paragraphs 5 and 6 of

15   our proposed order were proposed in the spirit, before I had a

16   chance to talk it through more completely with Mr. Schwartz,

17   that perhaps the closing of these controversial sale and

18   financing transactions would lead to circumstances where both

19   sides would be willing to just walk away from all of the

20   litigation.  Obviously, you need two hands clapping to do that,

21   and unfortunately I think we have to have more modest

22   aspirations in terms of what is achievable right now.

23       THE COURT:  If the default notices went away -- and

24   again, there is absolutely no reason to reach this issue now,

25   at this point the sole goal is to find a way to dissolve the PI

1    in a way that protects against the irreparable harm, but out of

2    curiosity, if the default notices went away, what would your

3    theory of damages be in this litigation?

4         MR. FISHER:  In lawsuit no. 2 we have incurred all

5    kinds of expenses and costs in connection with the sale

6    financing transaction and that would be the measure of damages

7    and losses, your Honor.

8         THE COURT:  We clearly don't need to go there now.  In

9    the event that we can clear this, perhaps it will put the

10   parties in a position where they can separately discuss a way

11   of resolving the two pending cases but, in any event, it is

12   clearly not business we need to take on here.

13        There is a more subtle difference between the orders

14   which is that the plaintiff's says that I will order the

15   defendants to rescind the default notice; the defendants' say

16   that they will withdraw them.  It is not obvious there is any

17   difference insofar as I would be issuing a Court order.  I

18   think either way it effectively follows.

19        Mr. Schwartz, do you see any difference between those

20   nuances?

21        MR. SCHWARTZ:  Yes, your Honor.  Let me just explain

22   the way we have structured it.

23        THE COURT:  Yes.

24        MR. SCHWARTZ:  The way we have structured it is we

25   give the guarantee.  That is the basis for which the injunction

N8A5froC

is dissolved.  There then needs to be -- Frontier needs to then

sign the documents.  I don't think that they're in a position

to do that immediately so there needs to be some time by which

they are required to have to sign the documents.

THE COURT:  You give them two weeks in your order.

MR. SCHWARTZ:  That's right.

THE COURT:  That doesn't seem unreasonable.  Why is it

that that is such a process?

MR. SCHWARTZ:  We provided the documents to Frontier.

I understand they haven't commented on all of them and there is

a number of -- I think it is dozens of documents.

THE COURT:  These are not standard form documents?

MR. SCHWARTZ:  They are, but we still haven't received

comments back.  It is industry standard, but it is not like the

old Bloomberg form where you print it out and they sign it.  My

client believes that this could be done in 24 to 48 hours, I

got a little heat for suggesting two weeks because I thought

that was a reasonable amount of time, but we wanted to build in

time where they have time to sign the documents and provide

them to us.  But if we just rescind the default notices now, we

are back to square one if they don't actually do that and so

that's why we wanted to have that outstanding.

THE COURT:  Walk through the sequence of events as you

plan it out.

MR. SCHWARTZ:  As I plan it out, the guarantee gets

1    provided tomorrow.  By two weeks from tomorrow, all the

2    documents that we need to have signed in order to do the

3    transactions, will have been provided to us by Frontier.

4                THE COURT:  And executed.

5                MR. SCHWARTZ:  Yes, correct; when I say provided I

6    mean executed copies are provided that is two weeks or one

7    week.  Whenever we get the final document, we then rescind the

8    notice of default.

9                THE COURT:  And in the intervening period no action

10   would be taken on the notice of default?

11               MR. SCHWARTZ:  Correct.  Correct.  We are not trying

12   to enforce, we are really hoping that this is the end of it;

13   right?

14               THE COURT:  You and me both.

15               Mr. Fisher, any problem with that sequence?

16               MR. FISHER:  Yes, your Honor.  I think this is really

17   important, the question sequencing I think is really important

18   to ensure that things potentially go as smoothly as they can

19   from here.

20               First of all, I think the fallacy in Mr. Schwartz'

21   argument is that the guarantee resolves the need for injunctive

22   relief.  What resolves the need for injunctive relief is the

23   withdrawal of the default notices, because until those are

24   withdrawn, we remain under threat of having the aircraft

25   impounded.

1          THE COURT:  Mr. Schwartz, didn't speak to one way or

2     the other to when the injunction lifts.  I assume,

3     Mr. Schwartz, the injuction, since it has been keyed to the

4     default notices, lifts when the default notices are withdrawn.

5          MR. SCHWARTZ:  Your Honor, the purpose of the

6     injunction falls away -- let me take a step back.

7          The basis on which the Court entered the injunction,

8     among others, was that there was a reasonable question going to

9     the merits as to whether, for lack of a better term, Frontier

10    was exposed on the first case.  The guarantee resolves that

11    issue so there is no -- to the extent there ever was one, there

12    is no plausible basis for Frontier to continue to withhold its

13    cooperation.  So my view is, by providing the guarantee, there

14    is no longer any justification for the injunction.  The reason

15    we want to have the default notices throughout is because,

16    otherwise, we are just back to where we are.

17         THE COURT:  Well, if you are agreeing to not act on

18    the default notices for the two-week period, I take it it is in

19    effect as if they are shelved, although they're not literally

20    withdrawn they are voided of any power in functional practice.

21         MR. SCHWARTZ:  Yes.  Exactly.  The question is in two

22    weeks -- and I am really not trying to cause problems here but

23    in three weeks, if we haven't gotten the documents, we are

24    still under an injunction, we then have to come back to the

25    Court again and ask the Court to lift the injunction because we

N8A5froC

1     haven't been provided the documents.

2              THE COURT:  But the injunction really involves

3     grounding, impounding, and de-registering the aircraft.

4              MR. SCHWARTZ:  That's correct.

5              THE COURT:  May I ask you, what is the problem with

6     that injunction remaining in place until the defendants'

7     notices have been retracted?  In other words, that's all the

8     injunction does, it doesn't do a bunch of other things.  Since

9     you are not going to be doing that, what is the harm in keeping

10    the injunction, as thus formulated, in place?

11             MR. SCHWARTZ:  We need to have a deadline by which

12    Frontier provides us with the executed documents.

13             THE COURT:  Right.

14             MR. SCHWARTZ:  And if that deadline is part of the

15    order, then I think it gets us to the same place.

16             THE COURT:  Right.  So that seems to me to be the

17    answer, right?  In other words, from my perspective, I treat

18    the irreparable harm here as flowing from the default notices

19    and I have rather narrowly drawn the injunction.  It seems to

20    me that you have an interest in getting this process done

21    quickly so build in a deadline in the proposed order.  Why

22    doesn't that solve all of your problems?

23             MR. SCHWARTZ:  I think it does.  As long as they're

24    under Court order to do it I think that's -- I don't think

25    either of us had envisioned necessarily to get a Court order to

1    provide it but if that is what is going to happen, that solves

2    the problem.  We just want to make sure there is some deadline

3    out there.

4              THE COURT:  Got that.

5              MR. SCHWARTZ:  Our mechanism is still have the notice

6    of default outstanding if the mechanism of the deadline -- if

7    the Court imposes the deadline I think that's fine.

8              THE COURT:  Sorry.  If I am imposing a deadline, are

9    the notices of default still outstanding and the injunction

10   therefore still in place?  My view is the injunction should be

11   dissolved once the notices of default go away.

12             MR. SCHWARTZ:  I think we can do that simultaneously,

13   that as soon as the documents are provided then the injunction

14   goes away and the notices of default are rescinded.

15             THE COURT:  Mr. Fisher, this feels like something that

16   thoughtful counsel can sort out without my wordsmithing.

17             MR. FISHER:  Yes, but with one remaining concern.

18             First of all, if what is being said now is that

19   Mr. Schwartz will agree that the injunction remains in place

20   until the default notices are withdrawn, I agree, that

21   alleviates the concern of some risk of irreparable harm while

22   we negotiate over these transactions, the sale financing

23   transactions proceeding.  To be very clear, in the event that

24   we receive a proposed guarantee that satisfies our concerns

25   about the collectability of a judgment in lawsuit 1, in

1    connection with the sale financing transactions going forward,

2    we will not raise any objection to those transactions going

3    forward in any way related to any of the transactions that are

4    the subject of this lawsuit or lawsuit 1 --

5         THE COURT:  Let me pin that down.  Have you had a

6    chance to review the transaction documents whose non-execution

7    is what prompted the issuance of the default notices?

8         MR. FISHER:  Your Honor, this is my concern.  I am not

9    an aircraft leasing transactional lawyer.  My understanding is

10   that we are talking about upwards of more than 165 different

11   documents that, even everyone working together cooperatively

12   with goodwill to get the transaction done, my understanding is

13   that two weeks is not a realistic deadline, it is actually

14   somewhat arbitrary and my concern is if that two weeks deadline

15   turns out to be three weeks, we end up with fights about not

16   reasonably cooperating with the transaction.

17        THE COURT:  I have to tell you, two weeks sounds like

18   a lot of time.  Honestly, this is New York law.  A colleague of

19   mine would say put on your big boy pants.  I mean, really.

20        MR. FISHER:  Understood, your Honor.  I am not -- I

21   have been talking to the lawyers that need to do it and my

22   understanding is two weeks is extremely rushed and not

23   realistic.  And we also have an interest in the -- once we get

24   the elephant in the room out of the courtroom, which is our

25   concern about the collective of lawsuit 1, we also have an

N8A5froC

1    interest in the sale financing transactions going forward

2    because it means less to do with Carlyle.  We are happy to have

3    it happen.

4              THE COURT:  I know you that but I mean, look, this has

5    been out there for a while.  Mr. Schwartz, does the front table

6    have the copy of the documents that need to be executed?

7              MR. SCHWARTZ:  Yes, your Honor, and I think they have

8    had it for weeks; July 18th.

9              THE COURT:  Mr. Fisher, is that true or not?

10             MR. FISHER:  Yes.  I believe that we have had many of

11   the documents.  I also understand that there are documents that

12   are necessary in order to close on these transactions that

13   involve -- that still need to be negotiated with third-parties.

14   We are not responsible for doing that, Carlyle is, I don't know

15   what the timeline is for those kinds of issues and I just don't

16   want to end up missing a deadline that sets this up for failure

17   and further controversy.

18             THE COURT:  Has your client reviewed the documents

19   that it has had since July 18th?

20             MR. FISHER:  Yes.  I believe so, your Honor.

21             THE COURT:  Do they have any problems?

22             MR. FISHER:  I think there are some comments that they

23   would send back to work through.

24             THE COURT:  I'm not buying it.  Sorry.  It seems to me

25   this has been out there for a long time.  If the notion was

N8A5froC

 1    going to be that the process of reviewing these documents was

 2    so complicated that it was going to need more time, there was

 3    every opportunity for you to have brought that to my attention

 4    beforehand.  This does not sound like decoding the Rosetta

 5    Stone.  It just does not.  I'm sorry.

 6            Is there anything else you want to raise with me,

 7    Mr. Fisher ?

 8            MR. FISHER:  No, your Honor.  I'm just -- once a

 9    guarantee is issued, and I do need to reserve our rights to see

10    the guarantee and continue to press objections, but if the

11    guarantee satisfies all of our concerns then we will consent to

12    the transactions and we will work diligently, in good faith

13    cooperatively, to just get this done so long as we are not

14    facing the risk of impoundment.

15            THE COURT:  To be clear about the guarantee, I

16    appreciate that there is a detail or two brought out here that

17    need to be worked through.  We don't have a guarantee yet in

18    final form, although on the substance of things I am, as you

19    can tell, with the defense as to the objections that you have

20    raised, I have reviewed them earlier, but I am broadly

21    comfortable with the guarantee as designed by the defendant.

22    And so it seems to me, once you have a final form guarantee, if

23    there are portions of it that you object to you are welcome to

24    bring it to my attention.  But, if at the end of the day I find

25    the guarantee to be satisfactory, it is your decision whether

1    or not to sign it but your not signing it isn't what preserves,

2    won't be a reason to preserve the preliminary injunction.  My

3    view is if this is satisfactory guarantee I have signed off on,

4    you can take it or leave it but it would, to my mind, the

5    existence of such a guarantee would mean that any harm here is,

6    from my perspective reparable, not irreparable, it would be at

7    your hand to repair it by executing the guarantee.  The client

8    can make the business decision not to do that, but at the end

9    of the day, if I find the guarantee is satisfactory on the

10   standards that we have been talking about, that's what gets rid

11   of irreparable harm here.

12          MR. FISHER:  I understand that, your Honor.  That's

13   fully understood and I think that as a result of this

14   conference there have been certain accommodations made that

15   will hopefully resolve in a proposed guarantee that does

16   satisfy many of our concerns and we will decide to simply

17   accept it.  My concern after that is -- and again, here I'm

18   talking about an area of law where I am not a transactional

19   lawyer, I'm not an expert -- but my understanding is that even

20   when straightforward, these are fairly complicated transactions

21   and I just want to ensure that the parties have enough space to

22   get it done without having to run back to court.

23          THE COURT:  Look.  There has been space already but

24   here is my suggestion.  There are -- here is how I propose we

25   would proceed.  Mr. Schwartz, are there any ambiguities that I

1    have left here as to my rulings with respect to the guarantee?

2    I think I have tried to be clear but if there is something I

3    have left unclear, I am happy to address it.

4            MR. SCHWARTZ:  No, your Honor.  I think you have been

5    clear.  The one thing that I would clarify is the form of

6    guarantee that we submitted wasn't actually bilateral, we were

7    just going to provide it.  So part of our concern is having to

8    have them countersign it.  Our proposal was just to provide the

9    guarantee and if the Court finds it acceptable, that's a

10   guarantee.

11           THE COURT:  Right, but look, if there was a detail

12   that still needs --

13           MR. SCHWARTZ:  We will provide it to them to review

14   first.  If they provide a reasonable comment then we are more

15   than happy to work with them but what we can't do is get into a

16   back and forth over the next few weeks about this or that.

17           THE COURT:  Here is my suggestion.  If we said that by

18   the end of Tuesday -- which gives you, Mr. Fisher, another five

19   days for your clients to get out of the gate dealing with the

20   transaction documents -- I was to be provided by the form of

21   guarantee that the defendants are proposing -- and I expect it

22   will be consistent with this discussion today -- it will pick

23   up the detail that I know still had to be included and I hope

24   you will be solicitous of suggestions from the front table

25   because, ideally, this is something that maximally achieves

N8A5froC

1    everybody's interest.  Provide to to me then, with a letter

2    that identifies, Mr. Fisher, if you have any additional

3    objections -- I'm not asking you to propose ones that have

4    already been covered -- I will promptly let you know whether or

5    not the guarantee is satisfactory.  If it is, then I would

6    expect to issue an order consistent, broadly, with the defense

7    form of order that would eventually cause the dissolution of

8    the preliminary injunction.  The important caveat there,

9    Mr. Schwartz, is the sequencing that we talked about, and I

10   would like the preliminary injunction to dissolve upon the

11   retraction of the default notices.

12          What that does is it, among other things, gives the

13   front table another five days on top of the two weeks in which

14   to review these documents.  Your client would, therefore, be

15   well-advised to put pen to paper this afternoon.

16          MR. SCHWARTZ:  I think your Honor's guidance is clear.

17   The only question I have is would you like for us to submit a

18   proposed form of order along with the letter on Tuesday?

19          THE COURT:  Yes.  Again, look, Mr. Fisher, I'm not

20   inviting you to go over ground that's already been covered but

21   I appreciate that we have covered some new subjects today and

22   there may be comments your client has, but at the end of the

23   day, broadly, I am envisioning an order that is broadly

24   structured as the defense has proposed it but with

25   modifications covered today.

N8A5froC

1          MR. SCHWARTZ:  Yes.

2          THE COURT:  So, yes, I would welcome essentially the

3    proposed guarantee, the proposed order, and let us say a joint

4    letter that sets out any outstanding issues with respect to

5    each and I will promptly review them, either rule by virtue of

6    an order or get everybody on the phone with a court reporter,

7    to take care of such loose ends that remain.

8          MR. SCHWARTZ:  Thank you, your Honor.

9          THE COURT:  Listen, before we go, because I am really

10   trying to be a force for closure and good here -- take a moment

11   I think -- Mr. Schwartz, take a moment.

12         (Counsel conferring)

13         THE COURT:  Mr. Schwartz?

14         MR. SCHWARTZ:  Thank you for the moment, your Honor.

15   That sounds fine with us.

16         THE COURT:  Mr. Fisher?

17         MR. FISHER:  Nothing further from us, your Honor.

18         THE COURT:  Any other guidance I can usefully give?  I

19   want you all collectively to get over the goal line.  Is there

20   anything I can do or say that will assist you, or that would be

21   useful for a client to hear?

22         MR. SCHWARTZ:  I don't think so, your Honor.  Thank

23   you for your attention.

24         THE COURT:  Mr. Fisher, same?

25         MR. FISHER:  No, your Honor.  Nothing.

1          THE COURT:  Be well, have a good rest of summer.  I

2     expect this will be the last time I see you on the injunctive

3     part of the case.  I am very much hopeful that this conference

4     will get us across the goal line.

5          Let me pause before I adjourn.  I look forward to

6     receiving what submit on Tuesday and I will act on it very

7     promptly.  I do want to thank counsel.  This is a complicated

8     problem and I appreciate very much the caliber of the advocacy.

9     No judge likes to get a motion for reconsideration but I

10    appreciated what the defense was trying to do and educate me

11    more about the issue at hand.  I thought it was a well done

12    document.  I will be eager to see the plaintiff's response

13    unless counsel are able to reach -- I think it is the 16th that

14    the submission is due.  I will let you all discuss it but

15    depending on, assuming that we have a guarantee that you have

16    essentially agreed on, you may agree that it is worth

17    suspending further briefing on that.  But the bottom line is I

18    have been the beneficiary of very thoughtful, careful,

19    lawyering from both sides and it has assisted me a great deal.

20    So, I thank you.  Please thank the members of your teams who

21    are not present here today for the hard work during the summer.

22    I look forward to seeing you down the road in this case.

23          I will ask you though, counsel, once we have put the

24    injunctive phase behind us, please speak with one another to

25    see whether there is a way that the two litigations that are

N8A5froC

1    before me can be resolved.  With this drama behind us there may

2    be grounds on which to conclude that further litigation on this

3    just isn't economically worthwhile but you will make that

4    judgment.

5              Thanks.  We stand adjourned.

6                             o0o

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25